IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| CARL WILSON, an individual, and AUDREE WILSON, an individual,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>HARPERCOLLINS PUBLISHERS, INC., a Delaware corporation,<br><br>　　　　　Defendant. | No. CIV 94-892 (JC) |

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . .   1

II.  THE APPLICABLE LAW . . . . . . . . . . . . . . . . . . .   3

III.  THE RULE 12(b)(6) STANDARD  . . . . . . . . . . . . .   4

IV.  THE FIRST CAUSE OF ACTION BY PLAINTIFF AUDREE WILSON
     SATISFIES THE PLEADING REQUIREMENTS FOR LIBEL  . . . . .   4

V.   THE STATEMENTS UPON WHICH THE FIRST CAUSE OF ACTION RESTS,
     DO NOT CONSTITUTE PROTECTED OPINION  . . . . . . . . . .  17

VI.  THE SECOND CAUSE OF ACTION FOR LIBEL ASSERTED BY PLAINTIFF
     CARL WILSON PLEADS ACTIONABLE DEFAMATION . . . . . . . .  24

VII. THE THIRD CAUSE OF ACTION FOR LIBEL SATISFIES THE
     REQUIREMENTS FOR NOTICE OF PLEADING  . . . . . . . . . .  26

## TABLE OF AUTHORITIES

**Federal Cases**                                                    **Page(s)**

Curtis Publishing Co. v. Cassel,
    302 F.2d 132 (10th Cir. 1962) . . . . . . . . . . . . . . 3

Fleury v. Harper & Roe Publishers, Inc.,
    698 F.2d 1022 (9th Cir. 1983) . . . . . . . . . . . . . 3

Gertz v. Robert Welch, Inc.,
    418 U.S. 323, 94 S.Ct. 2997,
    41 L.Ed.2d 789 (1974) . . . . . . . . . . . . . . . 18, 20

Haines v. Kerner,
    404 U.S. 519 (1972) . . . . . . . . . . . . . . . . . . . 4

Harte-Hanks Communications, Inc. v. Connaughton,
    491 U.S. 657 (1989) . . . . . . . . . . . . . . . . . . . 2

Milkovich v. Lorain Journal Co.,
    497 U.S. 1 (1990) . . . . . . . . . . . . 3, 18, 19, 21-23

NL Industries, Inc. v. Kaplan,
    792 F.2d 896 (9th Cir. 1964) . . . . . . . . . . . . . . 4

Paolini v. Channel Home Ctrs.,
    668 F.2d 721 (3d Cir. 1981) . . . . . . . . . . . . . . 4

Russell v. Landreiu,
    621 F.2d 1037 (9th Cir. 1980) . . . . . . . . . . . . . 4

Swoboda v. Dubach,
    992 F.2d 286 (10th Cir. 1993) . . . . . . . . . . . . . 4

United States v. City of Redwood City,
    640 F.2d 963 (9th Cir. 1981) . . . . . . . . . . . . . . 4


**State Cases**

Forsher v. Bugliosi,
    26 Cal.3d 792, 608 P.2d 716,
    163 Cal.Rptr. 628 (1980) . . . . . . . . . . . . . . 10, 11

Gregory v. McDonald Douglas Corp.,
    17 Cal.3d 596, 552 P.2d 425 (Supr. Ct. 1976) . . . . . . 22

Harris v. Superior Court of Los Angeles County,
    29 Cal.3d 442, 629 P.2d 1369,
    175 Cal.Rptr. 157 (Supr. Ct. 1981) . . . . . . . . . . 10

James v. Gannett Co., Inc.,
    40 N.Y.2d 415, 353 N.E.2d 834, 286 N.Y.S.2d 871 (1976) . . 9

<u>Kutz v. Independent Publishing Company</u>,
    97 N.M. 243, 638 P.2d 1088 (Ct. App. 1982) . . . . . . . 17

<u>MacLeod v. Tribune Publishing Co.</u>,
    52 Cal.2d 536, 343 P.2d 36 (Supr. Ct. 1959) . . . . . 6, 7

<u>Marchiondo v. Brown</u>,
    98 N.M. 394, 649 P.2d 462 (Supr. Ct. 1982) . . 7, 15, 20, 22

<u>McGaw v. Webster</u>,
    79 N.M. 104, 440 P.2d 296 (Supr. Ct. 1968) . . . . . . 5, 6

<u>Mendoza v. Gallup Independent Co.</u>,
    107 N.M. 721, 764 P.2d 492 (1988) . . . . . . . . . . 21

<u>Moyer v. Amador Joint Valley Union High School Dist.</u>,
    225 Cal.App.3d 720, 275 Cal.Rptr. 494 (Ct. App. 1990) . 21

<u>Ramsey v. Zeigner</u>,
    79 N.M. 475, 444 P.2d 968 (Supr. Ct. 1968) . . . . . . 14

<u>Reed v. Melnick</u>,
    81 N.M. 608, 610, 471 P.2d 178 (Supr. Ct. 1970) 6, 7, 13-16

<u>Weller v. American Broadcasting Cos., Inc.</u>,
    232 Cal.App.3d 991, 283 Cal.Rptr. 644 (1991) . . . . 22, 23

## **Statutes**

Federal Rules of Civil Procedure, Rule 12(b)(6) . . . . . . . . 4

New Mexico Statute Annotated 30-6-1 . . . . . . . . . . . . . 13

## **Other Authorities**

Uniform Jury Instructions (New Mexico) 13-1007
    (Defamatory Communication: Defined) . . . . . . . . . . . 5

Unpublished opinion, <u>Moore v. Sun Publishing</u>, p. 13. . . . . 21

## I.  PRELIMINARY STATEMENT

In September 1991, Defendant HarperCollins Publishers ("HarperCollins") published the book "Wouldn't It Be Nice" in reckless disregard of the fact that the Book's purported author, Brian Wilson, was the subject of a highly publicized pending conservatorship action, which sought, inter alia, to free Brian Wilson from the detrimental physical and psychological control of Eugene Landy, his defrocked psychologist.[1]

Prior to publication of the "Book", Plaintiffs warned HarperCollins of not only the conservatorship action, but also the fact that Landy was altering text and manipulating sources in a manner which seriously impaired the accuracy of the Book.

