FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

95 AUG 14  PM 4: 03

*Rd. Amanued*
CLERK  ALBUQUERQUE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

CARL WILSON, an individual,
and AUDREE WILSON, an
individual,

        Plaintiffs,

        v.

HARPERCOLLINS PUBLISHERS,
INC., a Delaware corporation,
        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No.   CIV 94 892 JC**

**JURY TRIAL DEMANDED**

## SECOND AMENDED COMPLAINT FOR LIBEL

    COME NOW PLAINTIFFS CARL WILSON AND AUDREE WILSON who allege as follows:

### FACTS COMMON TO ALL ALLEGATIONS

    1.   Plaintiff Carl Wilson ("Carl") is and, at all times herein mentioned, was an individual residing in the State of Colorado.

    2.   Plaintiff Audree Wilson ("Audree") is and, at all times herein mentioned, was an individual residing in the County of Los Angeles, State of California.

    3.   Plaintiffs are informed and believe and thereupon allege that defendant HarperCollins Publishers, Inc. ("HarperCollins") is a corporation duly organized and existing under the laws of the State of Delaware with principal business offices in New York City.

4.   The tortious acts complained of herein were committed, in part, in the State of New Mexico, and plaintiffs sustained injury in said state as a consequence of said tortious acts.

5.   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. 1332(a) which confers the subject matter jurisdiction on the United States District Court in all cases in which there is a diversity of citizenship and the amount in controversy exceeds the sum of $50,000, excluding interest and costs.

6.   Venue is proper pursuant to 28 U.S.C. section 1391(a) and (c).

7.   Within three (3) years of the filing of this Complaint, defendant HarperCollins caused to be written, printed, published and disseminated to the general public, including the public throughout the State of New Mexico, a book entitled Wouldn't It Be Nice (the "Book").

8.   The Book was purportedly written by Brian Wilson with Todd Gold.  However, Plaintiffs are informed and believe and thereupon allege that Eugene Landy ("Landy"), with the knowledge and consent of HarperCollins, collaborated extensively in the authorship and editing of the Book, and in doing so, altered text and manipulated sources in a manner which impaired the accuracy of the Book, defamed Plaintiffs, and misused and misrepresented the credibility, if any, that the purported authorship by Brian Wilson lends to the Book.  The actual malice and negligence of Defendant HarperCollins, as alleged below, in publishing the defamatory statements set forth below, are shown, in part, by the fact that HarperCollins knew or had reason to know that Landy was

-2-

acting as previously alleged, and that Brian Wilson was the subject of a conservatorship action instituted to free him from the detrimental physical and psychological control of Landy, having been specifically put on notice of such by Plaintiffs, in written and oral communications from Plaintiffs' attorneys. Further, HarperCollins knew or had reason to know that Landy collaborated in the authorship of the Book in the manner described above.  HarperCollins published the Book in reckless disregard of the aforementioned, and thus, in reckless disregard of the truth of the Book and the alleged defamatory statements. Further, the Book contains accounts that Brian Wilson repeatedly suffered from severe delusions resulting from schizophrenia and drug abuse.  These accounts, in and of themselves, gave HarperCollins reason to doubt Brian Wilson's ability to accurately remember the events and conversations set forth in the Book.  HarperCollins published the Book in reckless disregard of the aforementioned, and thus, in reckless disregard of the truth or falsity of the Book, and the alleged defamatory statements. Plaintiffs are informed and believe and thereupon allege that HarperCollins knew or should have known that publication of a book containing defamatory allegations about Plaintiffs generated by Landy would be especially damaging to Plaintiffs because the Book was ostensibly authored by Brian Wilson, and not by Landy.

-3-

### FIRST CLAIM FOR RELIEF

#### (Libel)

9.    Plaintiff Audree Wilson hereby repeats and realleges paragraphs 1 through 8 hereinabove and incorporate said paragraphs herein by reference as though set forth at length.

10.    The Book contained the following statements of and concerning Audree that are false and defamatory:

> "My mother was no help.  She almost never opposed my father, almost never rose up and defended her children. . . .  Who knows?  She might've been abused herself.  I often saw her pour a drink in the afternoon and continue sipping throughout the evening.  She was passive and aloof by the time my dad came home, a bystander who refused to intercede in the flagrant child abuse going on in front of her."

Book, p. 27.

> "She once looked on as he tied me to a tree for punishment.  Another time, while the rest of the family was eating dinner, my dad barged into my room and caught me masturbating. . . .  Not hiding his disgust, he shouted to my mom 'the boy's not to have dinner for two nights.'  My mom complied."

