UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

**FILED**

UNITED STATES DISTRICT COURT
ALB̲____ ___ __ NEW MEXICO

AUG 1 5 1995

*R. ̶ ̶m̶a̶c̶h̶*

CLERK

------------------------------------x

CARL WILSON, an individual, and
AUDREE WILSON, an individual,               :

                              :

                    Plaintiff,   :

                              :     94 Civ. 892 (JC)

          v.                  :

                              :

HARPERCOLLINS PUBLISHERS, INC.,             :
a Delaware corporation,

                              :

                    Defendant.   :

------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

William S. Dixon
RODEY, DICKASON, SLOAN,
 AKIN & ROBB, P.A.
Albuquerque Plaza
201 Third Street NW,
Suite 2200
Albuquerque, New Mexico 87103
505-768-7266

R. Bruce Rich
Katherine J. Daniels
Elizabeth Stotland Weiswasser
WEIL, GOTSHAL & MANGES
767 Fifth Avenue
New York, New York 10153
212-310-8000

Attorneys for Defendant
HarperCollins Publishers, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | |
|---|---|
| CARL WILSON, an individual, and<br>AUDREE WILSON, an individual, ) | **ORAL ARGUMENT<br>REQUESTED** |
| Plaintiffs, ) | |
| v. ) | 94 Civ. 892 (JC) |
| HARPERCOLLINS PUBLISHERS INC.,<br>a Delaware corporation, ) | |
| Defendant. ) | |

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

#### PRELIMINARY STATEMENT

HarperCollins Publishers Inc. ("HarperCollins") submits this memorandum in support of its motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for entry of summary judgment in favor of HarperCollins as to each of plaintiffs' claims for relief.

This dispute arises out of HarperCollins' publication, in October 1991, of Brian Wilson's autobiography, entitled WOULDN'T IT BE NICE -- MY OWN STORY (the "book"). Mr. Wilson, a widely-acclaimed musical genius, is the founder of the Beach Boys, an internationally-known rock-and-roll band. The book was co-written by Brian Wilson and Todd Gold, a professional writer. The autobiography recounts Brian Wilson's life story, including the development of his musical career and his life-long battle with drug addiction, alcoholism, eating disorders

and mental illness.  The book also describes the severe abuse that Brian experienced as a child at the hands of his now-deceased father, Murry Wilson.

Audree and Carl Wilson, respectively the mother and brother of Brian Wilson, have brought suit, not against Brian Wilson and Todd Gold as authors of the book, but solely against HarperCollins as its publisher, claiming that various passages in the book have defamed them.  These passages, in the case of Audree Wilson, relate to certain of Mr. Wilson's childhood recollections, particularly her passivity in the face of the severe abuse Mr. Wilson sustained at the hands of his father. First Amended Complaint ¶¶ 9-17.  Carl Wilson, in turn, takes issue with passages which he contends portray him as "callous" to his brother Brian, as more interested in money than in his brother's health, and as an abuser of drugs and alcohol.  First Amended Complaint ¶¶ 18-27.

On July 14, 1995, this Court granted in part HarperCollins' motion to dismiss certain of plaintiffs' claims, concluding that Audree Wilson's defamation claim asserting that the book falsely portrays her as an alcoholic could not stand because the challenged passages were not facially defamatory. The Court also concluded that Carl Wilson had failed to plead the third claim in the complaint, relating to assertedly defamatory statements concerning "the Beach Boys," with sufficient specificity.  The Court gave leave to amend the

2

complaint respecting the third claim by July 25, 1995.
Plaintiffs failed to do so and thus the third claim is now
dismissed.

For plaintiffs to prevail in what remains of their libel
action, they would have to show not merely that HarperCollins
published false and defamatory facts concerning them that
caused them injury (which HarperCollins firmly believes it did
not do), but also that it did so with a degree of fault that
strips the book of the First Amendment protections afforded
even erroneous speech that reflects honest error.  The
governing case law, beginning with New York Times v. Sullivan,
376 U.S. 254 (1964), establishes that book publishers such as
HarperCollins are not held to be guarantors of truth.  These
precedents erect a barrier against strict-liability recoveries
by libel plaintiffs, mandating instead that such publishers be
given the "breathing room" they require to publish vigorously.
So long as they publish with a good-faith belief in the
accuracy of their works, these publishers cannot be held
accountable in damages to a plaintiff claiming that he or she
was falsely defamed by what was published.

This motion, by stipulation of the parties, is directed
solely at the potentially dispositive fault issue:  whether
HarperCollins exercised the degree of care in publishing the
book which, the First Amendment instructs, prevents a libel
recovery no matter what else the plaintiff might demonstrate.

NYFS08...:\60\51660\0063\1631\BRF7135V.10A

In the instant case, if plaintiffs cannot demonstrate with "convincing clarity" that HarperCollins <u>knowingly published false facts defamatory of the plaintiffs or published them in reckless disregard of their truth or falsity</u>, the complaint must be dismissed.  There would, in such circumstance, be no need to examine the additional prerequisites to a recovery by the plaintiffs, including the truth or falsity of the challenged statements, whether they are factual in nature or unverifiable statements of opinion, and whether plaintiffs sustained cognizable, actual injury to their reputations.  It is to this threshold fault issue, and this issue alone, that discovery and expert reports have to this point been directed. Only if this case proceeds beyond this issue will discovery relating to the remaining issues be necessitated.

In an effort to withstand summary judgment on this first-level issue, plaintiffs have constructed a scenario which is wholly at odds with the now fully-developed factual record establishing HarperCollins' exercise of due care.  That scenario portrays HarperCollins as contracting with Brian Wilson to write his autobiography at a time when HarperCollins knew or should have known that Mr. Wilson, by reason of mental incapacity, was unable to accurately recount his life's story. The scenario further suggests that HarperCollins knew, or should have known, that Mr. Wilson, at the time the book was being written, was under the "undue influence" of an individual

named Eugene Landy, who, it is alleged, "controlled" the writing of the manuscript.  Since, the scenario concludes, Mr. Landy had a fractious relationship with other Wilson family members, he had both the motive and the opportunity (through the vehicle of the book) to "even the score" with the family.

As the ensuing Statement of Uncontested Material Facts, drawing upon approximately 3,000 pages of deposition testimony and the sworn affidavits of each of the key individuals with knowledge of the facts, makes abundantly clear, the scenario has been made out of whole cloth by the plaintiffs.  The unrebutted factual record reveals an altogether different reality:

- that HarperCollins entered into the book publishing contract in the belief that Brian Wilson <u>was</u> capable of telling his story;

- that HarperCollins pursued the project with a co-author with a proven track record in working with celebrity authors -- including those with troubled personal histories;

- that HarperCollins' editors and lawyers repeatedly undertook to assure themselves throughout the pre-publication process that the book represented Brian Wilson's own account of his life story and that its factual contents were accurate;

5

- that at no time did HarperCollins believe that Mr. Landy was controlling the contents of the book -- to the contrary, its publisher and editors took emphatic steps to assure that this was <u>not</u> the case; and

- specifically in relation to the passages assertedly defamatory of Audree and Carl Wilson, that there was adequate substantiation for them based upon Brian Wilson's recollections and other corroborative sources.

An unbroken line of case law makes clear that a book publisher which has undertaken such efforts more than satisfies the standard of care imposed upon it by law.  As we discuss in the legal analysis, HarperCollins' good-faith reliance on the reputation and integrity of the book's principal writer, Mr. Gold, its independent determination of Mr. Wilson's capacity to write -- and his involvement in the writing of -- his autobiography, and the thorough pre-publication legal review for accuracy through which HarperCollins put the book, foreclose the plaintiffs from showing by "clear and convincing" evidence that HarperCollins published the contested passages of the book with knowing falsity or in reckless disregard of their truth or falsity.  This being so, the First Amendment mandates dismissal of this suit at the summary judgment stage.

## STATEMENT OF UNCONTESTED MATERIAL FACTS

1.   In October 1991, defendant HarperCollins[1] caused a book entitled WOULDN'T IT BE NICE -- MY OWN STORY to be published and distributed for sale throughout the country. Miller Aff. ¶ 30; Martin Aff. ¶ 27.

2.   The publication process for the book spanned almost two years from the time that it was acquired to the date it was published.  HarperCollins was introduced to the project on February 2, 1990 when Robert Gottlieb and Dan Strone, two senior executives at the William Morris Agency, a leading literary agency, submitted a proposal for the autobiography of the founder of the world-famous Beach Boys singing group, Brian Wilson.  The book proposal, tentatively titled BRIAN WILSON: LOVE AND MERCY, was sent to Thomas Miller, a senior editor at HarperCollins and to Eddie Bell, publisher of HarperPaperbacks at HarperCollins.  The proposal stated that the book would be written by Mr. Wilson in collaboration with a professional writer named Todd Gold.  Miller Aff. ¶ 3.

3.   The proposed collaborative writing format was not unusual, especially for celebrity autobiographies.  Few celebrities have the time or talent actually to write their memoirs.  Key to a successful celebrity autobiography is an

---

1.  Until June 1990, HarperCollins did business as Harper & Row.  As the corporate name change has no bearing on the issues raised by this motion, we will, for sake of clarity, refer solely to HarperCollins.

NYFS08...:\60\51660\0063\1631\BRF7135V.10A

accomplished professional writer capable of drawing out the story, seeing that it is accurately told, performing supplemental research and capturing the "voice" of the celebrity.  Miller Aff. ¶ 4; Drew Aff. ¶ 21.

4.    Mr. Miller, an experienced editor, had a positive reaction to the proposal, which was reinforced by his past, favorable dealings with the William Morris Agency and his knowledge of Todd Gold's solid reputation as a professional writer.  Mr. Gold, moreover, had experience in working with celebrities.  He had collaborated on a best-selling autobiography of actress Drew Barrymore, who, like Brian Wilson, had recovered from drug problems and subsequently written about those experiences, with the assistance of Mr. Gold, in her autobiography.  Miller Aff. ¶¶ 5-6, 10.

5.    Mr. Miller knew Brian Wilson by reputation and was familiar with widely-publicized reports as to Mr. Wilson's prior bouts with mental illness.  This prompted Mr. Miller to inquire of Mr. Strone of the William Morris Agency as to Mr. Wilson's fitness to write his memoirs.  Mr. Strone in response assured him that Brian Wilson was "in good shape" to cooperate with Todd Gold in writing his autobiography.  This assurance, coupled with the book proposal's convincing portrayal of Mr. Wilson as having recovered from his difficulties, as well as news accounts of which Mr. Miller was aware reporting that Mr. Wilson had released a successful new album and was reappearing

8

on the concert circuit in apparently good form, convinced Mr. Miller that Mr. Wilson, aided by Mr. Gold, was capable of recounting his life story.  Miller Aff. ¶¶ 7-8.

6.  Mr. Miller recommended the book for publication to HarperCollins' editorial board on February 13, 1990. HarperCollins thereafter, on May 18, 1990, entered into a publishing contract with Brains & Genius, a business partnership between Brian Wilson and Eugene Landy, Brian Wilson's former psychotherapist and then-current business partner.  Miller Aff. ¶ 11.

7.  Mr. Landy's controversial relationship to Mr. Wilson had also been widely reported, including suggestions that Mr. Landy had, for a period of time, exerted undue control over Mr. Wilson.  Recognizing that the book was to be Mr. Wilson's (and not Mr. Landy's) autobiography, HarperCollins sought to assure that Mr. Wilson would take personal responsibility for its content.  Mr. Strone personally assured Mr. Miller that the book would be Brian Wilson's autobiography and not that of Eugene Landy.  HarperCollins further required that Mr. Wilson sign for Brains & Genius, that Eugene Landy not be a signatory to the contract and that Mr. Wilson agree to be personally bound by the obligations incurred by the partnership under the agreement.  Miller Aff. ¶¶ 9-11; Shinker Dep. 60-63 (attached hereto as Exh. 1); Publishing Contract (Exh. 1 to Miller Aff).

9

8.   The publishing contract called for the payment of an advance against royalties earned totalling $250,000, payable in stages as the manuscript was completed and accepted for publication, and following Mr. Wilson's fulfillment of his post-publication publicity obligations.  The amount of the advance was in the mainstream of HarperCollins' contracts during that period -- far from either the lowest or highest offered to authors.  Miller Aff. ¶ 12; Shinker Dep. 17; Publishing Contract.  See also Drew Aff. ¶ 27.

9.   From the beginning, it was HarperCollins' understanding that Mr. Gold and Mr. Wilson would be working together preparing the manuscript and that the interface between HarperCollins and the co-authors would be between Mr. Miller and Mr. Gold.  This working arrangement is a common one in relation to autobiographies co-authored by a professional writer.  The logical contact person for a book editor (acting on behalf of the publishing house) is the professional writer himself, since he typically is in charge of gathering, organizing and presenting the information to be conveyed in the manuscript.  Miller Aff. ¶ 13.  See also Drew Aff. ¶¶ 15-16, 31-32.

10.  Mr. Gold advised Mr. Miller as the project progressed that Mr. Gold was spending many hours with Mr. Wilson during which Mr. Wilson would relate stories about his life.  During their frequent conversations, Mr. Miller repeatedly asked Mr.

Gold for his evaluation of Mr. Wilson's credibility.  Mr. Gold regularly assured Mr. Miller that he was confident that Mr. Wilson's stories were accurate and honest.  He noted in particular Mr. Wilson's ability to remember certain events in great detail and his candor in telling Mr. Gold when he was unable to recall others.  Miller Aff. ¶ 17.  <u>See also</u> Gold Dep. 182, 197-98, 201-02 (attached hereto as Exh. 2).[2]

11.  Mr. Miller also regularly monitored the extent of Mr. Landy's involvement in the manuscript development process.  Mr. Gold made it clear to Mr. Miller that he and Mr. Wilson (and not Mr. Landy) were the co-authors and that Mr. Landy's contributions were as a source in areas where he had personal knowledge about a particular topic, such as his treatment of Mr. Wilson or their business relationship.  Miller Aff. ¶ 20.

12.  Mr. Gold's reportage did not consist merely of interviewing Mr. Wilson.  As reported to HarperCollins' representatives, he also interviewed many individuals who had been involved with Brian Wilson throughout his life, including his friends, family members, business associates and acquaintances.  Mr. Gold also consulted a variety of other published sources concerning Brian Wilson, his family and the

---

2.  Mr. Gold's deposition was taken on May 28, 1993, January 26, 1994 and January 27, 1994 in connection with prior litigation involving the book.  <u>Love</u> v. <u>HarperCollins Publishers Inc., et al.</u>, Civ. No. 92 6608 WJR (GHKx) (C.D. Cal. 1992) (dismissed pursuant to settlement).

Beach Boys.  Miller Aff. ¶ 17; Gavenchak. Aff. ¶ 7; Martin Aff.
¶ 9.  <u>See</u> <u>also</u> Gold Dep. 162-64, 199, 363-65.

13.  Mr. Gold's ability and/or success in interviewing
other members of the Wilson family was more limited.  Two
family members -- Brian's father, Murry Wilson, and Brian's
brother, Dennis Wilson -- were deceased.  As reported to
HarperCollins, Mr. Gold's efforts to interview the only
remaining family members, Brian's mother, Audree Wilson, and
Brian's brother, Carl Wilson -- the plaintiffs herein -- were
rebuffed.  Both flatly refused to be interviewed.  Gavenchak
Aff. ¶ 8a; Martin Aff. ¶ 10.  <u>See</u> <u>also</u> Gold Dep. 163-64.

14.  While the manuscript was in its early development
stages, Mr. Miller decided to fly to Los Angeles to meet Brian
Wilson in person.  Although he had received assurances from
both Mr. Strone and Mr. Gold as to the degree of Mr. Wilson's
involvement in the project, as well as his capacity to recall
events, as a careful editor Mr. Miller wanted his own
corroboration.  After spending some four hours with Mr. Wilson,
Mr. Miller was left with no doubt that Mr. Wilson was committed
to the project and was competent to collaborate with Mr. Gold
in writing a sincere autobiography.  Miller Aff. ¶ 15.

15.  On February 15, 1991, Mr. Miller received the first
full draft of the manuscript from Mr. Gold, who informed Mr.
Miller that Mr. Wilson had read the manuscript and approved of
its submission to HarperCollins.  Miller Aff. ¶ 16.

NYFS08...:\60\51660\0063\1631\BRF7135V.10A

16.   Following completion of Mr. Miller's initial review of the manuscript in late March 1991, Mr. Gold and Mr. Wilson, working from a lengthy editorial memorandum prepared by Mr. Miller that set forth numerous detailed comments and suggestions, made substantial revisions to the manuscript.  Mr. Gold submitted all of the revised chapters to Mr. Miller by the beginning of May.  Mr. Miller completed his line-edit (_i.e.,_ editorial revisions) of the manuscript by May 15th, and sent the revised manuscript to the authors for their review.  Miller Aff. ¶¶ 19-22.

17.   When Mr. Miller corresponded with Messrs. Gold and Wilson concerning the manuscript, it was his practice to include Mr. Landy as a recipient as well.  This was because Mr. Landy was co-proprietor of the book as a _business_ matter (through his partnership with Mr. Wilson in Brains & Genius), and hence Mr. Miller believed it only appropriate that Mr. Landy be kept apprised of the status of the project.  Mr. Miller never regarded Mr. Landy as a co-author.  To the contrary, Mr. Miller "personally made it a point that he was not."  Miller Aff. ¶ 20.

18.   In December 1990, Matthew Martin, an Assistant General Counsel in HarperCollins' legal department, determined that the book should be subject to legal review because it concerned a contemporary rock-and-roll figure and implicated sex, drugs and alcohol.  Submitting works of this genre to a

13

legal "vetting" process is the norm.  The New York law firm of
Squadron, Ellenoff, Plesant & Lehrer, which regularly performed
such reviews for HarperCollins, was retained for that purpose.
Eugenie Gavenchak, a partner in that firm who had conducted
numerous legal reviews for HarperCollins and other publishers,
took on the review of the book in the middle of May 1991.
Martin Aff. ¶¶ 4-6; Gavenchak Aff. ¶¶ 2-3; Miller Aff. ¶ 23.
See also Drew Aff. ¶ 44.

19.  The HarperCollins editorial and legal staff involved
in the project agreed with Ms. Gavenchak that she would work
directly with Mr. Gold in conducting her legal review and
addressing whatever concerns arose.  Mr. Gold, in turn, would
discuss with Mr. Wilson areas that required corroboration from
him.  This arrangement comported with Ms. Gavenchak's usual
practice in reviewing books co-written by a celebrity and a
professional writer and was consistent with others' experience
both inside and outside of HarperCollins.  Gavenchak Aff. ¶¶ 5-
6; Martin Aff. ¶ 8; Miller Aff. ¶ 13.  See also Drew Aff.
¶¶ 45-46.

20.  Ms. Gavenchak's pre-publication review, while
originally proposed to be completed in several weeks' time, in
fact extended over a two-month period.  In all, she devoted
some 53 hours to this matter.  In conducting her review, Ms.
Gavenchak read the manuscript and identified those passages
which, when considered in the context of the entire book,

14

raised questions in her mind and warranted further clarification or corroboration.  Ms. Gavenchak addressed each of these passages directly with Mr. Gold, requesting him to provide corroboration for certain passages and to rework others.  Mr. Gold repeatedly assured Ms. Gavenchak in response to her inquiries that he was regularly discussing her comments and concerns with Mr. Wilson.  Ms. Gavenchak regularly updated Mr. Martin on the status of her legal review, including advising him that Mr. Gold had been able to provide corroboration for virtually all of the passages that had initially concerned her.  Gavenchak Aff. ¶¶ 4-7, 12; Martin Aff. ¶¶ 7, 9.

