IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| CARL WILSON, an individual, and AUDREE WILSON, an individual,<br><br>    Plaintiffs,<br><br>v.<br><br>HARPERCOLLINS PUBLISHERS, INC., a Delaware corporation,<br><br>    Defendant. | Case No. CIV 94 892 JC |

## DECLARATION OF DR. JANET ROEHL

## IN SUPPORT OF PLAINTIFFS' MEMORANDUM IN OPPOSITION

## TO HARPERCOLLINS' MOTION FOR SUMMARY JUDGMENT

I, Dr. Janet Roehl, hereby declare as follows:

1. I have been retained by counsel for Plaintiffs Audree Wilson and Carl Wilson to serve as an expert witness concerning book publishing procedures, and further to provide testimony relevant to the Court's determination of whether HarperCollins published "Wouldn't It Be Nice" (the "Book") with actual malice (sometimes referred to as constitutional malice) and with negligence.

2. Attached hereto as Exhibit "A" and incorporated herein by reference and made a part hereof for all purposes, is a true and correct copy of my expert witness report on that subject, which accurately set forth my opinions and analysis, and the basis for such.

3. Attached hereto as Exhibit "B", and incorporated herein by reference and made a part hereof for all purposes, is a copy of my resume/curriculum vitae which accurately sets forth my qualifications. As stated therein, I am Assistant Professor at Eastern New Mexico University, in the Department of Communicative Arts and Sciences. The attached curriculum vitae accurately sets forth the publications I have authored as well as my journalism honors.

4. As more fully set forth in my report, the evidence shows that HarperCollins had substantial cause to have serious doubts as to the credibility of Brian Wilson as a source and author, and the accuracy of the information he provided, as well as the participation of Eugene Landy in the publishing process and the effect of allegations that Landy was exerting an undue influence over Wilson. HarperCollins failed to act reasonably to resolve these doubts and ascertain Brian Wilson's ability to accurately remember and relate the events and conversations. Further, my analysis shows and it is my opinion that HarperCollins violated basic standards of professional journalism in publishing the Book.

I declare under penalty of perjury, under the laws of the United States of America that the foregoing is true and correct.

DATED: 9/25/95

_____
DR. JANET ROEHL

Exhibit A

# Consultant's Report
# Wilson v. HarperCollins

*Dr. Janet E. Roehl*
*Assistant Professor of Journalism*
*Eastern New Mexico University*
*Prepared May 12, 1995*

The legal concept of libel revolves around six elements: defamation, identification, publication, falsity, personal harm, and fault. This report will be my professional opinion on the last element, fault, as pertinent to the case of Wilson v. HarperCollins. In this suit, the question of fault is being asked of the publisher, HarperCollins, of the book "Wouldn't It Be Nice" by Brain Wilson.

Specifically, in this case the key questions appear to be:

1. Was the author/source Brian Wilson credible?
2. If not, was the publisher aware of the situation?
3. If aware, what steps did the publisher take to verify the facts as presented by Brian Wilson in the book?
4. If steps should be taken, does failure to take appropriate steps lead to fault on behalf of said publisher?
5. If fault exist, is it negligence and/or actual malice/reckless disregard?

I will discuss these five questions posed in this case as they relate to standards of professional journalism. Where appropriate, academic references to support my opinions will be offered and specific examples from the documents will be cited.

## Question 1: Was the author/source Brian Wilson credible?

In any journalistic endeavor, the credibility of a source is a paramount issue. Reporters and editors daily ask themselves how believable is the source? Investigative Reporters and Editors offer guidelines for getting people to tell the truth. In these guidelines, it is suggested to talk to everyone, keep asking questions, go back and forth between several sources. They say to challenge your sources, contradict them a little, don't accept the easy explanation; let them prove it to you with more detail.

In "Reporting in Depth" (1991), the author states you compare sources, which has greater credibility, who is the most likely to know. Writers are warned to balance the interpretation of the facts. Facts can be self-serving to those who give them. When possible, check the fact with someone in an opposing camp. The author continues by telling the reporter to be aware that people vary in their perceptions.

