UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

----------------------------------------x

CARL WILSON, an individual, and             :
AUDREE WILSON, an individual,

                          Plaintiffs,       :

              v.                            :    94 Civ. 892 (JC)

                                            :
HARPERCOLLINS PUBLISHERS INC.,
a Delaware corporation,                     :

                          Defendant.        :

----------------------------------------x

### REPLY MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

William S. Dixon
RODEY, DICKASON, SLOAN,
 AKIN & ROBB, P.A.
Albuquerque Plaza
201 Third Street NW,
Suite 2200
Albuquerque, New Mexico 87103
Telephone: (505) 768-7266

R. Bruce Rich
Katherine J. Daniels
Elizabeth Stotland Weiswasser
WEIL, GOTSHAL & MANGES
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000

Attorneys for Defendant,
HarperCollins Publishers Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | |
|---|---|
| CARL WILSON, an individual, and AUDREE WILSON, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>HARPERCOLLINS PUBLISHERS INC., a Delaware corporation,<br><br>Defendant. | ORAL ARGUMENT REQUESTED<br><br><br>94 Civ. 892 (JC) |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

HarperCollins Publishers Inc.'s ("HarperCollins") moving papers demonstrated the extraordinary lengths to which its editorial and legal staff and representatives went to assure the accuracy of the factual contents of WOULDN'T IT BE NICE -- MY OWN STORY ("the book"). Two years in creation, the book was shepherded through the publishing process by one of HarperCollins' most experienced editors, whose objective was to see to it that the book, as published, represented Brian Wilson's own, faithful account of his life's story.

HarperCollins devoted significant legal resources toward the same objective. Expert outside publishing counsel, in coordination with HarperCollins' inside counsel, reviewed the manuscript for accuracy over a two-month period. The legal review process was determined to be so important, and in fact was so thorough, that the schedule for publication was pushed back by some six weeks to permit its completion.

The process was a textbook example of careful pre-publication procedures undertaken by a book publisher. Its outcome was a good-faith determination that the book's factual content was accurate.

In an effort to withstand summary judgment, plaintiffs attempt to paint a quite different portrait -- that of a publisher deliberately or recklessly pursuing a publishing project without concern for its accuracy.  The Court is invited by plaintiffs to believe that the entire two-year publishing effort was a sham -- that, for reasons never articulated by the plaintiffs, HarperCollins, acting through its editors and lawyers, was motivated to publish an autobiography it _knew_ (or had reason to know) was _not_ the story of Brian Wilson and it _knew_ (or had reason to know) was instead the handiwork of Eugene Landy.  The premise is illogical; more importantly, there is simply no record support for it.

There is even less basis for allowing the conclusion that the specific passages at issue in this suit were somehow the product of this allegedly reckless publishing venture.  Try as they might, plaintiffs simply cannot squeeze their square-peg scenario into the round-hold record facts presented here.

To be sure, in constructing their scenario, plaintiffs grab a sentence here and a phrase there from documents and depositions they otherwise contort or ignore.  This fast-and-loose treatment of the record is easily exposed, however, and we do so in this reply brief.

Plaintiffs are left to resort in desperation to "factual" declarations from their own counsel of record, who have now proffered themselves as plaintiffs' key factual witnesses.[1]  But these declarations are of no more probative value than plaintiffs' gloss on the fact record.  Ms. Drooz's declaration is as irrelevant as it is inadmissible in purporting to recount _post-_

---

1.  The propriety of this dual role as trial counsel and fact witness is the subject of separate disqualification motion papers being filed by HarperCollins.

<u>publication</u> discussions between plaintiffs and HarperCollins.  Mr. Langberg's declaration is a blend of argumentation and hearsay, none of which alters one iota the state of the record as to the dispositive issue on this motion -- HarperCollins' (as opposed to Mr. Langberg's) state-of-mind at the time the book was published.

Plaintiffs' final reach for a toe-hold to a possible trial takes the form of two expert submissions.  But their choice of experts to opine as to whether HarperCollins has acted within book publishing norms is a curious one, insofar as neither has book publishing background.  What is more, their reports suffer the same infirmity as the balance of plaintiffs' argumentation:  they consist of a combination of rank speculation and conclusions drawn from a morsel of record evidence (and a distorted one at that).  The approach to the evidence reflected in these reports betrays either a woefully inadequate knowledge of the record or a deliberate disregard of it.

The governing case law, which plaintiffs have also tried to sidestep, makes clear that the First Amendment protects a book publisher from defamation liability provided only that it has formed a good-faith belief in the truthfulness of a given manuscript.  The cases are uniform in dismissing libel claims in circumstances where, as here, the book publisher has relied on a reputable author and has taken other reasonable steps to gain a comfort level as to a book's accuracy.

For their part, plaintiffs fail to cite a single book publishing case to support denial of summary judgment here.  They, instead, reach for cases that do not deal with the standard of care pertaining to book publishers and which are grounded on extreme facts that bear not the slightest resemblance to those presented here.

3

To withstand summary judgment for HarperCollins here, plaintiffs were required to identify a sufficient quantum of <u>concrete</u> and <u>admissible</u> evidence such that a jury could find by <u>clear and convincing evidence</u> that HarperCollins <u>knowingly published false facts defamatory of plaintiffs or published them in reckless disregard of their truth or falsity</u>.  Plaintiffs have failed utterly to discharge that burden.  Summary judgment dismissing the complaint is the proper remedy in the circumstances.

I.  **PLAINTIFFS IGNORE THE OVERWHELMING WEIGHT OF LEGAL AUTHORITY ON A BOOK PUBLISHER'S STANDARD OF CARE**

A.  **Introductory Points**

Plaintiffs have conceded that Carl Wilson is a public figure to whom the actual malice test applies. Plaintiffs' Memorandum of Law in Opposition to Defendant HarperCollins' Motion For Summary Judgment ("Opp. Br.") 5.  As to Audree Wilson, plaintiffs dispute HarperCollins' contentions that:  (1) Audree Wilson is a public figure; and (2) under New Mexico choice of law rules, New York's gross irresponsibility test governs Ms. Wilson's claim if she is treated as a private figure.

While, as we demonstrate <u>infra</u>, plaintiffs are incorrect as a matter of law on both of these issues, they are not of great moment in relation to disposition of this motion because the unrefuted record conclusively establishes that HarperCollins' pre-publication conduct more than satisfied <u>any</u> potentially governing standard of care -- actual malice, gross irresponsibility or negligence.

4

**B.    Plaintiffs' Legal Analysis Is Flawed**

HarperCollins' opening brief cites and discusses case after case in which courts have entered summary judgment in favor of book publishers under each potentially applicable standard -- actual malice, gross irresponsibility or negligence -- when the publisher has engaged in the quantum and quality of pre-publication review that HarperCollins engaged in here. See Opening Br. 34-48.

Faced with no authority to rebut these cases and their implications here, plaintiffs have chosen to completely ignore them.  Their force cannot be avoided, however.  The wealth of book publisher precedent makes eminently clear that a publisher does not, as a matter of law, act with actual malice or with gross irresponsibility or negligently when it has done what the unchallenged record reveals that HarperCollins did here:  relied on a reputable and experienced author (Mr. Gold); met with the authors (Messrs. Gold and Wilson) to judge their credibility; required substantiation of numerous passages; and had the manuscript reviewed prior to publication by an experienced libel law attorney.

As discussed in HarperCollins' opening brief, the actual malice standard requires no more of a publisher than reliance on a reputable and experienced author in forming a good faith belief that the manuscript is accurate and truthful.  Opening Br. 34-38.  While this unchallenged legal standard clearly does not require the extensive pre-publication review that HarperCollins undertook -- and thus would have protected HarperCollins from liability had it done far less -- the unrefuted record reveals a course of conduct on the part of HarperCollins that far exceeded that of even a reasonable (negligence standard) book publisher.  See Opening Br. 49-51; Drew Aff. ¶¶ 9, 65.

In their search for helpful precedent, plaintiffs cite to a
line of cases (Opp. Br. 10-11, 15-19) which correctly observe that
actual malice may be found in egregious circumstances where a
publisher:  (1) "purposefully avoided the truth" of the story it
published; (2) "fabricated" a story; (3) published a "product of
[its] imagination," (4) based a story "wholly on an unverified
anonymous telephone call," or (5) reported "allegations [that] are
so inherently improbable that only a reckless [publisher] would
have put them in circulation."  See Harte-Hanks Communs., Inc. v.
Connaughton, 491 U.S. 657 (1989); St. Amant v. Thompson, 390 U.S.
727, 731-32 (1968).  But the mere articulation of these tests does
not get plaintiffs home.  They are required to match the fact
record here to the extreme departures from sound journalism that
the above-articulated legal standards require be shown.
Plaintiffs have not remotely made that demonstration.

Thus, plaintiffs' portrayal of HarperCollins as making "a
deliberate decision not to acquire knowledge of facts that would
confirm the doubts they possessed" (Opp. Br. 17) is a hollow
incantation of the actual malice test wholly divorced from the
record presented here.  That record demonstrates conclusively that
HarperCollins aggressively confronted each issue bearing on the
veracity of the book, concluding in each and every instance that
the book represented an honest account of Mr. Wilson's life from
Mr. Wilson's perspective.

Indeed, contrary to plaintiffs' assertion (Opp. Br. 2),
HarperCollins' motion for summary judgment does not rest on
"professions of good faith and ignorance," but on the thorough and
careful investigation that it undertook to assure itself that
Brian Wilson was competent to participate in the writing of his
autobiography and that the material in the book represented a
truthful account of Mr. Wilson's life.  See Opening Br. 7-26.

One need only compare the facts of the <u>Harte-Hanks</u> decision on which plaintiffs rely to those presented here to realize just how aberrant a publisher's conduct must be to allow a jury to reach a finding of actual malice.  The plaintiff in <u>Harte-Hanks</u>, an unsuccessful political candidate, challenged a newspaper's report that he offered bribes to two sisters for their help in a criminal investigation of his opponent.  The newspaper, a supporter of the opponent, obtained its information from one of the sisters and reported on the alleged bribery notwithstanding that:  the story had been "consistently and categorically" denied not only by the plaintiff, but by five other individuals who attended the meeting at which the plaintiff allegedly offered the inducements; despite these denials, the newspaper had failed to seek confirmation of the story from the other sister; and the newspaper was in possession of, but failed to listen to, tape recordings of the meeting at which the bribery allegedly occurred. 491 U.S. at 682-85.  Small wonder in these circumstances that the United States Supreme Court found sufficient evidence of purposeful avoidance of the truth to permit a jury to find actual malice.

Plaintiffs similarly misfire in their assertion that summary judgment in favor of the publisher in private figure cases governed by the negligence standard is "unusual."  Opp. Br. 25. Quite to the contrary, it is the norm.[2]

---

2.  <u>See</u>, <u>e.g.</u>, <u>Middleton</u> v. <u>Sutton</u>, Civ. No. 92-589-B, 1995 U.S. Dist. LEXIS 4687 (D.N.H. Mar. 31, 1995) (summary judgment for defendant on issue of negligence); <u>Holden</u> v. <u>Clary</u>, 20 Media L. Rep. 1829 (E.D. Va. 1992) ("mere speculation" as to negligence cannot overcome a publisher's motion for summary judgment); <u>Nesbitt</u> v. <u>Multimedia, Inc.</u>, 9 Media L. Rep. 1473 (W.D.N.C. 1982) (summary judgment for publisher on issue of negligence); <u>Dresbach</u> v. <u>Doubleday & Co., Inc.</u>, 518 F. Supp. 1285 (D.D.C. 1981) (same for book publisher); <u>Turner</u> v. <u>Harcourt, Brace, Jovanovich</u>, 5 Media L. Rep. 1437 (W.D. Ky. 1979) (same); <u>Lake Havasu Estates,</u>

(continued...)

Plaintiffs cite but a <u>single</u> case, <u>Ashby</u> v. <u>Hustler Magazine, Inc.</u>, 802 F.2d 856 (6th Cir. 1986), to support their assertion. Once again, merely to recite the facts presented in <u>Ashby</u> is to distinguish it totally from the record developed here.  <u>Ashby</u> involved Hustler Magazine's publication of nude photographs of the plaintiff without her permission (a forged consent form had been submitted).  In denying the magazine's motion for summary judgment, the Court emphasized that the nature of the subject matter at issue (nude photographs) required the magazine to establish procedures which would ensure that consent to publication was genuine.  The magazine's failure to establish such procedures, particularly in the face of overt signs that the person who signed the release form was not the individual depicted in the photographs, was sufficient to preclude summary judgment on the issue of negligence.  802 F.2d at 858-60.

---

2.  (...continued)
<u>Inc.</u> v. <u>Reader's Digest</u>, 441 F. Supp. 489 (S.D.N.Y. 1977) (same);
<u>Kendrick</u> v. <u>Fox Television</u>, 659 A.2d 814 (D.C. App. 1995) (same);
<u>Cefalu</u> v. <u>Globe Newspaper Co.</u>, 8 Mass. App. Ct. 71, 76-77, 391
N.E.2d 935, 938 (Mass. App. 1979) (same), <u>cert. denied</u>, 444 U.S.
1060 (1980); <u>Walters</u> v. <u>Sanford Herald, Inc.</u>, 31 N.C. App. 233,
228 S.E.2d 766 (N.C. App. 1976) (same); <u>Barbetta Agency, Inc.</u> v.
<u>Evening News Pub. Co., Inc.</u>, 135 N.J. Super. 214, 343 A.2d 105
(N.J. App. 1975) (same).

Indeed, a study published in July of this year by the not-for-profit Libel Defense Resource Center reveals that from 1990 to 1994, courts granted defendants' motions for summary judgment in 85.0 percent of all <u>private figure</u> cases in which decisions on motions for summary judgment were reported, while denying defendants' motions in only 11.7 percent of all such cases.  <u>LDRC Bulletin</u> No. 3, Table 7 at A6 (July 1995).  The same study indicates that courts entered summary judgment in favor of the defendant in 86.7 percent of all <u>public</u> figure cases and denied summary judgment in only 8.2 percent of all such cases.

II.   **PLAINTIFFS HAVE ADDUCED NO EVIDENCE THAT HARPERCOLLINS PUBLISHED THE BOOK WITH ANY DEGREE OF FAULT AND HAVE FAILED TO PRESENT A SINGLE DISPUTED MATERIAL FACT**

To overcome HarperCollins' motion for summary judgment, plaintiffs are constitutionally required to adduce a sufficient quantum of <u>affirmative</u>, <u>admissible</u> evidence such that a reasonable jury could find by <u>clear and convincing evidence</u> that HarperCollins knowingly published false facts defamatory of plaintiffs or that HarperCollins published such facts with a <u>subjective</u> awareness that they were probably false and "<u>in fact</u>" had serious doubts as to their truth or falsity.  <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 256-57 (1986); <u>St. Amant</u>, 390 U.S. at 731.  If Ms. Wilson is a private figure (which HarperCollins asserts she is not for the reasons set forth <u>infra</u>), plaintiffs have the burden of coming forward with <u>concrete and admissible</u> evidence that would establish, at a minimum, negligence on the part of HarperCollins by a <u>preponderance of the evidence</u>. Plaintiffs have failed to adduce <u>any</u> such evidence and thus cannot meet their burden irrespective of which standard of care or evidentiary standard is applied.

Plaintiffs' "Opposition to HarperCollins' Statement of Uncontested Material Facts" (Opp. Br. 25-38 (Section III))[3] consists, in equal parts, of pure conjecture and grossly distorted snippets of testimony and documents wrenched out of the broader contextual and temporal framework of the record as a whole.[4]

_____

3.  Paragraphs 1-3, 6, 8-9, 12-16, 18, 22, 25, 30-33 and 35 of HarperCollins Statement of Uncontested Material Facts have not been challenged by plaintiffs and are thus deemed admitted pursuant to D.N.M.LR-CV 56.1.b.  The remaining paragraphs are challenged only to the limited extent set forth in Section III of plaintiffs' opposition brief.

4.  For example, plaintiffs' assertion that Ms. Gavenchak "relied on as corroboration <u>one</u> incident reported as 'rumor' in <u>Heroes</u>
(continued...)

Indeed, in many instances the very deposition excerpts and documents appended to plaintiffs' opposition papers belie the assertions found in their brief.  The record, as summarized below and as recounted in detail in HarperCollins' opening brief at 7-26, disposes completely of so much of plaintiffs' eighteen asserted contested facts as have relevance and lays bare the absence of any disputed material fact in this case.

Plaintiffs' assertions of contested fact essentially boil down to the following premise: that HarperCollins' "purposefully avoided" or blinded itself to (1) Brian Wilson's psychological problems and (2) Eugene Landy's alleged control over the contents of the book.  Not only have plaintiffs failed to provide a single shred of evidence to support either prong of this premise, the record flatly contradicts their unsubstantiated assertions and the facts are clearly and decidedly to the contrary.  Indeed, plaintiffs have failed to address or even mention the abundance of evidence -- particularly unrefuted deposition testimony and affidavits -- establishing that HarperCollins carefully inquired into and investigated both facets of this contention and came to the good-faith and reasonable conclusions that Brian Wilson was competent to tell his story, that the story was both accurate and honest, and that it represented Mr. Wilson's viewpoint, not Mr. Landy's.

---

4.   (...continued)
and Villains" for the statements in the book concerning Audree Wilson's response to her husband's child abuse (Opp. Br. 31) is a patent distortion of the record.  Ms. Gavenchak testified repeatedly about her many conversations with Todd Gold concerning these very statements and the process by which she came to the conclusion that the statements were true.  Gavenchak Aff. ¶ 8a; Gavenchak Dep. 73-76 (Exh. 12 to Drew Aff.).  Indeed, in several instances, plaintiffs fail to provide the Court with a complete copy of the documents that they distort.  See Exh. F to Opp. Br. (neither memorandum is complete).

In this regard, so long as HarperCollins made such a determination based on its pre-publication "vetting" process as a whole, it is irrelevant which individuals acting on HarperCollins' behalf actually met Mr. Wilson or responded to concerns as to Mr. Wilson or Mr. Landy expressed by one or more third parties.  Thus, plaintiffs' effort to ascribe fault to HarperCollins on the basis that any given individual may or may not have replicated the efforts of other HarperCollins' representatives is plainly improper and invites the Court to lose the forest for the trees.

**A.    HarperCollins' Belief in Brian Wilson's Ability to Tell His Story**

While plaintiffs repeatedly attempt to make an issue of Mr. Wilson's competence per se, that issue is not material to the issue of HarperCollins' standard of care.  The only material question is whether HarperCollins made a good faith (actual malice) or reasonable (negligence) determination that Mr. Wilson was competent to truthfully tell his life story.

