UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
------------------------------------------x
CARL WILSON, an individual, and          )
AUDREE WILSON, an individual,            )
                                         )
            Plaintiffs,                  )
                                         )
      v.                                 )   94 Civ. 892(JC)
                                         )
HARPERCOLLINS PUBLISHERS INC.,           )   AFFIDAVIT OF
a Delaware corporation,                  )   <u>LISA DREW</u>
                                         )
            Defendant.                   )
------------------------------------------x

STATE OF NEW YORK   )
                    ) ss.
COUNTY OF NEW YORK  )


            LISA DREW, being duly sworn, deposes and says:

            1.  I have been retained by counsel for defendant
HarperCollins Publishers Inc. ("HarperCollins") to serve as
an expert witness concerning book publishing procedures.  I
submit this affidavit in support of HarperCollins' motion
for summary judgment in the above-captioned case.  I have
read and am familiar with the allegations set forth in the
First Amended Complaint, and I have personal knowledge of
the facts set forth herein.

I.   <u>Qualifications as an Expert Witnesses</u>

            2.  I have been involved in the book publishing
business for approximately thirty-four years.  For twenty-



four of those years, I have been an editor.  I have
acquired, edited and published approximately 350 books, an
average of fifteen per year.  Approximately 75 percent of
these have been non-fiction works, of which some 30 percent
have been biographies or autobiographies.  In the past 10-12
years, 80-90 percent of the books I have edited have been
works of non-fiction.   Annexed hereto as Exhibit 1 is a
copy of my Curriculum Vite and as Exhibit 2 a cover story
about me which was published two years ago in <u>The Milwaukee
Journal Magazine</u>.

3.  After obtaining a Bachelor's degree, cum
laude, from the University of Wisconsin, I moved to New York
and began my career in publishing in 1961 in the Production
Department at Doubleday.  One year later I moved on to the
editorial staff at Doubleday, first as personal secretary to
the Editor in Chief, Kenneth McCormick, then as his
administrative assistant, and finally as his editorial
assistant.  In 1971, I became an Associate Editor and soon
thereafter was promoted to Editor and then, in 1976, to
Senior Editor.  In 1979, I was named Executive Editor and
Co-Editorial Director of the General Books Department at
Doubleday, the largest general book department in American
publishing at that time.

4.   While at Doubleday, I edited approximately 200 books, both fiction and nonfiction, by numerous authors, including Pierre Salinger, Pulitzer Prize winner Alex Haley, well-known celebrities such as Barbara Walters, Barbara Bush and Jack Paar, and a host of others.

5.   In October, 1984, I moved to William Morrow and Company (owned by the Hearst Corporation), where I held the title of Vice President and Senior Editor.   While at Morrow, I edited approximately 100 books, mostly nonfiction. Approximately one third of these books were biographies and autobiographies by and of entertainers and other well-known public figures, including Debbie Reynolds, Barbara Bush (a different book from the one published by Doubleday), Lucille Ball and Desi Arnaz, Jane Powell, Charles Grodin, Edie Adams and Rock Hudson.

6.   In December, 1992, I left Morrow and joined Macmillan Publishing Company, which, in February, 1994, was bought by Simon & Schuster.   I am now officially affiliated with Scribner, a division of Simon & Schuster, where I am publisher of my own imprint, Lisa Drew Books.   Since joining Macmillian (now Scribner) in 1993, I have edited approximately 30 books, including eleven biographies and autobiographies.

3

7.   In addition to my editorial experience, I have taught a course called "The Role of the Editor" in the Continuing Education Department at New York University.   I have also served as a National Book Award judge in the field of biography and autobiography.

8.   I have also previously served as a legal consultant.   In 1994, I was retained as a paid expert in a legal proceeding to determine the value of a John Steinbeck, Jr. manuscript.   The matter is still pending.   I have also testified as a fact witness in two copyright infringement matters and one case involving a constitutional challenge to a state statute regulating violent speech.

II.   **Summary of Opinions**

9.   Based upon my reading of the depositions and an examination of the documents produced in this case, I conclude that HarperCollins fully met and indeed considerably exceeded the standard of care imposed by law upon book publishers in defending defamation suits.   Whether we are ultimately dealing with a "reasonable book publisher" standard (which I am informed is the basic test under a negligence standard) or a "significant departure" from the "standards of information gathering and dissemination ordinarily followed by responsible parties" (which I am

4

informed is the essential test under New York's gross irresponsibility standard), or knowingly or recklessly false publication (which I am informed is the constitutional "actual malice" standard pertaining to statements claimed to defame public figures), there is absolutely nothing in the extensive record which I have reviewed to suggest that HarperCollins acted in anything other than exemplary fashion in publishing what it believed to be Brian Wilson's sincere and truthful effort to recount his life story.

III. <u>Information Considered In Forming Opinions</u>

10.   In forming the opinions expressed in this Affidavit, I have spent a total of 32 hours reviewing the following:

a.   First Amended Complaint dated October 10, 1994;

b.   Deposition of Thomas Miller dated March 15, 1995 and Mr. Miller's sworn affidavit;

c.   Deposition of Eugenie Gavenchak dated March 14, March 30 and March 31, 1995 and Ms. Gavenchak's sworn affidavit;

d.   Deposition of Matthew Martin dated March 16, 1995, March 17, 1995 and April 3, 1995 and Mr. Martin's sworn affidavit;

e.   Deposition of James Hornfischer dated March 13 and March 14, 1995;

    f.   Deposition of William Shinker dated
April 6, 1995;

    g.   Deposition of Audree Wilson dated March
21, 1995;

    h.   Deposition of Carl Wilson dated April 4,
1995;

    i.   Portions of the Deposition of Todd Gold
taken in <u>Love</u> v. <u>HarperCollins, et al.</u>
dated May 28, 1993 and January 26-27,
1994;

    j.   Deposition of Edwin Diamond dated July
24, 1995

    k.   Deposition of Janet Roehl dated July 31,
1995;

    l.   Plaintiffs' Expert Witness disclosures
and all documents cited therein; and

    m.   Copies of the agreements, letters,
memoranda, notes, and other documents
produced in the litigation.

    11.  I have also drawn upon my extensive personal
experience in publishing books, particularly of the genre --
autobiography -- here involved.

**IV.   <u>General Comments Concerning The Role Of The Book
Publisher In The Fact Checking Process</u>**

    12.  In publishing works of non-fiction, any
reputable publisher is of course concerned with the factual
accuracy of what it publishes.  This is especially the case
with respect to statements of fact that might be defamatory.
But it is critical to understand, in this regard, the

6

practical constraints under which book publishers operate and how, as a result, the fact-checking abilities of book publishers are far more limited than those of the publishers of daily newspapers or weekly news magazines.

13.  Book publishers cannot afford to hire a cadre of fact-checkers charged with independently replicating the research of their authors.  Many works are years in the making, reflecting thousands upon thousands of hours of their authors' research.  As independent contractors, the authors warrant and represent to the publisher that their writings do not give rise to defamation or other claims, a representation that the publisher is entitled to, and as a practical matter must, generally rely upon.

14.  This is not to say that a responsible publisher takes every factual allegation presented to it by its authors at face value.  To the contrary, an important role for the editor is to flag potentially defamatory passages, and inquire of the author(s) as to the factual basis for the statements.  By this process, the editor is able to gain a feel for the reliability of the author and his sources.

15.  In the typical book publishing scenario, the book editor (acting on behalf of the publishing house) will

raise with an author (or in this instance authors) those facts that strike the editor as being potentially inaccurate, unfair or untrue.  It is then the responsibility of the author to check the references and determine -- to the satisfaction of both author and editor -- whether or not the facts, as presented, need to be clarified, corrected or deleted.

16.  In the case of a celebrity autobiography co-authored by a professional writer, the logical contact person in this regard is the professional writer himself, since he typically is in charge of gathering, organizing, and presenting the information to be conveyed in the manuscript.  Accordingly, it is common practice for the editor to resolve her concerns over the factual accuracy of particular passages by discussing those passages with the professional writer and making at least spot inquiries concerning potentially troublesome passages.  It is understood that, to the extent the source of the allegations is the celebrity himself, the professional writer will verify those allegations by consulting the celebrity.  In other instances, it may be necessary for the professional writer to consult third parties or examine materials that have already been published on the topic.

**V.    General Comments Concerning The Nature of Autobiography**

17.   Another set of observations on the subject of factual accuracy is in order when dealing with the genre of autobiography.  First, readers of autobiography recognize that they are not reading a clinical history purporting to present a detached, "objective" view of the events and personalities portrayed.  They appreciate instead that they are reading an account of events from the perspective of the writer.  They fully understand that the autobiography represents the author's own viewpoint and not the opinions of the "opposing camp."  Indeed, the very power of an autobiography comes, in large measure, from the author's own observations concerning his life experiences.  The notion, evidently supported by plaintiffs, that HarperCollins had an obligation to insure that Mr. Wilson's autobiography was "objective" is antithetical to the nature of autobiography. It is also disingenuous given that plaintiffs Carl Wilson and Audree Wilson both testified in their depositions that they were contacted but refused to be interviewed for the book.  Carl Wilson Dep. 76-77 (Annexed hereto as Exhibit 3); Audree Wilson Dep. 66-67 (Annexed hereto as Exhibit 4).

18.   This is certainly not to say that factual accuracy is unimportant in an autobiography.  Getting the

facts right is always important, regardless of the work one is editing.  But one should not confuse factual accuracy with "balanced views."  The latter is necessarily one of the goals of objective news reporting; it is not central to --- nor even expected in --- an autobiography.

VI.   **The Book Publishing Process And HarperCollins'
Adherence to that Process**

     19.  There is a fairly standard process by which major publishing houses such as HarperCollins take book projects from conception to publication.  For simplicity, I have identified four stages of the process that shape and influence the book's editorial content.  These are: (a) acquisition, (b) editorial, (c) legal, and (d) copyediting. Other aspects of the process, relating to design, production and distribution, are not relevant to the inquiry presently before the Court -- the degree of editorial care exercised by HarperCollins in publishing the book -- and are not addressed in this Affidavit.

A.   <u>Acquisition</u>

   <u>The Process in General</u>

   20.   Book publishers acquire the rights to publish
books in a number of different ways.  Perhaps the most
common is through a literary agent.  Literary agents bring
to publishing houses book proposals from authors they
represent, generally handling negotiations with publishers
on the authors' behalf.  Good literary agents typically
represent authors and works of interest and promise, and
come to know their clients -- the authors -- quite well.

   21.   Where one is dealing with a celebrity
autobiography such as Mr. Wilson's story, it is common for
the literary agent to match up the celebrity with a suitable
professional writer.  The professional writer often will
collaborate with the celebrity in writing the book proposal
submitted to publishing houses for consideration.

   22.   A book publisher's agreement to publish a
book is usually memorialized in a written document called a
"publishing contract."  It is not uncommon for the contract
to be between the publisher and a corporate or other
business entity with which the celebrity is affiliated.  In
such circumstances, the publisher will often require the
celebrity personally to sign a "guarantee letter" to ensure

that the celebrity is personally committed to perform the obligations of the contract and warrant that the book is his own.  Most commonly, the professional writer does not sign the publishing agreement as a co-author but, instead, executes a collaboration agreement with the celebrity (or the celebrity's business entity), setting forth the writer's compensation and other terms of engagement.  The publishing house is not itself a party to such a collaboration agreement and, in my experience, rarely is even privy to its terms.

23.  The book contract will typically call for the author(s) to receive an advance -- payable at defined stages of completion (and, ultimately, acceptance) of the manuscript -- against the royalties actually earned from the book's sales.  Advances for celebrity autobiographies, to my knowledge, can run from as little as $20,000 to as much as $5 million.

24.  Once a book has been acquired, the publisher will set a production schedule.  The schedule will depend upon, among other considerations, the time it is expected that the writer will require to complete the manuscript, the time required to edit and legally "vet" (i.e., review) the manuscript, and such publicity considerations as timing the

book's release to a movie opening, record release or
performance tour of the celebrity.  In my experience, the
production schedule for a celebrity autobiography of the
type here involved will typically call for a period of five
to nine months from acceptance of the manuscript (submitted
to copyediting) to the release of the book for sale to the
public.

### HarperCollins' Acquisition of the Book

25.  HarperCollins acquired the right to publish
Mr. Wilson's autobiography in the spring of 1990 after one
of its senior editors, Tom Miller, received a proposal for
the book from Robert Gottlieb and Dan Strone,
representatives of the William Morris Agency.  Miller Aff.
¶ 3.  The William Morris Agency is one of the premier
literary agencies.  I have had many dealings with it over
the years, and know it to be professional and fairly to
represent the qualities and characteristics of the authors
and works it has presented to me for consideration.  I note
from my review of Mr. Miller's deposition that the book
proposal submitted by Messrs. Gottlieb and Strone:

> was convincing in its argument that
> Brian had recovered from [his] emotional
> problems, which is why we decided to go
> ahead and offer on the book . . .

13

Miller Dep. 47 (Annexed hereto as Exhibit 5).

26.   The William Morris Agency chose Todd Gold as the professional writer for this autobiography.  Mr. Gold was known both to the William Morris Agency and to HarperCollins as having a solid reputation as a writer for People magazine and as a writer of celebrity autobiographies similar to this one.  Miller Aff. ¶ 5.  For example, Mr. Gold co-authored Drew Barrymore's autobiography.  Notably, like Mr. Wilson, Ms. Barrymore had a past history of drug and alcohol abuse.

27.   The record reveals that HarperCollins executed a publishing contract with the partnership Brains & Genius to publish the Book.  Brains & Genius's partners were Mr. Wilson and Eugene Landy -- Mr. Wilson's one-time therapist and, thereafter, business partner.  HarperCollins paid a $250,000 advance to Brains & Genius through its agent the William Morris Agency.  Miller Aff. ¶¶ 10-11  Such an advance is average for a book of this type.  Consistent with standard practice, HarperCollins required Mr. Wilson to execute a guarantee letter, assuring the publisher that Mr. Wilson would remain personally committed to and involved in the project.  Miller Aff. ¶ 10.

14

28.   The book was assigned a publication target date of September, 1991, with targets for completion of the legal review by May, 29, 1991 and typesetting on June 7, 1991.   HC000473 (Attached hereto as Exhibit 6).   This production timetable is well within the norm for this type of book.   The original production schedule slipped by some six weeks, owing to the careful legal review through which the book was put.   Martin Aff. ¶ 7.

29.   Plaintiffs have seized on a bit of publishing jargon to suggest that the book may have been rushed to publication at the expense of careful editorial and legal review.   This assertion is based on several references to the book's having been placed on a "crash" or "tight" schedule.   Plaintiffs' experts' conclusions misconstrue the meaning of such terms.   As Mr. Miller, the book's senior editor, and Matthew Martin, HarperCollins' Assistant General Counsel, explained at their depositions, all that a "crash" schedule entails is that the process be completed fairly quickly -- at some point prior to the nine months usually allotted for such books.   In his deposition, plaintiffs' own expert, Edwin Diamond, acknowledged that the term is "hyperbole" and means "normal schedule."   Diamond Dep. 177 (Annexed hereto as Exhibit 7).   However described, the

15

schedule on which the book was published was well within a normal production timetable.

30.  In sum, having reviewed the deposition testimony and documents in the record, as well as the other affidavits accompanying this motion, I find nothing unusual about the process by which HarperCollins acquired the rights to publish WOULDN'T IT BE NICE - MY OWN STORY and absolutely no support for plaintiffs' assertions that intense commercial pressures and a "crash" schedule impacted upon quality control.

**B.**   **Editorial**

**The Process in General**

31.  Once a book has been acquired, the editorial process begins.  This process is typically supervised by a "senior editor."  The senior editor's role is to work with the author(s) to achieve their literary objectives and maximize the work's creative potential.  At the outset of the editorial process, a good editor will discuss the book's overall messages or themes with the author or authors and make suggestions as to how those messages or themes can best be conveyed.  Some editors conduct this communication by memorandum; others do it orally.  HarperCollins, like most

publishers, does not have a single, customary practice in this regard.  Miller Aff. ¶ 12.

32.  In the case of books such as WOULDN'T IT BE NICE - MY OWN STORY, where most of the actual writing is being done by a professional writer, most of the direct contact is between the senior editor and the professional writer, with the professional writer acting as the liaison with the celebrity.  For instance, in 1992, I acquired and edited BEYOND CENTER COURT by Tracy Austin and Christine Brennan.  Because of Tracy's frequent travelling to play in exhibition matches and as a USA Television Network tennis commentator, I worked almost exclusively with Christine Brennan, who in turn spent time with Tracy doing interviews and writing the book.  Although I had several conversations with Tracy generally about how the work was going, the specifics were left completely up to Ms. Brennan.

33.  The manner in which celebrities work with their co-writers varies.  Some celebrities are very active in the preparation of the manuscript, but delegate entirely to the co-writer the task of working with the editor and making editorial changes.  In other instances, the celebrity might become more personally involved in the editorial

process, particularly at the copyedited manuscript stage. This is purely a matter of personal preference and style.

34.  Once an entire manuscript has been completed, the editor will typically line-edit it, making more specific suggestions concerning, for example, thoroughness, style, clarity, grammar, and consistency.  The editor then forwards these suggestions on to the author(s), who address the editor's concerns and make appropriate changes to the manuscript.

### The Editing of Wouldn't It Be Nice

35.  Plaintiffs' central assertion appears to be that HarperCollins acted in an unreasonable or reckless manner in publishing an autobiography about an individual (Brian Wilson) who, according to the plaintiffs, was not credible because of his past history of drug abuse and mental illness.  My review of the record evidence suggests that these charges directed against HarperCollins are unwarranted.

36.  Mr. Miller, the book's senior editor, made continual efforts throughout the editorial process to assure himself that Mr. Wilson both had the mental capacity to participate in writing an autobiography and was actively involved in that process.  Miller Aff. ¶¶ 7, 14, 16.  Mr.

Miller testified at his deposition that he and others at HarperCollins were aware of Mr. Wilson's history of mental illness and, for that reason, he (Mr. Miller) flew to California, met with Mr. Wilson, engaged him in conversation and satisfied himself (as the William Morris Agency had already concluded) that Mr. Wilson was both capable of active participation in writing his memoirs and credible as a source of information.  Miller Dep. 157 (Annexed hereto as Exhibit 5).  Indeed, Mr. Miller testified at his deposition that he was "impressed with [Mr. Wilson's] seemingly [sic] mental health."  Miller Dep. id. (Annexed hereto as Exhibit 5).  Todd Gold likewise testified in Love v. HarperCollins (a previous lawsuit involving this book) that he harbored no reservations about Mr. Wilson's mental health at the time the book was being written.  Gold Dep. 182 (Annexed hereto as Exhibit 8).

37.  With regard to Mr. Wilson's overall credibility, Mr. Miller testified that "over the course of my many months of working on this book, I did the best of my ability to determine whether what Mr. Wilson was saying in his autobiography was true."  Miller Dep. 128 (Annexed hereto as Exhibit 5).  Likewise, Mr. Gold testified that he never got the impression that Mr. Wilson was making up

19

information.   Gold Dep. 201-02 (Annexed hereto as Exhibit 8).

        38.  With respect to Mr. Wilson's personal involvement in writing the book, Mr. Miller testified as follows:

> Regularly over the course of the many months that I was working on this book, I asked Todd about Brian's involvement in the preparation of the manuscript. Todd assured me that he, Brian, was being forthcoming with stories, anecdotes, dialogue and he remembered a great deal about his past.
>
> When I received the first draft of the manuscript, I asked Todd if Brian had read the manuscript.  He said he had. The one thing that I do not recall is at what stage Todd and Brian actually sat down and went over the manuscript together, but I know that they physically did that at one point.

Miller Dep. 109-110 (Annexed hereto as Exhibit 5).   See also Miller Dep. 80, 107-08 (Annexed hereto as Exhibit 5).  In his deposition in Love v. HarperCollins, Mr. Gold likewise testified about the numerous interviews and meetings he had with Mr. Wilson while writing the book, Gold Dep. 157 (Annexed hereto as Exhibit 8), as well as Mr. Wilson's involvement in reviewing the manuscript.  Gold Dep. 508-11 (Annexed hereto as Exhibit 8).

20

39.   In addition, the deposition testimony and documents I have seen reveal that Todd Gold consulted a wide variety of independent sources (both previously published materials and individuals with knowledge of the events described in the book) as he was writing this book, during the editorial, and again during the legal review, process. Mr. Wilson's version of facts held up under these verification efforts, Gold Dep. 162, ████ 387-91 (Annexed hereto as Exhibit 8), and HarperCollins was so advised during the pre-publication process.  Miller Dep. 81-82 (Annexed hereto as Exhibit 5).

40.   With respect to Plaintiffs' contention that HarperCollins allowed Mr. Wilson's former therapist, Mr. Landy, to control the contents of the book, the record evidence I have reviewed is plainly and one-sidedly to the contrary.  HarperCollins itself had concerns at the project's outset about the extent of Mr.Landy's proposed involvement in the book.  Miller Aff. ¶ 8.  Those concerns were resolved at the time the contract was executed and during the editorial process.  Miller Aff. ¶¶ 10, 20.

41.   Mr. Shinker, Publisher of the Adult Trade Division, and Mr. Miller both insisted that a clause be added to the publishing contract to make perfectly clear

that if Mr. Wilson and Eugene Landy were to go separate ways and Mr. Wilson were to abandon his plans to publish the book, Landy would <u>not</u> have a contractual right to require HarperCollins to publish the book without Mr. Wilson's participation.  Miller Dep. 56 (Annexed hereto as Exhibit 5); Shinker Dep. 55-56 (Annexed hereto as Exhibit 9); HC00056 (Annexed hereto as Exhibit 10).  In addition, Mr. Miller testified repeatedly during his deposition that he discussed the issue of control with Todd Gold on numerous occasions and "never felt that Eugene Landy was in control of any aspect of this book publication process, and that [Mr. Miller] made it a point that he [Mr. Landy] didn't control it."  Miller Dep. 92 (Annexed hereto as Exhibit 5).

42.  Mr. Landy's limited editorial role, Mr. Miller came to understand, was to provide input and comments on the sections of the book that described Mr. Wilson's therapy with Mr. Landy (Miller Dep. 95-96 (Annexed hereto as Exhibit 5)) and the Brains & Genius business relationship (in which he was in partnership with Wilson).  "[A]t no point did [he] think that Landy was involved in the preparation of materials [concerning Mr. Wilson's life] before he met Landy."  Miller Dep. 133-34 (Annexed hereto as Exhibit 5).

43.   In my opinion, Mr. Miller did exactly what an editor is supposed to do when faced with issues such as Mr. Wilson's credibility and competence and the role of Eugene Landy.  He met with and spoke to the authors to satisfy his concerns.  I find no evidence in the record to support plaintiffs' views that HarperCollins either knowingly or recklessly ignored such issues, or acted unreasonably in addressing them.

C.   **Legal Review**

**The Process in General**

44.   Once the editor and the authors have worked through all of the editorial issues, the manuscript is ready for copyediting and, where appropriate, legal review.  Not every book warrants legal review.  Frequently however, whenever a book publisher does a memoir of a living pop figure, it will automatically do a libel read.  The decision to conduct a legal review is typically made by in-house counsel at or soon after the pre-sales meeting at which the editors present a brief description of their books.

45.   Different publishing houses employ different practices in conducting libel reviews.  Some have attorneys write a written report following their review of the manuscript identifying potential areas of concern, which are

then discussed by the editor with the author.  Others, like HarperCollins, dispense with written reports and instead encourage more direct contact between the legal reviewer and the author.  Martin Dep. 38-39 (Annexed hereto as Exhibit 11).  In my experience, both approaches are effective in accomplishing the basic objective, which is to insure that the book is as original, truthful, fair and accurate as is reasonably possible.

46.  Practice also varies among publishing houses in terms of who conducts the legal reviews:  in-house counsel, outside counsel, or some combination.  The determination is usually dictated by available in-house legal capacity to perform such reviews.  Either process is suitable for achieving the intended purposes.

### Legal Review of Wouldn't It Be Nice

47.  The record reveals that the HarperCollins legal department determined to conduct a legal examination of  WOULDN'T IT BE NICE - MY OWN STORY as part of its review of the fall 1991 book list.  Martin Dep. 35-37 (Annexed hereto as Exhibit 11).  Matthew Martin, Assistant General Counsel for HarperCollins, testified at his deposition that:

> it was pretty much apparent to Tom
> Miller that this book would require
> legal review. . .

> Because it's about a contemporary
> popular figure, a rock and roll star who
> had experienced drug problems.  And I
> would say as a rule, whenever we do a
> memoir of a living pop figure, we would
> generally do a libel review and most
> editors recognize the need for that.

Martin Dep. 22 (Annexed hereto as Exhibit 11).  This

judgment is consistent with my own practice and experience

with these types of works, which are routinely submitted for

legal review.

48.  In the case of WOULDN'T IT BE NICE - MY OWN

STORY, HarperCollins assigned the legal review to Eugenie

Gavenchak, a partner at the New York law firm of Squadron,

Ellenoff, Plesent & Lehrer.  Martin Aff. ¶ 6.  Ms. Gavenchak

and the Squadron firm have extensive experience with the

prepublication legal review of books and other media

presentations, performing this function for, among others,

New York Magazine, Premiere, Star Magazine and the New York

Post, in addition to HarperCollins.  Gavenchak Aff. ¶ 2.

HarperCollins forwarded the manuscript to Squadron, Ellenoff

on May 15, 1991.  Martin Aff. ¶ 6.  The legal review took

about two months to complete.  Gavenchak Aff. ¶ 5.

49.  In accordance with HarperCollins' usual

practice, Ms. Gavenchak was put in touch with Todd Gold and

they worked together to address her concerns about the manuscript.  Martin Aff. ¶¶ 9-10; Gavenchak Aff. ¶¶ 5-8.  I have reviewed the three days of deposition testimony given by Ms. Gavenchak, in which she testifies at great length about her initial concerns with the manuscript and what she and Mr. Gold did to resolve them.  It is clear from Ms. Gavenchak's testimony that she was careful and thorough in her review of this book and that her concerns were dealt with and resolved in a fashion that should have satisfied any prudent book publisher.

> 50.  Ms. Gavenchak thus testified:
>
> I spoke with Todd Gold about numerous passages in this book.  My general way of approaching this subject is to flag a passage, get on the phone with the author, in this case Todd, and say to him you said on page whatever it was, so-and-so, what's the source for that information.  The situations where I'm -- that I am referring to now are situations where he said to me well, Brian told me that.  I also read it in a <u>Rolling Stone</u> article.  It also appears in <u>Heroes and Villains</u>.  I spoke to Van Dyke Parks, and he confirmed it.

Gavenchak Dep. 61-62 (Annexed hereto as Exhibit 12).  In my opinion, this is exactly how a legal review ought to be conducted.

26

51.  Ms. Gavenchak, like Mr. Miller, testified that she had some initial concerns that Mr. Wilson might not be able to recall accurately events in his past because of his history of drug abuse and psychological break-down. Gavenchak Dep. 77-81 (Annexed hereto as Exhibit 12).  Ms. Gavenchak personally spoke to Mr. Gold about this subject and he told her that when Mr. Wilson did recall things, his recollection was very precise and that when he did not he came forward and candidly said so:

> Todd told me that Brian was honest about those times when he couldn't recall something and in fact they are reflected in the book, and that when he did recall something, he recalled it in such significant detail that Todd honestly believed that he was telling the truth, and I believed Todd and I didn't have any reason to doubt him.

Gavenchak Dep. 73-74 (Annexed hereto as Exhibit 12).

52.  With respect to periods that Mr. Wilson could not remember, Mr. Gold reported to Ms. Gavenchak that he conducted independent research, brought information back to Mr. Wilson and used that information to refresh Mr. Wilson's recollection.  The techniques employed by Mr. Gold are well-accepted ones.  Ms. Gavenchak's judgment that Mr. Gold was exercising appropriate journalistic care in going about the

process of refreshing Mr. Wilson's recollections was, in my estimation, a sound one.

53.   With respect to Mr. Wilson's memories from childhood concerning his mother and other family members, Ms. Gavenchak testified that, although Mr. Wilson's description of his family in general and his mother specifically were of initial concern to her, she resolved those concerns with Mr. Gold.   Gavenchak Aff. ¶ 8.

54.   In forming these judgments, Ms. Gavenchak was performing precisely the role required of her -- to formulate a judgment as to the veracity of the statements involved through discussion with the principal writer and researcher.   There is no question, based upon my review of the procedures employed by Ms. Gavenchak, as to the highly professional and good-faith nature of the examination she conducted or as to the reasonableness of the conclusions she drew.

55.   Ms. Gavenchak also testified about some of the other potential libel concerns posed by the manuscript. See, e.g., Gavenchak Dep. 21-24 (Annexed hereto as Exhibit 12).   In each instance she resolved those concerns after discussions with Mr. Gold; where appropriate, editorial changes addressing those concerns were made.

28

56.   I believe that Ms. Gavenchak's testimony concerning her review of the book demonstrates an exceptional level of care on HarperCollins' part to assure factual accuracy.  To its credit, HarperCollins went even further to satisfy itself that Mr. Wilson was responsible for the book and that he would stand behind it.

