UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
-----------------------------------------x
CARL WILSON, an individual, and          )
AUDREE WILSON, an individual,            )
                                         )
            Plaintiffs,                  )
                                         )
            v.                           )    94 Civ. 892(JC)
                                         )
HARPERCOLLINS PUBLISHERS INC.,           )    AFFIDAVIT OF
a Delaware corporation,                  )    THOMAS W. MILLER
                                         )
            Defendant.                   )
-----------------------------------------x

STATE OF NEW YORK    )
                     ) ss.
COUNTY OF NEW YORK   )


        THOMAS W. MILLER, being duly sworn, deposes and
says:

        1.  I submit this affidavit in support of
defendant HarperCollins Publishers Inc.'s ("HarperCollins'")
motion for summary judgment in the above-captioned case.  I
have read and am familiar with the allegations set forth in
the First Amended Complaint, and I have personal knowledge
of the facts set forth herein.

        2.  I am currently Senior Editor at Simon &
Schuster, located in New York City.  Prior to joining Simon
& Schuster, I worked for the Walt Disney Corporation and
before that for HarperCollins (and its predecessor, Harper &
Row).  While at HarperCollins, I was the Senior Editor

94

responsible for Brian Wilson's autobiography, WOULDN'T IT BE NICE:  MY OWN STORY, which was published in October, 1991.

3.  On February 2, 1990, Robert Gottlieb, a senior executive, and Dan Strone, a senior agent, of the William Morris Agency, a leading literary and talent agency, submitted to Eddie Bell, Publisher of HarperPaperbacks at HarperCollins, and to me, a proposal for the long-awaited autobiography of Brian Wilson, the creative force behind the Beach Boys, the legendary rock-and-roll group.  The proposed book was tentatively titled BRIAN WILSON: LOVE AND MERCY. According to the proposal, the book was to be written by Mr. Wilson in collaboration with Todd Gold, a professional writer experienced in the co-authorship of celebrity autobiographies.

4.  The proposed collaborative writing format was not unusual.  Few celebrities have the time or talent to write their memoirs.  Key to publishing a successful celebrity autobiography is an accomplished professional writer capable of drawing out the story from the celebrity, seeing that it is accurately told, performing supplemental research, and capturing the "voice" of the celebrity.

5.  At the time in question, I had a long professional relationship with the William Morris Agency in

general, and with Messrs. Gottlieb and Strone in particular. My experience was (and to this day remains) that William Morris agents generally bring publishing projects of quality to book publishers, and present proposals such as Mr. Wilson's autobiography only after satisfying themselves that the author has a thoughtful, accurate, and meaningful story to tell.

6.   Although I had never personally worked with Todd Gold prior to the Wilson autobiography, I knew of his solid reputation, based both on his writing for <u>People</u> magazine and on his bestselling autobiography of actress Drew Barrymore.  It was my understanding that, like Brian Wilson, Ms. Barrymore recovered from drug problems and subsequently wrote about those experiences in her autobiography.

7.   Although it had been widely reported that Mr. Wilson experienced an emotional breakdown in the late 1960s followed by twenty years of drug abuse and alcoholism, the book proposal submitted by the William Morris Agency was convincing in its portrayal of Mr. Wilson as having recovered from those problems.  The book proposal also mentioned that Mr. Wilson had recently released a successful solo album, which received critical acclaim, was coming out

3

with a new album, and was about to begin a nationwide tour to promote his music.

8. I had a number of conversations with Mr. Strone in which I asked him point-blank: "Is Brian in good shape?" "Is Brian going to be able to cooperate with this book and with Todd Gold in writing this book?"  "Is Brian going to be able to promote the book?"  Mr. Strone answered all of these questions strongly in the affirmative and I found his answers convincing.

9. I and others at HarperCollins were also aware of Mr. Wilson's controversial relationship with psychotherapist Eugene Landy, including rumors that Dr. Landy had, for a period of time, exerted undue control over Mr. Wilson.  I sought and received assurances from Mr. Strone that the book would be Brian Wilson's autobiography and not a collaborative story of Messrs. Wilson and Landy.

10. Impressed by the book proposal, I presented it to HarperCollins' editorial board on February 13, 1990 and recommended that it be accepted for publication.  Later that month, HarperCollins made an offer for the book. During the remainder of the month of March, 1990, I negotiated the key business terms of the publishing contract with William Morris' Mr. Gottlieb.

NYFS08...:\60\51660\0063\2536\AFF7275W.280

11.   On May 18, 1990, a contract was entered into between HarperCollins and Brains and Genius, a business partnership of Mr. Wilson and Dr. Landy, to publish the book.   To assure Mr. Wilson's personal involvement and commitment to the project, HarperCollins required that Mr. Wilson sign the contract for the business partnership, as well as provide a side letter by which he would agree to be personally bound by the obligations incurred by the partnership under the agreement.   The contract and personal guarantee are annexed hereto as Exhibit 1.

12.   The contract called for an advance (against the royalties earned from sales of the book) of $250,000, payable as follows:   $100,000 upon signing; $75,000 upon the publisher's acceptance of half of the manuscript; $50,000 upon the publisher's acceptance of the complete manuscript; and $25,000 upon Brian Wilson's successful completion of a promotional tour for the book.   In my considerable experience with celebrity books of this general nature, the advance was low to average.

13.   From the beginning, it was my understanding that Todd Gold and Mr. Wilson would be working together preparing the manuscript and that the working interface and dialogue between HarperCollins and the co-authors would be

between Mr. Gold and myself.  This working arrangement was (and is) standard practice for celebrity autobiographies co-authored by a professional writer.  The logical contact person for a book editor (acting on behalf of the publishing house) is the professional writer, since he or she typically is in charge of gathering, organizing, presenting and writing the information to be conveyed in the manuscript.

14.  On September 25, 1990 Dan Strone delivered to me a 260-page partial manuscript of the book.  My assistant, James Hornfischer, read the partial manuscript and prepared a report for me dated October 9, 1990.  Mr. Hornfischer's report was critical of the manuscript from a stylistic point of view, but concluded that it was on track and publishable with some editing.  Mr. Hornfischer also recommended paying the advance installment due upon acceptance of half the manuscript.  I found Mr. Hornfischer's comments helpful, although I did not agree with many of them.

