UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
----------------------------------------x
CARL WILSON, an individual, and          )
AUDREE WILSON, an individual,            )
                                         )
            Plaintiffs,                  )
                                         )
                v.                       )  94 Civ. 892(JC)
                                         )
HARPERCOLLINS PUBLISHERS INC.,           )  AFFIDAVIT OF
a Delaware corporation,                  )  <u>MATTHEW E. MARTIN</u>
                                         )
            Defendant.                   )
----------------------------------------x

STATE OF MASSACHUSETTS)
                      ) ss:
COUNTY OF BARNSTABLE  )

        MATTHEW E. MARTIN, being duly sworn, deposes and
says:

        1.  I submit this affidavit in support of
defendant HarperCollins Publishers Inc.'s ("HarperCollins")
motion for summary judgment in the above-captioned case.  I
have read and am familiar with the allegations set forth in
the First Amended Complaint, and I have personal knowledge
of the facts set forth herein.

        2.  I am an attorney admitted to the Bar of the
State of New York and an Assistant General Counsel for
HarperCollins, where I have been employed since September,
1989.  As Assistant General Counsel, my job responsibilities
include providing general legal advice to several of the
company's trade publishing divisions and the college

textbook division; conducting prepublication review of manuscripts for libel and other legal considerations; drafting and negotiating a variety of publishing agreements; investigating and responding to claims of libel, invasion of privacy, copyright and trademark infringement; and managing and supporting litigation assigned to outside counsel.  I also provide advice on the development, registration and protection of trademarks; human resources issues; general corporate and business matters; and the acquisition and divestiture of major corporate assets.

3.   HarperCollins is a Delaware corporation with its principal place of business in New York.  Substantially all of HarperCollins' editorial and prepublication review activities with respect to Brian Wilson's autobiography, WOULDN'T IT BE NICE -- MY OWN STORY, were conducted in New York.

4.   My personal involvement with WOULDN'T IT BE NICE -- MY OWN STORY began on December 10, 1990.  By the time I became involved, the work was under contract to HarperCollins and was slated to be published on HarperCollins' fall 1991 book list.  Thomas Miller, a HarperCollins Senior Editor, presented the book at the Adult Trade Division's pre-sales meeting on December 10, 1991.  As was (and is) our practice, I, as a member of our legal

department, attended the meeting to identify those books from the fall list which would require legal readings prior to publication.  Because the book concerned a contemporary rock-and-roll figure and involved sex, drugs and alcohol, I immediately identified it as requiring legal review.

5.  On May 15, 1991, I received from Mr. Miller a copy of the final edited manuscript, less the final chapters, which were subsequently supplied.  James Fox, Vice President and Publishing General Counsel for HarperCollins, and I decided to have the book read by outside legal counsel, since our legal department was overextended.  Were our department's circumstances otherwise, the book would have been reviewed by one of our in-house attorneys.

6.  That same afternoon, I sent the manuscript by hand to Slade Metcalf, a partner at the New York law firm then known as Squadron, Ellenoff, Plesent & Lehrer (now Squadron, Ellenoff, Plesent & Sheinfeld).  HarperCollins uses the Squadron, Ellenoff firm on an as-needed basis to conduct legal reviews of manuscripts.  My cover letter requested that any legal changes be finalized, if possible, by June 5, 1991, a fairly normal turn-around time for such a manuscript.  Mr. Metcalf called me later that same day to advise that he had given the manuscript to his partner, Eugenie Gavenchak, who would be performing the legal review.

legal review.  Ms. Gavenchak had previously performed similar prepublication legal reviews for HarperCollins.  As revised manuscript pages were provided me by Mr. Miller over the ensuing nine-day period, I forwarded them on to Ms. Gavenchak.

7.  My original expectation was that we would be able to meet our September publication target date.  As it turned out, the careful legal review conducted by Ms. Gavenchak and the additional legal work I personally did on the book took about six weeks longer than we expected and the publication date was delayed accordingly.  I am familiar with plaintiffs' suggestions to the effect that a thorough legal review may have been sacrificed for the sake of meeting a pre-determined publication deadline.  Our actions reveal precisely the opposite: a delay of publication to accommodate the legal review.

8.  Although different publishing houses employ different practices in conducting libel reviews (some requiring attorneys to prepare written reports for the authors identifying potential areas of concern), HarperCollins has dispensed with written reports and instead encourages more direct communication between the legal reviewer and the author or authors.  In my experience, this approach is most effective in accomplishing the basic

4

objective, which is to insure that the book is as original, truthful, fair and accurate as is reasonably possible. Consistent with that practice, Ms. Gavenchak, Mr. Miller and I determined that the optimal way for Ms. Gavenchak to proceed in addressing concerns she identified would be to work directly with Mr. Gold, as he was the person primarily responsible for eliciting Brian Wilson's recollections, was the researcher for the book, and had been the contact person with the editorial staff during the writing process.