The contents of the Book itself also gave HarperCollins reason to doubt Brian Wilson's ability to recall and accurately recount the "events" portrayed.  The Book contains accounts that Brian Wilson repeatedly suffered from severe delusions which resulted from schizophrenia and drug abuse, and which caused him to suffer several mental breakdowns.

Before instituting this lawsuit, Plaintiffs sought to remedy the damage caused by the defamatory statements contained in the Book, by requesting a retraction from HarperCollins. HarperCollins refused to issue any retraction.

Plaintiffs bring this libel action to hold HarperCollins accountable for its outrageously irresponsible publication of the

---

[1] The conservatorship action resulted in orders which, inter alia, placed Brian Wilson under the care of a conservator (under which he still remains today), and restrained Landy from having any contact with Brian Wilson whatsoever.  Landy's whereabouts are unknown.

defamatory statements contained in the Book.  HarperCollins
published the defamatory statements in reckless disregard for
their truth.  Indeed, the facts which HarperCollins has disclosed
regarding its pre-publication review suggest a "purposeful
avoidance of truth" on the part of HarperCollins more egregious
than that considered by any published libel opinion.[2/]

HarperCollins now comes to this Court seeking:
(1) dismissal of the First Cause of Action for Libel asserted by
Plaintiff Audree Wilson, (2) dismissal of a <u>portion</u> of the Second
Cause of Action for Libel asserted by Carl Wilson, and (3) a more
definite statement of the Third Cause of Action for Libel
asserted by Carl Wilson.  (The Second and Third Causes of Action
are premised on different statements in the Book.  The Third
Cause of Action primarily concerns statements defaming Carl
Wilson as regard to his activities as a member of the Beach
Boys).

HarperCollins' contentions -- that the alleged defamatory
statements are not <u>reasonably</u> susceptible to a defamatory meaning
<u>on their face</u>, and/or constitute protected opinion -- lack merit
because they are based on strained interpretations of the
defamatory statements, that misapplies the law.  Further, the
motion presents an incomplete and at times wholly incorrect
statement of the law regarding libel per se.  HarperCollins'

---

[2/] *See*, <u>Harte-Hanks Communications, Inc. v. Connaughton</u>, 491
U.S. 657 (1989) (actual malice, aka constitutional malice, can be
shown by proof of purposeful avoidance of truth).  Further, by
knowingly allowing Landy to edit and "ghost" author the Book,
HarperCollins misrepresented the credibility, if any, that the
purported authorship by Brian Wilson lent to the Book.

opinion argument fails to discuss the United States Supreme Court decision <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1 (1990), wherein the Court limited that category of speech which can properly be considered non-actionable opinion.

## II.  <u>THE APPLICABLE LAW</u>

HarperCollins' motion to dismiss presents a jumble of cases from New Mexico, California, Colorado, New York and elsewhere, and assumes that the laws of these jurisdictions are equally applicable.  HarperCollins' motion is thus fatally flawed.

Libel is considered a transitory tort "to which the law of the <u>forum</u> will normally be applied absent a strong governmental interest of another jurisdiction."  <u>Fleury v. Harper & Roe Publishers, Inc.</u>, 698 F.2d 1022, 1025 (9th Cir. 1983).  In <u>Curtis Publishing Co. v. Cassel</u>, 302 F.2d 132 (10th Cir. 1962), the court noted that "libel is a transitory tort."  <u>Id.</u> at 139. Research revealed no New Mexico state court decisions contradicting this rule.[3]

---

[3]  Accordingly, HarperCollins' heavy reliance on the law of New York (the state where its main offices are located), is misplaced.  If the law of any jurisdiction other than New Mexico is to be utilized, it is the law of the states in which Plaintiffs reside:  California, as regard to Plaintiff Audree Wilson, and Colorado, as regard to Plaintiff Carl Wilson.

If the Court so desires, Plaintiffs will brief the choice of law issue more thoroughly.

-3-

### III.  THE RULE 12(b)(6) STANDARD

A Motion to Dismiss pursuant to F.R. Civ. P. 12(b)(6), tests the legal sufficiency of the complaint pursuant to the liberal pleading rules of Federal Court.  It is axiomatic that in reviewing a motion to dismiss pursuant to F.R. Civ. P. Rule 12(b)(6) the Court should:  (1) accept as true all the material allegations of the complaint as well as reasonable inferences to be drawn from them.  Swoboda v. Dubach, 992 F.2d 286, 288 (10th Cir. 1993); NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1964); and (2) construe the complaint in a light favorable to the Plaintiffs.  Russell v. Landreiu, 621 F.2d 1037, 1039 (9th Cir. 1980).  A Complaint should not be dismissed unless "it appears beyond a doubt that the Plaintiffs can prove no set of facts in support of their claim which would entitle them to relief."  United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981).  Accord, Swoboda v. Dubach, 992 F.2d 286, 288 (10th Cir. 1993); Haines v. Kerner, 404 U.S. 519 (1972); Paolini v. Channel Home Ctrs., 668 F.2d 721 (3d Cir. 1981).