Book, p. 27.

v:\wil3\010\2ndamend.com

> "[My father] stalked off, irate, muttering
> threats under his breath, and continuing his
> tirade in another room.  My mother listened
> passively, as always, refusing to take either
> side in the matter."

Book, p. 48.

11.  These and other statements in the Book are defamatory per se in that they falsely portray Audree as an unfit mother who permitted child abuse to occur, and as an individual so emotionally demoralized that she was incapable of defending herself or her children against severe abuse.  Said statements expose Audree to contempt, ridicule and obloquy.  The defamatory sting of the statements is confirmed by the context of the statements, including the statements on page 27 of the Book ("Those incidents are modest compared to the worst," and "My Dad started berating me for something, I can't recall what, while my mom looked on passively from the sidelines, gripping her ever-present tumbler.")

12.  At the time defendant made said statements, it knew that said statements would expose Audree to contempt, ridicule and obloquy.

13.  Plaintiff Audree Wilson is informed and believes and thereupon alleges that defendant made the defamatory statements alleged hereinabove with actual malice (also known as constitutional malice), in that said defamatory statements were made with knowledge that they were false or with reckless disregard for their truth or falsity.  Said plaintiff further

alleges that defendant knew that it had no reasonable basis in fact to publish said statements and that it had no reliable and unbiased information with which to support said statements, in part, for the reasons set forth in paragraph 8 above.  Plaintiff further alleges that defendant failed to properly determine the truth or falsity of said statements prior to publication.

14.   Plaintiff Audree Wilson is informed and believes and thereupon alleges that defendant was negligent in publishing the defamatory statements alleged hereinabove, in that said statements were published without the exercise of ordinary and reasonable care as to the truth or falsity of the statements.

15.   Defendant caused the Book to be distributed throughout the United States.   The Book was widely sold in the State of New Mexico.   Accordingly, the above-enumerated defamatory statements were seen and read by persons who reside in the State of New Mexico.   Defendant knew, or should have known, that said defamatory statements would be read by individuals who reside in said state and elsewhere.

16.   As a direct and proximate result of the publication of said defamatory statements, Audree has suffered actual injury to her reputation and standing in the community, and further, she has suffered shame, mortification, personal humiliation, mental anguish and suffering and emotional distress, all to her general damage in the amount of Five Million Dollars ($5,000,000).

17.   Defendant's conduct was intentional and was done maliciously, with ill will towards Audree and in conscious

disregard for her rights.  As a result, Audree is entitled to punitive damages in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF

#### (For Libel)

18.  Plaintiff Carl Wilson hereby repeats and realleges paragraphs 1 through 8 hereinabove and incorporates said paragraphs herein by reference as though set forth at length.

19.  The Book contained the following false and defamatory statements of and concerning Carl:

> "One night, Dennis, Carl, and I were drunkenly walking through the redlight district in Amsterdam, heading for a restaurant while Dennis tried talking me into sampling one of the local girls." . . . "The piano bench was knocked over, punches were exchanged and before I knew it Carl and Dennis were dragging me out the front door and hustling me back to the hotel."  . . . "After downing a few, Dennis, Carl, and M hit the dance floor."

> "Dennis smuggled heroin into New Zealand . . . Carl, trying to calm the turbulence admitting his involvement in the purchase

the heroin, ended up getting punched in the face
by Rocky."

Book, p. 252.

"Within a week Carl was in Dr. Landy's
office, asking how much the treatment would
cost." . . . "Dr. Landy explained himself
clearly, knowing Carl was going to take the
information he got from the meeting and tell
Marilyn, who had helped him through the
dissolution of his marriage and now was
providing him comfort in dealing with me."
. . . "Carl never liked Dr. Landy's bluntness
and was scared of him." . . . "Carl and Al
complained Dr. Landy's fees were outrageous."
. . . "Predictably, the first thing they
wanted to discuss wasn't my health, it was
Dr. Landy's fee."

Book, pp. 273-275.

". . . Several weeks before Christmas 1983,
Carl and his manager, Jerry Schilling,
approached Dr. Landy about treating Dennis."
. . . "The next day, Schilling called Landy
and told him Carl needed longer to make up
his mind.  The price was steep, too steep, he
thought for the Beach Boys to carry."
"Beyond that, Carl didn't want to upset his
family's holiday plans by having, as Dr.