21.  In connection with her legal review, Ms. Gavenchak, much as Mr. Miller before her, wanted to be sure that Brian Wilson was providing accurate information.  As he had repeatedly done with Mr. Miller, Mr. Gold so assured Ms. Gavenchak.  Gavenchak Aff. ¶¶ 6, 8a.

22.  At the time she was reviewing the manuscript, Ms. Gavenchak was advised by Mr. Gold that he, quite appropriately, had utilized Mr. Landy as a source of information concerning his treatment of, and subsequent business relationship with, Mr. Wilson.  She uncovered no evidence, however, that Mr. Landy (as alleged in ¶ 8 of the First Amended Complaint) "collaborated extensively" in the authorship and editing of the book or "altered text and manipulated sources" so as to

"impair[] the accuracy of the book" and "defame[] [the] plaintiffs."  Gavenchak Aff. ¶ 9.

23.  With respect to the passages challenged in this action and not heretofore dismissed:

a.  Ms. Gavenchak and Mr. Gold made the collective decision, of which Mr. Martin was advised, that the references to Audree Wilson being a passive witness to her husband's abuse of their children (First Amended Complaint ¶ 10) would stay in the book because Mr. Wilson had represented to Mr. Gold that they were true.  Ms. Gavenchak saw no reason to doubt Mr. Gold's assessment of Mr. Wilson's recollections in this regard.  Moreover, Mr. Gold informed Ms. Gavenchak that he had corroborated Mr. Wilson's stories with other published accounts of his childhood.  Coupled with the information that Mr. Gold had tried, but had been unable, to interview Audree and Carl Wilson, Mr. Martin agreed with Ms. Gavenchak that there was no reason in the circumstances to disbelieve Mr. Wilson's account and that the passages should remain in the book.  Gavenchak Aff. ¶ 8a; Martin Aff. ¶ 10.

b.  Mr. Gold informed Ms. Gavenchak that the passages concerning Carl Wilson's drug and alcohol use were supported not only by Carl Wilson's own admissions, but by other published sources as well.  Todd Gold also confirmed for Ms. Gavenchak that the trust document giving Carl Wilson control of Brian Wilson's paychecks and his vote in the Beach

Boys' corporation had been signed by Brian Wilson and was accurately described in the manuscript (First Amended Complaint ¶ 19).  Gavenchak Aff. ¶¶ 8b, c, d.

 c.  Ms. Gavenchak reviewed, but did not consider potentially defamatory, the passages in the manuscript relating to Carl Wilson's expressions of concern over the cost of Mr. Landy's proposed treatment programs.  In contrast to the complaint's assertion that the passages portrayed Carl Wilson as "callous and unconcerned" about Brian Wilson's physical and emotional health and as being "willing to risk Brian's life to save money" (First Amended Complaint ¶ 19), Ms. Gavenchak viewed the passages as reflecting nothing more than an expression of legitimate concern over the cost of medical treatment, a concern made all the more innocent in light of the facts -- reported in the book -- as to the exorbitant cost of Mr. Landy's treatment and Carl Wilson's ultimate approval of the therapy.  Gavenchak Aff. ¶ 8e.

 24.  In the course of its pre-publication legal review, HarperCollins also investigated the nature, and circumstances, of a conservatorship proceeding commenced by Mr. Wilson's cousin, Stan Love, the purported purpose of which was to wrest Mr. Wilson free of Mr. Landy's control, for its potential relevance to Mr. Wilson's capacity to write the book.  Contrary to the allegation in the complaint that HarperCollins ignored the implications of this proceeding for the book project (First

Amended Complaint ¶ 8), it was, in fact, discussed in the
manuscript itself and thus considered by Ms. Gavenchak and Mr.
Martin.  In discussions with Donald Engel, Mr. Wilson's
personal attorney who attested to intimate knowledge of the
proceeding, Mr. Martin was advised that the proceeding had
little to do with Mr. Wilson's mental capacity and was,
instead, an outgrowth of the family's disaffection for Mr.
Landy and represented an effort to sever Mr. Landy's control of
Mr. Wilson's financial affairs.  Mr. Engel further informed Mr.
Martin that the conservatorship proceeding was likely to be
settled on terms that would accomplish that end.  Mr. Martin
advised Ms. Gavenchak of these discussions.  This information,
combined with all of the other indicia of Mr. Wilson's capacity
to write -- and his actual involvement in -- the book which
emerged during the pre-publication review process, led Ms.
Gavenchak to conclude that the pendency of the conservatorship
proceeding formed no basis for questioning Mr. Wilson's
competence to collaborate in writing his autobiography.
Gavenchak Aff. ¶ 10; Martin Aff. ¶ 25; Gavenchak Dep. 537-38
(attached hereto as Exh. 3).

     25.  On June 18, 1991, Mr. Martin submitted to Mr. Miller
Ms. Gavenchak's copy of the complete manuscript marked with the
changes to which she and Mr. Gold had agreed.  Mr. Miller made
sure that the changes were incorporated into the final work,
which Ms. Gavenchak confirmed by reviewing the first set of

galleys (the initial typeset version of the book) after it came back from the printer.  Martin Aff. ¶ 11; Miller Aff. ¶ 25; Gavenchak Aff. ¶ 12.

26.  Mr. Martin had assumed responsibility for verifying the book's discussion of a copyright ownership suit involving Brian Wilson.  On June 18, 1991, Mr. Martin called James Tierney, the lawyer representing Brian Wilson in that case, to verify that the book's description of the allegations made in the lawsuit was a fair one.  Instead of responding to Mr. Martin's queries, Mr. Tierney told Mr. Martin that he wanted to review the entire manuscript of the book before it was published, conclusorily suggesting that the book might contain false statements which could be damaging to Mr. Wilson if published.  Martin Aff. ¶ 12.

27.  Mr. Martin immediately called Mr. Gold to determine whether Mr. Tierney had a legitimate reason for wanting to review the manuscript.  Mr. Gold told Mr. Martin that Mr. Tierney had already reviewed the manuscript and suggested certain changes, which had been incorporated.  Mr. Gold expressed his view that Mr. Tierney's motive for wanting to review the manuscript a second time was not to ensure accuracy, but to avoid the prospect that it would offend the Beach Boys, whose cooperation he required in the lawsuit that he was handling on Mr. Wilson's behalf.  Mr. Gold also informed Mr. Martin that many attorneys were acting on behalf of Mr. Wilson

19

and that Mr. Tierney's authority over Mr. Wilson's affairs was limited.  Martin Aff. ¶ 13.

28.  The next day Mr. Martin received from Mr. Wilson a letter advising HarperCollins that Mr. Tierney was not representing Mr. Wilson in matters relating to the book and that an attorney named Donald Engel was acting as Mr. Wilson's legal representative for "any and all dealings" concerning the book.  In a follow-up conversation with Mr. Engel, Mr. Engel confirmed to Mr. Martin that Mr. Tierney was working for Mr. Wilson solely with respect to one litigation.  Mr. Martin was advised by Mr. Engel that Mr. Tierney lacked authority to demand to see the manuscript.  Martin Aff. ¶¶ 14-15.  See also Engel Dec. ¶ 5 (attached hereto as Exh. 4).[3]

29.  On June 26, 1991, Mr. Martin had another conversation with Mr. Tierney, who wanted to know why he had not received a copy of the manuscript.  Confirming Mr. Gold's suspicion as to Mr. Tierney's motives, Mr. Tierney expressed concern that if the book was negative toward the Beach Boys, they might refuse to cooperate with the pending copyright action.  Mr. Tierney proceeded to make a variety of assertions:  that Mr. Wilson might disown the book; that Mr. Wilson had no recollection of anything that occurred from 1969 to 1978; that Eugene Landy was

_____

3.  Mr. Engel's declaration was given in connection with prior litigation involving the book.  Love v. HarperCollins Publishers Inc., et al., Civ. No. 92 6608 WJR (GHKx) (C.D. Cal. 1992) (dismissed pursuant to settlement).

controlling the content of the book; and that Mr. Landy was "burning the oil fields" and "scorching the earth" in his relationship with Mr. Wilson.  Mr. Martin treated these allegations seriously, if somewhat skeptically, given what he had concluded as to Mr. Tierney's motives.  He discussed Mr. Tierney's assertions at length with his superior, Mr. Fox, HarperCollins' Publishing Counsel, and with Ms. Gavenchak. Their ultimate conclusion, based on the information already known to HarperCollins and buttressed by what it would learn in the ensuing weeks (as described in ¶¶ 33-37 _infra_), was that Mr. Tierney's concerns were not well founded.  Martin Aff. ¶¶ 17-19.

30.  At about the same time as Mr. Tierney was making demands to see the manuscript, Mr. Miller received a letter from a psychiatrist named Dr. Garrett O'Connor, requesting a copy of the manuscript.  The letter was accompanied by an authorization letter from Mr. Wilson.  Mr. Martin thereafter learned that Dr. O'Connor had been retained in connection with the Wilson conservatorship proceeding.  That same day, HarperCollins received from Mr. Gold a note requesting that no copies of the book be given to third parties until he and Mr. Wilson had reviewed the typeset galleys.  Martin Aff. ¶ 16. See _also_ Engel Dec. ¶ 8c.

31.  In the face of Mr. Tierney's and Dr. O'Connor's requests to see the manuscript, Mr. Martin met with Mr. Fox on

June 26th to discuss how to proceed.  Mr. Martin and Mr. Fox concluded that Mr. Wilson should himself decide who would be allowed to see the manuscript prior to publication.  A letter was sent to Mr. Wilson to that effect, advising him that he was free to share the manuscript with whomever he thought appropriate but cautioning that he should not circulate it in a fashion that would jeopardize its confidentiality and/or HarperCollins' right of first publication.  Martin Aff. ¶¶ 19-20.

32.  By late June, HarperCollins made the decision that the time necessary to complete the pre-publication legal review necessitated pushing the publication date of the book back some six weeks, from September 11, 1991 to October 23, 1991.  Miller Aff. ¶ 23; Martin Aff. ¶ 7.

33.  On July 15, 1991, Mr. Gold reported by telephone to Mr. Martin that Mr. Wilson had received the galleys and was busy reading them.  At about the same time, Mr. Engel communicated to Mr. Martin that Mr. Wilson had reiterated to Mr. Engel his commitment to see the book published, and had advised Mr. Engel, as of July 15th, that he was busy reading the galleys.  Mr. Engel also informed Mr. Martin that Mr. Wilson did not want Mr. Tierney or Dr. O'Connor to be given copies of the galleys.  Martin Aff. ¶ 22.

34.  In mid-July, Mr. Fox and Mr. Martin concluded that it would be advisable for Mr. Martin to meet personally with Mr.

Wilson to eliminate any lingering concerns about Mr. Wilson's commitment to the book and his approval of its contents.  The meeting took place in Los Angeles on July 17th.  During the meeting, Mr. Gold, an assistant to Mr. Wilson, and Mr. Engel (arriving late) were also present.  Messrs. Gold and Wilson advised Mr. Martin that they had just finished reviewing the galleys, which, Mr. Wilson reported, had taken him four days to review thoroughly and completely.  To memorialize his review and approval of the book, Mr. Wilson had signed the final page of the galleys indicating that he approved of the book and wanted it to be published.  Martin Aff. ¶ 24; Exh. 3 to Martin Aff.  See also Gold Dep. 223-26.

35.  On July 19, 1991, Mr. Martin met with Mr. Engel at Mr. Engel's Beverly Hills law office.  Mr. Engel advised Mr. Martin that he was in the process of attempting to settle the conservatorship proceeding.  He stated that Dr. O'Connor's forthcoming psychiatric report in that proceeding would conclude that Mr. Wilson was competent, although prone to Mr. Landy's influence.  Martin Aff. ¶ 25.

36.  On July 24th, Mr. Martin and Mr. Engel spoke again by telephone.  Mr. Engel informed Mr. Martin that he had read the book in its entirety, felt that it was a "balanced book" that was not all that favorable to Mr. Landy (as he initially speculated it might be) and that it said "what Brian Wilson wants it to say."  He observed that despite the people involved

23

in the conservatorship proceeding wanting to "kill the book," Mr. Wilson wanted the book to be published and "wants to tell the truth."  Mr. Martin responded that HarperCollins was now satisfied that the book was legally sound and "that it had Brian Wilson's complete blessing."  Mr. Martin informed Mr. Engel that HarperCollins intended to proceed with publication and Mr. Engel informed Mr. Martin that he supported that decision.  Martin Aff. ¶ 26.

37.  In September 1991, Craig Herman, the Assistant Director of Publicity at HarperCollins who was in charge of scheduling Mr. Wilson's publicity tour in connection with the publication of the book, met with Mr. Wilson in Los Angeles for the purpose of satisfying himself that Mr. Wilson intended to satisfy his publicity tour obligations.  Mr. Herman had arranged the meeting after several television producers expressed some concerns to him about Mr. Wilson's ability to communicate coherently and effectively on television.  Those concerns were allayed, however, after Mr. Herman met with Mr. Wilson over lunch and again over dinner, during which time he engaged Mr. Wilson in wide-ranging conversation.  Reacting similarly to Mr. Miller and Mr. Martin before him, Mr. Herman found Mr. Wilson to be competent and capable of performing his publicity obligations, which he ultimately did.  Herman Aff. ¶¶ 4-6.

24

38.  On August 8, 1991, William Shinker, Publisher of the Adult Trade Division of HarperCollins, and Mr. Miller each received a faxed letter from Barry Langberg (plaintiff's counsel in this action), writing on behalf of Carl Wilson, Audree Wilson, Carnie Wilson and Wendy Wilson, whom he reported to be his clients in the conservatorship proceeding.  Mr. Langberg's letter stated that while neither he nor his clients had seen the manuscript, they were concerned that it might be defamatory of his clients.  The letter also questioned the validity of HarperCollins' contract with Mr. Wilson (presumably on the ground that Mr. Wilson lacked the capacity to have entered into it).  The letter identified no statements claimed to be defamatory and merely invited HarperCollins to discuss the matter with Mr. Langberg.  Miller Aff. ¶ 26; Martin Aff. ¶ 27; Exhibit 4 to Martin Aff.

39.  Copies of Mr. Langberg's letter were forwarded to Mr. Martin, who, after consulting with Ms. Gavenchak, concluded that Mr. Langberg's non-specific letter did not raise any concerns that HarperCollins had not already addressed.  Mr. Martin and Ms. Gavenchak also regarded Mr. Langberg's motives as suspect given the adversarial position of his clients to Mr. Wilson, who was contesting appointment of a conservator and wanted the book to be published in part to relate his views as to that dispute.  Martin Aff. ¶ 28; Gavenchak Aff. ¶ 11.

40.  Mr. Martin responded to Mr. Langberg in a letter explaining that the book had undergone an exhaustive legal review, that HarperCollins was satisfied that its contract with Mr. Wilson was valid and that HarperCollins was confident that Brian had the capacity to write a book about his life.  Neither Mr. Langberg nor his clients were heard from further prior to publication of the book, which took place on October 23, 1991. Martin Aff. ¶ 29; Exhibit 5 to Martin Aff.

41.  Plaintiffs filed this action some three years later, on August 4, 1994.

## ARGUMENT

The First Amendment strictly limits the power of states to entertain and recognize defamation claims by requiring the plaintiff to establish, not merely the false and defamatory nature of statements claimed to have injured him, but also some degree of "fault" on the part of the defendant in publishing those statements.  A plaintiff's status dictates the standard by which a publisher's conduct is to be judged.  In the case of a public figure, the First Amendment requires the plaintiff to show by clear and convincing evidence that the publisher actually entertained serious doubts as to whether the publication was true or false.  A private figure must demonstrate at a minimum that the publisher acted negligently, that is, departed from the norms of editorial practice governing the genre of publishing involved -- in this case,

26

book publishing.  As will be demonstrated below, HarperCollins is entitled to summary judgment irrespective of the plaintiffs' status because it conducted itself in an exemplary fashion in publishing the book and plaintiffs have failed to come forward with any evidence to the contrary.

I.   **PLAINTIFFS ARE PUBLIC FIGURES**

The question of whether a libel plaintiff is a public figure is one of law for the court to resolve.[4]

1.   **Carl Wilson**

An individual who has achieved "pervasive fame or notoriety" is regarded as a public figure for all purposes. Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974).  Under this standard, entertainers are uniformly treated as public figures "because the first amendment requires that the press be afforded the protection of the 'malice' standard vis-a-vis those who have sought its coverage, either through direct invitation or by participating in activities whose success depends in large part on publicity."[5]  Because entertainers

---

4.  Rosenblatt v. Baer, 383 U.S. 75, 88 n.15 (1966); Brewer v. Memphis Publishing Co., 626 F.2d 1238, 1247 (5th Cir.), cert. denied, 454 U.S. 964 (1980); Rebozo v. Washington Post Co., 637 F.2d 375, 379 (5th Cir. 1981).

5.  Brewer, 626 F.2d at 1255 ("well-known" singer who had appeared on television and made recordings was public figure), cert. denied, 452 U.S. 962 (1981).  See also Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 57 (1988) (host of nationally syndicated television show is public figure); Waldbaum v. Fairchild Pubs., Inc., 627 F.2d 1287, 1292, 1294 (D.C. Cir.), cert. denied, 449 U.S. 898 (1980) (celebrities are public
(continued...)

"typically put more of themselves in the public view than their particular performances,"[6] they are treated as public figures so as to afford the media "breathing space . . . in fulfilling its role of reporting, analyzing and commenting on well-known persons."[7]

The record is clear that Carl Wilson has achieved fame and notoriety by entertaining the public for most of his life as a

---

5.   (...continued)
figures for all purposes); <u>Carson</u> v. <u>Allied News Co.</u>, 529 F.2d 206 (7th Cir. 1976) (Johnny Carson, television entertainer, is public figure); <u>Contemporary Mission, Inc.</u> v. <u>New York Times Co.</u>, 665 F. Supp. 248, 264-65 (1987)(nationally known folk singers who granted interviews, issued press releases, appeared on television and radio, gave musical performances and sold records are public figures), <u>aff'd</u>, 842 F.2d 612 (2d Cir.), <u>cert.</u> <u>denied</u>, 488 U.S. 856 (1988); <u>Burnett</u> v. <u>National Enquirer, Inc.</u>, 144 Cal. App. 3d 991, 193 Cal. Rptr. 206 (1983) (Carol Burnett, television entertainer, is public figure); <u>Owens</u> v. <u>National Broadcasting Co.</u>, 508 So. 2d 949 (La. App. 4th Cir.), <u>cert.</u> <u>denied</u>, 512 So. 2d 1182 (1987) ("entertainer" who was "star attraction" at nightclub, advertised her performances, made recordings and appeared on television and in other fora for commercial purposes was public figure); <u>Islam</u> v. <u>Globe Int'l, Inc.</u>, 12 Media L. Rep. 1864 (S.D. Fla. 1985) (Cat Stevens, "a popular composer, singer and entertainer," is a public figure); <u>Cochran</u> v. <u>Indianapolis Newspapers, Inc.</u>, 175 Ind. App. 548, 557, 372 N.E.2d 1211, 1219 (1978) ("Playboy Playmate" is public figure); <u>James</u> v. <u>Gannett Co.</u>, 40 N.Y.2d 415, 422, 353 N.E.2d 834, 839 (1976) (professional belly dancer is public figure; "without doubt," public figures include, <u>inter</u> <u>alia</u>, concert singers and recording artists).  <u>See</u> <u>also</u> <u>Chuy</u> v. <u>Philadelphia Eagles Football Club</u>, 595 F.2d 1265, 1280-81 (3d Cir. 1979) (en banc) (professional football player is public figure); <u>Cepeda</u> v. <u>Cowles Magazines & Broadcasting, Inc.</u>, 392 F.2d 417, 419 (9th Cir.) (professional baseball player is public figure; public figures "of course" include artists and "anyone who is famous or infamous because of who he is or what he has done"), <u>cert.</u> <u>denied</u>, 393 U.S. 840 (1968).