When working with any source it is prudent to check the motivation and competency of the source, and guard against being too quick to believe what ever the source says (Ward, 1991).

This recommended practice is reiterated by Evensen in "The Responsible Reporter" (1995). "People may lie. They may forget. They may change their story. They may have hidden agendas. They may tell a reporter what they think the reporter wants to hear. They may have friends they want to protect, or enemies they want to hurt." (pg. 109) Given this reality, it is standard practice to treat information cautiously and to always try to confirm what people say.

There is every indication in both the book and the documents that Brian Wilson was not a stable, competent source. There was ample reason to question his recollections and specific circumstances he cited in the book. Whether these were fabrications of Brian Wilson, interpretations of Gene Landy or whoever is open to speculation.

Indications of his instability as a source/author is summarized in the acquisition memo [HC 10216] which stated "the collapse was the beginning of a descent into a twenty-year nightmare of drugs, alcoholism, obesity and mental illness." The marketing plan card [HC 08739] also makes reference to "his crippling psychological breakdown." This condition would lead a prudent reporter and editor to question the reliability of someone's memory while in this impaired state. There appears that Brian Wilson had no recollection of anything that happened to him from 1969 to 1978 [HC 00601].

This would be the kind of source that would be used with great trepidation. Verification from at least one, probably several other sources, would be mandatory. Someone who has, by his own admission, suffered mental illness and substance abuse does not have credibility, as defined to by professional journalist.

### Question 2. If not, was the publisher aware of the situation?

It is clear that Brian Wilson was not credible. So the next question pertains to what the publisher knew of his unsuitability as a primary source.

There is an old adage in journalism that is forever true: "In case of doubt, leave it out." A reporter, editor and publisher must never take anything for granted and check everything (Hough, 1995). A standard practice in mass media communication is to keep in mind there are at least two sides to a story and if an article (manuscript) is critical about someone, give him a chance to tell you his views.

One of the most well-known journalist-scholars, Curtis MacDougall (1968), wrote that the cardinal sin is inaccuracy. It is the ethical and legal obligation of a publisher to ensure accuracy. In this case, HarperCollins had several indications that the primary source/author may not be credible and perhaps the material in some cases was inaccurate.

In the Reader's Report, dated October 9, 1990 [HC 08609 - HC 08611] there are several comments raising the specter of source credibility and author reliability. For example, on the second page of the memo, the reader states that Brian Wilson's description of this abusive father is "so horrible that it's almost unbelievable." In the next paragraph dealing with band members, the reader states that "the hostility, created in all likelihood when the author was fired from the Beach Boys, seems to color his early memories more than seems reasonable."

In June 1990 Matthew Martin asked, "Do we have any reason to believe Brain Wilson is capable of telling his story - Tierny question whole book - Brian Wilson is not capable of remembering what anybody said." [HC 00693].

In an editorial memo dated March 18, 1991 [HC 10270 - HC 10274], the issue of accuracy was questioned. "We will assume that Wilson's recollections of facts and events are accurate. Given the totality of his breakdown, I wonder how much he actually remembers himself and how much he relies on Dr. Landy to fill in the blanks. "In a July 17, 1991 memo [HC 09237 - HC 09248] the issue of "unreliable narrator" was raised.

In a memo date July 24, 1991 from Matthew Martin he summarizes various meetings and conversations he had with Brian Wilson and his representatives [HC 00486]. In this document they are allusions to the stability of the primary source. For example, "Brian Wilson illustrated the public response with a loud, boisterous rebel yell." Martin continues, "Brian tends to talk in rather broad, sweeping terms. He doesn't address specifics real well. He often struggles to find words and once asked me to back up and repeat myself because he had lost the meaning of my question." This was a red flag that if he can't remember specifics, lack concentration, behaves erratically there may be problems with his recollections over a lifetime as well.