The record facts (see Opening Br. 7-26) completely dispose of plaintiffs' unsupported assertions of contested fact in paragraphs 1, 2, 5-17 of Section III of their brief (Opp. Br. 25-27, 29-38), each of which (stripped of irrelevancies) relates to HarperCollins' investigation of Mr. Wilson's ability to participate, and his actual participation, in writing the book.

Thomas Miller (the editor), Matthew Martin (an in-house lawyer) and Craig Herman (HarperCollins' then-Assistant Director of Publicity) all testified that they personally met with Mr. Wilson to satisfy themselves that he was competent to write his memoirs and participate effectively in a publicity tour.  Miller Aff. ¶ 15; Martin Aff. ¶ 24; Herman Aff. ¶ 6.  In addition, Ms. Gavenchak, HarperCollins' outside counsel, testified that she received repeated assurances from Mr. Gold that Mr. Wilson had

been forthcoming with details about his life, that Mr. Wilson was perfectly capable of honestly remembering and reporting a great deal about his past, and that Mr. Wilson was honest with Mr. Gold when he was unable to recall certain events.[5]  Gavenchak Aff. ¶ 6; Gavenchak Dep. 53-57, 73-74 (Exh. 12 to Drew Aff.).  Further, Mr. Miller testified that Mr. Strone of the William Morris agency had given him assurances that Brian Wilson had overcome his emotional problems and was competent to co-author the book. Miller Aff. ¶ 8.

In an effort to refute this testimony, plaintiffs cite the preliminary reactions of a young editorial assistant, James Hornfischer, to the first draft of the manuscript.  See Opp. Br. 26, 28.  In typically selective fashion, plaintiffs ignore the stated purpose of Mr. Hornfischer's comments -- to help give the far more experienced senior editor, Mr. Miller, "a frame of reference for his own independent evaluation of the book project." Hornfischer Dep. 91-93, 100 (attachment 1 hereto).  Mr. Miller, as noted, undertook substantial efforts (along with other HarperCollins' representatives) to reach a comfort level on Mr. Wilson's competency.  See Hornfischer Dep. 317-19 (attachment 1 hereto).  Even respecting Mr. Hornfischer's supposed doubts, when asked at his deposition whether, at the time he was reviewing the manuscript, he had "any question in [his] mind as to whether Brian

---

5.  Moreover, Ms. Gavenchak testified that Mr. Wilson's accounts of many events from his past were consistent with previously-published accounts of the same events.  Gavenchak Aff. ¶ 8; Gavenchak Dep. 175 (Exh. C to Opp. Br.).  A publisher's reliance on previously published reports concerning the same subject matter is strongly probative of an absence of actual malice.  See Liberty Lobby, Inc. v. Rees, 852 F.2d 595, 599 (D.C. Cir. 1988), cert. denied, 489 U.S. 101 (1989); Rosanova v. Playboy Enterprises, Inc., 580 F.2d 859, 862 (5th Cir. 1978) ("defamation defendants will not be forced to defend, nor will a trial judge in a later libel case have to retry, the truthfulness of previous reports made by independent publishers").

Wilson was capable or competent to write an accurate book with a ghostwriter or to tell an accurate story of his life," Mr. Hornfischer's unequivocal answer was "No."  Hornfischer Dep. 196-97 (attachment 1 hereto).

Likewise a red herring is the fact that HarperCollins did not seek to obtain a copy of Dr. O'Connor's psychological evaluation of Brian Wilson.  Book publishers simply do not, as a pre-condition of publishing, undertake formal psychological profiles of their authors.  As HarperCollins' expert, Lisa Drew, has testified, in her thirty-four years of experience in book publishing she has <u>never</u> heard of any requirement that a book publisher wait for a psychological evaluation of a celebrity prior to publishing his autobiography.  Drew Supp. Aff. ¶ 2.

This is not to say that HarperCollins ignored potential concerns over Mr. Wilson's mental health.  To the contrary, it undertook to gain the necessary comfort level by the multiple techniques of meeting Mr. Wilson, monitoring his involvement through his co-author, Mr. Gold, and being authoritatively advised by Mr. Wilson's attorney, Donald Engel, that the conservatorship proceeding (in connection with which Dr. O'Connor's report was being prepared) was <u>not</u> fundamentally about Mr. Wilson's mental capacity.  <u>See</u> Opening Br. 17-18; Gavenchak Aff. ¶ 10.  In any event, HarperCollins was advised by Mr. Engel that the O'Connor report would conclude that Mr. Wilson <u>was</u> mentally competent.[6]
Martin Aff. ¶ 25.

_____

6.  It should be noted that the O'Connor report is dated October 4, 1991 -- <u>after</u> HarperCollins began shipping copies of the finished book from its warehouse to wholesale and retail booksellers throughout the country.  Martin Supp. Aff. ¶ 8.

**B.**     **HarperCollins' Belief As To Mr. Landy's Involvement in the Book**

Nor have plaintiffs come forward with any concrete evidence to support their assertions that Eugene Landy "manipulated" the content of the book or, more critically, that he inserted the specific statements in the book that are claimed to be false and defamatory as to Carl and Audree Wilson.  See Langberg Dec. ¶ 6E; Opp. Br. 3.  In fact, the record on these points is decidedly to the contrary and refutes completely plaintiffs' asserted contested facts in paragraphs 3-6, 9-12, 15-17 of Section III of their brief (Opp. Br. 27-38), each of which (stripped of irrelevancies) relates to the Landy issue.

Mr. Miller testified that William Shinker (the publisher) insisted from the start of this project that the book be Brian Wilson's and not Eugene Landy's.  Miller Dep. 54-56 (Exh. 5 to Drew Aff.); Shinker Dep. 55-56 (Exh. 9 to Drew Aff.).  To this end, Mr. Shinker insisted upon contractual language that would prevent Mr. Landy from continuing the project in Mr. Wilson's absence.  Id.  Mr. Miller further testified that throughout the editorial process he made concerted efforts to insure that Eugene Landy was not controlling the contents of the book, Miller Aff. ¶ 20, and that he was informed by Mr. Gold that Mr. Landy's participation in the writing of the book was limited to providing input on the sections discussing his treatment of Brian Wilson, Miller Dep. 53-55 (Exh. 5 to Drew Aff.).  Ms. Gavenchak testified that she came to the same conclusion as to Mr. Landy's involvement in the book.  Gavenchak Aff. ¶ 9.

Plaintiffs have not refuted any of this testimony and have not, as they are required to do, specifically tied a single one of the challenged passages to Mr. Landy's alleged manipulations.  See Bailey v. Dell Pub. Co., Inc., 790 F. Supp. 101, 105 (W.D. Pa.)

(plaintiff must establish publisher fault with respect to the specific passages that are challenged), <u>aff'd</u> <u>without</u> <u>opn.</u>, 983 F.2d 1049 (3d Cir. 1992); <u>Miele</u> v. <u>William Morrow & Co., Inc.</u>, 670 F. Supp. 136, 139 (E.D. Pa.) (same), <u>aff'd</u> <u>without</u> <u>opn.</u>, 829 F.2d 31 (3d Cir. 1987).

Bereft of record support, plaintiffs pin their "Landy-control-of-the-manuscript" hopes on the declaration of their attorney of record, Barry Langberg.[7]  The declaration relies upon such double-hearsay as the following to attempt to create a factual dispute where there is none:

> I had information that, over the years, Landy had made a number of statements about Carl Wilson and Audree Wilson that were false and defamatory. I was certain that Landy would take the opportunity to insert those statements in the purported autobiography of Brian Wilson.

Langberg Dec. ¶ 4.  Needless to say, Mr. Langberg does not come forward with his supposed "information"; neither does his carefully-worded statement claim that Mr. Landy actually inserted these mystery passages into the manuscript.

Finally, while Mr. Langberg trumpets his August 8, 1991 letter to HarperCollins (Exh. 4 to Martin Aff.) as if it were a veritable smoking gun, it scarcely constitutes a water pistol. That letter made no specific claims of factual falsity (Mr. Langberg advised HarperCollins that he had not reviewed the manuscript), and merely reiterated general assertions as to Brian Wilson's competency and Mr. Landy's control that HarperCollins had been investigating for many months.  Since the August 8, 1991 letter raised no new allegations and presented no new facts, it is hardly surprising that HarperCollins' inside and outside counsel would and did conclude that HarperCollins should proceed with

_____

7.  In Point III below, we address the evidentiary infirmities of the Langberg Declaration.

publication.  Martin Aff. ¶ 28; Gavenchak Aff. ¶ 11.  The law fully supports their decision.

The cases are legion that publication following a general and non-specific charge of possible falsity is not reckless and forms no basis for defeating a publisher's motion for summary judgment.[8]  "If potential plaintiffs in libel suits could cut off [an actual] malice defense by simply calling a [publisher] and giving a broad denial of an article, the first amendment principles in New York Times would be undermined."  Martin Marietta Corp. v. Evening Star Newspaper Co., 417 F. Supp. 947, 960 (D.D.C. 1976).  As one court noted, a potential plaintiff's general charge that material is false "hardly alert[s] the conscientious reporter to the likelihood of error," as such denials are simply "commonplace in the world of polemical charge and countercharge."  Edwards v. National Audubon Society, 556 F.2d 113, 121 (2d. Cir.), cert. denied, 434 U.S. 1002 (1977).  This observation is particularly apt here, where Mr. Langberg's clients avowedly had an interest in the book's not being published.  Martin Aff. ¶ 28; Gavenchak Aff. ¶ 11.

---

8.  See, e.g., Liberty Lobby, Inc. v. Anderson, 746 F.2d 1563, 1569 (D.C. Cir. 1984) (pre-publication letter from plaintiff containing "mere general allegations of falsity" cannot constitute sufficient evidence of actual malice to overcome a motion for summary judgment), vacated and remanded on other grounds, 477 U.S. 242 (1986); Davis v. Costa-Gavras, 595 F. Supp. 982 (S.D.N.Y. 1984) (unsubstantiated, non-specific pre-publication letter from plaintiff that failed to point out specific inaccuracies cannot create an issue of fact on the issue of actual malice; summary judgment for publisher); Dombey v. Phoenix Newspapers, 150 Ariz. 476, 724 P.2d 562 (1986) (a general and non-specific demand for retraction that fails to cite specific inaccuracies and the facts to rebut them are afforded no weight in actual malice inquiry); Curran v. Philadelphia Newspapers, Inc., 497 Pa. 163, 439 A.2d 652 (1981); Goldblatt v. Seaman, 22 Media L. Rep. 2059 (N.Y. Sup. Ct. 1994); New York Yankees v. CBS, 16 Media L. Rep. 1055, 1057 (N.Y. Sup. Ct. 1988) (letter from plaintiff that generally claimed book to be false and libelous and failed to delineate specific passages cannot create an issue of fact as to actual malice).

In sum, the record is devoid of any factual basis for Mr. Langberg's bald assertion that Mr. Landy inserted false and defamatory statements about his clients into the book and that HarperCollins looked the other way as he did so.[9]

### III. THE LANGBERG AND DROOZ DECLARATIONS CONTAIN INADMISSIBLE STATEMENTS THAT CANNOT BE USED TO DEFEAT HARPERCOLLINS' MOTION FOR SUMMARY JUDGMENT

Rule 56(e) of the Federal Rules of Civil Procedure expressly mandates that affidavits offered in opposition to a motion for summary judgment "shall set forth such facts as would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). What little evidence plaintiffs have attempted to marshal in the Langberg and Drooz declarations is inadmissible under the Federal Rules of Evidence and, as such, ought not to be considered here.

#### A. The References in the Langberg Declaration to Dr. O'Connor's Report and what Dr. O'Connor Allegedly Told Mr. Langberg are Inadmissible Hearsay

Rule 802 of the Federal Rules of Evidence provides that "[h]earsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress." Rule 801(c) defines hearsay as "a statement [oral or written], other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Inadmissible hearsay cannot be used to defeat a motion for summary judgment. Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995)

---

9. Nothing in plaintiffs' Second Amended Complaint respecting their third claim for relief alters the foregoing analysis or leads to a contrary conclusion as to HarperCollins' standard of care which attended its pre-publication review of the book. HarperCollins notes nonetheless that plaintiffs' untimely filing of their Second Amended Complaint (it was filed 21 days after the Court-imposed deadline) provides an independent basis for dismissal of plaintiffs' third claim for relief.

(Rule 56(e) expressly bars the use of hearsay in affidavits submitted in opposition to a motion for summary judgment).

Paragraphs 6B, 6C, 6D and 6E of Mr. Langberg's declaration (in which he recounts what Dr. O'Connor purportedly told to him and what others allegedly testified and wrote about) are classic examples of hearsay because they constitute out-of-court statements being offered to prove the truth of the matters being asserted and not merely to demonstrate the fact that the statements were made to Mr. Langberg. After all, Mr. Langberg's state of mind is not at issue here. Nor do any of the statements fit within any of the exceptions to the hearsay rule. Since these statements constitute inadmissible hearsay, they cannot be used to overcome HarperCollins' motion for summary judgment. Starr, 54 F.3d at 1555 (district court correctly refused to accord any weight to hearsay presented in opposition to motion for summary judgment and properly entered summary judgment for defendant on defamation claim).

Further, to the extent that Mr. Langberg has endeavored to represent the contents of the O'Connor Report or any other testimony from the conservatorship proceeding (none of which has been made part of the record in this case) those efforts also are in violation of the best evidence rule. Fed. R. Evid. 1002.

B.   **The Drooz and Langberg References to HarperCollins' Offer of Settlement Are Inadmissible**

Following HarperCollins' publication of the hardback edition of the book and during the time in which HarperCollins was considering publication of a paperback edition, Mr. Langberg and Deborah Drooz, a partner in Mr. Langberg's law firm, sent to HarperCollins letters claiming that the book had defamed their clients (Carl and Audree Wilson) and demanding that the allegedly

defamatory material be deleted from the paperback version of the book.  Martin Supp. Aff. ¶¶ 2-3, 5; Exh. 1, 3 to Martin Supp. Aff.

Although Mr. Martin believed the claims to be without merit, Mr. Martin nonetheless offered to settle the claims by deleting certain passages from the paperback edition (which was ultimately not published for unrelated reasons) in the interest of avoiding potential litigation.  Martin Supp. Aff. ¶ 6, 7; Exh. 4 to Martin Supp. Aff.  Plaintiffs now seek to rely on Mr. Martin's offer of settlement as evidence of HarperCollins' liability on the claims at issue.  Drooz Dec. ¶¶ 4-5; Langberg Dec. ¶ 7; Opp. Br. 38. This they cannot do, as Rule 408 of the Federal Rules of Evidence explicitly precludes the admissibility of such evidence.  Federal Rule of Evidence 408 provides:

> Evidence of . . . offering or promising to furnish . . . a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount [] is not admissible to prove liability for . . . the claim . . ..  Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

Offers of compromise are not admissible as evidence of the offeror's liability because:  (1) "[t]he evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position" and (2) public policy mandates the promotion of settlement.  See Fed. R. Evid. 408 Advisory Committee Notes.  "The philosophy of [Rule 408] is to allow the parties to drop their guard and to talk freely and loosely without fear that a concession made to advance negotiations will be used at trial."  Equal Employment Opp. Comm'n v. Gear Petroleum, Inc., 948 F.2d 1542, 1545 (10th Cir. 1991) (quotation omitted).  See also Bradbury v. Phillips Petroleum Co., 815 F.2d 1356, 1364 (10th Cir. 1987) (any doubt on the application of Rule 408 should be resolved in favor of exclusion).

Accordingly, the statements in the Drooz and Langberg Declarations concerning any offer of settlement are inadmissible and thus cannot be used by plaintiffs in seeking to overcome HarperCollins' motion for summary judgment.[10]

## IV.    PLAINTIFFS' "EXPERT" WITNESSES ARE NOT COMPETENT

Plaintiffs proffer Edwin Diamond and Janet Roehl to testify as "experts" on "book publishing procedures" and HarperCollins' standard of care in publishing the book.  Diamond Dec. ¶ 1; Roehl Dec. ¶ 1.  Mr. Diamond's and Dr. Roehl's own admissions during their depositions render each individual incompetent to testify as an expert on either of these issues.  Furthermore, as detailed in Lisa Drew's Supplemental Affidavit, plaintiffs' "experts" --taking a cue from plaintiffs themselves -- ignore the abundance of evidence establishing HarperCollins' good faith and due care and engage in gross distortions of the record.

### A.    Edwin Diamond Has No Experience in Book Publishing And Admittedly Ignored HarperCollins' Conduct

With respect to HarperCollins' standard of care, Mr. Diamond has admitted that his report focuses solely on the identification of so-called "warning signs" and does not address whether or how HarperCollins responded to such "warning signs" prior to publishing the book.  Diamond Dep. 59-61 (attachment 2 hereto). Mr. Diamond thus did not consider HarperCollins' investigations of Mr. Wilson's competency and Mr. Landy's involvement in writing the book.  Nor did he consider HarperCollins' legal vetting of the manuscript.  Since how HarperCollins went about satisfying the concerns which surfaced is key to the disposition of this motion, the failure of Mr. Diamond's report to address these matters renders his report completely irrelevant.

_____

10.  This analysis disposes of plaintiffs' asserted contested fact in paragraph 18 of its opposition brief.  Opp. Br. 38.

Mr. Diamond's testimony as to book publishing procedures in general is, moreover, incompetent. Expert testimony is admissible only if the witness is qualified as an expert by knowledge, skill, experience, training or education. Fed. R. Evid. 702. Mr. Diamond's admission that he was first exposed to the internal workings of a book publishing house when he reviewed the material to testify in this case (Diamond Dep. 121 (attachment 2 hereto)) renders him incompetent to serve as an expert on book publishing procedures in general, let alone HarperCollins' conformity therewith. See Broadcort Capital Corp. v. Summa Medical Corp., 972 F.2d 1183, 1194-95 (10th Cir. 1992) (witness incompetent to testify as expert based on witness' admission that he had no experience in the field in which he purported to be an expert).[11]

**B.** **Janet Roehl Lacks Book Publishing Experience and Failed to Consider the Full Record in Proffering Her Report**

Dr. Roehl is equally unqualified to testify in the instant case because she has no experience in book publishing and because she has admitted that she did not consider the majority of the record evidence in proffering her report.