57.   Prompted by inquires from a number of people demanding to see the manuscript and claiming to represent Mr. Wilson's interests, Matthew Martin personally met with Mr. Wilson in Los Angeles in July, 1991, several months before the book was published.  Martin Aff. ¶ 24.  During their meeting, Mr. Wilson told Mr. Martin that he had "read the galleys very carefully over several days and whenever he had a question or a concern about a passage, he and Todd would go over that passage and, if necessary, they would construct necessary changes."  Martin Dep. 155 (Annexed hereto as Exhibit 11).  Mr. Wilson also told Mr. Martin that he wanted the book to be published, believed in it and was prepared to stand behind it.  In his memorandum summarizing his meeting with Mr. Wilson, Mr. Martin wrote :

> Brian told me that he was satisfied with the book.
> He understood and well appreciated that it was a
> "revealing book" (a term he repeated throughout
> our conversation), but that it was an honest and
> appropriate account of his life and career.  He

> said that he wants the book to be published and
> the story to be told.  He admitted that earlier in
> the process he was concerned that maybe the book
> was too revealing, but he has since come to terms
> with the candor of the book and now wants the
> story told in this "revealing" and honest way.

HC00614-620 (See Exhibit 3 to Martin Aff.).  Mr. Wilson even

signed a statement to this effect.  See Exhibit 3 to Martin

Aff.  Mr. Martin testified that Mr. Wilson had "presented

himself as a competent and capable person" during the

meeting and that he (Mr. Martin) "had reason to believe that

Brian [had] recovered from his mental illness." Martin Dep.

157-58 (Annexed hereto as Exhibit 11).

          58.  By this point in the process, Dan Strone and

Robert Gottlieb (the literary agents), Todd Gold (the

professional writer), Tom Miller (the senior editor) and

Matthew Martin (in-house counsel) had, from personal

observation and interaction, each independently concluded

that Mr. Wilson was capable of credibly participating in the

writing of his autobiography -- a far cry from plaintiffs'

(and their experts') allegations that HarperCollins

recklessly or negligently ignored Mr. Wilson's prior history

in proceeding to publish the book.

          59.  With respect to the allegations concerning

Eugene Landy's role in the authorship of the book, Mr.

Martin and Ms. Gavenchak, like Mr. Miller, testified that they understood his role to be a limited one.  Gavenchak Dep. 44-46, 120-22 (Annexed hereto as Exhibit 12).  Mr. Martin testified that "my understanding was that Mr. Wilson Wilson would control the contents of the book because it was his book.  He was the author of the book" and not Eugene Landy.  Martin Dep. 141 (Annexed hereto as Exhibit 11).  I have seen absolutely nothing in the fact record that should have given HarperCollins reason to believe that Eugene Landy was controlling the contents of the book.

60.  Building on the careful editorial work which had been done, the legal review of the manuscript further evidenced HarperCollins' care in proceeding with this publishing project.  In editing at least 50 books of this nature, I have rarely, if ever, seen a more diligent effort to confirm the accuracy of a celebrity autobiography.

D.  **Copyediting**

61.  Copyeditors take the final version of the manuscript which the editor and the authors have worked through together and do a comprehensive edit to conform the manuscript to house style with respect to format, punctuation, grammar, usage, spelling, and the like.

62.  The copyediting process is typically overseen by the "production editor."  The production editor serves as a liaison between the acquiring editor and the individuals who actually do the copyediting.  The physical work of copyediting is sometimes done in-house and sometimes done by independent contractors.  Like editors and attorneys, copyeditors do not typically engage in fact checking, though they may pose queries to the authors concerning conventions such as the spelling of names.

63.  In cases where books are subject to legal review, the copyediting process often begins while the attorney is reading the manuscript.  The goal is to complete the legal review by the time the author has received the copyedited version of the manuscript so that the legal concerns can be addressed and changes made by the author at this stage, before the manuscript is set into type. Frequently, however, the legal vetting is not completed until the manuscript has been set.  In these cases, the lawyer will confer with the author about legal changes and then pass them on to the production editor whose job it is to make sure that all of these changes (as well as any additional corrections the author wishes to make) ultimately get into the typeset stage, or "galleys."  Sometimes these

changes can be fairly extensive; other times they are quite minor.  What is important is not the extent of the changes but, rather, assuring that they make their way into the copyedited manuscript, or, failing that, the galleys.  In fact, the galleys for a book that has been legally vetted may not proceed further through production without the explicit approval of the lawyer.

64.  Once corrected, the galleys proceed into page proofs which are sent to the authors for final reading.  The authors are free, of course, to make corrections to the galleys and it is not uncommon for them to do so.  Again, it is the production editor's job to make sure these corrections get into the final text of the book.  Once the changes have been made, the text is ready for final production and distribution.

## Conclusion

65.   Based on the totality of factors I have considered and set forth above, and my concomitant review of the record in this matter, I believe that HarperCollins more than satisfied the standard of care applicable to book publishers called upon to defend defamation actions.  I have seen no evidence that would support a finding that HarperCollins acted unreasonably, let alone with reckless disregard for the truth or falsity of what it published.  To the contrary, HarperCollins' editorial and legal representatives followed, in textbook fashion, the fact-checking and other prepublication review procedures appropriate to the type of work here involved.

_____
Lisa Drew

Subscribed and sworn to
before me this ⅠⅠ day of
August, 1995

_____
Notary Public

FERN COPAS
NOTARY PUBLIC, State of New York
No. 41-4823727
Qualified in New York County
Commission Expires July 31, 19 97

1

# ELIZABETH HEINEMAN (LISA) DREW

Home:
225 East 36th Street, 6F
New York, NY 10016

Office:
Lisa Drew Books/Scribner
866 Third Avenue
New York, NY 10022
212-702-3812

Education:
B.A. Cum Laude, University of Wisconsin, 1961
    Majors: English, Speech

Work Experience:

| | |
|---|---|
| Vice President/Publisher Lisa Drew Books - Scribner | 1994 - |
| Vice President/Publisher Lisa Drew Books - Macmillan | 1993 - 1994 |
| Vice President/Senior Editor - William Morrow & Co. | 1984 - 1992 |
| Executive Editor/Editorial Director General Books Doubleday & Co. | 1979 - 1984 |
| Senior Editor - Doubleday & Co. | 1977 - 1979 |
| Editor - Doubleday & Co. | 1974 - 1977 |
| Associate Editor - Doubleday & Co. | 1971 - 1974 |
| Editorial Assistant to Editor-in-Chief - Doubleday & Co. | 1969 - 1971 |
| Administrative Assistant to Editor-in-Chief - Doubleday & Co. | 1966-1969 |
| Personal Assistant to Editor-in-Chief - Doubleday & Co. | 1963-1969 |
| Production Assistant - Doubleday & Co. | 1961 - 1963 |

* * * * * * * * * * * * * * * * * * * * * * * * * *

Teacher - New York University School of Continuing Education
    "The Editorial Process"
                                                1981-1982

<u>Professional Associations:</u>
  Women's Media Group 1976 -
       Treasurer  1982 - 1984
       President   1985 - 1986

  National Press Club (Washington )  1977 -

  PEN (NY Chapter) 1974 -

  Association of American Publishers
     International Freedom to Publish Committee  1978 -
       Chair  1990 - 1003
     Freedom to Read Committee  1988 -
       Chair  1994 -

In the 23 years since I have become an editor, I have acquired, edited and published approximately 350 books, an average of 15 per year.  Over my career approximately 75% of those have been non-fiction books, and in the past 10-12 years 85%-90% have been non-fiction.  Around 30% of my list is in the area of biography/autobiography.

Among the many titles I have edited over the course of my career are:

ROOTS by Alex Haley

HANTA YO by Ruth Beebe Hill

P.S. JACK PAAR by Jack Paar

GOING MY OWN WAY by Gary Crosby with Ross Firestone

I'M EVE by Christine Sizemore and Ellen Pitillo

A MIND OF MY OWN by Christine Sizemore and Randall Greene

LONG TIME PASSING:  VIETNAM AND THE HAUNTED GENERATION by

Myra MacPherson

THE BRAIN:  THE LAST FRONTIER by Richard Restak, M.D.

THUMBS UP:  The James Brady Story by Mollie Dickenson

FREEDOM SONG by Mary King

SING A PRETTY SONG by Edie Adams with Robert Widener

THE GIRL NEXT DOOR by Jane Powell

IT WOULD BE SO NICE IF YOU WEREN'T HERE by Charles Grodin

HOW I GET THROUGH LIFE by Charles Grodin

WE'RE READY FOR YOU, MR. GRODIN by Charles Grodin

DEBBIE by Debbie Reynolds and David Columbia

ELECTION JOURNAL by Elizabeth Drew

COMING OF AGE IN THE MILKY WAY by Timothy Ferris

THE SUPREME COURT by William H. Rehnquist

GRAND INQUESTS by William H. Rehnquist

IN OUR DEFENSE:  THE BILL OF RIGHTS IN ACTION by Caroline Kennedy and

Ellen Alderman

BEYOND CENTER COURT by Tracy Austin and Christine Brennan

FIRST LADIES by Carl Sferrazza Anthony

REFLECTIONS IN A SILVER SPOON by Paul Mellon

WITNESS TO GENOCIDE by Roy Gutman

HERBLOCK:  A CARTOONIST'S LIFE by Herb Block

THEODORE ROOSEVELT by Nathan Miller

BARBARA BUSH:  A MEMOIR by Barbara Bush

MILLIE'S BOOK by Barbara Bush

NAPOLEON AND JOSEPHINE by Evangeline Bruce

POPE JOHN PAUL II by Tad Szulc

HERE WE GO AGAIN by Betty White

2

CLSG S11

WEEKS



# WISCONSIN

## THE MILWAUKEE JOURNAL MAGAZINE

July 18, 1993

### FORWARD

I LIKE today's cover story about book editor Lisa Drew. I wish book-world people got the attention some other arts people do. We're taking a step in that direction today.

But what I really want to tell you about is the time we were driving to Madison and got passed by a guy on a motorcycle. His helmet was hanging on the rear of his cycle and I made a sarcastic remark about how much protection that offered him. My wife said I was no one to snicker: I rode my bicycle often without a helmet and my exposure was about the same as this guy's, albeit at a slower speed. She was right, and, bit by bit, I'm becoming a helmet crusader.

That brings me to the Dave Barry column today (page 13). Read it. It's not like any Barry column you've read before. I hope all of us motorcyclists, bicyclists, roller skaters and skateboarders will keep it in mind.

—Alan Borsuk

## FEATURES

**5 Lisa Drew's imprint**
James Auer

**14 No limits**
Carol Kaufmann

## Departments

**13 America's Barryland**

**21 Sunday's Puzzle**

**21 The Far Side**

**23 The Sunday Cook**

**24 Wisconsin Notes**

**26 Tell Me a Story: Rapunzel**

**27 Dialog**

### Cover

Book editor Lisa Drew, a Neenah native, has risen to power in the New York publishing world. Story on page 5; photo by Richard Wood.



Page 5: How Lisa Drew became a book-world power.



Page 14: Steve Kettenhoven shows others with disabilities how tough.



Page 23: Sauteed chicken strips go easy on the calories.

Editor .............. Alan J. Borsuk
Assistant editor ... Paula Brookmire
Staff writers .. Richard Kenyon, Paul Hayes, Dave Hendrickson, Bill Nelson
Design artist ....... Gene Gerbasi
Artist .............. Luis Machare
Secretary .......... Amy Ambrose



Richard Wood

Lisa Drew says her Midwestern directness has helped her in New York publishing circles.

# THE ROOTS *of* ⚓LISA DREW'S SUCCESS

## By James Auer

**A passion for free speech, books, honesty, feminism wins her success**

ACH weekday morning at about 8:35, Lisa Drew locks up her one-bedroom co-op apartment on the sixth floor of a nondescript building in Manhattan's fashionable Murray Hill section and walks 18 blocks uptown to the offices of the Macmillan publishing empire at Third Ave. and E. 52nd St. It's a brisk stroll that takes no more than 20 minutes. Yet it represents a journey of some 32 years for Drew, a Neenah (Wis.) native who has risen through grit, tenacity and talent to become one of the more powerful and productive women in the US book industry.

Whip-smart, plainspoken and unabashedly ambitious, Drew has to her credit the late Alex Haley's tremendously popular book *Roots*, Barbara Bush's *Millie's Book* on the White House dog, a half-dozen fictive confections by Sidney Sheldon, actress Debbie Reynolds' tell-much (but not quite all) autobiography and scads of Broadway, Hollywood, true-crime, suspense and political best-sellers.

The slight, arrow-erect, 52-year-old editor marches into the Macmillan lobby and heads to the 21st floor. Here she steps out of the elevator into a tiny waiting room filled with posters that remind presumably awed visitors that this venerable firm has brought out everything from Margaret Mitchell's 1936 best-seller, *Gone With the Wind*, to former Secretary of State George Shultz's much-praised memoir, *Turmoil and Triumph*. Drew disappears through a remote-controlled door and strides down the long hall that is Editorial Row. Some of the most celebrated names in publishing

Continued

# LISA DREW

have nooks here: Charles Scribner's Sons, Atheneum, Collier, Howell, even the Macmillan label itself. These once-independent publishing houses have been embraced — or swallowed up by, depending on your view of corporate consolidation — by the large firm of Macmillan Inc.

These trademark names, or imprints, still operate with their own staff — usually just an editor and an assistant or two — who decide which books to buy and how to edit them. But they share Macmillan's legal, production, marketing, advertising, sales and other operations.

It was the chance to have her personalized imprint, Lisa Drew Books, that enticed her to switch from William Morrow & Co. to Macmillan in January. And now Drew has settled comfortably into her window-lit work space overlooking bustling Third Ave.

On this day she arrives shortly after 9 a.m. and greets her one assistant, reed-slim Kate Boyle, a 1991 college graduate with an English literature degree. Soon Drew is seated behind a modest desk in a surprisingly Spartan milieu for someone who edits the words of the powerful and the immensely popular.

While a new but as-yet-unused word processor sits to her right, its monitor endlessly promoting LISA DREW BOOKS in letters that float from right to left, Drew's essential tools remain the ones that editors have used for decades: a typewriter, a telephone and a phone list in the form of a bulging, hand-operated Rolodex.

None of Lisa Drew's working days is exactly like any other. That is the lure, charm and despair of the book business. It's one of the reasons why Drew — holder of a B.A. degree in English literature and theater from the University of Wisconsin-Madison; friend to innumerable celebrities; discreet and totally reliable keeper of prized secrets — stays in a field as demanding, competitive and financially unrewarding as the printed word.

Her agreement with the Milwaukee journalist who sits across from her on this dazzling, energy-charged Tuesday in New York is a simple one: She will conduct business and, when possible, pause to answer questions. He will take notes. He will not, however, report on specifics of the financial deals he hears discussed. Nor will he identify the subject, or author, of proposals rejected. That established, the workday begins.

AN EARLY call is an ill-fated one. An author's agent inquires about Drew's reaction to a proposed biography of a woman who was influential in the early years of the feminist movement but hasn't contributed a great deal, theoretically or practically, lately. Drew already has made up her mind. She is forthright yet, by virtue of her very bluntness, kind. The blow is delivered quickly and cleanly.

"We'd have a difficult time selling it in a major way," she informs the agent with near-surgical directness. "I doubt that her story would sell."

And that's it. End of conversation. Drew turns back to her visitor.

Potential marketability, she explains, must be taken into account in a business as costly and risky as modern-day publishing. That's why she seldom involves herself with elaborate picture books. An exception was Roddy McDowall's intimate, affectionate photographic studies of his fellow movie actors, which tap into the vast, worldwide appetite for Hollywood lore.

"For every picture book that works," Drew announces matter-of-factly, "there are dozens that don't work."

Nor, she makes clear, will she devote much time to do-it-yourself books. Too pragmatic, one suspects. Too mechanical and fiddly. Too — yes, let's face it — dull.

Where this bright, far-seeing paragon of good humor, enthusiasm and resourcefulness truly shines is in her ability to apply her multiple personal enthusiasms to the realities of today's book market.

Not only is Drew mad about reading (books, magazines, newspapers), but she also loves movies of all



*Roots* author Alex Haley and his editor, Lisa Drew, were guests at a White House dinner in 1976.



# There's no better time to have the time of your life

Now you can enjoy a carefree, active lifestyle in a warm community setting. Shopping trips, cook-outs, and other events are yours to choose from all at an affordable monthly rate. No endowment or enrollment fee.

Luxury independent adult living at its best... with a personal touch.

Call Mary today at 521-1388


Summit Woods

2501 Summit Avenue • Waukesha, WI 53188
Take I-94 to Hwy. T, then South to Summit Ave.
(On Hwy. 18) Near University Avenue



Country Setting.
Country Craft Furniture

GREENFIELD   WAUKESHA
4460 S. 108TH   4 BLKS W OF I-94 ON HWY 18
425-3600   786-1440
M,W,Th,Fri 10-9   MENOMONEE FALLS
Tues & Sat 10-5   MAIN ST. DOWNTOWN
Sun 12-5   251-6600



"IT HELPS ME UP!"

USED NEW $350.00 up

ASK ABOUT MEDICARE INFORMATION

FREE INFORMATION PACKET MAILED
CALL 242-2699 or Write
NOVA HEALTH CONCEPTS, INC.
118 Green Bay Rd., Thiensville, WI 53092

THE
METROPOLITAN
MUSEUM OF ART



THE METROPOLITAN MUSEUM OF ART

The perfect Christmas present.

Shop by mail with our new full-color catalogue of distinctive presents adapted from works of art in the Museum's collections. Select from jewelry, decorative objects, sculpture, Christmas cards and ornaments, posters, art books, and presents for children.

For your copy of the full-color catalogue, please send $1.00 to cover mailing.

THE METROPOLITAN MUSEUM OF ART
255 Gracie Station New York, New York 10028

Name
Address                                    Apt.
City              State        Zip

kinds (her library of videocassettes is legendary, even in New York), "serious music," opera and the living stage (her longterm friendship with the late actress Colleen Dewhurst finally will pay off, in the form of a warts-and-all autobiography, two years hence).

She's passionate about free-speech issues (she brought out Caroline Kennedy's well-reviewed treatise on the US Bill of Rights) and about the women's movement (she'll release David Garrow's monumental history of the right to privacy, *Liberty and Sexuality*, next Jan. 22, on the 21st anniversary of the Supreme Court's Roe-vs.-Wade abortion decision).

She has dealt with conservative writers such as William Rehnquist and, of course, Barbara Bush, but primarily she thinks of herself as "a little to the left of Clinton." Pragmatic to a fault, she holds that there is only one issue about which she will not deign to argue: a woman's right to choose an abortion. Anything else, she asserts, is pretty much up for grabs.

THE next incoming call is from the agent who is handling Cari Beauchamp's proposal for a book about the once famous Frances Marion, the 1930s-era Hollywood screenwriter who is now nearly forgotten. The agent tells Drew that Beauchamp has decided to place the project with Lisa Drew Books rather than with a competitor, even though a rival publisher offered comparable money. Drew is delighted.

"That's great!" she crows in a voice that carries clear across the hall. "So we got a deal! That's fabulous! I think it's going to work wonderfully here!"

Adding to Drew's instant euphoria: the knowledge that the advance she is paying, though substantial, is well in keeping with anticipated revenues from the book. Having signed off with the agent, she calls in her assistant, Boyle, and instructs her to draw up the necessary contract. Then she telephones Beauchamp to say how happy she is with the agreement.

"I just wanted you to know," Drew tells the obviously pleased writer, "I was just thrilled about the Frances Marion book. It's a wonderful subject; nobody's done it. You see these really talented women now, Streisand and Diane Keaton, who seem to me to be blatantly discriminated against. Why is it that 50 years ago things were easier...?"

In another minute the phone is back on its hook. Drew takes a deep breath, then glances involuntarily upward. Is she seeing in her mind, perhaps, the constantly receding glass ceiling against which she has, herself, been pushing so relentlessly and successfully in her three decades in publishing?

Frances Marion, a favorite writer of Metro-Golden-Mayer mogul L.B. Mayer, might well have been a kindred spirit. Maybe things *were* easier 50 years ago, in motion pictures and publishing. Then again....

"My agenda," Drew muses aloud after a moment, "is to make a success of Lisa Drew Books. And that is not a given in this market. And it's a high mountain. I want it to be financially successful, and I want to publish some prestigious books."

Why, she is asked, does she think she has reached this exalted point in her scramble up the super-slippery glass mountain of Manhattan belles-lettres?

"I was helped," she responds, "by being a very direct person, which may be a Midwestern trait, and having undeserved self-confidence. If I have any qualities admired by my peers, they are honesty, directness,



*Millie's Book* is one of two books former first lady Barbara Bush and Drew have collaborated on.

credibility. I was raised that way by my mother: to tell the truth, react honestly, maintain certain ethical standards...."

No doubt about it, Drew *is* direct. And she's fond of precise detail. For instance, she recalls the exact date that she gave up smoking: Nov. 14, 1978. And she can quickly rattle off the turning points in her slow, steady shinny up the greased pole of big-time book publishing, from "Gal Friday" through secretary, personal assistant,

Continued



# techline®

furniture and cabinetry for home and office

**techline studio**

3585 N. 124th Street/Brookfield, WI 53005 414.783.4933

Open Monday thru Saturday 10 to 5 and Sunday 12 to 4

residential furniture & cabinetry
office workstations
medical cabinetry & furnishings
planning & installation



**SUMMER SALE**

**Storewide Savings GOING ON NOW!**

# SCAN INTERIORS

14385 W. Capitol Dr., Brookfield, WI 53005
(414) 781-2882

Hours: M-Th, 10-9; Tues., Wed., Fri, 10-6; Sat 10-5; Sun. 12-4

**WISCONSIN'S LARGEST COLLECTION OF AMISH FURNITURE IS AT**

# Tadych FURNITURE

2974 S. 13TH ST.
(One Block North of Oklahoma)

**672-4909**
MILWAUKEE
FAMILY OWNED & OPERATED SINCE 1910

# Retirement Requirements.

To retire comfortably, you need a few basic requirements. First and foremost, a warm, secure, happy and affordable place to live. West Park Place provides just that. And a whole lot more. ► Our rent starts at just $775 a month...and that includes all utilities plus your choice of two nutritionally complete and delicious meals each day. ► In fact, with our excellent security, prescription reminder assistance, great peer social activities and West Allis shopping, we fill your requirements for retirement like no one else can.

Call today for a no-obligation tour. And see how we can help you retire with everything you require.

WE MAKE RETIREMENT AFFORDABLE

# WEST PARK PLACE

7400 W. GREENFIELD AVENUE • WEST ALLIS, WI 53214

**414-476-3900**

currently The Milwaukee Journal's radio-TV critic; and Lisa.

The Drew clan's economic status took a precipitous turn for the worse when Ben died unexpectedly at 38, just 10 months after Lisa's birth. Marion, lacking work experience, found herself on her own, an impoverished widow in a man's world at the darkest point in the Great Depression. Unable to afford Winnetka any longer, she moved with her offspring to Neenah to be near old Wausau friends who had settled in the paper industry there.

Outspoken, gregarious and politically progressive, Marion boasted of being the only Democratic voter in predominantly Republican Neenah. Born Jewish, she changed to Episcopalian and raised the children in the Episcopal Church. For a time, she worked in the bindery at the George Banta Co. Later she landed a series of office jobs via a temporary-services company. After World War II, she capitalized on her skills as a social observer by producing reams of readable, sometimes sarcastic newspaper copy for the Twin City News-Record and the Appleton Post-Crescent.

For a time, Marion even had a daily gossip column, which she wrote under the poison-pen name Winnie Bageaux, after Winnebago, the lake on which Neenah is situated. She called it Roundabout With Riverton, after Reynard T. Riverton II, a nonexistent dandy-about-town she created as her collaborator. Her nom de venom was never penetrated.

Marion Drew died two years ago.

THROUGH all this Lisa, the youngest of the children, was Marion's admiring companion, confidant and close ally, reports Mike Drew, whose own relationship with his mother was considerably less tranquil:

"As a child, Lisa was feminine, gentle and little-girlish. I was a surrogate dad, her older brother. Only since she got into publishing has she developed that authority, confidence and strength. To be a top editor, and succeed, you have to have overwhelming confidence."

A principal reason for Lisa's confidence, her brother suspects, is that Marion had enormously high expectations for all three children.

"Success was very important to my mother," Mike emphasizes. "She willed her kids to be successful. She was supportive, yet she was tougher than nails. She was an overwhelming presence. There's never been a daughter who was more enchanted by her mother."

Marion's resiliency in the face of multiple setbacks is proved, Mike goes on, by the fact that at one point the fatherless family was reduced to living in what the four Drews called, more with irony than affection, "the snake pit,"

in a poor area of Neenah.

"We had rats in the basement, mice on the first floor and squirrels in the attic," Mike recalls. "It was an old, old, old house, but it was all she could afford — a widow with three kids and no money."

Still, Marion and her spunky brood looked on their poverty as a momentary aberration. They continued to socialize with and entertain well-to-do friends from the upper reaches of Neenah society.

"Marion took enormous pride in Lisa's career," Mike says.

Once Lisa had moved to New York City and found an entry-level job at Doubleday, Marion proudly displayed, throughout her home, photographs of her daughter with famous friends and business associates such as Jacqueline Onassis (with whom Lisa worked during her 23 years at Doubleday) and columnist Ann Landers.



At a White House dinner in 1976, President Ford (center) introduces Drew to Liberian President William Tolbert.

WITH the influence of such a strong mother, it's no wonder that Lisa Drew is an advocate of women's rights. She still barely controls her indignation over the fact that it took 9½ long, ill-paid (starting out at $70 a week), arduous years to rise from secretary to editor at Doubleday.

Still, she gives immense credit to Doubleday's longtime editor-in-chief, Ken McCormick, for teaching her the ropes and smoothing her way into more prestigious, responsible positions. She was his administrative assistant.

"He is the world's nicest man," Drew says, "and he knew everybody." Through him she met presidential candidate Thomas E. Dewey, actor-playwright-songwriter Noel Coward, biographer Irving Stone, novelist Allen Drury (with whom she's still working) and author (and former Milwaukee Journal reporter) Edna Ferber, "a very prickly lady indeed," says Drew.

The highlight of her stint at Doubleday was the chance to shepherd Roots, Alex Haley's

Continued

# LISA DREW

editor, executive editor and, now, custodian of her own imprint at a major house:

- September 1961: Joined Doubleday as a secretary.
- March 1971: Became Doubleday's third female editor to be promoted up through the ranks.
- September 1984: Left Doubleday for William Morrow, which had offered her a vice presidency.
- Jan. 1, 1993: Switched to Macmillan with the agreement that she could have her own imprint.

And almost every step of the way, she says with consternation, she was made painfully aware, and sometimes penalized for the fact, that she was female.

DREW'S personal background, like that of many transplanted Midwesterners currently scrambling to succeed in the clubby but competitive Manhattan arts scene, is genteel but far from affluent. Wealth, once a given in her family, was but a distant memory by the time she came along, in 1941.

Her maternal grandfather, Walter B. Heineman, was a wealthy Wausau lumber executive who killed himself in 1930 after suffering heavy personal losses in the Wall Street crash of 1929. A former GOP national committeeman, Heineman had gained notice several years before by playing host to President Calvin Coolidge during one of Silent Cal's visits to the north country.

Although Heineman's suicide by gunshot initially was attributed to health problems, it soon became evident to stunned business associates and family members that he had emptied several trusts to which he had access in order to raise cash for his own stock-market losses. As a result of his actions, others in the Heineman clan were bankrupted as well.

Among the surviving children, left impecuniously on their own was a daughter, Marion. (A son, Benjamin, later gained fame and a substantial fortune as a Chicago investor and corporate attorney. Benjamin became chairman of the Four Wheel Drive Auto Co. of Fond du Lac and the Chicago and North Western Railway and a founder of Northwest Industries.)

Marion's plight was particularly critical. Raised as a veritable North Woods princess, with a private plane, pony and costly Eastern finishing-school education, she faced the prospect of making her own way with little more than a small trust fund (which had a built-in, 10-year expiration) and her own ingenuity.

But Marion proved resilient. She married a brash, extroverted coal salesman, Ben Drew, and moved with him from Chicago to Winnetka, Ill., in the mid-1930s. Their union yielded three children: Wally, who retired last year after occupying important executive posts at both Kimberly-Clark Corp. and Menasha Corp.; Mike,

# BILT/RITE FURNITURE FOR . . .

## BEST NAMES: Bassett • Berne • Cochrane • Clayton Marcus • Eaglecraft • Jasper • Lane • Peters Revington • Stanley • Sunline • Winners • many more



Lane COMFORT IN MOTION SALE

In stock or special order for your choice of color/cover.