15.  It was important to me and to HarperCollins early on in the manuscript development process that I have the opportunity to meet with Mr. Wilson face-to-face.  This was, after all, to be Mr. Wilson's own story, albeit told through the talents of a professional writer.  I wanted to be comfortable that the work in progress would accurately

6

reflect Mr. Wilson's thoughts, feelings, emotions, and recollections, and that Mr. Wilson was in fact capable of recording his life story.  To satisfy these concerns, in late summer, 1991, I flew to Los Angeles to meet with Mr. Wilson.  We had dinner together at Michael's Restaurant in Santa Monica in the company of Todd Gold, Daniel Strone, Eugene Landy and Dr. Landy's friend, Alexandra Morgan.  I spent approximately four hours with Mr. Wilson.  I found him charming, engaging and able to converse on a number of topics.  I left convinced that he was competent to participate in the writing of an honest and important autobiography.

16.  On February 15, 1991, I received the first full draft of the manuscript from Mr. Gold, which was superseded by another full draft I received from Mr. Gold on March 13, 1991.  I asked Mr. Gold if Mr. Wilson had read the manuscript.  Mr. Gold said that Mr. Wilson had read it and that he had approved it for submission to me.

17.  Continually over the course of the many months that I worked on the book, I sought reassurance from Mr. Gold about Mr. Wilson's involvement in the preparation of the manuscript.  Mr. Gold repeatedly responded that Mr. Wilson was being forthcoming with stories, anecdotes and

NYFS08...:\60\51660\0063\2536\AFF7275W.280

dialogue, and that Mr. Wilson remembered a great deal about his past.  Mr. Gold also assured me that Mr. Wilson's stories, anecdotes and dialogue were accurate in light of the other interviews he had conducted with individuals who had been involved with Mr. Wilson throughout his life, including friends, business associates and acquaintances. Mr. Gold also told me that he had consulted a variety of published sources concerning Mr. Wilson, his family and the Beach Boys and that these published sources supported Mr. Wilson's accounts.

18.  On March 18, 1991, Mr. Hornfischer prepared a second report for me with his comments on the full draft of the manuscript.  Mr. Hornfischer was generally enthusiastic about the book, but provided some specific editorial criticisms.  Again, I did not agree with all of his comments, but I found the report helpful.

19.  By March 25, 1991 I had completed my initial review of the full manuscript.  I wrote to Messrs. Wilson and Gold praising them for the good work.  I told them that it was one of the most candid and compelling books I had ever worked on.  My memorandum, which consisted of eleven pages, contained detailed comments and suggestions as to how the manuscript might be improved.  My goal, as in editing

8

any manuscript, was to work with the authors (here, Brian Wilson and Todd Gold) to make the book as accurate and compelling as possible.

20.   I also addressed my memorandum to Eugene Landy as a courtesy, given his role as Mr. Wilson's business partner.  In no sense did I regard Dr. Landy as a co-author and, in fact, during the entire writing and editing process, I regularly inquired of Mr. Gold as to the extent of Dr. Landy's involvement in the manuscript development process and personally made it a point that he was not controlling it.  Mr. Gold did inform me that Dr. Landy had provided input with respect to the description of his therapy work with Mr. Wilson and their business relationship.  Dr. Landy was also involved in compiling the acknowledgments and photo sections.  I never got the impression that Dr. Landy was involved in the writing of the manuscript.

21.   By May 15, 1991, I had completed my line edit of the finished manuscript and sent photocopies of it to Todd Gold, Dan Strone, Brian Wilson and Eugene Landy (the latter as a courtesy).  I asked Mr. Gold to contact me concerning my comments, as he was the person primarily responsible for researching, writing and implementing editorial changes to the book.

9

22.  On May 29th, I sent copies of the copyedited manuscript (copyediting is very detailed editing by an experienced freelance editor for consistency in spelling, grammar, usage, etc. and is always the publisher's next step after the editor's own line editing) to the authors for their review and so that they could respond to the copyeditor's queries.  In my cover letter, I advised them that an attorney would be contacting them regarding the legal review process.

23.  During the latter half of May, the HarperCollins legal department submitted the manuscript to outside counsel for review for possible libel, privacy, and related legal concerns.  That review process was supervised by the legal department, although I regularly was kept apprised of its progress.  By late June, it was apparent that the prepublication legal review would necessitate moving the publication date of the book back some six weeks from September 11th to October 23, 1991.

24.  During June, July and the beginning of August, 1991 (while the legal review was pending), I completed my editorial work on the book jacket flap copy, the acknowledgments and the photo selection and captions.

10

As I completed my work on these items, they were forwarded to the legal department for approval.

25.  Once the legal review was complete, I reviewed the changes the lawyers had made to the book and promptly submitted them to our Managing Editor's office, who supervises the copyediting process.

26.  On August 8, 1991, I received a faxed letter from an attorney named Barry Langberg, writing on behalf of Carl Wilson, Audree Wilson, Carnie Wilson and Wendy Wilson. Mr. Langberg's letter expressed general concerns about the veracity of the book even though Mr. Langberg acknowledged that neither he nor his clients had seen the manuscript.  A copy of Mr. Langberg's letter is attached as Exhibit 4 to Matthew Martin's Affidavit.  In accordance with standard practice, I forwarded Mr. Langberg's letter to Mr. Martin in our legal department for response.

27.  On October 18, 1991, a publication party was held at the Pierre Hotel in New York to honor Mr. Wilson and to celebrate the publication of his book.  Mr. Wilson performed at the party and seemed to be happy, articulate and in very good shape.  The following Monday, Mr. Wilson kicked off his author promotion tour with an appearance on NBC's "Today" show where he was interviewed by Katie Couric.

11

28.  The book's official publication date was October 23, 1991.

_____
Thomas W. Miller

Subscribed and sworn to
before me this __ day of
August, 1995.

_____
Notary Public

12

28.  The book's official publication date was
October 23, 1991.

_Thomas Miller_

Thomas Miller

Subscribed and sworn to
before me this 14ᵗʰ day of
August, 1995.