9.   Ms. Gavenchak periodically reported to me on the progress of her legal review.  She informed me that Mr. Gold was revising portions of the manuscript as necessary and that Mr. Gold was providing corroboration for some of her initial concerns.  Over time, I learned from Ms. Gavenchak that Mr. Gold had been able to provide corroboration for virtually all of the passages that had initially concerned her.

10.   On June 14 and June 17, 1991, Ms. Gavenchak advised me that she and Mr. Gold had concluded that the references to Audree Wilson being a passive witness to her husband's abuse of their children would stay in the book because Mr. Wilson had represented to Mr. Gold that they were true and also because Mr. Gold had corroborated Mr. Wilson's accounts with other published accounts of his

5

childhood.  Ms. Gavenchak reported to me that Mr. Gold believed that Mr. Wilson was telling the truth about his mother, having observed that Mr. Wilson remembered many things about his past and that when he did not remember, he was honest about it.  Ms. Gavenchak also reported that she trusted Mr. Gold's judgment in this regard and had no reason to doubt the truthfulness of the passages.  I likewise had no reason to doubt Mr. Wilson's account and thus believed (and still believe) that the passages are truthful.  Ms. Gavenchak further informed me that Mr. Gold had attempted to interview Mr. Wilson's mother, Audree, and Mr. Wilson's brother, Carl, to confirm the accuracy of Mr. Wilson's recollections but they had steadfastly refused to be interviewed.  As the only remaining family members are dead, I felt that Mr. Gold had been diligent in pursuing other possible corroboration.

11.  On June 18, 1991 I submitted to Mr. Miller Ms. Gavenchak's copy of the complete manuscript marked with the legal changes to which she and Mr. Gold had agreed.  I advised Mr. Miller that these changes must be incorporated into the final work.  Later, when the typeset galleys came back from the compositor, I sent them to Ms. Gavenchak so that she could verify that each of her legal changes had been made.

12.   Later that day, June 18th, I called James Tierney, a lawyer representing Brian Wilson in a lawsuit Mr. Wilson had filed against Irving Music and A&M Records.   The purpose of my call was to verify that the book's description of the allegations made in that lawsuit would constitute a fair report of those proceedings.   Without responding to my queries, Mr. Tierney told me that he wanted to review the entire manuscript before HarperCollins published it.   Mr. Tierney then told me in non-specific fashion that he was concerned that there might be false statements in the book which could be damaging to Brian Wilson if published.   Mr. Tierney demanded that a copy of the manuscript be sent to his office immediately.

13.   After I hung up with Mr. Tierney, I called Mr. Gold to find out if Mr. Tierney had a legitimate reason to demand to see the manuscript.   Mr. Gold told me that Mr. Tierney had already reviewed the manuscript and suggested certain changes, which Mr. Gold had implemented.   Mr. Gold told me that he believed that Mr. Tierney's motive in seeking again to review the book was not to ensure accuracy but, instead, to avoid the prospect that it would offend the Beach Boys, whose cooperation he required in the lawsuit Mr. Tierney was handling for Mr. Wilson.   Mr. Gold also told me that Mr. Wilson had a lot of attorneys and that Mr. Tierney

7

had only limited authority over Mr. Wilson's affairs.
Before hanging up, Mr. Gold reiterated to me that he had
made all of the changes to the manuscript that Mr. Tierney
had previously requested.  My notes from this conversation
with Todd Gold are annexed hereto as Exhibit 1.

14.  On June 19th, I received a facsimile from Mr.
Wilson attaching a short letter, dated June 18, 1991, from
Mr. Wilson to another Los Angeles attorney named Don Engel.
Mr. Wilson's letter requested Mr. Engel to oversee "any and
all dealings" concerning the book and also asked Mr. Engel
to "again inform Mr. Tierney not to represent himself as my
lawyer in areas he doesn't represent me."  A copy of Mr.
Wilson's letter is annexed hereto as Exhibit 2.

15.  Sometime between June 20th and June 26th, I
spoke with Mr. Engel by telephone and recounted my
conversation with Mr. Tierney.  Mr. Engel told me that Mr.
Tierney was speaking without authority and confirmed that
Mr. Tierney was working for Mr. Wilson only with respect to
one piece of litigation, the Irving Music/A&M Records case.
Mr. Engel told me not to worry about Mr. Tierney's demand to
see the manuscript, and advised me that he would speak to
Mr. Tierney and instruct him to cooperate with me in
confirming the allegations of the A&M Records case.

8

16.  On June 24th, Mr. Miller received a letter from Dr. Garrett O'Connor also requesting a copy of the manuscript.  Dr. O'Connor, I would learn shortly, is a psychiatrist who had been retained in a conservatorship proceeding which had been commenced against Mr. Wilson by his cousin, Stan Love.  Dr. O'Connor's letter was accompanied by an authorization letter from Mr. Wilson.  Mr. Miller forwarded a copy of the letter to me.  Later that same day, Mr. Gold faxed a note to Mr. Miller requesting that no copies of the book be sent out to third parties until he and Mr. Wilson had a chance to review the typeset galleys.  Mr. Miller forwarded a copy of Mr. Gold's note to me.