### IV.  THE FIRST CAUSE OF ACTION BY PLAINTIFF AUDREE WILSON SATISFIES THE PLEADING REQUIREMENTS FOR LIBEL

HarperCollins attacks the First Cause of Action for libel asserted by Plaintiff Audree Wilson, as not being premised on defamatory communications.  However, the snippets of case quotes on which HarperCollins' motion rests, fail to clearly set forth the standard by which a statement is judged to be actionable defamation under New Mexico law (or any other state).

-4-

A statement is defamatory if it "tend[s] to expose a person to contempt, to harm the person's reputation, or to discourage others from associating or dealing with him or her."  UJI 13-1007 (Defamatory Communication: Defined) (in pertinent part).

The statements from the Book upon which the First Cause of Action is premised are alleged to be, and are, <u>libelous per se</u>. A written statement is properly considered to be libelous per se if it is defamatory without the necessity of explanatory matter, such as inducement, innuendo or other extrinsic facts.  That is, a written statement is libelous per se if it can fairly be said that the natural and probable effect on the average reader is to defame the plaintiff without the necessity of considering circumstances not stated in the defamatory publication.  As the New Mexico Supreme Court stated in <u>McGaw v. Webster</u>, 79 N.M. 104, 440 P.2d 296 (Supr. Ct. 1968):

> "Any false and malicious writing published of another is libelous per se, when its tendency is to render him contemptible or ridiculous in public estimation, or expose him to public hatred or contempt, or to hinder virtuous men from association with him.
>
> The term 'per se' means by itself; simply as such; in its own nature without reference to its relation; and a connection with libel, the term is applied to words which are actionable because they of themselves, without anything more, are

-5-

opprobrious.

\*   \*   \*

We are required to determined whether the
letter itself, and without more, is
defamatory on its face, <u>within the four
corners thereof</u>.

> "In construing the claimed defamatory
> article, the language said to be libelous is
> to be given its <u>plain and natural meaning</u> and
> to be viewed by the court as people reading
> it <u>would ordinarily understand and give it
> meaning</u>, without knowledge or use of any
> special facts or circumstances."

<u>McGaw</u>, 79 N.M. at 106, 440 P.2d at 298 (emphasis added).

Among the cases in accord, is <u>Reed v. Melnick</u>, 81 N.M. 608,
610, 471 P.2d 178, 180 (Supr. Ct. 1970), wherein the New Mexico
Supreme Court cited with approval Justice Traynor's decision in
the California Supreme Court case <u>MacLeod v. Tribune Publishing
Co.</u>, 52 Cal.2d 536, 343 P.2d 36 (Supr. Ct. 1959).  In <u>MacLeod</u>,
the Court set forth the test for defamatory meaning as follows:

> ". . . [I]n passing upon the sufficiency of
> such language as stating a cause of action, a
> court is to place itself in the situation of
> the hearer or reader, and determine the sense
> or meaning of the language of the complaint
> for libelous publication according to its
> natural and popular construction.  That is to
> say, the publication is to be measured not so

-6-

much by its effect and subjected to the

critical analysis of a mind trained in the

law, but by the natural and probable effect

upon the mind of the <u>average reader</u>."

<u>MacLeod</u>, 52 Cal.2d at 546-547, 343 P.2d at 41-42 (emphasis

added).  (Publication accusing plaintiff of being a "mouthpiece

of the communist party" is libelous on its face).  *See*, <u>Reed</u>, 81

N.M. at 610, 471 P.2d at 180 modified on other grounds, relating

to protected opinion in <u>Marchiondo v. Brown</u>, 98 N.M. 394, 404,

649 P.2d 462 (Supr. Ct. 1982).

As shown below, the passages upon which Audree Wilson's

libel claim is premised are properly pleaded as libelous per se

because their defamatory meanings are apparent on their face.

The most serious defamatory passages identified in the First

Cause of Action are the following statements from page 27 of the

Book:

"My mother was no help.  She almost never

opposed my father, almost never rose up and

defended her children.  Not that we saw,

anyway.  Who knows?  She might have been

abused herself.  I often saw her pour a drink

in the afternoon and continue sipping

throughout the evening.  <u>She was</u> passive and

aloof by the time my dad came home, <u>a</u>

<u>bystander who refused to intercede in the</u>

<u>flagrant child abuse going on in front of</u>

<u>her</u>.

<u>She once looked on as he tied me to a
tree as punishment</u>.  Another time, while the
rest of the family was eating dinner, my dad
barged into my room and caught me
masturbating.  Discovering sex had been
confusing for me, since it caused me to be
attracted to other people, which ran counter
to my withdrawn psychological makeup.  My dad
led me to believe I was doing something
wrong.  Not hiding his disgust, he shouted to
my mom, 'the boy's not to have dinner for two
nights.'

<u>My mom complied</u>."

Book at page 27 (emphasis added); First Amended Complaint ¶10
(discussed at page 6 of the Motion to Dismiss as the second and
third defamatory passages).

On their face, without reference to any extrinsic facts, the
natural and probable effect of these passages on the average
reader is to render Audree Wilson contemptible for her failure to
"intercede" to protect her children from "flagrant child abuse."
The defamatory sting is <u>sharpened</u> by the fact that these
statements, and the context in which they appear, falsely accuse
Audree of not only failing to intercede, but sitting by and
drinking cocktails while her children were being abused.  That is
the plain and natural meaning of the passages, as would most
probably be understood by the average reader.  That meaning has a
tendency to expose Audree Wilson to contempt and disgrace, in the
mind of the average reader.

That false charge is made again on page 48 of the Book ("[My father] stalked off, irate, muttering threats under his breath, and continuing his tirade in another room. My mother listened passively, as always, refusing to take either side in the matter.") First Amended Complaint ¶10.