Landy suggested, an intervention in Lake
Arrowhead.  Carl suggested talking after the
holidays."  . . . "Carl was adamant, though;
he didn't want to deal with the problem until
after New Year."

Book, pp. 311-312.

"Carl didn't know what to do.  Before making
any decisions, he insisted on consulting with
John Rogers, a cult leader Carl referred to
as his spiritual master."

Book, p. 314.

"In early 1986, Carl threw his weight into
the war against Dr. Landy." . . . "But the
Beach Boys loathed the independence Dr. Landy
was giving me.  They hated that I was
beginning to be able to say no to them and
act on my own thoughts.  They resented that I
wrote songs, not with Dr. Landy, but without
them. . . .

"The struggle escalated when Carl began
withholding my paychecks and money.  That
authority was his through the Brian Wilson
Trust of 1982, which he had me sign prior to
Dr. Landy's beginning treatment again . . ."

Book, p. 332.

"In Carl's opinion, the trust was supposed to
protect me from Dr. Landy, but as I got

saner, I began questioning my brother.  I
couldn't remember signing the document in the
first place.  I was too incompetent at the
time to know what I was signing."

Book, p. 333.

"Filed by the Attorney General's office, the
BMQA's charges originated with a complaint
filed by Carolyn Williams in 1984.  They were
then fueled by the journal Gary Usher
compiled while we wrote songs together the
previous year and pressed by Marilyn and
Carl."

Book, p. 351.

"As soon as the Beach Boys returned to L.A.,
he [Carl] had me sign a trust document,
giving him control of both my money and my
vote in the Beach Boys' corporation, Brother
Records, Inc.  I didn't know what I was
signing, though he assured me it was for my
own protection."

Book, p. 268.

"For the first hour or so, Mike, Al, and Carl
avoided me like the plague.

"Then I decided to take action.  I found Carl
in his dressing room and asked if he wanted
to talk about what was going on.

> 'I can't, Brian,' he said.  'I've got to take
> care of some business I've got going in
> Colorado.' . . .  It was clear they were
> shutting me out."

Book, p. 371.

> "My brother Carl, on the other hand, stayed
> in his room and drank."

Book, p. 376.

> ". . . I was performing on my own, making my
> own decisions, even venturing out to art
> museums and restaurants while Carl was holed
> up in his room, avoiding the outside world,
> still drinking heavily, blind to his own
> problems." . . . "But then Carl had trouble
> making even the simplest decisions.  He had
> always needed to consult with numerous people
> -- his wife, lawyers, his spiritual master,
> John Rogers."

Book, p. 378.

> "Carl never once tried to talk to me
> personally.  He showed absolutely no
> sensitivity that I was being stripped of my
> dignity and rights as a human being."

Book, p. 387.

20.  These and other statements in the Book are defamatory
per se in that, _inter alia_, they falsely portray Carl as an
abuser of alcohol; falsely impute to him involvement in the

-11-

purchase of illegal narcotics; falsely characterize him as an emotionally troubled, weak individual who could be easily intimidated and/or controlled by his wife, John Rogers, Landy, and others; falsely suggest that he was callous and unconcerned about his brother Brian's physical and emotional health and was willing to risk Brian's life to save money; falsely state that he wrongfully withheld money that was payable to Brian; and falsely state that he obtained control over Brian's funds and Brian's position within the Beach Boys' corporation by trick and for improper purposes.  Said statements expose Carl to contempt, ridicule and obloquy, and have a tendency to injure him in his reputation.

21.  At the time defendant made said statements, it knew that said statements would expose Carl to contempt, ridicule and obloquy, and would have a tendency to injure him in his occupation.

22.  Plaintiff Carl Wilson is informed and believes and thereupon alleges that defendant published the defamatory statements alleged hereinabove with actual malice (also known as constitutional malice), in that said statements were published with knowledge that they were false or with reckless disregard for their truth or falsity.  Said plaintiff further alleges that defendant knew that it had no reasonable basis in fact to publish said statements and that it had no reliable and unbiased information with which to support said statements, in part, for the reasons set forth in paragraph 8, above.  Said plaintiff

further alleges that defendant failed to properly determine the truth or falsity of said statements prior to publication.

23.  Plaintiff Carl Wilson is informed and believes and thereupon alleges that defendant was negligent in publishing the defamatory statements alleged hereinabove, in that said statements were published without the exercise or ordinary and reasonable care as to the truth or falsity of the statements.