6.   <u>Brewer</u>, 626 F.2d at 1255.

7.   <u>Waldbaum</u>, 627 F.2d at 1292.

NYFS08...:\60\51660\0063\1631\BRF7135V.10A

singer and guitarist for the Beach Boys.  Carl Wilson has given
numerous television and radio interviews, has performed with
the Beach Boys 80-100 times each year, has recorded albums with
the Beach Boys and on his own, is recognized by strangers on
the street and is frequently asked for his autograph -- which
Carl Wilson refers to as a collector's item.  Carl Wilson Dep.
25-30, 60-63, 68-70 (attached hereto as Exh. 5).  As a member
of the Beach Boys, Carl Wilson has endorsed products and has
received support from corporate sponsors.  Id. at 62-63.  By
virtue of having "entered [a] profession[] that by [its] nature
require[d] public appearances and invite[d] press attention,"
Carl Wilson must be treated as a public figure.[8]

   2.   **Audree Wilson**

   Audree Wilson also deserves public figure treatment in the
instant case.  As the mother of three members of the Beach
Boys, Ms. Wilson has attracted notoriety in her own right.[9]
Ms. Wilson has toured with the Beach Boys throughout their
careers, spoken with fans at Beach Boys shows, been introduced
on stage at Beach Boys concerts 10-50 times, been frequently
recognized on the street and has even received her own fan

---

8.   See Brewer, 626 F.2d at 1254.

9.   See Carson, 529 F.2d at 210 (wife of famous television
entertainer was public figure); Meeropol v. Nizer, 381 F. Supp.
29, 34 (S.D.N.Y. 1974) (children of "famous parents" were
public figures), aff'd, 560 F.2d 1061, 1066 (2d Cir. 1977).
See also Wynberg, 564 F. Supp. at 928 (plaintiff was public
figure by virtue of his "close personal relationship" with
famous actress).

NYFS08...:\60\51660\0063\1631\BRF7135V.10A

mail.  Audree Wilson Dep. 54-55, 82-86 (attached hereto as Exh. 6).  Moreover, Ms. Wilson has evinced an untempered willingness to discuss with the press the Beach Boys, her relationship with the Beach Boys and family life in the Wilson household (including her husband's volatile temper), as evidenced by the variety of published books and articles for which Ms. Wilson has given interviews.[10]  Courts have regarded such conduct as highly probative of public figure status.[11]  In view of Ms. Wilson's public persona, her close relationship with other public figures and her participation and acquiescence in public discourse about the Wilson family, Ms. Wilson is properly accorded public figure status in this action.

---

10.  See, e.g., Steven Gaines, Heroes and Villians:  The True Story of the Beach Boys 46-47, 83, 190-92 (1986); David Leaf, Beach Boys 16-19, 33-34, 38, 49, 59 (1977); David Felton, The Healing of Brother Brian, Rolling Stone (Nov. 4. 1976).  See also Audree Wilson Dep. 22-26.

11.  See Rebozo, 637 F.2d at 379 (large number of articles mentioning plaintiff evidenced plaintiff's status as public figure); Jensen v. Times Mirror Co., 634 F. Supp. 304, 311 (D. Conn. 1986) (plaintiff's voluntary giving of interview supported public figure status); Wynberg v. National Enquirer, Inc., 564 F. Supp. 924, 928 (C.D. Cal. 1982) (same); Vitale v. National Lampoon, Inc., 449 F. Supp. 442, 445 (E.D. Pa. 1978) (plaintiff who was interviewed and photographed for magazine "voluntarily placed herself in the public domain" and accorded public figure status).

NYFS08...:\60\51660\0063\1631\BRF7135V.10A

## II. HARPERCOLLINS IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS CANNOT MEET THEIR BURDEN OF ESTABLISHING ACTUAL MALICE

### 1. Plaintiffs Are Required to Show with Convincing Clarity that Defendant Had a Subjective Awareness of Probable Falsity

The First Amendment bars a public figure from recovering for defamation absent proof with "convincing clarity" that the defendant published a false statement with "'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 285-86 (1964). "Actual malice" in the constitutional sense is wholly distinct from the common law conception of malice, generally implicating hatred or ill-will. See Harte-Hanks Communs., Inc. v. Connaughton, 491 U.S. 657, 666 (1989). Rather, constitutional malice focuses on the defendant's actual knowledge or awareness as to the truth or falsity of the subject matter at the time of publication, not on the defendant's feelings toward the plaintiff.

The Supreme Court has made clear that "[t]he [actual malice] standard is a subjective one -- there must be sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of . . . probable falsity.'" Harte-Hanks, 491 U.S. at 688, quoting Garrison v. Louisiana, 379 U.S. 64, 74 (1964) (emphasis added). Thus, the question of fault is not based on an objective standard, such

31

as what a reasonable or prudent publisher would have done or what the actual defendant should or should not have done, but instead on whether "the defendant <u>in</u> <u>fact</u> entertained serious doubts as to the truth of his publication." <u>St. Amant</u> v. <u>Thompson</u>, 390 U.S. 727, 731 (1968) (emphasis added); <u>see</u> <u>also</u> <u>Gertz</u>, 418 U.S. at 335 n.6.  Even an "extreme departure from professional standards" will not by itself suffice to establish the requirement of actual malice.  <u>Harte-Hanks</u>, 491 U.S. at 665.

    2.    <u>A Defamation Plaintiff Must Adduce Affirmative and Concrete Evidence of Publisher Fault to Overcome a Motion for Summary Judgment</u>

In entertaining a motion for summary judgment on the issue of actual malice, a federal court must apply the clear and convincing evidentiary standard and enter summary judgment in favor of the defendant when the plaintiff has failed to adduce sufficient evidence from which a reasonable jury might find that actual malice has been established with convincing clarity.  <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986).  The evidence of fault must be "affirmative" and "concrete" in order to overcome a motion for summary judgment. <u>Id.</u> at 256-57.  The non-moving party cannot rest upon "mere allegations" in its pleadings, Fed. R. Civ. P. 56(e), or simply assert that a jury might not believe the defendant's denial as to fault, <u>Anderson</u>, 477 U.S. at 256, or merely show "some metaphysical doubt as to the material facts." <u>Matsushita Elec.</u>

Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586
(1986).

Courts have regarded summary judgment as playing a
particularly important role in libel litigation in view of the
First Amendment interests at stake.  This notion stems from the
Supreme Court's recognition that the chilling effect of libel
claims may result, not only from the fear that a money judgment
will ultimately obtain, but from the fear of the expense
associated with the defense of such claims.  New York Times,
376 U.S. at 279; Time, Inc. v. Hill, 385 U.S. 374, 389 (1967).
Thus, "[j]udges, as expositors of the Constitution, have a duty
to independently decide whether the evidence in the record is
sufficient to cross the constitutional threshold that bars the
entry of any judgment that is not supported by clear and
convincing proof of 'actual malice'."  Bose Corp. v. Consumers
Union of United States, Inc., 466 U.S. 485, 511 (1984).  In
light of these principles, a New Mexico court recently
emphasized that a trial court must determine, "at the earliest
possible stage," whether the plaintiff can establish actual
malice.  Andrews v. Stallings, 892 P.2d 611, 616 (N.M Ct. App.

33

1995).[12]  These precepts apply equally whether the publication concerns a public or a private figure.[13]

> **3.**     **A Book Publisher Who Relies in Good Faith on the Reputation and Experience of Its Author -- Let Alone Takes Additional Verification Measures -- Does Not Publish With Actual Malice As a Matter of Law**

In applying the actual malice test to defamation claims brought against book publishers, courts have uniformly held that the publisher does not act with actual malice as a matter of law when it relies on a reputable author in forming a good-

───────────────────

12.  See also Hickey v. Capital Cities/ABC Inc., 19 Media L. Rep. 1983 (D. Or. 1992) ("Summary judgment is the preferred means of dealing with first amendment cases due to the chilling of first amendment rights inherent in expensive and time-consuming litigation."); Andrews v. Stallings, 892 P.2d 611, 616 (N.M Ct. App. 1995) ("The failure to dismiss an unwarranted libel suit might necessitate long and expensive trial proceedings that would have an undue chilling effect on public discourse."); Reader's Digest Ass'n v. Superior Court, 37 Cal. 3d 244, 252, 690 P.2d 610, 614 (1984) (en banc), cert. denied, 478 U.S. 1009 (1986) (the "potential chilling effect from protracted litigation as well as a public interest in resolving defamation cases promptly . . . . [renders] summary judgment . . . a 'favored' remedy in defamation cases involving the issue of 'actual malice'").

13.  See, e.g., Spears v. McCormick & Co., Inc., 520 So. 2d 805, 808 (La. App. 1987), cert. denied, So. 2d 563 (1988) (because summary judgment serves an "essential" First Amendment interest in libel actions, "the plaintiff in a defamation action who opposes summary judgment bears a burden of proof which is more onerous than usual"); Cefalu v. Globe Newspaper Co., 8 Mass. App. Ct. 71, 74, 391 N.E.2d 935, 937 (Mass. App. 1979) (summary judgment is "particularly appropriate" in defamation cases because "[t]he threat of being put to the defense of a lawsuit . . . may be as chilling to the exercise of First Amendment Freedoms as fear of the outcome of the lawsuit itself") (citations omitted), cert. denied, 444 U.S. 1060 (1980).

faith belief that the manuscript is truthful and accurate.[14]
Courts have routinely entered summary judgment in favor of book
publishers in such cases.  The actual malice standard does not
require book publishers to engage in independent fact
verification; it suffices that the publisher relied in good
faith on the author's reputation and experience.[15]  The logic

---

14.  See, e.g., Hotchner v. Doubleday & Co., Inc., 551 F.2d
910, 912-14 (2d Cir.), cert. denied, 434 U.S. 834 (1977) (book
publisher regarded author as highly reputed); Bailey v. Dell
Pub. Co., Inc., 790 F. Supp. 101, 105-06 (W.D. Pa.) (book
publisher entitled to rely on belief in author's integrity as a
matter of law), aff'd without opn., 983 F.2d 1049 (3d Cir.
1992); Murray v. Bailey, 613 F. Supp. 1276, 1280-81 (N.D. Cal.
1985) (book publisher entitled to rely on author's
representation in publishing contract that book was not
libelous); McManus v. Doubleday & Co., Inc., 513 F. Supp. 1383,
1390 (S.D.N.Y. 1981) (book publisher entitled to rely on
reputation and experience of author; "[the fact] that
inaccuracies in [the author's] report came to light after
publication is irrelevant to the essentially fault-based
determination of whether the report was published with actual
malice"); Cardillo v. Doubleday & Co., Inc., 366 F. Supp. 92
(S.D.N.Y. 1973) (book publisher entitled to rely on its belief
that author was reliable and knowledgeable on subject of book),
aff'd on other grounds, 518 F.2d 638 (2d Cir. 1975); Doubleday
& Co., Inc. v. Rogers, 674 S.W.2d 751, 756 (Tex. 1984) (book
publisher entitled to rely on reputable journalist); Bindrim v.
Mitchell, 92 Cal. App. 3d 61, 73 (Cal. App.) (book publisher
entitled to rely on author's assurances that characters would
be fictitious), cert. denied, 444 U.S. 984 (1979); Rinaldi v.
Holt, Rinehart & Winston, Inc., 42 N.Y.2d 369, 382-83, 366
N.E.2d 1299, 1307 (1977) (book publisher entitled to rely on
"reportorial abilities" of "controversial, well-known,
investigative journalist" and entitled to "credit its author's
version of the facts as well as its reasons for discrediting
[others]").

15.  See, e.g., Hotchner, 551 F.2d at 914 (book publisher's
failure to conduct independent investigation is not reckless
disregard of truth); Murray v. Bailey, 613 F. Supp. at 1280
(book publisher's failure to independently investigate
statements in book that plaintiff had driven drunk and

(continued...)

of these cases is plain:  publication in such circumstances is not with actual malice as a matter of law because the publisher neither knows of falsity nor, in reliance on its author's reputation, publishes in reckless disregard as to truth or falsity.

A _fortiori_, a book publisher cannot be found to have published with actual malice when it goes beyond such good-faith reliance and undertakes additional activities to ensure the factual accuracy of the book.  Virtually by definition, a publisher's resort to additional fact-checking procedures leads to the "inescapable" conclusion that the challenged statement was not published in reckless disregard of the truth.  See _Rogers_, 674 S.W.2d at 756.

Courts have thus made clear that a finding of actual malice is precluded by an editorial process which includes a variety of techniques designed to assure the factual accuracy of the work.  These include an editor's inquiry into the author's methodology, requests for substantiation for particular passages, and a determination to have the manuscript

---

15.  (...continued)
committed perjury was not reckless disregard of truth); _McManus_, 513 F. Supp. at 1389-90 (book publisher had no duty to investigate statement that priest had "homicidal tendencies" in view of its reliance on reputation and experience of author); _Rogers_, 674 S.W.2d at 756 (book publisher under no duty to independently investigate author's statement that plaintiff had been indicted for practicing optometry without a license); _Bindrim_, 92 Cal. App. 3d at 73-74 (book publisher entitled to rely on assurances of author and has no duty to conduct independent investigation).

36

reviewed by an attorney.[16]  Simply put, such measures "negate the sort of recklessness that sanctions liability." <u>Cardillo</u>, 366 F. Supp. at 94 (summary judgment for book publisher who conducted legal review of manuscript during which one co-author answered the attorney's questions).

Courts have routinely reversed jury verdicts against book publishers under the same principles.  For example, the Second Circuit in <u>Hotchner</u>, 551 F.2d 910, overturned a jury verdict against Doubleday, a book publisher, concluding that no reasonable juror could have found actual malice as to Doubleday for its publication of an English translation of a Spanish book in view of the facts that the publisher regarded the Spanish author as highly reputed, relied on an experienced translator, received assurances from the author as to the accuracy of the statements, and conducted a legal review of the book. <u>Id.</u> at 911-12.[17]

---

16. <u>See</u>, <u>e.g.</u>, <u>Murray</u> v. <u>Bailey</u>, 613 F. Supp. at 1280-81 (summary judgment for book publisher where author asked to confirm certain statements); <u>McManus</u> v. <u>Doubleday & Co., Inc.</u>, 513 F. Supp. at 1390 (summary judgment for publisher who had manuscript read by attorney); <u>Rogers</u>, 674 S.W.2d at 752, 756 (no actual malice where publisher had manuscript reviewed by an "experienced libel attorney" who required substantiation of potentially libelous passages); <u>Bindrim</u>, 92 Cal. App. 3d at 73 (no actual malice on part of book publisher who had manuscript read for libel).

17. <u>See</u> <u>also</u> <u>Bindrim</u>, 92 Cal. App. 3d at 73 (overturning jury verdict against book publisher because the author had assured Doubleday, per its request, that the characters would be fictitious and because Doubleday had the manuscript read for libel; <u>Rogers</u>, 674 S.W.2d at 756 (overturning jury verdict
(continued...)

37

These principles are not diluted even where there may be an issue of fact as to the <u>author's</u> degree of fault.  The propriety of summary judgment for a book publisher is to be considered separately from an evaluation of its author's conduct under the actual malice standard.  Thus, a finding that an author may not have acted with the requisite degree of care cannot be imputed to the book publisher so long as the publisher relied in good faith on the integrity and experience of the author.[18]

### 4.   <u>Plaintiffs Have Adduced No Evidence -- Much Less Clear and Convincing Evidence -- That HarperCollins Published the Book With Actual Malice</u>

In order to defeat the present motion for summary judgment, plaintiffs bear a heavy burden:  they must come forward with sufficient evidence such that a reasonable jury could find by <u>clear</u> <u>and</u> <u>convincing</u> evidence that HarperCollins

_____

17.  (...continued)
against book publisher which relied on a reputable journalist and had the book read for libel by outside counsel).

18.  <u>See</u>, <u>e.g.</u>, <u>McManus</u> v. <u>Doubleday & Co., Inc.</u>, 513 F. Supp. 1383 (S.D.N.Y. 1981) (author's inadequate sourcing not imputed to book publisher; summary judgment granted as to book publisher and denied as to author because publisher entitled to rely on integrity of author); <u>Dresbach</u> v. <u>Doubleday & Co., Inc. & Co., Inc.</u>, 518 F. Supp. 1285 (D.D.C. 1981) (same under negligence standard).  <u>See also</u> <u>Masson</u> v. <u>New Yorker Magazine, Inc.</u>, 960 F.2d 896, 902 (9th Cir. 1992) (author's misquotations not attributed to book publisher who republished a magazine article containing the misquotes; denying summary judgment as to author and granting it as to book publisher); <u>Bindrim</u>, 92 Cal. App. 3d at 73 (overturning jury verdict against book publisher but sustaining it as to the author based on publisher's good-faith reliance on author's assurance that character in novel was fictitious).

NYFS08...:\60\51660\0063\1631\BRF7135V.10A

published the book with a <u>subjective</u> awareness as to its
falsity -- that HarperCollins "<u>in fact</u> entertained serious
doubts" as to whether the book was true or false.  <u>St. Amant</u>,
390 U.S. at 731 (emphasis added); <u>Anderson</u>, 477 U.S. at 257.
This they cannot do.

The affidavits, depositions, documentary evidence and
expert testimony conclusively establish that HarperCollins had
relied in good faith on the journalistic reputation of Mr. Gold
and its evaluation of the credibility of Mr. Wilson, the book's
co-authors.  With respect to Mr. Gold, HarperCollins relied on
his strong reputation as a professional writer and particularly
his experience as a co-author of celebrity autobiographies.
Miller Aff. ¶ 6; Gavenchak Aff. ¶ 5; Shinker Dep. 33-35.

The record is also replete with evidence that
HarperCollins satisfied itself that Mr. Wilson was competent to
tell his story and collaborate in writing his autobiography.
Mr. Gold repeatedly assured Mr. Miller, the senior editor, and
Ms. Gavenchak, the outside lawyer reviewing the manuscript,
that Mr. Wilson was truthful as to his ability to recall
events, and that Mr. Gold was substantiating Mr. Wilson's story
where required.  Miller Aff. ¶¶ 7-9; Gavenchak Aff. ¶¶ 5-6, 8.
Moreover, Mr. Miller and Matthew Martin, the HarperCollins
attorney involved in the project, met with Mr. Wilson in person
and found him to be competent to tell his story.  Miller Aff.
¶ 15; Martin Aff. ¶ 24.

NYFS08...:\60\51660\0063\1631\BRF7135V.10A

Although it could have done so, HarperCollins did not rest on its appraisal of the authors' reliability.  It engaged experienced legal counsel to "vet" the manuscript for potential defamation problems.  As recounted at length in her affidavit, Ms. Gavenchak, in performing that role, worked intensively with Mr. Gold -- seeking corroboration and substantiation for those statements that raised potential concern, and only okaying them for publication once Mr. Gold satisfied her that they were truthful.  Gavenchak Aff. ¶¶ 4-10.  This process represents the antithesis of publication in reckless disregard of truth or falsity, and itself demonstrates why a finding that HarperCollins acted with actual malice is precluded as a matter of law.