A month later the issue of credibility was again raised by Craig Herman, assistant director of publicity. "My suspicions (fueled by TV producers) are that Mr. Wilson may not be as coherent as we were led to believe and that Dr. Landy might be looking for any excuse to cancel the book tour." [HC 08984] Herman also writes in a memo [HC 10196], "The attorney told me truthfully that there was a 50/50 chance that Brian, being the emotionally unstable chap that he is, could lose it for good and therefore be unfit to fulfill his tour agreement."

There were also indications that Brian Wilson may be under the influence of Gene Landy. In a memo dated July 3, 1991 by Matthew Martin in conversation with Don Engel [HC 00604-HC 00606], several doubts about the credibility of Brain Wilson were raised: Gene Landy "exercise undue influence over BW," "What if BW is declared incompetent? What if Landy has exerted undue influence over ms." Also from Engel [HC 00611], there are the same type of concerns raised, "BW has reviewed ms. twice, but always with Landy present" and Brian Wilson apparently telling Engel, "I don't know what's in the book."

Again, referring to that July 24 document, Martin notes a conversation with Mark Meadow expressing "Landy's concern with the manner in which the legal review was carried out without his consultation." [HC 00489]. In a meeting with Don Engel, Martin is told by Engel that O'Connor believes that "he [Brian] is emotionally and psychologically frail and therefore prone to Landy's undue influence.". . . "Brian is scared of Landy, yet totally in awe of him." In another conversation with Don Engel on July 24, 1991 they again discuss the influence of Landy and competency of Wilson [HC 00491-HC 00492], ". . . they wanted to be in a position to press forward with their effort to have a permanent conservator named for Brain to protect him from Landy's undue influence." Martin continues, "At one point in our conversation, Engel said that the conservatorship people want to kill the book, Jim Tierney (Brian's lawyer in the A&M lawsuit) wants to kill the book, and Dr. O'Connor is skeptical about the book because he hasn't been given the opportunity to read it."

It is obvious from this evidence that the publisher, HarperCollins, was aware of the credibility problem. It had been discussed both internally and with outsiders. It is clear that Brian Wilson was not credible and HarperCollins knew he was not.

**Question 3. If aware, what steps did the publisher take to verify the facts as presented by Brian Wilson?**

The subject of checking facts is so important that the American Society of Managing Editors puts on workshops just for fact-checkers. Bob Woodward and Carl Bernstein of the Washington Post agreed they would seek confirmation from a minimum of two other sources when investigating the Watergate break in. Many times they used three or four sources to corroborate information. This is common practice in professional journalism.

Numerous journalism textbooks clearly articulate this professional standard. Ward (1991) instructs reporters to make sure they understand what a person is saying, check every fact. Statements where there is any doubt should be double or triple sourced in order to verify accuracy. This means that controversial information should be verified by two or three different sources. Hough (1995) notes checking and verifying facts are basic steps in journalism practice. MacDougall (1968) writes that fairness and caution require a story be verified, i.e. checking the statements of different sources against each other.

4

Benjaminson and Anderson (1976) said to try to verify or corroborate the same facts from different sources. Others echoed these practices (Fedler, 1993; Fink, 1992; Garrison, 1990; Harriss, Leiter & Johnson, 1992; Rich, 1994;).

HarperCollins was aware of potential problems related to Brain Wilson, yet did not undertake the mandatory steps to verify the information. These steps would have been to verify by double or triple sourcing the controversial "facts" presented by Wilson.

There is also the worrisome problem of Brian Wilson reviewing the book. Again, this step would have been mandatory, yet there are some indications that he did not closely read it. In a meeting [HC 00486] on July 24, 1991, with Brian Wilson, Todd Gold and others Matthew Martin noted that "Todd and Brian explained to me that as Todd was writing the book, he would submit individual chapters to Brain which Brian would review in a cursory manner. Brain also read the completed manuscript but not very thoroughly." Later, apparently Brian read it. However, this is disputed in a conversation between Matthew Martin and Don Engel [HC 00604-HC 00606]. There Martin wrote, "Engel is suspicious that Wilson never saw the ms."