Dr. Roehl, a college professor, testified at her deposition that she has never held a journalism job, that she has never been employed in-house by a book publisher and that she has no expertise in the publication of celebrity autobiographies. Roehl Dep. 3-4 (attachment 3 hereto). Dr. Roehl's admission that she has no knowledge, skill, experience, training or education in the area of book publishing or in the publication of celebrity

---

11. Neither can Mr. Diamond be said to have brought a dispassionate eye to the subject. At his deposition, Mr. Diamond revealed his personal animosity toward the genre of literature at issue here -- celebrity autobiographies co-written by a celebrity and a professional writer -- through his references to ghost writers as "one of the lower forms of journalism" and "celebrity autobiographies" as "cheap, lousy stuff." Diamond Dep. 39-40, 117-18 (attachment 2 hereto). See also Drew Supp. Aff. ¶ 17.

autobiographies disqualifies her as an expert as a matter of law. See Fed. R. Evid. 702; <u>Broadcort</u>, 972 F.2d at 1194-95.

Further, Dr. Roehl repeatedly admitted that she generally did not rely upon deposition testimony in reaching her conclusions as to HarperCollins' standard of care, but only upon the internal documents produced by HarperCollins. Roehl Dep. 15-17, 22-26 (attachment 3 hereto). Amazingly, Dr. Roehl testified that she would rather rely upon her own interpretation of such documents -- principally handwritten notes from telephone conversations wholly removed from their contextual framework -- than the sworn testimony given under oath about such documents by their authors and recipients. Roehl Dep. 14, 16-17 (attachment 3 hereto).

Expert testimony is not competent when the witness admits that she has not considered the pertinent record evidence. <u>See</u> <u>Gates</u> v. <u>United States</u>, 707 F.2d 1141, 1144-45 (10th Cir. 1983) (witness not qualified to testify regarding causation of plaintiff's injury based on his admission that he had not reviewed the plaintiff's medical records). Accordingly, Dr. Roehl's testimony is incompetent because it is not based on any knowledge of book publishing or on a consideration of the full record in this case.

**V.     AUDREE WILSON IS A PUBLIC FIGURE**

The record is unchallenged that HarperCollins' pre-publication review of the book far exceeded that of even a reasonable book publisher. Thus, HarperCollins is entitled to summary judgment on Ms. Wilson's claim irrespective of her status. Nevertheless, HarperCollins maintains that Ms. Wilson's notoriety as the mother of three members of the Beach Boys renders her an all-purpose public figure for the reasons set forth in its opening brief. <u>See</u> Opening Br. 29-30.

At the very least, however, Ms. Wilson should be treated as a public figure for the limited purpose of the subject matter of her instant claim -- her reaction to her husband's flagrant child abuse -- in view of her extensive discussion of that issue with the media, including prior reports that she stood by and failed to intercede on her children's behalf.[12]  By willingly and openly discussing this issue with the media, Ms. Wilson purposefully injected the subject of her reaction to his behavior -- or lack thereof -- into the public forum as well.[13]  Ms. Wilson cannot purposefully engage in public discussions on the precise subject matter at issue here and then assert that she is not a public figure for the limited purpose of her instant claim.  Accordingly, plaintiff Audree Wilson must be treated as a public figure.

VI.    **PLAINTIFFS' CHOICE OF LAW ANALYSIS IS FLAWED**

Plaintiffs' legal analysis on the choice of law question as to which state will supply the standard of care if Audree Wilson is accorded private figure status typifies their misleading treatment of governing law.  HarperCollins' opening brief sets forth an analytically and legally sound analysis as to how this

---

12.  See, e.g., Steven Gaines, Heroes and Villains:  The True Story of the Beach Boys 46-47, 83 (Exh. 1 to Gavenchak Aff.), 190-92 (1986) (attachment 4 hereto); David Leaf, Beach Boys 49, 59 (1977) (attachment 5 hereto); David Felton, The Healing of Brother Brian, Rolling Stone 38-39, 46 (Nov. 4. 1976) (attachment 6 hereto).  See also Audree Wilson Dep. 22-26 (attachment 7 hereto).

13.  See Rebozo v. Washington Post Co., 637 F.2d 375, 379 (5th Cir.) (large number of articles mentioning plaintiff evidenced plaintiff's status as public figure), cert. denied, 454 U.S. 964 (1981); Jensen v. Times Mirror Co., 634 F. Supp. 304, 311 (D. Conn. 1986) (plaintiff's voluntary giving of interview supported public figure status); Wynberg v. National Enquirer, Inc., 564 F. Supp. 924, 928 (C.D. Cal. 1982) (same); Vitale v. National Lampoon, Inc., 449 F. Supp. 442, 445 (E.D. Pa. 1978) (plaintiff who was interviewed and photographed for magazine "voluntarily placed herself in the public domain" and accorded public figure status).

23

question is to be resolved under New Mexico's choice of law principles (which plaintiffs agree govern here).  Specifically, Section 380(2) of the First Restatement of Conflicts of Laws (which New Mexico follows in tort cases) is entitled "Application of Standard of Care" and provides that the forum must apply the standard of care of "the place of the actor's conduct," which is New York, the principal situs of HarperCollins' pre-publication activities.  Martin Aff. ¶ 3.

Rather than address this provision on the merits, plaintiffs completely ignore its clear and plain import and instead misrepresent its content in their parenthetical citation (<u>compare</u> Opp. Br. 8 <u>with</u> First Restatement § 380(2) (attachment 8 hereto)), summarily concluding that HarperCollins' reliance on this provision is "misplaced."

To the contrary, HarperCollins' reliance on Section 380(2) is precisely on point.  Section 377 of the First Restatement, on which plaintiffs rely, merely <u>defines</u> "the place of the wrong" and does not dictate the circumstances in which the governing law is supplied by the place of the wrong.  The actual choice of law rules are provided by subsequent sections of the First Restatement, such as Section 378, which provides that the question of whether the plaintiff has sustained an injury is resolved according to the law of the place of the wrong (plaintiff's domicile), while Section 380(2) provides that the <u>standard of care</u> (the issue now before this court), is supplied by the place of the defendant's conduct.

The Ninth Circuit case, <u>Fleury</u> v. <u>Harper & Row Pub., Inc.</u>, 698 F.2d 1022 (9th Cir.), <u>cert.</u> <u>denied</u>, 464 U.S. 846 (1983) on which plaintiffs rely is not applicable here because it involved application of <u>California's</u> choice of law rules which, contrary to New Mexico, are based on a "governmental interest" approach and

<u>not</u> on the First Restatement.  Furthermore, plaintiffs' citation to <u>Burt</u> v. <u>University of Neb.</u>, 757 F.2d 242 (10th Cir. 1985), is wholly inapposite, as that case did not involve a choice of law question at all.

### CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of HarperCollins as to each of plaintiffs' claims for relief.

WHEREFORE, HarperCollins prays for judgment dismissing the complaint in its entirety and for the award of its costs and expenses, and such other relief as the court deems just and appropriate.

Dated:  October 18, 1995

RODEY, DICKASON, SLOAN, AKIN & ROBB,
    P.A.

By _William S. Dixon_____
William S. Dixon

Albuquerque Plaza
201 Third Street NW,
Suite 2200
Albuquerque, New Mexico 87103
Telephone: (505) 768-7266


R. Bruce Rich
Katherine J. Daniels
Elizabeth Stotland Weiswasser
WEIL, GOTSHAL & MANGES
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000

Attorneys for Defendant,
HarperCollins Publishers Inc.

We hereby certify that a copy of the foregoing was hand-delivered to Ernesto Romero and forwarded via overnight service to Beth Dumas this 18th day of October, 1995, at the following addresses:

        Ernesto J. Romero
        3602 Campus Boulevard, NE
        Albuquerque, New Mexico 87106

        Beth Dumas
        Landberg, Cohn & Drooz
        12100 Wilshire Boulevard
        Suite 1650
        Los Angeles, California 90025

        RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.


By _____
        William S. Dixon

89

Hornfischer

1  doesn't recall.
2      MS. DUMAS:  He doesn't recall.
3      A.   I don't recall specific
4  conversations, I'm sorry.
5      Q.   Do you recall any general
6  conversations?  Do you recall whether that
7  subject came up for discussion?
8      A.   No, I don't.  The understanding
9  was that this 20-year nightmare was over.  The
10 reason we can say it's 20 years is because
11 there was an end point to it and our
12 understanding was that was a previous phase of
13 his life that he had successfully entered
14 counseling and had come out healed.
15     Q.   What was that understanding based
16 on?  What was your understanding based on?
17     A.   The statements by the author
18 himself in the book proposal.
19     Q.   And the book -- and when you were
20 reading the book and -- did any part of -- did
21 you edit the manuscript Wouldn't It Be Nice?
22     A.   Tom did the formal actual editing
23 of the book.  I -- depends on how you are
24 defining edit, I suppose.  I read the

90

Hornfischer

1  manuscripts and made recommendations about the
2  contents.  Tom actually did the editing.
3      Q.   What recommendations did you make
4  about the contents in general?  Could you
5  describe that part of your job?
6          MR. RICH:  That part of the job
7      or the nature of his comments?
8          MS. DUMAS:  No, that part of the
9      job.  What did that entail, making
10     recommendations?  What was the purpose
11     of?
12     A.   My job was to read manuscripts
13 and to evaluate them on the basis of whether
14 or not they were well written, well organized,
15 compelling and worthy of publication by a firm
16 of HarperCollins' reputation.
17     Q.   Were you, was anybody else
18 assigned that task with regard to the book
19 Wouldn't It Be Nice or is it only one
20 person -- let me back up.
21         On a book, is it -- do people --
22 is there duplicative effort or generally one
23 assistant editor is assigned the job of
24 reading the manuscript and making the types of

91

Hornfischer

1  recommendations and the types of analysis that
2  you just described?
3          MR. RICH:  I object to the form.
4          You can answer.
5      A.   I suppose I could be seen as
6  duplicating Tom Miller's own efforts to edit
7  the manuscripts.
8      Q.   As regards to the book, were you
9  duplicating Tom Miller's efforts or --
10     A.   My efforts were not simultaneous
11 with Tom's.  I would read it first, make
12 recommendations, and pass the manuscript on to
13 Tom who would then make his own independent
14 recommendation.
15     Q.   You would make a recommendation,
16 and what would he do with your recommendation?
17     A.   He would put them in the context
18 of his own reading of the manuscript and in
19 the context of his longer experience in the
20 book business to make a judgment about how the
21 book should ultimately be edited for
22 publication.
23     Q.   When you say how it should be
24 ultimately edited for publication, what do you

92

Hornfischer

1  mean by that?
2      A.   Changes in organization or
3  structure or language that he might recommend
4  the authors make by way of a revision of the
5  manuscripts or later on actual editing by his
6  own pen of the manuscript.
7          MS. DUMAS:  Can we take a break?
8          (Recess taken.)
9      Q.   What conclusions did you, what
10 recommendations and conclusions did you make
11 as regards to Wouldn't It Be Nice, as regards
12 to your job of reading and analyzing the
13 book -- let me start over again.  Strike the
14 question.
15         I just had the reporter read back
16 for me your description of the purpose of your
17 review of the book Wouldn't It Be Nice, and
18 your testimony was that you would, as a
19 general matter you were reading the book to
20 determine whether or not it was well written,
21 well organized, compelling and worthy of a
22 publication of a firm of HarperCollins'
23 stature or reputation.  And I believe you
24 testified earlier that you read the manuscript

93

Hornfischer

1 
2 and you made recommendations to Tom Miller on
3 the subject. What recommendations did you
4 make to Mr. Miller?
5     A.    I believe I expressed to him that
6 I felt the manuscript was progressing well,
7 that Brian and Todd seemed to be doing
8 basically a good job with some recommendations
9 about where revisions might be made.
10     Q.    What do you mean by doing a good
11 job and progressing well?
12     A.    That the story was well told,
13 that there seemed to be a consistent voice at
14 work in the manuscript, that it was well
15 structured and that a reader would come away
16 with a feeling of knowing something about
17 Brian Wilson.
18     Q.    When -- what about factual
19 accuracy?
20          MR. RICH:  What about it?
21     Q.    Was that a -- strike the
22 question.
23          Anything more you want to add
24 on -- do you want to add anything more to your
25 description of the recommendations that you

CLASSIC REPORTING, INC. (212) 268-2590

---

94

Hornfischer

1 
2 made to Mr. Miller?
3     A.    I can't think of anything.
4     Q.    So you thought that the story was
5 well told; what do you mean by that?
6     A.    That it clearly related events
7 and Mr. Wilson's evaluation of these events.
8     Q.    Do you remember any passages of
9 the book where Brian, any passages of the book
10 which recounted extensive drug use by Brian
11 Wilson? Do you remember any passages that
12 discussed intaking of LSD and having a
13 breakdown and do you remember any of those
14 passages? Do you have a general recollection?
15     A.    Yes, I do have a general
16 recollection.
17     Q.    Do you have a general
18 recollection of passages from the book
19 describing Brian Wilson as hearing voices?
20     A.    Not specifically.
21     Q.    Do you have any recollection of
22 the book, Brian Wilson saying there was a
23 period of time that he didn't bathe for, I
24 think it was three years, and he cloistered
25 himself up; do you have a general recollection

CLASSIC REPORTING, INC. (212) 268-2590

---

95

Hornfischer

1 
2 of that?
3     A.    Rings a rather smelly bell, yes.
4     Q.    When you read the book, what --
5 it talked about his mental illness. Do you
6 remember any passages about his mental
7 illness?
8     A.    Right now five years after
9 editing it? No.
10     Q.    When you read the passages about
11 not bathing for three years and the having the
12 breakdown after taking LSD and -- did you ever
13 consider whether Brian Wilson had the
14 capacity, the ability to tell an accurate
15 story?
16          MR. RICH:  Can we put a time
17     frame on this, Beth?
18     Q.    At about the time --
19          MS. DUMAS:  Could you read back
20     my question?
21          MR. RICH:  You incorporated
22     "ever" in there.  That was my problem.
23          (The record was read back as
24     follows:
25          "Q.    When you read the passages

CLASSIC REPORTING, INC. (212) 268-2590

---

96

Hornfischer

1 
2     about not bathing for three years and
3     the having the breakdown after taking
4     LSD and -- did you ever consider
5     whether Brian Wilson had the capacity,
6     the ability to tell an accurate
7     story?")
8          MS. DUMAS:  Let's take a break
9     for a minute.
10          (Recess taken.)
11     Q.    When you were performing, when
12 you were reading the book and formulating the
13 recommendations that you previously described
14 that you made to Mr. Miller, did you ever
15 consider after reading the passages about
16 Brian Wilson suffering a breakdown and
17 passages describing large intake of LSD and
18 not bathing for a period of up to three years,
19 did you ever consider at that period of time
20 when you were forming those recommendations,
21 the issue of whether this man, Brian Wilson,
22 is capable or competent or able to write a
23 truthful account of his life?
24          MR. RICH:  Objection to form.
25          You may answer.

CLASSIC REPORTING, INC. (212) 268-2590

97

Hornfischer

1
2       A.    I believe in one of my memos, I
3   don't remember if it's the first or second
4   one, I did raise such a question.  Yes.
5       Q.    What do you remember raising?
6   What do you remember thinking?
7       A.    I remember asking whether or not,
8   given the totality of his breakdown, whether
9   or not during that period of his life he would
10  be able to remember events clearly.
11      Q.    Who did you ask this question of?
12      A.    It was in the form of a memo to
13  Tom Miller.
14      Q.    What was his response?  What was
15  Mr. Miller's response?
16          MR. RICH:  Objection to form.
17      Lack of foundation.
18          You can answer.
19      A.    I don't recall Mr. Miller's
20  response.
21      Q.    Was it a subject of conversation
22  between you two or just the subject of a memo?
23      A.    Again, I don't remember if we had
24  any conversations about it.
25      Q.    Was it an important issue or a

98

Hornfischer

1
2   side issue?
3          MR. RICH:  To whom?
4       Q.    To you.
5       A.    It was important enough to raise
6   in the memo, so we felt it was worth
7   questioning.
8       Q.    You remember the memo, but you
9   don't remember any conversations with Mr.
10  Miller on the subject?
11      A.    No, I don't.
12      Q.    Do you have a general
13  recollection of any conversations taking
14  place, even if you don't have a specific
15  memory of the discussion, do you have a
16  general recollection?
17      A.    I remember general discussions
18  about the extent to which Brian Wilson's life
19  deviated from the norm.  It was a rather
20  astonishing story and we were both struck by
21  that and had discussions about that.
22      Q.    Did you ever have any discussions
23  with HarperCollins' legal counsel on this
24  subject?
25          MR. RICH:  "Ever" meaning at or

99

Hornfischer

1
2   about this time period while he was
3   reviewing the manuscript?
4          MS. DUMAS:  Ever being ever.
5          MR. RICH:  Then there are
6   privilege issues.
7          MS. DUMAS:  Fair enough.
8       Q.    Prior to publication of the book,
9   do you remember having any discussions with
10  Matthew Martin on the subject of Brian
11  Wilson's ability, capacity, to write a
12  truthful and accurate book, given the
13  descriptions of mental illness, breakdowns and
14  drug use contained in the book?
15      A.    I don't recall having any
16  conversations with Mr. Martin, no.
17      Q.    Do you recall having any
18  conversations with Genie Gavenchak prior to
19  publication of the book on that subject?
20      A.    I never spoke to Ms. Gavenchak,
21  no.
22      Q.    So you made recommendations to
23  Mr. Miller about the book, and what did Mr.
24  Miller do with those recommendations?
25      A.    I don't know.