Pillow Back
Wall or Rocker Recliner
Sale $333



Shaker Country
Rocker or Wall Recliner
Sale $399

100 RECLINERS ON SALE FROM $179
2 Way Action by Lane starts at just $239
FREE DELIVERY AND SETUP AND
REMOVAL OF OLD DONATED TO CHARITY

BONUS TRADE-IN SALE
Save an EXTRA $30 Off
Sale Prices This Week Only

## SOLID SAVINGS ON SOLID OAK
SAVE $200 TO $800 BY Cochrane Furniture

5 Pc. Dining Set
36x48 Table, 2 120 leaves, Formica Top, 4 Arrowback Chairs.
This Week Only $699

### HOME OFFICE GALLERY SALE

Deluxe Roll Top Desk. All Wood in Light or Dark Oak.
Save $300 While They Last $499

35 more desks on sale from $199

## BEST PRICES: SAVINGS OF 22% to 70% In Our Showroom

### 4 pc. Bedroom Set


- Triple Door Dresser
- Hutch Mirror
- Door Chest
- Full-Queen Bookcase Headboard

You'd expect to pay $1,200.
This week only $888

### TRUCKLOAD SAVINGS Sealy
WHILE THEY LAST
SEALY SUPER FIRM SETS
Firmer Posturpedic cover, Quality made in Wisconsin with a 10 yr. warranty.
Sealy is America's Best Seller for over 30 years

| 2 pc. Twin set | 2 pc. Full set | 2 pc. Queen set | 3 pc. King set |
|---|---|---|---|
| $177 | $267 | $317 | $417 |

Dial us for a mattress.
Order by phone 384-3770
SEALY WATERBED CONVERSION
Queen 58x82 $279   King 70x82 $379
FREE DELIVERY & REMOVAL OF OLD

### 10 DRAWER CHESSER

560Wx180Dx420H solid oak and veneers.
Matching bedroom pieces available • Also in whitewash oak.
You'd expect to pay $599.
This Week Only $469



## BEST HURRY: Quantities Limited • Sale Absolutely Ends Saturday at 5:30 p.m.

### CUSTOM ORDER SALE
At Affordable Prices
700 fabrics/colors


### WE HAVE YOUR TABLE AT SENSATIONAL SAVINGS!
Sale $129 Each or 3 for $349


NEW GLASS TOP IN OAK     NEW SHAKER IN CHERRY OR OAK
YOUR CHOICE OF END OR COCKTAIL STYLES

### 55 STYLES QUALITY SLEEPER SOFAS

- Claude Gable
- Marshfield
- Clayton Marcus
- Sealy

All with innerspring mattress. Many on casters easy to move.   Sale $399 to $999
Free Delivery & Setup



Michell St
2 Blocks West of I-94
Only 20 Minutes
Milw. Area

# Bilt/Rite
FURNITURE
brand names for less

723 W. MITCHELL STREET

½ Block Selection Of Quality Furniture
Free Parking In Rear
Shop Us On Sunday, 12-4
Mon., Thur., Fri. 9:30 to 8:30 P.M.
Tues., Wed., Sat. 9:30 to 5:30 P.M.
Phone 384-3770
WE STILL DELIVER FREE & SET UP

### EVERYTHING ON CLEARANCE
125 CURIO CABINETS, 55 CEDAR CHESTS, 25 ENTERTAINMENT CENTERS, 15 CONSOLES, HALL TREES, WARDROBES, 15 SECRETARY DESKS, DAYBEDS, LAMPS, PICTURES

85" Sofa just $499
62" Loveseat just $449

# LISA DREW

monumental chronicle of his African-American family, through the planning, writing and production phases. She and Haley became close friends and their shared vision, that *Roots* should be "American history, not just black history," made the book an immense bestseller and, later, a widely viewed TV miniseries.

Drew rounded out her Doubleday career as executive editor and co-director of books aimed at adult readers, overseeing an intimidating 700 titles a year. Then, when the company declined to name her a vice president, she jumped to William Morrow & Co., which did.

THE offer of her personal label, or imprint, came in late 1992 from fellow Doubleday alumnus Barry Lippman, now an executive at Macmillan. Because Drew had made money for Morrow, the company generously allowed her to take with her 19 works in progress, including Evangeline Bruce's *Napoleon and Josephine* and Colleen Dewhurst's interrupted (by her death) memoirs.

This permitted Drew to make a strong start, with some 31 well-diversified volumes slated for publication in the next two or three years.

Well aware that the publishing industry is littered with the bones of editors who have overpaid their way into oblivion, Drew budgets carefully. Still, she is willing to shell out big bucks on occasion, such as for some expensive research and international travel by former New York Times foreign correspondent Tad Szulc. He is doing a book, slated for 1997 publication, on the papacy at the end of the second Christian millennium.

The money being risked, Drew quickly notes, is Macmillan's rather than her own. Despite her exalted managerial status, she is an employe rather than an owner. Still, profit-sharing affects her annual take-home pay, and the success or failure of her imprint will be reflected in her year-end salary. Keep in mind that most publishing executives are not highly paid. The average salary in 1992 for someone at Drew's level was $75,000, according to the trade publication *Publishers Weekly*. Drew would not discuss her salary, but one could expect her salary to be higher than average since large firms such as Macmillan pay more.

In an average week, Drew performs several traditional publishing rituals. One is to entertain authors' representatives at lunch. Her guest this particular noon is Denise Marcil, a Manhattan-based agent who is also a good friend. Marcil suggests that Drew look at a first novel, a self-help book and a true-crime project.

They part, after 90 minutes of book-oriented chatter, with the promise of exchanging written proposals and informal reactions. The tab for lunch for three at La Cite, an understated but typically costly Manhattan eatery: $115. Naturally, it goes on a Macmillan credit card.

Back at the office, Drew learns that a com-



*'art Plus*
# ND FOR QUALITY!
:actory Direct Prices Saves You 20% to 50%

**100% NON PRORATED GUARANTEE**

| PRICED IN SETS | TWIN 2 pc. set | FULL 2 pc. set | QUEEN 2 pc. set | KING 3 pc. set | 100% GUARANTEE |
|---|---|---|---|---|---|
| BLUE CRYSTAL | $95.00 | $115.00 | $145.00 | — | 3 Year |
| BLUE CRYSTAL QUILTED | $138.00 | $196.00 | $219.00 | $295.00 | 5 Year |
| AMBASSADOR | $170.00 | $238.00 | $295.00 | $370.00 | 10 Year |
| DREAMLAND | $176.00 | $250.00 | $320.00 | $390.00 | 10 Year |

pany specializing in library-quality books has put in a bid for a leather-bound edition of Barbara Bush's autobiography. Drew makes a note to discuss it with the former first lady. Drew spends the rest of the afternoon:

■ Looking at press materials for the soon-to-be released autobiography of the aging and caustic, but still influential, Washington Post cartoonist Herblock.

■ Parrying with agents on the phone. Drew is intrigued by a proposed biography of screen actor Burt Lancaster but doubtful that his friends will talk freely, at least without his OK.

■ Discussing TV appearances for authors, a critical aspect of modern marketing.

■ Musing about the future of the book business, making such pronouncements as:

"People who love books love books, and they're not going to go to any other format, not in my lifetime. I don't care how advanced computer-chip technology gets. There's something about holding a book in your hand, the feel of it, turning pages. I don't think that's going to disappear."

"Sales of children's books are flying through the roof. Children's books are being read by children. And if kids are getting into the habit of being read to at 2, as I was, then there's always going to be a market for books."

YET another traditional New York City editorial ritual, a late-afternoon drink with an author, is dutifully acted out by Drew and one of her authors at 5:45 p.m.

Having dashed off the last of the day's rejection letters (unlike many editors, Drew types hers personally) and glanced through a stack of mail her assistant has filtered out of the "slush pile" for her, Drew sprints a few blocks down E. 52nd St. to the bar just off the lobby of the St. Regis Hotel. Here, she tilts a glass with Tad Szulc, who's in town gathering material for his overview of the papacy.

A big, hearty, jocular man, Szulc reports ebulliently on interviews conducted to date, asks help in gaining further access to sources — including the pontiff himself — and invites Drew to come along on his next face-to-face encounter, with a totally beguiling, free-thinking nun. Flattered, she accepts the invitation.

"I've learned so much I didn't know when I wrote the proposal," Szulc exclaims as his weary but fascinated editor listens with flattering attentiveness. "The story is so rich: politics, social justice, the third and first worlds, the role of women, the enormous role of the American church. I'm trying to avoid bias, rushing to any conclusions...." In short, the project is on track. Drew is pleased.

Her long working day over at last, Drew hustles off for a quick bite and then a Baltimore Symphony concert at Carnegie Hall. Season tickets for such things as a visiting-orchestra series, she says as she heads toward the door, are mandatory for a single in New York. They force her to make dates with friends and keep up with the cultural scene. Otherwise, a workaholic nature would preclude all social interaction for this never-married woman.

The next day will be busy as she flies first to

Continued

# LISA DREW

Washington, D.C., for a women-luminaries luncheon for Atty. Gen. Janet Reno, and later to Atlanta, where she'll spend four days helping newsman Gary Pomerantz. He is writing *From Peachtree to Sweet Auburn,* a history of Atlanta as told through the families of two mayors, one black, one white.

The basic cycle of publishing life never ends: pitch, peruse, purchase, produce, promote.

**W**HAT'S the prognosis for the survival of Lisa Drew Books? Bottom-line figures won't be in for two or three years, says Drew. Several factors, including bookstore sales, media reactions, TV and movie bids and book-club offers, make accurate prognostication impossible.

Complicating the equation is the pending sale of Macmillan Inc., a corporate treasure trove that includes everything from children's books to encyclopedias, to one of three bidders. Tragically, Macmillan was caught up in the collapse of piratical British publisher Robert Maxwell's media empire. Macmillan currently is controlled by a consortium of banks.

But the prognosis for Lisa Drew personally and professionally could scarcely be better. Staking money on this experienced, cool-headed, totally professional bookmaker, an editor-publisher who seems to make neither serious mistakes nor lasting enemies, is no gamble. It's a sure thing — until, that is, the next issue of the New York Times Book Review comes out.

P.S. Barbara Bush did approve a leather-bound edition of her autobiography, and the Burt Lancaster book, at one point close to being rejected, will, indeed, come out under Drew's imprint. Burt's Hollywood pals, from Deborah Kerr and Stanley Kramer to Shirley Jones, have promised to cooperate. **W**

James Auer is The Milwaukee Journal art critic.

3

CLSG S11

WEEKS

Carl Wilson and Audree Wilson v.
HarperCollins Publishers, Inc.
Case 1:94-cv-00892-JEC-LFG   Document 78   Filed 10/18/95   Page 51 of 130
Carl D. Wilson
Vol. 1, April 4, 1995

**Page 73**

### CARL DEAN WILSON

[1]
[2] **A:** No.
[3] **MS. DUMAS:** Objection, vague and
[4] ambiguous.
[5] **Q:** By a draft I mean either a galley or a
[6] manuscript. Do you remember seeing anything like
[7] that?
[8] **MS. DUMAS:** Objection, vague and
[9] ambiguous. Maybe you should ask him what a galley
[10] is. It's a pretty technical –
[11] **MS. DANIELS:** That's why I used the
[12] word draft. For your benefit I was being very
[13] specific. I am talking about either form a draft
[14] and a manuscript could come in including any form
[15] of draft that a book can come in.
[16] **BY MS. DANIELS:**
[17] **Q:** Do you recall seeing this book in
[18] draft form?
[19] **MS. DUMAS:** Same objection.
[20] **THE WITNESS:** No, I don't. I am
[21] sure I didn't because I remember we – rather Barry
[22] Langberg wrote a couple letters to HarperCollins
[23] before the book came out, and I don't believe they
[24] responded.
[25] **BY MS. DANIELS:**

**Page 74**

### CARL DEAN WILSON

[1]
[2] **Q:** Do you remember whether you had seen
[3] the book prior to the issuance of those letters?
[4] **A:** I am almost certain I did not.
[5] **Q:** Did Brian ever tell you that he was
[6] going to write an autobiography?
[7] **A:** I don't remember.
[8] **Q:** Do you recall whether he asked you to
[9] speak with Todd Gold?
[10] **A:** Oh, I do remember one time he did
[11] say – I can't remember the question, but it had to
[12] do with the book, and I remember my responses were,
[13] we will talk about that because of the Eugene Landy
[14] situation with Brian and the conservatorship.
[15] **Q:** Did Todd call you for an interview,
[16] Todd Gold?
[17] **A:** No, he did not. I met him, though,
[18] and I remember meeting him very well because his
[19] hands were real sweaty, real clammy. Brian's aid
[20] at that time, his name was Kevin, they both were
[21] real clammy. They both had real sweaty hands. It
[22] was kind of obvious they were nervous.
[23] **Q:** Is the Kevin you are referring to
[24] Kevin Leslie?
[25] **A:** Yes.

**Page 75**

### CARL DEAN WILSON

[1]
[2] **Q:** When you met Todd did he ask you
[3] whether you would agree to an interview?
[4] **A:** I don't remember. He may have said I
[5] would like to talk to you and he was very timid.
[6] **MS. DANIELS:** Read the last question
[7] and answer back.
[8] (The record was read as requested.)
[9] **BY MS. DANIELS:**
[10] **Q:** What did you say to Todd?
[11] **A:** I don't remember.
[12] **Q:** Did you agree to the interview?
[13] **MS. DUMAS:** Objection,
[14] mischaracterizes the witness' testimony.
[15] **THE WITNESS:** I remember noticing
[16] how weird it was that Brian asked me to come to his
[17] room with Todd and Kevin being there to ask me a
[18] really bizarre question, and it was can we do Good
[19] Vibrations really, really slow, like da, da, da,
[20] like a really weird slow motion. I mean, it was
[21] really a weird question, and it was obvious to me
[22] that he had been put up to asking me to come to his
[23] room and not really knowing what he wanted to talk
[24] about.
[25] So he asked me – it's very strange to

**Page 76**

### CARL DEAN WILSON

[1]
[2] say tomorrow in the concert can we do Good
[3] Vibrations like at half speed. It would be like a
[4] really weird thing to do to an audience, very, very
[5] strange. That's how come I remembered it so well.
[6] **BY MS. DANIELS:**
[7] **Q:** Did Todd say anything at that time?
[8] **A:** I don't know if he did or not. I know
[9] when Brian said, can we do that, I said, no, we
[10] can't do that, and he said we want you to – we
[11] want to talk to you for my book, and I said, well,
[12] we will have to talk about that. I don't remember
[13] the words I used, but it was – they all got very
[14] clear it had to do with Landy and this notorious
[15] person.
[16] **Q:** Do you feel that you conveyed to them
[17] that you refused to be interviewed?
[18] **MS. DUMAS:** What's the question
[19] again?
[20] **THE WITNESS:** It's very clear I
[21] wasn't talking to them due to the fact that we knew
[22] Landy was a bad man. It was not unknown. He was
[23] known by most people in entertainment to be a
[24] real bad, bad man, did bad things. It was very
[25] well known, in fact.

---

**Page 77**

**CARL DEAN WILSON**
**BY MS. DANIELS:**

[3] **Q:** Do you remember meeting Todd on any
[4] other occasion?

[5] **A:** Yes.

[6] **Q:** When was that?

[7] **A:** It was in Northern California near San
[8] Francisco.

[9] **Q:** And do you recall the date?

[10] **A:** No.

[11] **Q:** Was it a meeting in person? Did you
[12] see him in person?

[13] **A:** The weekend before – it was right
[14] when the conservatorship was starting to become
[15] known and they trotted Brian up to the San
[16] Francisco area to try to demonstrate that he was
[17] functioning and that he was not under anyone's
[18] control, which was total BS.

[19] I remember, I was irritated to see
[20] Todd Gold because it was very slimy, and I had the
[21] notion that he knew what he was being a part of,
[22] that he knew it was knotty to be there and to –
[23] with the pretense that everything was on the up and
[24] up knowing full well it was Landy's marching
[25] orders.

---

**Page 78**

**CARL DEAN WILSON**

[2] **Q:** Did you ever talk to Todd about that?

[3] **A:** No, I didn't talk to him. I remember
[4] just acknowledging that somebody said Todd Gold, I
[5] said yes.

[6] **Q:** So you really have no idea what he
[7] knew or didn't know; is that correct?

[8] **MS. DUMAS:** About what?

[9] **THE WITNESS:** Those are your words.
[10] Everybody knew that.

[11] **MS. DUMAS:** Objection. Read the
[12] question back.

[13] **MS. DANIELS:** It's a little late for
[14] the objection. The water is under the bridge.

[15] **MS. DUMAS:** I don't think so.

[16] (The pending question was read.)

[17] **MS. DUMAS:** Okay, you have
[18] answered.

[19] Pose your next question, counsel.

[20] **BY MS. DANIELS:**

[21] **Q:** Other than speculation, what is your
[22] basis for believing that Todd knew that this was, I
[23] think your words were, slimy or no good?

[24] **A:** Well, I did not say no good, for a
[25] start.

---

**Page 79**

**CARL DEAN WILSON**

[2] **Q:** Okay.

[3] **A:** Todd acted sheepishly every time I
[4] ever saw him.

[5] **Q:** How many times did you see him?

[6] **A:** I remember seeing him two or so, three
[7] times maybe.

[8] **Q:** Do you remember when the third –

[9] **A:** No.

[10] **Q:** What the third time was?

[11] **A:** No.

[12] **Q:** Do you know anything about Todd's
[13] reputation as an author?

[14] **A:** Well, it's not real good with me. I
[15] can't speak for anybody else.

[16] **Q:** Do you know that he has written books
[17] before?

[18] **A:** Yes.

[19] **Q:** Do you know that he has written
[20] autobiographies before?

[21] **A:** No.

[22] **Q:** Are you aware of any complaints as to
[23] Todd's work, any specific complaints as to Todd's
[24] work?

[25] **A:** I am not aware of the other work he

---

**Page 80**

**CARL DEAN WILSON**

[2] has done. I saw a book in a bookstore one time and
[3] it was a book about aviation in some way, and I was
[4] surprised to see his name on it.

[5] **Q:** Why were you surprised to see his name
[6] on it?

[7] **A:** Because I was looking through the
[8] aviation section and I saw Todd Gold on a book and
[9] that surprised me. I thought perhaps he only wrote
[10] trash, being ignorant to the other stuff. Just in
[11] actual fact I didn't know anything about him.

[12] **Q:** Prior to its publication, do you
[13] recall discussing Brian's book with anyone?

[14] **MS. DUMAS:** Objection,
[15] attorney-client privilege grounds. You can answer
[16] the question but you need to exclude your
[17] communications with your attorneys.

[18] **THE WITNESS:** I don't remember any
[19] conversations.

[20] **BY MS. DANIELS:**

[21] **Q:** Do you recall, again, prior to the
[22] publication of this book, which was approximately
[23] October of 1991, do you recall talking about the
[24] book with Don Engel?

[25] **A:** I have never talked to Don Engel.

---

4

CLSG S11 ——

WEEKS

5

Page 65

**Wilson**

[1]
[2]  **A:** When did the book come out?
[3]  **Q:** In October, mid-October, October
[4] 20th, 1991.
[5]  **MS. DUMAS:** Off the record for a
[6] moment while I answer the door.
[7]     (At this point BETH F. DUMAS, ESQ.
[8] left the deposition proceedings.)
[9]  **MS. DANIELS:** I believe it was the
[10] 24th.
[11]  **THE WITNESS:** Of '91?
[12]  **MS. DANIELS:** Yes.
[13]  **THE WITNESS:** I think I probably –
[14]     (At this point BETH F. DUMAS, ESQ.
[15] entered the deposition proceedings.)
[16]  **MS. DUMAS:** Back on the record.
[17]  **MS. DANIELS:** Whoops. Did you
[18] get –
[19]  **MS. DUMAS:** I specifically said
[20] "off the record while I answer the door."
[21]  **THE REPORTER:** I don't go off the
[22] record unless both attorneys agree to it, and the
[23] witness and Ms. Daniels continued talking about
[24] what I considered was adding to the record.
[25]  **MS. DUMAS:** Could you just make a

Page 66

**Wilson**

[1]
[2] note in the record that I asked to go off the
[3] record because someone was ringing the front door
[4] and I was the only one here and Ms. Wilson is in a
[5] wheelchair. Ms. Daniels, you can continue.
[6]  **MS. DANIELS:** Will you read back
[7] the pending question?
[8]     (The record was read as requested.)
[9]  **THE WITNESS:** Probably about a year
[10] later. That's just my – I think. I don't really
[11] know.
[12]  **BY MS. DANIELS:**
[13]  **Q:** So it's sometime in 1992? You'll
[14] have to state an answer for the record so he knows
[15] what the answer to the question is.
[16]  **MS. DUMAS:** I don't even think
[17] that's a complete question, Counsel, "So it's
[18] sometime in 1992."
[19]  **BY MS. DANIELS:**
[20]  **Q:** You believe you first read the book
[21] or parts of the book sometime in 1992?
[22]  **A:** Yes.
[23]  **Q:** Were you interviewed for this book?
[24]  **A:** No.
[25]  **Q:** Do you recall being contacted for an

Page 67

**Wilson**

[1]
[2] interview?
[3]  **A:** Yes.
[4]  **Q:** And what did you say?
[5]  **A:** "Thanks, but no thanks."
[6]  **Q:** Do you remember who contacted you?
[7]  **A:** Uh-huh.
[8]  **Q:** Who was that?
[9]  **A:** Gold.
[10]  **Q:** That's Todd Gold?
[11]  **A:** Yes.
[12]  **Q:** Do you recall what he said to you?
[13]  **A:** I didn't like him at all. He was
[14] rude. He wanted an interview. He was going to be
[15] doing a book, and I told him "No."
[16]  **Q:** What did he tell you about the book?
[17]  **A:** He didn't really tell me anything.
[18] I was – I was already angry.
[19]  **Q:** And why were you already angry?
[20]  **A:** I don't – you know, it's funny, I
[21] don't remember. I wasn't in a rage, but I was
[22] pissed off.
[23]  **Q:** At Todd Gold?
[24]  **A:** Uh-huh. He was just – he was just
[25] really very rude.

Page 68

**Wilson**

[1]
[2]  **Q:** Had you met him before he contacted
[3] you?
[4]  **A:** Huh-uh.
[5]  **Q:** And what was your basis for thinking
[6] he was rude?
[7]  **A:** What?
[8]  **Q:** Why did you feel he was rude?
[9]  **A:** Because he was rude.
[10]  **Q:** Was it a telephone conversation?
[11]  **A:** Uh-huh.
[12]  **Q:** And you felt that he was rude to you
[13] on the telephone?
[14]  **A:** Uh-huh, I did.
[15]  **Q:** After Todd called you to request an
[16] interview, did you discuss the book with anyone?
[17]  **MS. DUMAS:** Objection. I caution
[18] you not to disclose conversations that you had
[19] with your attorney, Barry Langberg, about the
[20] book, and also not to disclose conversations that
[21] you had with Jody Leslie, because at that time you
[22] were involved in – the conservatorship action was
[23] pending, so I want to preserve the attorney-client
[24] objection. But if you can answer the question
[25] without disclosing your communications with your

47

Miller

1   answer.
2
3       Q.    You talked about those concerns
4   and was there a resolution of those concerns
5   or --
6       A.    The proposal was convincing in
7   its argument that Brian had recovered from
8   those emotional problems, which is why we
9   decided to go ahead and offer on the book and
10  our knowledge of Todd Gold's experience and
11  Susan's having actually worked with Todd Gold
12  before gave added credibility to that concept.
13      Q.    The next step that is -- is that
14  contracts were prepared, is that correct?
15      A.    Yes.
16      MS. DUMAS:  Mark this as the next
17  exhibit.
18      (Contract Request dated 3/19/90,
19      bearing production No. HC10217,
20      marked Miller Exhibit 2 for
21      identification, as of this date.)
22      Q.    I just need to authenticate
23  certain documents.
24      A.    Sure.
25      Q.    I meant to ask you, on Miller

---

Miller

1       Miller
2   Magnuson was there?
3       A.    He was marketing director.  He is
4   now at the Random House.
5       Q.    What did he say?  What do you
6   remember him saying during the meeting?
7       A.    I actually don't remember what he
8   said.
9       Q.    Did he --
10      A.    It was usually he who would come
11  up with sales estimates.
12      Q.    Did you talk about sales
13  estimates at the acquisition meeting?
14      A.    As I remember, we did.  We
15  normally did.
16      Q.    You normally did and you did in
17  this instance?
18      A.    Yes.
19      Q.    What sales estimates were
20  discussed?
21      A.    We talked about 50- to 60,000
22  copies sold in hard cover.
23      Q.    How many printed?  Did you talk
24  about how many you would print?
25      A.    I don't believe we did.  Looking

---

46

Miller

1       Miller
2   at this memo, I left the first printing blank
3   which would imply that we didn't talk about a
4   first printing.  We would talk about net
5   sales.
6       Q.    So this, the estimate net sales,
7   that's an estimate that was arrived at at the
8   meeting?
9       A.    To the best of my recollection.
10      Q.    What about, you mentioned that
11  the publisher, Mr. Bill Shinker, was at the
12  meeting?
13      A.    Yes.
14      Q.    What do you remember he said?
15      A.    I remember him expressing some
16  concern over the book.  He had mixed feelings.
17  He felt that Brian Wilson was a major figure.
18  Obviously there had been stories that have
19  been circulating about Brian for years.
20      Q.    What do you mean?
21      A.    About his emotional troubles over
22  the years, and they were reflected in the
23  proposal, so we talked about that.
24      Q.    Go on.
25      MR. RICH:  He finished his

---

48

Miller

1       Miller
2   Exhibit 1, the acquisition memo, did you work
3   on this, did you prepare this yourself or did
4   Mr. Hornfischer work on it with you or give
5   you any assistance?
6       A.    I wrote it.
7       Q.    Did he at all revise it?
8       A.    No.
9       Q.    Or edit it?
10      A.    No.  I was in the habit of
11  writing my own acquisition memos.
12      Q.    And you wrote the acquisition
13  memo based on the proposal?
14      A.    Yes.
15      Q.    Moving on now to Miller Exhibit 2
16  which is HC10217, it's dated 3/19/90, and your
17  name appears there by "Editor:  Tom Miller";
18  right?
19      A.    Yes.
20      Q.    Could you please explain what
21  this document is?
22      A.    This is, as it says, contract
23  request which is a memo to the contracts
24  department to generate the contract giving
25  terms of to the best of our understanding the

Miller

1    Miller
2  partner.
3        Q.    At that time, did you envision
4  that Eugene Landy would be writing parts of
5  the book?
6        A.    No, I didn't.
7        Q.    Did anybody at the acquisitions
8  meeting -- strike that.  Was the subject of
9  Landy authoring any parts of the book or
10 working closely with Brian Wilson on the book
11 discussed at the acquisitions meeting?
12       A.    I don't remember if it was
13 discussed at the acquisition meeting.  There
14 were some discussions of Landy's involvement
15 in the book around this time, whether they
16 were private or at the acquisitions meeting,
17 and we were convinced that Landy would not be
18 writing parts of the book, but would act as
19 Brian's business partner and therapist.
20       Q.    Why were you convinced of that?
21       A.    I had discussions with Dan Strone
22 about it and we wanted to be sure that -- we
23 wanted it to be clear that Landy would not be
24 writing the book.
25       Q.    Why is that?  Why did you want to

---

1    Miller
2        A.    It was a point that Bill and I
3  agreed on.  I felt strongly about it, too.
4        Q.    And he felt strong -- why did he
5  feel strongly about it?
6        A.    I don't know.  I can't impute
7  feelings to him.
8        Q.    Why did you feel strongly about
9  it?
10             MR. RICH:  I believe he testified
11       to that.  You can testify further if
12       you need to.
13       A.    I was, I believed that Brian had
14 recovered and was competent to write the book
15 himself and this was Brian's autobiography.
16 It was no one else's autobiography.
17             MS. DUMAS:  I'm going to
18       authenticate another memo.
19             (Memo, bearing production No.
20             HC10215, marked Miller Exhibit 3
21             for identification, as of this
22             date.)
23       Q.    Miller 3.  Miller 3 is HC10215.
24 Is this a memorandum that you prepared?
25       A.    Yes.

---

1    Miller
2  make that point clear with Mr. Strone?
3        A.    Because we were under the
4  assumption from the beginning that this was
5  Brian Wilson's autobiography with the help of
6  Todd Gold, a reputed journalist, who already
7  had a strong track record, and his book with
8  Drew Barrymore, another troubled individual,
9  had been published to critical acclaim and was
10 just about to hit the bestseller list.
11       Q.    Did you discuss the subject of
12 Landy and working on the book with Mr. Shinker
13 at all during the time that we have been
14 discussing?
15       A.    Yes, I did, and --
16             MR. RICH:  That's your answer.
17       Q.    Do you recall any of those
18 discussions, the substance of any of those
19 discussions?
20       A.    Yes, the substance of the
21 discussions was that Landy would not be
22 writing the book with Brian.  This was Brian's
23 book with Todd Gold.
24       Q.    Was that a point that Mr. Shinker
25 was, a point that he made clear to you?