_Lucy M. Berglund_
Notary Public

LUCY M. BERGLUND
NOTARY PUBLIC, State of New York
No. 41-4622028
Qualified in Nassau County
Commission Expires March 30, 19 _April 30, 1996_

12

AGREEMENT made this 18th day of May, 1990, between

        BRAINS & GENIUS
        c/o William Morris Agency
        1350 Avenue of the Americas
        New York, N.Y. 10019

("the Proprietor") and HARPER & ROW, PUBLISHERS, INC., of 10 East 53rd Street, New York, New York 10022 ("the Publisher") with reference to the work tentatively titled

        LOVE AND MERCY
        By Brian Wilson with Todd Gold

("the Work").

WHEREBY, in consideration of the promises set forth in this Agreement, the Proprietor and the Publisher agree that:

### 1. GRANT

The Author grants to the Publisher the exclusive right to print, publish and sell the Work in book form in the English language and to exercise and grant to third parties the rights to the Work described in Paragraph 6 throughout the United States, its territories, dependencies and possessions, Canada, the Philippine Islands and the non-exclusive right to do so throughout the rest of the world with the exception of the countries listed on Schedule A to this Agreement (the "Territory") for the full term of copyright available to the Work in the Territory.

### 2. MANUSCRIPT DELIVERY

(a) The Proprietor shall deliver to the Publisher by January 15, 1991 one copy of the complete manuscript for the Work approximately 100,000 - 125,000 words in length and acceptable to the Publisher in content and form. If the complete manuscript delivered by the Proprietor is not acceptable to the Publisher, the Publisher shall give the Proprietor a request for changes and revisions. The Proprietor shall have 90 days from the Proprietor's receipt of such a request to deliver to the Publisher a revised manuscript for the Work that is acceptable to the Publisher.

(b) The Proprietor shall at the Proprietor's expense obtain and deliver to the Publisher with the complete manuscript written permissions deemed necessary by the Publisher for any quotations from other sources included in the Work by the Proprietor and 40-50 black and white mutually agreed upon photographs and written permission for their use as part of the Work. If the Proprietor fails to obtain such items, the Publisher may obtain them and charge the costs incurred to the Proprietor's royalty account.

(c) The Proprietor and the Publisher shall mutally agree on whether an index is required for the Work. If they agree an index is required, the Proprietor shall have the first opportunity to prepare one. If the Proprietor does not want to do so, or if the Proprietor elects to do so but does not prepare an index in a timely manner, the Publisher

HC 00031

may have an index prepared and charge the costs incurred, but not to exceed $1,000.00, to the Proprietor's royalty account.

(d)  The Proprietor will not agree to deliver a manuscript for another book by Brian Wilson to another publisher if the delivery of such manuscript would jeopardize the Proprietor's obligation to meet the delivery date in Paragraph 2.(a).  The Proprietor agrees to notify the Publisher before doing so if the Proprietor plans to enter an agreement with another publisher for a work by Brian Wilson prior to the delivery of a complete manuscript for the Work under the terms of this Agreement.

3.  EDITING AND PROOFS

(a) After the Work has been accepted by the Publisher, no material change may be made without the Proprietor's approval.  However, the Publisher may copyedit the Work in accordance with its standards of punctuation, spelling, capitalization and usage.  The Publisher shall send the copyedited manuscript to the Proprietor, who shall make any revisions and corrections and return it within two weeks of receipt.

(b) The Proprietor shall review and return within two weeks of receipt proofs or other production materials submitted by the Publisher.  The Proprietor shall pay all charges in excess of 10% of the cost of composition for changes (other than corrections of printer's errors or changes made at the Publisher's request) that the Proprietor makes in the Work after type has been set in conformity with the copyedited manuscript and all charges for changes requested by the Proprietor in second or subsequent printings.  These costs shall be charged to the Proprietor's royalty account, except the Proprietor shall upon request pay directly such charges that are in excess of 15% of the original cost of composition.  The Publisher shall show the Proprietor the design of the book pages prior to publication of the Work.

4.  PUBLICATION

(a) The Publisher shall publish a hardcover edition of the Work (which shall be the initial edition) in such style and manner as the Publisher deems appropriate within 12 months from the date of the Publisher's acceptance of the Work, provided the Proprietor has complied with Paragraphs 2.(b) and 3 and has responded in a satisfactory way to any requests made under Paragraph 9.(d).  Except as provided in Paragraph 4.(d), all details of publication, including manufacture, format and design, distribution, pricing, advertising and promotion and distribution of free copies, shall be determined by the Publisher.

(b) The Publisher shall give the Proprietor 25 copies of each of the Publisher's editions of the Work on publication of each.  The Proprietor may purchase additional copies at a discount of 50% for personal use, but not for resale.  The Publisher shall use its best efforts to obtain for the Proprietor 25 copies of any rack-size paperback edition of the Work licensed for publication by the Publisher.

(c) The title of the Work shall be LOVE AND MERCY unless the Publisher and the Proprietor mutually agree otherwise.

- 2 -

HC 00032

(d) The Proprietor shall approve the jacket design and jacket copy of the Work, publicity press kits and promotional material for the Work.

(e) The Proprietor represents that Brian Wilson shall initially participate in a four-week author promotion tour covering a minimum of twelve cities during the one month period immediately following the Publisher's first publication of the hardcover edition of the Work.  If Brian Wilson is not available to participate in such a promotional tour at the time the Publisher desires to publish the Work, the Publisher may postpone publication until such time as Brian Wilson is available.  At the Publisher's request, Brian Wilson shall also participate in a satellite tour (e.g. Brian Wilson sitting in a studio responding to questions being asked from interviewers in different cities throughout the United States and Canada), appearances on major network TV shows and at the American Booksellers Association convention.  Brian Wilson shall also participate in a three-week author promotion tour during the one month following the Publisher's first publication of the rack-size paperback edition of the Work. Schedules for all such promotion tours shall take into acount Brian Wilson's professional commitments.  All first class expenses incurred by Brian Wilson in connection with such promotional tours, including two hotel suites, two first-class airplane tickets and one limousine in tour cities shall be paid for by the Publisher.  The Publisher shall also pay for one coach airplane ticket in connection with said tours.  The Publisher shall consult with Brian Wilson regarding choice of, radio and TV shows, and press interviews.  If the Publisher publishes a trade paperback edition of the Work, Brian Wilson shall participate in an author promotion tour during the one month following the Publisher's first publication of such trade paperback edition according to a schedule to be mutually agreed upon. Brian Wilson will be consulted prior to the selection of hotels and ground transportation to be provided during the tour, and the Publisher shall give due consideration to his requests.  However, the Publisher shall make all final decisions regarding such hotels and transportation.  It is acknowledged that the Proprietor's promise to have Brian Wilson personally perform the foregoing promotional and publicity activities has been a material inducement to the Publisher to enter into this Agreement and constitutes an essential part of the consideration provided to the Publisher hereunder.