17.  On June 26th, I called Mr. Tierney to further pursue the open issues about the A&M lawsuit.  Mr. Tierney told me that he had expected to receive a copy of the manuscript and wanted to know why I had not sent it.  Mr. Tierney proceeded to tell me that he was concerned about the overall focus of the book and that it might "slime[]" members of the Beach Boys and prompt them to withhold performance royalties from Brian Wilson.  Mr. Tierney told me that Brian Wilson has a fiduciary duty not to "besmirch the image" of the Beach Boys and expressed his concern that the Beach Boys might refuse to cooperate with Mr. Wilson's

9

lawsuit against Irving Music and A&M Records.   These
statements confirmed in my mind the validity of Mr. Gold's
assessment that Mr. Tierney's motives had little, if
anything, to do with concern over the factual accuracy of
the book.

      18.   Proceeding with a long litany, Mr. Tierney
suggested that there was a chance that Mr. Wilson would
disown the book.   He also stated that the book contained
material falsehoods, for example, that Mike Love (a member
of the Beach Boys) had nothing to do with the writing of
"California Girls."   (As I would later learn, that passage
had already been removed from the book.)   Mr. Tierney also
claimed that Mr. Wilson has no recollection of anything that
occurred from 1969-1978; that the book would alienate Mr.
Wilson from his mother and the band; that Mr. Wilson could
be exposed to liability to the Beach Boys; that the
conservatorship proceeding could sever Mr. Wilson's
relationship with Gene Landy; that Mr. Landy was controlling
the content of the book against Mr. Wilson's best interests;
and that Mr. Landy was "burning the oil fields" and
"scorching the earth" in his relationship with Mr. Wilson.
Mr. Tierney ended the conversation by telling me that he
intended to write me a letter to put us on formal notice of

his objections to the book.  I never received any such letter.

19.  In light of Mr. Tierney's and Dr. O'Connor's requests to see the manuscript, as well as Mr. Tierney's allegations challenging the <u>bona</u> <u>fides</u> of the book, I met with Mr. Fox, our Publishing General Counsel, on June 26th, to determine how to proceed.  I recounted for Mr. Fox the particulars of the allegations which had been leveled by Mr. Tierney.  Mr. Fox and I had a long conversation during which we evaluated the credibility of Mr. Tierney's assertions in light of all of the other information we had received as a result of Ms. Gavenchak's legal review.  We determined that we had taken account of the issues raised by Mr. Tierney concerning Mr. Wilson's competency and credibility and Mr. Landy's alleged role in the authorship of the book.  Our continuing investigation and contacts with Mr. Wilson, Mr. Gold and Mr. Engel in the next several weeks led us to conclude that Mr. Tierney's assertions were unfounded.

20.  Mr. Fox and I further decided at the June 26th meeting that Mr. Wilson should himself determine who would be allowed to see the manuscript prior to publication. The next day, a letter was sent by Mr. Miller to Mr. Wilson advising him of Harper Collins' preference that he not share the manuscript with parties outside of the editorial

process, but at the same time indicating that he was free to share the manuscript with whomever he deemed appropriate. We encouraged him not to circulate the manuscript in such fashion as would jeopardize its confidentiality and/or our right of first publication.  The advice was consistent with our normal practice not to circulate drafts of unpublished materials to third parties not associated with the publishing process.

21.  By late June, it was clear that we would need extra time to complete the prepublication legal review.  On June 25, 1991, Mr. Miller circulated a memo in-house to advise that the schedule for the release and publication of the book had been changed.  Originally scheduled for a September 11, 1991 publication date, the publication date was moved back some six weeks, to October 23, 1991.

22.  Over the ensuing two-week period, I received a number of reports confirming Mr. Wilson's commitment to the project and his determination personally to read the galleys with care.  Mr. Engel, in telephone conversations on July 3 and July 16, advised me that Mr. Wilson was committed to seeing the book published and did not want to be "frightened out of the book" by those with ulterior motives. Mr. Engel and Mr. Gold both reported that, as of July 15th, Mr. Wilson was busy reading the galleys.  Mr. Gold advised

me that he planned to meet with Mr. Wilson on July 17th to review Mr. Wilson's comments.  Mr. Engel advised me on July 16th that Mr. Wilson had asked him not to send copies of the galleys to either Mr. Tierney or Dr. O'Connor.

23.  In my conversations with Mr. Engel in early to mid-July, Mr. Engel expressed preliminary concerns about Mr. Landy's relationship with Mr. Wilson and the possibility that Mr. Landy may have exerted undue influence over the manuscript.  Mr. Engel, as I discuss below, satisfied those concerns once he devoted time to reading the manuscript, discussing it with Mr. Wilson, and becoming acquainted with Dr. O'Connor's conclusions about Mr. Wilson's competency.