As noted above, the <u>context</u> of the passages <u>confirms</u> the defamatory meaning. The passages from page 27 are immediately followed by this passage:

> "Those incidents are modest compared to the worst. I blanked out most of the details leading up to it. I remember being in the kitchen with my mom and dad. It was just the three of us. My dad started berating me for something, I can't recall what, <u>while my mom looked on passively from the sidelines, gripping her ever-present tumbler.</u>
>
> Suddenly my dad threw a folded newspaper on the floor, opened it, and ordered me to take a shit. Right there. . ."

Book, p. 28 (emphasis added).

HarperCollins' argument that the statements are not libelous per se advances a strained interpretation which turns a blind eye to the meanings that naturally flow from the statements. The cases HarperCollins relies on are distinguishable. In <u>James v. Gannett Co., Inc.</u>, 40 N.Y.2d 415, 353 N.E.2d 834, 286 N.Y.S.2d 871 (1976), the court properly held that the sentence "men is my business," attributed to plaintiff in a newspaper interview about her work as a belly dancer, was not in context reasonably

-9-

susceptible to the defamatory interpretation that she was being charged with prostitution, because the thrust of the entire paragraph was that men attended her performances.  The leap necessary for the reader to find that the article was accusing the plaintiff of prostitution, was simply too far.

Here, by contrast, the defamatory passages expressly state that Audree Wilson was "a bystander who refused to intercede in the flagrant child abuse going on in front of her."  Book, p. 27; First Amended Complaint ¶10.  The reader needs to make no leap to ascertain the defamatory sting.

HarperCollins' reliance on <u>Harris v. Superior Court of Los Angeles County</u>, 29 Cal.3d 442, 629 P.2d 1369, 175 Cal.Rptr. 157 (Supr. Ct. 1981) is also misplaced, because in that case the plaintiff was suing based on an innuendo, rather than something that was explicitly stated in the defamatory passage.  No enlargement of the defamatory passages is necessary for the reader to conclude that the passages charge Audree Wilson with failing to intercede while flagrant child abuse was going on in front of her.

HarperCollins' reliance on <u>Forsher v. Bugliosi</u>, 26 Cal.3d 792, 805-806, 608 P.2d 716, 723-724, 163 Cal.Rptr. 628 (1980), is similarly misplaced.  There the court properly determined that a book about the murder of an attorney did not either explicitly or implicitly charge the plaintiff with responsibility for that murder, because the libel claim was based on passages which stated no more than that the plaintiff had driven the attorney to a remote area, and that the attorney was left there, by own choice, alive and well.  <u>Forsher</u>, 26 Cal.3d at 805.  ("No

-10-

reasonable imputation can be made that appellant was involved in Hughes' death other than being with Elder and driving Hughes to the camping area and at Hughes' election leaving him....[T]he book neither expressly nor by fair implication charges appellant with killing or aiding or abetting the killing of Hughes...[T]he claimed defamatory nature of the book insofar as it relates to appellant is so obscure and so attenuated as to be beyond the realm of reasonableness." <u>Id</u>.)

 <u>Here, no innuendo is needed</u> to comprehend the defamatory sting; the passages <u>explicitly</u> state that Plaintiff Audree Wilson failed to "intercede" in the face of "flagrant child abuse."  The defamatory meaning does not depend on special facts or knowledge extrinsic to the publication.  All the facts necessary to determine that the average reader could reasonably conclude that the statements carry with them a defamatory meaning are included in the passages.

 HarperCollins makes much of the fact that in paragraph 10 of the First Amended Complaint, the defamatory passages from page 27 are quoted as ending with the sentence "She sipped nervously and anxiously at her gin and tonic."  Plaintiff apologizes to the Court for that error; that statement was contained in the book proofs, and was deleted by the publisher in the final hour before publication.  However, that deletion, far from exonerating HarperCollins, suggests that HarperCollins entertained serious doubts as to the veracity of the statement.  HarperCollins is wrong if it believed that by removing that last sentence it removed the defamatory sting of the other false statements immediately above.

-11-



<u>Another</u> defamatory meaning evident from the face of the alleged defamatory statements is that Audree Wilson was an alcoholic.  The definition of an alcoholic is one who is "affected with alcoholism", which the dictionary defines as "continued excessive or compulsive consumption of alcoholic drinks."  Websters Ninth New Collegiate Dictionary.

The defamatory passages from pages 27 and 18, discussed above, as well as defamatory passage from page 17, portray Audree Wilson as a woman who nearly always had a drink in her hand, while her children were growing up.  ("I often saw her pour a drink in the afternoon and continue sipping throughout the evening.  I suppose my mom drank to ease her pain."  (Page 17); "My mom had been drinking," (page 18); "I often saw her pour a drink in the afternoon and continue sipping throughout the evening.  She was passive and aloof by the time my dad came home, a bystander who refused to intercede in the flagrant child abuse going on in front of her."  (Page 27); First Amended Complaint ¶10).

The <u>context</u> of the statements drives the point home ("My dad started berating me for something, I can't recall what, while my mom looked on passively from the sidelines, gripping her ever-present tumbler."  Book, page 28).

HarperCollins' fanciful argument -- that these statements simply portray Audree Wilson as a "social drinker" -- should be rejected out of hand.  The portrait painted of a mother who sits idly by drinking in her home while her children are being abused in front of her, hardly describes a "social" experience. HarperCollins' view is sharply out of touch with modern views,

which has made child abuse and child neglect a prominent issue.