24.  Defendant caused the Book to be distributed throughout the United States.  The Book was widely sold in the State of New Mexico.  Accordingly, the above-enumerated defamatory statements were seen and read by persons who reside in the State of New Mexico.  Defendant knew, or should have known, that said defamatory statements would be read by individuals who reside in said state and elsewhere.

25.  As a direct and proximate result of the publication of said defamatory statements, Carl has suffered actual injury to his reputation and standing in the community, and further, he has suffered shame, mortification, personal humiliation, mental anguish and suffering and emotional distress, all to his general damage in the amount of Five Million Dollars ($5,000,000).

26.  As a further direct and proximate result of the publication of said defamatory statements, Carl has suffered special damages in that the public's erroneous belief in the truth of the defamatory statements contained in the Book has caused the public to lose interest in The Beach Boys, the professional music group in which Carl performs.  As a result of the public's loss of interest, there has been a decline in

revenue derived from the group's live performances and record sales, which has resulted in a loss of business profits and a loss of salary to Carl.  Although the precise amount of Carl's special damages cannot be ascertained with certainty at this time, preliminary discovery shows that Carl has suffered a loss of profits associated with a drop in concert tour revenues in the amount of approximately five million and seven hundred and twenty-seven thousand dollars ($5,727,000), based on a comparison of tour revues for the year period ending June 30, 1991 and the year period ending June 30, 1992.  The defamatory statements were published in September 1991.

27.  Defendant's conduct was intentional and was done maliciously, with ill will towards Carl and in conscious disregard for his rights.  As a result, Carl is entitled to punitive damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF

### (For Libel)

28.  Plaintiff Carl Wilson hereby repeats and realleges paragraphs 1-8 and 19-27 hereinabove and incorporate said paragraphs herein by reference as though set forth at length.

29.  Carl is, and at all material times was, a member of the popular musical group professionally known as "The Beach Boys."

30.  The Book contains numerous false and defamatory statements of and concerning The Beach Boys, including statements falsely suggesting:  that The Beach Boys deliberately exploited Carl's brother and fellow band member, Brian Wilson, in order to

-14-

earn more money for themselves; that The Beach Boys coerced Brian
to write songs and produce records even though the group knew
that doing so would damage Brian Wilson's mental health; that The
Beach Boys' efforts to obtain and finance psychological/
psychiatric treatment for Brian Wilson were motivated by the
group's desire to secure a lucrative record deal; that The Beach
Boys opposed Wilson's therapy with Dr. Landy solely because it
was interfering with the group's ability to coerce Brian Wilson
to make records with them; that once the new record deal was
signed, The Beach Boys had no further regard for Brian Wilson's
mental and physical health (in this vein, the Book falsely states
that The Beach Boys "almost killed" Brian Wilson by requiring him
to work on songs and albums when he was not healthy enough to do
so); that The Beach Boys created a "Brian is back" publicity
campaign in 1976 without Brian Wilson's consent or approval,
which campaign attempted to capitalize on Brian Wilson's illness
for pecuniary gain; and that the Beach Boys allowed their
bodyguards to abuse and intimidate Brian Wilson:

> "My band mates were not bothered because I
> hung around with strange people, took drugs,
> behaved in ways that defied convention, and
> had a marriage that was truly weird.  Their
> problem was accepting what I was doing to the
> Beach Boys' music.  They were afraid I was
> fucking up the formula that had made all of

them wealthy and famous, and that wasn't

kosher."

Book, p. 148.

"After roughly two months, Dr. Landy

introduced the piano.  From the start of the

treatment, the Beach Boys had been pressuring

him to get me to a point where I could write

and produce again.  That's all they wanted.

But Dr. Landy resisted.  Becoming a Beach Boy

again, he explained repeatedly, wasn't the

goal of therapy. . . . [At the Beach Boys'

own recording studio Dr. Landy] booked ninety

minutes of piano time for me every day. . . .

Dr. Landy made sure the studio was empty.

Despite previous explanations, the Beach

Boys, especially Mike, made no secret that

they were anxious to put me back to work

writing songs.  But Dr. Landy kept them at

bay."

Book, p. 224

"Mike was the first to register a complaint

[about the "therapy" piano sessions with Dr.

Landy].  He said I was using the studio

unproductively.  Carl agreed.  He said the

music we were making sounded crazy."