In view of the foregoing, the record leads to only one inescapable conclusion:  no reasonable jury could find by clear and convincing evidence that HarperCollins published the book with knowledge that it was false or with reckless disregard as to its truth or falsity.

III. **PLAINTIFFS HAVE NOT MET THEIR BURDEN OF ESTABLISHING FAULT AS TO HARPERCOLLINS EVEN IF THEY ARE NOT PUBLIC FIGURES**

1. **New York's Standard of Care Governs Plaintiffs' Defamation Claims**

If either Audree Wilson or Carl Wilson is treated as a public figure, federal constitutional law mandates application of the actual malice test as discussed above.  If, however, either plaintiff is deemed to be a private figure, the standard

of fault as to HarperCollins will be governed by state law,
which states are free to define so long as they do not impose
liability without fault.  See Gertz, 418 U.S. 323.  In that
case a choice of law question is presented as to which state
will supply the controlling standard of care.

A federal court sitting in diversity must apply the forum
state's choice of law rules.  Klaxon Co. v. Stentor Electric
Mfg. Co., 313 U.S. 487 (1941).  New Mexico's choice of law
rules thus apply here.  In tort cases, New Mexico follows the
lex loci delicti or "place of the wrong" approach from the
First Restatement of Conflicts of Laws.[19]  Under the First
Restatement, "[t]he place of the wrong is in the state where
the last event necessary to make an actor liable for an alleged
tort takes place."  Restatement (First) of Conflict of Laws
§ 377 (1934).  However, when the choice of law question is
application of a standard of care, the First Restatement
provides a special rule.  Section 380(2), entitled "Application
of Standard of Care," provides as follows:

> Where by the law of the place of wrong, the
> liability-creating character of the actor's conduct
> depends upon the application of a standard of care,
> and such standard has been defined in particular
> situations by statute or judicial decision of the law

---

19.  See, e.g., Zamora v. Smalley, 68 N.M. 45, 358 P.2d 362
(N.M. 1961); First Nat'l Bank in Albuquerque v. Benson, 89 N.M.
481, 553 P.2d 1288 (N.M. App. 1976), cert. denied, 90 N.M. 7,
558 P.2d 619 (1976); Church v. Church, 96 N.M. 388, 630 P.2d
1243 (Ct. App. NM 1981).  See also Webb v. United States, 840
F. Supp. 1484, 1510 (D. Utah 1994) (applying New Mexico choice
of law rules in action under Federal Tort Claims Act).

of the place of the actor's conduct, such application of the standard will be made by the forum.[20]

New Mexico has followed Section 380(2), as illustrated by Wittkowski v. State.[21]  Wittkowski was a wrongful death action against New Mexico officials based on the murder of a Colorado resident in Colorado by escapees from a New Mexico prison.  The plaintiff alleged that New Mexico prison officials had breached their standard of care in overseeing New Mexico prison inmates.  Although the murder occurred in Colorado, which would generally be treated as the place of the wrong, the court held that because "[a]ll of the conduct of defendants allegedly leading up to the shooting occurred in New Mexico," under section 380(2), New Mexico law would supply the standard of care because that was the place of the defendants' conduct.

The comment following section 380(2) in the First Restatement illustrates further how this rule operates:  State X requires locomotives to carry a spark arrester; State Y has no such requirement.  A railway company operating a locomotive in State Y that causes a fire in State X is not liable because the governing standard of care is supplied by State Y -- the state in which the liability-creating character of the defendant's conduct occurred (installing or not installing a

_____

20.  First Restatement § 380(2).

21.  103 N.M. 526, 710 P.2d 93 (N.M. App. 1985), overruled in part on other grounds, Silva v. State, 103 N.M. 446, 745 P.2d 385 (N.M. 1987) (application of respondeat superior doctrine to actions under the Tort Claims Act).

42

spark arrester) -- and not by State X, the state in which the actual injury occurred.  First Restatement § 380(2), comment b.

These authorities mandate application of New York's standard of care in the instant case.  Irrespective of which state is regarded as the place of the wrong (New Mexico or that of the plaintiffs' domiciles), under the defamation law of each of the possible jurisdictions, "the liability-creating character of the actor's conduct depends upon the application of a standard of care."  <u>See</u> First Restatement § 380(2). Because New York, the place of HarperCollins' potentially "liability-creating conduct" -- its principal place of business and the state in which all of the pertinent pre-publication activities occurred (Martin Aff. ¶ 3) -- has defined a standard of care by judicial decision, the forum is required to apply that standard in the instant case.[22]

2.  <u>New York's "Gross Irresponsibility" Test</u>

The New York Court of Appeals, New York's highest court, has established that a private figure cannot recover for defamation based on subject matter that is "arguably within the

---

22.  <u>Cf.</u> <u>Davis</u> v. <u>Costa-Gavras</u>, 580 F. Supp. 1082, 1093 (S.D.N.Y. 1984) ("[L]ibel is a tort with widespread implications for interests of individual free expression and dissemination of ideas, and involves balancing the plaintiff's need for compensation against these competing interests.  In this respect, libel is less plaintiff-centered than other torts . . ..  Strong policy reasons exist for deciding issues whose major impact is on the behavior of potential defendants according to the rules of the jurisdiction where the conduct that gives rise to liability takes place, especially when that conduct may be protected speech.").

43

sphere of legitimate public concern" absent a showing, "by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." Chapadeau v. Utica Observer-Dispatch, Inc., 38 N.Y.2d 196, 199, 341 N.E.2d 569, 379, 571 N.Y.S.2d 61, 64 (1975).[23]

As applied to an action against a book publisher, summary judgment must be entered in favor of the defendant "upon an unrebutted showing 'that the publisher relied upon the integrity of a reputable author and had no substantial reason to question the accuracy of the information provided by such source.'" Naantaanbuu v. Abernathy, 816 F. Supp. 218, 226-27 (S.D.N.Y. 1993) (quotation omitted). This test is similar to that applied in the actual malice cases. Naantaanbuu provides an example.

The plaintiff in Naantaanbuu claimed that a passage in Reverend Abernathy's autobiography implied that she had an extramarital affair with Martin Luther King. The court granted

---

23. Issues of public concern are those "reasonably related to matters warranting public exposition." Chapadeau, 38 N.Y.2d at 199, 341 N.E.2d at 571. The question of whether an issue is one of public concern is within the discretion of editors and journalists and will not be disturbed absent a clear abuse of discretion. Gaeta v. New York News, Inc., 62 N.Y.2d 340, 349, 465 N.E.2d 802, 805, 477 N.Y.S.2d 82, 85 (1984). There is no basis for questioning HarperCollins' determination that the content of WOULDN'T IT BE NICE -- MY OWN STORY -- the life story of a famous musician -- is newsworthy.

HarperCollins' motion for summary judgment in view of the unrebutted showing that the publisher trusted the author, conducted a thorough editorial review, conducted a legal review of the book and generally followed its standard procedures for autobiographies.  816 F. Supp. at 227.  The court held that the plaintiff's allegation that the author was a "malicious, libelous liar" was insufficient to defeat the publisher's motion for summary judgment in view of the plaintiff's failure to come forward with affirmative evidence supporting its assertion.  Id.  See also Weiner v. Doubleday & Co., Inc., 74 N.Y.2d 586, 596, 54 N.E.2d 453, 457, 550 N.Y.S.2d 251, 255 (1989), cert. denied, 495 U.S. 930 (1990) (summary judgment for publisher of nonfiction book who relied on an author "whose experience and reputation are unquestioned" and conducted its own review of the contents of the book); Mingus v. Dell Pub. Co., 17 Media L. Rep. 1371 (N.Y. Sup. Ct. 1990) (summary judgment for publisher of Sam Shepard's biography who relied on a "reputable and recognized" author, reviewed the manuscript, questioned the author about his source, and had the book reviewed by counsel).

HarperCollins has far exceeded the requirements imposed on book publishers under the gross irresponsibility test and is thus entitled to judgment as a matter of law.  Akin to its pre-publication activities with respect to the biography at issue in Naantaanbuu, HarperCollins conducted a thorough editorial

and legal review of the book, had a good-faith basis for trusting both authors, and followed its standard procedures for publishing a celebrity autobiography.

3.   **Plaintiffs Cannot Meet Their Burden of Proving Fault Irrespective of Which State's Law is Applied**

Even if this court decides that New York should not supply the standard of care in the instant case, HarperCollins is entitled to summary judgment.  The remaining "choices" for supplying the substantive standard of care are New Mexico, the forum state, and California/Colorado, the states in which the plaintiffs are domiciled.  Courts following the First Restatement's choice of law rules have concluded that the "place of the wrong" is the state in which the plaintiff is domiciled because that is where the plaintiff likely incurred the greatest reputational injury, if any.[24]

Thus, Colorado law would govern Carl Wilson's claim and California law would apply to Audree Wilson.  In libel cases involving a private figure and a matter of public or general concern, Colorado has adopted the federal constitutional actual malice test set forth above.  _Diversified Management, Inc._ v.

---

24.  _See_, _e.g._, _Dworkin_ v. _Hustler Magazine, Inc._, 647 F. Supp. 1278 (D. Wyo. 1986) (Wyoming follows the First Restatement and would thus apply the law of plaintiff's domicile in a multistate defamation case (issue of first impression under Wyoming choice of law rules)); _Laxalt_ v. _McClatchy_, 116 F.R.D. 438 (D. Nev. 1987) (on the issue of privilege, Nevada, which follows the _lex loci_ rule of First Restatement, would apply the law of plaintiff's domicile). Neither of these cases involved choosing the governing standard of care.  _See_ _also_ First Restatement § 377 n.5, illus.7.

46

<u>Denver Post, Inc.</u>, 653 P.2d 1103 (Colo. 1982). Thus, under Colorado law, a private figure must establish that the defendant knew that the statement was false or made the statement with reckless disregard for whether it was true or not and must do so by clear and convincing evidence. <u>Id.</u> Accordingly, under the analysis of actual malice set forth above, HarperCollins is entitled to summary judgment as to Carl Wilson's libel claim irrespective of his status.

With respect to Audree Wilson's claim, California has determined that a private person must establish negligence on the part of the publisher in order to recover compensatory damages in an action for defamation. <u>See</u> <u>Brown</u> v. <u>Kelly Broadcasting Co.</u>, 48 Cal. 3d 711, 771 P.2d 406, 257 Cal. Rptr. 708 (1989).[25] Courts have routinely entered summary judgment for publishers in private figure cases governed by a negligence standard.[26] Under a negligence standard, a book publisher

---

25. New Mexico, the forum state, has also adopted the negligence standard. <u>Marchiondo</u> v. <u>Brown</u>, 98 N.M. 394, 402, 649 P.2d 462, 480 (1982).

26. <u>See</u>, <u>e.g.</u>, <u>Holden</u> v. <u>Clary</u>, 20 Media L. Rep. 1829 (E.D. Va. 1992) <u>Nesbitt</u> v. <u>Multimedia, Inc.</u>, 9 Media L. Rep. 1473 (W.D.N.C. 1982) (summary judgment for newspaper that followed its standard procedures in preparing the article); <u>Cefalu</u> v. <u>Globe Newspaper Co.</u>, 8 Mass. App. 71, 76-77, 391 N.E.2d 935, 938 (Mass. App. 1979) (summary judgment for newspaper), <u>cert. denied</u>, 444 U.S. 1060 (1980); <u>Turner</u> v. <u>Harcourt, Brace, Javanovich</u>, 5 Media L. Rep. 1437 (W.D. Ky. 1979) (summary judgment for magazine in private figure case); <u>Lake Havasu Estates, Inc.</u> v. <u>Reader's Digest</u>, 441 F. Supp. 489 (S.D.N.Y. 1977) (summary judgment for magazine publisher under Arizona's "simple" negligence standard); <u>Walters</u> v. <u>Sanford Herald, Inc.</u>, 
(continued...)

will be held to have acted reasonably as a matter of law when it relies on a reputable author and undertakes reasonable steps to gain a comfort level as to a book's accuracy.  The court's holding and reasoning in <u>Dresbach</u> v. <u>Doubleday & Co., Inc.</u>, 518 F. Supp. 1285 (D.D.C. 1981), provides an example of the application of this test.

<u>Dresbach</u> involved Doubleday's publication of the book <u>Life for Death</u> that allegedly identified the plaintiff as a co-conspirator and accessory to the murder of his parents. Applying a negligence test, the court stated:  "Clearly a publisher is not required to do independent research to verify everything written by a reputable author.  Unless there was some circumstance to raise suspicions, Doubleday, pursuing its own careful examination, was entitled to rely upon the efforts of [the author]."  <u>Id.</u> at 1292.   The court held that summary judgment in favor of the book publisher was warranted because Doubleday had, <u>inter alia</u>, relied on a reputable author, verified potentially libelous passages, reviewed the author's sources and engaged in extensive discussions with the author. <u>Id.</u>

---

26.  (...continued)
31 N.C. App. 233, 228 S.E.2d 766 (N.C. App. 1976) (summary judgment for newspaper under negligence standard); <u>Barbetta Agency, Inc.</u> v. <u>Evening News Pub. Co., Inc.</u>, 135 N.J. Super. 214, 343 A.2d 105 (N.J. App. 1975) (summary judgment for newspaper under negligence standard).

In the instant case, the record is clear that HarperCollins' pre-publication review of the book was reasonable. As set forth more fully above, HarperCollins exercised due care in the acquisition and editorial and legal reviews of the book. Individuals acting on behalf of HarperCollins carefully investigated the issue of whether Brian Wilson was competent to participate in writing his autobiography and, based on the representations of Todd Gold and their own interaction with Mr. Wilson, satisfied themselves that he was. Moreover, from the onset of the project, HarperCollins sought and received assurances from Mr. Gold that he and Mr. Wilson, as co-authors of the book, maintained ultimate responsibility for the content and editing of the manuscript and that the book would represent Brian Wilson's perspective, not that of Eugene Landy. Plaintiffs cannot provide any evidence to create a genuine issue as to any of these facts.

Defendant's expert, Lisa Drew, independently reached the same conclusion. Ms. Drew has gained distinction as a leading book editor over a 24-year period, during which she has acquired, edited and published approximately 350 books, at least 50 of which have been celebrity autobiographies. Drew Aff. ¶¶ 1, 4-6, 60. Based on that experience and her review of the record in this case, Ms. Drew has concluded that she has "rarely, if ever, seen a more diligent effort to confirm the

49

accuracy of a celebrity autobiography."  Drew Aff. ¶ 60.  Ms. Drew states that "there is absolutely nothing in the extensive record . . . to suggest that HarperCollins acted in anything other than exemplary fashion in publishing what it believed to be Brian Wilson's sincere and truthful effort to recount his life story."  Drew Aff. ¶¶ 9, 65.

Ms. Drew's analysis examines HarperCollins' conduct at each stage of the publishing process and concludes that it exceeded that of a reasonable book publisher each step of the way.  Drew Aff. ¶¶ 9, 65.  Respecting acquisition, Ms. Drew has dealt with the William Morris Agency and regards it as a premier agency that fairly represents the "qualities and characteristics of the authors and works" that it presents. Drew Aff. ¶ 25.  In Ms. Drew's view, the selection of Todd Gold for this project was appropriate in view of his strong reputation as a writer of celebrity autobiographies.  Drew Aff. ¶ 26.

With regard to the editorial process, Ms. Drew reviewed Mr. Miller's testimony about his meeting with Mr. Wilson and his interaction with co-author Mr. Gold and concludes that "Mr. Miller did exactly what an editor is supposed to do when faced with issues such as Brian Wilson's credibility and competence and the role of Eugene Landy."  Drew Aff. ¶ 43.  In Ms. Drew's view, there is "no evidence in the record to support plaintiffs' views that HarperCollins either knowingly or

50

recklessly ignored such issues, or acted unreasonably in addressing them." Drew Aff. ¶ 43. Respecting Ms. Gavenchak's legal review of the book, Ms. Drew concludes:

> I have reviewed the three days of deposition testimony given by Ms. Gavenchak, in which she testifies at great length about her initial concerns with the manuscript and what she and Mr. Gold did to resolve them. It is clear from Ms. Gavenchak's testimony that she was careful and thorough in her review of this book and that her concerns were dealt with and resolved in a fashion that should have satisfied any prudent book publisher. . . . There is no question, based upon my review of the procedures employed by Ms. Gavenchak, as to the highly professional and good-faith nature of the examination she conducted or as to the reasonableness of the conclusions she drew.

Drew Aff. ¶¶ 49, 54.

In sum, judged under the standard of a reasonable book publisher, "HarperCollins fully met and indeed considerably exceeded the standard of care imposed by law upon book publishers in defending defamation suits." Drew Aff. ¶¶ 9, 65.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of HarperCollins as to each of plaintiffs' claims for relief.

WHEREFORE, HarperCollins prays for judgment dismissing the complaint in its entirety and for the award of its costs and expenses, and such other relief as the court deems just and appropriate.

Dated:  August 15, 1995

                    RODEY, DICKASON, SLOAN,
                    AKIN & ROBB, P.A.


                    By _William S. Dixon_____
                         William S. Dixon

                    Post Office Box 1888
                    Albuquerque, New Mexico 87103
                    Telephone: (505-765-5900)

                    R. Bruce Rich
                    Katherine J. Daniels
                    Elizabeth Stotland Weiswasser
                    WEIL, GOTSHAL & MANGES
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone: (212) 310-8000

                    Attorneys for Defendant,
                    HarperCollins Publishers, Inc.

NYFS08...:\60\51660\0063\1631\BRF7135V.10A

We hereby certify that a copy of the foregoing was hand-delivered to Ernesto Romero and forwarded via overnight service to Beth Dumas this 15th day of August, 1995, at the following addresses:

Ernesto J. Romero
3602 Campus Boulevard, NE
Albuquerque, New Mexico 87106

Beth Dumas
Landberg, Leslie & Gabriel
2049 Century Park East
Suite 3030
Los Angeles, California 90067

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By _____
       William S. Dixon

17

Shinker

1
2  magnitude of a $250,000 advance for an
3  autobiography -- withdrawn.
4        In 1990, was a $250,000 advance
5  for an autobiography a sizable advance?
6              MR. RICH:  Object to the form.
7        You can answer.
8        A.    Rephrase the question.  I am
9  still confused.
10             MS. DUMAS:  Read the question
11  back, please.
12             (Question read.)
13  ("Q.    In 1990, was a $250,000
14  advance for an autobiography a sizable
15  advance?")
16             MR. RICH:  I restate my
17  objection.
18        A.    I think that -- I am just trying
19  to figure how precisely how to answer this
20  question.  Any time you're talking about a
21  six-figure amount of money, you know, from one
22  standpoint, it's a lot of money.  In the
23  spectrum of autobiographies, it was in
24  probably the lower quarter of what one would
25  spend for a celebrity autobiography.