It does not appear that HarperCollins made any attempt to verify the claims made by Brian Wilson. They did not seek confirmation from other sources and locate documents. The only hint that HarperCollins took any steps at verification was in a fax to Brain Wilson and Eugene Landy [HC 08858] asking them to send "us copies of all media (magazine articles, newspaper articles, etc.) about Brian and the Beach Boys, especially material in which some the of the revelations (about disputes with the Beach boys, relations with Marilyn and her sisters, Brian's mother's alcoholism, etc.) are mentioned. We're doing research on this end, too." This seems to be too little, too late.

On professional journalism publications the story would have been pulled, or in this case the final manuscript held, until proper verification could have been conducted. It is unacceptable in journalism to be inaccurate. "If in doubt, leave it out."

**Question 4. If steps should be taken, does failure to take appropriate steps lead to fault on behalf of said publisher?**

Thorough reporting is the best protection to legal action (MacDougall, 1968). This was not the practice in this case. The publisher did not make an effort to verify the claims by Wilson. They failed to address the likelihood that a source, in this case Landy, may try to use the publication to promote his own agenda. They failed to investigate the strong possibility that their primary author and source, Brain Wilson, was not credible. They failed to question in a substantial way the reliability of the information.

5

In the ethical case book, "Doing Ethics in Journalism" (1995), the authors offered an accuracy checklist. This list articulates the basic professional standards as endorsed by the Society of Professional Journalists for ensuring accuracy in print. These standards include the following questions that should be asked by author, editor and publisher:

1. Do you have a high level of confidence about the facts in your story and the sources that are providing them? If not, can you tell your story in a more accurate manner? If you have any doubts about your sources, can you delete them or replace them and achieve a higher likelihood of reliability?
2. Have you double-checked the key facts?
3. Are you highly confident that all the factual statements in your story reflect the truth?
4. Are you prepared to defend publicly your fact checking and whatever other measures that were taken to verify your story?

It is clear from the documents that the editors at HarperCollins would have been unable to answer these questions in the affirmative. They failed to investigate doubts they knew surrounded the credibility of Brian Wilson. There was certainly reasonable doubt about Brian Wilson's ability to recall much of the incidences in the book and the undue influence Eugene Landy had on him. Subsequently there could have been only minimal confidence in the facts as Brian Wilson told them. It does not appear that HarperCollins double-checked the facts as presented. As a result of the omission of this critical step in reporting, they could not have been highly confident of the truth of these claims. They simply did not verify them. It would be very difficult to defend this lack of verification and violation of professional journalism standards.

## Question 5. If fault exist, is it negligence and/or actual malice/reckless disregard?

Numerous codes of ethics of professional associations have addressed the issue of accuracy and fairness. The Code of Ethics of the Society of Professional Journalist states there is no excuse for inaccuracies or lack of thoroughness. Public Radio News Directors in their code wrote all errors of fact, bias or omission must be corrected immediately. Radio-Television News Directors Association wrote they will evaluate information solely on its merits as news, rejecting sensationalism or misleading emphasis in any form. Members of Associated Press Managing Editors included in their code an admonition to guard against inaccuracies, carelessness, bias or distortion through either emphasis or omission. Perhaps stated most succinctly, KTVQ-2 in Billings, Montana included in its code of ethics: "In all cases . . . ask yourself WHY? . . . Are they lying to you? . . . Do they have an ax to grind?"

In suits such as this, there are three questions that are commonly asked (Rich 1994):

6

a. Are you publishing something you aren't sure is truthful?
b. Are you carelessly publishing something that is inaccurate?
c. Are you publishing something accusatory that you haven't checked out?

An affirmative response to any of these could lead to sanctions. In such cases, it must be shown that the defendant acted in an irresponsible manner. From the material I have read, it appears that HarperCollins would have to answer these questions "yes."