100

Hornfischer

1
2       Q.    Generally what was the purpose --
3   is this a job -- had you performed a similar
4   function with respect to other books that you
5   worked on at HarperCollins with Mr. Miller?
6       A.    Yes.
7       Q.    Do you have an understanding of
8   what the purpose of what you were doing was?
9   What was the purpose of the job that you were
10  performing?
11          MR. RICH:  I believe he testified
12      to it earlier.
13          You can testify again.
14      A.    As I previously explained, it was
15  to help give Mr. Miller a frame of reference
16  for his own independent evaluation of the book
17  project.
18      Q.    What do you mean by a frame of
19  reference?
20      A.    To make some comments about the
21  manuscript which he might take into
22  consideration when he did his own reading of
23  it, and he was at liberty to agree with me or
24  disagree with me and to pursue revisions -- to
25  pursue any revisions that might be necessary

193

```
1              Hornfischer
2      Q.    What do you remember of that
3  review?
4      A.    It was a good evaluation.
5      Q.    What do you remember -- that was
6  your last review; is that correct?
7      A.    I think so.
8      Q.    So your leaving HarperCollins was
9  not in any way precipitated by any criticism
10 as to your work performance?
11     A.    No, in fact, I was on the verge
12 of a promotion when I left.
13     Q.    What promotion?
14     A.    To associate editor.
15         MS. DUMAS:  Next exhibit.
16         (Document headed "Reader's
17         Report," dated October 9, 1990,
18         bearing production Nos. HC08609
19         through 08611, marked Hornfischer
20         Exhibit 8 for identification, as
21         of this date.)
22     Q.    Hornfischer 8, which is HC08609
23 through 08611, it says "Reader's Report. To:
24 Tom. From: Jim." Dated October 9, 1990.
25         Is this the initial, the earlier
```

194

```
1              Hornfischer
2  report that you had referred to earlier in
3  your testimony today?
4      A.    Yes.
5      Q.    Why is there such a time lapse
6  between the two reports, the October 1990 and
7  I believe --
8          MR. RICH:  March '91.
9      Q.    March '91?
10     A.    Due to the time it required the
11 authors to complete the first draft.  The
12 first report was based on the first half of
13 manuscript approximately and the second report
14 was based on the complete manuscript, so --
15     Q.    So for this report, you read the
16 first half of the manuscript?
17     A.    Yes.
18     Q.    For the March '91 report, did you
19 just, did you read the whole manuscript over
20 again?
21     A.    Yes, because the first half had
22 been revised.  What we received, the basis of
23 my March report was a revised first half and
24 the balance of a first draft.
25     Q.    So you had invested, by the time
```

195

```
1              Hornfischer
2  you were done with your second report, you had
3  invested considerable time in reading and
4  analyzing Wouldn't It Be Nice?
5      A.    Safe to say.
6      Q.    Did Mr. Miller read the initial
7  264 pages of the manuscript that resulted in
8  this October '90 report?
9      A.    I believe he did.
10     Q.    So he read it twice, then, as
11 well?
12     A.    I believe so.
13     Q.    So you also drew -- I see here,
14 the fourth paragraph down, "The chapters are
15 roughly chronological, covering Wilson's
16 teenage years and taking us up to the peak of
17 his fame, the beginning of his dabbling in
18 drugs, and the resultant descent into paranoid
19 psychological instability."
20         That's a conclusion that you drew
21 based upon reading the first 264 pages of the
22 manuscript?
23     A.    Yes.
24         MS. DUMAS:  Next exhibit.
25         (Multipage document titled
```

196

```
1              Hornfischer
2          "Transaction Report," bearing
3          production Nos. HC08624 through
4          08635, marked Hornfischer Exhibit
5          9 for identification, as of this
6          date.)
7      Q.    Let me ask you one question about
8  the last exhibit.  When you were reading the
9  passages that caused you to describe the
10 manuscript at that point as describing a
11 descent into paranoid psychological
12 instability, did you at that time have any --
13 did, at that time did you have any question in
14 your mind as to whether Brian Wilson was
15 capable or competent to write an accurate book
16 with a ghostwriter or to tell an accurate
17 story of his life?
18         MR. RICH:  May I hear the
19         question again, please.
20         MS. DUMAS:  I will rephrase it.
21     Q.    Reading the manuscript that
22 caused you to conclude that --
23         MS. DUMAS:  Read back my
24         question.  It was actually better the
25         first time.
```

197

Hornfischer

1
2    (The record was read back as
3    follows:
4        "Q.    Let me ask you one
5    question about the last exhibit. When
6    you were reading the passages that
7    caused you to describe the manuscript
8    at that point as describing a descent
9    into paranoid psychological
10   instability, did you at that time have
11   any -- did, at that time did you have
12   any question in your mind as to whether
13   Brian Wilson was capable or competent
14   to write an accurate book with a
15   ghostwriter or to tell an accurate
16   story of his life?")
17   A.    No.
18   Q.    Do you have any reason for why
19   you answered the question no?
20   A.    Yes.
21   Q.    What's that reason?
22   A.    It was generally known to us that
23   he was busy conducting his solo career. We
24   received news clippings from our publicity
25   department and from other people, news reports

198

Hornfischer

1
2    of his concerts and general commentary of
3    people who were observing him in action that
4    he was, seemed to be a whole person and
5    competent and therefore capable of reflecting
6    on his life and discussing periods of
7    difficulty for him.
8        In addition, several other
9    authors whose books we published had
10   psychological breakdowns, that kind of thing.
11   It's certainly not something that's as
12   uncommon as many people would like to think.
13       MS. DUMAS:  What was the last
14       part of the answer, please.
15       (The record was read back as
16       follows:
17       "In addition, several other
18       authors whose books we published had
19       psychological breakdowns, that kind of
20       thing. It's certainly not something
21       that's as uncommon as many people would
22       like to think."
23   Q.    What authors are you thinking of
24   that had psychological breakdowns?
25   A.    I think Colonel North had a

199

Hornfischer

1
2    breakdown in the wake of his Vietnam war
3    experience and Philip Caputo, the war
4    correspondent, describes some very serious
5    periods in his life when he became estranged
6    from family, that sort of thing.
7    Q.    Of course in the case of Colonel
8    North -- well, had you ever met -- did you
9    ever meet Brian Wilson?
10   A.    Not until after the book was
11   published.
12   Q.    Did Tom Miller ever meet Brian
13   Wilson before the publication of the book?
14   A.    Yes.
15   Q.    When did he meet him?
16   A.    I don't remember exactly when,
17   but I know he flew to Los Angeles to meet with
18   Brian Wilson, Todd Gold and Dr. Landy at one
19   point.
20   Q.    Do you remember any -- prior to
21   the publication of the book -- do you remember
22   any concerns that were raised as to the
23   accuracy of statements that Brian Wilson's
24   mother, Audree Wilson, drank alcohol often?
25       MR. RICH:  I would like to hear

200

Hornfischer

1
2    the question again, please.
3        (The record was read back.)
4        MR. RICH:  You can answer.
5    A.    No, I don't.
6    Q.    Do you remember prior to
7    publication of the book, do you remember any
8    concerns being raised by anyone at
9    HarperCollins, including the legal staff, and
10   also I would add outside legal counsel, Genie
11   Gavenchak, on the subject of whether passages
12   from the book describing Brian Wilson being
13   abused by his father while his mother stood by
14   and watched, do you recall whether there were
15   any concerns about those passages raised?
16   A.    They weren't expressed to me if
17   there were concerns. The legal department
18   functioned more or less autonomously from in
19   terms of their substantive review of the
20   manuscript. We were copied on their
21   occasional correspondence, but I wasn't aware
22   of any direct expressions of concern.
23   Q.    Do you remember any concerns by
24   anybody at HarperCollins or outside legal
25   counsel as to the accuracy of passages that

314

Hornfischer

1  
2     Q.    What makes a well-written  
3  autobiography?  
4     A.    A complete and nuanced telling of  
5  one's life story.  
6     Q.    What's nuanced telling?  
7     A.    As opposed to a simplistic  
8  telling. One which appreciates the complexity  
9  of life and relates dilemmas and explains  
10 decisions and talks about complex events in a  
11 way that communicates to the reader the  
12 experience that the author had.  
13    Q.    Stylistically, I mean, an  
14 autobiography that's paraphrased, is that a  
15 good autobiography? That's not dialogue,  
16 shouldn't an autobiography --  
17    A.    Be all dialogue.  
18    Q.    Do you want a good portion of it  
19 to be dialogue?  
20        MR. RICH: Objection to form.  
21    A.    There should be dialogue.  
22    Q.    How much dialogue?  
23    A.    6.27 percent. I don't know how  
24 much; what do you mean how much?  
25    Q.    I know that I don't read books  

316

Hornfischer

1  
2        MS. DUMAS: We are done with  
3     this.  
4        MR. RICH: I think this is  
5     getting truly beyond the pale.  
6     Q.    What do you mean by fiction?  
7     A.    A novel or a short story.  
8     Q.    You mean something that's not  
9  accurate?  
10    A.    Fiction does not purport to  
11 accurately relate events. It's an irrelevant  
12 consideration.  
13        MS. DUMAS: Thank you for your  
14     time over these last couple days and I  
15     appreciate your patience.  
16        Mr. Rich, can you propose a  
17     stipulation since I frankly don't know  
18     one that would be appropriate for  
19     federal court.  
20        MR. RICH: I think we can talk  
21     about it. The only stipulation that is  
22     probably appropriate is waiver of  
23     formalities with respect to signing on  
24     review of the transcripts. Sign under  
25     perjury.  

315

Hornfischer

1  
2  that don't have dialogue. I pick up a book  
3  and when I'm reading fiction and if it doesn't  
4  have a lot of dialogue, I frankly get tired of  
5  it. That's my own personal viewpoint. If I  
6  was editing a book, I would have certain  
7  opinions about what I thought was a good book  
8  and I'm asking you, based on your experience  
9  as an editor and a writer, what makes a good  
10 autobiography?  
11        MR. RICH: You asked him that  
12     question and he answered it.  
13    A.    Let me make one thing abundantly  
14 clear. This manuscript is not fiction. It's  
15 an autobiography and it is bound to contain  
16 dialogue wherever the author might remember  
17 conversations.  
18    Q.    Why do you say this is not  
19 fiction?  
20    A.    By simple definition, an  
21 autobiography is not fiction. I would refer  
22 you to Webster's on that one, I'm afraid.  
23    Q.    What do you mean by fiction?  
24        MR. RICH: Beth, I think you are  
25     losing it.  

317

Hornfischer

1  
2        I do have a brief  
3     cross-examination.  
4  EXAMINATION BY MR. RICH:  
5     Q.    Several questions, sir, relating  
6  to the document which has been previously  
7  marked for identification as Hornfischer  
8  Exhibit 3. Do you recall at yesterday's and  
9  to some extent today's deposition session  
10 being asked certain questions relating to this  
11 document?  
12    A.    Yes.  
13    Q.    I specifically direct your  
14 attention to the paragraph at the bottom of  
15 Page 1 and you may recall giving some  
16 testimony concerning the statement in the  
17 middle of that paragraph, "Given the totality  
18 of his breakdown, I wonder how much he,"  
19 meaning Mr. Wilson, "actually remembers  
20 himself and how much he relies on Dr. Landy to  
21 fill in the blanks."  
22        Do you see that, sir?  
23    A.    Yes.  
24    Q.    Ms. Dumas asked you whether, to  
25 your knowledge, Mr. Miller acted on or

318

Hornfischer

1  otherwise communicated your own concerns in
2  that regard in his own communication of
3  reactions to the manuscript to one or more of
4  the authors; do you recall those questions and
5  giving certain answers?
6
7       A.    Yes.
8       Q.    My question to you is, sir, to
9  what extent were you privy to any or all of
10 Mr. Miller's various communications with Mr.
11 Gold or Mr. Wilson or Mr. Landy for that
12 matter with respect to his own reactions to
13 the manuscript in its various stages?
14      A.    I received a copy of his
15 editorial memo which he sent to the authors.
16      Q.    Is it your understanding that the
17 only form of communication which Mr. Miller
18 had with the authors was reflected in that
19 editorial memo to which you referred and which
20 has been marked in this deposition for
21 identification as Hornfischer Exhibit 9?
22      A.    Yes, that's the memo.
23            MR. RICH:  Could you read back my
24      question, please, to the witness.
25            (The record was read back.)

319

Hornfischer

1
2       A.    No, that's not my understanding.
3       Q.    What is your understanding?
4       A.    My understanding is that Tom
5  engaged in a process of continuous
6  communication with the authors via telephone
7  to which these conversations I wasn't privy to
8  them.
9       Q.    To your knowledge, did those
10 conversations both precede and postdate his
11 own memorandum of March 25, 1991, his
12 editorial memorandum?
13      A.    Safe to say, yes.
14      Q.    Is it your understanding that
15 there were numerous such interchanges between
16 him and one or more of the authors?
17      A.    Yes.
18            MR. RICH:  I have no further
19      questions.
20            MS. DUMAS:  I have a brief
21      question.
22 FURTHER EXAMINATION
23 BY MS. DUMAS:
24      Q.    How do you know about those
25 telephone conversations that you just

320

Hornfischer

1
2  testified about?
3       A.    Generally because Tom would often
4  agonize aloud over the need to call them and
5  set them straight at one point or another
6  whereupon he would close his door with some
7  fanfare and I would hear him, I would hear
8  mumblings and voices behind the closed door.
9       Q.    Did he ever tell you, did Mr.
10 Miller ever tell you that he had to set any of
11 the authors straight with regard to the
12 concern that you were, that Mr. Rich
13 identified from your memo?
14      A.    I don't recall ever being briefed
15 on the comments he was about to make to the
16 authors.  He handled this himself.  This was
17 his business --
18      Q.    How do you know he had
19 conversations?
20            MR. RICH:  Let him finish.
21      A.    This was his business which he
22 handled himself and I guess he is sort of
23 territorial about the content of his, about
24 the extent of his contact with the authors and
25 what was said to them.  He wanted to be the

321

Hornfischer

1
2  one presenting the face of the company to them
3  from the editorial standpoint so my own
4  discussions with them was minimized.
5       Q.    Your own discussions with the
6  authors were minimized?
7       A.    Substantive discussions about
8  editorial points, yes.
9       Q.    With the authors?
10      A.    Yes.
11      Q.    You talked about it with Mr.
12 Miller, did you not?
13            MR. RICH:  What's "it"?
14      Q.    Substantive points.
15      A.    I think I answered that
16 yesterday.  I don't recall any specific
17 conversations that we had, any discussions
18 about specific points.  I remember passing
19 along my written comments and trusting that he
20 would read them carefully and form his own
21 judgment.
22            MR. RICH:  One question of
23      recross.
24 FURTHER EXAMINATION
25 BY MR. RICH:

**EDWIN DIAMOND**   Page 37

[2] and I really wanted to include this information in
[3] my book. Now, what do you do as a professional
[4] writer?
[5]   MS. SMOLER: A continuing objection
[6] to the hypothetical. However, I will allow him to
[7] answer.
[8]   THE WITNESS: Yeah, this is a
[9] problem area for me, because I am not a ghost
[10] writer, I would never be a ghost writer, you know,
[11] and it's hard for me to put myself – you know,
[12] I've never been a hooker, I've never been a ghost
[13] writer, so it's hard for me to put myself in those
[14] shoes.

**BY MS. DANIELS:**

[16]   Q: Have you ever been a book publisher?
[17]   A: No, I'm not a businessman, no.
[18]   Q: So it's hard for you to know – also
[19] hard for you to know what a book publisher would do
[20] under these situations?
[21]   A: No, book publishers belong to the
[22] same – we're not talking about the accountants,
[23] we're talking about the people who edit books.
[24] They're in the same craft, not profession, that I'm
[25] in; truth, words.

**EDWIN DIAMOND**   Page 38

[2]   Q: But writers are not professional
[3] writers, ghost writers?
[4]   A: Ghost writer, entitled to First
[5] Amendment protections. It is a big tent, the
[6] courts have decided. I wouldn't sit in that
[7] section of the tent though.
[8]   Q: Do you think there is something
[9] suspect about hiring somebody to help you write
[10] your autobiography?
[11]   A: Suspect? I think we could figure a
[12] better word than that.
[13]   Q: Yeah, I gather from your reluctance to
[14] put yourself in the camp, I think was your word,
[15] I'm not sure, of ghost writers, there seems to be
[16] some hesitation on your part about what they do,
[17] and I was wondering if you could explain that for
[18] me.
[19]   MS. SMOLER: I will allow him to
[20] answer the question, but I will object to your
[21] characterization of his testimony. There is a
[22] difference between a ghost writer and someone who
[23] has been hired to assist writing an autobiography,
[24] but you can answer the question.
[25]   THE WITNESS: A writer – repeat the

**EDWIN DIAMOND**   Page 39

[1] question, I'm sorry. There is so many things I'd
[2] like to say, but repeat the question.
[4]   (The pending question was read.)
[5]   THE WITNESS: I could explain it,
[6] yes, I can explain it.

**BY MR. DANIELS:**

[8]   Q: What is a ghost writer, in your
[9] understanding?
[10]   A: It's a lower form – it's one of the
[11] lower forms of journalism, as tab TV is the lower
[12] form of television journalism.
[13]   Q: Does a ghost writer usually identify
[14] him or herself as an author of a book?
[15]   A: There are various contractual ways
[16] that this is specified, right? Sometimes the ghost
[17] writer is completely ghosty. You never know,
[18] right? Sometimes there is a little tip of the hat
[19] in the introduction, which would be the case here,
[20] as I recall.
[21]   Q: Do you think there was a tip of the
[22] hat in the introduction?
[23]   A: An acknowledgment. There is an
[24] acknowledgment that Todd Gold helped Brian Wilson.
[25]   Q: Do you recall the cover of the book?

**EDWIN DIAMOND**   Page 40

[2]   A: Yes, I recall the cover of the book.
[3]   Q: Isn't it true that Todd Gold's name is
[4] right there on the cover of the book?
[5]   A: It says Brian – remind me of what it
[6] says again. Brian Wilson with Todd Gold –
[7]   MS. SMOLER: I believe it says
[8] Wouldn't It Be Nice: My Own Story; by Brian Wilson
[9] with Todd Gold.
[10]   THE WITNESS: With. Well, what does
[11] with mean?

**BY MS. DANIELS:**

[13]   Q: I don't know. I'm not here to
[14] testify. What do you think it means?
[15]   MS. SMOLER: Well, I object to the
[16] question. You're asking him to speculate.
[17]   Q: Well, obviously you have some problem
[18] with the word, and I'd like to know –
[19]   A: A problem with being ghost writer? I
[20] would never do it for a living. I would hope none
[21] of my students would do it for a living.
[22]   Q: I see. How would you go about writing
[23] a celebrity's autobiography?
[24]   A: I would never write a celebrity's
[25] autobiography.