---

1    Miller
2        Q.    The first sentence states,
3  "Eugene Landy will sign contract in addition
4  to Brian Wilson"?
5        A.    Yes.
6        Q.    Is that what occurred?  Did Mr.
7  Landy sign the contract?
8        A.    No.
9        Q.    Why not?
10       A.    Bill Shinker didn't want him to.
11       Q.    Did Mr. Shinker tell you why?
12       A.    No.
13       Q.    Did you have any understanding of
14 the reason why he didn't want the contract to
15 be signed by Landy?
16       A.    I assumed it was because it was
17 Brian Wilson's autobiography.
18       Q.    Did you have any discussions on
19 the subject with anybody else -- that assumes
20 that you had discussions with Mr. Shinker.
21       I apologize.
22       Did you have any discussions on
23 the subject of whether Mr. Landy would sign
24 the contract with anybody at HarperCollins?
25       A.    Well, this was in response to a

77

Miller

1
2     Q.   Can you go through and do you
3  remember whether you adopted any of his
4  comments and incorporated them into your
5  comments to the authors?
6          MR. RICH:   Just so the question
7      is clear, do you mean incorporated them
8      and adopted them through any further
9      conversations with authors?
10         MS. DUMAS:   Strike that.
11     Q.   If I think I understand things
12  right, you got the manuscript, you read the
13  manuscript.  Your assistant editor, Mr.
14  Hornfischer, read the manuscript, gave you
15  this report.  You talked about it with him and
16  then you had discussions with the authors; is
17  that correct?
18     A.   I had discussions with Todd Gold
19  who I had developed a very close relationship
20  with at this point.
21     Q.   How many discussions do you think
22  you had with him as regards to the initial
23  review of the manuscript draft?
24         MR. RICH:   Just -- again, just so
25     I'm at least clear we are talking now

79

Miller

1
2  had.  I would talk with Todd usually about
3  twice a week.
4     Q.   Were these long conversations or
5  short conversations?
6     A.   Sometimes long, sometimes short.
7     Q.   What, if you could estimate for
8  me, what would be a long conversation, is that
9  more than 30 minutes?
10    A.   No, not that long.  I would say
11  long conversations with Todd are tended to be
12  about 10 minutes and short conversations about
13  two minutes.  He was very busy; I was very
14  busy.
15    Q.   Did you communicate to him by
16  letter during the period of time we are
17  talking about?
18    A.   Mostly on the phone.
19    Q.   What were you discussing with Mr.
20  Gold?
21    A.   At this point after I read half
22  the manuscript, I told Todd I thought he was
23  generally on the right track, that he had
24  gotten some good material from his many
25  meetings with Brian.  And I told him I thought

78

Miller

1
2  specifically about what Mr. Hornfischer
3  refers to as the first nine and a half
4  chapters, in other words your focus now
5  on this stage of the manuscript
6  development process and Mr. Miller's
7  interactions with Mr. Gold at this
8  stage, is that right, as opposed to
9  when the full manuscript was developed?
10         MS. DUMAS:   I haven't mentioned
11     the full manuscript in my question, so
12     yes, I am only talking about this
13     stage.
14    A.   I certainly don't remember.
15         MS. DUMAS:   Start again.  Could
16     you read the question back?  Thank you.
17         (The record was read back as
18     follows:
19         "Q.   How many discussions do
20     you think you had with him as regards
21     to the initial review of the manuscript
22     draft?")
23    A.   I was having regular discussions
24  with Todd Gold at this point.  I don't
25  remember specifically how many discussions I

80

Miller

1
2  there needed to be a few structural changes,
3  and that I would need to line-edit the
4  manuscript, but when I got half the
5  manuscript, I don't as a practice line-edit.
6  The purpose of reading and getting half a
7  manuscript is to determine whether it is
8  acceptable as a first draft of half the
9  manuscript, and I told him that I thought it
10  was acceptable as a first draft of half the
11  manuscript, which I believed.
12    Q.   How at that time did you
13  understand Mr. Gold to be writing the book?
14  How did you understand him to be -- how did
15  you understand the authorship to be working
16  between Mr. Wilson and Mr. Gold?
17    A.   One of the reasons I kept in
18  constant contact with Todd and that Todd kept
19  in constant contact with me was to inform me
20  of his regular meetings with Brian, and I
21  would ask him how Brian was, was he getting
22  good stories from Brian.  He was telling me he
23  was.
24    Q.   How was the information that --
25  at that time, what was your understanding of

**Page 81**

```
 1                Miller
 2      how the information from Brian was getting
 3      into Todd Gold's manuscript draft?
 4          A.   My understanding was that he was
 5      having one-on-one meetings with Brian and
 6      Brian was telling him stories of his life.
 7          Q.   Did that --
 8          A.   Todd also did tell me that he was
 9      relying to a certain extent on secondary
10      sources.
11          Q.   What secondary sources?
12          A.   Previously published material.
13          Q.   Any that you remember?
14          A.   No.  Magazine articles, other
15      books, that sort of things.
16          Q.   Was Heroes and Villains one of
17      those books?
18          A.   I'm sure Todd read the book.  I
19      never did.
20          Q.   Did you learn early on that Todd
21      Gold was relying on Heroes and Villains in
22      part?
23          A.   I don't believe Todd was relying
24      on Heroes and Villains.
25          Q.   You mentioned that you knew that
```

**Page 82**

```
 1                Miller
 2      he was using secondary sources, and do you
 3      know whether one of those secondary sources
 4      was Heroes and Villains or did you know at the
 5      time?
 6          A.   I didn't know at this stage.
 7          Q.   At some point you did learn that
 8      one of Todd Gold's secondary sources was
 9      Heroes and Villains?
10          A.   I learned that he had read the
11      book.
12          Q.   Do you recall how late in the
13      publication process or how early you learned
14      of that?
15          A.   I believe it was after the first
16      draft was delivered.
17          Q.   Is it before it went -- was it
18      before the galleys were printed up?
19          A.   I don't remember.
20          Q.   Was it before the legal,
21      prepublication legal review?
22          A.   It may have surfaced during the
23      prepublication legal review.
24          Q.   Was it an issue, Mr. Gold's
25      reliance on Heroes and Villains --
```

**Page 83**

```
 1                Miller
 2          MS. DUMAS:  Did you have an
 3      objection?
 4          MR. RICH:  I wanted you to finish
 5      the question before he was answering.
 6          MS. DUMAS:  Thanks.
 7          Q.   Was Mr. -- do you have an
 8      understanding of whether -- strike that.
 9          Did you have any information as
10      to whether Mr. Gold's reliance on Heroes and
11      Villains as a secondary source became an issue
12      in the prepublication legal review?
13          MR. RICH:  Could I hear the
14      question again, please.
15          (The record was read.)
16          MR. RICH:  My only concern with
17      the question, Ms. Dumas, is timing in
18      terms of does he now have a present
19      understanding or did he at some point
20      develop that understanding.
21          Q.   Prior to publication of the
22      book --
23          MS. DUMAS:  Read back the
24      question.
25          (The record was read back as
```

**Page 84**

```
 1                Miller
 2      follows:
 3          "Q.   Was Mr. -- do you have an
 4      understanding of whether -- strike
 5      that.
 6          Did you have any information as
 7      to whether Mr. Gold's reliance on
 8      Heroes and Villains as a secondary
 9      source became an issue in the
10      prepublication legal review?")
11          Q.   Let me just --
12          MR. RICH:  I think implicit in
13      your question was at any point in the
14      prepublication process did he become
15      aware?  Yes?
16          MS. DUMAS:  Yes, but I assumed my
17      question was unclear because you wanted
18      me to clarify it.  I am happy to
19      oblige.
20          MR. RICH:  Thank you.
21          Q.   Prior to publication of the book,
22      did you have any information as to whether Mr.
23      Gold's reliance on Heroes and Villains as a
24      secondary source was a subject of discussion
25      in the prepublication review?
```

Miller

1 long as the substance is accurately conveyed
2 of a conversation, that there could be
3 fine-tuning of certain words as long as it
4 doesn't change the substance and the truth.
5     Q.    How do you know, who makes the
6 decision as to whether it changes the
7 substance and the truth?
8     A.    The author.
9     Q.    So in this case --
10    A.    We rely on the author to provide
11 to the best of his or their recollection the
12 substance and truth of a given conversation.
13    Q.    But if a conversation, if the
14 dialogue in a conversation is edited, if I
15 understand your testimony, in those -- it's a
16 practice that the dialogue can be changed as
17 long as the substance and truth remain intact;
18 is that your testimony?
19    MR. RICH: Can I hear the
20    question again, please.
21    (The record was read back.)
22    MR. RICH: You can answer.
23    Q.    You can elaborate your answer.
24 I'm not trying to put words in your mouth.

Miller

1     A.    I would never substantially
2 change dialogue.  I would merely try to
3 fine-tune it and clarify it as long as it
4 doesn't change the substance of truth.
5     Q.    Who is it that makes the decision
6 as to whether changes to a dialogue do not --
7 strike that.
8         Who is it that makes the decision
9 whether changes to dialogue alter the
10 substance and truth?
11    A.    As I previously said, the author.
12    Q.    So is there some point when the
13 author is then told there have been changes to
14 the dialogue, and so please confirm whether
15 the truth and substance has not been changed?
16    A.    I sent a photocopy of my
17 line-edit to the three people involved in the
18 authorship of this book.
19    Q.    Who are you referring to?
20    A.    Brian Wilson, Todd Gold and
21 Eugene Landy.
22    Q.    Did you explain to them that, did
23 you explain to any of them that they needed to
24 confirm that changes made to the dialogue had

Miller

1 not altered the substance and truth of the
2 text?
3     MR. RICH:  Objection.
4     You can answer.
5     A.    This was an ongoing discussion I
6 had with Todd.
7     Q.    It's a discussion you had with
8 Todd Gold?
9     A.    Yes.
10    Q.    Did you have that discussion with
11 Brian Wilson?
12    A.    No.
13    Q.    Did you have that discussion with
14 Eugene Landy?
15    A.    No.  Todd was my pointperson in
16 the writing of the book as is often the case
17 in collaborations.
18    Q.    Why were you sending a copy to --
19 why did a copy of the line-editing go to
20 Eugene Landy?
21    A.    Because he was the co-proprietor
22 of the contract.  He was Brian's business
23 partner.
24    Q.    Why would he be approving changes

Miller

1 that were made?
2     A.    Because he was Brian's business
3 partner.
4     Q.    Therefore, he had a right to
5 control the text of the manuscript to some
6 degree?
7     MR. RICH:  Objection.
8     Argumentative.
9     You can answer.
10    A.    I never felt that Eugene Landy
11 was in control of any aspect of this book
12 publication process, and I made it a point
13 that he didn't control it.
14    Q.    But the galleys were submitted to
15 him for some type of approval -- strike that.
16        The line-edit was submitted to
17 him for some type of approval, were they not?
18    A.    The line-edit was sent to him as
19 consultation.  There's a difference between
20 consultation and approval.
21    Q.    Could you explain the difference
22 to me?
23    A.    With consultation, and this is a
24 standard publishing distinction, you show

93

Miller

1
2  things to authors, co-authors, proprietors,
3  but you don't have to do what they say.
4          With approval, you have to do
5  what they say.
6      Q.    So Landy was consulted as regards
7  to the text of the book?
8      A.    Yes.  As the co-proprietor of the
9  contract, it was only appropriate,
10 professional for me to do that.
11     Q.    Did he make any changes?
12         MR. RICH:  Beth, at any time?  Is
13 that the question?  Are we jumping from
14 specific chronology to --
15         MS. DUMAS:  Okay.
16     Q.    You sent the line-edit to Mr.
17 Gold, Mr. Wilson and Mr. Landy, to those three
18 people.  Did you get any changes from Mr.
19 Landy back at that point?
20     A.    Gene couldn't write his way out
21 of a paper bag and was almost illiterate, so I
22 made a point of if he had any comments that
23 they be filtered through Todd Gold so they
24 could be translated into English.
25     Q.    You told Landy, "Give your

CLASSIC REPORTING, INC. (212) 268-2590

---

95

Miller

1
2          You can answer.
3      A.    I don't know all of the
4  discussions that Todd had with Gene Landy.
5  Todd was very forthcoming about things such as
6  that, about the cocksucker request.  I got the
7  feeling that, and Todd did tell me this, that
8  Gene's comments were not very substantial.
9      Q.    How did you get that
10 understanding?
11     A.    Todd told me.
12     Q.    Mr. Gold told you that?
13     A.    He told me that Gene's comments
14 had mostly to do with the section that
15 described Brian's therapy with Landy which
16 Landy was in a position as the authority to
17 comment on.
18     Q.    You mean the period of time
19 during which, when you say commenting on,
20 changes to that portion of the manuscript, do
21 you mean that portion of the manuscript which
22 deals with the period of time under which
23 Brian Wilson, during the period of time in
24 which Brian Wilson was under Dr. Landy's
25 psychiatric care?

CLASSIC REPORTING, INC. (212) 268-2590

---

94

Miller

1
2  comments to Gold"?
3      A.    No, but I told Todd that I wanted
4  him to be my pointperson during the editing
5  process.
6      Q.    So it was your understanding that
7  Mr. Wilson and Mr. Landy were giving their
8  changes to Gold?
9      A.    That was my understanding.
10     Q.    Do you know which changes, if
11 any, were suggested by Mr. Landy to the
12 manuscript draft following, to the line-edited
13 manuscript draft rather -- strike that.
14         Do you know what changes, if any,
15 were suggested by Mr. Landy to the line-edited
16 manuscript?
17     A.    Yes.  As I recall, Gene Landy
18 suggested that Todd Gold refer to Brian's old
19 girlfriend Carolyn as a cocksucker and that
20 was not a change that I approved or accepted
21 for obvious reasons.
22     Q.    Did Todd Gold only talk to you
23 about the more controversial changes that Mr.
24 Landy was suggesting?
25         MR. RICH:  I object to the form.

CLASSIC REPORTING, INC. (212) 268-2590

---

96

Miller

1
2      A.    I don't know if it was
3  psychiatric care.  It was therapy.
4      Q.    So when you say that Landy only
5  made changes to part of the manuscript, are
6  you referring to that part of the manuscript
7  which deals with Brian's life while he was
8  under Dr. Landy's care?
9      A.    I am not saying that Landy made
10 changes at all.  I am saying that Landy did
11 give Todd some input about the therapy
12 section.
13     Q.    But when you say therapy section,
14 are you referring to the section of the book
15 which discusses Brian's life during the period
16 that he is having therapy with Landy?
17     A.    Yes.
18     Q.    Going back to this Page 1 of this
19 memo and going back to the "It's all cliches
20 and, I hope, inaccurately remembered
21 melodramatic dialogue."
22         At this point in time, at about
23 this point in time, did you have any concern
24 as to whether Brian Wilson could have the
25 capacity or ability to recollect the events

CLASSIC REPORTING, INC. (212) 268-2590

105

Miller

1  provides the manuscript.  That's my first
2  reliance on the author:  to provide accurate
3  dialogue.
4
5          If I then alter dialogue slightly
6  for line-editing and fine-tuning, I then
7  consult with the authors, as I did with this
8  case.  I got responses and then went to
9  galleys and got further responses in the
10  galleys.
11      Q.    What about in the case that's
12  being written by a professional co-writer?
13          MR. RICH:  What about it?
14      Q.    What function -- how does -- in
15  the case when the book is being co-written,
16  it's not the subject of the autobiography
17  that's himself typing out the words in the
18  dialogue; is that correct?
19      A.    In the case of a collaboration, a
20  publisher relies on the co-author to have
21  accurately gleaned from the author the
22  anecdotes and dialogue that go into the
23  manuscript.
24      Q.    So the co-author does that.  When
25  does the subject of the autobiography, the

106

Miller

1
2  prime -- when does the subject of the
3  autobiography approve what the co-author has
4  written and gleaned?
5          MR. RICH:  I object to the lack
6          of foundation for that question.  The
7          question presupposes there's a discrete
8          point in time when that happens.
9          You can answer, if you are able
10          to.
11      A.    When Todd sent me the first draft
12  of the manuscript, he had told me that Brian
13  was not only involved in the writing of the
14  manuscript, but that he had also read the
15  manuscript and had approved it for
16  consideration by me.
17      Q.    Did Todd give you this
18  information in response to a question by you?
19      A.    Yes.
20      Q.    What did you ask him?
21      A.    I asked him, as I have said,
22  every week how Brian was doing and how his
23  work with Brian was progressing, if he was
24  having meetings with Brian and if Brian had
25  read the material.  And Todd had told me yes,

107

Miller

1
2  he had.
3      Q.    Read what material?
4      A.    The manuscript, as it was being
5  developed, the first half and the first draft
6  of the entire thing.
7      Q.    Did Todd, did Mr. Gold say that
8  he sat down with Brian and went over the
9  manuscript draft together?
10      A.    Yes.
11      Q.    At that point in time, Mr. Gold
12  told you that he had sat down with Brian and
13  he read the manuscript draft together?
14      A.    Todd told me that at some stage
15  of the process.  I don't remember if it was in
16  here or galleys.  He did tell me he sat down
17  with Brian and went over the manuscript
18  together.
19      Q.    But you could be thinking of --
20  so your testimony is you could be thinking of
21  the galley stage, having -- you could be
22  thinking of Mr. Gold telling you that during
23  the galley stage, Mr. Wilson sat down and read
24  the galleys; is that your testimony?
25          MR. RICH:  Objection to the form

108

Miller

1
2  of that question.
3      Q.    I'm not trying to trip you up.
4  It sounds like you were unsure of your answer
5  and you are not certain whether Mr. Gold told
6  you that he sat down with Brian Wilson and
7  they together read the manuscript versus
8  telling you that he gave the galleys to Brian
9  Wilson and he knows that Brian Wilson read the
10  galleys?
11          MR. RICH:  This is hopelessly
12          convoluted.  The only uncertainty is to
13          the exact timing when Todd sat with Mr.
14          Wilson.  At some point in the process,
15          I heard this witness testify Mr. Gold
16          sat with Mr. Wilson and reviewed the
17          manuscript.  The only problem is when
18          it occurred.
19          MS. DUMAS:  I don't want to trip
20          you up.  Go back and read his answer
21          and you can go back and unclear --
22          MR. RICH:  There was nothing
23          unclear.
24          MS. DUMAS:  Not that he is being
25          purposefully unclear.

Miller

1       Miller
2       MR. RICH:  His answer is clear.
3   Listen to the answer and tell us what
4   you don't understand about it.
5       MS. DUMAS:  I object to the
6   argument, but let's proceed.
7       Can you read back Mr. Miller's
8   answer, please.
9       (The record was read back as
10  follows:
11      "A.  Todd told me that at some
12  stage of the process.  I don't remember
13  if it was in here or galleys.  He did
14  tell me he sat down with Brian and went
15  over the manuscript together.")
16      MR. RICH:  Something got a little
17  mangled.
18      THE WITNESS:  I didn't say "in
19  here."
20      MR. RICH:  Restate.
21  Q.   Do you remember the question?
22  A.   I do remember the question.
23      Regularly over the course of the
24  many months that I was working on this book, I
25  asked Todd about Brian's involvement in the

CLASSIC REPORTING, INC. (212) 268-2590

---

110

1       Miller
2   preparation of the manuscript.  Todd assured
3   me that he, Brian, was being forthcoming with
4   stories, anecdotes, dialogue and he remembered
5   a great deal about his past.
6       When I received the first draft
7   of the manuscript, I asked Todd if Brian had
8   read the manuscript.  He said he had.  The one
9   thing that I do not recall is at what stage
10  Todd and Brian actually sat down and went over
11  the manuscript together, but I know that they
12  physically did that at one point.  I did,
13  however, ask after the first draft of the
14  manuscript whether Brian had read the
15  manuscript and I was assured that he had.
16  Q.   Why did you ask that question?
17  A.   Because as I have said, during
18  the entire process of the book, I wanted to be
19  sure that this was accurately Brian's
20  autobiography and no one else's.
21  Q.   So you have a specific
22  recollection of asking Mr. Gold after you had
23  read the first draft -- strike that.
24      After you read the first draft,
25  you have a specific recollection?

CLASSIC REPORTING, INC. (212) 268-2590

---

111

1       Miller
2   A.   Before I read the first draft.
3   Q.   Before you read?
4   A.   I asked Todd if Brian had read
5   the manuscript, and he said he had.
6   Q.   At that point what did you -- you
7   hadn't had the draft yet, so you didn't, did
8   you know in what form the manuscript was?
9   A.   After he delivered the manuscript
10  before I read it.
11  Q.   Okay?
12  A.   I called Todd and asked him.
13  Q.   So you have a specific
14  recollection that when you received the
15  manuscript you called up Mr. Gold and you
16  asked him did Brian Wilson read this draft of
17  the manuscript.
18      MR. RICH:  Is that a question?
19  A.   Yes.
20  Q.   Yes?
21  A.   Yes.
22  Q.   You have a specific recollection
23  of that?
24  A.   Yes.
25  Q.   What did Mr. Gold tell you?

CLASSIC REPORTING, INC. (212) 268-2590

---

112

1       Miller
2   A.   He told me that he had.
3   Q.   Did he say anything more than
4   that?
5   A.   No.
6   Q.   What else did you discuss in that
7   conversation?
8   A.   I told him I was going to read
9   the manuscript and looked forward to reading
10  it.
11  Q.   At that point did you have an
12  understanding that -- did Todd Gold ever tell
13  you that Brian Wilson was dictating things,
14  dictating stories into a tape recorder?
15  A.   No, he never told me that.
16  Q.   So, was it your understanding
17  that Brian Wilson was sitting down together
18  with Mr. Gold?
19  A.   Yes.
20      MR. RICH:  I object to the form.
21  They don't follow one from the other.
22  Q.   Yes or -- I don't want to put
23  words in your mouth.
24      MR. RICH:  It's when you start a
25  question with "So," as if there was an

CLASSIC REPORTING, INC. (212) 268-2590

Miller

1
2  those dates weren't provided in the draft that
3  you had received?
4        A.    In my many years of working with
5  other celebrity autobiographies and
6  biographies, I find it often the case that
7  authors don't often provide precise dates and
8  if you provide too many:  On March 16, 1967 at
9  1:17 in the morning I woke up and brushed my
10 teeth, one doesn't want to know those things.
11 Sometimes one does need to go back and
12 clarify.  I found that's often the case in
13 working on celebrity autobiographies.
14       Q.    Although in this case Mr. Gold
15 was a very experienced writer of celebrity
16 autobiographies?
17       A.    He had written two others.
18       Q.    Did that cause you to wonder that
19 perhaps Mr. Wilson couldn't remember the time
20 references that were missing from the
21 manuscript draft?
22       MR. RICH:  Objection to form.  I
23   really don't understand the question.
24         If you do, you can answer.
25       A.    I think you are leading me in a

---

126

Miller

1
2  direction I disagree with.  I was simply more
3  concerned with it as an editorial point.
4    .  Q.    My question to you is did you
5  have a concern -- strike that.
6         You testified earlier that Mr.
7  Gold was an experienced writer of celebrity
8  biographies and he had an editor position at
9  People magazine; is that correct?
10       A.    Right.
11       MR. RICH:  Among many other
12   things said about Mr. Gold, yes.
13  .  Q.    My question to you is, did you
14 ever consider as you were -- did you ever
15 consider when you read the initial draft that
16 the lack of time references was the result of
17 an inability on the part of Brian Wilson to
18 accurately remember details?
19       A.    As I have previously testified, I
20 was constantly asking the question, "Does
21 Brian remember this and is this accurately
22 portrayed?" and Todd would tell me that things
23 were and there were also not a lack of time
24 references.  That's an inaccurate portrayal.
25 There were many time references in the

---

127

Miller

1
2  original draft.  There were simply times when
3  a few, very few times when a few more time
4  references were required merely to ground the
5  reader as an editorial device.
6        MR. RICH:  Do you have a further
7          question or proceed into the next
8          paragraph?
9        MS. DUMAS:  Could you please
10         repeat my question.
11       A.    "I thought this paragraph read a
12 little like a college sophomore reader's
13 report."  I think Jim was not as experienced
14 as I have been over the years in working on
15 books like this, and I think he was reading
16 this as if he were reading Don Quixote rather
17 than working on a commercial contemporary
18 autobiography.
19       Q.    What do you mean by that?
20       A.    The term "unreliable narrator" is
21 a very in-vogue college phrase in describing
22 fiction.  It has nothing to do with nonfiction
23 and I thought it was irrelevant.
24       Q.    Why would it be irrelevant?
25       A.    Because --

---

128

Miller

1
2        MR. RICH:  I think he answered
3          you.
4        A.    It refers to fiction, not
5  nonfiction.
6        Q.    What is it about fiction that
7  makes the comment relevant but to nonfiction
8  not relevant?
9        A.    Fiction is, by definition,
10 invented and not true.  Nonfiction is, by
11 definition, true.
12         And over the course of my many
13 months of working on this book, I did the best
14 of my ability to determine whether what Brian
15 was saying in his autobiography was true, so I
16 can't answer for why Jim used that term,
17 but...
18       Q.    He says here "...this device is
19 equally useful here."
20         Are you disagreeing it was a
21 device or disagreeing that the impression from
22 the manuscript was that it was narrated by a
23 "unreliable narrator," as the term is used in
24 the literary world?
25       A.    I disagreed in the use of the

Miller

1    regular contact with Todd who told me about
2    the process.
3            As I previously testified, Landy
4    was involved in the discussions of therapy
5    where he was the expert and was in a position
6    to describe it better than Brian himself was,
7    but I did not, I never over the course of this
8    editing process believed that Landy was
9    filling in blanks about the rest of Brian's
10   life.
11       Q.   What do you mean by filling in
12   blanks as regards to the rest of Brian's life?
13       A.   Portrayals of his childhood,
14   portrayals of the years before he met Landy
15   and portrayals of the years after he, I
16   believe, had recovered.
17       Q.   What about the -- so you
18   thought -- if I understand your testimony
19   correctly, you believe that Landy was a source
20   for only that period of time dealing with
21   Brian's life while he was under Landy's
22   treatment?
23           MR. RICH:   I object to the form
24           and the characterization of prior

134

Miller

1    testimony, but you can answer.
2        A.   I believe that Landy was, as I
3    said, involved in discussions of the portrayal
4    of the therapy, particularly in Hawaii.
5    Certainly Landy became Brian's business
6    partner and would have been a source for some
7    material having to do with business
8    arrangements after Brian's recovery, but at no
9    point did I think that Landy was involved in
10   the preparation of the material before he met
11   Landy.
12       Q.   It's only -- in other words, you
13   thought Landy was a source only for material
14   after Landy --
15       A.   Met Brian.
16       Q.   -- met Brian.   So he was a source
17   for the post-Landy years, but not the
18   pre-Landy years?
19       A.   That was my understanding.   I
20   thought he was an useful source as well.
21       Q.   Why did you think he was an
22   useful source?
23       A.   Because he was an intimate player
24   in Brian's life.   You can't leave out an

135

Miller

1    intimate player in a full autobiography.
2        I agreed there was a poignancy in
3    the tone in Brian's voice.   I believe that
4    Todd captured Brian's voice.   There was a
5    poignancy to it.
6        "Self-effacement"; I wouldn't
7    have used that term.
8        Q.   Can I ask you one question about
9    the previous sentence before you get too
10   farther into your next train of thought?
11       A.   Yes.
12       Q.   Is it your understanding that
13   Landy did in fact fill in certain blanks?
14       A.   No.
15       Q.   So --
16       A.   I believe this was Jim's
17   hyperbole once again.
18       Q.   What do you mean by his hyperbole
19   once again?
20       A.   Jim has a tendency to exaggerate
21   in his writing, if not in face-to-face
22   meetings.   Fill in the blanks is an
23   exaggerated term is what I'm saying.
24       Q.   But it does communicate, it's

136

Miller

1    exaggerated but it is communicating an idea,
2    although in an exaggerated form, correct?
3        A.   Correct.   And I didn't agree with
4    it.
5        Q.   What was the idea that it was
6    communicating?
7            MR. RICH:   You are asking him now
8            to put himself in Mr. Hornfischer's
9            head.   That's not a proper question.
10           Objection to form.   The only proper
11           question is whether this witness has an
12           understanding as to what the letter
13           communicated.
14       Q.   I'm not trying to be complicated
15   here.   What idea did you understand was being
16   communicated by Mr. Hornfischer's comment that
17   he wonders how much "he relies on Dr. Landy to
18   fill in the blanks"?
19       A.   My understanding of what Jim
20   meant was that he was concerned that Brian
21   might not remember everything from his past,
22   and that Landy might have been there and
23   remembered some things that Brian didn't
24   remember.

157

Miller

1  to -- strike.
2
3          Prior to publication, is this a
4  subject that you discussed with Matthew
5  Martin?
6      A.    Brian's mental condition was a
7  subject that I discussed with Matthew, yes.
8      Q.    What do you recall was the
9  substance of your discussions with Mr. Martin
10 on that subject?
11     A.    We both discussed what mental
12 condition Brian was in at the point prior to
13 publication. I met with him and was impressed
14 with his seemingly mental health. Prior to
15 publication, Matthew himself met with him and
16 was impressed with his seemingly mental
17 health, so we were satisfied on the issue.
18     Q.    Did Mr. Martin ever ask you if
19 you had any information as to whether Mr.
20 Wilson was taking medication?
21     A.    I'm sorry, can you repeat the
22 question?
23         MS. DUMAS:  Could you read back
24     the question?
25         (The record was read back as

CLASSIC REPORTING, INC. (212) 268-2590

159

Miller

1  discussion, though? Why was it a topic of
2  conversation?
3
4      A.    As I said before, I'm a very
5  curious editor. I like to know details when I
6  can. Brian discussed that he had mental
7  problems and merely out of curiosity wanted to
8  know what sort of medications he might be on
9  or might have been on, because Brian seemed
10 remarkably unmedicated when I met with him.
11     Q.    Could you turn to page HC10273.
12 I think Mr. Rich's point is a good one. I
13 don't want to draw it out on paragraphs that
14 aren't specific enough to refresh your
15 recollection.
16     A.    Yes.
17     Q.    The paragraph that begins "p.
18 325. A little more elaboration is needed on
19 the author's emotions about having kids. Can
20 he reflect on his own upbringing and how it
21 influenced he attitude?"
22     A.    And what's the question?
23     Q.    I guess the same question that we
24 have had?
25     A.    What was my feeling about this?