The above tour shall be coordinated with Rogers and Cowan and the Proprietor shall pay all costs for the participation of Rogers and Cowan in connection with such tour.

5. ROYALTIES

(a) The Publisher shall pay to the Proprietor royalties on sales, less returns, of copies of the Publisher's editions of the Work as follows:

(1) on all hardcover copies sold through ordinary channels of trade in the United States (except as otherwise provided below), 15% of the suggested customer's price.

(2) on all hardcover copies sold in the United States at discounts higher than the Publisher's announced

- 3 -

HC 00033

discounts for wholesale and retail accounts in the booktrade and (i) on a non-returnable basis; or (ii) as special sales, as premiums, to catalog accounts, to book fairs or outside the ordinary channels of the book trade, 10% of the amounts received by the Publisher;

(3) on all hardcover copies sold outside the United States or for export to Canada or to other countries throughout the territory, 10% of the amounts received by the Publisher;

(4) on all trade size paperback copies sold through ordinary channels of trade in the United States (except as otherwise provided below) the following percentages of the suggested customer's price;

(A) 1 to 50,000 copies: 7½%
(B) in excess of 50,000 copies: 10%

(5) on all trade-size paperback copies sold in the United States at discounts higher than the Publisher's announced discounts for wholesale and retail accounts in the book trade and (i) on a non-returnable basis; or (ii) as special sales, as premiums, to catalog accounts, to book fairs or outside of the ordinary channels of the book trade, 7½% of the amounts received by the Publisher;

(6) on all trade-size paperback copies sold outside the United States or for export to Canada or to other countries throughout the Territory, 7½% of the amounts received by the Publisher;

(7) on all rack size paperback copies sold through ordinary channels of trade in the United States (except as otherwise provided below) the following percentages of the suggested customer's price;

(A) 1 to 150,000: 10%
(B) in excess of 150,000:  12½%

(8) on all rack-size paperback copies sold in the United States at discounts higher than the Publisher's announced discounts for wholesale and retail accounts in the book trade and (i) on a non-returnable basis; or (ii) as special sales, as premiums, to catalog accounts, to book fairs or outside of the ordinary channels of the book trade, 10% of the amounts received by the Publisher;

(9) on all rack-size paperback copies sold outside the United States or for export to Canada or to other countries throughout the Territory, 10% of the amounts received by the Publisher;

(10)  on all copies of the Publisher's editions of the Work sold directly by the Publisher to consumers in response to mail order or other direct-response solicitations sponsored by the Publisher, 5% of the price paid by the consumer, exclusive of shipping and handling charges;

(11) on all copies sold as remainders at more than the cost of manufacture, 10% of the amounts received by the Publisher; (The Publisher shall use its best efforts to give the Proprietor notice of the Publisher's intention to remainder copies of the Work and give the Proprietor a reasonable opportunity to purchase copies at the best

HC 00034

remainder price; however, the Publisher's failure to do so shall not be considered a breach of this Agreement nor give the Proprietor any claim for damages.)

(12) on copies given to or sold to the Proprietor, given away to promote sales or to charitable institutions, sold at or below the cost of manufacture or damaged or destroyed, no royalties shall be paid.

(13) For purposes of the foregoing provisions, "suggested customer's price" shall mean the price printed on copies of the work printed by the Publisher.

(b) Only copies sold under 5.(a)(4) shall be counted in determining the royalty escalations described in 5(a)(4).

(c) As an advance against all royalties and all proceeds from the disposition of subsidiary rights due the Proprietor under this Agreement, the Publisher shall pay to the Proprietor the sum of $250,000.00 payable:

(1)  $100,000.00     upon execution of this Agreement;

(2)  $75,000.00      upon Publisher's acceptance of one-half of the manuscript for the Work;

(3)  $50,000.00      upon the Publisher's acceptance for publication of the complete and final manuscript for the Work; and

(4)  $25,000.00      upon completion of the promotion tour for the hardcover edition of the Work by Brian Wilson pursuant to Paragraph 4.(e).

6. SUBSIDIARY RIGHTS

(a) The subsidiary rights to the Work granted to the Publisher, and the allocation of proceeds received by the Publisher from the grants of such rights to third parties, are:

|  |  | Proprietor's Percentage | Publisher's Percentage |
|---|---|---|---|
| (1) | periodical or newspaper publication prior to book publication; | 90 | 10 |
| (2) | periodical or newspaper publication following book publication, including syndication rights; | 50 | 50 |
| (3) | permissions, including publication of portions of the Work in anthologies; | 50 | 50 |
| (4) | condensations and abridgements; | 50 | 50 |
| (5) | book club publication; | 50 | 50 |

HC 00035

(6)  publication of editions for
     premium or special use or for
     direct sale to consumers;              50              50

(7)  paperback reprint editions;            50              50
     subject to the Proprietor's
     approval;

(8)  hardcover reprint editions;            50              50

(9)  subject to the Proprietor's
     sole prior approval, which
     approval may be withheld in
     the Proprietor's discretion,
     the right to record and transmit
     the verbatim text of the Work or
     parts of the Work by any means,
     electronic or otherwise, the
     result of which serving as a
     substitute for sales of the Work
     in book form; (In no event
     will the foregoing grant of
     rights be interpreted as a grant
     to the Publisher of audio
     recording rights, nor will these
     reproductions be on compact disc
     or contain music).                     50              50

(10) Braille, large-type and other
     editions for the handicapped
     (the Publisher may grant such
     rights to recognized non-profit
     organizations for the handi-
     capped without charge and with-
     out payment to the Proprietor);        50              50

     (b) If the Publisher itself desires to exercise any
of the rights described above (as opposed to licensing
such rights to third parties), other than those rights for
which royalty rates are already provided in Paragraph 5
hereof, the Publisher shall obtain the Proprietor's
approval of the exercise of any such right by the
Publisher and the royalties payable to the Proprietor on
such exercise shall be mutually agreed upon.  In the event
that the Publisher and Proprietor cannot agree on such
royalty, the Publisher may not exercise such rights.