24.  In mid-July, Mr. Fox and I concluded that it would be advisable for me to meet with Mr. Wilson to eliminate any lingering concerns about Mr. Wilson's commitment to the book and his approval of its contents.  I scheduled the meeting around a trip to Los Angeles that I had previously planned.  On July 17, 1991, at approximately 5:00 p.m., I met with Mr. Wilson and Mr. Gold at the offices of Brains & Genius in West Los Angeles.  Kevin Leslie, Mr. Wilson's personal assistant, was also present.  Mr. Engel joined the meeting some time after it began.  When I arrived, Messrs. Gold and Wilson told me that they had just finished going over the typeset galleys.  In response to my

inquiries about how the book had been written, they explained to me that as Mr. Gold was writing the book (following many hours of interviews), Mr. Gold would submit individual chapters to Mr. Wilson, which Mr. Wilson would quickly review.  Mr. Wilson told me that he had previously read the completed manuscript, although not very thoroughly. With the galleys, however, Mr. Wilson told me that he had taken much more time and care in his reading and had spent nearly four days doing a thorough and complete reading of the book.  To memorialize that he, in fact, had thoroughly reviewed the manuscript and personally approved of its contents, Mr. Wilson signed the final page of the galleys indicating that he approved of the book and wanted it to be published.  My file memorandum summarizing my meeting with Messrs. Gold and Wilson is annexed hereto as Exhibit 3.  Mr. Wilson's handwritten acknowledgment is annexed to that memorandum.

25.  On July 19th, I met with Mr. Engel at his offices in Beverly Hills.  Mr. Engel told me that he had read about 200 pages of the galleys and found nothing that caused him concern.  He expressed the view that Mr. Gold had done an excellent job and that the book would be a best-seller.  During this same meeting, Mr. Engel told me that Dr. O'Connor's report in the conservatorship proceeding --

which, as I understood it, was to appraise Mr. Wilson's
competence and ability to handle his personal and financial
affairs -- would issue within the next week and that Dr.
O'Connor had concluded that Brian Wilson was competent,
although prone to Mr. Landy's influence.

26.   On July 24th, after returning to my office
following my trip to California, I had another telephone
conversation with Mr. Engel.  He told me that he had
finished reading the book and had no real problems with it.
He said that he felt that Mr. Gold had written a "balanced
book," not all that favorable to Mr. Landy.  Mr. Engel said
that he was satisfied, after consulting with Mr. Wilson,
that "the book says what Brian Wilson wants it to say."  At
one point during this conversation, Mr. Engel remarked that
the people involved in the conservatorship proceeding wanted
to "kill the book," that Mr. Tierney also wanted to "kill
the book," and that Dr. O'Connor was skeptical about the
book because he had not been given the opportunity to read
it.  Mr. Engel told me, however, that the conservatorship
parties were confident that Mr. Engel would be able to
resolve the matter through a negotiated separation agreement
with Mr. Landy.  Further, Mr. Engel assured me that Brian
Wilson wanted to do the book -- that he "wants to tell the
truth."  I told Mr. Engel that HarperCollins was now

satisfied that the book was legally sound and that it had
Mr. Wilson's complete blessing.  I told him that
HarperCollins was going to proceed with the publication
scheduled for October 23, 1991.  Mr. Engel responded that he
had no problem with our proceeding in this manner.

     27.  On August 8, 1991, William Shinker, Publisher
of the Adult Trade Division of HarperCollins, and Tom Miller
each received a faxed letter from an attorney named Barry
Langberg, writing on behalf of Carl Wilson, Audree Wilson,
Carnie Wilson and Wendy Wilson, who were reported by Mr.
Langberg to be his clients in the conservatorship
proceeding.  Mr. Langberg's letter stated that, while
neither he nor his clients had seen the manuscript, they
nonetheless were concerned about its potentially defamatory
content.  The letter further questioned the validity of our
contract with Mr. Wilson (presumably based upon their view
that Brian Wilson lacked the capacity to have entered into
it).  Copies of the letters were forwarded to me and are
annexed hereto as Exhibit 4.

     28.  After consulting with Ms. Gavenchak, to whom
I provided copies, I concluded that Mr. Langberg's non-
specific letters did not raise any issues that HarperCollins
had not already addressed in the preceding weeks and months
as part of the prepublication review process.  Furthermore,

16

we felt that Mr. Langberg's clients' motives were suspect.
Mr. Wilson was contesting his family's efforts to have a
conservator appointed and clearly wanted the book to express
his views on that subject.  In the circumstances, we saw no
reason why Mr. Langberg's letter should cause us not to
publish the book.

29.  I responded to Mr. Langberg in a letter dated
August 14, 1991, which is annexed hereto as Exhibit 5.  My
letter explained to Mr. Langberg that the book had undergone
an exhaustive legal review, that Harper Collins was
satisfied that its contract with Mr. Wilson was valid and
that it was confident that Mr. Wilson had the capacity to
write a book about his life.  We did not hear from Mr.
Langberg again prior to the book's publication.

30.  WOULDN'T IT BE NICE -- MY OWN STORY was
published on October 23, 1991.

_Matthew Martin_
Matthew E. Martin

Subscribed and sworn to
before me this 11th day of
August, 1995.