HarperCollins' reliance on the unique and inapplicable rule of New York law, that "the imputation of drunkenness is libelous only when accompanied by aggravating fact by some aggravating factor," does not advance HarperCollins' motion. [Motion, p. 9, fn. 6]. Not only does New York law not apply, but even if the Court decided to apply that rule, the aggravating factor of "flagrant child abuse" (Book, p. 27), renders the statements defamatory. Under New Mexico law, as in most other states, it is a crime to knowingly or negligently cause or permit a child to be abused. N.M.S.A. 30-6-1.

In any event, the First Cause of Action does not stand or fall based on whether the statements can fairly be said to charge Audree Wilson with being an alcoholic, because, as shown above, the statements are otherwise defamatory on their face.

HarperCollins errs, when it argues in a footnote on page 20 of the motion, that a statement is libelous per se only if its imputation meets one of the four categories of slander per se. As the New Mexico Supreme Court explained in Reed, supra, "slander per se" is that category of defamation by oral statements which contains "imputations of (1) a crime; (2) a loathsome disease; (3) those adversely affect[ing] the plaintiff in his business, trade, profession, office or calling; [or] (4) unchastity to a woman." Reed, supra, 81 N.M. at 609, 471 P.2d at 179. Thus, the requirement of slander per se is stricter than that of libel per se. Reed, 81 N.M. at 610-612 ("In New Mexico, we continue to make a distinction between oral and written defamation. . . We reaffirm our statement in Ramsey v. Zeigner,

-13-

*supra*, that different rules are applicable to libel and slander actions.")  However, "since the rules of slander are more strictly construed . . . the pseudo maxim 'actionable as slander-a-fortiori-actionable-as-libel' is applicable."  <u>Reed</u>, 81 N.M. at 612.[4]

---------

[4] The difference between libel per se and slander per se is shown by the New Mexico Supreme Court's decision in <u>Ramsey v. Zeigner</u>, 79 N.M. 475, 458, 444 P.2d 968, 969 (Supr. Ct. 1968) wherein the Court held that written words "charging a person with being a liar or uttering falsehoods . . . are libelous per se," <u>without reference to</u> the four categories of slander per se.  <u>Id</u>. (ellipses in original) (emphasis added) (modified on other grounds, <u>Reed v. Melnick</u>, 81 N.M. 608 at 610, 471 P.2d at 180.

As noted above in <u>Reed v. Melnick</u>, discussed above, the Court emphasized the distinction between libel per se and slander per se in its discussion of the requirement of proof of special damages:

> "In New Mexico, we continue to make a distinction between oral and written defamation.  The reason for such a distinction was set forth in *Dillard v. Shattuck*, 36 N.M. 202, 11 P.2d 543 (1932), where Justice Sadler said:

>> 'Finally, it should be borne in mind, as an established distinction, that oral defamation is more strictly construed than is libel.'  The reason for this is obvious.  Written slander by reason of its wider circulation, is calculated to inflict greater permanent injury to character...'

> The reasons for the requirement of proof of special damages <u>in libel actions</u> where the defamatory words do <u>not</u> convey a defamatory meaning <u>without resort to extrinsic facts</u> which demonstrate the defamatory nature of the writing [i.e., not libel per se], <u>and why all slander actions except those involving the four imputations</u> above mentioned require proof of special damages are largely historical . . .
> * * *
> <u>We reaffirm our statement in *Ramsey v. Zeigner, supra,* that different rules are applicable to libel and slander actions</u>.

-14-

As shown above, even if the passages do not rise to the level of slander per se, they are still libelous per se. HarperCollins' assertion at page 3 of their brief, that this claim for libel per se fails because Plaintiff "was obligated, but has failed, to plead special damages with specificity," is simply wrong.  [Motion, p. 19].  Pleading and proof of special damages is only required for libel per quod, that is, for statements "where the defamatory character of the writing can only be shown by extrinsic facts."  Reed v. Melnick, *supra*, 81 N.M. at 610 (modified on other grounds, in Marchiondo v. Brown, *supra*, 98 N.M. at 404).

Libel per se, by contrast, does not require pleading and proof of special damages.  Id.[5/]  As demonstrated above,

─────────────────

> Since the rules of slander are more strictly construed, *Dillard v. Shattuck, supra,* the pseudo-maxim 'actionable-as-slander fortiori actionable-as-libel' is applicable."

Reed, 81 N.M. at 609-10, 612, 471 P.2d at 179-180, 182 (parenthetical added) (emphasis added) (modified on different grounds in Marchiondo v. Brown, 98 N.M. 394, 404, 649 P.2d 462 (1982)).  While the Reed court doubted whether all of the historical reasons for the distinction between written and oral defamation are still valid (given the wide circulation of radio and television), the Court did not rule that libel per se must meet the tougher requirements of slander per se.  Reed, 81 N.M. at 610, 471 P.2d at 180.

[5/] In Reed, the New Mexico Supreme Court also modified the rule that in a case for libel per quod, pleading and proof of special damages, is required.  The Court held that special damage are not necessary if the plaintiffs pleads and proves that the publisher knew or should have known of the extrinsic facts which were necessary to make the statement defamatory in its innuendo:

> "One who falsely, and without privilege to do so, publishes matter defamatory to another in such a manner as to make the publication a libel, is liable to the other although no special harm or loss of reputation results therefrom; provided, however, that where the

─────────────────

-15-



Plaintiff Audree Wilson's libel claim does not need to meet the requirements of libel per quod, <u>because Plaintiff properly pleads a claim for libel per se</u>.