Book, p. 225

-16-

"Dr. Landy told the Beach Boys I wasn't ready
to cope with the pressure of making an album.
I was still too fragile.  They didn't see it
that way and began complaining about the
studio time he and I were using, time they
could have been renting to other people.
'You want Brian back?' Landy asked.  'Or do
you want to make a couple hundred bucks a
week?  What's more important?'  When they saw
that Dr. Landy had begun recording our piano
sessions, they asked for the masters.  Dr.
Landy refused to turn them over.  They were
part of my therapy, privileged . . . But that
as only the beginning of war with the Beach
Boys."

Book, pp. 226.

"Steve Love was pushing everyone, especially
me, to step up the pace on the next album . .
. At the same time, Dr. Landy was trying to
keep me within a therapeutic regimen rather
than let the guys take over and put me to
work full-time.  But there were priorities.
Steve and the others wanted to get out of the
Warners contract while they could still
capitalize on the success of *15 Big Ones*
somewhere else.  Steve wanted the new LP done
no later than January 1, 1977.  [Landy

-17-

rejected that, stating that Brian needed a month's vacation at Christmas] . . . 'That's ridiculous to take so much time off work,' Steve said.  Steve had his own agenda in mind, and Dr. Landy's struck him as unreasonable.  Tempers flared.  They called Dr. Landy a 'control freak.'  Dr. Landy responded by telling the Beach Boys it was exactly this kind of attitude that caused me to break in the first place. . . . 'He's supposed to make records,' Steve said.  'What the hell are we paying you for?  'To make him well,' Dr. Landy replied. . . .'[H]e can only make records when he's well, something not one of you seems to understand."

Book, pp. 239-240.

"Later, Dr. Landy spoke with Steve, who came right out and said he was fired.  'You guys don't understand,' said Dr. Landy.  "If I'm not in the studio, you're not going to get anything out of Brian.'"  'Not true,' Steve countered.  "Brian's going to work.  He'll work.  We're all working.  The group's going to finish their album.'"

Book, p. 243.

"What could be better for me to be writing songs with Mike again?  It had nearly killed

me several times before."

Book, p. 373.

"We were dumbfounded.  Then angered.  We'd
been had.  It turned out Mike had been
working for months on this huge publicity
campaign heralding my return.  He'd written a
terrible song, 'Brian's Back,' and sold
Warner Brothers on a publicity campaign
designed to exploit the fact that I'd
produced the Beach Boys' latest album.  No
one had mentioned a word to me.  Nor to Dr.
Landy.  Everyone knew except us....It wasn't
enough for me to write and produce songs.
Now they had to sell my illness publicly
too."

Book, p. 232

"I understood and agreed with the concept,
which was more than I could say about the
Brian is Back campaign."

Book, p. 239.

"One morning Stan and Steve, my tenders,
appeared at my bedside. . . . 'Get out of
bed!' Stan barked, yanking back the covers.
The sudden movement scared me.  I put my
hands over my face.  'Don't hit me, I
pleaded.'  'Then get out of bed,' Stan said.
. . . My life became hell under these three

-19-

hypermacho watchdogs."

Book, p. 246.

> "For the most part, Stan and Rocky
> intimidated me.  They towered over me.
> Chided me for being overweight.  Both
> screamed at me, 'You goddamn fat, lazy,
> fucking rock star!  You chickenshit!  When
> are you going to straighten the fuck up and
> get your shit together?  You fucking pussy!'
> Against my wishes the Beach Boys ordered them
> to drag me on several tour dates early that
> summer.  Every afternoon my bodyguards took
> me to a local YMCA to play basketball. . . .
> In the elevator, Stan pushed me into a
> corner.  He clenched his fist and pushed it
> into my chest.  'You fucking rock star,' he
> growled.  'You goddamn, fucking obese rock
> star.  You fucking disgust the shit out of
> me.' . . .  As he chided me, Stan pounded his
> fist into my chest. . .  In a state of
> regression and constant fear, I obeyed like
> an abused dog."

Book, p. 247.

31.  Readers of said defamatory statements reasonably
understood said statements to refer to The Beach Boys and their
agents, and thus to have personal reference and application to
Carl, as a member of The Beach Boys.

32.  At the time defendant made said statements, it knew that said statements would expose The Beach Boys and its members to contempt, ridicule and obloquy, and would have a tendency to injure them in their business.

33.  Plaintiff Carl Wilson is informed and believes and thereupon alleges that defendant published the defamatory statements alleged hereinabove with actual malice (also known as constitutional malice), in that said statements were published with knowledge that they were false or with reckless disregard for their truth or falsity.  Said plaintiff further alleges that defendant knew that they had no reasonable basis in fact to publish said statements and that it had no reliable and unbiased information with which to support said statements, in part, for the reasons set forth in paragraph 30, above.  Said plaintiff further alleges that defendant failed to properly determine the truth or falsity of said statements prior to publication.