CLASSIC REPORTING, INC. (212) 268-2590

18

Shinker

1
2        Q.    During your tenure at
3  HarperCollins, what autobiographies received a
4  higher advance?
5        A.    Oliver North, Dan Quayle, I think
6  Ginger Rogers, I can't quite -- Hank Aaron,
7  those are the ones that come to mind.
8        Q.    What were the amount of the
9  advances for the books you just mentioned?
10             MR. RICH:  Do you have a problem
11  putting that on the public record?
12             THE WITNESS:  I do.
13             MR. RICH:  Pending a
14  confidentiality or other restrictive
15  treatment, the witness should not
16  answer on the public record.  Are you
17  comfortable talking in terms of order
18  of magnitude in relation to the advance
19  so we can advance the deposition
20  without disclosing details?
21             THE WITNESS:  I think I can.
22        A.    I can tell you that I know that
23  in the first two books that I mentioned with
24  Oliver North and Dan Quayle, there were signed
25  agreements that we would not disclose those

CLASSIC REPORTING, INC. (212) 268-2590

19

Shinker

1
2  amounts of money, I am quite sure.  I can tell
3  you that in the case of Ollie, it was what I
4  would characterize substantial seven figures.
5  And in the case of Mr. Quayle, it was very
6  close to seven figures.  If you look in the
7  press, you might see some numbers that might
8  contradict that.
9        Q.    That's sufficient.  I don't need
10  any more information than that.
11             Can you give me a range for the
12  advance on the Ginger Rogers book?
13        A.    I don't precisely remember the
14  number.  I think it was under $500,000.
15        Q.    What was the range of the advance
16  for the Hank Aaron autobiography?
17        A.    It was somewhere between, I think
18  $450- and $600,000.
19        Q.    During your tenure at
20  HarperCollins, what autobiographies did
21  HarperCollins publish for which the advance
22  was less than $250,000?
23        A.    I hope you understand that these
24  are not comprehensive lists that I am giving
25  you.  There is no way that I could remember.

CLASSIC REPORTING, INC. (212) 268-2590

20

Shinker

1
2  In my time we probably published -- I hate to
3  even think about it -- somewhere between 4-
4  and 10,000 different titles, so Ricky
5  Henderson, you said the question was less
6  than?
7        Q.    Less than $250,000.
8        A.    Ricky Henderson, Bud Webb, Whitey
9  Herzog.  There were lots of them.  I can't
10  remember all of them.
11        Q.    During your tenure at
12  HarperCollins, what autobiographies had an
13  advance of approximately equal to $250,000?
14             MR. RICH:  If you recall.
15        A.    Something in the same ballpark
16  was Roseanne Barr, her first autobiography.
17        Q.    Any others that you remember?
18        A.    No.
19        Q.    In 1990, what sales expectations
20  did HarperCollins have for an autobiography
21  that would receive a $250,000 advance?
22             MR. RICH:  General question, not
23             related specifically to this work, is
24             that your question?
25             MS. DUMAS:  Yes.

CLASSIC REPORTING, INC. (212) 268-2590

33

Shinker

1  My real question to you is, given
2
3  your understanding that the public record
4  generally disclosed the fact that Brian Wilson
5  experienced a twenty-year nightmare of drugs,
6  alcoholism, obesity and mental illness, did
7  those facts cause you to have any concern
8  about Brian Wilson's ability to complete the
9  book?
10     A.   No, because it was also not of
11  public record that he once again had just
12  released an album, as it mentions later on in
13  this document, and he was working with a
14  professional writer, Todd Gold.  So in terms
15  of completing the book, you know, we had every
16  reason to believe that the book would be
17  completed and they would deliver on a schedule
18  that had been negotiated.
19     Q.   Did the purported fact that Brian
20  Wilson suffered a twenty-year nightmare of
21  drugs, alcoholism, obesity and mental illness
22  cause you to have any concern about Brian
23  Wilson's ability to accurately remember events
24  and conversations at about the time that this
25  memo was issued?

CLASSIC REPORTING, INC. (212) 268-2590

34

Shinker

1
2     MR. RICH:  Object to the form.
3  You can answer.
4     A.   Repeat the question or read the
5  question back.
6        (The record was read back as
7  follows:
8        "Q.   Did the purported fact
9  that Brian Wilson suffered a
10  twenty-year nightmare of drugs,
11  alcoholism, obesity and mental illness
12  cause you to have any concern about
13  Brian Wilson's ability to accurately
14  remember events and conversations at
15  about the time that this memo was
16  issued?")
17        THE WITNESS:  Could I talk to
18  you?
19        MR. RICH:  You can talk to me at
20  any time.  If it's in relation to how
21  you answer a pending question, you can
22  ask for clarification.
23     A.   I think in general I was aware of
24  from reading the popular press and my
25  knowledge of culture and music that he had

CLASSIC REPORTING, INC. (212) 268-2590

35

Shinker

1
2  gone through this phase of his life.  The fact
3  that he was working with a widely respected
4  People magazine reporter who had done this
5  sort of as-told-to-autobiography in the past
6  and the representations that were made to us
7  by the William Morris Agency, I felt that he
8  would write, with Mr. Gold, an autobiography.
9     Q.   Did you have any concern about
10  Brian Wilson's ability to accurately remember
11  events and conversations?
12        MR. RICH:  I believe that was the
13     same question you just asked.  If you
14     want to embellish your answer, go
15     ahead.
16     A.   No more than I just stated.
17     Q.   Is it your statement that you had
18  a concern about Brian Wilson's ability to
19  accurately remember events and conversations
20  but that the answer you just gave me is why
21  that concern was resolved?
22        I don't want to put words in your
23  mouth, and I don't really think you responded
24  to my question.
25        MR. RICH:  He really did respond

CLASSIC REPORTING, INC. (212) 268-2590

36

Shinker

1
2  to your question.  You may not like the
3  response.
4        MS. DUMAS:  I don't think so.  I
5     think his answer went to the subject of
6     Mr. Gold working with Mr. Wilson, and I
7     was really ask about --
8        MR. RICH:  How he developed a
9     comfort level.  As long as we're
10     characterizing, I will characterize,
11     too.
12        If you care to embellish your
13     answer further, you may.
14     Q.   My question again is did you have
15  any concern about Brian Wilson's ability to
16  accurately remember events and conversations?
17        MR. RICH:  Objection; asked and
18     answered.
19        You can answer again.
20     A.   I think I answered that question.
21     Q.   Did you think Brian Wilson had
22  the ability to accurately remember events and
23  conversations?
24     A.   I mean that's -- the trouble I am
25  having that's a very broad question.  I can't

CLASSIC REPORTING, INC. (212) 268-2590

57

Shinker

1
2   that way.
3       Q.   How would you characterize it?
4       A.   My concern was that being aware
5   of the press coverage and some people's
6   negative view of Landy and Brian Wilson's
7   relationship or the nature of their
8   relationship, that we -- what we wanted to
9   publish was his, meaning Brian's,
10  autobiography.
11      Q.   Did you understand from your
12  reading some people to have the opinion that
13  Landy was a sort of Svengali-type figure to
14  Brian Wilson?
15      A.   I don't know if I would use that
16  exact term.  But that, you know -- I remember
17  that there were allegations that he had
18  influence over Brian.
19      Q.   Are you thinking of a pernicious
20  influence or a benign influence?
21      A.   I think some people pernicious, a
22  pernicious influence.
23      Q.   Do you remember any discussions
24  with Jim Fox or Matthew Martin on the subject
25  of Eugene Landy's reputation?

58

Shinker

1
2       A.   I don't specifically recall.  I
3   don't recall any specific discussions.  But in
4   general yes, I am sure we discussed it.
5       Q.   Let me see if I could refresh
6   your recollection.
7            MS. DUMAS:  I am marking as
8       Shinker Exhibit 3, HC00634, a page of
9       handwritten notes.
10           (Page of handwritten notes,
11           bearing production No. HC00634,
12           marked Shinker Exhibit 3 for
13           identification, as of this date.)
14      Q.   Do you recognize the handwriting
15  on these notes?
16           As you read these notes, does it
17  refresh any recollection you have of
18  conversations with Jim Fox?
19           MR. RICH:  Are you implying that
20      these are Jim Fox's notes by your
21      question?
22           MS. DUMAS:  I am fairly certain
23      that these are either Jim Fox's notes
24      or Matthew Martin's notes.
25           MR. RICH:  You should be fairly

59

Shinker

1
2       certain they are Matthew Martin's notes
3       because you questioned him about them
4       the other day and he said they were his
5       notes, and he didn't recall when they
6       were written or whether they were
7       written at separate times.
8            MS. DUMAS:  It wasn't out of
9       desire to trick Mr. Shinker.  I
10      obviously have forgotten.  There were
11      obviously some notes that were Mr.
12      Martin's that turned out to be Mr.
13      Fox's.
14      Q.   As Mr. Rich just reminded us that
15  Mr. Martin authenticated these notes, does
16  this refresh your recollection of any
17  discussion you had with either Mr. Martin or
18  Mr. Fox?
19           MR. RICH:  On the subject of
20      Landy?
21           MS. DUMAS:  Yes.
22           MR. RICH:  You can answer.
23      A.   The question is does this refresh
24  my memory about discussions?
25      Q.   I will read you part of the

60

Shinker

1
2   notes, part of Mr. Martin's note:  "Bill
3   Shinker insisted that BW sign contract and
4   guaranty letter.  Would not tolerate Landy
5   signing for Brains & Genius.  Bill didn't
6   trust Landy; didn't want Landy involved."
7       A.   That's what that says.
8            MR. RICH:  That's what Mr.
9       Martin testified, contract and guaranty
10      letter, shorthand for those, yes.
11           THE WITNESS:  Okay.
12      A.   Some of this is consistent
13  with -- it's generally consistent with my
14  attitude.  I would not necessarily
15  characterize -- I would not necessarily agree
16  with characterization that Bill didn't trust
17  Landy.
18      Q.   What about that characterization
19  do you disagree with?
20           MR. RICH:  I think he testified
21      to that about five or six questions
22      ago.
23           You can testify further.
24      A.   My -- since I never met Mr.
25  Landy, my position was that I wanted this to

61

```
 1              Shinker
 2  be Brian Wilson's book.  So it's not a
 3  question of not trusting Mr. Landy, it was a
 4  question of this is Brian Wilson's book.
 5       Q.   Do you have any understanding of
 6  how it is Mr. Martin got the impression that
 7  you didn't trust Landy?
 8            MR. RICH:  You have to ask Mr.
 9       Martin that question.
10            THE WITNESS:  Right.
11            MR. RICH:  Mr. Shinker is a lot
12       of good things, but he is not a mind
13       reader.
14            MS. DUMAS:  I am asking if he has
15       any understanding.
16       A.   No.
17       Q.   Is it true that you would not
18  tolerate Landy for signing for Brains and
19  Genius?
20       A.   Yes, generally, yes.  My position
21  was that this was a contract, this is Brian
22  Wilson's autobiography and that Brian Wilson
23  is the one that would sign the contract.
24       Q.   Is it true that you didn't want
25  Landy involved?
```

CLASSIC REPORTING, INC. (212) 268-2590

63

```
 1              Shinker
 2  answer beyond that, then I won't waste your
 3  time and that's okay, we will move on.  It's
 4  true I don't want to waste your time.  If
 5  that's your answer, then that's your answer.
 6            Is it true that you insisted that
 7  Brian Wilson sign a guaranty letter?
 8       A.   I think it was common -- it was
 9  our common practice if a contract for the
10  individual is made out to a corporate entity,
11  that the actual author of the book would then,
12  in addition to signing the contract would also
13  sign a guaranty letter and in this case we
14  were, in addition to his cooperation to do the
15  book we wanted him to do publicity and make
16  himself available to do that.
17       Q.   What did you understand to be the
18  corporate entity that HarperCollins was
19  contracting with for the book?
20       A.   I am reminded by looking at this
21  document it was a company called Brains and
22  Genius I guess.
23       Q.   Did you have an understanding of
24  whether Landy was a principal in Brains and
25  Genius?
```

CLASSIC REPORTING, INC. (212) 268-2590

62

```
 1              Shinker
 2            MR. RICH:  In what?
 3            MS. DUMAS:  The question stands.
 4            MR. RICH:  Objection.  Vague.
 5       Ambiguous.
 6            You can answer.
 7       A.   I certainly -- I have no control
 8  over who people associate with.  But my
 9  concern was limited to this book and who was
10  going to sign the contract.  And that this be,
11  I said this now 20 times, that this be Brian
12  Wilson's autobiography as told to Todd Gold.
13       Q.   What about the fact of the book
14  being an autobiography made it undesirable for
15  Landy to be involved in its authorship?
16            MR. RICH:  My God, asked and
17       answered at least half a dozen times
18       today.  It's your choice how to use
19       your remaining 40 minutes, but I
20       certainly don't think you're getting
21       anywhere.
22            You can answer again, if you care
23       to.
24       A.   An autobiography is --
25       Q.   If you are not going to have any
```

CLASSIC REPORTING, INC. (212) 268-2590

64

```
 1              Shinker
 2       A.   You know, I don't really recall.
 3  You know, I think it depends on when the
 4  understanding would have taken place.
 5       Q.   Does this refresh your
 6  recollection, prior to publication, what was
 7  your understanding of Brains and Genius?
 8       A.   Prior to September, October of
 9  1991?
10       Q.   Yes.
11       A.   Was that it was a --
12       Q.   I am, by the way, I am asking
13  that question as to prior publications because
14  we have a relevancy dispute and I just want to
15  make my questions clean so they are not
16  objectionable.
17       A.   I want to make sure what you
18  meant by publication is what I mean,
19  publication date of the book, sometime in the
20  fall of 1991.
21       Q.   Yes.  Prior to publication of the
22  book, what did you understand to be Landy's
23  involvement with Brains and Genius?
24       A.   As I recall, my understanding was
25  that Brains and Genius was a corporate name
```

CLASSIC REPORTING, INC. (212) 268-2590

NSRA

ML 01086

1          MR. EDWARDS:  It sounds like there may be

2   some more destruction problems.

3          MR. FLYNN:  Or spoliation as the case may

4   be. .

5          THE WITNESS:  I did try to -- I thought she

6   would be easy to get everything from, and she didn't

7   have it.

8   BY MR. FLYNN:

9      Q.    Let's talk for a little bit about interviews

10  with other people that you taped.  Can you identify

11  the -- anyone else that you had taped interviews with

12  in connection with the preparation of the book

13  Wouldn't It Be Nice?

14     A.    Yes.  Al Jardine, Bruce Johnstone, Danny

15  Hutton, Tony Asher, Van Dyke Parks.  There were

16  some -- there were a few people, associates of Landy's

17  that I talked to and remember taping but I don't know

18  if I ever saved those tapes because I never used them

19  in the book.

20     Q.    Who were those people?

21     A.    I don't remember.

22     Q.    Kevin Leslie?

23     A.    No, not Kevin.

24     Q.    Rocky Pamplin?

25     A.    No.  They were doctors who had treated

162

1   Brian's teeth and Landy thought they would have some

2   insight.

3       Q.    How about Gary Usher?

4       A.    No.

5       Q.    Roger Christian?

6       A.    No.

7       Q.    Any of the other Beach Boys?

8       A.    No.

9       Q.    David Marks?

10      A.    No.

11      Q.    Did you ever talk to David Marks?

12      A.    No.

13      Q.    Did you ever make an effort to talk to David

14  Marks?

15      A.    I don't remember.

16      Q.    You're aware that "People" just did a piece

17  on him?

18      A.    I am, and I am the one who told the reporter

19  to call Mike for a comment.

20      Q.    You didn't do the piece, though?

21      A.    No.

22      Q.    Carl Wilson I know refused an interview; is

23  that correct?

24      A.    For -- for the book?

25      Q.    For the book.

163

ML 01124

1        A.    Yes.

2        Q.    And Audree refused an interview?

3        A.    Yes.

4        Q.    Marilyn refused an interview?

5        A.    Yes.

6        Q.    How about Shane Wilder?

7        A.    I don't know who that is.

8        Q.    What about Bob Norberg?

9        A.    I never contacted him.

10       Q.    What about Chuck Britz?

11       A.    I never contacted him.

12       Q.    Jim Tierney, did you do an interview with

13    Tierney?

14       A.    No.

15       Q.    Or Little?

16       A.    No.

17       Q.    Mason?

18       A.    No.

19       Q.    Branca?

20       A.    No.

21       Q.    Gaines?

22       A.    No.

23       Q.    Steve Gaines?

24             David Leaf?

25       A.    No.

164

1     Q.   Did you have reservations about doing this

2  project because Brian was potentially mentally ill?

3        MR. EDWARDS:  Objection.  Assumes facts not

4  in evidence.

5        THE WITNESS:  No.

6  BY MR. FLYNN:

7     Q.   Now, again, I want to be fair to you.

8  You're represented here today by Mr. Block; is that

9  correct?

10    A.   Yes.

11    Q.   And before being represented by Mr. Block

12  you were represented by Vincent Cox and Slade Metcalf;

13  is that correct?

14    A.   Yes.

15    Q.   And I've seen your declaration that you

16  filed in connection with their withdrawing as your

17  counsel.

18        MR. BLOCK:  Well --

19        MR. EDWARDS:  Objection.  How does he know

20  if you've seen it?

21        MR. BLOCK:  Right.

22  BY MR. FLYNN:

23    Q.   Do you remember doing that declaration,

24  Todd?

25    A.   Yes.

182

```
 1        A.     No.

 2               MR. BLOCK:  I'm going to --

 3               THE WITNESS:  Sorry.

 4               MR. BLOCK:  Allow me to intercede with an

 5     objection before you answer.

 6     BY MR. FLYNN:

 7        Q.     Did you have reservations about Brian's

 8     competency when you undertook the project?

 9               MR. BLOCK:  I'm going to object.  Vague and

10     ambiguous as with respect to the term "competency."

11               MR. EDWARDS:  I also believe it's been asked

12     and answered.

13               MR. BLOCK:  It has.

14               Go ahead.

15               THE WITNESS:  I don't understand what you

16     mean by "competency."

17     BY MR. FLYNN:

18        Q.     As a journalist the reliability of your

19     sources is a fundamental issue; isn't that true?

20               MR. BLOCK:  Objection.  Vague and

21     ambiguous.

22               THE WITNESS:  Yes.

23     BY MR. FLYNN:

24        Q.     Did you have any concern when you undertook

25     the writing of Wouldn't It Be Nice as to the
```

197

ML 01158

1   reliability of Brian Wilson because of his mental

2   health?

3          MR. BLOCK:  Object.  Vague and ambiguous.

4   Asked and answered.

5          Go ahead.

6          THE WITNESS:  I didn't have any reservations

7   about Brian being able to tell me a story, tell me --

8   answer questions about his life and his career.

9   BY MR. FLYNN:

10      Q.    Did you have any reservations about whether

11   what he would tell you would be accurate or not?

12      A.    I don't remember.

13      Q.    At any time during the writing of the book,

14   did you become concerned about the accuracy of

15   statements Brian was making to you?

16      A.    Not really.

17      Q.    When you say "not really," what do you mean?

18      A.    I mean, things -- what he said seemed to

19   correspond to -- seemed to correspond or parallel what

20   had been written in other books or in articles.

21      Q.    Well, you wrote -- you made statements in

22   the book relating to Brian owning the copyrights to

23   his songs.

24          Do you recall that?

25      A.    Yes.

198

ML 01159

*pages 201 and 202 have been inadvertently reversed.*

1   impression is that when he knew something he an:
2   it.  When he didn't, he didn't answer it.
3       Q.    Now, generally when he didn't answer
4   he say "I don't know" or "I don't remember"?
5               MR. BLOCK:  Objection.  Compound.  Vague and
6   ambiguous.
7               THE WITNESS:  I can't recall.
8   BY MR. FLYNN:
9       Q.    Did you question Brian when you had these
10  interview sessions with him in preparation of the book
11  about his medications?
12      A.    No.
13      Q.    Did you ever ask Brian about his
14  medications?
15              MR. EDWARDS:  Objection to the extent it
16  assumes the fact that the witness knew he was on
17  medication.
18              THE WITNESS:  Repeat your question.
19  BY MR. FLYNN:
20      Q.    I want to know while you were preparing the
21  book whether you ever asked Brian about what
22  prescriptive drugs he was taking for his problems.
23      A.    One -- well, once.
24      Q.    What did you ask him?
25      A.    "What's that pill you're taking?"