In the case of a public figure, like Carl Wilson, fault is proven if it can be shown the statement was made by the publisher even though it was known in advance to be false or that there was serious doubt at to its truth. For Audree Wilson, a private figure, it must be proven the publisher was negligent in failing to determine that the statement was false.

From the documents, it is clear that HarperCollins knew that Brian Wilson was not credible and they did not take the necessary and reasonable steps to verify his version. They are willfully at fault. The question then becomes, did they purposefully and knowingly continue with the publication of the book.

It appears that one of the motivations to disregard the concerns raised by both they own professional staff as well as outside experts was a self-imposed timeline. This timeline is much different than that a newspaper faces with deadline. For books the issue of timeliness is not as relevant as "hot news" media outlets. Yet, there are repeated assertions in the documents to the "'crash' schedule." [HC 00472] Sandy Wolf in a memo to Matthew Martin where she sent him the catalog copy for legal review refers to "running on a very tight schedule." [HC 00662] In another request for a legal review, Matthew Martin ask Slade Metcalf to conduct a legal review that "needs to be completed within the next 2 1/2 - 3 weeks." [HC 00672]. Again reference to a tight timeline was made in a memo to Brian Wilson, Eugene Landy and Todd Gold from Tom Miller [HC 08624-HC 08635]. "It goes without saying that since we are on such a tight crash schedule, we'd like the revised manuscript as soon as you are humanly able to deliver it." Genie Gavenchak had an initial reaction that "there were perhaps some insurmountable problems" with the manuscript. Yet these were apparently quickly resolved so they could come "close to the production schedule required." [HC 00475]. Her concerns were at the heart of the credibility problem. She thought that "all the recent stuff came a lot from Landy," she questioned "Wilson's mental competency in 1968-69," and inquired at to the reliability of the author, i.e. "if BW doesn't know who wrote Calif. Girls, who does?" [HC 00631 - HC 00633].

It appears accuracy was scarified for expediency.

7

Based on the references and documents cited in this report, I feel that HarperCollins failed to conduct a reasonable investigation. There was substantial cause to have serious doubts as to the credibility of Brian Wilson as a source and author, and the accuracy of the information he provided. Due to self-imposed time constraints as well as perhaps other factors, HarperCollins failed to act reasonably to verify the information. They violated basic standards of professional journalism as detailed in both professional literature and various codes of ethics of professional media organizations.

## References

Benjaminson, P. & Anderson, D. (1976). <u>Investigative reporting</u> (2nd ed.). Ames: Iowa State University Press.

Black, J., Steele, B. & Barney, R. (1995). <u>Doing ethics in journalism</u>. (2nd ed.) Boston: Allyn and Bacon.

Evensen, B.J. (1995). <u>The responsible reporter</u>. Northport, AL: Vision Press.

Fedler, F. (1993). <u>Reporting for the print media</u>. (5th ed.) Ft. Worth, TX: Harcourt Brace Jovanovich.

Fink, C.C. (1992). <u>Introduction to professional newswriting: Reporting for the modern media</u>. White Plains, NY: Longman.

Garrison, B. (1990). <u>Professional news writing</u>. Hillsdale, NJ: Lawrence Erelbaum Asso.

Harriss, J., Leiter, L. & Johnson, S. (1992). <u>The complete reporter: Fundamentals of news gathering, writing and editing</u> (6th ed.) NY: Macmillan.

Hough, George A., III (1995). <u>News writing</u> (5th ed.) Boston: Houghton Mifflin Co.

MacDougall, C. (1968). <u>Interpretative reporting</u>. NY: Macmillan Co.

Metzler, K. (1989). <u>Creative interviewing</u>. (2nd ed.) Englewood Cliffs, NJ: Prentice Hall.

Rich, C. (1994). <u>Writing and reporting the news</u>. Belmont, CA: Wadsworth.

Ward, H.H. (1991). <u>Reporting in depth</u>. Mountain View, CA: Mayfield Publishing Co.