Page 57

**EDWIN DIAMOND**

[1]
[2] a letter so that there is a record of his
[3] objections. I mean, this is a businesslike memo.
[4] Why would anyone question its accuracy? I mean,
[5] the writer of this is saying here is what I got on
[6] the phone, and now it's going to come. This
[7] happens all the time. You know, somebody will tell
[8] you something, and says I'm going to put this in
[9] the form of a letter. So there is no reason, based
[10] on being a journalist and being in the news
[11] gathering business and writing books and dealing
[12] with interviewers and lawyers and people all the
[13] time, this is perfectly within the envelope of
[14] one's experience. Someone gets on the phone and
[15] yacks, yacks, yacks at you, and a stronger letter
[16] follows and you take the notes. You do this –
[17]        **BY MS. DANIELS:**
[18]    Q: Do you always get the notes right when
[19] you take them?
[20]    A: Journalism is a craft, an art, and one
[21] tries, you know, we aim at the stars. Sometimes we
[22] hit London.
[23]    Q: Do you sometimes include questions
[24] that you may have in your notes?
[25]    A: When you are taking down a

Page 58

**EDWIN DIAMOND**

[1]
[2] conversation from somebody, you're trying, on the
[3] phone, to get – you've got all your faculties
[4] focused as clearly as you can, try to screen out
[5] all extraneous things, get down what he or she is
[6] saying. Get it down, get it down. No judgments,
[7] get it down. Get the information down. I'll react
[8] to it after I get it down. And this guy is on the
[9] phone beating into his ear and saying I'm going to
[10] send you a letter. It's such a normal, everyday
[11] kind of memo that – you know, I don't look at the
[12] elevator certificate in your elevator when I get in
[13] that the elevator is going to operate. One day it
[14] doesn't, maybe.
[15]    Q: Did you read the deposition testimony
[16] concerning this document?
[17]    A: I think I tried to read them all, I
[18] think so.
[19]    Q: Whose deposition testimony did you
[20] read?
[21]    A: I read them all, and you would have to
[22] show me, tell me which one you are referring to.
[23]    Q: Well, do you remember any testimony
[24] about this document?
[25]    A: I'm going to have to look at my –

Page 59

**EDWIN DIAMOND**

[1]
[2] when I prepared – can I answer – when I prepared
[3] my report, I was – the topic sentence was, at
[4] every step along the way, clear warning signs
[5] regularly popped up. And that was the topic
[6] sentence. So I went through this material. We
[7] went through this material, we did many things.
[8] But one of the things we did was to look for, you
[9] know, warning signs. We are faced – you have a
[10] book, the book is out, and we were trying to piece
[11] together the sequence of how this book came out.
[12] and we saw a series of warning signs, which we list
[13] in our report. And this is what this report is
[14] about, warning signs.
[15]    Q: Okay. And you conclude that
[16] HarperCollins did not investigate these warning
[17] signs, is that correct?
[18]    A: No, I don't say that. I said at every
[19] step along the way, clear warning signs regularly
[20] popped up. Just as regularly, the HarperCollins
[21] publication process plowed ahead.
[22]    Q: Well, what do you mean by plowed
[23] ahead? Do you – are you –
[24]    A: They listed it – you know, publishing
[25] involves production schedules, it involves

Page 60

**EDWIN DIAMOND**

[1]
[2] catalogue listings, it involves publicity plans.
[3] HarperCollins kept this project on track.
[4]    Q: Well, what is wrong with keeping the
[5] project on track if you are investigating the
[6] issues that come up?
[7]    A: If the driver is drunk, you know,
[8] if – to use the analogy of the track, if you've
[9] got a runaway locomotive, at one switch you've got
[10] to pull a switch to divert it, to slow it down, to
[11] send somebody to the engine room to see what is
[12] going on. We see warning signs, and the image of a
[13] runaway locomotive, we see this project moving
[14] ahead with all these warning signs, and it keeps
[15] going ahead.
[16]    Q: What evidence can you point to,
[17] documents or otherwise, that suggest in any way
[18] that HarperCollins failed to investigate these
[19] warning signs? Show me some evidence.
[20]    A: I didn't say that. I didn't say they
[21] failed to investigate them, I said there were all
[22] these warnings signs and yet they went ahead and
[23] the book came out.
[24]    Q: So you don't know whether they
[25] investigated them or not, is that correct?

**EDWIN DIAMOND**

Page 61

[1]
[2]   **A:** I didn't say that.
[3]   **Q:** What is your testimony?
[4]   **A:** The report testifies to the fact of
[5] warning signs. Now, if you want to discuss their
[6] investigation, that is another question.
[7]   **Q:** Okay, let me ask you that question.
[8]   **A:** Yes.
[9]   **Q:** What do you know about HarperCollins'
[10] efforts in investigating some of the issues that
[11] you have called warning signs?
[12]   **A:** They would – if they worked in a
[13] newspaper or magazine, or if I were their book
[14] editor, I would have kept sending this manuscript
[15] back until it was right.
[16]   **Q:** Do you have any evidence to suggest
[17] that they did not do that, HarperCollins did not do
[18] that?
[19]   **A:** I read testimony about his line
[20] editing, I read Miller's suggestions to Gold, I
[21] think there were some signals sent back from New
[22] York to Los Angeles, yes.
[23]   **Q:** Some signals about what?
[24]   **A:** Explain this better, do we really have
[25] to go into this, what does this mean, you slept in

**EDWIN DIAMOND**

Page 62

[1]
[2] the same room with two sisters, this is very
[3] bizarre, what is going on. I mean, there were some
[4] picking around the edges of the story, yes. But
[5] what they were doing on the train in the first
[6] place, that is the fascinating question.
[7]   **Q:** So you never would have published this
[8] autobiography regardless of any comfort level you
[9] could ever obtain about the credibility of Brian
[10] Wilson, is that correct?
[11]   **A:** If I ran HarperCollins, I would have
[12] invited them to go to some other publishing house.
[13] First Amendment, they are entitled to publish it
[14] elsewhere. My kind of publishing, I wouldn't have
[15] published it. But I would, you know, suggest maybe
[16] take it over to Lyle Stuart.
[17]   **Q:** But it would have been okay for Lyle
[18] Stuart to publish it?
[19]   **A:** I'm not Lyle Stuart. He has to
[20] answer. You asked me a hypothetical, if I were
[21] Bill Shinker, if I were running HarperCollins, I
[22] would not have published this book, no.
[23]   **Q:** Why not?
[24]   **A:** Because as the report says, all the
[25] warning signs that were in it.

**EDWIN DIAMOND**

Page 63

[1]
[2]   **Q:** What if you had investigated each and
[3] every warning sign and satisfied yourself, would
[4] that change your view?
[5]   **A:** What if I –
[6]   **Q:** What if you had investigated each and
[7] every warning sign and satisfied yourself that they
[8] were not sufficient to warrant a decision not to
[9] publish the book? Would that change your view?
[10]   **MS. SMOLER:** I object to the
[11] question in that it doesn't accurately reflect the
[12] facts of this case. However, I will allow him to
[13] answer the hypothetical.
[14]   **THE WITNESS:** Now I've forgotten the
[15] question. I'm sorry. What was the question?
[16] Would I have published –
[17]                **BY MS. DANIELS:**
[18]   **Q:** Would you have published the book if
[19] you had investigated each and every warning sign,
[20] as you put it, and satisfied yourself that it was
[21] not necessary to make a decision not to publish the
[22] book.
[23]   **MS. SMOLER:** Same objection. You
[24] can answer it.
[25]   **THE WITNESS:** It's a hypothetical,

**EDWIN DIAMOND**

Page 64

[1]
[2] so I have to answer in that spirit.
[3]   Given all, what I call warning signs,
[4] you know, Geiger counter ticking away, Brian
[5] Wilson's history, Landy's role, sending – given
[6] the history of the project, the history of the
[7] writer, given the circumstances of the book, if I
[8] were running HarperCollins, I would have taken a
[9] pass on that. Who needs it? You know, that
[10] doesn't mean Brian Wilson – Todd Gold isn't
[11] entitled to sell the Brian Wilson story, or Landy
[12] isn't entitled to sell the story someplace else.
[13] But if I were running HarperCollins – you know,
[14] HarperCollins was a great – when I grew up,
[15] HarperCollins was Harper & Row, and was a great,
[16] you know, kind of white shoe publishing house.
[17] Kind of classy publishing house. It wasn't Lyle
[18] Stuart.
[19]   (Recess taken.)
[20]                **BY MS. DANIELS:**
[21]   **Q:** Mr. Diamond, going back to your litany
[22] of warning signs, you mentioned the role of, I
[23] believe in your words, the Svengali Landy.
[24]   On what basis have you concluded that
[25] Eugene Landy was Svengali-like?

## EDWIN DIAMOND

Page 117

[1]
[2] the changes in the book business, in the last 35
[3] years. I just want to get that on the record. I
[4] mean, I was put off by the word studies.
[5]     You know, writers, we call ourselves
[6] reporters. So I have reported and studied and
[7] written about the book business over the last 35
[8] years. That's – let's clear that one up.
[9]     Secondly, what evidence do I see of
[10] what is happening, the changes in book categories.
[11] I just got done, at the request of – you want
[12] studies? I'll give you studies. I call it
[13] reporting, okay? I was called, told we're – they
[14] are preparing a 50th anniversary, when will anybody
[15] see this? Anyway, they are preparing some special
[16] report. They asked me to discuss the changes in
[17] publishing in the last 50 years, and to make a
[18] projection for the next 50 years. So yes, I've
[19] done a study of these things. How do I do
[20] studies? I interview people, I talk to people, I
[21] think, I read, I look at what I've written, and
[22] I've made some conclusions about how book
[23] publishing has changed in the last 50 years. The
[24] paperback revolution, self-help books, celebrity
[25] autobiographies. I was going to say cheap, lousy

## EDWIN DIAMOND

Page 118

[1]
[2] stuff, but I'll use a different phrase.
[3]     I wrote a piece for New York called
[4] The Death of Truth, which I would love you to
[5] read. And I talk about the declining standards of
[6] truth in book publishing. The piece has been
[7] anthologized and recorded and quoted. And I think
[8] it's in your – I would urge you to take a look at
[9] it, if you want studies.
[10]     Q: Does the book mention HarperCollins?
[11]     A: I'd have to go read it again. Let me
[12] just give you the name of the book.
[13]     Q: That's all right.
[14]     A: The article is 33, The Death of Truth,
[15] the Increase in False Information Being Published,
[16] New York Magazine, May 3, 1993, abstract and text
[17] available on-line. If you want to send me a
[18] self-addressed envelope, I will send you a copy of
[19] it.
[20]     So I have done studies. I prefer to
[21] be known as a reporter, but I have done studies.
[22]     Q: Now, in preparing the report, were you
[23] intending to make just – make a general statement
[24] about book publishing generally, or were you
[25] intending to make a statement about HarperCollins?

## EDWIN DIAMOND

Page 119

[1]
[2]     MS. SMOLER: Objection, which
[3] report? This report marked Exhibit 1?
[4]     MS. DANIELS: Yes, Exhibit 1, the
[5] expert report in this case.
[6]     THE WITNESS: I was intending to
[7] make a general statement about the atmosphere of
[8] publishing in New York today.
[9]     BY MS. DANIELS:
[10]     Q: So you have no specific information
[11] about HarperCollins that would lead to you
[12] believe –
[13]     MS. SMOLER: Objection.
[14]     THE WITNESS: That is not true.
[15] That orange crate full of stuff was to me, you
[16] know, the demonstration. There was the proof right
[17] there, that this project gets commissioned, steams
[18] ahead and comes out, is an example of what I was
[19] trying to say.
[20]     (Discussion off the record.)
[21]     BY MS. DANIELS:
[22]     Q: On page 2 of your report, you state
[23] that new-think arithmetic that leads to the
[24] purposeful avoidance of fact and truth is simple.
[25] I'm sort of misquoting, but what do you mean by

## EDWIN DIAMOND

Page 120

[1]
[2] new-think arithmetic?
[3]     A: It's coming out of the thoughts about
[4] these being publicly traded media conglomerates,
[5] where it's – that's one aspect, is the
[6] conglomeration of the book, which is another aspect
[7] which I tried to explain. In my article on The
[8] Debt of Truth, the general rise in tolerance, I was
[9] kidnapped by aliens, and the general – the kind of
[10] sliding back down the evolutionary tree of
[11] journalism back to, you know, the 19th century.
[12]     Q: Well, do you have any evidence that
[13] HarperCollins is using new-think arithmetic to
[14] purposely avoid the truth?
[15]     A: Again, this – the Brian Wilson book
[16] was fresh in my mind when I wrote this.
[17]     Q: So the Brian Wilson book is evidence
[18] that HarperCollins employs new-think arithmetic to
[19] purposely avoid the truth, is that what you're
[20] saying?
[21]     A: It struck me as an example of the new
[22] reality in the book business today.
[23]     Q: Have you spoken to anyone from
[24] HarperCollins who confirmed that new-think
[25] arithmetic was at work and led to the purposeful

Page 121

**EDWIN DIAMOND**

[1]
[2] avoidance of the truth?
[3]    **A:** Have I – I've read the materials in
[4] the depositions and came to that conclusion from
[5] that.
[6]    Can I add something? As a journalist,
[7] I found these – as someone who has tried to get
[8] information for 45 years as a reporter, I realize
[9] how weak and inadequate the journalistic techniques
[10] are compared to what really goes – you know, to
[11] see this crateload of – this orange crate of
[12] material was, you know, something you don't as a
[13] journalist get to see usually, these internal
[14] memos, and it's very hard to ever penetrate this
[15] deeply. So this gave me a greater look into an
[16] organization than most journalists get, as, you
[17] know, normally we deal with people and what they
[18] tell us; here is a case of what was really going on
[19] inside.
[20]    **Q:** And what is it exactly that you
[21] reviewed that made you think that HarperCollins was
[22] purposefully avoiding the truth because of economic
[23] pressure?
[24]    **A:** I don't say that HarperCollins
[25] purposely avoided the truth because of economic

Page 122

**EDWIN DIAMOND**

[1]
[2] pressures. I say that too many publishers think
[3] that way, and the Beach Boys book – I'm sorry, the
[4] Brian Wilson book struck me as an example of we've
[5] got a quarter of a million dollars invested in
[6] this, you know, we can make some – this is a big
[7] name, all those kids will buy the records, will buy
[8] the book, and you know, a quarter million dollars
[9] is a lot of money these days.
[10]    **Q:** Do you have any personal knowledge
[11] about HarperCollins overall budget?
[12]    **A:** I have journalistic anecdotal personal
[13] knowledge of how book publishers operate.
[14]    **Q:** I don't believe that was the
[15] question.
[16]    Do you have any personal knowledge
[17] about the size of HarperCollins' budget?
[18]    **A:** I could sit down and extrapolate and
[19] figure it out.
[20]    **Q:** And how would you go about doing that?
[21]    **A:** The number – I make three phone calls
[22] and find it out. Two phone calls.
[23]    **Q:** Did you make those phone calls before
[24] writing this report?
[25]    **A:** Phone calls about what?

Page 123

**EDWIN DIAMOND**

[1]
[2]    **Q:** The size of HarperCollins budget.
[3]    **A:** I don't see what relevance that had to
[4] this book in front of us.
[5]    **Q:** You seem to be making assertions that
[6] $250,000 is a lot of money, and put undue pressure
[7] on HarperCollins, and I was wondering whether you
[8] took the time to figure out whether that was a
[9] sizeable sum in relation to the rest of the budget.
[10]    **A:** It's a sizeable sum in relation to a
[11] book contract, and you can ask 99 authors and
[12] they'll tell you that.
[13]    **Q:** Which 99 authors are you referring to?
[14]    **A:** The 99 who aren't named, Colin Powell,
[15] Brian Wilson and Newt Gingrich.
[16]    **Q:** The 99 who are not those people?
[17]    **A:** Who are not named.
[18]    (The deposition of EDWIN DIAMOND was
[19] adjourned at 1:10 p.m., for a luncheon recess.)
[20]
[21]
[22]
[23]
[24]
[25]

Page 124

[1]
[2] APPEARANCES OF COUNSEL:
[3]
[4]    (P.M. SESSION)
[5]
[6]
[7]    KATHERINE J. DANIELS, ESQ.
[8]    ELIZABETH STOTLAND WEISWASSER, ESQ.
[9]    ARLENE R. SMOLER, ESQ.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17] REPORTED BY:
[18]    DAVID HENRY, RPR
[19]
[20]
[21]
[22]
[23]
[24]
[25]

1

1           IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW MEXICO

3

4

    CARL WILSON, et al.,

5              Plaintiffs,

6

    v.               No. CIV 94 892 JC

7

    HARPERCOLLINS PUBLISHERS, INC., a Delaware corporation,

8

          Defendant.     **ORIGINAL**

9

10

11          TELEPHONIC DEPOSITION OF JANET ROEHL

12                July 31, 1995
                  10:15 a.m.

13       201 Third Street, Northwest, Suite 2200
           Albuquerque, New Mexico 87102

14

15      PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE, this

    deposition was:

16

17    TAKEN BY: MS. KATHERINE DANIELS
          ATTORNEY FOR THE DEFENDANT

18

19    REPORTED BY:  MARY ABERNATHY SEAL, RPR, RMR, RDR, NM CCR #69
             Bean &  Associates, Inc.

20             Professional Court Reporting Service
             500 Marquette, Northwest, Suite 280

21             Albuquerque, New Mexico 87102

22

    5187-13 MAS

23

24

25

SANTA FE OFFICE
123 East Marcy, Suite 208
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


**BEAN & ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
**1-800-669-9492**

3

1          JANET ROEHL,

2      after having been first duly sworn under oath, was

3      questioned and testified as follows:

4                      EXAMINATION

5   BY MS. DANIELS:

6      Q.    Good morning, Ms. Roehl.

7      A.    Good morning.

8      Q.    According to your resume, you're a professor at

9   Eastern New Mexico University; is this correct?

10     A.    Assistant professor, yes, ma'am.

11     Q.    Okay.  And the subjects you teach are listed in your

12  resume; is that correct?

13     A.    Yes.  Do you want to know the courses I teach?

14     Q.    Why don't you just go ahead and list them?  I

15  believe they're listed in your resume, but let's just list them

16  one more time.

17     A.    Okay.  I teach mass media law, ethics of public

18  communication, two communication design courses, photo

19  journalism, the basic reporting course, investigative

20  reporting, and then several other writing courses.

21     Q.    Are these undergraduate or graduate courses?

22     A.    Undergraduate.  Most of them are upper division.

23     Q.    Other than teaching, what journalism jobs have you

24  held?

25     A.    None.  I'm an academician.

SANTA FE OFFICE
123 East Marcy, Suite 208
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

4

1      Q.    So you have never been employed in-house by a book

2   publisher?

3      A.    No, I have not.

4      Q.    What, then, is the basis for your expertise with

5   respect to book publishing and the day-to-day activities

6   involved in book publishing?

7      A.    I was asked to discuss journalism practices and

8   standards.

9      Q.    So you also do not have an expertise in the

10   publication of celebrity autobiographies?

11      A.    No, I do not.

12      Q.    I think I'd like to begin by marking a copy of your

13   expert report as an exhibit.

14           MS. DANIELS:  I believe Mr. Purcell has a copy

15   there.