CLASSIC REPORTING, INC. (212) 268-2590

158

Miller

1
2  follows:
3          "Q.    Did Mr. Martin ever ask
4      you if you had any information as to
5      whether Mr. Wilson was taking
6      medication?")
7      A.    No. I don't believe he did. The
8  implication from my discussion with Todd was
9  that prior to Wilson's therapy with Landy and
10 having worked with other physicians and other
11 psychiatrists before meeting Landy, that he
12 had been heavily medicated and that was part
13 of his problem, and that Landy put him in a
14 sort of withdrawal from medication as well as
15 addictive substances like cocaine that he
16 admits to having used.
17     Q.    Why is it that you had a
18 discussion with Todd Gold on the subject of
19 whether Mr. Wilson was taking medication?
20     A.    Because Todd was the author of
21 the book and was my pointperson in dealing
22 with the authorship of the book. And Todd had
23 had substantial discussions with Brian and had
24 been with him many more times than I had.
25     Q.    Why was it a subject of

CLASSIC REPORTING, INC. (212) 268-2590

160

Miller

1
2      Q.    Right. What did you agree and
3  disagree with?
4      A.    I agreed that Brian was not quite
5  as forthcoming in his discussions of having
6  children as I might have liked, and I did ask
7  for more of his feelings and Brian and Todd
8  provided as much clarification as they could.
9      Q.    The second sentence says, "Can he
10 reflect on [his] own upbringing and how it
11 influenced his attitude," correcting the
12 grammar there.
13         MR. RICH:  And the question is?
14     A.    I don't remember the specific
15 segment in the manuscript so I don't recall
16 whether I felt it was appropriate. He
17 certainly reflected on his own upbringing in
18 the sections where he was discussing his own
19 upbringing.
20     Q.    Moving on to the next paragraph,
21 that begins "p. 421"?
22     A.    Yes.
23     Q.    "Dr. Landy co-wrote a song?"
24     A.    Yes.
25     Q.    Same question?

CLASSIC REPORTING, INC. (212) 268-2590

10 East 53rd Street  Telephone 212-207-7664  Matthew E. Martin
New York, New York  Fax 212-207-7552  Associate General Counsel
10022-5299

# HarperCollins*Publishers*

**BY FAX**

May 17, 1991

Slade Metcalf, Esq.
Squadron Ellenoff Plesant & Lehrer
551 Fifth Avenue
New York, New York  10176

RE:  **WOULDN'T IT BE NICE by Brian Wilson**

Dear Slade,

Here is the "crash" schedule I promised you for the above title which you are reading for libel:

| | |
|---|---|
| Ms. due back from Copyeditor | May 29 |
| Copyedited Ms. goes to Authors for their review | May 29 |
| Manuscript due back from Authors; **All legal changes should be finalized** | **June 5** |
| Book goes to typesetter | June 7 |

Please let me know if you have any questions about this schedule or if you foresee any problems with meeting the required deadline.

Sincere regards,

Matthew E. Martin

Enclosures
cc:  Tracy Behar
     Jim Fox
     Kim Lewis
     Tom Miller
     Bill Shinker

HC 00473

CLSG S11

WEEKS

---

Page 177

### EDWIN DIAMOND

[2] this report?

[3] **A:** That with all the warning signs,
[4] washed out bridges, rock slides, detours,
[5] avalanches on this project, they're still going
[6] ahead with their crash schedule to get it out.

[7] **Q:** What do you think crash schedule
[8] means?

[9] **A:** Oh, I understand – I know it's
[10] hyperbole. Normal schedule. You say this, we do
[11] it in the magazine, we say we're going to crash a
[12] cover. You know, it's Friday, we're going to throw
[13] Clinton on the cover and we're going to put Bosnia
[14] on it. I mean, I understand that that is just the
[15] romance of journalism and publishing. And crash
[16] cover, crash schedule is, you know, like super
[17] octane gas. It's just a schedule. I understand
[18] that. I understand it. I understand.

[19] **Q:** You said Simon & Schuster published
[20] one of your books, is that correct?

[21] **A:** Simon & Schuster is one of my
[22] publishers, yes.

[23] **Q:** Do you believe that Simon & Schuster
[24] has integrity as a publisher?

[25] **MS. SMOLER:** Do we have a point in

---

Page 178

### EDWIN DIAMOND

[2] time for this?

[3] **Q:** Let me ask a different question. No.
[4] Strike the question.

[5] Would it have been relevant to your
[6] conclusions in your discussion of document – of
[7] Diamond Exhibit 8, to know that Mr. Miller is a
[8] highly respected editor, and that your views
[9] diverge wildly from everything certainly I have
[10] ever heard about?

[11] **MS. SMOLER:** Objection to your
[12] characterization of his views, but you can answer
[13] the question. His comments were in connection with
[14] a particular project, not Mr. Miller's reputation
[15] or work in general.

[16] **Q:** Let me ask a different question.
[17] Do you know anything about
[18] Mr. Miller's reputation in general?

[19] **A:** No.

[20] **Q:** Would that information have been
[21] relevant to your opinions here?

[22] **A:** Would it weigh against the totality of
[23] the record of the publishing of this book, the
[24] editing of this book, the promotion of this book,
[25] no. You are as good as your last picture, they say

---

Page 179

### EDWIN DIAMOND

[2] in Hollywood, right?

[3] **Q:** In your report, you state that, and I
[4] quote, recklessly, foolishly, Miller does not take
[5] up any of the specific concerns with Wilson.
[6] What evidence do you have that
[7] Mr. Miller FAILED to address – well, first of all,
[8] what concerns are you referring to here?

[9] **A:** Pardon?

[10] **Q:** What concerns are you referring to
[11] here in this passage?

[12] **A:** Well, you know, again, you are going
[13] over ground – this is a person who according to
[14] his friends, was blotto from 1968 to 1970, 69. I
[15] mean, this is a person who was out of it for 10
[16] years. He is involved in a conservatorship. I
[17] mean, I don't know what bigger warning signs – I
[18] mean, you got – you know, you got the hired hand,
[19] you got Landy the Svengali-like figure feeding
[20] changes in. You've got all these warning signs and
[21] they're steaming down the old washed out road.

[22] **Q:** The conservatorship proceeding was
[23] contested, was it not?

[24] **A:** Yes. And how did it come out?

[25] **Q:** You don't know?

---

Page 180

### EDWIN DIAMOND

[2] **A:** I think I know, I think I know, but
[3] I'd appreciate it –

[4] **Q:** Let me read to you from Mr. Engel's
[5] declaration that you just looked at, paragraph 3.

[6] **MS. SMOLER:** Let him just pull out
[7] the document.

[8] **Q:** Second sentence, line 14. It was my
[9] opinion, based on many conversations and meetings,
[10] that Brian was mentally competent during the period
[11] that I represented him. If I had thought Brian was
[12] not competent, I would have not represented him in
[13] attempting to resolve the conservatorship
[14] proceedings."

[15] How does that square with your report?

[16] **A:** That's what I would expect. You know,
[17] it's boilerplate. I would expect it from anybody.
[18] You know, the minister said he was such a good boy,
[19] right? When the guy goes up to the tower and
[20] shoots 10 people, right? The next door neighbor
[21] says oh, he was always such a quiet boy.

[22] **Q:** Would you, Mr. Diamond, put
[23] boilerplate in an affidavit that you filed with the
[24] court?

[25] **A:** No.

---

CLSG S11

WEEKS

ML 01086

1      Q.    And how about with Brian, how many taped

2   interviews?

3      A.    I would say -- estimate 20 or 30.

4      Q.    Okay.  Now, we're talking about a tape -- a

5   normal cassette size as opposed to a mini?

6      A.    Yes, my standard practice is to buy

7   hour-long --

8      Q.    60-minute tapes?

9      A.    60-minute tapes of regular size.

10      Q.    Okay.  Now, I take it from your testimony of

11   a few minutes ago that when you finished the book you

12   took all of those tapes and returned them to Brains

13   and Genius; is that correct?

14      A.    Yes.

15      Q.    Did you keep any of them?

16      A.    Any of the tapes?

17      Q.    Any of the tapes.

18      A.    No.

19      Q.    Did you --

20      A.    Except for what I found in the box.  They

21   weren't my taped interviews.  They were the ones I

22   described.

23      Q.    I understood those were not your taped

24   interviews.

25      A.    Okay.

157

ML 01118

1          MR. EDWARDS:  It sounds like there may be

2    some more destruction problems.

3          MR. FLYNN:  Or spoliation as the case may

4    be.

5          THE WITNESS:  I did try to -- I thought she

6    would be easy to get everything from, and she didn't

7    have it.

8    BY MR. FLYNN:

9      Q.    Let's talk for a little bit about interviews

10   with other people that you taped.  Can you identify

11   the -- anyone else that you had taped interviews with

12   in connection with the preparation of the book

13   Wouldn't It Be Nice?

14     A.    Yes.  Al Jardine, Bruce Johnstone, Danny

15   Hutton, Tony Asher, Van Dyke Parks.  There were

16   some -- there were a few people, associates of Landy's

17   that I talked to and remember taping but I don't know

18   if I ever saved those tapes because I never used them

19   in the book.

20     Q.    Who were those people?

21     A.    I don't remember.

22     Q.    Kevin Leslie?

23     A.    No, not Kevin.

24     Q.    Rocky Pamplin?

25     A.    No.  They were doctors who had treated

                                                    162

1      Q.    Did you have reservations about doing this

2  project because Brian was potentially mentally ill?

3          MR. EDWARDS:  Objection.  Assumes facts not

4  in evidence.

5          THE WITNESS:  No.

6  BY MR. FLYNN:

7      Q.    Now, again, I want to be fair to you.

8  You're represented here today by Mr. Block; is that

9  correct?

10     A.    Yes.

11     Q.    And before being represented by Mr. Block

12  you were represented by Vincent Cox and Slade Metcalf;

13  is that correct?

14     A.    Yes.

15     Q.    And I've seen your declaration that you

16  filed in connection with their withdrawing as your

17  counsel.

18          MR. BLOCK:  Well --

19          MR. EDWARDS:  Objection.  How does he know

20  if you've seen it?

21          MR. BLOCK:  Right.

22  BY MR. FLYNN:

23     Q.    Do you remember doing that declaration,

24  Todd?

25     A.    Yes.

ML 01143

1      Q.    Did you ask Brian Wilson about whether or

2  not Landy had taken control over Wilson's life?

3            MR. BLOCK:  Same objections.

4            Go ahead.

5            THE WITNESS:  I think I did.

6  BY MR. FLYNN:

7      Q.    And what did Wilson tell you?

8      A.    I can't recall exactly.  My impression is

9  that he did not think Landy had taken over his life.

10     Q.    Now, did you inquire into any outside source

11 as to whether or not -- strike that.

12           Did you inquire into any outside source to

13 determine yourself as the author of the book whether

14 Landy had taken control of Wilson's life?

15           MR. BLOCK:  Objection.  Vague and

16 ambiguous.

17           MR. EDWARDS:  Join.

18           MR. BLOCK:  Go ahead.

19           THE WITNESS:  The subject was discussed with

20 others.

21 BY MR. FLYNN:

22     Q.    What others?

23     A.    I can't say that it was discussed in the

24 exact question that you posed, but the question of

25 Landy and Brian and their relationship was discussed

387

ML 01387

1   by me with Al Jardine and Bruce Johnston and Tom

2   Hulett and Brian and Landy.  That's -- you know,

3   that's what comes to mind now.

4       Q.     What did Hulett tell you?

5       A.     Well, we discussed Brian working with the

6   group.  We discussed whether or not Brian was

7   better -- he compared Brian at his worst with Brian

8   then, and whether Gene had been beneficial.  He said

9   he thought he had.  I think I asked -- I think I

10  discussed with him about Brian writing with the

11  Beach Boys or for the Beach Boys, and why they

12  couldn't all get it together to do that.  What else

13  did we talk about?

14          MR. BLOCK:  The question wasn't what is

15  everything you talked with Hulett about.  It was

16  narrowed with respect to --

17          THE WITNESS:  To Brian's and Landy's

18  relationship.

19          MR. BLOCK:  Correct.

20          THE WITNESS:  You know, I think I -- I think

21  I also discussed it with Mike briefly too, come to

22  think of it, but I can't remember anymore with

23  Hulett.

24  BY MR. FLYNN:

25      Q.     Is it your testimony, Mr. Gold, that Tom

388

1    Hulett gave you a favorable impression of the

2    Landy/Wilson relationship?

3         A.    Yes, and he supposedly also gave -- I'm told

4    he gave a favorable review of the book, that Landy had

5    given him a copy of the book prior to its publication

6    and he said that it was -- seemed pretty good.

7         Q.    That's what Landy told you that Hulett told

8    Landy?

9         A.    Yes.

10        Q.    Did you ever look at any minutes of BRI

11   meetings in preparation for the book?

12        A.    I saw minutes, but I didn't read them.

13        Q.    And did Hulett tell you anything about the

14   change in Landy after he stopped being a therapist and

15   started being a partner and business manager and

16   fellow songwriter?

17        A.    Not that I recall.

18        Q.    What about Alan Jardine, what did Jardine

19   tell you about the Landy/Wilson relationship?

20        A.    I can't recall specifically.  I think we

21   talked about the clash of egos that prevented Brian --

22   that made it difficult for Brian to work with the

23   Beach Boys.  He mentioned how good Brian looked.

24   That's all I can recall specifically.

25        Q.    Is it your testimony that Alan Jardine gave

389

1   you a favorable impression about the Landy/Wilson

2   relationship?

3             MR. BLOCK:  Objection.  Vague and

4   ambiguous.

5             THE WITNESS:  It was neither unfavorable or

6   favorable.

7   BY MR. FLYNN:

8        Q.    Did Jardine say anything negative about

9   Landy?

10       A.    Not that I recall.

11       Q.    And what about Bruce Johnston with regard to

12   the Landy/Wilson relationship, what did he tell you?

13       A.    I remember him making a funny comment about

14   how Landy liked champagne, and I remember Brian

15   playing him a song and asking if it was one -- I think

16   he asked if it was one that Brian and Landy had

17   written, and he complimented the song and then he

18   suggested slowing down the tempo, but otherwise said

19   the song was great, and that's all I can remember

20   specifically.

21       Q.    Did Bruce Johnston give you a negative

22   impression or positive impression about the

23   Landy/Wilson relationship?

24             MR. BLOCK:  Objection.  Vague and

25   ambiguous.  Compound.

                                              390

1                    Go ahead.

2                    THE WITNESS:  I would say neither

3    unfavorable or favorable.

4    BY MR. FLYNN:

5        Q.    Did he, Johnston, stay anything negative

6    about Landy usurping control of Wilson's life?

7                    MR. BLOCK:  Same objections.

8                    THE WITNESS:  No.

9    BY MR. FLYNN:

10       Q.    And you said you spoke to Mike Love?

11       A.    I recall having a few words with him, yes.

12       Q.    When did you speak with him?

13       A.    It was shortly after the conservatorship was

14   filed in San Francisco outside the Cow Palace.  I

15   don't know if it was the Cow Palace, wherever they

16   played up there and I said to him -- I asked him what

17   he thought of the -- what he thought of the

18   conservatorship filing, and I don't recall his answer

19   about that.  My only impression of that conversation

20   was that he -- he said something about just hating

21   Landy, something about hating Landy, and I don't know,

22   wanting to get rid of him, wanting to kill him,

23   something like that.

24       Q.    Did he use the word "hate"?

25       A.    It was along those lines, yeah.

391

1      Q.    And what is it about Brian's involvement

2  with the book that makes you think that he knew more

3  about the book's contents than you did?

4           MR. BLOCK:  Objection.  Mischaracterizes

5  the testimony.  Lack of foundation.  Calls for

6  speculation.

7           Go ahead.

8           THE WITNESS:  It was his life.

9  BY MR. FLYNN:

10     Q.    And you knew for a fact -- I take it that

11 Brian had read the book; is that correct?

12          MR. EDWARDS:  Objection.  Argumentative.

13          MR. BLOCK:  It's argumentative.  It's asked

14 and answered.  It's harassment of the witness.

15          Go ahead.

16          THE WITNESS:  As I said many times

17 yesterday, I believe so.

18 BY MR. FLYNN:

19     Q.    Now, if I suggest to you that Brian Wilson

20 testified that he skimmed the book, does that refresh

21 your memory in any way as to whether -- as to what

22 Brian's familiarity was with regard to the contents of

23 the book?

24          MR. BLOCK:  Objection.  Lack of foundation.

25 Calls for speculation.

ML 01508

508

1          Go ahead.

2          THE WITNESS:  No.

3    BY MR. FLYNN:

4       Q.    Did you see Brian Wilson read the book?

5          MR. EDWARDS:  Objection.  Vague as to form.

6          MR. BLOCK:  And as to time.

7          Go ahead.

8          THE WITNESS:  Several times I saw him

9    reading pieces of the book.

10   BY MR. FLYNN:

11      Q.    What did you see Brian Wilson reading?

12         MR. BLOCK:  Objection.  Asked and answered.

13   He just told you.

14         Go ahead.

15         THE WITNESS:  Pieces of the book.

16   BY MR. FLYNN:

17      Q.    What pieces of the book was Brian Wilson

18   reading?

19      A.    Chapters of the book that had been given

20   him.

21      Q.    Were these galley proofs or your drafts that

22   you saw him reading?

23         MR. BLOCK:  Objection.  Compound.

24         Go ahead.

25         THE WITNESS:  I can't recall.          ML 01509

                                                       509

1   BY MR. FLYNN:

2       Q.    Did you ever see him reading a final

3   manuscript of the book?

4           MR. BLOCK:  Objection.  Vague and

5   ambiguous.

6           Go ahead.

7           THE WITNESS:  I can't recall.

8   BY MR. FLYNN:

9       Q.    Did you ever question Brian as to whether he

10  had read the book thoroughly and understood its

11  contents?

12          MR. BLOCK:  Objection.  Vague and

13  ambiguous.  Asked and answered.

14          Go ahead.

15          MR. EDWARDS:  It's also compound.

16          MR. BLOCK:  That's true.

17          THE WITNESS:  Yes.

18  BY MR. FLYNN:

19      Q.    When did you ask him that?

20      A.    I can't recall.

21      Q.    What did he say?

22          MR. BLOCK:  Objection.  Asked and answered.

23          THE WITNESS:  I can't recall the specifics.

24  BY MR. FLYNN:

25      Q.    Can you recall generally?

ML 01510

510

1          MR. BLOCK:  Same objection.

2          THE WITNESS:  In general he said yes, he

3     read it.  He was enjoying it.  He liked it.

4     BY MR. FLYNN:

5          Q.    Did he ever tell you that the book was

6     quote, "Bullshit," end quote?

7          MR. BLOCK:  Objection with respect to the

8     quote.  Lack of foundation.

9          Go ahead.

10          THE WITNESS:  No.

11     BY MR. FLYNN:

12          Q.    Did he ever tell you that the book was,

13     quote, "Absolute fiction," end quote?

14          MR. BLOCK:  Same objection.

15          Go ahead.

16          THE WITNESS:  No.

17     BY MR. FLYNN:

18          Q.    Did he ever tell you that, "You took

19     liberties," end quote, with the facts?

20          MR. BLOCK:  Same objection.

21          THE WITNESS:  No.

22     BY MR. FLYNN:

23          Q.    Did he ever tell you that you misquoted him?

24          A.    No.

25          Q.    With regard to the incident that you

ML 01511

511

9

53

Shinker

1
2 inappropriate for the collaborating writers to
3 be both Eugene Landy and Todd Gold?
4       A.      I mean, my understanding is that
5 Todd Gold is a writer.  I had no knowledge
6 that Mr. Landy was a writer.
7       Q.      At the time that HarperCollins
8 executed the contract for the book, what was
9 your understanding of what Mr. Landy's
10 involvement with the book was going to be?
11              MR. RICH:  Could I hear the
12       question, please.
13              (The record was read back as
14       follows:
15              "Q.  "At the time that
16       HarperCollins executed the contract for
17       the book, what was your understanding
18       of what Mr. Landy's involvement with
19       the book was going to be?")
20              MR. RICH:  You can answer.
21       A.      You are asking at the time that
22 we actually signed the contract?
23       Q.      At about the time that
24 HarperCollins had the acquisition meeting and
25 entered into the contract for the book, what

54

Shinker

1
2 was your expectation of Landy's involvement
3 with the book?
4       A.      My expectation was that -- I
5 don't remember specifically as I have told you
6 what the discussion was at the acquisition
7 meeting.  But my understanding of this project
8 was that this was going to be a book that
9 would be Brian Wilson's autobiography written
10 with or told to Todd Gold.  And that's what we
11 bought.
12       Q.      Did you have any discussions with
13 Jim Fox on the subject of concerns you had
14 about Landy?
15       A.      I don't recall.
16       Q.      I am going see if I could refresh
17 your recollection in that regard.
18       A.      Do you have some tapes of the
19 discussion?
20              MR. RICH:  While you're doing
21       that, let's take a short break.
22              (Recess taken.)
23       Q.      Prior to publication of the book,
24 what discussions did you have with other
25 representatives of HarperCollins on the

55

Shinker

1
2 subject of Landy being a signatory to the book
3 contract?
4       A.      I don't remember precise
5 discussions, you know, specific discussions.
6 Because when you say your question was prior
7 to the publication of the book, you are
8 talking about a period that's probably what,
9 18 months, 20 months, something like that.
10       Q.      Do you have a general
11 recollection of the persons you spoke to at
12 HarperCollins on the subject of Landy being a
13 signatory to the book contract?
14       A.      My general recollection is that I
15 spoke to, I don't remember specific
16 conversations but generally I would have
17 spoken to the editor, Tom Miller, his boss,
18 Gladys Carr, Richard Cariello, Matthew Martin,
19 Jim Fox.  And possibly our editor in chief.
20       Q.      Do you have any recollection of
21 the specifics of your conversations with any
22 of those persons on the subject of Landy being
23 a signatory to the contract?
24       A.      I don't remember specifically but
25 my general posture was that this contract was

56

Shinker

1
2 to be with Brian Wilson with Todd Gold as the
3 writer.
4       Q.      Why did you have an objection to
5 Landy being a signatory to the book publishing
6 contract?
7       A.      Because it wasn't his book.
8       Q.      Any reason other than that?
9       A.      As I said earlier, by its very
10 nature an autobiography is one person's -- is
11 the person's memoir of their life and it would
12 have been highly unusual to have other than
13 the writer on the project, to have someone
14 other than the subject sign the contract.
15       Q.      When you made the decision to
16 acquire the book, was it important to you that
17 Landy not be involved in the authorship of the
18 book?
19       A.      Yes.  Landy or anyone else other
20 than Brian Wilson and Todd Gold.
21       Q.      At about the time that
22 HarperCollins made the decision to acquire the
23 book and enter into the contract, did you have
24 a distrust of Landy?
25       A.      See, I would not characterize it

10

CLSG S11

WEEKS



1817

*Harper & Row, Publishers, Inc.*
10 East 53rd Street, New York, New York 10022
Cable: Harpsam Phone: (212) 207-7199

---

*Thomas Ward Miller*
*Senior Editor*



RECEIVED
MAR · 2 1990
CONTRACTS DEPARTMENT

March 21, 1990

to:  Richard Cariello
cc:  Gladys Carr, Bill Shinker

re:  BRIAN WILSON/LOVE AND MERCY

Richard, per our discussion today, please have inserted
into this contract (which is to be signed by both
Brian Wilson and Eugene Landy) some sort of wording
to the effect that if Wilson and Landy split up,
Wilson will still be allowed to do the book with
us.  We don't want to be in a situation in which
Wilson and Landy split up and Landy wants to do
the book with us solo.  This should be worded very
delicately so as not to offend either party.

Also, we should have some wording to the effect that
if the manuscript comes in and is unacceptable,
we can use another writer (other than Todd Gold)
with mutual approval of Author and Publisher.

I'd appreciate if the contract could be drafted with
dispatch.  Thanks.

4

HC 00056

---

21

```
 1                Martin
 2       A.   December of 1990.
 3       Q.   Who in the legal department made
 4  the decision?
 5       A.   I made that decision in
 6  consultation with other members of the legal
 7  department.
 8       Q.   Who were the other members of the
 9  legal department that you consulted with as
10  regards to that decision?
11       A.   Jim Fox and Chris Goff.
12       Q.   What is Mr. Fox's position at
13  HarperCollins?
14       A.   Today his position is general
15  counsel.
16       Q.   What was his position at that
17  time?
18       A.   Publishing general counsel.
19       Q.   What was Mr. Goff's position at
20  that time?
21       A.   Associate general counsel.
22       Q.   What is his position now?
23       A.   It is still associate general
24  counsel.
25       Q.   It's your understanding that
```

CLASSIC REPORTING, INC. (212) 268-2590

22

```
 1                Martin
 2  other people at HarperCollins, aside from the
 3  legal department, as you put it, recognized
 4  the need for a prepublication legal review
 5  with respect to Wouldn't It Be Nice?
 6            MR. RICH:  Objection to the form
 7       of that question.
 8            You can answer.
 9       A.   Our editorial -- our editors are
10  very savvy and they are knowledgeable as to --
11  they know how to recognize books that need
12  legal review and I think it was pretty much
13  apparent to Tom Miller that this book would
14  require a legal review.  I think it would be
15  obvious to any editor.  It's simply the kind
16  of book that generally undergoes legal review.
17       Q.   Why is that?
18       A.   Because it's about a contemporary
19  popular figure, a rock and roll star who had
20  experienced drug problems.  And I would say as
21  a rule, whenever we do a memoir of a living
22  pop figure, we would generally do a libel
23  review and most editors recognize the need for
24  that.
25       Q.   What were the factors that
```

CLASSIC REPORTING, INC. (212) 268-2590

23

```
 1                Martin
 2  prompted your decision that Wouldn't It Be
 3  Nice would undergo a prepublication legal
 4  review?
 5            MR. RICH:  Beyond what he
 6       testified to?
 7            MS. DUMAS:  I'm asking the
 8       witness for the factors as to the
 9       decision?
10            THE WITNESS:  I can answer the
11       question.
12            MR. RICH:  I had understood his
13       last answer to be responsive to that.
14            THE WITNESS:  Why don't I
15       clarify?
16            MS. DUMAS:  I don't wish to put a
17       fresh question on the table.  Read that
18       back.
19            (The record was read back as
20       follows:
21       "Q.   What were the factors that
22       prompted your decision that Wouldn't It
23       Be Nice would undergo a prepublication
24       legal review?")
25       A.   The same factors that influence
```

CLASSIC REPORTING, INC. (212) 268-2590

24

```
 1                Martin
 2  the editors would have influenced me at that
 3  stage in determining that this manuscript
 4  required legal review.
 5       Q.   Any additional factors other than
 6  the fact that the subject matter was a popular
 7  figure and that there was drug abuse mentioned
 8  in the book?
 9            MR. RICH:  Excuse me?
10            MS. DUMAS:  I don't mean to
11       mischaracterize.
12            MR. RICH:  You are.
13            MS. DUMAS:  Let's not get
14       excitable in the first 10 minutes of
15       the deposition.
16            MR. RICH:  By saying I don't mean
17       to mischaracterize, Beth, does not
18       excuse improper questions as to form.
19       I am not getting excited.  I am going
20       to be firm as I have from the beginning
21       to make sure the questions are properly
22       posed.  If you want to recast your
23       question, feel free.
24            MS. DUMAS:  You have certainly
25       had more than ample evidence of my good
```

CLASSIC REPORTING, INC. (212) 268-2590

Martin

1  Martin
2  the veracity of the book. I was generally
3  concerned that this is the type of book that
4  we, as a routine procedure for books of this
5  nature, would read for libel, and therefore I
6  put it down for libel review.
7      Q.   What discussions did you have
8  with the editors as regards to -- strike.
9          Earlier you mentioned that the
10  decision was made after you read the
11  description in the marketing plan card and
12  after you had discussions with certain
13  editors?
14     A.   I don't believe I testified to
15  that. I did not have discussions with editors
16  before making my decision that this needed
17  legal review. I attended what's called a
18  presales meeting. At a presales meeting, the
19  editors get up and give a short presentation
20  of the books that they will be working on that
21  will be published in the season for which the
22  presales meeting is targeted.
23          In December of 1990, the presales
24  meeting was targeting books to be published in
25  the fall of 1990, so Tom Miller presented the

CLASSIC REPORTING, INC. (212) 268-2590

---

34

1  Martin
2  various books that he would be publishing in
3  the fall of 1990. This was one of them. He
4  gave a five- or 10-minute presentation. By
5  then, I already read the marketing plan card.
6  By then I was quite convinced this needed a
7  legal review and no further discussion was
8  required. The book would be read for libel.
9      Q.   What did Mr. Miller say at the
10  presales meeting?
11     A.   I don't remember his
12  presentation, to be honest. He probably was
13  not --
14         MR. RICH: Don't speculate,
15         please.
16     Q.   Do you have a general
17  recollection even though you don't have a
18  specific recollection?
19     A.   Usually when editors present
20  their books, they present more or less what's
21  in the brief description that's presented on
22  the plan card. They don't have a lot more to
23  say about it at that point.
24     Q.   I believe you stated that prior
25  to making your decision, you spoke with

CLASSIC REPORTING, INC. (212) 268-2590

---

1  Martin
2  general counsel -- you spoke with publishing
3  general counsel, Jim Fox; is that correct?
4      A.   Let me elaborate on that. I
5  attended --
6          MR. RICH: She hasn't asked a
7          question. Let her pose a question and
8          answer the questions.
9      Q.   What were your discussions with
10  Mr. Fox on the subject of Wouldn't It Be Nice
11  up until that time that you made your
12  decision?
13     A.   After I attended the presales
14  meeting, I had a list of books that I believe
15  needed legal review, and I presented those
16  books to Jim Fox and to Chris Goff, and we sat
17  in a room together, and they basically
18  confirmed which of the books I selected needed
19  to be reviewed for libel and then we allocated
20  assignments. I think I can say with some
21  certainty that there was almost no discussion
22  about Wouldn't It Be Nice other than yes, of
23  course, this book will be read for libel.
24          It's probably the case with the
25  rest of the books I presented at that meeting,

CLASSIC REPORTING, INC. (212) 268-2590

---

36

1  Martin
2  because by then, I had been doing this for
3  about a year and my judgment was pretty sound
4  about which books needed to be reviewed for
5  libel. The crux of the meeting was more who
6  was going to read what, not whether or not
7  books would be read.
8          There might have been one or two
9  books that were borderline, and we would have
10  said: What do you think? Do you think it
11  needs to be read? Maybe it doesn't. We might
12  have had those discussions.
13          We wouldn't have had a discussion
14  about this book. There was a certainty that
15  this book would be read.
16     Q.   At that time, how many books had
17  the legal department decided would undergo a
18  prepublication legal review?
19         MR. RICH: Are you saying at this
20         particular point in time when there
21         were presentations, Beth? Or let's get
22         a temporal sense; are we saying during
23         this immediate time? During that year?
24         I'm certainly not clear.
25          If you can respond, respond.