     7. ACCOUNTING

     (a) Following first publication of the Work by the
Publisher, an accounting of all of the Proprietor's
earnings under the terms of this Agreement, accompanied by
payment of amounts due on such accounting, shall be
rendered no later than April 1 and October 1 of each year
for the periods ending the preceding December 31, and June
30, respectively.

     (b) The Publisher may retain a reasonable reserve
against returns on any accounting statement, provided the
amount of the reserve held is clearly indicated and
provided the subsequent statement clearly indicates how
such reserve has been applied.  Any reserve held shall be
related to sales and returns of the Work during the
accounting period for which the reserve is held and the
Publisher's reasonable expectation of sales and returns at

HC 00036

the time the accounting statement for such period is prepared.  On request, the Publisher shall provide a written explanation of any reserve.

(c) If the Proprietor receives an overpayment of royalties because of copies reported sold but subsequently returned, the Publisher may deduct the amount of the overpayment from further sums due the Proprietor under this Agreement.  If any such overpayment is not recouped in two accounting periods, the Proprietor, upon request, shall pay the Publisher the unrecouped portion of the overpayment.

(d) Any sums owed by the Proprietor to the Publisher under Paragraph 7.(c) or 14.(a) may be deducted from any amounts due the Proprietor by the Publisher under any other agreement between them.

(e) The Publisher shall upon request pay to the Proprietor the Proprietor's share of subsidiary rights payments received by the Publisher pursuant to Paragraph 6 within 30 days of the Proprietor's request for such payment provided the following conditions are met:

(1) advances and other valid charges pursuant to Paragraphs 2.(b), 2.(c), 3.(b), 7.(c) and charges for copies of book puchases to the Proprietor's account permitted by the terms of this Agreement have been recouped by the Publisher from all earnings, including the Proprietor's share of subsidiary rights payments, credited to the Proprietor's account hereunder; and

(2) the Proprietor's share of a payment as to which a request is made is $5,000.00 or more.


8. RIGHT TO AUDIT

(a) Upon written request from the Proprietor, the Publisher shall provide the following information: the number of copies of each edition of the Work printed by the Publisher; the date of each printing; the cumulative number of copies sold, returned, distributed free of charge, remaindered, destroyed or lost; copies of any licenses made by the Publisher; and any other information the Proprietor may reasonably request on the basis that it is required in order to ascertain the accuracy of accountings rendered.  The Publisher shall use its best efforts to obtain the number of copies of the Work printed pursuant to any subsidiary rights licenses that it may enter into.

(b) The Proprietor may upon written notice examine the Publisher's records relating to the Work during normal business hours under such conditions as the Publisher may reasonably prescribe.  If an error is discovered as a result of any such examination, the party in whose favor the error was made shall promptly pay the other the amount of the error.  Any such examination shall be at the Proprietor's expense unless errors of accounting in the Publisher's favor amounting to 5% or more of the total sum paid to the Proprietor under this Agreement are found, in which event the Publisher shall contribute to the cost of the examination up to the amount of the error determined as a result of the examination.

HC 00037

9. <u>WARRANTIES</u>

(a) The Proprietor warrants to the Publisher that:

(1) the Proprietor is the sole proprietor of the Work and sole owner of the rights granted in this Agreement, has a valid and existing agreement with Brian Wilson and Todd Gold to write the Work, has not assigned, pledged or otherwise encumbered them and has the right to enter this Agreement;

(2) the Work is an original work, has never before been published in whole or in part in any form in the Territory, is not in the public domain in any country in the Territory and does not infringe any copyright or any other proprietary or personal right; and

(3) the Work contains no material that is libelous, in violation of any right of privacy or publicity, or harmful so as to subject the Publisher to liability to any third party or otherwise contrary to law.

<u>INDEMNITIES</u>

(b) The Proprietor shall indemnify the Publisher from any loss, damage, expense (including attorneys' fees), recovery or judgment arising from any breach or alleged breach of any of the Proprietor's warranties, subject to the limitations stated below.

(1) Each party shall promptly inform the other of any claim made against either which, if sustained, would constitute a breach of any warranty made by the Proprietor to the Publisher in this Agreement.  The Publisher shall defend any such claim made against the Publisher with counsel of the Publisher's selection.  The Publisher shall consult with the Proprietor regarding the selection of such counsel.  The Proprietor shall fully cooperate with the Publisher in such defense and may join in such defense with counsel of the Proprietor's selection at the Proprietor's expense.

(2) After consultation with the Proprietor and serious consideration of any objections the Proprietor may have, the Publisher may settle any such claim made against the Publisher.  The Proprietor and the Publisher shall attempt to agree in writing on the percentage of settlement costs which each shall bear.  Failing such agreement, the Publisher shall retain any remedies available to it based on the Proprietor's breach of any warranty made by the Proprietor in this Agreement but can only recover from the Proprietor amounts paid in settlement by the Publisher if the Publisher can establish that such settlement costs were paid because of a breach of warranty made by the Proprietor in this Agreement. Alternatively, the Proprietor may, at the Proprietor's discretion, provide security reasonably acceptable to the Publisher for the further costs of defending the claim, in which event the Publisher shall not settle without the Proprietor's written consent.

(3) If any such claim is successfully defended, the Proprietor's indemnity shall be limited to 50% of the costs (including attorneys' fees) incurred by the Publisher in the defense of the claim.