_Lena St Sullivan-Ell_
Notary Public
My Commission expires:
June 17, 1997

18

CLSG S11 ——

WEEKS



Tom - 7199                          (213) 824 - 7232
Jim - 7182

Conversation = T. Gold   6/18/91

Gold watched Tierney review ms.

Tierney suggested changes.

Gold made the nec. changes in his presence

Tierney read the entire ms.

Tierney is desperate to get cc of ms.

BW is being treated by psych. selected
by Tierney.
Tierney is concerned that Beach Boys will be
put off by portrayal in book and will
not cooperate in A+M

Wilson has a batch of lawyers.
Tierney's rep. is limited.

Gold made _all_ the changes that Tierney requeste

• BW + Father form Sea of Tunes

• BW + Father sell Sea of Tunes

• BW instigates law suit vs. A+M.

90-days will probably expire early August.

HC 00597

A+M attorney:

T.G.
read allegations from book.

John Diamond — BW "literary attorney"

HC 00598

CLSG S11

WEEKS

June 18, 1991


Mr. Donald Engel
ENGEL AND ENGEL
9200 Sunset Boulevard
Suite #505
Los Angeles, California 90069

    re:  Brian Wilson

Dear Don:

    As my lawyer, you and I have talked about my book in the past.  I would like you to oversea any and all dealings concerning my book "Wouldn't It Be Nice."  But I must insist that Steve Moller not deal for me as I have a personal relationship with you, And he is to distant and impersonal for me to feel comfortable with.  Also I hope you will again inform Mr. Tierney not to represent himself as my lawyer in areas he doesn't represent me.

    If you have any questions or comments, please feel free to call me at anytime.

                    Best regards,

                    Brian Wilson

cc:  Sean Corrigan
     Tom Miller
     James P. Tierney
     Dan Strone
     Mathew Martin
     Todd Gold
     Mark Meador
     Michael Rosenfeld

3

<u>**M E M O R A N D U M**</u>

July 24, 1991

TO:     File

               Enclosure
               cc:  Jim Fox
                   Bill Shinker

FROM:  Matthew Martin

RE:   <u>Brian Wilson</u>

The following is a summary of my various meetings and
conversations with Brian Wilson and his representatives which
took place while I was in Los Angeles last week on a separate
business matter.

I.  <u>Meeting with Brian Wilson</u> - July 17, 1991

     I met with Brian on Wednesday afternoon at 5:00 P.M.
at the offices of Brains and Genius on West Pico Boulevard in
West L.A.  Todd Gold and Kevin Leslie (Brian's personal
assistant) were also in attendance.  Later, we were joined by
Don Engel, Brian's personal attorney and the person charged
by Brian to oversee of the legal aspects of Brian's book.

     When I arrived, Todd and Brian had just finished
going over the galleys.  Todd and Brian explained to me that
as Todd was writing the book, he would submit individual
chapters to Brian which Brian would review in a cursory
manner.  Brian also read the completed manuscript but not
very thoroughly.  With the galleys however, Brian told me
that he took much more time and care in his reading.  He
spent nearly 4 days reviewing the galleys; it was his first
thorough and complete reading of the book.  He noted certain
changes that he wanted made and discussed them with Todd.
Earlier Todd had received changes from Gene Landy, which
Brian also reviewed with Todd and approved.  On the last page
of Brian's copy of the galleys, he indicated in writing that
the text was "Approved by BW as being an acceptable book for
release.  Brian Wilson.  7-17-91."  (see enclosure).

HC 00614

Brian told me that he was satisfied with the book. He understood and well appreciated that it was a "revealing book" (a term he repeated throughout our conversation), but that it was an honest and appropriate account of his life and career. He said that he wants the book to be published and the story to be told. He admitted that earlier in the process he was concerned that maybe the book was too revealing, but he has since come to terms with the candor of the book and now wants the story told in this "revealing" and honest way.

Brian appreciates that the book is at times severe with his former bandmates. He believes that they are probably going to be upset with the book, but he is not overly concerned with their reaction. He no longer sees any of the Beach Boys on a regular basis.

Brian understands and appreciates that he is expected to go on tour to promote the book in late September. He is prepared to do this and is even excited about the opportunity (this despite, as Todd Gold pointed out, Brian's historic aversion to touring for his music). Brian understands that he is expected to discuss, support, and defend the book while on tour, and he maintains that he is eager and quite capable of performing this function.

Brian believes that the book is going to be well received, and that readers and fans will appreciate the candor and honesty of the book. At one point, in responding to my question about the likely public reaction to the book, Brian illustrated the public response with a loud, boisterous rebel yell. He then gave a smile and quickly said, "But seriously, it is a very <u>revealing</u> book . . ." and resumed his discussion of the book.

Brian tends to talk in rather broad, sweeping terms. He doesn't address specifics real well. He often struggles to find words and once asked me to back up and repeat myself because he had lost the meaning of my question. Though I am not a psychiatrist, I found Brian to be quite capable and generally responsive to my concerns that as a publisher, HarperCollins must be assured that Brian Wilson understands and appreciates the content of his book, that he is comfortable with the way his story has been portrayed and that the book is something he believes in and feels good about. He confirmed for me that this is indeed the case, and that he wants the book to be published.