Throughout the motion, HarperCollins makes oblique references to the statements having an "innocent construction." New Mexico's "innocent construction rule" provides that a statement will not be found to be libelous per se, when the statement is <u>fairly</u> susceptible to a <u>completely innocent</u> interpretation. <u>Reed v. Melnick</u>, *supra*, 81 N.M. at 612, modified on other grounds in <u>Marchiondo v. Brown</u>, *supra*, 98 N.M. at 404. In such a case, the statement will be deemed libel per quod (because its defamatory meaning will depend on hidden innuendo or extrinsic facts), and the question of defamatory meaning will be submitted to the jury. <u>Id</u>. at 612 ("If the court determines the communication is capable of an innocent meaning as well as a defamatory meaning, it is then for the jury to determine whether the communication capable of defamatory meaning was so understood by its recipient.") The <u>unpublished</u> opinion that HarperCollins attaches to its motion is in accord. (Unpublished opinion, <u>Moore v. Sun Publishing Corp.</u>, page 7, line 26).

The innocent meaning rule has no application here because the statements sued on are not <u>fairly</u> susceptible to a <u>completely</u>

-----

> <u>defamatory character</u> of the writing <u>can only</u> be shown by reference to <u>extrinsic</u> facts the plaintiff must plead and prove either:
> (1) that the publisher knew or should have known of the extrinsic facts which were necessary to make the statement defamatory in its innuendo; or (2) special damages."

<u>Reed</u>, 81 N.M. at 612.

<u>innocent</u> meaning.

HarperCollins' last ditch argument as regard to defamatory meaning is that a passage elsewhere in the Book describing a tender and poignant meeting between Audree Wilson and Brian Wilson somehow negates the defamatory meaning of passages accusing Audree Wilson of passively drinking while Brian Wilson was being subjected to "flagrant child abuse."  The argument is absurd.  That "tender" passage from pages 108-109 of the Book deals with a meeting that occurred when Brian Wilson was an adult (22 years old).  The passage does not retract the false charges made about Audree Wilson's conduct while her minor children were being abused.

**V.    <u>THE STATEMENTS UPON WHICH THE FIRST CAUSE OF ACTION RESTS,</u>**
**<u>DO NOT CONSTITUTE PROTECTED OPINION</u>**

HarperCollins next argues, in the alternative, that the statements identified as defamatory in the First Cause of Action are non-actionable opinion.

In <u>Kutz v. Independent Publishing Company</u>, 97 N.M. 243, 244, 638 P.2d 1088, 1089 (Ct. App. 1982), the court agreed with the California rule that "the question of [protected opinion] is one of law for the judge <u>only</u> when 'the statement <u>unambiguously</u> constitutes either fact or opinion.  Where...the allegedly libelous remarks could have been understood by the average reader in either sense, the issue must be left to the jury's determination.'"  <u>Id</u>. (emphasis added).  As shown below, the defamatory passages are not unambiguous statements of opinion (nor are they even ambiguous statements of opinion).

-17-

Accordingly, HarperCollins' flawed opinion argument is one it must present to the jury.

Either by design or neglect, HarperCollins fails to discuss the United States Supreme Court decision <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), which limited that category of speech which can properly be considered non-actionable opinion.

In <u>Milkovich</u>, the Supreme Court made it clear that only pure statements of opinion are protected.  Prior to <u>Milkovich</u>, many courts interpreted the Supreme Court's comment on the value of ideas in <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 339-340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)[6] as "creating a wholesale defamation exemption for anything that might be labeled 'opinion.'"  <u>Milkovich</u>, 497 U.S. at 17, 110 S.Ct. at 2707.  In <u>Milkovich</u>, the Supreme Court rejected that interpretation and rejected the existence of a constitutional opinion privilege, stating as follows:

> "Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the fact that <u>expressions of 'opinion' may often imply an assertion of objective fact</u>.
>
> If the speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of

---

[6] The <u>Milkovich</u> court was referring to its statement in <u>Gertz</u>, that "Under the First Amendment there is no such thing as a false idea.  However pernicious any opinion may seem, we depend for its correctness not on the conscious of judges and juries but on the competition of other ideas".  <u>Gertz</u>, 418 U.S. at 339-340.

facts which lead to the conclusion that Jones
told an untruth.  <u>Even if the speaker states
the facts upon which he bases his opinion, if
those facts are either incorrect or
incomplete</u>, or if his assessment of them is
erroneous, the statement may still imply a
false assertion of fact.  Simply couching
such statements in terms of opinion does not
dispel these implications; and the statement,
'In my opinion Jones is a liar,' can cause as
much damage to reputation as the statement,
'Jones is a liar.'  As Judge Friendly aptly
stated:  <u>'[It] would be destructive of the
law of libel if a writer could escape
liability for accusations of [defamatory
conduct] simply by using, explicitly or
implicitly, the word 'I think.'</u>"

<u>Milkovich</u>, 497 U.S. at 17, 94 S.Ct. at 2707 (emphasis added)
(parenthetical in original).

        The charges on page 27 of the Book, that Audree Wilson sat
by drinking cocktails and failed to "intercede" in the "flagrant
child abuse going on in front of her," contain provably false
statements of fact.  The fact that the passage contains the
statement "Not that we saw anyway", does not negate the fact that
the surrounding statements charge Audree Wilson with sitting by
and drinking while her husband abused her children.  Further, the
First Cause of Action refutes the veracity of the statement that
Brian Wilson did not see his mother make efforts to intercede.

-19-

HarperCollins' argument that the inclusion of the phrase "she looked helpless and frightened," in the defamatory passage from page 18 of the Book, renders that passage protected opinion, is also without merit. That passage falsely charges that "My mom had been drinking," which is a provably false assertion of fact about Audree Wilson. That defamatory statement supports the charge that this and the other statements sued upon portray Audree Wilson as an alcoholic.

Similarly, the insertion of the phrase "I suppose" in the defamatory passage at page 17 of the Book ("My mother often drank I suppose, to ease her pain") does not negate the fact that the statement charges Audree Wilson with drinking often. The "I suppose" goes to whether Audree Wilson drank to ease her pain. It does not negate the factual nature of the statement that she drank often; it does not transform that statement into a protected opinion.