34.  Plaintiff Carl Wilson is informed and believes and thereupon alleges that defendant was negligent in publishing the defamatory statements alleged hereinabove, in that said statements were published without the exercise of ordinary and reasonable care as to the truth or falsity of the statements.

35.  Defendant caused the Book to be distributed throughout the United States.  The Book was widely sold in the State of New Mexico.  Accordingly, said defamatory statements were seen and read by persons who reside in the State of New Mexico.  Defendant knew, or should have known, that said defamatory statements would be read by individuals who reside in said state and elsewhere.

36.  As a direct and proximate result of said defamatory statements, The Beach Boys' reputation has been injured and the good will associated with The Beach Boys' name has been diminished.  As a member of The Beach Boys, Carl has suffered actual injury to his reputation and standing in the community, and further, has suffered shame, mortification, personal humiliation, mental anguish and suffering, and emotional distress, all to his general damage in the amount of Five Million Dollars ($5,000,000).

37.  As a further direct and proximate result of said defamatory statements, the business of The Beach Boys has been damaged, including but not limited to business resulting from record sales, merchandising and concert tours.  As a member of The Beach Boys, Carl has suffered special damages in that he has suffered pecuniary losses by virtue of the diminution of such business, including loss of business profits and loss of salary. Although the precise amount of Carl's special damages cannot be ascertained with certainty at this time, preliminary discovery shows that Carl has suffered a loss of profits associated with a drop in concert tour revenues in the amount of approximately five million and seven hundred and twenty-seven thousand dollars ($5,727,000), based on a comparison of tour revues for the year period ending June 30, 1991 and the year period ending June 30, 1992.  The defamatory statements were published in September 1991.

38.  Defendant's conduct was intentional and was done maliciously, with ill will towards The Beach Boys and in

conscious disregard for its rights.  As a result, Carl is entitled to punitive damages in an amount to be proven at trial.

WHEREFORE, plaintiffs pray for judgment as follows:

### ON THE FIRST CLAIM FOR RELIEF

1.   For general damages in the amount of Five Million Dollars ($5,000,000); and

2.   For punitive damages in an amount to be proven at trial.

### ON THE SECOND CLAIM FOR RELIEF

1.   For general damages in the amount of Five Million Dollars ($5,000,000);

2.   For special damages in excess of Two Hundred Thousand Dollars ($200,000); and

3.   For punitive damages in an amount to be proven at trial.

### ON THE THIRD CLAIM FOR RELIEF

1.   For general damages in the amount of Five Million Dollars ($5,000,000);

2.   For special damages in excess of Two Hundred Thousand Dollars ($200,000); and

v:\wil3\010\2ndamend.com

3.    For punitive damages in an amount to be proven at trial.

DATED: *August 14*, 1995



Ernesto J. Romero
3602 Campus Boulevard, N.E.
Albuquerque, New Mexico 87106
(505) 262-2131

Barry B. Langberg (#48158)
Beth F. Dumas (#150064)
LANGBERG, LESLIE & GABRIEL
2049 Century Park East
Suite 3030
Los Angeles, California 90067
(310) 286-7700

Attorneys for Plaintiffs
CARL WILSON and AUDREE WILSON

-24-

## PLAINTIFFS HEREBY DEMAND A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs hereby demand a trial by jury in this action.

DATED: _____, 1995

_____
Ernesto J. Romero
3602 Campus Boulevard, N.E.
Albuquerque, New Mexico 87106
(505) 262-2131

Barry B. Langberg (#48158)
Beth F. Dumas (#150064)
LANGBERG, LESLIE & GABRIEL
2049 Century Park East
Suite 3030
Los Angeles, California 90067
(310) 286-7700

Attorneys for Plaintiffs
CARL WILSON and AUDREE WILSON

-25-

## CERTIFICATE OF SERVICE

I certify I caused a true copy of the foregoing pleading to be hand delivered to opposing counsel, William S. Dixon, Esq., and mailed to Defendant, care of Mr. Dickson's co-counsel, Bruce Rich, Esq., Weil, Gotshal & Manges, 767 Fifth Avenue, New York, New York 10153.  This ___ day of August, 1995, with first class postage affixed.

_____
Ernesto Romero