                                                202

ML 01163

1    remember anything else.

2         MR. BLOCK:  Can we go off the record for a

3    second.

4         (Pause in proceedings.)

5    BY MR. FLYNN:

6    Q.    When the conservatorship proceedings were

7    pending while you were writing the book, did you

8    become concerned about the reliability of Brian as a

9    source of material for the book?

10   A.    I asked Brian questions and he answered

11   them, and when he didn't know an answer he said he

12   didn't know.

13   Q.    Did he ever tell you that he couldn't

14   remember?

15   A.    Probably.  I'm sure.

16   Q.    Did he often say that he couldn't remember?

17        MR. BLOCK:  Objection.  Vague and

18   ambiguous.

19        THE WITNESS:  I don't remember.  I mean, I

20   can't characterize that.

21   BY MR. FLYNN:

22   Q.    Did you ever get the feeling from him that

23   he was making up information on the spot because you

24   were asking him questions?

25   A.    No, I didn't get that impression.  My

201

1            THE WITNESS:   Prepublication?

2  Postpublication?

3  BY MR. FLYNN:

4      Q.     Any time.

5      A.     Alone?

6      Q.     With anyone.

7      A.     I met with -- I saw Matthew Martin once.

8      Q.     When, prepublication?

9      A.     Yes.

10     Q.     When was that?

11     A.     I don't know the time.  Prior to

12  publication.

13     Q.     What was discussed?

14     A.     He -- he asked Brian if he thought -- what

15  he thought about the book, if he had been involved in

16  the book, if he thought it was accurate, things along

17  those lines.

18     Q.     What did Brian say?

19     A.     He -- I don't recall exactly what he said

20  but he was very enthus- -- he said things along the

21  lines that he was very enthusiastic about the book;

22  that he had been involved throughout; that it was

23  accurate; that, you know, it really captured his

24  personal trip, something along that -- those lines.

25     Q.     Are you finished?

                                        223

ML 01184

1      A.     Yes.

2      Q.     Did Brian say he had read the book?

3      A.     I can't -- in that discussion I think so.  I

4  can't answer exactly, but I think that was part of the

5  reason that Matthew flew out, is to find out, you

6  know, the extent that Brian had been involved.

7      Q.     How long before publication was this?

8      A.     I don't remember.

9      Q.     A matter of months?

10      A.     I don't remember.  If I was going to

11  estimate I would say a matter of months.  I don't

12  remember at all.

13      Q.     Was it after you sent the memo to Fox about

14  not having the book sent -- the manuscript sent out to

15  anyone before publication?

16      A.     I don't remember.

17      Q.     And I believe that was dated June 24th,

18  1991; does that refresh your memory at all?

19      A.     No.

20      Q.     What else was said in the meeting with Brian

21  and Mr. Martin?

22      A.     I don't -- I remember Brian played him some

23  song or they went in the studio and played -- I don't

24  know if he played on a piano or had, you know, Kevin

25  Leslie play a tape of a song.  I remember that,

                                            224

1   otherwise I don't know what else.

2       Q.    Was Landy present?

3       A.    No.

4       Q.    This was after Landy had been -- a court

5   order had been issued separating Landy and Brian?

6       A.    I'm not sure of the dates.

7           MR. BLOCK:  We don't want you to speculate.

8   You have to testify from your personal knowledge.

9           THE WITNESS:  I don't recall any of the

10  dates.

11  BY MR. FLYNN:

12      Q.    Did Martin call you in advance of coming

13  out?

14      A.    He must have.

15      Q.    Did he send you a letter?

16      A.    I don't remember.

17      Q.    What did you understand to be the purpose of

18  his visit?

19          MR. BLOCK:  Objection.  Asked and answered.

20          Go ahead.

21          THE WITNESS:  Exactly that, I think they

22  wanted to know if Brian had been involved in the

23  book.

24  BY MR. FLYNN:

25      Q.    And they wanted to know whether this was

                                          225

ML 01186

1    accurate?

2       A.    If he had been involved in -- in the

3    interviews, you know, if it was accurate as much as he

4    knew, if he was happy with it.  That's the gist of

5    what I recall.

6       Q.    Did Martin say in this meeting that he had

7    spoken to Jim Tierney on the telephone?

8       A.    I don't recall.

9       Q.    Did Martin say in this meeting that some of

10   Brian's other representatives were contesting the

11   accuracy of the book?

12          MR. EDWARDS:  Objection.  Assumes facts not

13   in evidence.

14          MR. BLOCK:  I'll join.

15          Go ahead.

16          THE WITNESS:  I don't remember.

17   BY MR. FLYNN:

18      Q.    Do you have any memory of it being an issue

19   that some of Brian's representatives were trying to

20   stop publication and you and Brian were trying to go

21   forward with the publication?

22          MR. EDWARDS:  Objection.  That was asked and

23   answered extensively during the earlier part of this

24   deposition.

25          MR. BLOCK:  It's also vague and ambiguous.

226

1          mental illness."

2          Do you see that?

3     A.   Yes.

4     Q.   When you were writing the book did you

5 understand that to be true?

6          MR. BLOCK:  Objection.  Asked and answered.

7 Compound.  You're harassing the witness.

8          Go ahead.

9          THE WITNESS:  I don't remember.  I don't

10 remember what's in the book so I can't comment on

11 that.  Just as some of this other stuff doesn't ring

12 true.

13 BY MR. FLYNN:

14     Q.   What doesn't ring true?

15     A.   Now that you refresh me the sentence that

16 you were talking about that starts, "Since

17 approximately 1970, Brian's mental illness, diagnosed

18 as paranoid schizophrenia, has rendered him virtually

19 dysfunctional as a member of the Beach Boys," but I

20 now I remember there was a big campaign in 1976, I

21 think around then, "Brian is back."  I remember it was

22 on the cover of magazines.  So he seemed functional.

23     Q.   Where did you learn about the "Brian is

24 back" campaign?

25     A.   It just -- from -- I'm remembering it from

                                                363

1    the book, I'm remembering it from magazines, I think I

2    remember it from when I was little at the time, well,

3    not little, but whatever age I was at the time.

4         Q.    Which magazine do you remember reading?

5         A.    I believe there was a story in Rolling

6    Stone, People magazine, and others.  I think they did

7    a TV special too, NBC.

8         Q.    And the Rolling Stone article was written by

9    Steven Gaines; is that correct?

10        A.    I don't know who wrote it.

11        Q.    Did you read the book Heroes & Villains?

12        A.    Yes.

13        Q.    Did you read the Rolling Stone article?

14        A.    I think so.

15        Q.    Did you read the Rolling Stone article in

16   connection with your preparation for the book?

17        A.    I think so.

18        Q.    Just so the record is clear, this is the

19   Rolling Stone article relating to the "Brian is back"

20   campaign; is that correct?

21        A.    I think so.  I can't -- I'm working off

22   recall, but I can't say exactly.

23        Q.    And do you know what that Rolling Stone

24   article states with regard to the "Brian is back"

25   campaign, as you sit here today?

364

1  JAMES E. HORNSTEIN
   BRIAN L. EDWARDS
2  GREENBERG, GLUSKER, FIELDS,
    CLAMAN & MACHTINGER
3  1900 Avenue of the Stars
   Suite 2000
4  Los Angeles, California  90067-4590
   (310) 553-3610
5
6  Attorneys for Defendant
   HARPERCOLLINS PUBLISHERS, INC.
7
8              UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA
10
   MICHAEL E. LOVE,                )    CASE NO. CV 92 6608 WJR
11                                 )    (GHKx)
             Plaintiff,            )
12                                 )
       v.                          )
13                                 )    DECLARATION OF DONALD S.
   HARPERCOLLINS PUBLISHERS, a     )    ENGEL
14 corporation; BRIAN D. WILSON,   )
   an individual, by and through   )
15 JEROME S. BILLETT as            )
   Conservator of the Estate and   )
16 Person of BRIAN D. WILSON;      )
   TODD GOLD, an individual;       )
17 EUGENE LANDY, an individual;    )
   and DOES 1 through 50,          )
18 inclusive.                      )
                                   )
19           Defendants.           )
   _____)
20
21
22 DONALD S. ENGEL DECLARES:
23
24      1.   I am an attorney and a member of the law firm of Engel
25 & Engel.  I was admitted to the New York Bar in 1959 and the
26 California Bar in 1977.  My experience includes extensive work-
27 in the publishing field; among other things, I have reviewed (or
28 "vetted") more than 300 books for possible defamation problems.

1  The facts set forth in this Declaration are personally known to

2  me, and if called as a witness I could and would testify

3  competently to those facts under oath.

4

5     2.    Although I had previously represented the Beach Boys

6  as a group in connection with certain matters, I first began to

7  represent Brian Wilson personally in about January 1991.  I was

8  initially retained to oversee and supervise the several other

9  lawyers performing legal services for Brian on all his business

10 and personal matters.

11

12    3.    One of my earliest tasks was to try to resolve the

13 then-pending conservatorship proceeding that had been initiated

14 in May 1990 by Brian's cousin, Stan Love.  It was my opinion,

15 based on many conversations and meetings, that Brian was

16 mentally competent during the period that I represented him.  If

17 I had thought Brian was not competent, I would not have

18 represented him in attempting to resolve the conservatorship

19 proceeding.

20

21    4.    While representing Brian, I learned that HarperCollins

22 Publishers, Inc. ("HarperCollins") was planning to publish

23 Brian's autobiography, entitled "Wouldn't It Be Nice?" (the

24 "Book").

25

26    5.    In June 1991, Brian specifically authorized me to

27 represent him in connection with "any and all dealings

28 concerning" the Book.  A true and correct copy of a letter dated

1   June 18, 1991, from Brian to me which sets forth this authority

2   is attached to this Declaration as Exhibit A.  As Exhibit A

3   indicates, Brian copied his letter to several other people,

4   including Matthew Martin, whom I understood to be a

5   HarperCollins representative working on the Book.

6

7       6.   As a result of Brian's instructions to me, I had many

8   discussions concerning the Book with Brian, Matthew Martin and

9   others over a period of several months.  My meetings and

10  telephone conversations with Matthew Martin concerning the Book

11  took place from late June through October of 1991.

12

13      7.   My first meeting with Matthew Martin in person

14  occurred on about July 17, 1991, when I met with him, Brian,

15  Todd Gold (co-author of the Book) and Kevin Leslie (an assistant

16  of Brian's) in order to discuss the Book.  During that meeting,

17  Matthew Martin and I discussed HarperCollins' requirement that

18  the Book be a work that Brian believed in and supported.  I told

19  him that I was equally concerned that the Book be Brian's

20  product.

21

22      8.   My second meeting with Matthew Martin took place on

23  about July 19, 1991, when Matthew Martin came to my office.  I

24  had obtained a copy of the Book galleys either during or shortly

25  after our July 17 meeting, and by the time of our second meeting

26  I had read about 200 pages of those galleys.  During our July 19

27  meeting at my office, I told Matthew Martin that:

28

1          a.   I had found nothing which concerned me in the

2    portion of the Book galleys that I had read;

3          b.   I thought Todd Gold had done an excellent job on

4    the Book; and

5          c.   Dr. Garrett O'Connor, a psychiatrist who had been

6    examining Brian in connection with the conservatorship

7    proceeding, had told me that it was his opinion that Brian was

8    competent (although emotionally and psychologically frail).

9

10        9.   My next contact with Matthew Martin was a telephone

11   conversation on about July 24, 1991.  By then, I had finished

12   reading the Book galleys.  I told Matthew Martin that the Book

13   appeared to reflect Brian's opinions, although I did express

14   some concern about material regarding Brian's brother, Carl --

15   specifically, two or three passages in the Book that we felt

16   might be overly harsh (although I did not consider them

17   libelous).  Brian and I both wanted to make certain changes to

18   those passages and I suggested those changes to Matthew Martin.

19   It is my understanding that the changes I suggested -- none of

20   which dealt with Michael Love -- were made.

21

22        10.  During our July 24 meeting, Matthew Martin and I also

23   discussed other issues relating to the conservatorship

24   proceeding and the Book, such as Brian's obligation to undertake

25   a promotional tour in support of the Book.

26                              -

27        11.  Several times during the course of our various

28   meetings and conversations, Matthew Martin told me that

1  HarperCollins was very interested in ensuring that the Book was

2  the product of Brian's efforts and that it accurately reflected

3  what Brian wanted to say.

4

5      12.  I told Matthew Martin on several occasions that I

6  believed that Brian was competent, that Brian knew the contents

7  of the Book, that Brian had stated and honestly believed it was

8  his story, and that Brian wanted the Book published.  On one

9  such occasion, I said to Matthew Martin (in substantially the

10  following words), "Everything I know leads me to believe that

11  this is Brian's story and that he wants the book out."

12

13      13.  To that end, during one discussion that I had with

14  Brian in July 1991 at which Matthew Martin was present, I asked

15  Brian a series of leading questions designed to suggest that the

16  Book's contents had been dictated by his co-author Todd Gold, or

17  by his former psychiatrist, Dr. Eugene Landy.  Despite my

18  probing, Brian continued to insist that the Book was true and

19  that it was the product of his own thoughts and recollections

20  (assisted, although not dictated, by his co-author Gold).

21

22      14.  Further, prior to October 1991 Brian frequently told

23  me (in the presence of third parties) that it was very important

24  to him that the Book be released.  Indeed, Brian said on more

25  than one occasion (again, in the presence of third parties) that

26  the three most important things in his life at that time were

27  (i) his musical career, (ii) that he not be subjected to a

28  conservatorship, and (iii) to have the Book published.

1    15.  In addition to these events, Brian's co-author, Todd

2  Gold, told me on several occasions that he obtained the

3  information for the Book from Brian Wilson.  In turn, I relayed

4  many of these statements by Gold to Matthew Martin.

5

6    16.  As to possible influence by Dr. Eugene Landy, I should

7  note that from approximately April 23, 1991, to July 23, 1991, a

8  temporary "separation agreement" was in effect that required Dr.

9  Landy not to have contact with Brian.  I had negotiated that

10  "separation agreement" while representing Brian in the

11  conservatorship proceeding.

12

13    17.  On the whole, it was my opinion that Matthew Martin

14  did an excellent job investigating the contents of the Book and

15  attempting to ensure that the Book was fair and accurate.  I

16  also told Matthew Martin that I felt he did an excellent job on

17  the Book.  (The Court should know that I have never represented

18  either HarperCollins or Matthew Martin personally.)

19

20    18.  Further, while my primary purpose in reviewing the

21  Book was not to review it for libel issues, at no time did I

22  tell Matthew Martin that I considered anything in the Book to be

23  defamatory of Michael Love.

24

25    19.  Finally, I wish to make clear that the statements by

26  Brian which I refer to in this Declaration were all made in the

27  presence of third parties, or were statements which Brian

28  authorized me to disclose to others at the time.  Nothing in

3468400004-306577.1                    23

1    this Declaration is intended to waive any attorney-client or

2    work-product privilege that may attach to any aspect of my

3    representation of Brian Wilson or the Beach Boys.

4

5        I declare under penalty of perjury under the laws of the

6    United States that the foregoing is true and correct.

7

8        Executed on November _10_, 1993, at Los Angeles, California.

9

10                       _____
                         DONALD S. ENGEL

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                          24

536

Gavenchak

1
2  Q.   I think you testified that -- if
3  you could think back to your testimony on your
4  understanding of the allegations in the
5  conservatorship proceeding, and I think you
6  testified that you had an understanding that
7  the conservatorship proceeding made the
8  allegation that Landy exercised an undue
9  influence over Brian Wilson, with that
10  testimony in mind, my question to you is what
11  connection did you understand the potential
12  settlement of the conservatorship proceeding
13  to have on the truth or falsity of the
14  allegation that Landy had exercised undue
15  influence over Brian Wilson?
16        MS. DANIELS:  Objection, form,
17     foundation.
18        A.   I'm not sure there was a
19  connection.  I'm having trouble answering the
20  question because of the way in which you put
21  it.
22        Q.   I got the impression from your
23  testimony that because Matthew Martin told you
24  that Engel told him that the conservatorship
25  proceeding was going to be settled, that that

537

Gavenchak

1
2  settlement somehow resolved concerns that
3  might otherwise have arisen from the fact that
4  a conservatorship proceeding was pending.
5        MS. DANIELS:  Do yourself and me
6     and Genie a favor and try not to
7     interpret the testimony right now.
8     Just ask her the facts.  Ask her for
9     the facts that she is able to provide
10     to you and let's move on.  We are
11     wasting a lot of time with you trying
12     to interpret and getting it wrong.
13        MS. DUMAS:  It's not a matter of
14     trying to interpret, counsel.  It's a
15     matter of trying to understand state of
16     mind.  It's not something that's so
17     clear-cut.  It's reactions and analysis
18     to a set of facts and information and
19     it's an understanding and that is hard
20     to discover.
21        MS. DANIELS:  In this fashion,
22     yes, it is.
23        Q.   What was the significance of your
24  understanding that the conservatorship
25  proceeding was going to settle?

538

Gavenchak

1
2        MS. DANIELS:  Asked and answered.
3        A.   The reason that that was
4  significant, and I have to back up for a
5  minute, because it becomes important here that
6  I wasn't able to finish my earlier answer.  It
7  was a combination of factors that Matthew
8  Martin related to me about his conversation
9  with Don Engel, not just the fact that the
10  conservatorship proceeding was going to
11  settle, but also that it was more a matter he
12  have money and making some kind of an
13  arrangement that was suitable for the family
14  with respect to Gene Landy and not so much a
15  matter of Brian Wilson's competency.
16        The reason that it became
17  significant to me that Brian -- that Don Engel
18  had said that the matter might settle is that
19  I had viewed the allegations made in the
20  conservatorship proceeding as just that,
21  allegations, as a kind of posturing, if you
22  will.  And the fact that the matter was going
23  to settle and the fact that Brian Wilson's
24  lawyer had characterized that it's really a
25  matter of money and not so much a matter of

539

Gavenchak

1
2  competency led me to believe that my initial
3  impression was true.
4        Q.   Is it correct that you came to
5  the conclusion that your impression was true
6  on the basis of the information that Matthew
7  Martin provided to you about his conversations
8  with Don Engel?
9        A.   In part.
10        Q.   In your discussions with Matthew
11  Martin prior to publication, did he ever tell
12  you that Don Engel told him that Brian Wilson
13  claimed to being told that the book stated
14  that Mike Love didn't write "California
15  Girls"?
16        MS. DANIELS:  Objection as to
17     form.
18        Q.   Or words to that effect?
19        A.   Could I have that read back?
20        (The record was read back as
21     follows:
22        "Q.   In your discussions with
23     Matthew Martin prior to publication,
24     did he ever tell you that Don Engel
25     told him that Brian Wilson claimed to

Page 25

### CARL DEAN WILSON
#### BY MS. DANIELS:

[1]
[2]
[3] **Q:** Turning to page 34 which bears the
[4] Bates No. 2488. Excuse me, let me ask you first a
[5] couple of preliminary questions.
[6]     Do you recognize this article?
[7] **A:** This picture of Brian looks – I think
[8] I have seen it.
[9] **Q:** Do you recall –
[10] **A:** It's a terrible reproduction so it's
[11] hard to say, but I think I remember a picture of
[12] Brian – maybe I saw a photo, but I remember a
[13] picture of Brian I think standing on the beach or
[14] near the beach in a green robe.
[15] **Q:** Do you recall reading the article?
[16] **A:** No.
[17] **Q:** Do you recall whether you were
[18] interviewed for it?
[19] **A:** I don't recall specifically. I mean,
[20] I have been interviewed over the years, you know,
[21] many times, but I don't remember.
[22] **Q:** Do you know approximately how many
[23] times you have been interviewed over the years?
[24] **A:** No, I don't know.
[25] **Q:** Would it be –

Page 26

### CARL DEAN WILSON

[1]
[2] **A:** A lot more before. I haven't granted
[3] interviews in a long time.
[4] **Q:** When did you stop granting interviews,
[5] approximately?
[6] **A:** I don't remember.
[7] **Q:** Was it as recently as the 1990s?
[8] **A:** Certainly.
[9] **Q:** Was it prior to that time?
[10] **A:** I don't remember when. I just know I
[11] got way out of the mood and just didn't really care
[12] to – maybe perhaps late '80s.
[13] **Q:** Is that the reason you stopped giving
[14] interviews, you were out of the mood?
[15] **A:** Well, it's hard to turn stuff around
[16] when you can't talk to someone. It's more
[17] difficult to distort what they have said or mold it
[18] into what your thesis is anyway when they don't
[19] give you anything.
[20] **Q:** But you have been performing, haven't
[21] you, since you stopped giving interviews?
[22] **A:** Oh, certainly. We've performed
[23] anywhere between 80 and a hundred times a year,
[24] depending on what kind of year, how full our
[25] schedule is.