Wilber, R. (1995). <u>Magazine feature writing</u>. NY: St. Martin's Press.

Consultant's Report
Wilson v. HarperCollins

Prepared by:

*[signature]*

Janet E. Roehl, Ph.D.
May 12, 1995
Portales, New Mexico

9

Exhibit B

# DR. JANET E. ROEHL

**Home**
505 East 17th Lane
(505) 356-6245
Portales, NM 88130

**Work**
Communicative Arts and Sciences
Eastern New Mexico University
Lea Hall Room 109, Station 3
Portales, NM 88130

## EDUCATION

BS   1975   Journalism Education, Northern Arizona University

MA   1977   Journalism Education, Arizona State University

PhD  1981   Adult Education, Department of Higher and Adult Education, Arizona State University (dissertation topic: "Stressful Life Events of Reentry Women Students")

## WORK EXPERIENCE

**Assistant Professor**, Department of Communicative Arts and Sciences, Eastern New Mexico University.
Responsibilities include: lead journalism faculty member and advisor of student publications; curriculum review; recruiting and marketing; student advisement; graduate committees; faculty committees; teach law, ethics, reporting, communication design, photojournalism and various writing courses. 1992-current.

**Director**, University Outreach and Summer Sessions, Eastern New Mexico University
Responsibilities include: chief administrative officer of all outreach programs and summer session; directing, marketing, and coordination of distance education programs and Evening College; offer educational programs at local military base; developing new programs in lifelong learning; administer the community programs; direct extended degree programs and College of the Air (instructional television); serving on appropriate committees; institutional representative to external publics. 1987-1992.

**Associate Director**, Office of Continuing Education and Summer Session, University of Wisconsin-Stout.
Responsibilities include: primary budget preparation and monitoring for office including state appropriations and self-sustaining accounts; supervision of professional and clerical staff; coordinate all off-campus credit course offerings, including television, radio, newspaper, interactive video and teleconference classes; coordinate national non credit conferences and plan summer institutes; develop certificate programs; develop videotapes and other instructional materials; serve on campus and state committees. 1983-1987.

**Graduate Faculty**, University of Wisconsin-Stout.
Responsibilites include: Serve as a research advisor for graduate students' thesis work; available for consulting. 1983-1987.

**Program Specialist**, Office of Continuing Education and Summer Session, University of Wisconsin-Stout.
Responsibilties include: Work with various schools of the University in the development and scheduling of off-campus credit courses and non credit conferences and workshops; coordination of outreach program in cooperation with other campuses in University of Wisconsin System; initiate experimental programs; staff supervision. 1981-1983.

Publications Coordinator, Office of Research Services, College of Education, Arizona State University. Responsiblities include: Supervision of staff; development of proposals; design, production, evaluation, and dissemination of Research Services' publication, i.e., newsletters, bulletins, monographs, and journals; editor of six regular research and service publications, plus several special issue publications; and liaison between College of Education Editorial Board, Dean's Office, faculty members, and publications interest. 1978-1979.

Intern, University Continuing Education and Summer Sessions, Arizona State University. Responsiblities include: Proposal writing; staff development and training; conference assistance; research design and implementation; credit and non credit scheduling and enrollment; budget preparation; committee assignments. 1977-1978.

Research Associate, Department of Higher and Adult Education, Arizona State University. Responsiblities include: In service training of Adult Basic Education teachers in Arizona; design and development of instructional materials; workshop training leader. 1976-1977.