16           MR. PURCELL:  Yes.

17           (Exhibit 1 marked for identification.)

18      Q.    Ms. Roehl, could you describe for me, please, how

19   your report was prepared?

20      A.    I'm not sure what you are asking.

21      Q.    Did you draft the first -- or did you write the

22   first draft of your report?

23      A.    Yes, I did.

24      Q.    And you sent it to Ms. Dumas?

25      A.    No, I did not send her a draft.  I sent her a final



SANTA FE OFFICE
123 East Marcy, Suite 208
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

1   not appear that HarperCollins made any attempt to verify the

2   claims made by Brian Wilson and that they did not seek

3   confirmation from other sources"; is that correct?

4        A.    "And locate documents," is the rest of that

5   sentence, yes, it is.

6        Q.    Other than the documents cited in your report, what

7   evidence do you have that HarperCollins failed to verify

8   Brian's version of the facts?

9        A.    None.

10       Q.    I'm hearing a long pause.  Did you hear my

11  question?

12            MR. PURCELL:  Katherine, it was answered.

13            MS. DANIELS:  It was answered?

14            MR. PURCELL:  Yes.

15            MS. DANIELS:  Could you repeat the answer,

16  please?  I didn't hear it.

17       A.    None.

18       Q.    (By Ms. Daniels)  Did you consider Ms. Gavenchak's

19  testimony on this point?

20       A.    No, I looked again at the documents that were

21  provided to me with the HC preface.

22       Q.    Do you recall Ms. Gavenchak's testimony that Brian's

23  stories were substantiated, where necessary, with other

24  published sources and with interviews with other people?

25       A.    I don't remember that exactly.  I remember in her

SANTA FE OFFICE
123 East Marcy, Suite 208
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

14

1    Q.    How do you square all of this testimony with the

2    conclusions that you reach in your report?

3    A.    "Square" meaning what, in this situation?

4    Q.    I mean, how did you reach the conclusions in your

5    report, in face of all of this testimony?

6    A.    I think that it's critical that your primary source

7    on this kind of review are those documents written at the time,

8    and those are the ones I weighted.  I think after-the-fact

9    explanations are just that.  They're simply explanations

10   prepared after it is over.

11   Q.    So you would prefer to rely on handwritten telephone

12   notes from -- handwritten notes from telephone conversations

13   than sworn testimony given under oath?

14   A.    I think documents, notes that were prepared during

15   the event, would, to me, be stronger or would be more helpful

16   than those that are --

17   Q.    How can you be certain that your interpretation of

18   those documents is correct?

19   A.    I can't.  I am reading them at face value.

20   Q.    Wouldn't it be logical to go to the deposition

21   testimony, see what the people who wrote those notes have to

22   say about it?

23   A.    Well, my preference was to rely on the current -- on

24   the documents that were in place at the time.

25   Q.    In your report at page 5, you state that "It does

SANTA FE OFFICE
123 East Marcy, Suite 208
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

16

1    deposition some reference to an article or to another book.

2    Something to do with heroes and villains.  I think that was her

3    deposition.  I'm not sure.

4        Q.    Did you consider that testimony in forming the

5    opinions set forth in your report?

6        A.    No, just on the primary documents provided.

7        Q.    Do you recall Ms. Gavenchak's testimony that she and

8    Mr. Gold went through the manuscript page by page, and Mr. Gold

9    answered each of her questions concerning the sources for

10   specific statements?

11       A.    Yes.

12       Q.    Did you consider that testimony in forming your

13   opinions?

14       A.    No, I was really looking here at Brian Wilson's

15   role, as well; not just Mr. Gold's.

16       Q.    What evidence do you have that -- well, maybe you

17   could explain that for me.  I don't quite understand how

18   that --

19       A.    Well, I was looking for both Mr. Gold's verification

20   as well as Mr. Wilson's, and in the HC-prefaced documents, I

21   did not see where Mr. Wilson -- that there was some concern

22   that he had read that thoroughly, and there was some suspicion.

23       Q.    Did you consider the testimony on that point, the

24   deposition testimony?

25       A.    That Mr. Wilson had not read it?

SANTA FE OFFICE
123 East Marcy, Suite 208
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

17

1    Q.    Yes.

2    A.    No, I went again to the recorded conversations

3    between Mr. Martin and Mr. Engel, as well as several others

4    where they were concerned he had not read it.

5    Q.    The recorded conversation between Mr. Martin and Mr.

6    Engel?

7    A.    That there was some suspicion there that Mr.

8    Engel -- from Mr. Engel that Mr. Wilson had not read the

9    manuscript, and there were some other documents that indicated

10   some concern that Mr. Wilson was only reviewing the material in

11   a cursory manner.

12   Q.    Well, let me read a paragraph from one of the

13   documents that you cited in your report.  It's number HC00486.

14   This is a memorandum that Matthew Martin did to the file on

15   July 24, 1991.  In it he summarizes or he describes a meeting

16   he had with Brian Wilson.  Do you recall the document that I'm

17   mentioning?

18   A.    If you can wait a moment, I'm looking it up.

19   Q.    Okay.

20   A.    Okay, I have that document.

21   Q.    Would you please turn to page 6 of this document,

22   which is numbered HC00491?

23   A.    Yes, I have that.

24   Q.    These are Mr. Martin's notes from a conversation he

25   had with Don Engel on July 24, 1991; is that correct?

SANTA FE OFFICE
123 East Marcy, Suite 208
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

1   meaning of the term?

2       A.    If you want, I have her report.  If you'll give me a

3   moment, I'll find it.

4       Q.    If it would help, I can identify the page number for

5   you.  Why don't we just come back to this in just a minute?

6       A.    Here it was, on page 9, where she talked -- the

7   first full paragraph --

8       Q.    Okay.

9       A.    -- was the reference, where she defined "crash" as

10  completed fairly quickly.

11      Q.    Let's wait a minute so I can get the text of it.

12  Based on Mr. Diamond's testimony, which you haven't seen, but

13  which I just relayed to you, and what Ms. Drew says in her

14  report, you wish to maintain your view about the meaning of the

15  term "crash schedule"?

16      A.    That I would have no other frame of reference to

17  change it, you know, without going into and speaking to Mr.

18  Diamond or -- I'd be uncomfortable with a change.

19      Q.    I'm sorry?

20      A.    Without speaking directly to Mr. Diamond, I still

21  think "crash" would imply an immediacy.

22      Q.    In your report, you state that HarperCollins failed

23  to address the likelihood that Eugene Landy may try to use this

24  publication to promote his own agenda; is that correct?

25      A.    Yes.

SANTA FE OFFICE
123 East Marcy, Suite 208
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

1    Q.    What evidence do you have that HarperCollins failed

2    to address this issue?

3    A.    Just a moment, and I'll find that reference.  There

4    were several references in the HC prefix documents about Landy,

5    and his -- I think it was referred to as undue influence on

6    Brian Wilson.  And those are cited on page 4 of my report.

7    Q.    Is there anything else that you relied upon in

8    reaching that conclusion?

9    A.    No.

10    Q.    I may have missed that answer, too.

11    A.    I'm sorry.  No.  If there's a pause --

12    Q.    Did you consider the deposition testimony on this

13    point?

14    A.    No, I primarily on this focused on the HC-prefixed

15    documents.

16    Q.    Do you recall Mr. Miller's testimony that he

17    repeatedly sought reassurances that Eugene Landy was not

18    inappropriately involved?

19    A.    I don't remember that directly.  I do remember in

20    his deposition he did address that issue.

21    Q.    But you didn't consider Mr. Miller's testimony in

22    reaching the conclusions set forth in your report; is that

23    correct?

24    A.    No, not on -- no.

25    Q.    Did you consider the paragraph from Mr. Martin's

SANTA FE OFFICE
123 East Marcy, Suite 208
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

1   notes of his July 24, 1991 conversation with Don Engel that I

2   previously read to you?

3       A.    What reference are we speaking of?

4       Q.    On page 6, number HC00491.  Mr. Diamond states that

5   it is not all that favorable to Landy and Engel's opinion, nor

6   does it appear to be Landy's parting shot, as he feared it

7   might be.

8       A.    Yes, I do have that.

9       Q.    Did you consider that?

10      A.    I looked again at the document in total.  And let me

11  see that.  I could find that quote.  It's cited in my report.

12  Here they talk about on the next page, page 7, HC00492, where

13  they talk about they wanted to be in a position to press

14  forward with their effort to have a permanent conservator name

15  for Brian to protect him from Landy's undue influence.  The

16  next one, Landy is asking for a lot.

17              (A discussion was held off the record.)

18      Q.    Let's let Ms. Roehl finish what she was about to

19  say, and then I'll re-ask my question.

20      A.    Okay.  I'm not sure where I was.  But anyway, I was

21  going on in there reading about that Landy is asking for a lot,

22  and so forth, that in this there were several references to

23  their concerns with Landy.

24      Q.    Then what, in your mind, is the relationship between

25  these statements concerning Eugene Landy's influence over

SANTA FE OFFICE
123 East Marcy, Suite 208
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

25

1   Brian's finances -- what does that have to do with the notion

2   that Eugene Landy was using this book to promote his own

3   agenda?

4        A.    Well, the fact that he was concerned, that he was

5   wanting his consultation on it, that they were consulting, that

6   his overall influence -- undue influence, using their

7   vernacular, over Brian, there were comments that Brian was

8   scared of him, and so forth.

9        Q.    Did you review Mr. Miller's testimony on this

10  point?

11       A.    That they did discuss it.  I don't recall

12  specifics.

13       Q.    Do you recall Mr. Miller's testimony that his

14  understanding was that Eugene Landy was used by Todd Gold as a

15  source for information about his treatment of Brian, and their

16  business life together?  Do you recall that testimony?

17       A.    I recall about -- no, not specific.  I recall his

18  talking about whether he was a consultant, and so forth.

19       Q.    Do you recall Mr. Miller's testimony that he was

20  never under the impression that Eugene Landy was a source of

21  information about Brian's life, other than his experience in

22  treating Brian and their business relationship?

23       A.    I don't remember that exactly, no.

24       Q.    So you didn't consider that testimony in reaching

25  the conclusions set forth in your report?

SANTA FE OFFICE
123 East Marcy, Suite 208
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

26

1   A.   No.

2   Q.   I'm sorry.  Again?

3   A.   No.  I'm sorry.

4   Q.   I didn't pick that one up.  Was that an answer?

5   A.   No.

6   Q.   Why don't we go off the record for just a minute?

7   I'm going to look through my notes, and I think we may be

8   done.

9            (A discussion was held off the record.)

10           MS. DANIELS:  I have no further questions.

11           MS. ROMERO:  We have no cross-examination.  We'd

12   like to read and sign the transcript.

13           (The deposition concluded at 10:55 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE
123 East Marcy, Suite 208
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
500 Marquette NW, Suite 280
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

# HEROES & VILLAINS

## *The True Story Of The* BEACH BOYS

### STEVEN GAINES



190  S T E V E N   G A I N E S

born, maybe while I was pregnant. Murry was really against drugs, and at first so was Dennis. This was one way Dennis could be separate from everybody else and get the love he wanted from Murry. I would say a big part of Dennis's problem was that he could never connect with his father or please Murry."

But of all the problems Carol had with Dennis, his extra-marital affairs hurt the most. While Dennis was extremely prim and moral about Carol—she joked that she was the only woman on the beach in a turtleneck bathing suit—he had another standard for himself. Dennis cheated on Carol without apologies or apprehensions. He bragged to his friends that the night his daughter was born, he made love to another woman on the lawn of his house. Frequently he would come home from touring with a case of gonorrhea, contracted from a groupie on the road. He and Terry Melcher and Gregg Jakobson formed a club called the Golden Penetrators. "They considered themselves roving cocksmen," Carol said. "It was mostly guys hanging out and getting stoned." Gregg Jakobson donated his old car. "They even painted this old car gold, drove it up our driveway, and parked it on the side of our hill. It hurt, of course. You don't like thinking of your husband belonging to a club called the Golden Penetrators. It was tough."

When the fights with Carol became onerous, Dennis would disappear for days, usually sleeping at Gregg Jakobson's house. The marriage took a disastrous turn with the death of one of the horses. Dennis claimed that Carol had starved it to death; Carol said it had gotten pneumonia and had to be put to sleep. The horse's death caused an irreparable rift. Much to Carol's relief, early in 1968 Dennis finally rented his own place, an enormous house at 14400 Sunset Boulevard. Once a hunting lodge owned by Will Rogers, it had vast, manicured grounds with trees so rare they were registered. The house was wood-paneled, with handmade furniture, and out in back was a swimming pool the shape of the state of California.

Murry and Audree's marriage continued to have its ups and downs. Audree loved Murry, and could see the misguided but well-meaning man so often hidden from strangers by his gruff

exterior. But even for Audree, Murry was often difficult to take, and she spent much of her time at her favorite son Carl's house before Murry bought a second house for her to live in. Still, Murry and Audree were extremely dedicated to one another.

One major breach occurred when Murry discovered that his sons were smoking marijuana. "I remember Carl and Brian telling me," Audree said, "we were walking through the airport—they had just come back to Los Angeles from someplace—and [they told me about smoking pot]. I just choked because at that time it was such a new thing to me. . . . I knew nothing about it except, 'Oh, stay away! Dangerous! Bad!' And of course, their father, oh Jesus, he just went wild cause they all told him—they were very honest. I wished they had never told us." Murry forbade Audree to have anything to do with them. "It was a terrible time in my life," she said. "He wouldn't allow them to come over until they would say, 'I'll never touch another marijuana cigarette again.' I only got to see them sort of sneakily because he didn't want me to go to their houses. Instead of asserting myself and saying, 'Go to hell, they're my sons,' I did what he told me." Murry finally relented on Christmas Day of 1967. "All of a sudden," Audree related, "he said, 'You can have the family for Christmas,' and I was ecstatic. I was so thrilled—they all came and had a wonderful day. But the important thing that I remember was the pain of the months he wouldn't allow them to come to my house."

The worst was to come in January 1967, when Audree went on a short vacation to Las Vegas with her brother, Carl Korthof. Carl, who had been trying to cut down on his drinking because of a serious heart condition, had been introduced by his nephews to a much less lethal high—marijuana—and had brought some with him to Las Vegas. By this time Audree was no stranger to marijuana. One morning while her brother was in the other room, he had a sudden and fatal heart attack. In a panic, Audree called for an ambulance. When the police and paramedics arrived, the first thing they saw was the marijuana on the living-room coffee table. Already beside herself with shock at her brother's death, poor Audree was now arrested and "put behind bars," according to Carl's son, Steve Korthof.

Said Steve, "I flew to Vegas with my mom and Murry, and Murry didn't know anything about [Audree's arrest]. They were going to Vegas to identify my dad, and when they got to the hotel I already knew. I didn't say a word. They were told that Audree was at the police station. So Murry says, 'Police station? I guess she went to file a report.' When he got down to the station and went to the normal department where she should have been, he found out she was [being held] in the narcotics division. 'What?' he said. When he found out what happened, he totally flipped out...oh Jesus, when he found out..." It took a long time for him to forgive Audree for that one."

During this period Murry was still promoting various new ventures in the music business. He had recently re-teamed with Rick Henn, of the Sunrays, who said he "sort of became Murry's Brian." One of Murry's projects was to write unsolicited jingles for television commercials, "because he felt the sponsors needed his help," according to Rick Henn. "Little did Murry know that no advertising agency takes outside input." Murry wrote and recorded a Kentucky Fried Chicken commercial and a Taco Bell commercial, among others—all were politely turned down. The only song of Murry's to be heard by the general public was one he wrote with Brian under the pseudonym Reggie Dunbar, called "Break Away." The Beach Boys released the song as a single in June 1969, without much success.

But to Murry, his most important project was the LP entitled, *The Many Moods of Murry Wilson*. Murry wrote and produced most of this album, with Don Ralke doing arrangements. However, Murry still fancied himself a talent scout and showcased a new discovery on the LP—a forty-year-old plumber named Eck Kynor who had helped with the renovations on Murry's Whittier house. Kynor was represented on the album by tunes called "The Plumber's Tune" and "The Happy Song." Also included on the LP were tunes entitled "Leaves" and "Betty's Waltz" (with an assist from Audree). Capitol released the album in October 1967.*

---

*Allegedly, Murry arranged for Capitol to have the cost of his album charged back to the Beach Boys' account.



TG          05026

fright, and the increasing sound volume that was beginning to bother his one good ear. Those reasons never changed, and it is curious that Brian returned to touring in the latter half of the 1970s.

In addition to his dislike of live performing, Brian was also having difficulties in other areas. He was having trouble dealing with the group's rapid rise and the increased pressures that success brought. Brian was not a stay-at-home as a teenager; he was an athlete, an active person. Less than two years into the Beach Boys' existence, Brian was already partially in retreat, although in 1963, the highs and lows were relatively balanced and Brian was a "happy" person.

As a hitmaker, Brian was having no problems at all. He was incredibly prolific; the melodies seemed to spill from his head onto the records, and resulted in an incredible string of seven straight top-ten singles. As Chuck Britz remembers, Brian was so fruitful that "he could write a song on the spot that would be a hit" and he might not use it because "he'd come up with something better and he'd use it" instead.

The music world loved Brian's work, yet Murry could still find fault with Brian's ideas. Audree Wilson insists that Brian and Murry "didn't fight a lot about the music," but she relates one disturbing incident that may exemplify the kind of arguments that occurred between father and son. "When Brian



Frederick Vail Productions
* * * * *
A GALA
CHRISTMAS CONCERT

THE BEACH BOYS

SAT. DEC. 21 8:00 P.M.
SACRAMENTO
MEMORIAL AUDITORIUM

wrote 'Surfin' U.S.A.,'" Audree recalls. "I was down in the music room with him and Murry was up in the bedroom watching TV. Murry came rushing down, and he criticized his [Brian's] rhythm. Brian was furious, just furious. He said, 'Fuck you!' It was just horrible. And I said, 'Brian!' And Carl was sitting down there, too, and he said, 'Brian!' Murry never got over that . . . he used to bring that up to me. I was supposed to go over there and hit Brian with a board,

or clobber him or some horrible thing because he said that. I didn't approve of it [the profanity], but I didn't think it called for that."

There were two other noteworthy events that took place in 1963. Brian broke up with Judy Bowles, and Gary Usher helped his lovelorn pal by introducing him to Marilyn Rovell, a cousin of a girl he was dating, Ginger Blake (whose real name is Sandra Glantz). Marilyn eventually became Mrs. Brian Wilson.