CLASSIC REPORTING, INC. (212) 268-2590

39

Martin

1
2    Q.    You met with Mr. Fox.  You met
3    with Mr. Goff.  You made decisions as to which
4    books would undergo prepublication review?
5            MR. RICH:  So it's at that time?
6    A.    When I met with Mr. Fox and Mr.
7    Goff in or about December of 1990, the scope
8    of our review was the -- were the books from
9    the adult trade list for the fall of 1991.
10   Q.    How many books were selected to
11   undergo prepublication legal review?
12   A.    I don't know for certain, but on
13   average, we usually read about between 12 and
14   15 books from the adult trade list in a given
15   season.
16   Q.    On average, at that time, how
17   many books were sent to outside counsel for
18   prepublication legal review?
19           MR. RICH:  Can I hear the
20           question again, please?
21           (The record was read.)
22           MR. RICH:  Put it in whatever
23           time frame works for you, annually,
24           whatever.
25   A.    Most of the books that

---

40

Martin

1
2            MR. RICH:  I believe it's been
3            asked and answered.
4            If you want to add anything to
5            that.
6    A.    All I can add to it, it's a
7    question of style.  It really is a question of
8    style.  Different publishers have different
9    practices.  And our style was to delegate to
10   the attorney assigned to read the manuscript
11   to read it and work with the author and convey
12   any changes that were required, and then
13   deliver a conclusory either verbal or a short
14   written report that the libel review had been
15   conducted and that the concerns had been
16   resolved.
17   Q.    What happens when after the
18   legal -- what happens when late in the legal
19   review process you receive information that
20   would be -- that might be relevant to
21   prepublication legal issues that were dealt
22   with earlier?
23           MR. RICH:  Is this a general --
24   Q.    How do you -- is the absence of a
25   legal report problematic?

---

38

Martin

1
2    HarperCollins published that required
3    prepublication review are read by in-house
4    counsel.  We will occasionally send a book to
5    outside counsel for any number of reasons, so
6    on average, we send maybe two, three books
7    outside a year.
8    Q.    Up until that point, had you at
9    any time received a written report -- strike.
10           Up until that time when you sent
11   books to outside counsel for prepublication
12   legal review, had you ever received from that
13   outside counsel a written report as regards to
14   their review?
15   A.    When I was at Putnam, the
16   practice was that outside counsel would render
17   a written report after conducting a legal
18   review.  Harper had a different practice.  At
19   Harper neither the in-house attorneys nor the
20   outside attorneys prepared written reports.
21   Q.    What was the reason for that
22   policy at Putnam?
23   A.    Just the way the communication
24   was set up.  The outside attorney read the
25   manuscript, prepared a report, submitted it to

---

Martin

1
2    in-house counsel and in-house counsel worked
3    with the editor to satisfy the concerns raised
4    by the outside attorney.  At Harper, they
5    preferred to have more direct contact between
6    the attorney reading the manuscript and the
7    author.
8    Q.    What's the connection between
9    having direct contact with the author and the
10   preparation of a written report?
11   A.    At Putnam, the written report was
12   the means by which the author -- was the means
13   by which the attorney brought to the author's
14   attention the legal concerns he had with the
15   manuscript.
16   Q.    As a general matter, there was no
17   oral communications between the attorney who
18   performed the prepublication legal review and
19   wrote a report, and the authors?
20   A.    Depended.  Sometimes and
21   sometimes it was all done through this written
22   communication.
23   Q.    Why is it that HarperCollins had
24   the policy of not having prepublication
25   written reports prepared?

143

Martin

1  possibility that Gene Landy was an author of
2  the book, no.
3
4       Q.   Did you have any discussions with
5  Brian Wilson on the subject of whether Eugene
6  Landy was an author of all or part of the book
7  prior to publication?
8       A.   No, I had no reason to believe
9  that Gene Landy was an author of the book, so
10 I did not discuss that with Brian Wilson.
11      Q.   Except for the fact that Mr.
12 Tierney told you that, correct?
13          MR. RICH:  That doesn't call for
14      an answer.  That's argumentative.
15      Q.   Is it not your testimony that Mr.
16 Tierney advised you that Landy had written the
17 book?
18          MR. RICH:  It's not inconsistent
19      with the witness's answer.
20      A.   I believe what I testified to was
21 that Mr. Tierney raised the specter that it
22 was possible that Gene Landy might be the
23 person who was authoring the book.
24      Q.   Did you discuss the specter that
25 Mr. Tierney raised with Genie Gavenchak?

---

Martin

1       A.   My understanding was that Brian
2  Wilson would control the contents of the book
3  because it was his book.  He was the author of
4  the book.  It was a book, it was an
5  autobiography which was the story of his life,
6  and he was telling his story and therefore he
7  was responsible for the contents of the book.
8       Q.   Prior to publication of the book,
9  did you have any information that loose
10 galleys were sent to Eugene Landy for his
11 review by HarperCollins?
12      A.   Yes, I understand that loose
13 galleys were sent to Gene Landy.
14      Q.   When were they sent to him?
15      A.   I don't remember.  It was
16 sometime in July, I believe.
17      Q.   Why were they sent to him?
18      A.   They were sent to him at the same
19 time they were sent to Brian Wilson and to
20 Todd Gold.  As I understood it, it was as a
21 courtesy to him since he was, by record, a
22 co-proprietor of the copyright in the book.
23      Q.   Did you have any discussions with
24 Todd Gold on the subject of Landy making


1       Martin
2       A.   My understanding was that Brian
3  Wilson would control the contents of the book
4  because it was his book.  He was the author of
5  the book.  It was a book, it was an
6  autobiography which was the story of his life,
7  and he was telling his story and therefore he
8  was responsible for the contents of the book.
9       Q.   Prior to publication of the book,
10 did you have any information that loose
11 galleys were sent to Eugene Landy for his
12 review by HarperCollins?
13      A.   Yes, I understand that loose
14 galleys were sent to Gene Landy.
15      Q.   When were they sent to him?
16      A.   I don't remember.  It was
17 sometime in July, I believe.
18      Q.   Why were they sent to him?
19      A.   They were sent to him at the same
20 time they were sent to Brian Wilson and to
21 Todd Gold.  As I understood it, it was as a
22 courtesy to him since he was, by record, a
23 co-proprietor of the copyright in the book.
24      Q.   Did you have any discussions with
25 Todd Gold on the subject of Landy making

---

142

Martin

1
2  changes to the text of the book prior to
3  publication?
4       A.   No, I don't believe I ever spoke
5  to Todd Gold about that.
6       Q.   Did you have any discussions on
7  that subject with the senior editor?
8       A.   I don't recall talking to Tom
9  Miller about that either.
10      Q.   Do you have any information if
11 anybody made it clear to Tom Miller that
12 Eugene Landy was not to participate in the
13 authorship of the book?
14          MR. RICH:  Can I hear the
15      question, please.
16          (The record was read back.)
17          MR. RICH:  You can answer.
18      A.   I really don't know.
19      Q.   Is the subject of -- was the
20 subject of Eugene Landy being an author for
21 all or parts of the book a subject of
22 discussion between you and Ms. Gavenchak at
23 any time prior to publication?
24      A.   No, I don't think, I don't think
25 I recall talking to Genie about the

---

144

Martin

1
2          MR. RICH:  The what?  What was
3      that?  Could I hear the question?
4          (The record was read back.)
5          MR. RICH:  You can answer.
6       A.   I think I testified earlier I
7  don't remember exactly what I discussed with
8  Genie Gavenchak after I spoke to Mr. Tierney.
9  I just don't recall.
10      Q.   If you had discussed it with her,
11 would you expect it to be noted in the notes
12 of your telephone conversations with her?
13          MR. RICH:  Well, that's
14      objectionable form of question.
15          You can answer.
16      A.   Not necessarily.
17      Q.   Why not?
18      A.   Because I wouldn't necessarily
19 take notes of everything I would say to Genie
20 Gavenchak in a conversation with her.
21      Q.   When would you take notes?
22      A.   I might take notes of things that
23 Genie Gavenchak said to me.  Depends on what
24 she said to me whether I thought it was
25 noteworthy.

153

Martin

1
2          I understand your question to be
3   asking.  Do you understand what I'm
4   asking?
5          MS. DUMAS:  No.
6          MR. RICH:  Read the question
7   back.  I think you will hear what my
8   concern is.
9          (The record was read.)
10   Q.    That's the question.
11          MR. RICH:  Okay, you can answer.
12   A.    I had no such information, no.
13   Q.    How did you understand that Brian
14   Wilson's changes -- before your meeting with
15   Brian Wilson in Los Angeles -- how did you
16   understand that Brian Wilson's changes to the
17   galleys were got to HarperCollins?
18   A.    They hadn't gotten to
19   HarperCollins by then.  Brian Wilson was
20   reviewing the galleys in the days leading up
21   to the meeting.  The day I arrived there for
22   the meeting, he had completed that task.
23   That's what he and Todd told me, so the
24   galleys hadn't even been returned by that
25   point.

CLASSIC REPORTING, INC. (212) 268-2590

---

155

Martin

1
2    A.    I testified to this this morning.
3          He said that he read the galleys
4   very carefully over several days and whenever
5   he had a question or a concern about a
6   passage, he and Todd would go over that
7   passage and, if necessary, they would
8   construct necessary changes.
9    Q.    Did you understand him to mean
10   that he read the galleys side by side with Mr.
11   Gold?
12   A.    I wasn't sure whether Todd sat by
13   him as he read every page or that Todd either
14   was by him or he was available to him as he
15   was reading the galleys.  It wasn't clear to
16   me exactly where Todd was with every page.
17   Q.    Did you ever question whether Mr.
18   Wilson had the mental ability to read through
19   all the galleys in a few days?
20   A.    Did I ask him specifically,
21   "Brian Wilson, do you have the metal ability
22   to read a book?"
23   Q.    Did you ever consider the
24   question of whether Brian Wilson had the
25   capacity, the stamina, the mental ability --

CLASSIC REPORTING, INC. (212) 268-2590

---

154

Martin

1
2    Q.    What was your understanding of --
3   I'm sorry, because I had forgotten the date of
4   your meeting with --
5          MR. RICH:  With Mr. Wilson?
6          MS. DUMAS:  Yes.
7          MR. RICH:  July 17th.
8    A.    Well, I'm the one giving
9   testimony, Mr. Rich.  It was July 17th.  It
10   was a Wednesday.
11   Q.    When had the -- how far earlier
12   had the galleys been sent to Brian Wilson?
13   A.    I don't recall.  Maybe a week,
14   two weeks before.
15   Q.    So you had the meeting with Brian
16   Wilson and you -- and you discussed Brian
17   Wilson's review of the galleys at the meeting
18   on July 17th?
19   A.    Not in any detail.  They -- he
20   told me that he had been reviewing the
21   galleys, and he relayed for me how he and Todd
22   went about that process.
23   Q.    What did Mr. Wilson tell you?
24          MR. RICH:  I think we have
25          testified to this.

CLASSIC REPORTING, INC. (212) 268-2590

---

156

Martin

1
2   strike.
3          Did you ever consider whether
4   Brian Wilson had the mental ability to read
5   all the galleys in a few days?
6    A.    I had no reason to believe that
7   he did not.
8    Q.    Why is that?
9    A.    I sat there with him.
10          MR. RICH:  How do you prove a
11   negative?  Go ahead.
12   A.    I sat there with him for an hour.
13   I talked to him.  I asked him questions.  He
14   responded.
15   Q.    How did he respond?  In a way
16   that made you think that -- is how he
17   responded to you have anything to do with the
18   answer to your question?
19          MR. RICH:  Objectionable
20          question.
21   A.    Just as you are asking me
22   questions and I am giving you, doing my best
23   to give you clear, concise, truthful answers,
24   Brian was doing the same with me, and I was
25   impressed that he was able to conduct a

CLASSIC REPORTING, INC. (212) 268-2590

159

Martin

1
2    MS. DUMAS:  I think what I would
3  like you to do is read the question
4  back and read the answer, and I am
5  going to ask you if you wanted to add
6  anything to your answer.
7    MR. RICH:  I doubt it.  He
8  finally got it out.
9    MS. DUMAS:  Because I interrupted
10  you, I think it's only fair.
11    MR. RICH:  Do you feel -- I don't
12  think it's necessary.  Let's do it.
13    (The record was read back as
14  follows:
15    "Q.    Is that because you
16  believe Brian Wilson had recovered
17  completely from the effects of drug
18  abuse?
19    "A.    Not necessarily.  That's
20  not the only reason that that -- I
21  mean, as far as I know, people who
22  abuse drugs are still able to read and
23  comprehend what they read.  People who
24  suffer mental illness are still able to
25  read and comprehend what they read.

CLASSIC REPORTING, INC. (212) 268-2590

---

Martin

1  perfectly cogent and clear conversation with
2  me.  I didn't ask him to take a literacy test,
3  no, I didn't.  I took for granted that the man
4  could read, and when he told me he read the
5  galleys that, indeed, he had.
6
7    Q.    Given his prior history of drug
8  use and mental illness, did you ever stop to
9  consider that he might not have the ability to
10  carefully read all the galleys in a few days?
11    MR. RICH:  Objection, asked and
12    answered.
13      If you care to amplify any prior
14    answers.
15    A.    I had no reason to believe that
16  he didn't have that ability.
17    Q.    Is that because you believe Brian
18  Wilson had recovered completely from the
19  effects of drug abuse?
20    A.    Not necessarily.  That's not the
21  only reason that that -- I mean, as far as I
22  know, people who abuse drugs are still able to
23  read and comprehend what they read.  People
24  who suffer mental illness are still able to
25  read and comprehend what they read.

CLASSIC REPORTING, INC. (212) 268-2590

---

160

Martin

1
2    "I had reason to believe that
3  Brian recovered from his mental illness
4  because that was presented to us by his
5  agent, William Morris Agency in
6  presenting the book.  It was part of
7  the story that had been carefully
8  reviewed and vetted by Genie Gavenchak
9  and it was subject to a lot of scrutiny
10  by her in her discussions with Todd
11  Gold.
12    "Q.    You are not exactly
13  certain, though?
14    "MR. RICH:  Whoa, please don't
15  interrupt.
16    "A.    If I can finish my answer.
17      And in my meeting with him, he
18  presented himself to me as a competent
19  and capable person.
20    "So, based on all those factors
21  together, I had reason to believe that
22  he had made a reasonable recovery and
23  that he was capable of performing the
24  duties of an author writing about his
25  life.")

CLASSIC REPORTING, INC. (212) 268-2590

---

158

Martin

1
2      I had reason to believe that
3  Brian recovered from his mental illness
4  because that was presented to us by his agent,
5  William Morris Agency, in presenting the book.
6  It was part of the story that had been
7  carefully reviewed and vetted by Genie
8  Gavenchak and it was subject to a lot of
9  scrutiny by her in her discussions with Todd
10  Gold.
11    Q.    You are not exactly certain,
12  though?
13    MR. RICH:  Whoa, please don't
14    interrupt.
15    A.    If I can finish my answer.
16      And in my meeting with him, he
17  presented himself to me as a competent and
18  capable person.
19      So, based on all those factors
20  together, I had reason to believe that he had
21  made a reasonable recovery and that he was
22  capable of performing the duties of an author
23  writing about his life.
24    Q.    My apology for interrupting you.
25    MR. RICH:  It's okay.

CLASSIC REPORTING, INC. (212) 268-2590

12

CLSG S11



WEEKS

**Gavenchak**

1  
2      Q.   Do you remember any of the  
3  questions that you had flagged in the book?  
4      A.   Well, I remember -- in the whole  
5  book?  Yes, I do.  
6      Q.   What do you remember?  
7      A.   I remember speaking to him about  
8  Brian Wilson's nurse and girlfriend Carolyn.  
9  I remember speaking to Todd about Brian  
10  Wilson's childhood and his teenage years and  
11  his family situation.  I remember speaking to  
12  him about certain incidences that occurred in  
13  the book involving drug use.  I spoke to him,  
14  I had many conversations with Todd and we  
15  spoke about a lot of things, and what we spoke  
16  about is reflected in the manuscript, at least  
17  topicwise.  
18      Q.   Did you have conversations with  
19  Brian Wilson?  
20      A.   Prior to publication of the  
21  manuscript?  
22      Q.   Yes.  
23      A.   No.  
24      Q.   Is there any reason why you  
25  didn't speak to Brian Wilson and ask him  

CLASSIC REPORTING, INC. (212) 268-2590

---

**Gavenchak**

1  
2           MR. RICH:  Objection to the form.  
3      You can answer.  
4      A.   Not necessarily, but in this  
5  instance, Brian Wilson was asked questions by  
6  Matthew Martin, who is an in-house counsel to  
7  HarperCollins.  We met with him and Brian  
8  Wilson actually signed off on the manuscript  
9  as, I forget the specific words, but he said  
10  that he had read the whole thing, that it did  
11  tell his story, that it was truthful and  
12  accurate and that he wanted it published.  
13      Q.   When you spoke to Todd Gold, you  
14  spoke to Mr. Gold about specific passages that  
15  you had concerns about the defamatory nature  
16  of?  
17      A.   I spoke to him about passages  
18  that I had flagged as potentially creating  
19  problems.  
20      Q.   You had flagged particular  
21  passages.  Why didn't you think it would be  
22  prudent to speak to Brian Wilson about those  
23  particular passages?  
24           MR. RICH:  Objection, asked and  
25      answered.  

CLASSIC REPORTING, INC. (212) 268-2590

---

22

**Gavenchak**

1  
2  questions about the manuscript?  
3      A.   Yes.  
4      Q.   What was that reason?  
5      A.   Because I was speaking to Todd  
6  Gold who had gotten the material of the book  
7  from Brian Wilson in great part and put it  
8  down in words, and he was my contact, and I  
9  felt comfortable with that.  
10      Q.   Wouldn't It Be Nice is an  
11  autobiography -- purported to be an  
12  autobiography of Brian Wilson; is that  
13  correct?  
14      A.   Do you have the book?  
15           MR. RICH:  Are you asking her  
16      whether it was purported to be or it  
17      was?  
18      Q.   Do you understand it to be an  
19  autobiography of Brian Wilson?  
20      A.   Yes, as told to Todd Gold.  
21      Q.   If you had questions about the  
22  factual accuracy of Brian Wilson's  
23  autobiography, would not Brian Wilson be a  
24  person to whom you -- to whom it would be  
25  prudent and useful to ask questions of?  

CLASSIC REPORTING, INC. (212) 268-2590

---

24

**Gavenchak**

1  
2      You can respond.  
3      A.   I felt that Todd Gold, who was a  
4  respected journalist and author, was capable  
5  of answering the questions that I had and  
6  alleviating the concerns that I had.  I  
7  thought that he was being truthful.  He had  
8  conversations directly with Brian Wilson and I  
9  didn't feel it necessary for me to speak to  
10  him directly, and this is not unusual in books  
11  like this.  
12      Q.   Why do you say it's not unusual  
13  in books like this?  Have you had, with what  
14  books have you -- what books have you vetted  
15  that were written by celebrities in  
16  conjunction with a ghostwriter or in this case  
17  this wasn't a ghostwriter, but what books have  
18  you vetted that were written in -- that were  
19  reported to be celebrity autobiographies?  
20      A.   I can't remember whether they  
21  were supposed to be autobiographies or not,  
22  but I have read books about famous people and  
23  dealt with the author, not with the famous  
24  people.  Very often the famous people are busy  
25  and don't want to deal with lawyers.  

CLASSIC REPORTING, INC. (212) 268-2590

43

Gavenchak

1    Q.   On Page 47 of Exhibit 4, HCO1533,
3 there's an "OK" in the left-hand column in the
4 top half of the page?
5    A.   Right.
6    Q.   Do you recognize that as being
7 your handwriting?
8    A.   That looks like my handwriting.
9    Q.   So do you have a memory of
10 reviewing the manuscript draft twice?
11    A.   They're probably pages, you know,
12 portions of the manuscript that I looked at
13 twice or even three times, but I worked off of
14 my working copy.
15    Q.   Let's put aside Exhibit 4 for
16 right now.
17    Gavenchak Exhibit 1, a letter
18 dated May 15, we already looked at that.  Do
19 you believe that this is the manuscript draft
20 that was sent along with this letter by Mr.
21 Martin to Mr. Metcalf dated May 15th?
22    A.   Well, there were certain portions
23 of the manuscript that were, where the pages
24 were superseded, and when those portions came
25 in, I substituted them in my working copy for

CLASSIC REPORTING, INC. (212) 268-2590

---

43

Gavenchak

2    A.   No.  I don't recall the
3 discussion.  I mean, I spoke with Mr. Martin
4 numerous times while I was involved in the
5 legal review of this manuscript.  I couldn't
6 tell you which conversations I had when
7 without something more.  I do remember having
8 a discussion with him about having received
9 the manuscript.  I told him I started working
10 on it, but beyond that, I don't really
11 remember anything.
12    Q.   This letter refers to discussions
13 with the authors -- and the word is plural.
14 Did you discuss with Mr. Martin the fact that
15 you would be having, that you might be or
16 would be having conversations with all the
17 authors of the book?
18    A.   No.
19    Q.   Who did you understand the
20 authors of the book to be?
21    MR. RICH:  Are you asking what
22    Mr. Martin meant or what she understood
23    Mr. Martin meant or what her own
24    understanding of who the authors of the
25    book are?  What's your question?

CLASSIC REPORTING, INC. (212) 268-2590

---

42

Gavenchak

2 the ones that were no longer to be reviewed,
3 and I believe -- well, I don't really have any
4 way of knowing if this is my final working
5 copy, then it's got the superseded pages in
6 it.
7    Q.   Did you begin immediately
8 reviewing the manuscript?
9    A.   Well, yes.
10    Q.   Soon thereafter?
11    A.   Yes.
12    Q.   Gavenchak Exhibit 2 is a letter
13 dated May 28, 1991 from Mr. Martin addressed
14 to you, HCO0675.  Do you recognize the letter?
15    A.   Yes, I do.
16    Q.   The letter seems to reference a
17 discussion that you had with Mr. Martin.  It
18 says, "As we discussed last week, please keep
19 me informed about the progress of your
20 discussions with the authors, and let me know
21 whether Jim and I can be of any assistance to
22 you in the process."
23    Do you recall the substance of
24 your conversation with Mr. Martin that's
25 referenced in this letter?

CLASSIC REPORTING, INC. (212) 268-2590

---

44

Gavenchak

2    Q.   Who do you understand the authors
3 of the book to be?
4    A.   Now?
5    Q.   Now.
6    A.   Well, my understanding is that
7 HarperCollins had a contract with an entity
8 called Brains and Genius which was some kind
9 of a partnership between Brian Wilson and Gene
10 Landy.  I don't know how that contract
11 referred to the individuals, whether it
12 referred to them as authors or not, but I'm
13 aware of that contract and I also consider
14 Todd Gold to be an author.
15    Q.   At the time that you began your
16 review of the manuscript, did you consider
17 Eugene Landy to be an author?
18    A.   No.
19    Q.   Would it have been, would it have
20 changed, would it have been useful for you to
21 have known that Eugene Landy -- that the book
22 publishing contract was with Brains and Genius
23 and Eugene Landy was a principal in that
24 entity?
25    MR. RICH:  Could I hear the

CLASSIC REPORTING, INC. (212) 268-2590

53

Gavenchak

1
2          (The record was read.)
3      Q.    To put a clean question on the
4   table, when you read Page 28 paragraph
5   beginning, "Although he saw himself as a
6   loving father," when you read Pages 46 through
7   47 beginning with "My mother was no help," did
8   you at the time that you performed your
9   prepublication legal review, your initial
10  read, did you at that time think that those
11  passages were capable of defamatory meaning?
12      A.    The statements that appear in a
13  book have to be read in the context of the
14  entire book in order to determine whether they
15  are capable of a defamatory meaning.  At the
16  time that I flagged these passages, I hadn't
17  read the whole book.  After having read the
18  whole book, spoken to Todd Gold a number of
19  times, I came to the conclusion that with the
20  revisions that we made, the statements were
21  not capable of a defamatory meaning.  I also
22  came to the conclusion that they were true.
23      Q.    How is it that you came to the
24  conclusion that they were true?
25      A.    Todd Gold told me that they, that

54

Gavenchak

1
2   all the statements came from Brian Wilson, and
3   that in fact there might have been a time when
4   Audree Wilson's drinking was reported.  He
5   subsequently found that report.  But I suppose
6   more importantly, my conclusion was based on
7   the fact that Brian Wilson was at the time
8   that he was watching his mother drink and
9   experiencing these events in his life, he was
10  old enough to distinguish between a gin and
11  tonic and a glass of seltzer, and I believed,
12  as did Todd Gold, that he was reporting these
13  incidences truthfully.  Audree Wilson refused
14  to cooperate with the book, refused to speak
15  to Todd Gold as did Carl Wilson, so we
16  couldn't ask her and Todd couldn't ask her.
17  But my conclusion was that Brian Wilson told
18  this to Todd Gold and that he was telling him
19  the truth.
20      Q.    Why do you believe that Brian
21  Wilson was telling Todd Gold the truth?
22      A.    He had told him the truth about
23  many other things that appeared in the book
24  which we were able to confirm independently.
25  I had no reason to believe that he would lie

55

Gavenchak

1
2   about this.
3      Q.    Do you have any, are there any
4   specific items in the book that you can --
5   would you please read back the answer?
6          (The record was read back as
7      follows:
8          "A.    He had told him the truth
9          about many other things that appeared
10         in the book which we were able to
11         confirm independently.  I had no reason
12         to believe that he would lie about
13         this.")
14      Q.    What are the things that you are
15  referring to in your answer?
16          MR. RICH:  There are a lot of
17  things in that answer.
18      A.    What things?
19          MR. RICH:  What things are you
20  asking about in the question?
21          MS. DUMAS:  Could you read the
22  answer back.
23          (The record was read back as
24      follows:
25          "A.    He had told him the truth

56

Gavenchak

1
2          about many other things that appeared
3          in the book which we were able to
4          confirm independently.  I had no reason
5          to believe that he would lie about
6          this.")
7      Q.    What are the "things," that you
8   are referring to that gave you reason to
9   believe that Mr. Wilson was telling the truth
10  with respect to the passages under discussion?
11          MR. RICH:  I object to the form.
12          You can answer.
13      A.    I can't remember all of them, but
14  there were descriptions of events that he gave
15  Todd Gold pertaining to time that he spent
16  with certain people which Todd Gold confirmed
17  with the people themselves who were
18  participating in the events.
19          There were also things that Brian
20  Wilson told Todd Gold which we confirmed
21  independently in the book by Steven Gaines,
22  Heroes and Villains.
23          I can't tell you all of them
24  without going through every page of the
25  manuscript and trying to recollect where we

57

Gavenchak

1  independently confirmed things that Brian had
2  told Todd, but there were many instances of
3  that.
4
5      Q.   Did Mr. Martin request, did
6  HarperCollins request the issuance of a
7  prepublication libel review report, a written
8  report?
9      A.   No.
10     Q.   Have you written reports for --
11  have you written libel review reports for
12  other books that you vetted?
13     A.   I don't know if I would call them
14  libel review reports.  I have from time to
15  time put my questions in a memo form and sent
16  them to the publishers for whom I was
17  performing the review, but in those instances,
18  I generally did not deal with the author in
19  the first instance.  Somebody at the publisher
20  did that, tried to get answers to my
21  questions.  And I don't think I have ever done
22  it with HarperCollins, although it's possible.
23     Q.   How many books have you vetted
24  for HarperCollins?
25     A.   I really don't remember.