HC 00038

(4) If any such claim is made, the Publisher may withhold a portion of payments due the Proprietor under this Agreement to cover the Proprietor's obligations stated above.  (Amounts withheld shall be reasonably related to the Publisher's reasonable assessment of the damages claimed and of the anticipated defense costs.) The Publisher shall deposit monies so withheld in an interest-bearing account pending disposition of the claim; monies withheld and the interest thereon will be first applied to satisfy the Proprietor's obligation to indemnify the Publisher, and the balance remaining shall be promptly remitted to the Proprietor after the disposition of the claim or after the claim has in the Publisher's good faith opinion been abandoned.  If amounts are withheld under this provision on account of a claim, but a litigation based on the claim is not commenced within one year of the date of receipt of such claim, withheld amounts shall be released unless at the end of such year settlement discussions are being actively conducted or the claim is being actively defended by correspondence, in which event amounts may continue to be withheld, but for no more than an additional six months.

(c) The Proprietor shall be responsible for any claims made against any third party to which the Publisher grants subsidiary rights to the Work to the same extent as the Proprietor is responsible to the Publisher under the indemnification provisions of this Agreement.  The warranties and indemnities made by the Proprietor in this Agreement shall survive the termination of this Agreement.

(d) At or about the time the Publisher copyedits the Work, the Publisher may have the Work read by the Publisher's counsel at the Publisher's expense.  If the Proprietor makes changes in the Work as are recommended by the Publisher's counsel, the Proprietor's indemnity for a judgment shall be limited to 50% to the extent that such judgment arises from a matter within the scope of the review by the Publisher's counsel and as to which the Proprietor made full disclosure to the Publisher.  If the Proprietor will not make changes recommended by the Publisher's counsel, the Publisher shall not be required to publish the Work and shall have the right to recover from the Proprietor any advances made to the Proprietor under this Agreement.  When such advances are fully repaid, this Agreement shall terminate.


10. RESERVED RIGHTS

(a) All rights to the Work not granted to the Publisher in this Agreement are reserved by the Proprietor.  In exercising such rights, the Proprietor shall reserve for the Publisher's benefit the rights granted to the Publisher in this Agreement and, in addition, shall comply with the following:

(1) In connection with the Proprietor's disposition of reserved first serial rights, the Proprietor shall consult with the Publisher about the timing of first serial publication and the portion of the Work that is to be used first serially.  The Proprietor shall endeavor to require any licensee of such rights to carry a credit to the publication of the Work by the Publisher.

HC 00039

(2) In connection with the Proprietor's disposition of reserved motion picture, television, radio, live-stage dramatic adaptation or audio-visual adaptation rights, the Proprietor shall not make any grant of print rights without the Publisher's written consent not to be unreasonably withheld and shall in no event make any grant of novelization or photonovel or similar rights. The Publisher will consent to the publication of synopses of motion picture and television dramatic adaptations of the Work, and photonovels  (being defined as a publication that tells the narrative story of the work or a dramatic adaptation of the Work) based thereon, provided no such synopsis exceeds 10,000 words in length, no such synopsis or photonovel is offered for sale (except as it may appear in motion picture-television fan magazines or souvenir programs) and each such synopsis or photonovel is published with an appropriate copyright notice.

NON-COMPETITION

(b) For a period of time commencing on the signing of this Agreement and ending three years after the first publication of the Work, the Proprietor and Brian Wilson shall not without the Publisher's written consent, not to be unreasonably withheld, publish another biography of Brian Wilson or autobiographical work by Brian Wilson.

11. COPYRIGHT

(a) The Publisher shall print a copyright notice in conformity with the United States Copyright Act and the Universal Copyright Convention in the name of Brains and Genius in each copy of the Work printed by the Publisher and require its licensees to do the same.  The Publisher shall register the copyright on the Work with the United States Copyright Office promptly after first publication and may record this Agreement with the United States Copyright Office.

(b) Any textual or illustrative material prepared for the Work by the Publisher at its expense shall be approved by the Proprietor, such approvals not to be unreasonably withheld or delayed and may be copyrighted separately as the Publisher deems appropriate.

(c) All references to copyright in this Agreement shall reflect any amendment made subsequent to the date of this Agreement in the copyright laws of the United States, in any international copyright convention to which the United States is a signatory or in the copyright laws of any other country within the Territory.  Both parties shall execute such documents as may be necessary to effectuate copyright to the Work in accordance with this Agreement.

(d) In the event of any infringement of the copyright to the Work, the Publisher may employ such remedies as it deems advisable and may name the Proprietor a co-plaintiff in any litigation the Publisher may commence.  The Publisher shall bear the entire expense of any such litigation.  Any recovery shall be applied first to reimburse the Publisher for its expenses; the balance shall be divided between the Proprietor and the Publisher as follows: that portion which is based on actual damages

HC 00040

shall be divided in proportion to the losses from such infringement suffered by each, and that portion which is based upon the infringers' profits, statutory damages or punitive damages shall be divided equally.

(e) So that the Publisher may comply with the requirements of the United States Copyright Act, the Proprietor shall promptly provide the Publisher with two copies of any edition of the Work and any publication that contains a portion of the Work published before publication of the Work under this Agreement and all information requested by the Publisher about such publications.  If requested, the Proprietor shall obtain assignments that permit the Work to be copyrighted in the Proprietor's name.

## 12. OPTION

In further consideration of this Agreement, the Proprietor grants to the Publisher an option on the Proprietor's next book-length autobiographical work by Brian Wilson to which the Proprietor controls the rights, ("the option book"), such option to be exercised as follows.  The Proprietor shall submit to the Publisher a reasonably detailed outline for the option book before offering rights to the option book to any other party. The Publisher shall have 15 days from its receipt of the outline to advise the Proprietor whether it wishes to publish the option book and upon what financial terms. If within such 15-day period the Publisher does not advise the Proprietor that it wishes to publish the option book, the Proprietor may offer the option book to other parties without further obligation to the Publisher.  If within such 15-day period the Publisher does advise the Proprietor that it wishes to publish the option book but within 15 days of the Publisher so advising the Proprietor, the Proprietor and the Publisher have not agreed on financial terms for such publication, the Proprietor may offer the option book to other publishers without further obligation to the Publisher.