2

Brian invited me into his studio to listen to a cut from his new album. He played for me a song called "Rainbow Eyes". As the song played, he seemed to lose himself in the music; almost trance-like, he was studying it with such intensity. Don Engel arrived a few moments later, and Brian played the cut of "Rainbow Eyes" again for Don to hear.

Afterwards, I briefed Engel on my earlier conversation with Brian. Engel said that he was glad that we had discussed these points and that Brian was able to reaffirm his support for the book. Engel then reiterated many of the points that he had been making with Jim Fox and me over the past week or so. i.e. that Brian was concerned about the power of the Beach Boys to withhold song and performance royalties from Brian in retaliation for the book; the significance of the pending conservatorship proceedings; HarperCollins's concern that the book be something that Brian believes in and can support; Engel's role as Brian's attorney, and the fact that he has yet to receive a copy of the manuscript or galleys to read; that he does not wish to vet the book or interfere with its publication; he wants whatever Brian wants for the book; that he thinks there is benefit to Dr. O'Connor (Brian's present psychiatrist) reading the book, but that if Brian does not want him to share it with O'Connor, Engel will honor that request.

Engel was given a copy of the galleys accompanied by a letter from Brian (which he signed in my presence when I first arrived). Though I did not see the letter, I was led to believe that it contained instructions to Engel that he not permit anyone else to read the book, including O'Connor and Tierney. Engel said that he would certainly comply with the instructions.

Engel was also provided with a copy of an opinion letter prepared by John Diamond who was asked by the authorship team (Wilson, Landy and Gold) to read the manuscript and offer a legal opinion. The idea was to obtain an independent, objective review of the book for the author's benefit. I did not see Diamond's report. It appeared to be no longer than 2 or 3 pages in length. Engel read through it briefly and remarked that it was a fairly standard opinion letter commenting only generally about allegations of drug use, sexual behavior, criminal acts and the like.

Engel had other business to discuss with Brian and Kevin, so I excused myself. Engel and I agreed to try to get together at his office for a casual meeting before I left L.A. My meeting with Brian, Todd and Engel ended at approximately 6:10 P.M.

3

HC 00616

\*   \*   \*   \*   \*

II.  <u>Conversation with Mark Meador</u> - July 19, 1991

On Thursday, July 18, upon returning to my hotel room after a long day of depositions on a separate matter (<u>Cleary v. HarperCollins</u>) I found a phone message from a Mark Meador, calling on behalf of Gene Landy.  I knew from earlier conversations with Don Engel that Meador is a former attorney (no longer practices law; possibly disbarred?) who acts as Gene Landy's business manager.

I returned the call to Meador on Friday morning, July 19.  Meador introduced himself to me as Gene Landy's business manager.  He wanted to attend my meeting with Wilson on Wednesday evening, but was concerned about the risk of breaching the separation agreement that is in effect for Wilson and Landy.  I told Meador that the meeting was intended as an informal meeting between an author and a publisher's representative; that I just wanted to get a sense of Brian's confidence in the book; and that I thought the meeting went well.  I did not go into much detail with Meador about what was discussed at the meeting.

Meador wanted to set the record straight with me concerning the allegations made by Engel that Landy had intercepted Brian's mail.  Meador contends that the secretary at the B & G office opened the mail and left the manuscript lying out on a desk.  Landy went into the office late at night, as is his custom, to avoid running into Brian, and happened to see the finished manuscript lying on the desk, so he picked it up and took it with him.  According to Meador there was no intention to keep the ms. from Brian or from those to whom Brian wished to show it

Meador also wanted to express Landy's concern with the manner in which the legal review was carried out without his consultation.  I told Meador that we placed the book with outside counsel who consulted with Todd Gold extensively in determining the appropriate legal changes to the ms.  Our understanding was that Gold was acting on behalf of the authorship team, and Landy was certainly welcome to join in the discussions at any time if he cared to.  I also told Meador that I felt the legal review was handled very well by our outside counsel and that both the authors and the publisher were served well by the process.

\*   \*   \*   \*   \*

4

HC 00617

III.  **Meeting with Don Engel** - July 19, 1991

At Noon on Friday, July 19, I met with Don Engel at his offices in Beverly Hills.  Engel told me that he had read about 200 pages and found nothing that caused him concern. He thought that Todd Gold had done an excellent job. He thinks the book is going to be a best-seller.

Engel told me that Brian may be meeting with his brother, Carl Wilson, to discuss the pending conservatorship proceedings.

Landy and Wilson's separation period ends on Tuesday, July 23.  Engel is at work in negotiating the terms of a more permanent separation that may or may not permit casual, social contact, but would definitely prohibit further business relations, unless Brian was properly represented by totally independent counsel.  The separation would involve a break-up of jointly controlled assets including the Brains & Genius corporation, copyright and royalty interests in Brian's book, movie rights to Brian's book, record deals and song royalties.  We will be formally advised of the final terms of the separation as it affects our payment of proceeds from the book.