Here again, as with defamatory meaning, HarperCollins relies on cases which are clearly distinguishable. In Marchiondo v. New Mexico State Tribune Co., 98 N.M. 282, 648 P.2d 321 (Ct. App. 1981), the court dismissed a libel claim based on a newspaper's editorial. The New Mexico Supreme Court affirmed that dismissal in Marchiondo v. New Mexico State Tribune Co., 98 N.M. 394, 649 P.2d 462 (1982) on the ground that the article was "privileged as a constitutionally protected opinion," pursuant to Gertz v. Robert Welch, Inc., supra, 418 U.S. at 3006-007. That ruling is no longer an accurate statement of the law, in light the Supreme Court's subsequent decision in Milkovich, that Gertz did not provide such a privilege for editorials.

In <u>Mendoza v. Gallup Independent Co.</u>, 107 N.M. 721, 764 P.2d 492 (1988), another pre-<u>Milkovich</u> case, the court held that the publication at issue was an editorial opinion on a matter of local political interest, protected by the First Amendment privilege.

HarperCollins' reliance on <u>Moyer v. Amador Joint Valley Union High School Dist.</u>, 225 Cal.App.3d 720, 725, 275 Cal.Rptr. 494, 499 (Ct. App. 1990) is also not well founded. There, the court properly held that the statements "Moyer is a babbler," and "Moyer is the worst teacher at FHS" were non-actionable opinion because they did not assert provable statements of fact and could properly be classified as <u>hyperbole</u>. <u>Id</u>.

The unpublished opinion which HarperCollins attaches to its motion does not support a finding of unambiguous opinion. In that case, the publication at issue was held to be protected opinion because it did "not encourage readers to draw a <u>particular</u> negative reference," about the plaintiff. The publication was a notice which the newspaper's legal advertising department had sent to lawyers, explaining that the newspaper's $25 affidavit fee, whose institution was "a very unpopular" and "unfortunate" decision, was being rescinded. The court held that while the "notice stated facts from which readers might have drawn the inference that the author of the notice held and intended to convey a [general] negative opinion about Moore," the words did not imply a "provably false factual assertion." (Unpublished opinion, <u>Moore v. Sun Publishing</u>, p. 13.) Such is not the case with the passages Plaintiff here sues on.

HarperCollins' reliance on Gregory v. McDonald Douglas Corp., 17 Cal.3d 596, 603, 552 P.2d 425 (Supr. Ct. 1976) another pre-Milkovich opinion, is also misplaced.  There, the court protected a writing as privileged opinion primarily because it was made in the political context of a heated labor dispute.

More on point is Weller v. American Broadcasting Cos., Inc., 232 Cal.App.3d 991, 283 Cal.Rptr. 644 (1991), decided after Milkovich.  There, the California Court of Appeals interpreted the test for opinion, after Milkovich, to be whether:  "the statements that form the basis of a defamation claim (1) expressly or impliedly assert a fact that is susceptible to being proved false; and (2) whether the language and tenor as such that it cannot 'reasonably [be] interpreted as stating actual facts.'"  Weller, 232 Cal.App.3d at 1001, 283 Cal.Rptr. at 644 (quoting Milkovich and other cases) (parenthetical in original).[7/]  In Weller, the court "reject[ed] the notion that merely couching an assertion of a defamatory fact and cautionary language as such as "apparently" or "some sources say" or even putting it in the form of question, necessarily diffuses the impression that the speaker is communicating an actual fact."  Weller, 232 Cal.App.3d at 1004, 283 Cal.Rptr. at 653.  The Weller court's position was properly based on the Milkovich Court's rejection of "the concept that perceiving an assertion of

_____

[7/] The Court of Appeal's decision in Marchiondo v. Brown, 98 N.M. 282, 648 P.2d 321 (Ct. App. 1981) cited by HarperCollins is in accord ("The degree to which the truth or falsity can be objectively determined is another consideration."  Id. at 291).  However, that pre-Milkovich opinion relied heavily on the now debunked "rule" that political and public debate is generally sheltered by the constitution as opinion.  Marchiondo, 98 N.M. at 291-292.

defamatory fact by the language, 'in my opinion,' should insulate the speaker from a defamation action."  <u>Id</u>.

The <u>Weller</u> court affirmed a jury award based on a television broadcast which the plaintiff contended implied the defamatory fact that plaintiff had sold stolen candelabras to a museum at a grossly inflated price, and misrepresented the candelabra's origins.  Applying the aforementioned principles drawn from <u>Milkovich</u>, the <u>Weller</u> court <u>rejected</u> the defendants' argument that "statements to the effect that the candelabra were 'ruined in value' or that there 'appears to be a sweetheart deal,' or 'in our terms, they have lost their virginity' are the kind of 'hyperbole' or 'imaginative expression' that negates any impression that the broadcasts conveyed assertions of actual facts.  Assuming arguendo that these comments are nothing more than hyperbole, <u>these isolated phrases taken out of context are insufficient to overcome the overwhelming impression that the report implied actual facts</u>."  <u>Weller</u>, 232 Cal.App.3d at 1005, 283 Cal.Rptr. at 21 (emphasis added).

Finally, HarperCollins makes the far-fetched argument that the statements constitute protected opinion because how one should deal with what it terms "domestic violence" is a subjective issue.  This argument does not address the relevant inquiry.  The inquiry is whether the statements on their face, impart to the reader provably false assertions of fact.  An assertion as to what someone should have done, is an assertion that someone <u>did not act</u> in a certain fashion, and that is a provably false assertion of fact, in the context of the statements at issue.