Page 27

### CARL DEAN WILSON

[1]
[2] **Q:** Are you touring all over the country?
[3] **A:** Well, we did last year and we'll see.
[4] I am going to meet my partners down in Atlantic
[5] City tonight where we begin working tomorrow, and I
[6] am sure we will discuss what we are going to do and
[7] see what opportunities are available to us.
[8] **Q:** Do you know roughly how many
[9] television interviews you have given over the
[10] course of the years?
[11] **MS. DUMAS:** Objection. Withdraw the
[12] objection, go ahead.
[13] **THE WITNESS:** Several.
[14] **BY MS. DANIELS:**
[15] **Q:** Would you say less than ten?
[16] **A:** No.
[17] **Q:** More than ten?
[18] **A:** I think so.
[19] **Q:** Do you recall when the most recent
[20] television interview you gave was?
[21] **A:** Yes.
[22] **Q:** When was that?
[23] **A:** It was January the 14th, I think.
[24] **Q:** Of this year?
[25] **A:** Uh-huh.

Page 28

### CARL DEAN WILSON

[1]
[2] **Q:** And what program was it?
[3] **A:** I don't know.
[4] **Q:** Do you recall where you gave the
[5] interview?
[6] **A:** I do.
[7] **Q:** Where was it?
[8] **A:** Salt Lake City.
[9] **Q:** And was it a local station?
[10] **A:** No, I don't remember the name of the
[11] show. I think it was a national show.
[12] **Q:** Was it subsequently broadcast?
[13] **A:** No.
[14] **Q:** Have you given any recent television
[15] interviews that were broadcast?
[16] **A:** No. I mean, I certainly don't
[17] remember doing that. Sometimes there will be a
[18] camera somewhere whether you have agreed to do it
[19] or not and I don't – but I don't remember
[20] cooperating and being – I think Salt Lake City was
[21] the last one. It was a fund-raiser, a program for
[22] children.
[23] **Q:** Do you recall roughly how many times
[24] the Beach Boys have performed on television during
[25] the last, say, ten years?

**CARL DEAN WILSON**

Page 29

[1]
[2] A: Several, many, several times, perhaps
[3] ten, maybe more.
[4] Q: Are those performances followed by
[5] interviews typically?
[6] A: It depends on what it is. Sometimes
[7] yes, sometimes no.
[8] Q: Do you give interviews following your
[9] performances?
[10] A: Usually not.
[11] MS. DUMAS: Objection. The question
[12] is a little vague and ambiguous. Could you read it
[13] back so I can assess my objection.
[14] (The pending question was read.)
[15] MS. DUMAS: You can answer if
[16] counsel doesn't want to clarify. You can answer.
[17] THE WITNESS: Usually not.
[18] BY MS. DANIELS:
[19] Q: Is it more typical that you would give
[20] an interview following a performance if the
[21] performance were televised?
[22] A: That doesn't ring a bell. I mean, I
[23] don't –
[24] Q: I am just wondering. It's not that
[25] important.

**CARL DEAN WILSON**

Page 30

[1]
[2] A: I don't think it's typical.
[3] Q: Do you recall how many times during
[4] the past ten years that you have given an interview
[5] following a performance?
[6] A: I don't actually recall giving one
[7] after a performance. Maybe once. That doesn't
[8] seem very familiar. Maybe twice, but the truth is,
[9] I don't know. Usually, no.
[10] MS. DUMAS: I can see you are
[11] struggling and it's in part because she asked a
[12] very open-ended question and you gave an answer and
[13] Ms. Daniels can ask you any follow-up questions
[14] that she desires.
[15] Q: Do you recall how many radio
[16] interviews you have done over the years? Again, I
[17] am just looking for your best guess. You probably
[18] can't remember each and every one.
[19] A: In what period of time?
[20] Q: Beginning way back in the 1960s.
[21] A: Good heavens. We used to go to radio
[22] stations went we first started out and do
[23] interviews because we would get our records
[24] played. So we would do radio station visits,
[25] and – but that's been many, many, many years ago.

**CARL DEAN WILSON**

Page 31

[1]
[2] Q: Did you do any of those in the 1970s?
[3] A: Yeah, a few.
[4] Q: How about the 1980s?
[5] A: In the very beginning of the '80s,
[6] yeah, I think maybe 10, 20 maybe.
[7] Q: Have you done any in the 19 –
[8] A: Those were local, but not national, I
[9] don't think. Excuse me.
[10] Q: Do you remember any interviews with
[11] Pete Fornatale?
[12] A: I do. He is a really nice man.
[13] Q: Were those national interviews?
[14] A: NEW, I think. I am not aware of it
[15] being national. It certainly is possible. It
[16] would be more likely these days. Pete Fornatale
[17] has been very good to the Beach Boys and he happens
[18] to be just a really nice man, truly.
[19] Q: Does Brother Records or anyone in the
[20] Beach Boys organization keep track of the
[21] interviews that are taped for radio?
[22] A: I don't know in fact if that's –
[23] perhaps.
[24] Q: Would it be possible for you to find
[25] out whether there is a list of the interviews that

**CARL DEAN WILSON**

Page 32

[1]
[2] have been given for radio?
[3] A: I very much doubt it. Sure, it's
[4] within the realm of possibility, but I doubt very
[5] much if it's kept track of to that extent.
[6] MS. DANIELS: Beth, to the extent
[7] there are records of that nature, I think they
[8] clearly fall within the scope of our request and
[9] seeing as Mr. Wilson does have access to those
[10] files, I request that they be produced.
[11] MS. DUMAS: I don't have a problem
[12] with facilitating instructions, but Mr. Wilson and
[13] Brother Records are not synonymous. Brother
[14] Records is a corporation with shareholders and I
[15] don't have a problem facilitating the request and I
[16] will call and see whether they require any type of
[17] a formal discovery request or not.
[18] MS. DANIELS: Let me know as soon as
[19] you possibly can about that. A shareholder,
[20] certainly a director of a corporation, does in fact
[21] have access and control of the documents at the
[22] corporation.
[23] MS. DUMAS: I don't think so based
[24] on my research of corporate law. I don't think
[25] there is – I think corporate law does restrict the

---

Page 57

### CARL DEAN WILSON

[2] Q: Can you honestly say that you never
[3] told anyone during an interview that you have used
[4] cocaine?
[5] A: That's certainly possible, I could
[6] have. I just don't remember. I am not denying
[7] that I ever said it because I don't remember.
[8] Q: Okay. Do you recall telling anyone
[9] during an interview that you have used heroin?
[10] A: I do not.
[11] Q: You don't recall?
[12] A: No, I do not. I don't remember. I
[13] think not, and the truth is I don't remember.
[14] Q: Do you recall whether or not you have
[15] given any interviews where you discussed your
[16] relationship with your mother?
[17] A: Certainly not in the recent past.
[18] Nothing comes to mind, you know. I have always had
[19] a really good relationship with her, so it wouldn't
[20] surprise me, but I just don't happen to remember
[21] right now.
[22] Q: Do you recall giving any interviews
[23] where you discussed Brian's contribution to the
[24] Beach Boys?
[25] A: No, but that's very likely that I did

---

Page 58

### CARL DEAN WILSON

[2] on many occasions.
[3] Q: Do you recall any specific instances?
[4] A: No, I don't.
[5] Q: Do you recall the general information
[6] that you would have given to people –
[7] A: Gratitude, a grateful feeling.
[8] Gratitude.
[9] Q: Have you ever in an interview referred
[10] to Brian as the creative force behind the band?
[11] And I am not looking for those exact words.
[12] A: I am sure I have.
[13] Q: Do you recall giving any interviews
[14] where you discussed Brian's relationship with you
[15] and the other members of the band? And –
[16] A: I don't remember – yeah, I remember
[17] that I did, sure. That would seem like that would
[18] be a pretty basic question.
[19] Q: How about the interpersonal
[20] relationships between Brian and the individual
[21] members of the band?
[22] MS. DUMAS: Objection, vague and
[23] ambiguous.
[24] THE WITNESS: I don't remember
[25] specifically.

---

Page 59

### CARL DEAN WILSON
#### BY MS. DANIELS:

[3] Q: You don't recall any interviews where
[4] you discussed the interpersonal relationships
[5] between Brian and the other members of the band?
[6] MS. DUMAS: Same objection.
[7] THE WITNESS: I don't remember any
[8] specific interviews, but it's, you know, likely
[9] that I at some point touched on it. I mean, it
[10] would seem –
[11] BY MS. DANIELS:
[12] Q: And what would be – generally I mean,
[13] how would you characterize – would you have
[14] characterized Brian's relationship with the other
[15] members of the band?
[16] MS. DUMAS: Objection. I have no
[17] problem with you asking him about what he remembers
[18] saying, but to have a general question as to what
[19] he might or could have said is – I don't think
[20] that's a fair question.
[21] MS. DANIELS: Okay.
[22] MS. DUMAS: Read the question back.
[23] THE WITNESS: Can I hear it again?
[24] MS. DANIELS: I may want to rephrase
[25] it so, yes, read it back.

---

Page 60

### CARL DEAN WILSON

[2] (The pending question was read.)
[3] BY MS. DANIELS:
[4] Q: Let me ask you this –
[5] A: It depends on what – I guess it would
[6] depend on the interview. It would depend on in
[7] relation to what time period.
[8] Q: Do you recall any specific interviews
[9] in about 1990, 1991 where you discussed Brian's
[10] relationship with the other members of the band? I
[11] am looking for
[12] specific –
[13] A: No, I don't, but that brings up a very
[14] irritating time frame of, you know, Brian's book.
[15] Q: Do you know, do the Beach Boys, or
[16] does the Beach Boys organization do publicity
[17] campaigns?
[18] MS. DUMAS: Objection to form, vague
[19] and ambiguous.
[20] You can go ahead and answer.
[21] Q: Let me ask this. What type of
[22] promotional work, promotional effort, does the
[23] organization make?
[24] A: Well, when we release a record, there
[25] is obviously an endeavor to get space in magazines

---

Page 61

### CARL DEAN WILSON

[1]
[2] and newspapers as well as record stores, marketing
[3] of the music. Radio is of course the most
[4] important. Traditionally radio has been the most
[5] important thrust of an album release or single
[6] release, for that matter.
[7]    Q: When a space is taken out in
[8] magazines, is there usually a photograph of the
[9] band members?
[10]    A: Sometimes yes and sometimes it's just
[11] the name.
[12]    Q: Or the album cover?
[13]    A: Uh-huh, or the photograph,
[14] reproduction of the album cover. But album art, of
[15] course as everyone knows, is not as important as it
[16] was because it's not a 12-inch disc any longer,
[17] it's a smaller, compact disc.
[18]    Q: Are the names of the individual
[19] members of the band usually included in magazine
[20] pieces?
[21]    A: Yes, certainly.
[22]    Q: How about radio?
[23]    A: Radio, no. Maybe sometimes, but not
[24] always.
[25]    Q: Did you also mention freestanding

Page 62

### CARL DEAN WILSON

[1]
[2] advertising pieces?
[3]    A: I don't know if I did, but they
[4] certainly exist.
[5]    Q: And what would those be, flyers, what
[6] else?
[7]    A: Posters or point of purchase, photos
[8] or whatever.
[9]    Q: Do they typically list the individual
[10] names of the members of the Beach Boys?
[11]    A: Maybe. Sometimes yes, sometimes no.
[12]    Q: Have you ever appeared in commercials
[13] for products other than Beach Boys recordings or
[14] concerts?
[15]    A: Yes, I believe we did. We were on a
[16] Delco radial commercial which was run on TV back in
[17] perhaps 1986, maybe.
[18]    Q: Do you recall any others?
[19]    A: Well, we did a Sunkist commercial, but
[20] I think it was for radio. I am not certain if that
[21] was on TV or not. They sponsored us one year.
[22] That could have been the same year. Mid '80s.
[23]    Q: Any others?
[24]    A: I don't know. Those are the ones I
[25] recall. Last year Premier Cruise Lines were

Page 63

### CARL DEAN WILSON

[1]
[2] co-sponsors of our touring season along with
[3] Fleishman Margarine.
[4]    Q: Did you appear in commercials for
[5] either Premier or Fleishman?
[6]    A: No way. We had meet-and-greets, it's
[7] a thing known as a meet-and-greet, and that's where
[8] the people who – I think it's the people who work
[9] in the supermarkets will come back, ask would we
[10] meet them and take photos with everybody before a
[11] performance, and I think subsequent to that Premier
[12] Cruise Lines ran a promotion, win a cruise with the
[13] Beach Boys, so I think if people would send in
[14] their margarine wrapper, or whatever it is,
[15] something to do with the proof of purchase, I
[16] think, a sweepstakes, and if they would get chosen
[17] they would get to go on this cruise with us this
[18] coming May.
[19]    Q: Have you ever lent your name to a
[20] manufacturer of a product, for example, a guitar,
[21] so that they could use your name to give
[22] credibility or prestige to their product?
[23]    A: Well, Sunkist –
[24]    Q: I mean your name personally.
[25]    MS. DUMAS: I think she is asking if

Page 64

### CARL DEAN WILSON

[1]
[2] there was like a Fender guitar that was issued,
[3] like The Carl Wilson Guitar.
[4]    MS. DANIELS: Exactly.
[5]    THE WITNESS: They are about to do
[6] that now, another guitar maker, actually. I don't
[7] know. I don't remember. We were very big in
[8] recording studios because we became so successful
[9] back in the early '60s, people wanted to use the
[10] same room that we recorded in, so we were partners
[11] in a couple studios, as I recall, a couple
[12] studios.
[13]    Product endorsement, perhaps. I don't
[14] remember. I think something, but I don't – oh,
[15] right, Coca-Cola wanted us. We couldn't get
[16] together on it. Coca-Cola wanted us to identify a
[17] jingle back in the '60s.
[18]    BY MS. DANIELS:
[19]    Q: I think I know the answer to this one,
[20] but are there Beach Boys fan clubs?
[21]    A: Yes, maybe one or two, perhaps three.
[22] I don't really know.
[23]    Q: Do you know whether they publish their
[24] own newsletters?
[25]    A: They certainly do.

Carl Wilson and Audree Wilson v.
Harper Collins Publishers, Inc.

Case 2:94-cv-00892-JEC-LFG   Document 53   Filed 08/15/95   Page 86 of 94

Carl D. Wilson
Vol. 1, April 4, 1995

Page 65

**CARL DEAN WILSON**

[1]
[2] Q: Have you ever given interviews for
[3] those newsletters?
[4] A: I may have. I am sure I have. I
[5] mean, it could even have been a de facto just by
[6] virtue of being in the room with Alice or somebody,
[7] you know, Alice Lilly, this person who likes our
[8] music a lot. And they all write to each other,
[9] newsletters – they call them newsletters, but they
[10] are really just communications between people who
[11] very much like our music.
[12] Q: Do you remember discussing more
[13] personal aspects of yourself with –
[14] A: Alice?
[15] Q: – fan club authors or whoever
[16] compiles information?
[17] MS. DUMAS: Objection, vague and
[18] ambiguous.
[19] Q: Do you understand the question?
[20] A: I may have. I don't remember any
[21] particular conversation with any of them. I mean,
[22] I am aware of a group of people who really like our
[23] music a lot and who follow us around, and we had
[24] one girl follow us for like a year and a half one
[25] time to every concert.

Page 66

**CARL DEAN WILSON**

[1]
[2] Q: Was she doing a newsletter as well?
[3] A: I don't know, I doubt it, but she
[4] became very inventive and we saw her with crutches
[5] and we said, oh, my God, she must have hurt
[6] herself, and it was just a ploy to get up by the
[7] stage. Very inventive people can be.
[8] Q: Do you recognize a fan newsletter
[9] called BBFun newsletter?
[10] A: Yeah. I don't want to be unkind, but
[11] they are a bit weird so I find it just a wee
[12] disturbing sometimes.
[13] Q: How about Endless Summer Quarterly?
[14] A: I have heard of that one. I can't
[15] bring myself to read them, though. I can't do it.
[16] Q: Do you recall the names of any others
[17] after I mentioned those two?
[18] A: Friends of Dennis Wilson. I think
[19] Friends of Dennis Wilson. I don't remember – I
[20] think there is some – this English – I think
[21] there is one in England. Australia has – I think
[22] I remember seeing some pretty bizarre stuff.
[23] Q: Are there any that focus specifically
[24] on you?
[25] A: No. They want to, but I have not – I

Page 67

**CARL DEAN WILSON**

[1]
[2] am kind of trying to discourage that.
[3] Q: Do you receive fan mail?
[4] A: A little bit.
[5] Q: Do you –
[6] A: There could be bundles, but I don't
[7] see it. I mean, I see a few things here and
[8] there. My ex-manager, some people still have his
[9] address and so a couple, few times a year I will
[10] get several pieces. It's usually just an autograph
[11] request, usually.
[12] Q: When it's an autograph request do you
[13] comply?
[14] A: Certainly, except now they are
[15] becoming collectibles so it's kind of getting
[16] annoying every time you go somewhere people come
[17] with like 20 albums. It's just a business which
[18] kind of, I guess, sort of creates an ambivalence.
[19] Q: Do you know whether your fan mail gets
[20] answered, for example, by your manager?
[21] A: No. There is certainly room for humor
[22] there.
[23] Q: Do you recall ever – other than the
[24] autographs, do you recall ever answering any fan
[25] mail?

Page 68

**CARL DEAN WILSON**

[1]
[2] A: Sure. I don't remember the letter,
[3] but, sure, I have answered some.
[4] Q: Do strangers recognize you on the
[5] streets?
[6] A: You mean do they acknowledge?
[7] Q: Yes.
[8] A: It seemed like – let's see, so about
[9] 11, 12 years ago I would get mistaken for Brian.
[10] There was a tough period there where it seemed like
[11] about five, six people would ask me if I was Brian,
[12] and I would say no, I am not, because I am not.
[13] Q: Do you recall instances where people
[14] recognized you as Carl?
[15] A: Yeah. Just the other night we were
[16] out to dinner with Brian and his new wife Melinda
[17] and my wife Gina and Brian's ex-wife Marilyn and
[18] her boyfriend Daniel and my mom. We were out in a
[19] restaurant in Santa Monica. Someone came over to
[20] me and didn't say anything to Brian, which struck
[21] me strange, but he was a serious music fan who
[22] acknowledged a particular work.
[23] Q: One of your solo works?
[24] A: No, something I had done within the
[25] group but it was something that was known that I

Carl D. Wilson
Vol. 1, April 4, 1995

Carl Wilson and Audree Wilson   v.
Harpercollins Publishers, Inc.