## HONORS

| | |
|---|---|
| 1994 | Invited participant in "Journalism Educators Seminar" sponsored by American Press Institute |
| 1993 | Invited participant in "Seminar for Professors" seminar sponsore by C-SPAN. |
| 1993 | Invited participant in "Journalism and Society" seminar sponsored by The Poynter Institute |
| 1987 | Outstanding Young Women in America |
| ,87 | Selected as participant in "Learn From Success" program sponsored by National University Continuing Education Association |
| 1987-1988 | Notable American Women |
| 1986-1987 | Who's Who in America |
| 1984-1985 1987-1988 | Who's Who in the Midwest |
| 1980-81 | Who's Who Among Students in American Universities and Colleges |
| 1974 | Outstanding Journalism Student in the College of Education, Northern Arizona University |
| 1971-1974 | Academic Scholarship, Northern Arizona University |

## PROFESSIONAL MEMBERSHIPS

Society of Professional Journalists; New Mexico Press Women; National Press Women; Correspondents Fund Committee, Association for Education in Journalism and Mass Communications; CMA Liaison, Media Law and Ethics Committee, College Media Advisors; American Statistical Association; New Mexico Foundation for Open Government; Newspaper Association of America; Investigative Reporters & Editors

## COMMUNITY MEMBERSHIPS

Board member, Roosevelt County Literacy Council; Chair of Family Ministries, member Staff Parish Relations Committee, member Administrative Board, member Nominating and Personnel Committee, First United Methodist Church; Roosevelt County Chamber of Commerce; Military Affairs Committee; steering committee for Habitat for Humanity

Case 1:94-cv-00892-JEC-LFG   Document 62   Filed 09/27/95   Page 16 of 18
P.04

## PUBLICATIONS

Roehl, J.E. (1995). Code of Ethics for College Press. CMA Review. (forthcoming Spring 1995).

Roehl, J.E., Okun, M.A. (1985). Life events and the use of social support systems among reentry women students. Journal of the National Association for Women Deans, Administrators, & Counselors. 48 (4), 23-30.

Roehl, J.E., Herr, J., & Applehans, D.J. (1985). Parenting education-now more than ever. Lifelong Learning: The Adult Year, 9 (3), 20-22, 27.

Roehl, J.E., & Burns, S.R. (1985). Talking to sexually abused children: A guide for teachers. Childhood Education, 62 (1), 19-22.

Roehl, J.E., (Ed.) (1984). Computers for the disabled. Menomonie, Wisconsin: University of Wisconsin-Stout.

Roehl, J.E., & Gray, D. (1984). The crises of rape: A guide to counseling victims of rape. Crisis Intervention. 13 (2), 67-77.

Roehl, J.E., & Okun, M.A. (1984). Depression symptomatology among reentry women students: The role of negative life events and family social support. Journal of College Student Personnel, 25(3), 251-254.

Rossman, M.H., Fisk, E., & Roehl, J.E. (1984). Teaching and learning basic skills: A guide for adult basic education and developmental education programs. New York: Teachers College Press, Columbia University.

Fowler, D., Burns, S.R., & Roehl, J.E. (1983). Counseling the incest offender. International Journal of Family Therapy, 5 (2), 92-97.

Fowler, C., Burns, S.R., & Roehl, J.E. (1983). The role of group therapy with members of incestuous families. International Journal of Family Therapy, 5 (2), 127-135.

Kissinger, B., Boettcher, B., & Roehl, J.E. (1983). The conference and workshop budget planning model (computer program). Menomonie, Wisconsin: Stout Foundation.

Roehl, J.E. (1981). Stressful life events of reentry women students. Unpublished doctoral dissertation, Arizona State University.

Roehl, J.E. (1980). Improving the self-concept of reentry women students: Techniques and principles. Lifelong Learning: The Adult Years, 3 (10), 12-13, 22.

Roehl, J.E. (1977). Behavior objectives. In M.H. Rossman (Ed.), Adult education staff development: Six instruction units for BA, GED, & ESL personnel (Vol. II) (pp. 381-413). Phoenix: Arizona Department of Education.

Roehl, J.E. (1977). Improving self-concept. IN M.H. Rossman (Ed.), Adult education staff development: Six instruction units for ABE, GED, & ESL personnel (Vol. II) (pp. 331-380). Phoenix: Arizona Department of Education.

Roehl, J.E. (1977). Questioning techniques. In M.H. Rossman (Ed.), Adult education staff development: Six instruction units for ABE, GED, & ESL personnel (Vol. II) (pp. 249-330). Phoenix: Arizona Department of Education.