The other big happening was the return of Al Jardine to full-time status as a Beach Boy. With Al back in "the family," the Beach Boys' lineup appeared to be set; However, 1964 would be the last year Brian Wilson would be a full-time Beach Boy.

It was also the year that the decade called "The Sixties" finally began in California. The years from 1960 to 1963 had been an extension of the fifties' easygoing complacency. The assassination of President John Kennedy may have ended the fifties for California. If it hadn't, the Vietnam War certainly would have. Still, as 1963 ended, California was mostly preoccupied with itself. It took the arrival of the Beatles to shake that sunny state out of its blissful provincialism.



(9)

mind. In other words, it was a break-down period. I must have cried about fifteen times the next day. Every half hour I'd start crying. Carl came to my hotel room. I saw him and I just slammed the door in his face. I didn't want to see him or anybody, because I was flipping out. Nobody knew what was going on. I wouldn't talk. I just put my head down and wouldn't even look at anybody. That night, the road manager took me back to L.A., and I didn't want to see anybody except my mother. She was at the airport to meet me. As soon as I saw her, I started crying again. I just needed to hear her talk to me; it's a kind of security to be able to talk to your mother as I can talk to Audree. We went over to the house and we had a three-hour talk there. I told her things I'd never told anyone in my life, and she sort of straightened me out. Generally, I







*From Carl Wilson's high school senior yearbook: Above, Carl and date. Far left, Marilyn Rovell. Left, Diane Rovell. Below, Carl. Bottom, Brian and Mike used to have pretend fights.*

dumped out a lifelong hangup.''

Remembering that night, Audree Wilson describes what happened. ''We received a phone call . . . saying that Brian was coming home and that he had been crying and breaking down and couldn't carry on. He [Dick Cummings—an accountant and a road manager] made it very clear that only I was to meet Brian, not his father. . . . Once again, my husband was just crushed, and oh, just furious with me.'' Instead of being totally concerned with what was happening to Brian, Murry had found a reason to get angry and be hurt. As Brian said,

looking back on the whole experience, ''My dad always had a problem of understanding people and their feelings.''

Audree Wilson resumes the story: ''I met Brian at the airport, and we got in the car'' and went to the house in Hawthorne, which the Wilsons still owned even though they were living in Whittier. At the house, Brian was ''really in a bad state, he was crying and then he would stop crying, and he'd talk about—'' At that point, Audree refused to reveal any more. The ''lifelong hang-up'' Brian unloaded that night is a secret that Brian and Audree still share. The



59

TG          05086



# ROLLING STONE

## THE HEALING OF BROTHER BRIAN

*A candid interview with the Beach Boys' Brian, Dennis, Carl, Mike and Al, plus Brian's mother, his Dad, his wife and his shrink. By David Felton*

## DRAWING FIRE: BILL MAULDIN

14023

TG    02485



*Rising and shining: Brian Wilson (yawn) and bodyguard Scott Steinberg*

## SLEEPERS AWAKE



**T**HIS MAY HAVE BEEN, AS the trades predicted, the bitchinest summer ever for the Beach Boys, what with their new album, their tour, and Brian Wilson finally getting out of bed. But as far as I'm concerned these last four months have been one endless bummer. I couldn't seem to come up with a new handle to their venerable rock legend. Let's face it, the Beach Boys are probably the most thoroughly written about, mythicized, analyzed, agonized over and deeply probed pop group in America. And this summer especially we've had Beach Boys up the ass: dozens of heavy feature articles in major magazines and newspapers; a dazzling, hour-long TV documentary; a three-month concert tour of stadiums and fairgrounds throughout the United States and Canada; release of *15 Big Ones*, the first album of new Beach Boys material in 42 months, in honor of the 15 years they've miraculously played, strayed, prayed and stayed together; and a scholarly sounding paperback entitled *The Beach Boys: Southern California Pastoral*, in which Cal State professor Bruce Golden puts the guys right up there with Dante, Cervantes, Shakespeare and Milton as masters of the pastoral form.

Well, why not, it's a great legend, and just like nearly everything the Beach Boys ever recorded, I can never stop listening to it. Mainly it's about Brian Wilson, the partially deaf boy wonder turned mad genius who tuned his one good ear into the drone of middle-class America and heard the lost chord of God. Until it drove him nuts, and finally silent.

So in June, when the word started spreading that Brian was ready to talk for the first time in half a decade, I flew down to Los Angeles to conduct an official ROLLING STONE interview. But it didn't work out exactly. Brian was ready to talk all right, just as he was ready to walk or ready to start dressing himself; but there could be no definitive Brian Wilson interview because Brian Wilson was not yet definitively himself. Therefore I also talked to the other Beach Boys and to Brian's mother, his wife and his shrink. Plus in late 1971 I'd interviewed Brian's father Murry, while he was still alive, and I threw a little of that in somewhere.

The raw material, I think, is pretty good—some really touching stories, some laughs, hopefully some answers. But focusing it, as I mentioned, was a bitch. First I tried a musical analysis thing, portraying the Beach Boys as "primitivists" like contemporary composer Carl Orff. Both Orff and the Beach Boys ignored the virtuosic contrivances of established music and returned to the common, simple rhythms and harmonies of the people. They both orchestrated this folk element with layers of brilliant tonal color and ambiance to produce a music of incredible spiritual purity. I mentioned this to the Beach Boys and none of them had ever heard of Carl Orff. Which in a way, I thought, reinforced my theory but also sort of soured me on it.

Finally, in late September, I returned to Los Angeles at the suggestion of Brian's shrink, Dr. Eugene Landy. He wanted me to see Brian's progress since June. That day disturbed me a great deal, but it did provide an update and ultimately a focus for the story. For this in one sense is a story of gurus, of old and new methods of personal growth in the promised land called California. Brian's father was a guru of sorts, a frustrated songwriter and ruthlessly aggressive man who heard in his three sons the music he could never articulate himself, who as their manager drove them to such heights of success they eventually fired him. Then Brian took over as guru to the group, teaching the others his genius art of composing and producing, teaching them so well that when he eventually ascended to his bedroom, they could carry on his work with the public hardly noticing. Later came the Beach Boys' professional gurus—Maharishi Mahesh Yogi of TM and Dr. Landy of Dr. Landy.

I've no idea which method works best and I really don't care. But if you're seeking peace of mind and body, positive energy and a little spiritual glue, let me strongly recommend adding some Beach Boys music to your day, perhaps when you get up and just before dinner. It'll give you something.

## MAMA SAYS



**S**HE'S SO GOSH DARN CUTE, the colorful clothes she wears and the way the sunlight plays upon her short platinum hair, you wish they all could be California girls like Audree Wilson, mother of Carl, Dennis and Brian and den mother to the Beach Boys since their first days in Hawthorne, California. More amazing, she was the wife of Murry Wilson, by all reports an extremely difficult man, as work-driven as she was playful, as rough as she was easy. A small, quiet, funny woman surrounded by fighting men, she spent much of her time and understanding bridging gaps and soothing wounds. Now the old man has died and the young ones have long since moved away to grow old themselves; so Audree sits alone these days in an elegant, hillside home above Hollywood, with the view and the pool and the shiny Jag in the driveway, and tries to adjust to the strange new peace that plagues her every hour.

AUDREE: The way it really started, Brian, he started sing-ing when he was just a little bitty guy, three years old. He'd sing right on key. He loved to hear him play the piano, he loved the chords. And he'd say, "Play that chord again."

Brian ... always had this incredibly marvelous talent. The other boys were a little slower, they were kinda like slow bloomers. Brian started writing arrangements when he was around 14. He loved the Four Freshmen—I know you've read that over and over—and he would make these incredible arrangements, sorta like them but he'd add what he wanted. And we'd sing the first two parts on the tape recorder, then play it back and sing the other two parts with it. That was great fun.

*Did he ever take formal piano lessons or anything like that?*

AUDREE: Brian took accordion lessons, on one of those little baby accordions, for six weeks. And the teacher said, "I don't think he's reading. He just hears it once and plays the whole thing through perfectly." Anyway, at the end of six weeks he was supposed to buy a large accordion, but we couldn't afford it. And that's all the training he ever had.

*Brian is deaf in one ear. Was he born that way?*

AUDREE: We don't really know. Brian thinks it happened when he was around ten. Some kid down the street really whacked him in the ear. However, it's a damaged ninth nerve, so he could have been born that way; it's called the ninth nerve and there's nothing they can do about that. I think it makes him more incredible.

*The way he arranges, produces and records—the ambiance and total sound—is something that two ears can really appreciate. He's never heard that and I guess he never will.*

AUDREE: Ah, he hears. [Audree laughs in amazement.] He doesn't maybe hear like we do, but he does.

*So when did your sons start to record?*

AUDREE: My husband was in the machinery business, big lathes from England, and the people from whom he imported them were here to visit us. And we took them to Mexico City. When we left, the refrigerator was com-pletely stocked and we gave the boys enough money to buy whatever else they needed. We came back and here they had gone out and rented a bass, a big standup, as tall as Al for sure, and drums and a microphone. They had used every bit of their food money. And they said, "We want to play something for you." They were very excited about it, and I thought the song was darling—never dreaming anything would happen.

*And that song was "Surfin'."*

AUDREE: Right.

*Well, then they signed with Capitol and they started making a lot of hits. How did that change your life at home?*

AUDREE: Well, it was really very hectic. Telephones never ever stopped ringing. And I was doing all of the book work. I was making all the forms for the musicians' union and I was going to the bank and being so careful that all five of them got exactly the same amount to the penny. And I remember cooking dinner and we'd have to leave. I remember dinners not even being eaten because we had to fly out to wherever they had to appear.

*How did they handle this success?*

AUDREE: Well, being a mother, I thought they handled it so beautifully for being that young. But their father had a strong hand as far as . . . well, they didn't always listen to him. Later he'd say, "Why didn't you listen to me?" And they'd say, "Well, I guess we were punks."

*There was a night during or after the concert tour when they decided they didn't want their father to manage them.*

AUDREE: It destroyed him.

*Did you understand why they . . .*

AUDREE: Oh, I understood perfectly. That was a horrible time for me. He was just destroyed by that and yet he wasn't really up to it. He'd already had an ulcer and it was really too much for him; but he loved them so much, he was so overly protective, really. He couldn't let them go. He couldn't stand seeing anyone else handling his kids.

... were terrible days, frankly, and he was angry with me. You always take it out on the closest one. He was angry at the whole world.

*What did he say at the time?*

AUDREE: Not too much. He stayed in bed a lot.

## YOU NEED A MESS OF HELP TO STAND ALONE



**M**EANWHILE, BACK AT THE Bel Air mansion, Brian had just gone upstairs for his noontime nap when Dennis Wilson bounded into the living room. Dennis is easily the most infectious Beach Boy, the prettiest, wittiest, most outgoing and independent, the most, say his family, like his father. Not surprisingly, it's gotten him into a lot of trouble over the years, with his dad, his schoolteachers and later with his notorious roommate Charles Manson, to whom he now, heartsick and practicing impulsively, bore a striking resemblance. (According to *New Musical Express*, Dennis told a reporter for England's *Rave* maga-zine in 1968, "Fear is nothing but awareness, man. . . . Sometimes the 'Wizard' frightens me. The 'Wizard' is Charlie Manson, who is another friend of mine, who says he is God and the Devil. He sings, plays and writes poetry and may be another artist for Brother Records.")

As Dennis sat down, Sandy Friedman handed him a local trade paper with the Beach Boys on the cover. He glanced at it for a moment, then shrugged and said, "Come on, you can't read everything you believe." Then he stood up and walked to the center of the room for an important announcement.

DENNIS: I've just made a monumental decision. [*Dennis pauses dramatically.*] I'm not guilty about masturbation anymore! [*Then seriously, folks.*] I just started my own record company. It's like, I've been in one group my whole life. I always thought if I wasn't a Beach Boy I would fail. [*Here Dennis sticks his arms straight out in mock agony.*] So I called up my attorney and said, "Hey, get me a record company." But my biggest piece of shit is, I'm gonna do a movie where I'm gonna be a flaming gay boy who wants to be a policeman.

So many positive things are happening in the Beach Boys' career right now. Let me tell you something about the Beach Boys . . . we had a very normal childhood. Our father beat the shit out of us; his punishments were out-rageous. I never saw eye to eye with him, ever. In fact



*Carl and Annie Wilson*

But one thing about my father—beautiful music would always melt my father's heart. You always wanted to sing for him. Dad was a frustrated songwriter, and I think Brian wrote his music through him.

[*Dennis suggests we go to his VW camper in the driveway, where his fence to a cassette of two cuts from his planned solo album. They have kind of a Beach Boys sound to them, but rougher, more rock & roll, like Dennis' voice and temperament. Actually, they sound great. Finally I get up enough nerve to ask him a question that has intimi-dated me for some time.*]

*I know this is an unpleasant subject, but it's been a number of years now, and I was wondering if we could discuss your experience with Charles Manson. . . .*

[*But even before I finish, Dennis is shaking his head.*]

DENNIS: No. Never. As long as I live, I'll never talk about that. [*He gazes out the windshield of his camper.*] I don't know anything, you know? If I did, I would've been up on that witness stand.

[*Just then enters Karen Lamm Wilson, Dennis' new wife, drives up in a small sports car. "Gotta go, guys," yells Dennis, bolting from the camper and taking off.*]

✿ ✿ ✿

Inside, Carl, the youngest and most stable Wilson brother, had arrived, sporting, like all the Beach Boys these days, a full, rough beard and like himself, a work-manlike jumpsuit. He owns a whole closetful of jump-suits, in a spectrum of colors from gray to brown, and one suspects they are designed to ameliorate the last vestiges of a sweet baby chubbiness. Although he's occasionally made headlines in the past, resisting the draft for years before a federal court granted him C.O. status, his personality is basically shy and quiet. It was Carl who invariably kept his head while all about him were losing theirs, who took charge of stage performances after Brian left the road and who later took over record production when Brian could no longer handle that one.

*Why was your father fired as manager?*

CARL: My recollection could be kind of foggy on that. I just know it started in Australia—this was around '63 or '64. Brian, and Michael especially, wanted to not have my father involved because he screwed them up with chicks, you know? We'd want to find a girl to be with, the thing on the road, and he was really kind of prudish about it. Also, Brian really disagreed with the way my dad wanted things to sound. And I remember having a conversation with my dad in his bedroom at home. I said, "They really, you know, don't want you to manage the group anymore." When I think about it now, Jesus, that must have really crushed him. After all, he gave up his home and business for us, he was kind of crackers over us, you know?

*Would your dad be more likely to confide in you?*

CARL: Yeah, we had a great relationship. He was crazy about Brian, but he and Brian drove each other nuts. You know, here Brian is really growing massively mu-sically, right? And his old man's telling him how the records should sound. My dad would say do it faster, and Brian would say no, it's gotta be more laid back, have more feel to it. But he was a great man, very sen-sitive. I really loved my dad a lot.

It about killed Brian when my dad died. He went to New York; my dad passed away, Brian split. He could not handle it.

*He didn't go to the funeral?*

CARL: No. That's how come he left, so he wouldn't have to be here and go. I think Brian hung onto that one for quite some time. I think he's okay with it now, maybe.

*The area of questioning I find most difficult, it's so per-sonal, is what we might call "Brian's problem."*

CARL: Brian's behavior?

*Yeah, well, you once said he went through hell.*



*Al and Lynda Jardine, with sons Matthew and Adam*

I held it on the back of his neck. And he still just sat there. I said, "Are you okay?" And he said, "I don't know."

I got up next to him to hold him—he was much bigger than I am—and he just toppled over. So I turned him over—I don't know how I did it, but I did it. And I realized he was really in bad trouble. In fact, I thought he was gone. By that time his face looked very flushed and his eyes . . . I knew he didn't see me because I went like this [*pats her cheek*] and said, "Baby, baby." All I said to him was, "Baby, baby, I love you." I ran into the bedroom and called the fire department. I never went back in that bathroom.

I locked the house, got in my car and went to the hospital . . . and sat there for quite a while. A doctor came out once and said, "We're doing everything we can." And I said, "I'm sure you are." And I knew that that was it.

*Brian did not go to the funeral.*

AUDREE: Nope. I understand that perfectly. You know, Carl was very angry that Brian didn't go to the funeral. And I said, "Carl, I understand perfectly." It didn't bother me. Brian couldn't face it. No way.

*Do you think he'll go to yours?*

AUDREE: I'd be surprised. You know, I don't know if he's ever been to one. To me, so what? I don't believe in funerals, frankly—the most barbaric, outmoded bunch of . . . [*censors herself and laughs*]. Anyway. . . .

*In general you seem to have been much looser than your husband.*

AUDREE: Oh yeah, a great deal more. He took life so seriously, really. It was hard for him to have fun. Once he said to me, "Sometimes you can be so mad or in some kind of mood, and somebody comes over and you can laugh and have a good time. Maybe I'm jealous of you." I used to think it would be so nice if he could just loosen up. But he was what he was, you know?

*About ten years ago everyone started getting into drugs and marijuana, and I'm sure your boys did too. How did that affect you?*

AUDREE: Well, I had a horrible problem with my husband about that. He was so, sooo against it, so mortified—I can't even think of a strong enough word. They all went and told him that they were smoking pot and, oh, he just thought that was the end of the world, the most horrible thing they could do. And of course he was angry with me. In fact, he was so angry he wouldn't allow them

to come to our house for quite a while. And he told me I couldn't go see them.

*But now, of course, dope is much better understood. Have you ever tried it?*

AUDREE: Frankly, I did try it. In fact, I just zonked out. I was at Carl and Annie's house and I walked into the living room and I couldn't get up. I didn't like it at all. Then one other time, though, I tried it and I've never had more fun in my life. Laughed and laughed and laughed, just had a ball. This is since Murry's gone.

*How old are you?*

AUDREE: Thirty-seven. You know I'm lying. Should I tell the truth?

*Let's see . . . you said you got married when you were 20 . . . and you had Brian after four years, and he just turned 34 . . . so you're about 58.*

AUDREE: Exactly. Rats.



*Mike Love and fiancé, Sue Oliver*

*So what are you doing with your time?*

AUDREE: Not as much as I should.

*You mean not as much as you'd like?*

AUDREE: Well, as I'd like and should for my own good, because I'm lonely a lot and that's ridiculous.

*Do you still play music?*

AUDREE: I don't like to play by myself. And I should because I just adore it. In fact, the other night some of my relatives were here and they were watching *Gone with the Wind*, and all of a sudden I just got bored and I went into the living room and I played the piano for a while. And I played the organ. And I was comfortable because I knew there was somebody here. But by myself I'm not comfortable. I just don't have anything in particular going for me.