58

Gavenchak

1
2  Somewhere between a half-dozen and a dozen I
3  would guess.
4      Q.   Are there any publishers who
5  customarily request written reports for
6  prepublication review?
7      MR. RICH:  Of which you are
8  aware, needless to say.
9      A.   I don't know what their practice
10  is now.  Simon & Schuster used to do it.
11     Q.   Why did they have that general
12  practice, do you know?
13     A.   I have no idea.
14     Q.   Have you ever been to any
15  seminars on the subject of defamation which
16  suggested the preparation of a prepublication
17  libel review report?
18     A.   No.  Not that I remember.
19     Q.   Do you know of any prepublication
20  libel review attorneys whom it's their
21  customary practice to issue written reports?
22     A.   No.  Not that I'm aware of.
23     Q.   Are you a member of the Libel
24  Defense Resource Center?
25     A.   My firm buys a table every year.

59

Gavenchak

1
2      Q.   We are sort of in the unfortunate
3  position where we don't have a record of what
4  it is you relied on to cause you, we don't
5  have a record of the passages that you found
6  to be true and that, therefore, you concluded
7  that this passage was likely truthful.
8      MR. RICH:  Is that a statement?
9      A.   I don't understand.
10     Q.   The other passages were true and
11  so you decided that this was likely truthful
12  because other passages were true.
13     MR. RICH:  Are you asking a
14     clarification of certain of her prior
15     answers?
16     MS. DUMAS:  Yes.
17     MR. RICH:  Going to what gave her
18     an overall comfort level about Brian's
19     veracity as to the allegations dealing
20     with his mother's drinking, is that
21     what you are asking for amplification
22     of, to the best of her recollection?
23     Q.   Did you come to the conclusion
24  that this passage was likely true because
25  certain other passages which you can't

60

Gavenchak

1
2  identify now you found to be true?
3      A.   I didn't say I couldn't identify
4  them.  If you want to go through the
5  manuscript page by page and ask me, I would be
6  happy to try to remember which passages they
7  were and which they weren't.  I gave you some
8  examples and yes, I did come to the conclusion
9  that the passages with respect to Audree
10  Wilson's drinking were true.  I believed he
11  was telling Todd the truth and Todd believed
12  he was telling Todd the truth, and we had no
13  reason to believe that he had told a lie about
14  it or about anything else.  There are
15  situations where you cannot get independent
16  corroboration of a statement that somebody is
17  making, and at that point, you have to rely on
18  what your impression of their truthfulness is,
19  and our impression of Brian Wilson's
20  truthfulness was a very positive one.
21     Q.   And that impression is based upon
22  what?
23     A.   I just told you.  That he had
24  provided a lot of information for this book.
25  This book is his life story.  And the

61

Gavenchak

1 information that he had provided that we were
2 able to obtain independent corroboration of,
3 we did. We didn't find that he had lied.
4
5 Q. When you were deciding that there
6 were other portions of the book, how did you
7 know that that wasn't Todd Gold researching
8 those other portions of the book? You have
9 identified specific -- I'm not trying to, I
10 just want to make myself clear so you can see
11 where I'm going. Did you look at a passage
12 and ask Todd, did this come directly from
13 Brian and then Todd went about and confirmed
14 for you that this, a particular passage which
15 came directly from Brian's mouth was factually
16 accurate?
17 A. I'm not sure I understand the
18 question, so I will make a statement. You
19 tell me if you don't think I'm being
20 responsive. I spoke with Todd Gold about
21 numerous passages in this book. My general
22 way of approaching this subject is to flag a
23 passage, get on the phone with the author, in
24 this case Todd, and say to him you said on
25 page whatever it was, so-and-so, what's the

CLASSIC REPORTING, INC. (212) 268-2590

---

62

Gavenchak

1 source for that information. The situations
2 where I'm -- that I am referring to now are
3 situations where he said to me well, Brian
4 told me that. I also read it in a _Rolling_
5 _Stone_ article. It also appears in _Heroes and_
6 _Villains_. I spoke to Van Dyke Parks, and he
7 confirmed it.
8
9 I am giving you examples of the
10 kinds of things he would say to me. That's
11 what I'm talking about.
12 Q. Getting back to Page 28, it says
13 in the left-hand margin, I think, question
14 mark, "has mother's drinking been reported,"
15 question mark, and then is the word "No."
16 MR. RICH: There are a number of
17 words, one of which is "No."
18 MS. DUMAS: We are going to get
19 on to them in a second, Mr. Rich.
20 A. Is there a question?
21 Q. The question is, does this
22 notation, is this an answer to the question
23 has mother's drinking been reported and the
24 answer, the word is no?
25 A. That's what it says. I believe

CLASSIC REPORTING, INC. (212) 268-2590

---

63

Gavenchak

1 later on in the manuscript there's a similar
2 question about her drinking and the answer is
3 may have been reported or words to that
4 effect.
5 Q. Then it says -- what else have
6 you written here?
7 A. "Audree refused to talk - Todd
8 doesn't know who else to ask."
9 Q. So in a situation where you have
10 a statement that hasn't been reported
11 elsewhere and the, and you have been told that
12 an author doesn't know how to otherwise
13 corroborate the statement, when if ever do you
14 make the decision that the statement should be
15 deleted from the book because it may be
16 untrue?
17 MR. RICH: Objection to the
18 hypothetical quality of the statement.
19 The witness moreover in the context of
20 this passage I think has given the
21 answer, but she may answer.
22 A. You are asking me when would I
23 delete a passage where there's no way of
24 obtaining independent corroboration, even

CLASSIC REPORTING, INC. (212) 268-2590

---

64

Gavenchak

1 though I believe the information to be true
2 and that the author is telling the truth when
3 the author says it? Is that the question?
4 Q. What would have caused you to --
5 did you ever think about -- did the, did you
6 ever have the thought that this passage on
7 Page 28 might have to be deleted, the charge
8 that "My mother drank"?
9 A. Yes, when I first read it, I
10 thought it might have to be deleted.
11 Q. What about the passage on Page
12 47?
13 A. Which words?
14 Q. Page 46, "My mother was no help.
15 She almost never opposed my father, almost
16 never rose up and defended children."
17 MR. RICH: What's the question.
18 Q. Did you ever think that the
19 passage, "My mother was no help," on Page 46
20 through to Page 48 which describes Audree
21 Wilson as I believe on Page 47 "Looked on
22 passively from the sidelines, gripping her
23 ever present tumbler," and then the book goes
24 on to describe Murry Wilson throwing a

CLASSIC REPORTING, INC. (212) 268-2590

75

Gavenchak

1  Q.  Yes.
2
3  A.  Murry Wilson's behavior, abusive
4  behavior, had been reported before.  In my
5  mind, there was no question as to the
6  truthfulness of that material in this book.
7  What I wrote there "She had to have known,"
8  refers to the fact that I believed that the
9  abuse took place and I also believed that
10 there was no way that she could have lived in
11 that household and not known about it.
12 Q.  Did you have any information
13 whether she specifically looked on as Murry
14 Wilson tied her son to a tree?
15 A.  Yes.  That came from Brian
16 Wilson.
17 Q.  And you know that because?
18 A.  Because Todd Gold told me.
19 Q.  And you had no reason to doubt
20 Brian Wilson's ability to accurately recall
21 and describe events in his life?
22 A.  No, I didn't.  I specifically
23 spoke to Todd about it.  Todd told me that
24 Brian was honest about those times when he
25 couldn't recall something and in fact they are

CLASSIC REPORTING, INC. (212) 268-2590

Gavenchak

1  against abuse was true?
2  MR. RICH:  Your tensing is mixed
3  up, I think.  You stated in the present
4  tense.  I think your question should be
5  stated in the past tense at the time of
6  this review.
7  Q.  Why do you believe this statement
8  as revised on Page 46 "Almost never rose up
9  and defended her children" -- strike that.
10 I guess I'm trying to understand
11 I see a distinction between believing that the
12 abuse took place generally and coming to the
13 conclusion that therefore statements that
14 Audree Wilson stood by as a bystander who
15 refused to intercede in flagrant child abuse
16 is corroborated for publication.
17 MR. RICH:  Why don't you pose a
18 question as opposed to stating what
19 your concerns with the testimony may or
20 may not be.
21 Q.  What caused you to believe that
22 the passages on Page 46 through 47 charging
23 Audree Wilson with being a bystander who
24 refused to intercede in flagrant child abuse

CLASSIC REPORTING, INC. (212) 268-2590

74

Gavenchak

1  reflected in the book, and that when he did
2  recall something, he recalled it in such
3  significant detail that Todd honestly believed
4  that he was telling the truth, and I believed
5  Todd and I didn't have any reason to doubt
6  him.
7  Q.  Did you have any reason to doubt
8  that Audree Wilson stood by while the abuse
9  was taking place and didn't make an effort to
10 intercede?
11 A.  No, I had no reason to doubt it.
12 Q.  Because Todd had told you and
13 Todd told you that Brian had told you?
14 MR. RICH:  I think you misspoke.
15 A.  No.
16 MR. RICH:  You said that Brian
17 had told you.  You meant Brian had told
18 him?
19 MS. DUMAS:  Strike my whole
20 comment.
21 Q.  Why is it that -- why did you
22 believe that it was this -- why do you believe
23 the charge that Audree Wilson didn't oppose
24 Murry ever rise up or defend her children

CLASSIC REPORTING, INC. (212) 268-2590

76

Gavenchak

1  were reliable?
2  A.  I think I told you.  That
3  information that took place at the time when he was
4  old enough to know what was happening.  He
5  told all of this to Todd Gold along with a lot
6  of other things that appear in the book.  Todd
7  felt that Brian was telling the truth and that
8  he was recounting events accurately.  I
9  believed that also.  I didn't have any reason
10 to doubt it, and that's my answer.
11 Q.  There was a point in time when
12 you became aware of a conservatorship
13 proceeding over Brian Wilson; is that correct?
14 A.  Yes.
15 Q.  What point in time was that?
16 A.  I don't remember, but it was
17 sometime during the vetting process.
18 Q.  Did that information ever cause
19 you to question whether Brian Wilson had the
20 mental capacity to truthfully account events
21 or whether he truthfully accounted the events
22 in the book -- let me strike the question and
23 ask it again.

CLASSIC REPORTING, INC. (212) 268-2590

Gavenchak

1               Gavenchak
2       Did that information ever cause
3 you to question whether the statements in the
4 book were truthful about -- yes.
5       MR. RICH:  Hold it.  Your
6      question sort of trailed off.
7       Q.   Whether any statements in the
8 book were truthful?
9       MR. RICH:  You have a variety
10     of -- could you rephrase it, please?
11     MS. DUMAS:  Yes.
12      Q.   Did that information, when you
13 learned during the vetting process that Brian
14 Wilson was the subject of a conservatorship
15 proceeding, did that information ever cause
16 you to question whether any of the statements
17 contained in the book were true?
18      A.   Initially when I learned about
19 the conservatorship proceeding, I thought that
20 it was something that had to be looked into.
21 What I subsequently learned about it and about
22 other things caused me to believe that Brian
23 was telling the truth and that he was capable
24 of telling the truth.  So I suppose the answer
25 is that initially it was of some concern to

---

1     about money, that it wasn't about Brian's
2 competency, that he thought Brian was
3 competent.  During --
4      Q.   Excuse me.  Don Engel was Mr.
5 Wilson's attorney in a contested
6 conservatorship proceeding?
7      A.   He was an attorney representing
8 him, not necessarily in the conservatorship
9 proceeding, but Brian Wilson referred to him
10 as his attorney and said that he wanted him to
11 represent him insofar as HarperCollins was
12 concerned.
13      Q.   Did you consider Mr. Engel to be
14 a neutral observer?
15      A.   Yes, I did.
16      Q.   Why is that?
17      A.   I know Mr. Engel's reputation and
18 it's a good one.  I don't have any reason to
19 think he was lying.  He didn't seem to have a
20 vested interest in the outcome of the
21 conservatorship proceeding or anything else
22 that was going on at the time whereas other
23 people did.
24      And I just have to say that I'm


---

Gavenchak

1 me, but ultimately I concluded that the
2 statements were true, that the book was true.
3      Q.   What is it that resolved your
4 doubt?
5      MR. RICH:  I object to the form.
6     You can answer.
7      A.   It wasn't doubt.  It was concern.
8 What ultimately led me to the conclusion that
9 Brian was reliable and truthful and capable of
10 being truthful were a number of factors.  One
11 of those factors was who was bringing the
12 conservatorship and what the motives were.  I
13 questioned the motives of the people who were
14 bringing the conservatorship proceeding.  It's
15 not a secret that there was no love lost
16 between Gene Landy and members of Brian
17 Wilson's family.
18      Also, Matthew Martin, as you
19 probably know, went out to California and
20 spent time with Brian Wilson and Don Engel, a
21 lawyer who was representing him, and Don Engel
22 told Matthew that he believed that the
23 conservatorship proceeding was going to be
24 resolved and that it was really basically

---

Gavenchak

1 answering your questions, but I didn't finish
2 answering the one that I was in the process of
3 and I forgot where I was.
4      MR. RICH:  Why don't we let the
5 reporter read back as much of the
6 answer as you had completed when you
7 were interrupted by Ms. Dumas.  Then
8 you can complete the answer.
9     (The record was read back as
10 follows:
11     "A.   It wasn't doubt.  It was
12 concern.  What ultimately led me to the
13 conclusion that Brian was reliable and
14 truthful and capable of being truthful
15 were a number of factors.  One of those
16 factors was who was bringing the
17 conservatorship and what the motives
18 were.  I questioned the motives of the
19 people who were bringing the
20 conservatorship proceeding.  It's not a
21 secret that there was no love lost
22 between Gene Landy and members of Brian
23 Wilson's family.
24     Also, Matthew Martin, as you

83

Gavenchak

1
2  probably know, went out to California
3  and spent time with Brian Wilson and
4  Don Engel, a lawyer who was
5  representing him, and Don Engel told
6  Matthew that he believed that the
7  conservatorship proceeding was going to
8  be resolved and that it was really
9  basically about money, that it wasn't
10 about Brian's competency, that he
11 thought Brian was competent.
12          During -- ")
13     A.    He thought Brian was competent.
14 During the meeting, Brian read the entire book
15 and told Matthew that he understood that there
16 were things in the book that were not going to
17 be popular with members of his family but that
18 he wanted the book published.  It told his
19 story, and he ultimately signed off on the
20 last page of the book.
21          I think that's the end of the
22 answer.
23     Q.    Did you at any point in time
24 become aware of the fact that a psychiatrist
25 by the name of Garrett O'Connor had been

84

Gavenchak

1
2  evaluation; is that correct?
3     A.    That was my understanding.
4     Q.    Why didn't -- did you ever
5  recommend to Matthew Martin or anybody at
6  HarperCollins holding off on publication of
7  the book until Dr. O'Connor had completed his
8  psychological evaluation and issued a written
9  report about Brian Wilson?
10     A.    No, I did not.
11     Q.    Is there any reason why you
12 didn't make that recommendation?
13     A.    I didn't have any idea when the
14 report was going to be completed.  In fact, I
15 didn't know that the report would be completed
16 because the information that Matthew got from
17 Don Engel was that he thought that the matter
18 was going to be settled which would have
19 obviated the need for a report.
20          Beyond that, I was comfortable
21 with all of the information that we had gotten
22 from Matthew's visit with Brian Wilson himself
23 and Don Engel.
24     Q.    So Mr. Martin never told you
25 about any timetable or estimates as to when

82

Gavenchak

1
2  selected to perform a psychological
3  examination of Brian Wilson for its submission
4  to the conservatorship court?
5     A.    Yes.
6     Q.    Did you at any time question
7  whether that evaluation would form opinions as
8  to Brian Wilson's mental condition?
9          MR. RICH:  Objection to the form.
10         You can answer.
11     A.    I really can't.  I don't know
12 what you want me to --
13     Q.    You knew that -- how did you find
14 out that Dr. O'Connor was going to be issuing
15 a report?
16     A.    I think that I found that out
17 from Matthew Martin.
18     Q.    What did you think was the
19 purpose of his evaluation?
20     A.    I assumed that he was going to
21 be, that it would be relevant to the judge in
22 deciding the outcome of the competency
23 proceeding.
24     Q.    So it -- you understood that he
25 was going to be performing a psychological

84

Gavenchak

1
2  Dr. O'Connor would issue a report?
3     A.    I don't recall whether he did or
4  he didn't.
5     Q.    If he did, would it have made a
6  difference if he said in a month Dr. O'Connor
7  is going to be issuing a report on Brian
8  Wilson?  Would you have recommended delay of
9  publication?
10         MR. RICH:  Objection.
11         You can answer.
12     A.    No.  As I said before, our
13 information was that this matter was going to
14 be settled, which would have obviated the need
15 for a report at all, so if in fact -- I mean,
16 given that we had satisfied ourselves that
17 Brian was capable of telling the truth, that
18 he had told the truth, that he wanted the book
19 published, there was no reason to postpone
20 publication because of some report that may or
21 may not be issued within whatever time frame
22 it was.
23         MR. RICH:  Could we take a break
24 at some point for a couple minutes?
25         MS. DUMAS:  Yes, but can we hold

117

Gavenchak

1  what Matthew did.

2  Q.   What is it that -- why was

3  this -- why was that meeting necessary or why

4  did it take place?

6  A.   Well, it took place because

7  people had started raising questions about

8  whether Brian was really the author of the

9  book.  There were a lot of people who were

10  coming out of the woodwork claiming to

11  represent him and claiming that he had

12  requested that HarperCollins send a copy of

13  the manuscript to them, and we wanted to get

14  to the root of the matter.

15  Q.   When you say people were

16  claiming, were questioning whether Brian

17  Wilson was really the author, what more

18  specifically were they questioning?

19  A.   I think there were claims being

20  made that what was in the book was really

21  colored by Eugene Landy.

22  Q.   Why was that a concern that

23  warranted HarperCollins in-house counsel to

24  investigate?

25  A.   Well, HarperCollins was

118

Gavenchak

1

2  publishing this book as an autobiography of

3  Brian Wilson with Todd Gold.  I think it only

4  prudent that they make sure that that in fact

5  is what it was.

6  Q.   If Landy had authored parts of

7  the book, could it have affected the veracity

8  of those passages?

9  MR. RICH:  Objection, improper

10  hypothetical.

11  THE WITNESS:  You want me to

12  answer it?

13  MR. RICH:  I prefer you answer

14  questions that are likely to lead to

15  the discovery of admissible evidence

16  which this is not.  This will be

17  immediately excluded if not

18  reformulated if she wants to press

19  improper questions.

20  MS. DUMAS:  What's objectionable

21  about the hypothetical, Mr. Rich?

22  MR. RICH:  It's a hypothetical

23  question not elucidating facts from

24  this witness.  She is not here

25  testifying as to hypotheticals what

119

Gavenchak

1  would she have done if something not in

2  evidence had occurred.

4  MS. DUMAS:  I am trying to get

5  the understanding of her skills as a

6  prepublication libel review lawyer.

7  MR. RICH:  She is not here

8  testifying generally as she -- she is

9  testifying here as a fact witness who

10  happened to be engaged because of her

11  expertise in this area.

12  MS. DUMAS:  I am trying to

13  understand the extent of her expertise.

14  MR. RICH:  Those questions aren't

15  really going to get us anywhere.  If

16  you want to press the question -- I'm

17  not instructing the witness not to

18  answer them.  I'm simply saying they

19  are a waste of time.

20  MS. DUMAS:  Can you please read

21  back the question.

22  (The record was read back as

23  follows:

24  "Q.   If Landy had authored

25  parts of the book, could it have

120

Gavenchak

1

2  affected the veracity of those

3  passages?")

4  MR. RICH:  I repeat my objection

5  and you can attempt to answer.

6  A.   I don't know.  If you are asking

7  if he authored portions of the book, would I

8  have necessarily killed those portions, the

9  answer is no.

10  Q.   But would it have affected your

11  analysis?

12  MR. RICH:  Of what?

13  Q.   The book?

14  A.   You mean in the process of

15  analyzing it or the conclusions?

16  Q.   Both.  Would it have been a

17  factor?

18  A.   It would depend own what portions

19  he authored.  If he authored portions about

20  which he shouldn't have any knowledge, I would

21  raise questions about it.

22  Q.   Are you aware of whether -- I

23  think you testified that the conservatorship

24  proceeding -- that in the conservatorship

25  proceeding, the allegation was made that

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
------------------------------------x
CARL WILSON, an individual, and      )
AUDREE WILSON, an individual,        )
                                     )
                Plaintiffs,          )
                                     )
        v.                           )   94 Civ. 892(JC)
                                     )
HARPERCOLLINS PUBLISHERS INC.,       )   SUPPLEMENTAL AFFIDAVIT
a Delaware corporation,              )   OF LISA DREW
                                     )
                Defendant.           )
------------------------------------x

STATE OF NEW YORK    )
                     ) ss.
COUNTY OF NEW YORK   )

        LISA DREW, being duly sworn, deposes and says:

        1.  I submit this supplemental affidavit in further support of HarperCollins' motion for summary judgment in the above-captioned case.  I have read the papers submitted by plaintiffs in opposition to HarperCollins' motion for summary judgment, in particular the declarations and reports of Dr. Janet Roehl, Assistant Professor of Journalism, Eastern New Mexico University and one by Edwin Diamond, Department of Journalism, New York University.  I have personal knowledge of the facts set forth herein.

        2.  In their opposition papers, plaintiffs argue that HarperCollins' should have delayed publication of WOULDN'T IT BE NICE -- MY OWN STORY until they had had a chance to read Dr. Garrett O'Connor's psychological report



of Brian Wilson (the "O'Connor Report").  Opp. Br. 4, 27;
Langberg Dec. 6B.  I have never heard of any such
requirement in connection with deciding whether to publish
an author and, under the circumstances of this case, it was
unnecessary to delay publication awaiting such report.  The
record is perfectly clear that by the time HarperCollins
learned from Mr. Engel that Dr. O'Connor's Report would
issue, HarperCollins had already done extensive
investigation concerning Mr. Wilson's ability to relate his
story truthfully and accurately to Mr. Gold.  See generally
Miller Aff.; Martin Aff.; Gavenchak Aff.  HarperCollins had
also thoroughly investigated charges by various third
parties that Eugene Landy was exerting "undue influence"
over Mr. Wilson.  Martin Aff.  Thomas Miller, the book's
editor, and Matthew Martin, in-house counsel at
HarperCollins, had both met with Mr. Wilson and determined
that he was competent to tell his story, had read what Mr.
Gold had written, believed in it and wanted it to be
published.  Miller Aff. ¶ 15; Martin Aff. ¶ 24.  Further,
Ms. Gavenchak had already had repeated conversations with
Mr. Gold, the author, in which he assured her that Mr.
Wilson was perfectly capable of telling his story truthfully
and accurately.  Gavenchak Aff. ¶ 6; Gavenchak Dep. 51-57,
73-74 (Exhibit 12 to my original Affidavit) (Attachment C to

Opp. Br.).  Under these circumstances, there was absolutely no reason to wait for Dr. O'Connor's Report.

3.  Plaintiffs argue that Ms. Gavenchak was somehow remiss because she did not speak directly with Brian Wilson as she was conducting her libel read of the book.  To the contrary, it is entirely consistent with customary practice in the book publishing industry for the lawyer conducting a legal review of a celebrity autobiography to work with the professional writer rather than the celebrity. The fact that Mr. Miller and Mr. Martin <u>both</u> personally met with Mr. Wilson to discuss the book further undermines the notion that Ms. Gavenchak's decision to work directly with Mr. Gold rather than Mr. Wilson is evidence of careless practice.

<u>Plaintiffs' Expert Reports</u>

4.  Plaintiffs submitted three expert reports, two by Dr. Roehl and one by Mr. Diamond, which were incorporated by reference into their respective declarations.  I have both general observations and specific comments concerning their reports.

A.    <u>General Observations</u>

5.  My first observation is that none of the reports has relevance to book publishing, let alone the genre of book here involved.  The reports focus almost

exclusively on notions of "objectivity" and "double verification" of sources, drawing, in Mr. Diamond's case, on a career as a newspaper and magazine reporter and editor, and, in Dr. Roehl's case, on secondary sources dealing with newspaper and magazine reporting.  These reports wholly ignore that we are not dealing here with newspaper coverage of the Watergate scandal or an "objective" history of the role of the U.S. Government in the Vietnam War, but, rather, with an autobiography expressing its subject's viewpoints on himself and his family, friends, fellow band members as well as other relationships.  "Objectivity" is, in fact, the antithesis of autobiography, and the notion of "double sources" for recollections of childhood impressions of family members is equally inapposite.  I note finally in this regard that neither of plaintiffs' experts says a single word on the special attributes of book publishing which require a different set of expectations in examining a book publisher's standard of care than pertain to the news media with which Mr. Diamond and Dr. Roehl are more familiar.

6.  My second observation is that both Dr. Roehl and Mr. Diamond either largely ignore, or lack a familiarity with, the factual record in this case.  In their effort to lend support to the plaintiffs' theories that Brian Wilson

4

is not "credible" or competent to tell his own story and that Eugene Landy, and not Brian Wilson, "controlled the contents of the book," both Dr. Roehl and Mr. Diamond have grossly mischaracterized the few documents they cite -- without any regard to the context in which the documents were written or the unchallenged testimony concerning them. Dr. Roehl and Mr. Diamond have completely ignored hundreds of pages of deposition testimony concerning these very documents and which, in addition, demonstrate that HarperCollins made every reasonable effort to ensure that Mr. Wilson was credible, capable and competent to write his memoirs and that the book that was ultimately published by HarperCollins was Mr. Wilson's book (not Mr. Landy's), that Mr. Wilson believed in its contents, and that he wanted it to be published.

B   **Janet Roehl**

**First Roehl Report**

7.  Dr. Roehl's first report begins with the premise that "[i]t is clear that Brian Wilson was not credible" because he "experienced drug and alcohol addiction and psychological breakdown in his past."  Roehl First Report 2.  Dr. Roehl's apparent premise is that people who have experienced drug or alcohol addiction or psychological breakdown are incapable of recovery and should thereafter be

treated with "great trepidation" and apparently shunned as
book authors.  Id.  This supposition ignores the reality of
human experience.  Innumerable people have experienced drug
or alcohol addiction and/or psychological breakdowns of one
form or another and have made substantial or complete
recoveries.  Many, to society's benefit, have subsequently
written about their lives and their period of dysfunction --
with candor and credibility.  Just a few examples include:

       I'M EVE by Chris Sizemore (Doubleday)
       A MIND OF MY OWN by Chris Sizemore (Morrow)
       EVERY SECRET THING by Patricia Campbell Hearst
            (Doubleday)
       GOING MY OWN WAY by Gary Crosby (Doubleday)
       GETTING BETTER: INSIDE ALCOHOLICS ANONYMOUS by Nan
            Robertson (Morrow)
       POSTCARDS FROM THE EDGE (autobiographical novel)
            by Carrie Fisher (S&S)
       THE TIMES OF MY LIFE by Betty Ford (Harper & Row)
       A GLAD AWAKENING by Betty Ford (Doubleday)
       I NEVER PROMISED YOU A ROSE GARDEN by Joanne
            Greenberg (Dutton/NAL)
       DARKNESS VISIBLE by William Styron (Knopf)
       I'LL CRY TOMORROW by Lillian Roth
       DANCING ON MY GRAVE by Gelsey Kirkland (Doubleday)
       Autobiographies of Peter O'Toole, Josh Logan
       LITTLE GIRL LOST by Drew Barrymore
       A DRINKING LIFE by Pete Hamill (Little Brown)

       8.   I personally edited the first five of these
books, two of which (Robertson, Crosby) were by alcoholics
and three by people who were declared mentally incompetent.
Chris Sizemore was the subject of the classic THE THREE
FACES OF EVE, written by her first two psychiatrists.  Her
own story, I'M EVE, was more accurate than theirs.  Patricia

Hearst's view of her notorious kidnapping case and trial (at which eminent Yale Professor Robert Jay Lifton testified that she was a brainwashed victim) was considerably different from the government's position.  In at least one instance, photographs supported her version of events.  Robertson, a recovered alcholic, previously won a Pulitzer Prize for an article on Toxic Shock Syndrome.