## 13. PROPRIETOR'S RIGHTS OF TERMINATION

(a) If the Publisher does not publish the Work within the time specified in Paragraph 4.(a) for reasons other than first serial or book club use (for book club use the delay may be no more than three months), delays of the Proprietor in returning the copyedited manuscript or proofs, the Proprietor's failure to comply with requests made by the Publisher's counsel or delays caused by circumstances beyond the Publisher's control and if the Publisher at any time thereafter receives written notice from the Proprietor demanding publication, the Publisher shall within 90 days of the Publisher's receipt of such written demand either publish the Work or revert to the Proprietor in writing all rights to the Work granted to the Publisher in this Agreement, subject to any outstanding licenses, which shall be assigned to the Proprietor, and the Proprietor shall retain any advance payments made under this Agreement prior to such reversion as liquidated damages for the Publisher's failure to publish the Work.  In so far as any portion of the advance payable under Paragraph 5.(c) has not been paid prior to such reversion, such portion shall be paid upon such

HC 00041

revision.  Notwithstanding the foregoing, the Publisher agrees to obtain the Proprietor's approval of any delay in publication to be caused by any book club usage of the Work.

(b) (1) If the Work is out-of-print and the Publisher receives from the Proprietor a written request for a reversion of rights, the Publisher shall within four months of the Publisher's receipt of such request do one of the following: (i) announce that it will reissue an edition of the Work under one of its imprints within one year from the date of the request; or (ii) enter a license providing for the publication in the United States of an edition of the Work within one year from the date of the license; or (iii) revert in writing to the Proprietor the rights granted to the Publisher in this Agreement.  (If the Publisher does announce that it will reissue an edition of the Work but has not reissued an edition one year after the Publisher's receipt of a request for reversion, the rights shall on such date automatically revert to the Proprietor.)

(2) Any reversion shall be subject to grants of rights made to third parties prior to the date of the reversion and the right of the Proprietor and the Publisher to participate in the proceeds from such grants. Upon reversion, the Publisher shall provide to the Proprietor fully executed copies of any agreements relating to the Work made by the Publisher then in effect.

(3) The Work shall be considered out-of-print if no edition is available for sale through ordinary channels of the book trade in the United States from the order fulfillment department of the Publisher or a licensee of the Publisher and no license is in effect which provides for the distribution of an edition of the Work through ordinary channels of the book trade in the United States within at least 12 months from the date of the Proprietor's request for a reversion.

14. **PUBLISHER'S RIGHTS OF TERMINATION**

(a) If the Proprietor does not deliver the complete manuscript for the Work within three months of the delivery date specified in Paragraph 2.(a) or, if requested to do so, does not deliver a revised, complete manuscript for the Work within the time specified in Paragraph 2.(a), the Publisher shall not be required to publish the Work and shall have the right exercisable at the Publisher's discretion at any time thereafter to recover from the Proprietor any advances made to the Proprietor under this Agreement.  When such advances are fully repaid, this Agreement shall terminate.

(b) If the complete manuscript as first submitted by the Proprietor is unacceptable and the Proprietor, after receiving the Publisher's request for changes and revisions, in good faith makes a timely delivery of a revised, complete manuscript for the Work prior to notice under Paragraph 14.(a) that satisfies all the provisions of this Agreement except the requirement of being acceptable to the Publisher in content and form, the Publisher shall not be required to publish the Work and the Publisher shall give the Proprietor written notice of its decision not to publish.  Thereafter, the Proprietor

- 12 -

HC 00042

may enter an agreement for the Work for the portion of the
Territory exclusive to the Publisher herein provided the
Proprietor pays to the Publisher all monies payable
thereunder promptly as and when received until advances
made to the Proprietor under this Agreement have been
recouped by the Publisher.  If within five years from the
date of the Publisher's notice that it will not publish
the Work the Proprietor has not made arrangements for the
publication of the Work by another publisher, the rights
to the Work shall automatically revert to the Proprietor
and the Proprietor shall have no further obligation to the
Publisher with respect to the Work.

15. FORCE MAJEURE

   The failure of the Publisher to publish or reissue the
Work shall not be a breach of this Agreement or give rise
to any right of termination or reversion if such failure
is caused by restrictions of governmental agencies, labor
disputes, inability to obtain materials necessary for
manufacture of the Work or any other reason beyond the
Publisher's control; in the event of delay from any such
cause, the publication or reissue shall be postponed for a
period of time reasonably related to such cause.

GENERAL PROVISIONS

   16. The Proprietor shall keep at least one copy of the
manuscript for the Work and any other materials submitted
to the Publisher under this Agreement.  The Publisher
shall upon the Proprietor's written request, made within a
year after first publication by the Publisher, return to
the Proprietor the copy of the manuscript used for
typesetting; the Publisher shall not be required to retain
such manuscript for more than one year.  The Publisher
shall not be responsible for the loss of or damage to any
manuscript or other materials submitted by the Proprietor
except in the event of its gross negligence.

   17. No advertisements shall be included in the
Publisher's hardcover edition of the Work and no
advertisements (other than advertisements for other
publications of the Publisher thereof) shall be included
in any other edition of the Work published by the
Publisher or under license from the Publisher without the
Proprietor's written consent.

   18. The Publisher may use the name, likeness and
biographical data of Brian Wilson on any editions of the
Work published by the Publisher and in any advertising,
publicity or promotion for the Work and may extend these
rights in connection with grants of the subsidiary rights
made by the Publisher.

   19. (a) If the Publisher is required by law to withhold
and pay to any U.S. or foreign government taxing authority
any portion of amounts due the Proprietor under this
Agreement, such payments shall be deducted from the
amounts due the Proprietor hereunder.

       (b) If any foreign taxes, bank charges or agents'
commissions are imposed on any payments due the Publisher

- 13 -

HC 00043

from the exercise of any right granted in this Agreement,
the appropriate allocation of proceeds between the
Publisher and the Proprietor from the exercise of such
right shall be made on amounts received after such charges
have been paid.

20. In the event of the bankruptcy, insolvency or
liquidation of the Publisher, this Agreement shall
terminate and all rights granted to the Publisher shall
revert to the Proprietor automatically and without the
necessity of any demand or notification.

21. This Agreement shall be binding upon and inure to
the benefit of the successors and assigns of the
Proprietor and the successors and assigns of the Publisher
and may not be assigned by either without the written
consent of the other, with the following exceptions.  The
Proprietor may assign the Proprietor's right to receive
payment under this Agreement upon written notice to the
Publisher.  The Publisher may upon written notice to the
Proprietor assign this Agreement to any company that
acquires or succeeds to all or a substantial portion of
the assets of the Publisher.