Right now, Brian's cash flow is very low.  They will be selling some of Brian's assets to obtain some cash. Brains & Genius will be dissolved and the office real estate sold.  Engel is doing all he can to keep Brian's creditors at bay.

Dr. O'Connor's report will issue next week (?). O'Connor has told Engel that he believes that Brian is competent, but that he is emotionally and pychologically frail and therefore prone to Landy's undue influence.

Engel believes that Brian is scared of Landy, yet totally in awe of him.  Engel recognizes that Landy saved Brian's life and was a positive influence at a very significant time for Brian, but that at some point, the relationship must subside and Brian must be free to pursue his life free of Landy's influence and power.

Engel has written a letter to Brian to tell him what he thinks of the first 200 pages of the book and recommending that if Brian remains under the care of Dr. O'Connor, Engel believes that O'Connor should be provided with a copy of the book; that it would be a valuable tool to understanding and treating Brian.

HC 00618

\* \* \* \* \*

IV.  <u>Conversation with Don Engel</u> - July 24, 1991

I spoke with Don Engel on Wednesday afternoon, July 24. He told me that he had finished reading the book and had no real problems with it. He felt that Todd wrote a "balanced book". It is not all that favorable to Landy in Engel's opinion, nor does it appear to be Landy's "parting shot", as he feared it might be. Engel is satisfied, after consulting with Brian that "the book says what Brian Wilson wants it to say."

The one passage that gave Engel pause was the part where Dennis Wilson's death is indirectly attributed to Carl Wilson's inaction to seek help for his brother from Dr. Landy, and that Carl's refusal to act was motivated solely by financial considerations.  [At Brian and Engel's request, this passage has been significantly toned down, and Genie Gavenchak and I reviewed the revised text of this passage with Todd Gold yesterday. The change will be among those changes made by hand to the bound galleys].

Don repeated his opinion that if Brian remains under Dr. O'Connor's care, O'Connor should have a copy of the book, but he would recommend to Brian to wait until late August or early September before giving O'Connor the book. Engel reasons that by then, the book will be printed and on the verge of distribution, at which point it would be virtually unstoppable.

Engel raised with me the issue of Brian's promotion of the book. I reminded Engel that Brian is specifically committed by contract to tour for the book and that plans are under way for his tour. I also noted that in my meeting with Brian last week, I specifically raised the point about the tour and that Brian confirmed his commitment and capacity to promote the book for us. Engel feels that he may need to assure the conservatorship parties (i.e. Carl Wilson, Mike Love, Brian's ex-wife, Marilyn) that Landy will not be involved with Brian during the tour. I told him that Landy's role in the tour was not a concern of ours, but that Brian's personal promotion of the book is critical to its success.

Engel told me that the conservatorship proceedings were formally reactivated on Tuesday of this week, which is the day that the Landy/Wilson separation agreement expired.

HC 00619

Brian met with his brother Carl this past weekend to discuss how a conservatorship might be averted. The conservatorship parties have expressed their confidence that Engel will be able to resolve the matter through negotiating a permanent separation agreement with Landy, but failing that, they wanted to be in a position to press forward with their effort to have a permanent conservator named for Brian to protect him from Landy's undue influence.

Engel says that the negotiations with Landy are going to be tricky. Landy is asking for a lot, for example: a great deal of money in cash, more than Brian has at the time; 1/2 of Brian's interest in the book (I believe that would amount to 1/3 of the whole, with Brian and Todd each getting 1/3). Engel believes that this is too great an interest, especially with the potential for movie rights. Engel told me that Landy is now living in a large, opulent house that is Brian's property. Landy pays just 1/3 of the mortgage as rent. Engel wants him out.

At one point in our conversation, Engel said that the conservatorship people want to kill the book, Jim Tierney (Brian's lawyer in the A&M lawsuit) wants to kill the book, and Dr. O'Connor is skeptical about the book because he hasn't been given the opportunity to read it. Nevertheless, according to Engel, Brian wants to do the book. "He wants to tell the truth."

Engel thinks he can avert a conservatorship proceeding. But if there is a conservatorship hearing, Engel is concerned about the effect it will have on Brian. Engel feels that Brian is now stronger than ever, but if this gets out of hand, he may crawl into a shell.

I told Engel that we are now completely satisfied that the book is legally sound and that it has Brian's complete blessings. Therefore, we are going to proceed with publication, on schedule for our planned pub. date of October 13, 1991. Engel has no problem with our proceeding in this manner.

7

HC 00620

**MADE-UP FIRST PASS**

V0042/FP 0402-0404
30042      50/7        3869.0.0        COMCOM
07/02/91      15:45:05      MCL

MS. P. 636; FF 6.; MV 1.3

30042    X

390   /   *Brian Wilson*

It was a beautiful day in Malibu, one created for enjoyment rather than worry. I breathed the salty air and studied my palette. The blue, whitecapped water, the sandy beach, the sky dotted with pillowy white clouds, surfers cutting across the waves, and girls on the beach. Beyond the breakers, two dolphins poked through the water. A sign of good luck.