-23-

VI.  **THE SECOND CAUSE OF ACTION FOR LIBEL ASSERTED BY PLAINTIFF CARL WILSON PLEADS ACTIONABLE DEFAMATION**

HarperCollins contends that a <u>portion</u> of the second cause of action for libel asserted by Plaintiff Carl Wilson fails.  More specifically, HarperCollins contends that three passages sued upon from pages 273-275, 371 and 387 of the Book, do not carry with them a defamatory meaning because they do not portray Carl Wilson to be more concerned about money than about his brother's need for treatment for his severe psychological and drug abuse problem, and callous to his brother's concern about the institution of the conservatorship proceeding over him.

Plaintiff Carl Wilson submits that those three defamatory passages do portray him as such.  The passages from pages 273-275 state, <u>inter alia</u>, that "within a week Carl was in Dr. Landy's office, asking how much the treatment would cost." ..."Carl and Al complained Dr. Landy's fees were outrageous." ... "Predictably, the first thing they wanted to discuss wasn't my health, it was Dr. Landy's fee."  First Amended Complaint ¶19.

The plain and natural meaning of these statements are such that people reading them would conclude that Carl Wilson cared more about money than about his brother's need for treatment for the severe psychological and drug abuse problems that were threatening his life.  That interpretation, which appears from the face of the statements, is defamatory.

As regard to the defamatory statements from pages 371 and 378 of the Book, those passages falsely state that when Brian Wilson asked about the conservatorship action instituted to declare him incompetent, that Carl Wilson refused to answer his

-24-

questions stating "I can't, Brian.  I've got to take care of some business I've got going in Colorado."  Book, p. 371.  The meaning of this sentence is confirmed by the statement attributed to Brian Wilson a couple of lines later that "It was clear they were shutting me out."

The third passage HarperCollins takes issue with, from page 387, falsely charges that Carl "never once" tried to talk to Brian Wilson personally about the conservatorship action and why the action sought to remove Brian from Landy's control.  Book, p. 387 ("Carl never once tried to talk to me personally.  He showed absolutely no sensitivity that I was being stripped of my dignity and rights as a human being.")

HarperCollins makes the argument that in the abstract, not wanting to talk to someone about a subject is not defamatory. However, the average reader would probably conclude that when the subject of the conversation is your family's institution of a legal action to have you declared incompetent, and to remove you from the mind control of your psychologist, that it is defamatory to state that the man's brother refused altogether to talk about his concerns, and answer any questions.

Even assuming that the passages HarperCollins takes issue with are not libelous per se, but libel per quod, the claim does not fail because special damages are properly alleged.  And, what HarperCollins is arguing is the innuendo, is set forth in paragraph 20 of the First Amended Complaint (explaining why the statements are defamatory).  It is for the jury to decide whether the statements are defamatory.

-25-

## VII. **THE THIRD CAUSE OF ACTION FOR LIBEL SATISFIES THE REQUIREMENTS FOR NOTICE OF PLEADING**

The Federal Rules of Civil Procedure contain no express requirement that the exact words complained of must be set forth in the complaint.  The Third Cause of Action for Libel by Plaintiff Carl Wilson gives HarperCollins notice of the defamatory charges which Plaintiff contends the Book asserts, because the defamatory charges are described in detail.[8]

---

[8]  Paragraph 30 of the First Amended Complaint states:

"The Book contains numerous false and defamatory statements of and concerning The Beachboys, including statements to the effect that The Beachboys deliberately exploited Carl's brother and fellow band member, Brian Wilson, in order to earn more money for themselves.  The Book suggests that, in furtherance of that purpose, The Beachboys coerced Brian to write songs and produce records even though the group knew that doing so would damage Brian Wilson's mental health. The Book also falsely suggests that The Beachboys' efforts to obtain and finance psychological/psychiatric treatment for Brian Wilson were motivated by the group's desire to secure a lucrative record deal.  The Book falsely alleges that, once that deal was signed, The Beachboys had no further regard for Brian Wilson's mental and physical health.  In this vein, the Book falsely states that The Beachboys "almost killed" Brian Wilson by requiring him to work on songs and albums when he was not healthy enough to do so; that, at one point, The Beachboys opposed Wilson's therapy because it was interfering with the group's ability to coerce Brian Wilson to make records with them; that The Beachboys created a "Brian is back" publicity campaign in 1976 without Brian Wilson's consent or approval, which campaign attempted to capitalize on Brian Wilson's illness for pecuniary gain; and that The Beachboys allowed their bodyguards to abuse and intimidate Brian Wilson and his brother, Dennis Wilson."

Plaintiff submits that given the specificity of the description of these charges, HarperCollins' motion for a more definite statement should be denied as unnecessary. HarperCollins can request by document demand or interrogatories, a quotation of the exact text of the defamatory statements.

As this is a libel claim for which special damages are alleged, the cause of action is not vulnerable to a motion to dismiss on the ground that the statements do not constitute libel per se. The innuendo of the defamatory statements, if any is needed, is set forth in paragraph 30. Accordingly, an amendment is unnecessary.

However, if the Court so desires, an amendment to the pleading will be made, and Plaintiff Carl Wilson respectfully asks the Court for leave to amend.

Attorneys for Plaintiffs,
Carl Wilson and Audree Wilson:

THE ROMERO LAW FIRM

By: _____
        Ernesto J. Romero
3602 Campus N.E.
Albuquerque, New Mexico 87106
Telephone:  (505) 262-2131

Barry B. Langberg
Jody R. Leslie
Beth F. Dumas
LANGBERG, LESLIE & GABRIEL
2049 Century Park East
Suite 3030
Los Angeles, California 90067
Telephone:  (310) 286-7700

-27-