Page 69

**CARL DEAN WILSON**

[2] wrote the song and I had been very active. That
[3] was in the early '70s.
[4]   Q: Which song was it?
[5]   A: Feel Flows was the title of the song,
[6] which is I think one of the only times that's
[7] happened.
[8]   Q: One of the only times that somebody
[9] has recognized you?
[10]   A: Yeah, and come up and – it was a
[11] serious music fan. He was – it's fairly obscure,
[12] so, and it just happened the other day. That's how
[13] come –
[14]   Q: You remember it?
[15]   A: Uh-huh.
[16]   Q: Do you remember being stopped a lot on
[17] the street back in the 1960s?
[18]   A: Well, when we were on tour in a place
[19] where we were going to perform, when we were going
[20] to appear there and it was in the air and the
[21] newspaper, yes. But other than that, no.
[22]   Q: Now, have you had a solo career in
[23] addition to your career as a Beach Boy?
[24]   A: Sort of. I did two albums.
[25]   Q: And those are called what?

Page 70

**CARL DEAN WILSON**

[2]   A: One album was just titled with my name
[3] and the second album was called Young Blood.
[4]   Q: And Carl Wilson was done in
[5] approximately 1991 – 1981; is that correct?
[6]   A: 1980. It was released in 1981.
[7]   Q: When was Young Blood released?
[8]   A: I think '83.
[9]   Q: Did you also produce a Brother Records
[10] LP for a group called Flame?
[11]   A: Yes, yes, I did, back in '69 maybe,
[12] '70, something like that, '71, I don't know.
[13]   Q: Have you produced any other records
[14] for third parties like Flame?
[15]   A: Yeah, Ricky Martin, my brother-in-law,
[16] made a record in the late '70s which I produced.
[17]   Q: Any others?
[18]   A: Several Beach Boy albums, of course,
[19] through the '70s. I don't remember any other
[20] projects just now. I could have done Billy Joel,
[21] but I passed.
[22]   Q: Oh, you passed on that, okay.
[23]   A: Yep. I was very involved with the
[24] group. We were too busy, actually, to do it.
[25]   Q: And when was that, approximately?

Page 71

**CARL DEAN WILSON**

[2]   A: That was mid-'70s. I got a demo on
[3] Captain Jack and some other good stuff.
[4]     Could we take a break?
[5]   MS. DANIELS: Sure.
[6]     (Recess taken.)
[7]   MS. DANIELS: I would like to mark
[8] as Carl Wilson Exhibit 7 a copy of the book at
[9] issue in this litigation called Brian Wilson
[10] Wouldn't It Be Nice.
[11]   MS. DUMAS: My Own Story.
[12]   MS. DANIELS: My Own Story. With
[13] Todd Gold.
[14]   MS. DUMAS: Off the record.
[15]     (Discussion off the record.)
[16]   MS. DANIELS: For purposes of the
[17] questions I am about to ask Mr. Wilson, I am going
[18] to refer to a hard bound copy of Wouldn't It Be
[19] Nice. But for purposes of the deposition I am
[20] going to mark a photocopy of the book so that it
[21] can at Ms. Dumas' request be bound with the other
[22] deposition exhibits.
[23]     (Carl Wilson Deposition Exhibit No. 7
[24] was marked for identification. Exhibit bound
[25] separately.)

Page 72

**CARL DEAN WILSON**
**BY MS. DANIELS:**

[3]   Q: Do you recognize the book that's been
[4] marked as Carl Wilson Exhibit 7, Mr. Wilson?
[5]   A: Yes.
[6]   Q: Have you read it?
[7]   A: I have read parts of it.
[8]   Q: Did you read a draft version or the
[9] final version?
[10]   A: I am not sure.
[11]   Q: Did it look like this, with a blue
[12] cover and a photograph of Brian?
[13]   A: Well, I have seen that. Yeah, I have
[14] seen this, I mean, this artwork, this book art, and
[15] I have also seen – I know it's a blue book without
[16] the photo cover, whatever that material is.
[17]   Q: Do you recall whether the copy that
[18] you reviewed –
[19]   A: I did read parts of a book that was
[20] blue.
[21]   Q: Okay. When did you first read the
[22] book that was blue or parts of it?
[23]   A: I am not sure. A few years ago.
[24]   Q: Did you read a draft of the book prior
[25] to its publication?

**Min-U-Script®**

Noon & Pratt

Page 53

**Wilson**

[1]
[2] beyond. Let me just ask you whether people
[3] recognize you on the street.
[4]     **A:** I don't know.
[5]     **Q:** Do they ever stop you and say "Are
[6] you Audree Wilson?"
[7]     **A:** Not really.
[8]     **Q:** Do you recall anyone stopping you
[9] within the last two years and asking you if you
[10] were Audree Wilson?
[11]     **MS. DUMAS:** Objection. I would
[12] like to note an objection for the record that
[13] whether or not people recognized her after the
[14] book was published would not be relevant to the
[15] public figure inquiry. However, you can go ahead
[16] and – I'm not going – the witness can answer the
[17] question.
[18]         **BY MS. DANIELS:**
[19]     **Q:** The question was do you recall
[20] anybody stopping you on the street and asking you
[21] whether you were Audree Wilson?
[22]     **A:** Not really.
[23]     **Q:** Do you recall people stopping you on
[24] the street in the 1980s and asking you if you were
[25] Audree Wilson?

Page 54

**Wilson**

[1]
[2]     **A:** You mean if I were just out alone?
[3]     **Q:** Yeah, if you were just walking down
[4] the street.
[5]     **A:** No.
[6]     **Q:** How about in restaurants or any
[7] public place?
[8]     **A:** If I were with one or two of my
[9] sons, of course they would – no.
[10]     **Q:** Do you recall that happening often,
[11] did people, when you were with your sons, did
[12] people stop you and try to speak with you?
[13]     **A:** Sort of.
[14]     **Q:** Did they say hello and recognize the
[15] boys and you?
[16]     **A:** Of course.
[17]     **Q:** Did they recognize you?
[18]     **A:** I don't know.
[19]     **MS. DUMAS:** It's really two
[20] separate questions. You're sort of asking a
[21] compound question: "Do they recognize Brian
[22] Wilson" and then you're also adding in "do they
[23] recognize her," and –
[24]     **MS. DANIELS:** We'll separate them.
[25]     **Q:** Did people recognize your sons

Page 55

**Wilson**

[1]
[2] during the 1980s?
[3]     **A:** Oh, sure.
[4]     **Q:** And do you recall them recognizing
[5] you, specifically?
[6]     **A:** No. I was just there.
[7]     **Q:** How about in the 1970s?
[8]     **A:** Oh, that I can't remember.
[9]     **Q:** In the 1970s did you receive mail
[10] from people asking – did you receive mail from
[11] Beach Boys fans?
[12]     **A:** Yes.
[13]     **Q:** Was the mail directed specifically
[14] to you?
[15]     **A:** Sometimes.
[16]     **Q:** Did you respond to the letters that
[17] were directed to you?
[18]     **A:** Sometimes.
[19]     **Q:** Do you know approximately how many
[20] letters you may have responded to?
[21]     **A:** No.
[22]     **Q:** Would you say it's hundreds?
[23]     **A:** Hundreds?
[24]     **Q:** Yes.
[25]     **MS. DUMAS:** She doesn't want you to

Page 56

**Wilson**

[1]
[2] guess and she doesn't want you to speculate. She
[3] only wants your best recollection.
[4]     **THE WITNESS:** Not hundreds.
[5]         **BY MS. DANIELS:**
[6]     **Q:** So it's somewhere less than 100
[7] letters, and was this just during the 19 – again,
[8] we're talking just during the 1970s, less than 100
[9] letters.
[10]     **A:** Uh-huh. Yes.
[11]     **Q:** How about during the 1980s, did you
[12] receive any mail from Beach Boys fans directed to
[13] you?
[14]     **MS. DUMAS:** Objection. A little
[15] bit vague and ambiguous.
[16]         **BY MS. DANIELS:**
[17]     **Q:** Do you understand the question? Do
[18] you recall receiving any mail addressed to Audree
[19] Wilson from Beach Boys fans?
[20]     **A:** What did you just say?
[21]     **Q:** Do you recall during the 1980s
[22] receiving any mail addressed to you from Beach
[23] Boys fans?
[24]     **A:** That's too long ago.
[25]     **Q:** How about during the 1990s, between

Page 81

**Wilson**

[1]
[2]    **MS. DUMAS:** I'm instructing the
[3] witness not to answer. I think that – I'm
[4] concerned that I'll have a waiver here of the
[5] attorney-client privilege.
[6]                    **BY MS. DANIELS:**
[7]    **Q:** What specific evidence of falsity do
[8] you have vis-a-vis the statements made about you
[9] in the book?
[10]    **MS. DUMAS:** Objection. This is not
[11] relevant to Phase I discovery and on that basis –
[12]    **MS. DANIELS:** The letter was sent
[13] prior to publication of the book.
[14]    **MS. DUMAS:** That wasn't your
[15] question. Your question wasn't about the letter.
[16] Your question said, to me, was something
[17] different.
[18]    **MS. DANIELS:** Read back the
[19] question and, again, we are talking about what's
[20] been marked as Audree Wilson Exhibit 6.
[21]    **MS. DUMAS:** I need you to put a
[22] clear question on the table that relates the
[23] question directly to the letter.
[24]    **MS. DANIELS:** Let me ask the
[25] question again.

Page 82

**Wilson**

[1]
[2]    **Q:** Around August 8th of 1991, what
[3] evidence did you have that there were false
[4] statements about you in this book "Wouldn't It Be
[5] Nice"?
[6]    **MS. DUMAS:** Again, I'm going to
[7] caution the witness not to disclose
[8] attorney-client communications. To the extent
[9] that she can answer the question, go ahead.
[10]    **THE WITNESS:** I can answer?
[11]    **MS. DUMAS:** Yes.
[12]    **THE WITNESS:** I was on tour
[13] someplace, and in the "USA Today" newspaper was an
[14] article about – it was kind of a horrible
[15] article, an excerpt taken from the book.
[16]                    **BY MS. DANIELS:**
[17]    **Q:** Now, you mentioned that you were on
[18] tour. What were you on tour for?
[19]    **A:** With the Beach Boys.
[20]    **Q:** Do you tour often with the Beach
[21] Boys?
[22]    **A:** Uh-huh – well, not often, but I
[23] usually go on their spring tours with them.
[24]    **Q:** Did you go on the spring tour in
[25] 1991?

Page 83

**Wilson**

[1]
[2]    **MS. DUMAS:** When you say "go on the
[3] tour," are you asking her if she traveled with any
[4] of her sons and saw them perform? Are you asking
[5] her whether she toured on stage with the Beach
[6] Boys?
[7]    **MS. DANIELS:** I'm asking her what
[8] she meant by "touring with the Beach Boys." She
[9] said she was "on tour."
[10]    **MS. DUMAS:** What do you mean –
[11]    **THE WITNESS:** Well, the boys are on
[12] tour but I just go there to have fun, I go there
[13] to see the shows and have a wonderful time.
[14] That's my only function.
[15]                    **BY MS. DANIELS:**
[16]    **Q:** And you say you usually go in the
[17] spring.
[18]    **A:** I have been for the last few years.
[19]    **Q:** Did you go on tour with them in the
[20] 1970s?
[21]    **A:** Yes. It's sort of spotty. I did go
[22] with them many times.
[23]    **Q:** In the 1980s?
[24]    **A:** Probably. I don't really remember.
[25]    **Q:** When you're on tour with the Beach

Page 84

**Wilson**

[1]
[2] Boys –
[3]    **MS. DUMAS:** Objection to the phrase
[4] "being on tour." It kind of makes for a
[5] misleading record. She said she went to some of
[6] the shows.
[7]    **MS. DANIELS:** I'll ask you a
[8] question about that then. I believe she used the
[9] phrase "on tour with the Beach Boys."
[10]    **MS. DUMAS:** And then she qualified
[11] it.
[12]    **MS. DANIELS:** Frankly, I believe I
[13] understand what that means.
[14]    **Q:** Can you at this point explain what
[15] you mean by "on tour"? Does that just mean going
[16] on –
[17]    **MS. DUMAS:** She already answered.
[18] Objection. Asked and answered.
[19]    **MS. DANIELS:** Well, I don't know
[20] what the problem is with that phrase, Beth,
[21] frankly. I really don't think it's confusing at
[22] all, but if you prefer, I will ask in terms of
[23] going to shows.
[24]    **Q:** When you go to Beach Boys shows with
[25] them, do you recall speaking to fans?

Page 85

**Wilson**

[1]
[2]   **A:** Speaking to fans?
[3]   **Q:** Yes.
[4]   **A:** Yes.
[5]   **Q:** Does that happen frequently when you
[6] go to shows with them?
[7]   **MS. DUMAS:** Objection as to
[8] "frequently." Vague and ambiguous.
[9]   **THE WITNESS:** Not frequent.
[10]          **BY MS. DANIELS:**
[11]   **Q:** Do you sit in the audience when you
[12] go to their shows?
[13]   **A:** No, I never do.
[14]   **Q:** Do you sit backstage?
[15]   **A:** Uh-huh.
[16]   **Q:** Do you ever go on stage?
[17]   **A:** No.
[18]   **Q:** They've never called you on stage
[19] and introduced you?
[20]   **A:** Oh, yeah.
[21]   **Q:** How many times have they done that?
[22]   **A:** I don't know.
[23]   **Q:** Would you say they've done it more
[24] than ten times?
[25]   **MS. DUMAS:** She's asking for your

Page 86

**Wilson**

[1]
[2] best recollection. She's not asking you to guess
[3] or speculate.
[4]   **THE WITNESS:** You mean through all
[5] the years?
[6]          **BY MS. DANIELS:**
[7]   **Q:** Yeah, through all the years.
[8]   **A:** Oh, sure.
[9]   **Q:** Do you think they've done it 50
[10] times?
[11]   **A:** No.
[12]   **Q:** So somewhere between 10 and 50.
[13]   **MS. DUMAS:** Let the record reflect
[14] that everybody is laughing at the range.
[15]          **BY MS. DANIELS:**
[16]   **Q:** It's more than ten times; correct?
[17]   **A:** All told?
[18]   **Q:** Yeah, all told.
[19]   **A:** I don't know.
[20]   **Q:** Do you remember the date of the "USA
[21] Today" article that you mentioned before, the one
[22] that mentioned from the book or quoted from the
[23] book "Wouldn't It Be Nice"?
[24]   **A:** It was probably August.
[25]   **MS. DUMAS:** Counsel, since we've

Page 87

**Wilson**

[1]
[2] been going two hours, and it looks like you're
[3] going to get into a new area of questioning, I was
[4] going to suggest that we take a break, but if you
[5] think you're going to finish this line of
[6] questioning soon, we can hold off until after
[7] that.
[8]   **MS. DANIELS:** Well, it's all part
[9] of the same line, but it's a perfect time to take
[10] a break.
[11]      (Recess taken.)
[12]   **MS. DANIELS:** Back on the record.
[13]   **MS. DUMAS:** Or did you want to –
[14] during our brief break to get some soda,
[15] Ms. Wilson commented that she was starting to
[16] remember more about her conversation with Todd
[17] Gold that you had questioned her about earlier,
[18] and so she asked me whether or not she should
[19] bring that up, and I said that I would do that and
[20] leave it to you as to whether you wanted to
[21] question her further on the subject.
[22]   **MS. DANIELS:** Okay.
[23]   **THE WITNESS:** Well, I told you I
[24] was pissed off, I think, and you wanted to know
[25] why, and I said "I don't know."

Page 88

**Wilson**

[1]
[2]          **BY MS. DANIELS:**
[3]   **Q:** Yes.
[4]   **A:** But I do know. I remember.
[5]   **Q:** Okay.
[6]   **A:** He told me that he was going to be
[7] writing the autobiography with Gene on Brian, and
[8] immediately I was angry. That's why.
[9]   **Q:** He told you he was writing an
[10] autobiography of Gene?
[11]   **A:** No, of Brian, with Gene.
[12]   **Q:** Oh. With Gene. I see.
[13]   **A:** And I think he said with Brian,
[14] also, but, huh-uh, I didn't like him.
[15]   **Q:** Just before the break you had
[16] mentioned an article in "USA Today." Did the "USA
[17] Today" article mention you?
[18]   **A:** Yes.
[19]   **Q:** Do you recall what it said about
[20] you?
[21]   **A:** I think it said that's – I don't
[22] remember verbatim, but it did say that I had my
[23] perennial – no – my gin and tonic in my hand,
[24] which seemed to be like daily, and it's such a
[25] lie.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
----------------------------------------x
CARL WILSON, an individual, and          )
AUDREE WILSON, an individual,            )
                                         )
            Plaintiffs,                  )
                                         )
        v.                               )    94 Civ. 892(JC)
                                         )
HARPERCOLLINS PUBLISHERS INC.,           )    AFFIDAVIT OF
a Delaware corporation,                  )    CRAIG HERMAN
                                         )
            Defendant.                   )
----------------------------------------x

STATE OF NEW YORK    )
                     ) ss.
COUNTY OF NEW YORK   )


        CRAIG HERMAN being duly sworn, deposes and says:

        1.  I submit this affidavit in support of the
motion of defendant HarperCollins Publishers Inc.
("HarperCollins") for summary judgment in the above-
captioned case.

        2.  I am Director of Publicity at HarperCollins.
I am responsible for formulating and implementing publicity
strategies in conjunction with the marketing department.  In
that connection I meet with producers and editors of
national television and print media.  I am also responsible
for placing trade news stories on major book acquisitions,
handling publicity campaigns and planning press conferences
and special events.  I am also director of publicity for

HarperPerennial, HarperPaperbacks, HarperAudio, HarperInteractive and HarperReference.

3.  In the fall of 1991, I was Assistant Director of Publicity.  In that capacity I was in charge of scheduling the publicity tour Brian Wilson conducted in connection with the publication of his autobiography, WOULDN'T IT BE NICE -- MY OWN STORY.

4.  In August, 1991, I encountered some difficulties in scheduling Mr. Wilson's tour as the publicity dates we had set appeared to conflict with scheduled Beach Boys concert appearances.  In the course of scheduling Mr. Wilson's publicity tour, I also had discussions with several television producers who expressed some concerns from prior experience with Mr. Wilson about Mr. Wilson's ability to communicate coherently and effectively on television.

5.  I expressed these concerns to my department head, Karen Mender.  Having had no opportunity to meet Brian personally, Ms. Mender and I agreed that I should do so and thereby satisfy ourselves as to Mr. Wilson's intentions and ability to satisfy his publicity tour obligations.

6.  In September, 1991, I flew to Los Angeles to meet personally with Brian.  We met over a two hour lunch, and the next night over dinner at the house of the book's co-author, Todd Gold.  I had extensive opportunity to

interact with Mr. Wilson, ask him questions, and engage in wide-ranging conversation.  I found Mr. Wilson to be perfectly competent and quite capable of performing his publicity obligations, which he did.

Craig Herman

Subscribed and sworn to
before me this 11 day of
August, 1995

Notary Public

FERN COPAS
NOTARY PUBLIC, State of New York
No. 41-4823727
Qualified in New York County
Commission Expires July 31, 19 97

3