## MAJOR PRESENTATIONS

"Can the First Amendment Survive on College Campuses?" College Media Advisers Convention, New Orleans, LA, 1994

"Current Legal Issues" panel, College Media Advisers Convention, New Orleans, LA, 1994

"The First Amendment and Diversity," First Annaul First Amendment Issues Confernece, Portales, NM, 1994

"Mary Magdalene,: New Mexico Women's Studies Conference, Las Cruces, NM, 1994

"What Should I Do? Ethics for College Journalists", College Media Advisers Convention, Dallas, TX, 1993

"Trends in Brochure Design", 6th Annual NCMPR District 4 Conference, Santa Fe, NM, 1992

"Achieving Competency in Brochure Design", 41st Annual Adult Education Conference, Anaheim, CA, 1992

"Bridging the Marketing Distance: Effective Brochure Design", Quality in Off-Campus Credit Programs, San Antonio, TX, 1992

"Using Novelties in Marketing and Public Relations", NUCEA Region VI, Tucson, AZ, 1992

"Gender Distinctions in the Adult Education Classroom: An Update", Lifelong Learning Conference, San Diego, CA, 1992

"Brochure Design to Attract the Adult Learner", Lifelong Learning Conference, San Diego, CA, 1992

"Gender Distinctions in the Adult Education Classroom", NUCEA National Conference, Miami, FL 1991

"Your Image: Brochures, Posters, and Advertising", NAASS Annual Conference, Tucson, AZ, 1991

"Guess Who's Coming to Your Programs in the 21st Century", National Issues in Higher Education: Quality in Off-Campus Credit Programs, Orlando, FL, 1990

"Demographic Forecasting", LERN National Conference, Cincinnati, OH, 1990

"Pluralism in Era of Limited Resources - Implications for University Leadership", North American Association of Summer Sessions, Minneapolis, MN, 1990

"Better Utilizing Existing Financial Resources: A Summer Budget Allocation Model", Maximizing Summer Opportunities Conference, Hilton Head, SC, 1990

"Educational Guidelines To Distant Learners", NUCEA National Conference, New Orleans, LA, 1990

"Financing of Continuing Education in New Mexico", PACE-New Mexico, State Meeting, Santa Fe, NM, 1989

"Is Continuing Higher Education Only for the Rich?", National Issues in Higher Education: Quality in Off-Campus Credit Programs, Washington, DC, 1986

"Certificate Programs in Continuing Education", NUCEA Region IV Conference, Minneapolis, MN, 1986

"A Conference and Workshop Budget Planning Model", Adult and Continuing Education Computer Software Fair, Madison, WI, 1984

"Life Events and Social Support Utilization and Satisfaction Among Reentry Women Students", American Education Research Association Annual Meeting, New Orleans, LA, 1984

"Promises of Technology - Practical Realities", National Adult Education Conference, Louisville, KY, 1984

"Interdependence: Microcomputers and Conference Planners", National Adult Education Conference, Philadelphia, PA, 1983

"Sexual Assault - A Family Affair", International Symposium on Family Sexuality, Minneapolis, MN, 1982

"Microcomputers: The New Secretary in Offices of Continuing Education", Wisconsin Association for Adult and Continuing Education, Telemark, WI, 1982

"Occupational Stress", Wisconsin State Convention of American Association of University Women, Fond du Lac, WI, 1982

"The Effect and Mediation of Stress on Reentry Women Students", Wisconsin Adult Education Conference, Cable, WI, 1982

"The Use of Microcomputers in Offices of Continuing Education and Universities under 10,000 Students", National Adult Education Conference, San Antonio, TX, 1982

## TRAVEL

Most of the United States, including Hawaii; Belgium; Canada; England; France; Hong Kong; India; Indonesia; Japan; Kenya; Mexico; Mozambique; Senegal; South Africa; Sri Lanka; Taiwan; Tanzania