## MURRY WILSON OBITUARY
### Distributed by Warner Bros. Records in June 1973

Murry Wilson, father of Brian, Dennis and Carl, died Monday, June 4th, 1973. The Beach Boys have released the following statement:

"Murry Wilson was a hard, oyster shell of a man, aggressively masking a passionate softness which revealed itself at the sound of a beautiful chord or the thought of his wife and three sons. An unending source of high-powered energy, he could tear down the strongest soul just by explaining his thoughts at a telephone call. A jealous guardian of the incredible career he helped build for his sons, he was the enthusiastic champion of any who sought to help them, and the scourge of those who used the Wilson name for personal gain.

"He was a proud man, who wanted more than anything for his sons to be 'good boys.' In his eyes they remained 'boys' until the end, though Brian is now 30, Dennis 28, and Carl 26. They were the 'tough' men he used to say he wanted them to be but, over his last years, Murry Wilson whittled down the generation gap through increased confidence in all three, despite their 'soft' ways.

"Although there were periods of storms too for Murry and his wife Audree, the last 18 months found them together nearly all the time. And, as if out of a gallant other-age, he almost always referred to her as 'Mrs. Wilson' when others were about.

"When it came to his machinery business, which fed the Wilsons until the Beach Boys were born, Murry worked harder than any man. The shop had to be absolutely clean and the demanding father devoted to his sons. 'Get in the trucks,' as they assured the place on Saturday mornings. On the business side Murry said he wasn't a financial wizard, but he spent money too lavishly. But it was he who would first raise the alarm when his sons were about to embark on questionable business deals. Of one man who had not a complete and astute scheme, Murry screamed, 'Sophisticated businessman? Hell no, he's just a son of a bitch and a crook. Get rid of him.'

"His continuing pleasure for years was music. He relished writing songs, anguished over lyrics and drove studio musicians like a construction foreman in his role as producer. His subdurable energy could be applied equally to a studio session for the Beach Boys or a demonstration tape for a musical commercial he created. In a recent transatlantic telephone call, Murry devoted nearly a quarter of an hour to playing tapes of a tune he had written and was hoping the Beach Boys would record. As the tapes spanned through the overseas connection, Murry enthused: 'Here's where Mike will come in . . . this part is a natural for Carl' . . . and on and on.

"Murry Wilson remained his sons' most enthusiastic advisor even in 1973, years after his formal managerial ties with the Beach Boys had ended. His compassion for their good fortune was undeniable, but critics when he saw them performing live about two months ago. After the concert Murry told everyone: 'Tell the boys to sing out more, especially Carl—he's not projecting enough. They're getting good but I know I could pay to see them great. And tell Dennis to keep his hands out of his pockets. But don't let him know the old man said it.'"



## A REALLY NEAT VISION

**T**ALK ABOUT GOOD VIBRATIONS, Mike Love's seven-acre spread near Santa Barbara is positively infested with them. There on a bluff overlooking the blue Pacific and a tiny surfers' cove, Mike spends his few non-working days of the year surrounded by jasmine, bougainvillea, wild strawberries, exotic chickens and a small community of serious transcendental meditators. These radiant, gracious people, most of whom help run the place when Mike's away, were heavy into abstinence abuse—no booze, no drugs, no tobacco, no meat.

Naturally I could only take it for about 24 hours, but I

Page 21

*Wilson*

[1]
[2] question of public figure status, and unless there
[3] is a further explanation from Ms. Daniels as to
[4] the relevancy, I instruct the witness not to
[5] answer.
[6]          **BY MS. DANIELS:**
[7]     **Q:** Would the statement have been
[8] accurate back in '77 when this book was published?
[9]     **MS. DUMAS:** Objection. Unless
[10] Ms. Daniels provides a further explanation of
[11] relevancy, I instruct the witness not to answer on
[12] the grounds that this line of questioning has no
[13] relevancy to the question of public figure status.
[14]          **BY MS. DANIELS:**
[15]     **Q:** Did you ever contact anybody about
[16] the accuracy of that passage?
[17]     **A:** No.
[18]     **Q:** In the next column, at the end of
[19] the first paragraph, which is a carry-over
[20] paragraph from the left-hand column –
[21]     **MS. DUMAS:** You're saying that for
[22] my benefit –
[23]     **MS. DANIELS:** For your benefit.
[24]     **MS. DUMAS:** – because Ms. Wilson is
[25] relying on your oral recitation of the text.

Page 22

*Wilson*

[1]
[2]     **MS. DANIELS:** Yes.
[3]     **Q:** Here, you're quoted as saying, and
[4] I'll quote:
[5]     "'Dennis had it the hardest; he
[6] got some very hard spankings.
[7]     (Murry) was tough; I used to think
[8] he was too tough.'"
[9]     And that's the end of the quote. He
[10] says:
[11]     "Audree also feels that Dennis is
[12] the most like Murry."
[13]     And then he quotes you again:
[14]     "'The temper, sort of bombastic at
[15] times. It's just like Murry
[16] revisited. They were certainly
[17] the most alike.'"
[18]     Do you remember giving that quote to
[19] Mr. Leaf?
[20]     **MS. DUMAS:** She's asking you a very
[21] particular question.
[22]     **THE WITNESS:** What?
[23]     **MS. DUMAS:** She's asking you a very
[24] particular question.
[25]     **THE WITNESS:** Yes.

Page 23

*Wilson*

[1]
[2]     **MS. DUMAS:** What's the question
[3] again?
[4]
[5]          **BY MS. DANIELS:**
[6]     **Q:** Do you remember giving that quote to
[6] Mr. Leaf?
[7]     **A:** It sure sounds like I said it.
[8]     **Q:** And so you believe it's an
[9] accurate –
[10]     **MS. DUMAS:** Objection on the
[11] grounds of relevancy. Unless an explanation is
[12] provided as to how this line of questioning
[13] relates to public figure status, I instruct the
[14] witness not to answer.
[15]     **MS. DANIELS:** Let me finish my
[16] question and then you can reassert the objection
[17] if you still want to.
[18]     **Q:** Do you feel that that's an accurate
[19] description of what you told to Mr. Leaf?
[20]     **MS. DUMAS:** Objection for the
[21] reasons stated before. The witness is instructed
[22] not to answer unless a further explanation is
[23] provided by counsel as to relevancy.
[24]     **MS. DANIELS:** I'm just trying to
[25] understand whether what she believes was in the

Page 24

*Wilson*

[1]
[2] public domain at the time of publication was
[3] accurate or inaccurate.
[4]     **MS. DUMAS:** I don't think that has
[5] any relevancy to the question of establishing a
[6] public figure status.
[7]     **MS. DANIELS:** Well, let's move on.
[8] You've instructed her not to answer.
[9]     **Q:** On Page 49 of this book, which is
[10] pretty far into this exhibit, Page 49, beginning
[11] in the middle, right under the – I guess it's a
[12] reproduction of a poster –
[13]     **THE WITNESS:** Thank you.
[14]     **MS. DUMAS:** You're welcome, Audree.
[15]          **BY MS. DANIELS:**
[16]     **Q:** Mr. Leaf recounts a scene, which is
[17] told by you, about when Brian was writing the song
[18] "Surfin' U.S.A."
[19]     **A:** Writing what?
[20]     **Q:** The song "Surfin' U.S.A."
[21]     **MS. DUMAS:** The sentence is
[22] apparently quoted by Ms. Wilson.
[23]     **MS. DANIELS:** Yes, she's quoted
[24] here.
[25]     **MS. DUMAS:** Purportedly quoted.

**Carl Wilson and Audree Wilson   v.**
**Harpercollins Publishers, Inc.**

---

Page 25

*Wilson*

[1]
[2]    MS. DANIELS: There's quotations in
[3] the text and first he begins:
[4]    "Audree recalls, 'I was down in
[5] the music room with him and Murry
[6] was up in the bedroom
[7] watching'" –
[8]    Oh. Here. Let me start again.
[9] "'I was down in the music room
[10] with him'" – I think meaning
[11] Brian – "'and Murry was up in the
[12] bedroom watching TV. Murry came
[13] rushing down, and he criticized
[14] his'" – meaning Brian's –
[15]    "'rhythm. Brian was furious, just
[16] furious. He said, 'Fuck you!' It
[17] was just horrible. And I said,
[18] 'Brian!' And Carl was sitting
[19] down there, too, and he said,
[20] 'Brian!' Murry never got over
[21] that. He used to bring that up to
[22] me. I was supposed to go over
[23] there and hit Brian with a board,
[24] or clobber him or some horrible
[25] thing because he said that. I

---

Page 26

*Wilson*

[1]
[2] didn't approve of the profanity
[3] but I didn't think it called for
[4] that.'"
[5]    Do you remember giving that
[6] statement to Mr. Leaf?
[7]    A: I do –
[8]    MS. DUMAS: First of all I think
[9] you misquoted it. The end of the quoted section
[10] has a open bracket around the words "the
[11] profanity," close bracket.
[12]    MS. DANIELS: Right.
[13]    MS. DUMAS: Okay. With that
[14] qualification, what's your question?
[15]    BY MS. DANIELS:
[16]    Q: Do you remember giving that
[17] statement to Mr. Leaf?
[18]    A: I do.
[19]    Q: Did you ever contact Mr. Leaf about
[20] this statement or the accuracy of this statement?
[21]    A: I don't remember.
[22]    MS. DANIELS: Now, on Page 159,
[23] Mr. Leaf, and, Beth, this is in the first column,
[24] and it is the third full paragraph.
[25]    MS. DUMAS: That begins "The Wilson

---

Page 27

*Wilson*

[2] family"?
[3]    MS. DANIELS: Yes.
[4] "The Wilson family business was
[5] not a smoothly operating machine
[6] by 1966."
[7]    In the middle of this paragraph
[8] Mr. Leaf recounts the story about Carl and Brian
[9] and marijuana, and I'll just read it to you.
[10]    MS. DUMAS: Objection. The
[11] paragraph speaks for itself.
[12]    BY MS. DANIELS:
[13]    Q: I'm reading here, beginning with the
[14] third sentence in the paragraph.
[15]    "The Wilson brothers' use of drugs
[16] served to further divide the
[17] family. Audree Wilson painfully
[18] recalled that time: 'I remember
[19] Carl coming to me and telling me
[20] that he had smoked marijuana.
[21] Brian and Carl both told me at the
[22] time.'"
[23]    MS. DUMAS: "At the same time."
[24]    MS. DANIELS: "At the same time.
[25] We were walking through an

---

Page 28

*Wilson*

[1]
[2] airport, and I just choked,
[3] because at that time it was such a
[4] new thing to me. I knew nothing
[5] about it except "Stay away!
[6] Dangerous! Bad!" And of course,
[7] their father, oh, he just went
[8] wild, because they all told him.
[9] They were very honest, and I used
[10] to wish they had never told. We
[11] talked about that later and Carl
[12] said, "No, we had to do that, we
[13] had to be honest about it." They
[14] were very upfront.'"
[15]    Q: Do you remember giving that
[16] quotation to Mr. Leaf?
[17]    A: I don't really remember but it's –
[18] I don't really remember.
[19]    Q: Did you ever contact Mr. Leaf with
[20] respect to this passage after you saw it in print?
[21]    A: No.
[22]    MS. DUMAS: Your question implied
[23] that she saw it in print.
[24]    BY MS. DANIELS:
[25]    Q: Do you recall seeing it in print at

---

# RESTATEMENT OF THE LAW

## OF

# CONFLICT OF LAWS

AS ADOPTED AND PROMULGATED

BY THE

## AMERICAN LAW INSTITUTE

AT WASHINGTON, D. C.

MAY 11, 1934

1934

AMERICAN LAW INSTITUTE PUBLISHERS

ST. PAUL

CONFLICT OF LAWS

Ch. 9

# Chapter 9

## WRONGS

### TOPIC 1. TORTS

Section
377. The place of wrong
378. Law governing plaintiff's injury
379. Law governing liability-creating conduct
380. Application of standard of care
381. Specific conditions of liability
382. Duty or privilege to act
383. Causation
384. Recognition of foreign cause of action
385. Contributory negligence
386. Liability to servant for tort of fellow servant
387. Vicarious liability
388. Defenses
389. Discharge or modification of cause of action
390. Survival of actions

### TOPIC 2.   ACTIONS FOR DEATH

391. Right of action for death
392. Suit on foreign right of action
393. Damages on foreign right; how distributed
394. Person to bring suit
395. Right of action to widow or named relative
396. Right of action to executor or administrator
397. Limitation of action for death

### TOPIC 3.   WORKMEN'S COMPENSATION

398. Compensation under act of state of employment
399. Compensation under act of state of harm
400. Neither employment nor injury in state
401. Abolition of right of action for common law tort or wrongful death
402. Effect of two acts governing injury
403. Effect of previous award

Ch. 9

WRONGS

### TOPIC 4.   MARITIME TORTS

Section
404. Tort in territorial waters
405. Tort in territorial waters affecting only internal economy of vessel
406. Tort on high seas
407. Navigation in territorial waters
408. Navigation on high seas
409. Tort by collision in territorial waters
410. Tort by collision on high seas
411. Limitation of liability

### TOPIC 5.   DAMAGES

412. Measure of damages for tort
413. Measure of damages for breach of contract
414. Measure of damages against telegraph company for failure to deliver message
415. Measure of damages against carrier for misdelivery or non-delivery
416. Measure of damages for breach of mercantile obligation
417. Measure of damages for death of human being
418. Interest as damages for breach of contract
419. Interest on injury to property
420. Interest on foreign judgment
421. Exemplary damages
422. Liquidated damages
423. Damages on contract for foreign money
424. Rate of exchange when judgment given on foreign cause of action

### TOPIC 6.   CRIMES

425. Jurisdiction
426. Jurisdiction to punish foreign act of national
427. Crime under law of another state
428. Law determining what constitutes crime

### TOPIC 1.   TORTS

*Scope Note*: Whether a tort has been committed is a question of the law of Torts of some particular state. If a tort has been committed by the law of a

the harm nor acted negligently, it is immaterial that by the law of the state in which he acted no liability is imposed in the absence of such fault. Thus, if an actor maintains an artificial reservoir filled with water in a state in which he is liable for harm caused by the escape of the water only if the reservoir was negligently built or maintained, and the water escapes therefrom and causes harm to another in a state in which the maintenance of such a reservoir is at the peril of the actor, the law of the latter state will determine the actor's liability for the harm thus caused.

*Illustrations:*

4. By the law of state X, the keeper of a tamed wild animal is liable for injury done by the animal only if the keeper is negligent; by the law of state Y, he is liable irrespective of negligence for any injury done by the animal. A in X keeps a tame bear; the bear escapes without A's fault and bites B in Y. A is liable.

5. By the law of state X, a man is liable for injury caused by the operation of his automobile only if he or his servant is driving it at the time. By the law of state Y, a man is liable for injury caused by the operation of his automobile if any member of his immediate family is driving it with his consent at the time. A keeps an automobile in X; his minor child with his consent takes the automobile, drives it into Y and there injures B. A is liable to B.

§ 380. APPLICATION OF STANDARD OF CARE.

(1) Except as stated in Subsection (2), where by the law of the place of wrong, the liability-creat-

461

---

*Illustration:*

2. A hires B in state X to go into state Y and there kill C. B starts to Y. A changes his mind and follows B with the purpose of preventing his carrying out the arrangement. B arrives in Y and kills C before A can intercept him. A has intentionally caused C's death.

*d. Where harm caused by defendant's intentional failure to act.* If a harm is caused by a failure to act, whether the failure is tantamount to an intention to commit the harm depends on the condition of the defendant's mind while he might so have acted and not later than the last moment when he might so have acted as to prevent the harm.

*Illustration:*

3. A nurse in charge of an insane patient sees his patient with a pistol. Because the nurse wishes the patient to die, he does not take the pistol from the patient. The patient kills himself with the pistol. The nurse may be found intentionally to have caused the patient's death.

*e.* The law of the place of wrong determines whether an actor is liable for harm which he has caused only if he has been negligent. If negligence is a condition to liability, the application of the standard of due care is made in accordance with the rule stated in § 380.

*Comment on Clause (c):*

*f. Liability without fault.* If, by the law of the place of wrong, an actor is liable for harm caused though he neither acted with the intention of causing

460

§ 380          CONFLICT OF LAWS          Ch. 9

ing character of the actor's conduct depends upon the application of a standard of care, the application of such standard will be made by the forum in accordance with its own rules of evidence, inference and judgment.

(2) Where by the law of the place of wrong, the liability-creating character of the actor's conduct depends upon the application of a standard of care, and such standard has been defined in particular situations by statute or judicial decision of the law of the place of the actor's conduct, such application of the standard will be made by the forum.

Comment:

a. Finding of negligence in particular case. Under the rule stated in § 379, the liability-creating character of the actor's conduct is determined by the law of the place of wrong. Where, however, the law of the place of wrong prescribes a standard of care by which the actor's conduct is to be judged, the application of such standard to the facts in a particular case must necessarily be made by a fact-finding body at the forum in accordance with local procedure. Thus, if the general standard of the conduct of a reasonable man has not been defined by statute or judicial decision of the state of acting, the question whether the actor's conduct is negligent is decided by the forum in accordance with its own rules of evidence, inference and judgment. Negligence is lack of due care under the circumstances; and what care should be given under certain circumstances is a question for adjudication in each particular case. The tribunal at the forum will decide this question and will not be influenced by the fact that another court, even the

Ch. 9          WRONGS          §§ 380-381

court of the state where a defendant acted, would have come to a different conclusion on the facts proved.

b. Negligence per se and breach of statutory duty. If, by the law of the place of the actor's conduct, the general standard of due care has been defined by judicial decision so as to pronounce certain conduct, as specific acts or omissions, to be or not to be negligent, the forum will apply the standard in the same manner although under the local law the case would have been for the judgment of the jury on the facts in question. So too, if by statute or other legislative enactment of the state of the actor's conduct the general standard of due care has been narrowed in a particular situation, the forum will make a similar application of the standard of care although under the local law the case would have been one for the jury because no such statute there existed.

Illustration:

1. By the law of state X, it is settled that due care requires that every locomotive be equipped with an efficient spark arrester; by the law of state Y, there is no such requirement. By the law of both X and Y, a railway company is liable for fires only if they are negligently started. A locomotive being carefully run in state Y throws out sparks which would not have escaped if there had been a spark arrester, and thereby sets fire to a stack of wheat in state X. The company will not be held liable for the fire.

§ 381.  Specific Conditions of Liability.

The law of the place of wrong may impose the doing of a particular act or the happening of a cer-