        9.   Dr. Roehl also makes the factually erroneous assertion that HarperCollins failed adequately to investigate what she terms Brian Wilson's "credibility problem."  Roehl Report 4.  The deposition testimony, to which she never refers, makes clear that five different individuals (Todd Gold, Dan Strone, Thomas Miller, Matthew Martin and Craig Herman) each had occasion personally to appraise Brian Wilson's mental capacity at different points in the prepublication process and independently concluded that he was credible and capable of telling his story.  Gold Dep. 182 (Exhibit 8 to my original Affidavit); Miller Dep. 80, 107-08, 157 (Exhibit 5 to my original Affidavit); Gavenchak Dep. 76-81 (Exhibit 12 to my original Affidavit); Martin Dep. 157-58 (Exhibit 11 to my original Affidavit); Herman Aff. ¶ 6.  Todd Gold, in particular, worked closely with Mr. Wilson for many months and has testified that he had "no reservations about Brian's mental health" or his

credibility.  Gold Dep. 182, 201-02 (Exhibit 8 to my original Affidavit).

10.  Dr. Roehl's intimations about "the worrisome problem of Brian Wilson reviewing the book," Roehl First Rep. 5, are also fully addressed in the deposition testimony.  That testimony reveals that Todd Gold gave both Mr. Miller and Ms. Gavenchak repeated assurances that Brian was very much involved in the writing of the book and had read it.  Miller Dep. 80, 107-08 (Exhibit 5 to my original Affidavit); Gavenchak Dep. 23, 81 (Exhibit 12 to my original Affidavit).  And, in their face-to-face meeting, Brian Wilson personally assured Mr. Martin that he had read the manuscript, believed in its contents and wanted it to be published.  Martin Dep. 79-83 (Exhibit 11 to my original Affidavit); HC00614-620 (Exhibit 3 to Martin Aff.).  He even signed a statement to that effect.  HC00621 (Exhibit 3 to Martin Aff).

11.  It also appears that Dr. Roehl either failed to consult or completely ignored Ms. Gavenchak's deposition testimony (among other evidence) in making the assertion that "[i]t does not appear that HarperCollins made any attempt to verify the claims made by Brian Wilson" in the book.  Roehl Rep. 5.  Ms. Gavenchak was specifically asked to provide plaintiffs' counsel with examples of the many

passages for which she believed Brian Wilson to be the source and concerning which she asked Todd Gold to verify the statements from other sources. Gavenchak Dep. 53-57, 101-02 (Exhibit 12 to my original Aff.). Ms. Gavenchak provided plaintiffs' counsel with a long list of examples. Gavenchak Dep. 278-82 (attached hereto as Exhibit 1). In addition, there is deposition testimony from Ms. Gavenchak and Mr. Miller in which they report that Todd Gold gave them repeated assurances that Brian was honest about those times when he could not recall something; when, on the other hand, he could, he recalled it in such significant detail that Mr. Gold believed that he was telling the truth. Gavenchak Dep. 73-74 (Exhibit 12 to my original Affidavit); Miller Dep. 96-97 (attached hereto as Exhibit 2). Mr. Miller and Ms. Gavenchak both testified that they didn't have any reason to doubt Mr. Gold's judgments in this regard. Gavenchak Dep. 73-74 (Exhibit 12 to my original Affidavit); Miller Dep. 96-102 (attached hereto as Exhibit 2).

12. On page 6 of her report, Dr. Roehl sets forth what she calls the "basic professional standards" endorsed by the Society of Professional Journalists, Public Radio News Directors, the Radio-Television News Directors Association, Associated Press Managing Editors and KTVQ-2 in Billings, Montana. Roehl Rep. 6. These are not, and never

9

have been, the appropriate "standards" by which to assess the conduct of a book publisher.  Furthermore, even if they were, Dr. Roehl has failed to cite any evidence whatsoever to support her conclusory assertions that HarperCollins violated those standards.  Indeed, the assertions she makes about HarperCollins' "fail[ure] to investigate doubts they knew surrounding the credibility of Brian Wilson" and "undue influence by Eugene Landy" and the impact of the misunderstood "crash" schedule are based entirely upon misleadingly-quoted snippets from five or six documents and are completely at odds with the balance of the factual record.

13.  Finally, I have seen absolutely no evidence to support Dr. Roehl's notion that "accuracy was scarified [sic] for expediency."  Nor does she cite any.

### Second Roehl Report

14.  Dr. Roehl's second report purports to demonstrate why certain statements in the Book are capable of defamatory meaning.  I am not aware of the qualifications that make Ms. Roehl an expert on this topic, or, for that matter, that this issue is one calling for expert testimony at all.

10

C.    **Edwin Diamond**

15.   Like Dr. Roehl, Mr. Diamond attempts to
analyze HarperCollins' conduct with the mind set of a news
journalist (not to mention a very skewed view of the fact
record).  For example, he places heavy emphasis on "two
source confirmation," "independent verification" of "facts,
statistics, quotes, etc.," and the notion that a story
should be "kill[ed] at once" if it is "on the wire."
Diamond Rep. 2.  Such concepts may reflect newsroom
journalistic norms, but they bear little relation to the
book publishing process.

16.   In book publishing, an editor (representing
the publisher) has a responsibility to address with the
author any statements that strike the editor as possibly
inaccurate, unfair or untrue.  It is then the author's
responsibility to be certain that the statements in question
are accurate, fair and true.  Based upon my review of the
record, I believe that HarperCollins more than adequately
met the appropriate standard of care in this regard.  It is
simply not the responsibility of the editor or the publisher
to do any independent fact checking of its own.  Nor is it
necessary for a book publisher to "kill" an autobiography
simply because the professional writer may have been unable
to find independent corroboration for some of the

11

author/subject's observations, especially in circumstances where, as here, the author is viewed as credible in his recollections.

17.   Mr. Diamond's sweeping assertions that "too many book publishers have decided that they are not information providers so much as operators of booths on the entertainment midway," that "diverse and newly intense commercial pressures have decisively altered the old notions of a quality control process" and that "[t]he new-think arithmetic that leads to the purposeful avoidance of facts and truth is simple," Diamond Rep. 2, are as unsubstantiated as they are incorrect.  I have been in the book publishing business for 34 years and the "quality control process" has not diminished one iota.  Even if it were otherwise, HarperCollins should not be tarred with Mr. Diamond's simplistic, condemnatory brush.  The record of HarperCollins' diligence on the book belies any assertion that quality control was abandoned here.  There is no evidence that "facts and truth" were avoided, or that the financial impetus to publish was so strong as to lead to the avoidance, or short-circuiting, of normal publishing procedures.  To the contrary, the record clearly shows that publication was postponed for six weeks to allow for further legal consultation and investigation.  Martin Aff. ¶ 21.

18.  The superficial quality of Mr. Diamond's report is nowhere better demonstrated than by the purported evidence he marshals for the premise that "HarperCollins' representatives responsible for bringing the book through the publication process harbored real doubts about the accuracy of the Wilson story, the competency of the storytellers and the dangers of the Svengali-like Landy figure."  Diamond Rep. 3.  As discussed above and in my original affidavit, the fact record conclusively establishes exactly the opposite -- that HarperCollins' representatives took great pains to assure themselves about the "competency of the storytellers" and the role of Eugene Landy and did everything they were required to do and more to assure themselves about the "accuracy of the Wilson story."

19.  Mr. Diamond is able to reach his conclusions only by extracting out-of-context snippets from twenty-five documents (out of the many thousands of documents and thousands of pages of deposition testimony produced in this litigation thus far) -- failing in the process fairly to present the documents themselves, other documents that provide context, or the deposition testimony given by their authors and recipients.  He also grossly distorts the chronological sequence of the record.  It appears to me that the distortions of the trial record found in Mr. Diamond's

report exemplify the very form of biased journalism he decries.

20.   A few examples suffice to demonstrate the severe misrepresentations found in Mr. Diamond's selective citations of documents:

- HC00056 (Exhibit 10 to my original Affidavit) (a memorandum from Tom Miller to Richard Cariello dated March 21, 1990) states:

> Richard, per our discussion today, please have inserted into this contract (which is to be signed by both Brian Wilson and Eugene Landy) some sort of wording to the effect that if Wilson and Landy split up, Wilson will still be allowed to do the book with us.  We don't want to be in a situation in which Wilson and Landy split up and Landy wants to do the book with us solo.  This should be worded very delicately so as not to offend either party. . .

The memorandum reflects Mr. Miller's concern (which he testified to extensively during his deposition) that this book be Mr. Wilson's life story and not Eugene Landy's. Miller Dep. 109-110 ("during the entire process of the book, I wanted to be sure that this was accurately Brian's autobiography and no one else's") (Exhibit 5 to my original Affidavit).  See also Miller Dep. 92-96, 133-34 (Exhibit 5 to my original Affidavit).  Mr. Diamond inaccurately concludes, from his excerpted quotation from this document:

"Thus, there is already doubt as to who is really telling the story."  Diamond Rep. 3.

- HC000609 (Matthew Martin's handwritten notes concerning a July 15, 1991 telephone conversation with Todd Gold) reads:

> Per Todd Gold 7/15/91
>
> BW has galleys; has read 130 pp. by now
>
> Todd Gold will meet w him on Wednesday.  Intend to mail back galleys on Thursday.
>
> Gene will feed changes to Todd directly
>
> BW will sign off on his copy of the galleys.

Mr. Diamond, quoting solely the passage, "Gene will feed changes to Todd directly," contorts the document into one assertedly demonstrating that "HarperCollins has effectively been told that Wilson is out of the loop."  Diamond Rep. 5. Plaintiffs neglected to append this document to their papers, so it is attached hereto as Exhibit 3.

- Mr. Diamond characterizes HC00614 (Exhibit 3 to Martin Aff.) (Matthew Martin's detailed memorandum concerning his personal conversations with Brian Wilson, Todd Gold and Don Engel) as bespeaking "concerns over Landy's input and Wilson's serious lack of knowledge about the contents of 'his' own book"  A review of the memorandum reveals exactly the opposite:

15

When I arrived, Todd and Brian had just finished going over the galleys. Todd and Brian explained to me that as Todd was writing the book, he would submit individual chapters to Brian which Brian would review in a cursory manner. Brian also read the completed manuscript but not very thoroughly. With the galleys however, Brian told me that he took much more time and care in his reading. He spent nearly 4 days reviewing the galleys; it was his first thorough and complete reading of the book. He noted certain changes that he wanted made and discussed them with Todd. Earlier Todd had received changes from Gene Landy, which Brian also reviewed with Todd and approved. On the last page of Brian's copy of the galleys, he indicated in writing that the text was "Approved by BW as being an acceptable book for release. Brian Wilson. 7-17-91." (see enclosure).

21. Mr. Diamond's use of the twenty-two remaining documents he cites is similarly misleading. They simply do not, individually or collectively, permit the inferences as to HarperCollins' actions in relation to this publishing project that Mr. Diamond would draw.

*Lisa Drew*

Lisa Drew

Subscribed and sworn to
before me this 16th day of
October, 1995

*Lucy M. Berglund*
Notary Public

LUCY M. BERGLUND
NOTARY PUBLIC, State of New York
No. 41-4622028
Qualified in Nassau County
Commission Expires March 30, 19 *April 30, 1996*

16



277

```
1                  Gavenchak
2        A.    We certainly discussed that.
3  Yes, it is.
4        Q.    As regards to the underlined text
5  "My mother drank," what was the concern you
6  had regarding that text?
7        A.    I testified to that, and I would
8  like to see my transcript.
9             MS. DUMAS:  Off the record.
10            (Discussion off the record.)
11       Q.    Ms. Gavenchak, you have asked to
12  look at your prior deposition testimony before
13  answering.  I direct you to Page 62.
14       A.    Do you have a question?
15       Q.    I think the question pending was:
16  What was the concern you had regarding the
17  underlined phrase, "My mother drank"?
18       A.    Well, I would direct you to Page
19  47, Page 48, Page 49.
20       Q.    You have no further testimony on
21  the subject?
22       A.    Well, I told you what my concern
23  was at numerous points in my previous
24  deposition.  You want me to tell you again?
25       Q.    No, no, I simply, I don't want to
```

CLASSIC REPORTING, INC. (212) 268-2590

278

```
1                  Gavenchak
2  badger you in that way.  We are sort of going
3  through the book and now we are at these
4  statements, and you have directed me to your
5  testimony on that subject and if you don't
6  have anything to add, I will move on to
7  another question.
8        A.    I don't have anything more to
9  add.
10       Q.    Your earlier testimony, you made
11  reference to relying on other passages from
12  the book for which you believed Brian to be a
13  source for which you were able to obtain
14  independent corroboration, and I believe you
15  testified to the effect that those other
16  passages for which you obtained independent
17  corroboration was a factor in your clearing
18  the passages regarding Audree Wilson drinking
19  and being present while abuse occurred.
20            Is my account of your testimony
21  generally correct?  Because I'm going to ask
22  you a follow-up question.
23            MS. DANIELS:  Objection as to
24       form.  Her testimony is what it is, for
25       one.  And I'm not sure it's appropriate
```

CLASSIC REPORTING, INC. (212) 268-2590

279

```
1                  Gavenchak
2  for you to try to summarize it and ask
3  her if it's correct, but Genie, if you
4  understand the question in the summary,
5  you can try to answer.
6        A.    Well, I think I testified that
7  after reading the entire book, I came to the
8  conclusion that the material that appeared
9  with respect to Audree Wilson in the hard
10  cover book was not defamatory.  I also
11  testified that, that there were passages for
12  which I believe Brian Wilson to be the source
13  which there was additional independent
14  corroboration independent of Brian Wilson, and
15  that the fact of those instances where we
16  could corroborate something independent of
17  Brian Wilson gave me a comfort level with
18  respect to those, at least certain of those
19  passages where we couldn't obtained
20  independent corroboration, comfort level that
21  those passages were true.
22       Q.    Those other passages, do you
23  remember what they were?
24       A.    I do not remember all of them.  I
25  did go through the book, and I did prepare a
```

CLASSIC REPORTING, INC. (212) 268-2590

280

```
1                  Gavenchak
2  list -- it's not an exhaustive list -- of
3  instances of those types of passages.
4        Q.    You prepared that list during the
5  prepublication review process or in
6  preparation for the deposition?
7        A.    No, in preparation for this
8  session of the deposition.
9        Q.    Do you have the list with you to
10  refresh your recollection?
11       A.    Yes, I do.
12            MS. DUMAS:  Counsel, what's your
13       position on admission of the list,
14       attaching it as an exhibit?  Do you
15       want a moment to confer on this point?
16            MS. DANIELS:  I don't object to
17       it being attached as an exhibit.
18       However, I want the record to reflect,
19       I want it to be perfectly clear to
20       everyone, that this is a list of
21       examples that Ms. Gavenchak was able to
22       come up with.  I'm going to have her
23       describe what it is and it is in no way
24       meant to be an exhaustive list of the
25       examples that she will describe.
```

CLASSIC REPORTING, INC. (212) 268-2590

281

Gavenchak

1
2      Q.    Let me ask you a question.  Did
3 you submit a declaration on behalf of
4 HarperCollins in support of HarperCollins'
5 motion for summary judgment in the Mike Love
6 defamation action?
7      A.    I don't think so.
8      Q.    Were you deposed in that action?
9      A.    No.
10      Q.    Was your deposition noticed even
11 if it wasn't taken in that action?
12      A.    I think it was, but I don't
13 remember -- I couldn't swear to it.
14          MS. DANIELS:  Off the record.
15          (Discussion off the record.)
16          MS. DUMAS:  I'm going to mark as
17      the next Gavenchak exhibit in order, a
18      copy of the handwritten list that Ms.
19      Gavenchak prepared.
20          (Copy of handwritten list
21          prepared by Eugenie Gavenchak,
22          marked Gavenchak Exhibit 6 for
23          identification, as of this date.)
24          MS. DANIELS:  Before Ms.
25      Gavenchak starts testifying about this,

282

Gavenchak

1
2      I would like her to describe what it
3 is.
4      Q.    What does this list represent?
5      A.    This list represents examples of
6 situations where I believed material had been
7 provided by Brian Wilson to Todd Gold, and we
8 were able to confirm the substance of what was
9 said with some source independent of Brian
10 Wilson.  It's examples, it's not an exhaustive
11 list.
12      Q.    As to each of these examples, did
13 you have a specific recollection of Todd Gold
14 telling you that Brian Wilson was the source
15 for the text in the book?
16          MS. DANIELS:  You are asking her
17      in each and every one of these
18      instances?
19      A.    Of Todd Wilson telling me Brian
20 Wilson was the source?  No, I do not have a
21 recollection in each and every instance.
22      Q.    What's the basis for your belief
23 that these examples here refer to text for
24 which Brian Wilson was a source?
25      A.    At least in some instances Todd

283

Gavenchak

1
2 told me that he was the source.  In other
3 instances, it was the context in which the
4 statements were made.
5      Q.    You mean that the statements were
6 attributed to Brian's -- strike.
7          What do you mean by the context
8 in which the statements were made?
9      A.    That it appears from the book
10 that he is relating an incident to which he
11 was a party or which he observed or an event
12 in his life which he experienced.
13      Q.    How did you remember these
14 examples?  Was there something in the text of
15 the manuscript that identified for you that
16 these were the other passages that were
17 corroborated and therefore gave you some
18 comfort in clearing the passages about Audree
19 Wilson?
20          MS. DANIELS:  I object to form.
21          You can answer, if you can.
22      A.    You're focusing on the passages
23 about Audree Wilson in a way that I don't
24 think is fair to my previous testimony, so I
25 will answer the question this way.  I, in

284

Gavenchak

1
2 response to your request for examples, I went
3 through portions of the manuscript and tried
4 to find pages where either because of the note
5 that I made or because of something that
6 appeared on the page, it refreshed my
7 recollection that here was a passage which we
8 independently corroborated.
9      Q.    What was the notation that
10 informed you that the passage had been
11 independently corroborated?
12          MS. DANIELS:  Object as to form.
13      A.    I can't answer that question with
14 respect to in general.  It's just not
15 answerable that way.
16      Q.    I'm trying to get an
17 understanding whether in comprising this list
18 you just are relying upon the text of the
19 passage itself to trigger a memory or whether
20 there's a systematic notation that you are
21 relying on?
22      A.    Well, it's neither exclusively.
23 I marked the page numbers of the instances
24 with the exception of the last two which I
25 didn't have the page numbers for.  In some

2

CLSG S11

WEEKS.

93

```
 1              Miller
 2  things to authors, co-authors, proprietors,
 3  but you don't have to do what they say.
 4              With approval, you have to do
 5  what they say.
 6       Q.   So Landy was consulted as regards
 7  to the text of the book?
 8       A.   Yes.  As the co-proprietor of the
 9  contract, it was only appropriate,
10  professional for me to do that.
11       Q.   Did he make any changes?
12       MR. RICH:  Beth, at any time?  Is
13       that the question?  Are we jumping from
14       specific chronology to --
15       MS. DUMAS:  Okay.
16       Q.   You sent the line-edit to Mr.
17  Gold, Mr. Wilson and Mr. Landy, to those three
18  people.  Did you get any changes from Mr.
19  Landy back at that point?
20       A.   Gene couldn't write his way out
21  of a paper bag and was almost illiterate, so I
22  made a point of if he had any comments that
23  they be filtered through Todd Gold so they
24  could be translated into English.
25       Q.   You told Landy, "Give your
```

95

```
 1              Miller
 2       You can answer.
 3       A.   I don't know all of the
 4  discussions that Todd had with Gene Landy.
 5  Todd was very forthcoming about things such as
 6  that, about the cocksucker request.  I got the
 7  feeling that, and Todd did tell me this, that
 8  Gene's comments were not very substantial.
 9       Q.   How did you get that
10  understanding?
11       A.   Todd told me.
12       Q.   Mr. Gold told you that?
13       A.   He told me that Gene's comments
14  had mostly to do with the section that
15  described Brian's therapy with Landy which
16  Landy was in a position as the authority to
17  comment on.
18       Q.   You mean the period of time
19  during which, when you say commenting on,
20  changes to that portion of the manuscript, do
21  you mean that portion of the manuscript which
22  deals with the period of time under which
23  Brian Wilson, during the period of time in
24  which Brian Wilson was under Dr. Landy's
25  psychiatric care?
```

94

```
 1              Miller
 2  comments to Gold"?
 3       A.   No, but I told Todd that I wanted
 4  him to be my pointperson during the editing
 5  process.
 6       Q.   So it was your understanding that
 7  Mr. Wilson and Mr. Landy were giving their
 8  changes to Gold?
 9       A.   That was my understanding.
10       Q.   Do you know which changes, if
11  any, were suggested by Mr. Landy to the
12  manuscript draft following, to the line-edited
13  manuscript draft rather -- strike that.
14              Do you know what changes, if any,
15  were suggested by Mr. Landy to the line-edited
16  manuscript?
17       A.   Yes.  As I recall, Gene Landy
18  suggested that Todd Gold refer to Brian's old
19  girlfriend Carolyn as a cocksucker and that
20  was not a change that I approved or accepted
21  for obvious reasons.
22       Q.   Did Todd Gold only talk to you
23  about the more controversial changes that Mr.
24  Landy was suggesting?
25       MR. RICH:  I object to the form.
```

96

```
 1              Miller
 2       A.   I don't know if it was
 3  psychiatric care.  It was therapy.
 4       Q.   So when you say that Landy only
 5  made changes to part of the manuscript, are
 6  you referring to that part of the manuscript
 7  which deals with Brian's life while he was
 8  under Dr. Landy's care?
 9       A.   I am not saying that Landy made
10  changes at all.  I am saying that Landy did
11  give Todd some input about the therapy
12  section.
13       Q.   But when you say therapy section,
14  are you referring to the section of the book
15  which discusses Brian's life during the period
16  that he is having therapy with Landy?
17       A.   Yes.
18       Q.   Going back to this Page 1 of this
19  memo and going back to the "It's all cliches
20  and, I hope, inaccurately remembered
21  melodramatic dialogue."
22              At this point in time, at about
23  this point in time, did you have any concern
24  as to whether Brian Wilson could have the
25  capacity or ability to recollect the events
```

97

```
 1                    Miller
 2  and conversations set forth in the text?
 3       A.    It was a concern I had from the
 4  beginning, as I always do in dealing with any
 5  autobiography, and I was constantly asking
 6  Todd Gold over the months whether he was sure
 7  that this was in substance the truth.  And he
 8  assured me that it was.
 9       Q.    What do you mean when you say in
10  substance the truth?
11       A.    That the substance of the
12  conversation was accurate, that it was
13  accurately conveyed.
14       Q.    Here, again, is this an instance
15  where the author's approval of the book at the
16  end is important to confirm that the substance
17  has not altered the truth of the story?
18            MR. RICH:  I don't understand
19       that question.  If you do, you can
20       answer.
21       A.    I consult with the authors along
22  the way during the editing process and ask
23  repeatedly, "Is this in fact the substance of
24  the conversation that took place?"
25            And I was told yes.
```

CLASSIC REPORTING, INC. (212) 268-2590

98

```
 1                    Miller
 2       Q.    What do you mean by the substance
 3  then?  I don't understand that.  How are you
 4  using that word, the "substance"?
 5       A.    Well, I will simplify it.  If
 6  Brian asked his father something and his
 7  father said yes, that would be the substance
 8  of that conversation.  If it were inaccurately
 9  conveyed, his father might have said no, but
10  Brian -- do you understand what I'm saying?
11       Q.    Give me an example if the
12  conveyance is -- what about more complex
13  dialogue that goes beyond a yes or a no
14  answer?
15            MR. RICH:  What about it?
16       Q.    What does the substance of more
17  complex dialogue mean?  How is that word used
18  with reference to more complex dialogue?
19            MR. RICH:  I object to the form.
20            You can answer.
21       Q.    Really the question is when you
22  use the word the substance of the
23  conversation, what meaning did that word have
24  with reference to more complex dialogue,
25  dialogue that goes beyond yes or no but
```

CLASSIC REPORTING, INC. (212) 268-2590

99

```
 1                    Miller
 2  recounts a more complicated conversation?
 3       A.    It simply reflects the increasing
 4  complexity of increasingly complex
 5  conversations, and if the gist of the
 6  conversation is accurate, that's what I was
 7  working over the months to make sure was the
 8  case.
 9       Q.    How were you working to make sure
10  that the gist of the conversations was
11  accurate?
12       A.    By having constant conversations
13  with Todd Gold, competent and reputed
14  journalist, was deputy bureau chief for People
15  magazine.
16       Q.    Did you ever have any
17  conversations with Brian Wilson on that
18  subject?
19       A.    No, I didn't.
20       Q.    Did you ever have any
21  conversations with Eugene Landy on that
22  subject?
23       A.    No, I didn't.
24       Q.    Did you ever have any
25  conversations with Martin Miller on that
```

CLASSIC REPORTING, INC. (212) 268-2590

100

```
 1                    Miller
 2  subject?
 3            MR. RICH:  Who?
 4       Q.    Matthew Martin on that subject --
 5  strike that.
 6            Did you ever have any
 7  conversations with Matthew Martin on that
 8  subject?
 9       A.    I don't recall.
10       Q.    Did you ever have any
11  conversations with Genie Gavenchak on that
12  subject?
13       A.    I had very few direct
14  conversations with Genie Gavenchak.  Genie was
15  outside counsel, and I dealt mostly with
16  Matthew, which was appropriate.
17       Q.    Did you ever have any
18  conversations with Mr. Fox on that subject?
19       A.    I don't recall.
20       Q.    Did you ever have any
21  conversations with Bill Shinker on that
22  subject?
23       A.    No.
24       Q.    Did you ever have any
25  conversations with Gladys Carr on that
```

CLASSIC REPORTING, INC. (212) 268-2590

Miller

1    subject?
2
3    A.    No.
4    Q.    Did you ever have any
5    conversations with Jim Hornfischer on that
6    subject?
7    A.    Yes.
8    Q.    What do you remember of your
9    conversations with Mr. Hornfischer on that
10   subject?
11   A.    Jim's memos reflected, actually
12   points that I had raised myself.  I do care
13   about publishing the truth.  It's important
14   for me to do that, and I expressed my concern
15   to Jim and to Todd whether or not various
16   scenes and conversations were accurate in
17   truth and substance, and I raised the point
18   repeatedly, and I was satisfied by the
19   answers.
20   Q.    What answers were they that
21   satisfied you?
22   MR. RICH:  I think it's asked and
23   answered.
24         You can testify again.
25   A.    The answer is that the

---

Miller

1    always has to approve the final version of the
2    manuscript that goes to press.  That's the
3    standard procedure in publishing.
4    Q.    My question to you is, is the --
5    in this case, the subject of the
6    autobiography, is the author -- was Brian
7    Wilson's approval needed in order to ensure
8    that the account of dialogue and events --
9    strike that.
10        MS. DUMAS:  You know, what was my
11        original question, because I don't want
12        to get a long complicated question.
13        Let me try to simplify it.  It's hard
14        to kind of think on the spot.
15        What was my question?
16        (The record was read back as
17        follows:
18        Q.    At some point in time, the
19        need for Brian Wilson to approve or
20        sign off on the manuscript, sign off on
21        the book, became an issue; is that
22        correct?")
23   Q.    I want to see if I can give you a
24   question that's not so complicated.

---

102

Miller

1    conversations were substantially accurate as
2    conveyed.
3    Q.    That's what Todd Gold told you?
4    A.    Yes.
5    Q.    Is the need to ensure that the
6    dialogue and accounting of events are
7    substantially accurate a reason why it was, it
8    became an issue to have Brian Wilson approve
9    the final galleys?
10        MR. RICH:  May I hear that
11        question, please?
12        (The record was read.)
13        MR. RICH:  I object to the form.
14        You can answer, if you are able.
15   A.    It is a difficult question to
16   answer.  I don't quite understand the
17   question.
18        MR. RICH:  Maybe rephrase.
19        MS. DUMAS:  Sure.
20   Q.    At some point in time, the need
21   for Brian Wilson to approve or sign off on the
22   manuscript, sign off on the book, became an
23   issue; is that correct?
24   A.    It always is.  I mean an author

---

104

Miller

1    A.    Something that I can answer.
2    Q.    Exactly.  To put it simply, is
3    the author's approval of the galleys needed to
4    ensure that the dialogue and events set forth
5    in the text are accurate?
6        MR. RICH:  This is a general
7        question?
8        MS. DUMAS:  No.
9        MR. RICH:  This is in the context
10        of this book?
11        MS. DUMAS:  Generally.
12        MR. RICH:  You can answer.
13   A.    Generally the author needs to
14   sign off on galleys and accuracy of dialogue
15   is only one of the considerations.
16   Q.    But is the author signing off one
17   way in which -- in other words, is that how
18   the dialogue gets approved, when the author
19   receives the galleys?
20        MR. RICH:  I object to the form.
21        You can answer.
22   Q.    Is that how the author approves
23   that the dialogue and text are accurate?
24   A.    No.  The author, first of all,

3

PER TODD GOLD  7/15/91

BW has galleys; has read 130 pp. by now.

Todd Gold will meet ū him on Wednesday.
Intend to mail back galleys on Thursday.

Gene will feed changes ~~from~~ to Todd directly.

BW will sign off on his copy of galleys.

HC 00609