22. If under any provision of this Agreement, the
Publisher is required to obtain the Proprietor's approval,
such approval shall not be unreasonably withheld or
delayed.  If the Publisher fails to receive a response
from the Proprietor within such time as the Publisher may
reasonably designate to accommodate its schedule for
publication, promotion or the exercise of rights when any
approval is requested, the approval requested shall be
deemed granted.

23. This Agreement contains the entire understanding of
the Proprietor and the Publisher with reference to the
Work; there are no warranties other than those expressly
stated in this Agreement.  No waiver or modification of
any provision of this Agreement shall be valid unless in
writing and signed by both parties.  No waiver of any
breach shall be deemed a waiver of any subsequent breach.
If any provision of this Agreement is held to be invalid
or unenforceable, the remaining provisions shall not be
affected.

24. Regardless of its place of physical execution or
performance, the provisions of this Agreement shall in all
respects be construed according to, and the rights and
liabilities of the parties hereto shall in all respects be
governed by the laws of the State of New York.

25. The caption headings of this Agreement are inserted
for convenience only and are without substantive effect.

26. This Agreement shall be of no force and effect
unless signed by both parties within 60 days of the date
first stated above.

27. The Proprietor hereby authorizes the Proprietor's
agent, William Morris Agency, Inc., 1350 Avenue of the

HC 00044

- 14 -

Americas, New York, New York 10019, to collect and receive all sums of money that are payable to the Proprietor under the terms of this Agreement and declares that the receipt of the said agent shall be a good and valid discharge in respect thereof, and said agent is hereby empowered to act in the Proprietor's behalf in all matters arising out of this Agreement.

28. As a condition precedent to the signing of this Agreement by the Publisher, the Proprietor shall deliver to the Publisher a copy of the letter attached as Exhibit A signed by Brian Wilson.

IN WITNESS WHEREOF, the parties have signed this Agreement to be effective as of the date first stated above.

BRAINS AND GENIUS

By _Brian Wilson_____
    Brian Wilson

HARPER & ROW, PUBLISHERS, INC.

By _____
    William M. Shinker
    Senior Vice President & Publisher
    Adult Trade division

By _____
    Gladys Justin Carr
    Vice President
    Associate Publisher
    Adult Trade division

Agent's Federal Tax Identification Number:_____
Brian Wilson's Citizenship:_____
Brian Wilson's Birth Date:_____
Todd Gold's Citizenship:_____
Todd Gold's Birth Date:_____
(This information is needed for copyright purposes.)

WILSON/J:Trade



HC 00045

<u>SCHEDULE A</u>

ADEN
AUSTRALIA
BANGLADESH
BELIZE
BOTSWANA
    (formerly Bechuanaland)
BRITISH WEST INDIES
    comprising:
    Bahamas, Bermuda, Barbados,
    Guyana, the Caicos, Cayman,
    Leeward, Turks, and Windward
    Islands
BRUNEI
CAMEROUN

CYPRUS
EIRE (Republic of Ireland)
FALKLAND ISLANDS
GAMBIA
GIBRALTAR
GHANA
HONG KONG
INDIA
JAMAICA
KENYA
KUWAIT
LESOTHO
    (formerly Basutoland)
MALAWI
    (formerly the Nyasaland
    Protectorate)
MALAYSIA
    (comprising:
    the Malayan Union, Sabah
    and Sarawak
MALTA and GOZO
NAMIBIA
    (formerly South West
    Africa)
NATIVE STATES OF INDIA
NEW ZEALAND
    (including Ross)

NIGERIA
PACIFIC ISLANDS
comprising:
    British Solomon
    Islands, Tonga
    Western Samoa, Fiji,
    Nauru Islands, New
    Hebrides, Gilbert and
    Ellice Islands, Union
    Islands (New Zealand),
    Papua New Guinea
    (Australia), Pitcairn
    Island
PAKISTAN
REPUBLIC OF SOUTH AFRICA
St. HELENA
SEYCHELLES
SIERRA LEONE
SINGAPORE
SRI LANKA
SUDAN
SWAZILAND
TANZANIA
    (formerly Tanganyika
    and Zanzibar)
TRINIDAD and TOBAGO
UGANDA
UNITED KINGDOM
    (including Northern
    Ireland, the Isle of
    Man, and the Channel
    Islands)
ZAMBIA
    (formerly Northern
    Rhodesia
ZIMBABWE
    (formerly Rhodesia)

HC 00046

EXHIBIT A

May 18, 1990

Harper & Row, Publishers, Inc.
10 East 53rd Street
New York, New York 10022

    RE:  LOVE AND MERCY, by Brian Wilson with Todd Gold

Dear Sir:

I acknowledge that Harper & Row, Publishers, Inc. ("H&R")
is entering an agreement dated May 18, 1990 (the
"Agreement") with Brains & Genius (the "Partnership")
which provides for H&R's publication of a book entitled
LOVE AND MERCY written by me.  I understand that H&R will
countersign the Agreement only if I agree to the
following:

1.  I represent to H&R that the Partnership has the right
to enter the Agreement and bind me personally to the terms
of the Agreement and to provide the services of me
required under the terms of the Agreement.

2.  I represent to you that I have read the Agreement,
understand its terms, and agree to be personally
responsible for the performance of the Partnership and to
be personally bound by the obligations of the Partnership.
Without limiting the generality of the foregoing, I agree
to the provisions of Paragraphs 4.(e), 9, 12, and 18.

3.  To induce H&R to enter the Agreement with the
Partnership, I agree that all obligations of the
Partnership will be duly performed by the times and manner
described in the Agreement and that I will perform all
obligations required of me so that the Partnership will at
all times be in full compliance with the terms and
conditions of the Agreement.  Any notice given to the
Partnership shall be sufficient notice to me for my
personal guarantee of the performance of the Agreement by
the Partnership.

4.  I agree that the entering of the Agreement by H&R with
the Partnership is sufficient consideration to me for the
agreements and representations made by me in this letter.

Sincerely,

Brian Wilson

HC 00047

- 17 -