Then I went downstairs to my piano. It was time to go to work.

APPRoved By BW As Being AN Acceptable Book FoR Release

Brian Wilson

7—17—91

HC 00621

4

CLSG S11

WEEKS

AUG 08 '91 12:01

LAW OFFICES

## BARRY B. LANGBERG & ASSOCIATES
A PROFESSIONAL CORPORATION

2049 CENTURY PARK EAST

SUITE 3030

LOS ANGELES, CALIFORNIA 90067

BARRY B. LANGBERG
(213)286-7717

OF COUNSEL
J. WILLIAM HAYES

TELEPHONE
(213)286-7700

TELECOPIER
(213)284-8388

August 8, 1991

Mr. Tom Miller, Editor
HarperCollins Publishers
10 East 53 Street
New York, NY 10022

Dear Mr. Miller:

We represent Carl Wilson, Audree Wilson, Carnie Wilson and
Wendy Wilson (the brother, the mother, and daughters of Brian
Wilson) in the conservatorship proceeding in Los Angeles County
California entitled In The Matter of Petition for the
Conservatorship of Brian Wilson, Los Angeles Superior Court Case
Number SP000008.

It has come to the attention of our clients that you intend
to publish a book that is apparently an autobiography of Brian
Wilson. Although we have not had an opportunity to review a
manuscript of the book, we understand that there are numerous and
substantial references to our clients, some of which may be
defamatory.

Furthermore, allegations in the pending conservatorship
proceeding seriously question the capacity of Brian Wilson to
enter into a valid contract with you granting rights to publish
the book. In addition, it has become apparent during the
progress of the conservatorship proceeding that Brian Wilson may
well be subject to the undue influence of Eugene Landy. We
understand that Landy was instrumental in dealing with your
company and was a principal participant in the writing of the
book. As a result, the validity of both the contents of the book
and the contract between Brian Wilson and your company are in
serious doubt.

Of course, the existence of the conservatorship proceeding
is a matter of public record. So too are the allegations
concerning the undue influence of Mr. Landy on Brian Wilson.
Therefore, you had actual and constructive knowledge of the
issues that I have raised in this letter. Your publication of
the book could result in serious harm and damage to both Brian
and his family. I would suggest that prior to publication you

HC 00214

LAW OFFICES

BARRY B. LANGBERG & ASSOCIATES
A PROFESSIONAL CORPORATION

Mr. Tom Miller, Editor
August 8, 1991
Page 2

determine the veracity of the statements made in the book and the
validity of the contract giving you the rights to publish the
book.

My clients, the family of Brian Wilson, will be happy to
cooperate with you in any effort to investigate these matters.
The fact is that it is very likely that much of the material in
the book is not statements by Brian Wilson but instead defamatory
accounts of events by Eugene Landy.

Please understand that in the event you recklessly publish
this book we intend to pursue all legal remedies.

Yours very truly,

BARRY B. LANGBERG

BBL:cmc

f:..\wil3\001\hrprclnt.bbl

HC 00215





CLSG S11 ⎯⎯⎯

10 East 53rd Street          Telephone 212 207-7004      Matthew E. Martin
New York, New York           Fax 212 207-7552            Assistant General Counsel
(212) 224-7300

◤ HarperCollins*Publishers*

<u>BY FAX and BY REGULAR FIRST CLASS MAIL</u>

August 14, 1991

Barry B. Langberg, Esq.
Law Offices of Barry B. Langberg & Associates
2049 Century Park East
Suite 3030
Los Angeles, California  90067

                RE:  <u>Brian Wilson</u>

Dear Mr. Langberg:

        As Assistant General Counsel for HarperCollins
Publishers, I am writing in response to your identical
letters to William Shinker and Thomas Miller, dated August 8,
1991, which were referred to my attention.

        First of all, I wish to confirm that HarperCollins is
publishing a book entitled **Wouldn't It Be Nice** by Brian
Wilson with Todd Gold, an autobiography of Mr. Wilson's life.

        The book has been read and thoroughly reviewed by
outside counsel specializing in pre-publication review.
Based on this extensive legal review process, we are
confident that the book has been written in a competent and
responsible manner and that it is free of libelous or other
actionable statements.

        Furthermore, we have a valid and enforceable
publishing agreement for the work which was signed by Brian
Wilson.  We have never had any reason to believe, nor are we
now impressed, that Mr. Wilson lacks the individual right or
the legal capacity to collaborate in a book about his life
and enter into a valid and binding contract for its
publication.

                                                    HC 00345

Barry B. Langberg, Esq.                          Page 2
August 14, 1991


        I trust that this letter is responsive to the
concerns of your clients.

                          Sincerely yours,

                          *Matthew Martin*

                          Matthew E. Martin


Enclosure
cc:  Donald S. Engel, Esq.
     Mr. Todd Gold
     Mr. Thomas Miller
     Mr. William Shinker
     Mr. Brian Wilson

HC 00346