IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CARL WILSON, an individual, and
AUDREE WILSON, an individual,

       Plaintiffs,

   v.

HARPERCOLLINS PUBLISHERS, INC.,
a Delaware Corporation,

       Defendant.

No. CIV 94-892 JC/LFG

**MEMORANDUM IN SUPPORT OF MOTION FOR
PRECLUSION ORDER UNDER RULE 37(c)(1) FOR FAILURE TO COMPLY
WITH RULE 26(a)(2) CONCERNING DISCLOSURE OF EXPERT REPORTS**

I.   Introduction

    Under the Court's Scheduling Order of July 11, 1996, plaintiffs were required to provide the reports of their trial experts by November 15, 1996. On November 18, 1996 Defendant received three documents purporting to meet the disclosure requirements of Rule 26(a)(2). Two of these documents were "declarations", in affidavit form, of a Barry Fey and a Mark Kaplan. The declarations were not accompanied by a report. The other document, a report by one Marilyn A. Lashner and a Coding Manual explaining certain terms used in the report, was also submitted along with her declaration.

    Each of the submissions materially fails to comply with the requirements of Rule 26(a)(2). The Fey and Kaplan declarations fail to make even a modest gesture toward compliance with the disclosure requirements of Rule 26(a)(2). The Lashner report, including her declaration and the coding manual, fails to provide the information required by Rule 26(a)(2), particularly

the pertinent underlying data on which her opinion is based. Because plaintiffs have previously failed to comply with the Court's discovery deadlines regarding expert reports in Phase I of this case and because the deficiencies in the declarations and reports submitted on November 15, 1996 are so comprehensive as to constitute a total disregard of plaintiffs' discovery obligations under Rule 26(a)(2), the Court should preclude the admission of any testimony from these three experts witnesses at trial as a sanction pursuant to Rule 37(c)(1).

II.  Rule 26(a)(2)

Rule 26(a)(2) was adopted to eliminate the gamesmanship that typified discovery from experts under the predecessor rule. Prior to Rule 26(a)(2) the parties were required to propound interrogatories to obtain minimal information regarding expected expert testimony, seek leave of the court to depose an expert witness, and then spend inordinate amounts of time at the deposition discovering his opinion testimony, its underlying bases, the supporting data, and background information concerning witness fees and prior testimonial experience. Reports generated by experts were often designed to disclose minimal information to opposing counsel; the underlying data and reasoning were typically absent or unavailable before deposition; and expert depositions dragged out for extended periods of time, were rarely completed in one sitting, and were frequently retaken.

2

Rule 26(a)(2) radically altered the regime of nondisclosure and evasion of the pre-1993 years. Rule 26(a)(2)(B) requires a party to provide a comprehensive statement not only of the subject matter of the opinion, but of the opinion itself, the reasoning and bases for the opinion, the data considered by the witness in forming the opinion, and any exhibits to be used as a summary of or in support of opinions.  In addition, Rule 26(a)(2) reports must include a list of publications authored by the witnesses within the preceding ten (10) years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the expert witness has testified as an expert at trial or by deposition in the preceding four years.  Information not included in the report is excludable under Rule 37(c)(1).

Beyond its general goal of complete, pre-deposition disclosure, Rule 26(a)(2) was intended to reduce and simplify discovery by giving an opposing party the opportunity to address only those opinions which would actually be rendered at trial and to analyze the supportive data and reasoning in preparing its own expert reports.  By requiring a comprehensive specification of the opinions, their bases, and the underlying data, the opposing party would be able to prepare its own report without having to guess at the issues actually in contention.

Finally, a major purpose of the Rule 26(a)(2) requirement was to reduce the time for taking of the expert's deposition or alternatively, eliminate entirely the need for a deposition.

III. <u>Plaintiffs' Expert Declarations And Report Materially Fail To Provide The Information Required by Rule 26(a)(2)</u>

A review of the documents provided by plaintiffs demonstrate that the declarations and the one report submitted fail to address, much less provide, the information required by the rule. In order to facilitate the analysis of each of these declarations, copies of which are attached as exhibits to this motion, defendant will examine each report and demonstrate its inadequacies under Rule 26(a)(2)(B). (<u>See</u> Exhibit 1 (Fey Declaration); Exhibit 2 (Kaplan Declaration); Exhibit 3 (Lashner Declaration); Exhibit 4 (Lashner Report); Exhibit 5 (Lashner Coding Manual).)

A. <u>Complete Statement of Opinions to Be Expressed and The Basis and Reasons Therefor, And Underlying Data</u>

<u>Declaration of Barry Fey</u>

The declaration of Barry Fey states bald opinions and nothing more. The first seven paragraphs of the declaration address Fey's qualifications as a promoter of rock concerts and his impression that the Beach Boys were "family type entertainment." (Para. 7.) The major opinion expressed is that the Beach Boys' marketability changed after publication and that the book "was perceived and talked about amongst disc jockeys and others in the music industry as presenting to the public the dirty truth that the quest for the almighty dollar was the driving force behind the band with total disregard to the consequences (mental and physically) to Brian Wilson, and that instead of being a close knit family America thought they were,

4

the Beach Boys brothers were victims of flagrant child abuse."
(Para. 8.)   Moreover, the declaration asserts that the Beach
Boys became the object of ridicule by disc jockeys and that "it
became increasingly difficult for anyone to be enthusiastic
about the Beach Boys following the publication of the book."
(Para. 8.)   The only specific information set forth in the
entire declaration is found in paragraph 9 in which Fey recounts
that he is involved in planning an Oldies Radio 1997 Summer
Concert and that "the Beach Boys have been ruled out by all
involved parties."

Clearly, this affidavit does not even begin to provide the
information required by Rule 26(a)(2).   No data or other
supporting information is specified by the witness. Indeed, the
affidavit appears to be based on undisclosed hearsay statements
by unidentified declarants at unknown times.  While it is
doubtful that plaintiffs could ever show that experts in this
field reasonably rely on this kind of information in rendering
opinions, see Fed. R. Evid. Rule 703, the hearsay statements are
the data on which the opinion appears to be based and should
have been disclosed.  Fey never identifies the disc jockeys who
perceive the Beach Boys differently, and he fails to make
reference to any other data establishing different patterns of
airtime for Beach Boys records after the publication of the
book.

The basis for the statement that the Beach Boys have become
the object of ridicule is similarly unsupported by any data or

other basis.  Moreover, the statement "it became increasingly difficult for anyone to be enthusiastic about the Beach Boys following the publication of the book" is simply an unsubstantiated assertion without any underlying reasoning, data or reasoning to explain why or how the conclusion is reached.

Moreover, the statement that the Beach Boys "have been ruled out by all involved parties" from the Cool Oldies Radio 1997 Summer Concert (para. 9.) informs the defendant of virtually nothing in terms of the identities of the "parties," the previous years that the Beach Boys appeared at the concert, and the reasons why the involved parties ruled them out. Clearly, this declaration was concocted without even a nod toward the requirements of Rule 26(a)(2). The Court should bar any testimony from Mr. Fey at trial for substantial failure to comply with Rule 26(a)(2).

<u>Declaration of Mark Kaplan</u>

The Kaplan declaration is even more deficient. While Fey at least gave a bald opinion, albeit unsupported by reasoning or data, Kaplan does not even do that.  Kaplan states that he will testify as a lay and a fact witness.  Kaplan purports to offer expert testimony on the nature of the "music industry accounting practices" (para. 4.) and other matters, and it is doubtful that his testimony even about the books and records of Brother Records and Brother Tours can be limited to purely lay testimony without reliance on accounting expertise.

Mr. Kaplan's "declaration" is a masterpiece in evasion and flouting of Rule 26(a)(2). First, he disclaims that he has even formulated an opinion regarding his analysis of revenues and profits received by the Beach Boys before and after publication of the book. He apparently has not reviewed the information prepared by the Beach Boys' prior accountants and expresses his intention to rely on "any accounting and royalty records obtained by defendant via subpoena or otherwise, and any other accounting records produced in discovery." (Para. 5.) In short, Mr. Kaplan is apparently waiting to rely on defendant's discovery of Carl Wilson's records in order to render an opinion on behalf of Carl Wilson![1] It is hardly an excuse for failing to file a timely and complete expert report that one's client has failed to provide necessary data generated by his own business entities.

Moreover, in speculating on his future testimony, Kaplan purports to rely on his "understanding of the Beach Boys' business practices and contractual relationships, including the

---

[1] Because of the failure of plaintiff Carl Wilson to produce the complete financial records of Brother Records and Brother Tours for the relevant time periods, Harpercollins was forced to subpoena Brother Records and Brother Tours in an effort to obtain complete records concerning touring, merchandising, and recording revenues and related expenses. These records were not made available by the entities subpoenaed until November 18, 1996 and the records for the periods 1990 through 1992 were not produced until November 22, 1996. Even this production is not complete. Both counsel for plaintiffs and counsel for Brother Records and Brother Tours have represented to Harpercollins during the course of the production that Kaplan is the custodian of these records. Under the circumstances, it is a mystery why he would not have them available to review in preparing his expert report.

7

manner in which various revenues are paid, and further, my understanding music industry accounting practices". (Para. 5.) This statement tells defendant nothing about his conclusions, opinions, or the reasons for the opinion and provide none of the data upon which any future opinion is based.

The only reference in his declaration to an opinion is the assertion that touring revenues have diminished since the publication of the book along with a reference to a decrease in the number of shows and average income. The data on which this opinion is based is not disclosed. From these statements, Kaplan speculates that the gross income loss in touring is $2.3 million. None of the data on which this information is based has been provided; nor is there any discussion of net loss, the proper measure of damages, in calculating lost profits.

The Lashner Report

Dr. Lashner purports to be a specialist in "content analysis" of communication, a discipline which apparently originated in ecclesiastical attempts to ferret out heretical meanings and implications in literary works. (Lashner Decl., para. 6.) Unlike the Fey and Kaplan declarations, this report possesses some of the attributes of a report contemplated by Rule 26(a)(2). It states or implies essentially two opinions: that the book portrays Carl Wilson negatively in relation to Eugene Landy and that Landy must have written portions of the book. (Lashner Decl., para. 8; Report at 5-6, 29-30.) It also describes generally the methodology used in analyzing the book

8

to arrive at these conclusions.  Yet, like the Fey and Kaplan declarations, the report and coding manual fail to provide the underlying data to which the methodology was applied.

Dr. Lashner states "[A]ll in all, there was a total of twenty-seven designated passages which were subjected to content analysis.  Of the designated passages, three focused on Audree Wilson, thirteen on Carl Wilson, and eleven on the Beach Boys (to the extent that Carl Wilson was referred to individually or as an integral member)." (Lashner Report at 9.) However, while Lashner references these passages to the second amended complaint, and states that they were analyzed "in terms of the context in which they occurred," the particular contexts pertinent to each passage are not specified.

Dr. Lashner then apparently broke the "passages" into "assertions."  ("A single sentence in a paragraph may harbor multiple assertions.")  (Lashner Report at 11.)  Dr. Lashner states the conclusion that "scientific content analysis of the 27 designated passages generated a total of 298 assertions of relevant information:  80 focusing on Audree Wilson; and 218 focusing on Carl Wilson." (Lashner Report at 18.)  Yet, Dr. Lashner never identifies what she considered to be the 218 assertions.  Nor does she state how the assertions were categorized.  "Such assertions as were subsumed within each category were then counted and reviewed for patterns of content ..." (Lashner Report at 11.)  In order to test the validity of the opinion of this extremely unusual expert witness, the

9

defendant is entitled to the basic data to which her methodology was applied and her opinions are based.

The court should be alerted at this time to two other major difficulties with this expert report, although not strictly relevant to plaintiffs' noncompliance with Rule 26(a)(2).

First, a review of Lashner's declaration, the report, and the coding manual, discloses that it will most probably be necessary to conduct a <u>Daubert</u> hearing on whether the field of expertise claimed by Lashner is based on a scientific methodology at all and whether it can be validated as a matter of scientific principle.   The "expertise" on which Lashner relies appears to be based on a technique or methodology which lacks scientific validity and is based on the purely pseudo-scientific and subjective interpretations of the expert. As gatekeeper for opinion evidence allegedly rooted in scientific principles, the federal court should be alerted to the highly suspect nature of her expertise and to defendant's expected <u>Daubert</u> challenge to her methodology.

Second, the burden of Dr. Lashner's elaborate report clearly invades the province of the court and the jury and relies on an expertise which she indubitably does not possess.

Lashner seeks to prove by content analysis that some portions of the book contain negative material concerning Carl and Audree Wilson.   It is the province of the Court to determine whether a statement is capable of a defamatory meaning, and the function of the jury to determine whether the statement was

10

reasonably understood in its defamatory sense.   Foretich v. Chung, 23 Media L. Rep. 144 (D.D.C. 1995).   Moreover, the Court determines whether the "negative" passages are opinion (in which case they are absolutely protected) or statements of fact capable of sustaining an action for defamation.

Stripped to its basics, the Lashner report purports to do no more than to relate that certain passages in the book present Audree and Carl Wilson negatively.   However, the court and the jury are solely entitled to decide those issues, and expert testimony can be of little or no assistance in helping them make that determination.   If the words in the book within the context in which they are used are defamatory, it will be apparent to the jury without an expert telling it that a passage is "really" defamatory, although it does not appear to be so.

Second, Lashner's content analysis purports to give an opinion on a historical fact, i.e., whether Dr. Landy wrote parts of the book.   Content analysis, whatever its utility, can not provide a window into the issue of authorship.   At most, it can establish that Landy is presented positively and Carl Wilson in a comparatively negative context.   Lashner arrives at her opinion that Landy contributed to the book by focusing on whether Brian was able to recall various events himself in light of his drug use and mental illness.   She draws on selected statements by Brian concerning substance abuse and mental illness, relates them to defects in his memory, and then concludes that he could not have remembered the events he

11

recounts.   (Lashner Report at 7. ("a goodly portion of information which the book advanced about Dr. Landy and others was incompatible with Brian's memory or personal knowledge.").) Therefore, she continues, Landy must have contributed these passages to the book.   (Lashner Report at 7.)

Lashner, however, is not a psychologist or a psychiatrist and does not purport to have any qualifications allowing her to give a professional opinion on whether Brian Wilson was able to recall accurately the events recounted in the book, what events he could or could not recall, and whether the material included was his own recollection of the historical past or someone else's.   She has never examined Brian Wilson and would be incompetent to give an opinion on this issue if she had.[2] Therefore, the conclusions and opinions of the report seek to use content analysis to speculate that Landy contributed to the book, a conclusion based on her assessment of Brian Wilson's psychological ability to recall. Such psychological speculation and inference-drawing is clearly beyond the expertise she claims to have.

---

[2] Moreover, even a qualified psychiatrist would not be allowed to give an opinion on whether Landy actually contributed material for the book. Lashner's report seeks to opine, in this respect, on matters heretofore considered within the province of parapsychology, a discipline which is not recognized as grounded in scientific principle at all.

B.   <u>Any Exhibits To Be Used As Summary of Or Support for</u>
<u>The Opinions</u>

The declaration of Barry Fey has no exhibits supporting the opinions but includes only attachments purporting to state his qualifications and his experience.

The declaration of Mark Kaplan has no exhibits whatsoever. As we have discussed, Kaplan does not even purport to have an opinion at this time and has not even reviewed the relevant financial documents.

Unless the Coding Manual, which appears to be only a statement of definitions, can be considered an exhibit, the Lashner report includes no exhibits identifying the "contexts" in which the "passages" were analyzed or identifying the "assertions" which form the basis of her opinion.

C.   <u>Qualifications of Witness Including A List of All</u>
<u>Publications Authored by The Witness Within The</u>
<u>Preceding Ten Years</u>

The declaration of Barry Fey is devoid of any reference to publications at all.

The declaration of Mark Kaplan does not even address the issue of publication.

Dr. Lashner's declaration does include a list of publications.

D.   <u>Compensation To Be Paid For The Study and Testimony</u>

The Kaplan declaration makes no reference to the amount of money paid or to be paid for the declaration, report, or testimony.

IV.   <u>Plaintiffs   Should   Be   Precluded   From   Adducing   Expert
Testimony On These Subjects</u>

This nearly total failure to comply with the requirements
of Rule 26(a)(2)(B) is particularly unseemly given plaintiffs'
earlier insistence that the court impose strict deadlines on
discovery in this case. Clearly, plaintiffs have not taken
seriously their obligations under Rule 26, as evidenced by the
fact that the declarations do not even address, much less
attempt to provide, the most fundamental information required by
Rule 26(a)(2).  Plaintiffs have simply flouted the disclosure
requirements and thus have made it impossible for defendant to
respond with their own expert reports within the time limits
imposed by the court.

Defendant's own expert disclosures are due on December 15,
1996.  Because the financial data regarding the Beach Boys has
been obtained only recently and then inadequately, (Mr. Kaplan's
declaration implies that it has not yet been provided to him),
defendant is unable to conduct its own analysis of the records.
Because plaintiffs have failed to provide opinions and the
underlying data, defendant is unable to join the expert issues
likely to be raised a trial, limit the scope of their own
experts' preparation, or to conduct their own analysis of the
data on which plaintiffs rely.

Moreover, each of the objectives of the revised Rule 26 has
been frustrated by their failure to provide disclosures under
Rule 26(a)(2).  The reports are virtually useless as a
disclosure device for learning anticipated testimony of

15

plaintiffs' experts and the supporting data.  The Kaplan and Fey declarations do not disclose any methodology or data. Defendant is unable to present material to its own experts based on these "reports" to enable them to formulate their responsive opinions.

In addition, based on the tentative and dataless nature of these reports, defendant is unable to take the depositions of these expert witnesses.  To do so would clearly be futile at this point.  Mr. Kaplan does not even purport to be able to give an opinion at this time; Mr. Fey presents no data or information upon which a deposition could be taken; and Dr. Lashner fails to provide the enumeration of the "assertions" on which she bases her opinion.  Thus, not only do the deficiencies of the reports and declarations interfere with the goal of dispensing with the necessity of taking a deposition altogether, they do not even provide enough information to warrant the taking of depositions at all.

This is not the first time that plaintiffs have violated the Court's order regarding expert witnesses.  In Phase I of the case, the plaintiffs failed to file their expert reports and affidavits on time.  The Court granted an extension based on extenuating personal circumstances.

In Phase II plaintiffs have no such excuse. This case has been pending for over two years.  At the initial pre-trial conference, the court specifically inquired into the plaintiffs' calculation of damages.  That their accounting expert has not even received the documents to which Carl Wilson has access by

16

The declaration of Mark Kaplan is devoid of any reference to compensation for the preparation of his opinion and his testimony.

The declaration and report of Dr. Lashner states in paragraph 5 what her standard rates are, but there is no statement of what she has charged to prepare her report and the Coding Manual. Rule 26(a)(2) requires a statement of "the compensation to be paid for the study and testimony," not merely a recounting of standard rates.

E.    <u>A Listing of Any Other Cases In Which The Witness Has Testified As An Expert At Trial or By Deposition Within The Preceding Four Years</u>

The declaration of Barry Fey does not address this requirement.

The declaration of Mark Kaplan does not address this requirement.

The declaration of Marilyn A. Lashner addresses generally that she has previously testified but does not give specific information regarding the cases or the testimony.  In paragraph 4 she includes a generic reference to depositions or affidavits and "various other contested matters" in several states and trial testimony in "courts in Houston, Texas and Denver, Colorado."  Rule 26(a)(2)(B) requires "a listing of any other cases" in which the testified as an expert or a deposition within the preceding four years.  Plaintiffs have failed to provide this information.

14

virtue of his corporate interest constitutes an astonishing neglect of his obligation to provide his experts with the relevant data necessary to formulate an opinion.

The appropriate remedy for this wholesale failure to comply with Rule 26 is dictated by Rule 37(c)(1). Rule 37(c)(1) provides that unless the failure is harmless, information not disclosed shall not be permitted to be used at trial. There is no excuse or justification, much less substantial justification, for this unwillingness to comply with the requirements of Rule 26. Other courts, when faced with a material violation of Rule 26(a)(2) have issued preclusive orders. See, e.g., Sierra Club v. Cedar Point Oil Co., 73 F.3d 546, 573 (5th Cir.) (designation of experts stricken and experts precluded from testifying at trial), cert. denied, 117 S. Ct. 57 (1996); Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 281-84 (8th Cir. 1995) (precluding testimony).

This Court should enter an order barring the plaintiffs from introducing any expert testimony at the Phase II regarding the issues addressed by the declarations of Fey, Kaplan and the report and declaration of Dr. Lashner. By doing so, the Court will give meaning to the requirements of Rule 26 and protect the defendant against the prejudice to their own expert preparation inherent in this violation of the rules.

Defendant is entitled to reasonable attorneys fees and costs for the preparation of this motion and brief.

Respectfully submitted,

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: _William S. Dixon_____
     William S. Dixon
     Post Office Box 1888
     Albuquerque, New Mexico  87103
     Telephone:  (505) 765-5900

R. Bruce Rich
Katherine J. Daniels
WEIL, GOTSHAL & MANGES
767 Fifth Avenue
New York, New York  10153
Telephone (212) 310-8000

Attorneys for Defendant
HarperCollins Publishers, Inc.


We hereby certify that a copy of
the foregoing was hand-delivered
to Ernesto Romero and forwarded
via facsimile without exhibits and
via overnight service with exhibits
to Beth Dumas this _25th_ day of
November, 1996 at the following
addresses:

    Ernesto J. Romero
    3602 Campus Blvd., N.E.
    Albuquerque, NM  87106

    Beth Dumas
    Langberg, Cohn & Drooz
    12100 Wilshire Boulevard, Suite 1650
    Los Angeles, CA  90025

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: _William S. Dixon_____
    William S. Dixon

18

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CARL WILSON, an individual,      )      Case No. CIV 94 892 JC
and AUDREE WILSON, an            )
individual,                      )
                                 )
            Plaintiffs,          )
                                 )
      v.                         )
                                 )
HARPERCOLLINS PUBLISHERS,        )
INC., a Delaware corporation,    )
                                 )
            Defendant.           )

## DECLARATION OF BARRY FEY

I, BARRY FEY, declare as follows:

1.   My career and experience as a concert promoter has spanned 29 years.  I have dominated live entertainment in the Denver market and have been a strong force in Las Vegas, Phoenix and Albuquerque, to name a few.

2.   My concert promotion experience includes bookings for the *Doors, Big Brother, Jimi Hendrix, Led Zeppelin, Crosby, Stills & Nash, the Who, the Rolling Stones* and the *Beach Boys.* My concert promotion experience includes concert series (such as the "Summer of Stars" held annually at Red Rocks Amphitheater in Denver, Colorado) and single events.

wil3\010\fey.dec



EXHIBIT

1

3. I have received international recognition for high quality presentations, resulting in *Billboard Magazine's* "Concert Promoter of the Year" for an unprecedented three years in a row. Attached hereto are true and correct copies of various newspaper articles about me, and a brochure describing my concert promotion business.

4. I have been retained by Plaintiffs as an expert on the subject of concert promotion as it relates to Carl Wilson's claim for general damage to reputation and special damages resulting from lost concert revenues.

5. The subject of my expert testimony includes the factors that influence the booking of shows. The bottom line in whether or not a band is going to be booked is money. It is necessary to look at many different factors that are going to affect a band's success in any given market (i.e., reputation, air play and album sales) and a venue is selected accordingly. However, occasionally a band will elect to play a smaller facility than they can fill or may opt for a larger one.

6. My expert opinion is based on my concert promotion experience, my review of the alleged defamatory statements from *Wouldn't It Be Nice* (the "Book"), the *Beach Boys'* gig sheets from 1988 to 1995, the comments of disc jockeys and comments I remember hearing after the Book came out, and my own experience with *Beach Boys'* bookings.

7. I have always been a big fan of the *Beach Boys*. In 1974, the producers of the *Crosby, Stills & Nash* stadium tour

were going to put *Santana* on as the opening act, and I convinced them to put the *Beach Boys* on instead. In fact, I promoted the *Beach Boys'* concerts in Denver at Mile High Stadium, in Kansas City at the Royal Stadium, and in Milwaukee at the Milwaukee County Stadium. At that time, and for numerous years to follow, the *Beach Boys* were an ideal act due to the fact that they had about 65 three-minute songs that everyone knew all of the words to. Although in some of their concert performances it could be said that there was a decline in singing or performance strength, the *Beach Boys* still remained a favorite in the public eye and were the first choice for "family" type entertainment. The public seems to have set aside, and was not influenced by, the publicized behavior of Dennis Wilson before his death (i.e., his drug abuse and his Charles Manson association). I have had the *Beach Boys* play at an Annual Salute to Dad, with the Denver Symphony Orchestra, and after baseball games, to give a few examples. They were the epitome of an "all American" band.

8. The *Beach Boys'* concert marketability changed following publication of the Book in that the Book was perceived and talked about amongst disc jockeys and others in the music industry as presenting to the public the dirty truth that the quest for the almighty dollar was the driving force behind the band with total disregard to the consequences (mentally and physically) to Brian Wilson, and that instead of being the close-knit family that America thought they were, the *Beach Boy* brothers were victims of flagrant child abuse. This caused the *Beach Boys* to become the

WJ3\010\fey.dec

3

object of ridicule by disc jockeys.  One of the largest
contributors to a band's success lays in the enthusiasm of the
disc jockeys when they are on the air, and it became increasingly
difficult for anyone to be enthusiastic about the *Beach Boys*
following publication of the Book.

9.   At one time, I would have paid $100,000 to the *Beach
Boys* without batting an eye, but now I would hesitate to pay them
$25,000 (if I agreed to book them at all).  In fact, I am
involved in planning the KOOL Oldies Radio 1997 *Summer Concert*,
an event which, in prior years, a band like the *Beach Boys* would
have been perfect for.  However, the *Beach Boys* have been ruled
out by all involved parties.

Executed this 15th day of November, 1996, at Greenwood
Village, Colorado.  I declare under penalty of perjury under the
laws of the United States of America, the State of California,
the State of Colorado and the State of New Mexico that the
foregoing is true and correct.

BARRY FEY





# F    E    Y
# C O N C E R T
# C O M P A N Y

has been a major force in the
entertainment industry since its
beginnings as Feyline Presents, Inc. in
1967; its history of accomplishments is
one of profitable partnerships. From the
inception of planning to the moment the
house lights dim, the objectives of co-
producers are shared and met by Fey
Concerts. Now, well into its fourth
decade of operation, Fey Concerts
draws upon experience gained through
years of success while maintaining a
young and vital attitude.



5889 South Greenwood Plaza Blvd.
Suite 400
Greenwood Village, CO 80111
(303)694-1234
Fax (303)741-1831

# OUR BACKGROUND

More than just the Rocky Mountain region's premiere promoters, Barry Fey and Pam Moore have made an international impact with events such as the US Festival, The Jamaican World Music Festival in 1982, the first major music event presented in a third world country and the legendary Summer of Stars series at Red Rocks Amphitheater. Known and respected throughout the industry, Fey Concerts is successful in all aspects of concert/event promotion, booking, production and related opportunities. In an increasingly intricate and competitive field, Fey Concerts is recognized as a full-service operation with a competent staff of specialists who handle everything from the imaginative packaging of each event to complex last minute details.

Fey Concert Company has produced more concert dates with The Who and The Rolling Stones than any other regional promoter worldwide. In addition, their close association with U2 led to the production of the best-selling music video of all time, "Under A Blood Red Sky," filmed entirely on location at Red Rocks. So successful was that joint venture that U2 again came to Fey Concerts to produce all the live music segments in their next film, "Rattle and Hum," shot at McNichols Arena in Denver and Arizona State University in Tempe. The respect of both performers and audiences alike has prompted international recognition of Fey Concert's high quality presentation, and resulted in Billboard Magazine honoring Barry Fey as "Promoter of the Year" for an unprecedented three consecutive years.

With over three hundred shows a year in Denver, Phoenix, Las Vegas and other major western markets, Fey Concerts has attracted audiences in the millions for shows featuring the hottest contemporary, country and classic music talent as well as family events including The Moscow Circus, Old Timers Baseball, featuring such legends as Joe DiMaggio and Ernie Banks (in 1983, Old Timers Baseball, which was not presented in conjunction with a regular season game, drew an outstanding crowd of 56,800 ...more than any major league game that season!), The Teenage Mutant Ninja Turtles and Salute to Dad. Booking such prestigious venues as Mile High Stadium, Bally's Resort in Las Vegas and Reno, America West Arena in Phoenix and the spectacular Red Rocks Amphitheater, Fey has established a solid reputation for their ability to sell more tickets than any other promoter in the region. In 1990 alone, the Red Rocks summer series grew an impressive 71% due to increased bookings and attendance.



Billboard International Talent Forum

TALENT FORUM 6

CONCERT PROMOTER OF THE YEAR
BARRY FEY

BILLBOARD PROMOTER OF THE YEAR Barry Fey

# OUR SHOWS

Fey Concert's continuous record of success in the presentation of events and the crowd management situations inherent to such presentations extends in an unbroken line from Denver's 1969 Pop Festival to the "Colorado Sunday" series to stadium and arena shows as well as smaller venues. Fey Concerts prides itself in offering more talent under the finest conditions at the fairest ticket price possible.

Considered the most spectacular outdoor venue in the world, Red Rocks Amphitheater, located in Morrison just 15 miles west of Denver, has hosted the biggest names in the entertainment industry – The Beatles, Jimi Hendrix, Bruce Springsteen, The Eagles, Robert Plant, Mikhail Baryshnikov, Whitney Houston, Bette Milder, Neil Diamond and The Grateful Dead …to name just a few! Named the Best Outdoor Concert Venue by Pollstar Magazine, an international entertainment industry publication, for an unprecedented six years the magazine notes: "Red Rocks loyalists say that the concert experience becomes even more memorable thanks to the special effects provided by Mother Nature's sunsets; the open sky can be magic …" Red Rocks was also cited twice as the country's premier outdoor venue in an award determined by Performance Magazine. With a capacity of 9,500, Fey Concerts books an average of 30 shows during its "Summer of Stars" series from May to September; in 1985, 53 shows played to 92% capacity.

Offering a new level of sophistication in arena rock, Fey Concerts has presented artists as diverse as Elton John, David Bowie, Motley Crue, The Who, Michael and Janet Jackson and AC/DC at McNichols Arena. Hailed by sound technicians as having optimum construction for the proper dispersal of sound, McNichols enjoys a reputation as one of the finest sounding large venues utilized by major performers. Simplified, direct stage access, modern ventilation, security, ample parking and complete catering/dressing facilities along with an 18,000 seat capacity qualifies McNichols as one of America's premier arenas.

In addition, Fey Concerts utilizes numerous small halls in the region from the Paramount Theatre (Capacity 2,000) to the Fieldhouse at the University of Colorado (3,800 seats) in the presentation of acts such as Big Head Todd & The Monsters, Blues Traveler and Red Hot Chili Peppers.

The Historic Paramount Theatre is Denver's last grand movie palace, now operating as a performing arts and entertainment center. The Paramount Theatre has been serving Denver and millions of visitors since 1929 and now Fey Concert Company is responsible for all management, booking and operations of the theatre in collaboration with The Historic Paramount Foundation.

From the enormous complexities of planning and executing major events such as the annual Winter Park festival to production support on sporting events, Fey Concert Company enters the 90's firmly entrenched as the concert industry pacesetter.



CONTACT: MICHELE 'MEL' GIBSON/PUBLICIST 303•694•1234

Friday, September 15, 1989

THE DENVER POST

NEW ERA FOR SYMPHONY

23A

# DSO officials hopeful musicians someday will return

By Judith Brimberg
Denver Post Staff Writer

Denver Symphony musicians have struck out on their own, but some symphony backers said yesterday they hope musicians eventually will return to a broadened, more responsive Denver Symphony Association.

Several members of the association arm — have been working since June to reconstruct the organization "in a way in which we are compatible with the musicians," said yesterday.

Denver Symphony Orchestra Chairman John Law said the association probably won't be vindictive.

"It is my view that attempting to resolve any differences we may have with the musicians' union through litigation probably is not productive," Law said.

Mayor Federico Peña said he will await a presentation from musicians and Fey before deciding whether to let the new orchestra or a broadened, city-owned Boettcher Concert

"I am not closing the door on the musicians and Barry Fey are making," Peña said. "It appears to be the only scenario under which the musicians will play."

## Fey's had plenty of highs — and some lows — as a promoter

By Dick Brown
Denver Post Special Writer

Barry Fey's career as a promoter has spanned more than two decades, from bringing classic rockers like the Doors to Denver in the '60s to presenting the Who this summer at Boulder's Folsom Field.

There's been football, baseball and bankruptcy along the way. Some highlights:

■ 1967 — Fey promoted his first Denver-area concerts in September, bringing Big Brother & The Holding Company and Blue Cheer at the Family Dog, as well as the Doors — his first concert as Feyline Inc. — at the Denver University student union. On Dec. 26, he promoted his first show outside of Denver, with Canned Heat in Phoenix.

■ 1968 — On Sept. 2, Fey promoted a Jimi Hendrix/Vanilla Fudge/Soft Machine billing at Red Rocks Amphitheater, his star guitarist he discovered playing first concert using a city facility. In 1975, he began booking the Red Rocks "Summer of Stars" series, now in its 19th year.

■ 1969 — Fey promoted the three-day Denver Pop Festival, June 25-27 at Mile High Stadium. On Nov. 6, he staged the first Rolling Stones show at Mammoth Gym in Fort Collins. It was the first show on the Stones' 1969 tour, three years later, the band failed to become a nonprofit impresario in the United States.

■ 1970 — Fey brought the Who to Denver's Mammoth Gardens on June 9-10. He has since promoted more concert dates than anyone else in the United States.

■ 1975 — Fey took over management.

"Fudge/Soft Machine billing at guitarist he discovered playing died in December 1976.

"Promoter of the Year" by Billboard magazine, an honor that repeated in 1979 and 1980. At one point in the '70s, he was booking shows in all American cities, including Salt Lake City, Phoenix and Kansas City, Mo.

■ 1979 — Fey opened the Rainbow Music Hall, a state-of-the-art concert facility, in Denver.

■ 1982 — Fey promoted the first American-produced concert held in a Third World country.

■ 1983 — In May and June, Fey coordinated talent for the first US Festival in San Bernardino, Calif. He won the three-day event at the Denver World Cup of Thoroughbred Handicapping in Las Vegas, Nev. Red Rocks the most successful season in history for the "Summer of Stars" series. He sold 137,000 tickets for two Bruce Springsteen shows at Mile High, the largest-grossing event of his career.

■ 1986 — On May 23, Feyline Inc. wound up in bankruptcy court as a condition of the company's sale to Canadian promoter Michael Cohl. When the court approved the plan, Fey and Cohl emerged as partners in a reorganized venture called Fey Concert Co.

■ 1989 — On Sept. 12, members of the Denver Symphony Orchestra agreed to make Fey the promoter of a proposed self-managed concert season starting in the fall.

One of the symphony's support groups, the Men's Organization of the Denver Symphony, is studying whether it can help.

Denver rock promoter Barry Fey, as marketing agent. Fey said yesterday he plans to put $8,000 a week into promoting the new Colorado Symphony Orchestra.

"We're just trying to step good quality classical music alive in Denver," said board member Bob Scofield.

Reactions to the formation of a new orchestra ranged from cautious encouragement to dismay.

"It is a very courageous step but it is a step which I understand," said former DSO conductor Brian Priestman. "I wish the new orchestra every great success. . . . If it is in my power to help them, they know where my heart is."

More power to them.

"I'll douglas, executive director of the Boettcher Foundation, a major DSO contributor, said: "In due course we know musicians as an independent group, 'It's unfortunate because we know that frustrations, but evidently they have difficulty in understanding the Denver Symphony Association's economics problems."

"Penny Shoemaker, president of the Denver Symphony Guild, said the DSO's oldest support group, said musicians as an independent group, 'It's unfortunate because we know that frustrations, but evidently they have difficulty in understanding the Denver Symphony Association's economics problems."

has been established, Douglas said.

Case 1:94-cv-01842-JEC-LFG   Document 132   Filed 12/13/96   Page 28 of 95

# Fey keeps things rockin' in the Rockies



By Brian Gadbery, Special for USA TODAY

## MUSIC

### BY NANCY MALITZ

DENVER — Rock promoter Barry Fey started Feyline with $220 in September 1967. And until July 14, 1971, he didn't lose money on a single concert.

"I couldn't afford losers," says music's King of the Rockies. "I didn't have the money."

Fey sits in United's Red Carpet Lounge at Stapleton International Airport amid a confusion of cashmere coats, leather briefcases and business executives. They drink scotch, make trans-Atlantic phone calls and wait for the fog to lift.

Wearing jeans, Fey sits with legs crossed, sneakers dirty. His Rolling Stones jacket, his name on the front, is unzipped. A Coca-Cola is in his hand. He is 43, grossed $17 million last year and has Coloradans do music under his thumb. He looks like he crashed the joint.

But nobody will kick Fey out, because everybody in Denver knows who he is. One of the country's biggest rock promoters — on a par with San Francisco's Bill Graham and Florida's Jack Boyle — Fey has presented more Rolling Stones concerts than anyone else.

He also has turned Denver into the best per-capita audience for rock in the country, he says. "We did 120,000 for the

Stones in 1981," says Fey. "That's 10 percent of the population, when you put it out."

Despite the bad economy, big-name bands have been touring and Fey has done brisk business. He recently handled four shows in Denver's McNichols Sports Arena — Aerosmith, Neil Young, Barry Manilow and Willie Nelson. His 10-city national tour with Willie Nelson closed in Honolulu, last Tuesday, grossing $1.3 million. Next, he has present Journey, Bob Seger, Hall and Oates, Billy Squier, and Crosby, Stills and Nash in the Rockies.

Fey puzzles over the success. He is sure it has something to do with the physical abuse and psychological harassment he endured as a fat and lonely 17-year-old from New Jersey under a sadistic Marine Corps drill sergeant. "I was lucky. Two other guys committed suicide," he says. "No matter where I was going after that, I knew it was up."

"Up" was netting $92 from a Baby Huey and the Babysitters concert in Rockford, Ill., in 1965. He had been making

$88.50 a week as manager of Rockford's Robert Hall clothing store for men. He says "I this been going on?" And a rock promoter was born.

His first Denver date came in 1966 — a fraternity dance. With profound good luck he booked the Association just before their Cherish became the country's No. 1 single. Denver gave him a Rocky Mountain high. "I decided if I'm gonna be a bum, I might as well be (in) someplace like this."

He tells his stories with a hoarse, East Orange accent, a tough-guy voice straight out of the gangster movies. He is uncomfortable talking about the music he likes or the bands he thinks are best. Restaurants, he'll talk about. But he'd rather think of music as a business.

"I'm not creative in that sense," he says. "I don't develop talent. What I do is merchandising and marketing of things that are already developed. Chuck Morris (Feyline's vice president) is very creative. He can hear a demo record and say there should be strings here or piano. But I don't do that. I sell what's already there."

Fey plays hardball with any

promoter who invades his territory, but he is friends with promoters in other markets, such as San Francisco's Graham. Graham has two years seniority on Fey, which makes him forever older and wiser. When Fey finally broke his winning streak in 1971 and lost money on Stephen Stills in Kansas City, Mo., Graham sent him a wreath.

The competition seems friendly enough: "Bill is No. 1 for special effects and concepts, that kind of thing. No one can outproduce him." He grins. "But I sell more tickets."

Fey has a rock star's bankroll and access to a rock star's lifestyle, but he isn't interested. He says he doesn't drink, smoke or do drugs.

"I take a walk when I get lonely," says Fey. Divorced, he says he rarely dates. "People just come up and tell me how much they appreciate what I do. It really knocks me out."

He thrives on such love injections. "Once in a while some guy will ask me if I don't get fed up with all those kids competing up to tell me how much they love the concerts.

"I tell him, 'Yeah, that's why I wear my name on my jacket.'"

Co. for about $100 million. Lieberman, a Minneapolis-based video, music and computer software distributor, had been a profitable venture for Live. The sale should be completed by late July and will cause a $37 million write off on Live's books. Live may also be planning to merge with Carolco Pictures, which owns 54 percent of the company......... EMI-CAPITOL has secured a worldwide licensing agreement to issue the entire Apple Records catalogue of non-Beatles product. Some of the Apple material has not been available for over 20 years, and never previously on CD, and many will contain bonus tracks. Among the first Apple/Capitol recordings to be released this fall are James Taylor's *James Taylor*, Badfinger's *Magic Christian Music*, Mary Hopkin's *Postcard*, Modern Jazz Quartet's *Under The Jasmin Tree*, and Billy Preston's *That's The Way God Planned It*. Also reissued will be the live recording in CD configuration only of *The Concert For Bangladesh*. That record will be released on July 30th, two days prior to the 20th anniversary of the concert.

## A Double Team For Desert Storm Families



Whitney Houston's rendition of the National Anthem and The Jukebox Network interactive music video channel combined to raise $20,000 for the American Red Cross. Every time the song was requested by viewers during the Red Cross fundraiser, proceeds were donated to the organization's Gulf Crisis Fund to benefit military families. Here, Jukebox Network programming VP Les Garland (left) and Houston present the check to Red Cross official Carlos Rainwater.

## Court Rules Against Club Admission Policy

The Vertigo nightclub in Los Angeles has been found in violation of California's civil rights act because its admission policy is based on "nebulous criteria" including fashion or style of dress, social status and acquaintance with management. Being a single female also helps, according to the court decision handed down by Administrative Law Judge Milford Maron. In the June 12th ruling, Maron found the trendy nightclub arbitrarily discriminated against single men and the general public. The judge revoked the club's liquor license but stayed the order for one year during which the club must write a non-discrimination policy to stop discriminating against people lined-up to get in. Vertigo has appealed the decision and will operate as usual pending a new hearing. The club maintains it can extend special treatment to some patrons as long as it does not discriminate on the basis of race or sex.

## Fey Finds A Rock Hotspot In Glitter Gulch



Denver-based concert promoter Barry Fey has hit a musical jackpot at Bally's Casino Resort in Las Vegas. The gambling mecca has long been perceived as a rock and roll wasteland, but Fey Concerts has had more than a little success bringing major touring acts into Bally's 4,000-capacity ballroom and 1,476-seat showroom. "We started with Sam Kinison, then did Andrew Dice Clay, Heart and INXS," said Fey. Pictured above are INXS members Michael Hutchence and Kirk Pengilly during the band's April 5th show at the ballroom. Fey says the ballroom dates can be more lucrative for acts because expenses are significantly lower than in an arena and the ticket price is higher, about $33.50. The Labor Day holiday will be Fey's biggest weekend at Ballys with Harry Connick Jr. in the showroom for three days, Don Henley in the ballroom for two days and The Moody Blues in the ballroom for one day.

## A Super Sloppy Arena Show

John Burnap of Events! Inc. and the Nickelodeon cable network will co-produce an arena tour of the network's hot children's game show "Super Sloppy Double Dare." Events! will book the show in mid-size arenas starting October 5th and running weekends only through November 17th. Marc Summers, who hosts the show on Nickelodeon, will travel with the touring show and children will be chosen from the audience as contestants. Promoters will want to note the production rider which calls for 12 cans of whipping cream, 6 bananas, 16 dozen eggs, 1 jar of Maraschino cherries, 6 packs of Bubble Yum, and 1 bag of marshmallows.

## Medical Notes

The BLACK CROWES have often been referred to as skinny guys in tight pants, but it turns out lead singer Chris Robinson's weight is not something to joke about. Robinson collapsed in London June 21st at a party thrown in the band's honor. Doctors found him to be suffering from severe exhaustion and considerably underweight. The band returned home immediately and canceled its European promotional tour. Robinson is now resting so he can return to Europe August 3rd to begin a three-month tour of that continent, Japan and Australia. The Black Crowes reportedly played 285 shows in 16 months......... The illness which has caused ROD STEWART to totally rearrange his European tour has finally been diagnosed, according to the New York Daily News. The surprise medical verdict was Stewart had been suffering from hay fever. He now plans to start his North American tour on August 16th.......... MARY WELLS is back in the hospital in Los Angeles with

(Continued Page 9)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

```
_____ )
CARL WILSON, an individual,         )      Case No. CIV 94 892 JC
and AUDREE WILSON, an               )
individual,                         )
                                    )
          Plaintiffs,               )
                                    )
     v.                             )
                                    )
HARPERCOLLINS PUBLISHERS,           )
INC., a Delaware corporation,       )
                                    )
          Defendant.                )
_____ )
```

## DECLARATION OF MARK KAPLAN, C.P.A.

I, MARK KAPLAN, declare as follows:

1.    I am a certified public accountant, specializing in music industry accounting. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently thereto.

2.    I hold a bachelor's degree earned at the University of Michigan in 1980, and I hold the license of Certified Public Accountant which I obtained in 1982.  Additionally, I have been employed in the accounting field since 1980, and am currently president of the Kaplan Corporation, CPA.  My prior employment from 1980 forward is as follows: 1980-1983: Deloitte, Haskins & Sells; August, 1983- August, 1985: Bernard Gudvi & Co; August, 1985-September, 1986: Pro Peace; August, 1986- February, 1987:

WIL3\010\KAPLAN3.DEC

EXHIBIT

2

Wershow & Shapiro; February, 1987-January, 1989: Zeiderman Oberman & Associates; January, 1989-May, 1991: Direct Management Group; May, 1991-August, 1992: Pay Per View Music; August, 1992-May, 1993: Radio Vision; August, 1993- June, 1994: Prager & Fenton; June, 1994-February, 1995: Jenkins & Keenburg; February, 1995 to June, 1996: Jerry Swartz Accountancy Corp.; and, from June, 1996 to present: Kaplan Corporation CPA.  A significant portion of the aforesaid work experience has been devoted to music industry accounting.

3.   My fee for rendering expert testimony at deposition and/or trial is $200 per hour, plus expenses.

4.   It is my understanding that I will be providing lay witness testimony on the subject of the revenues and profits received by the Beach Boys before and after publication of "Wouldn't It Be Nice" (the "Book"), and the distributions made to the members of the Beach Boys.  However, to the extent such matters are deemed to involve matters of expert testimony on music industry accounting practices, I am being designated to provide such expert testimony on plaintiffs' behalf.

5.   My testimony on the revenues and profits received by the Beach Boys before and after publication of the Book, and the distributions made to the members of the Beach Boys, will be based on information prepared by the Beach Boys' prior accoun-tants as well as accounting records that I received or generated during my tenure as the Beach Boys' accountant and further, by any accounting and royalty records obtained by Defendant via subpena or otherwise, and any other accounting records produced

KAPLAN CORPATION CPA    Fax:3108587605          Nov 15 '96   17:38     P.02
NOV 15 '96 17:38

in discovery. My testimony will also be based upon my under-
standing of the Beach Boys' business practices and contractual
relationships, including the manner in which various revenues are
paid, and further, my understanding of music industry accounting
practices.

6.    My analysis of the revenues and profits received by
the Beach Boys before and after publication of the Book, and the
distributions made to the members of the Beach Boys, is not
complete. However, my analysis to date shows that touring
revenues have gone down since the publication of the Book.
In the period July 1, 1989 through October, 1991, the average
number of shows per year was 102, whereas, after October, 1991,
the average number of shows per year dropped to 83, for an
approximate 20% decline. The average gross income per show in
those respective periods dropped from approximately $82,387.00 to
approximately $73,653.00 per show. Based upon the foregoing, the
gross income loss in touring is approximately $2.3 million per
year. The foregoing is subject to continuing analysis.

Executed this 15th day of November, 1996, at Beverly Hills,
California.

I declare under penalty of perjury under the laws of the
United States of America, the State of California and the State
of New Mexico that the foregoing is true and correct.

                                    MARK KAPLAN

WILS\010\KAPLAN3.DEC                        3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

|  |  |  |
|---|---|---|
| CARL WILSON, an individual, and AUDREE WILSON, an individual, | ) ) ) ) | Case No. CIV 94 892 JC |
| Plaintiffs, | ) ) | DECLARATION OF MARILYN A. LASHNER, Ph.D |
| v. | ) ) | |
| HARPERCOLLINS PUBLISHERS, INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) | |

**EXHIBIT**

3

## DECLARATION OF MARILYN A. LASHNER, PH.D.

Re:  Carl Wilson and Audree Wilson v. HarperCollins Publishers, Inc.


I, MARILYN A. LASHNER, declare:


     1.    By training and experience, I am a specialist in content analysis of communications.  Attached to this declaration is my Curriculum Vitae.  Each statement contained therein is true and correct.


     2.    I hold the degree of Doctor of Philosophy in Communications, earned at Temple University in Philadelphia, Pennsylvania.  Additionally, I hold the Master of Science and Bachelor of Science degrees earned at the University of Pennsylvania where I majored in secondary education and the teaching of English. I was a teacher of English at Cheltenham High School in Elkins Park, Pennsylvania;  at Pennsylvania State University at its campus in Abington, Pennsylvania;  and for the United States Civil Service Communication Training Division in Philadelphia Pennsylvania. I also taught Communications at Temple University.  My publications include assorted articles in learned journals and a book entitled, The Chilling Effect in TV News: Intimidation by the Nixon White House. The book, which presents data derived from content analysis, was cited in 1986 as evidence by petitioners before the FCC and again before the District of Columbia Court of Appeals in briefs seeking review of broadcasting's Fairness Doctrine.

3.     Since 1981 I have devoted my efforts to content analysis research.  The name of my company is Media Analysis and Communications Research, wherein I am the principal researcher.

4.     I have been qualified as an expert witness on content analysis and have testified at trial in courts in Houston, Texas and Denver, Colorado.  Also, I have given depositions and/or have submitted affidavits in various other contested matters in Nevada, New York, Texas, Florida, Michigan, Mississippi, Indiana, Utah, North Carolina, California, Oklahoma, Wyoming, West Virginia, Washington, D.C. and the Republic of the Philippines.

5.     My fee for rendering testimony at deposition and/or trial is $2,500.00 per 8-hour day or any part thereof, plus expenses; and $350.00 for each hour over eight on any given day.  My fee for conferences and office preparation, including review of data and collection of documents, is $200.00 per hour.  And my charge for travel time is $150.00 per hour, portal to portal.

6.     Content analysis is a multipurpose research method for making replicable and valid inferences about communication content. Rooted in the science of rhetoric, linguistics and communication theory, content analysis has a long and distinguished history in academic and social scientific research.  First used for studies in theology when the Church had interest in checking the spread of nonreligious matters, the procedures have evolved into a scientific methodology commonly used in universities and elsewhere for research

in Journalism, Literature, Education, Sociology, Anthropology, Political Science, Psychiatry, and Psychology.  From early in the twentieth century when the first book on scientific analysis of communication content was published in German, a profusion of textbooks, articles, scholarly studies and academic conferences has been devoted to its development and use.  Today, in all universities dealing with communication studies, content analysis is recognized and taught as a classic among research methodologies of enduring importance and value.

7.    Upon authorization by the attorney for the Plaintiff in the above-captioned case, I have undertaken to perform a research project that includes content analysis of the following book:

> Wouldn't It Be Nice:  My Own Story,
> by Brian Wilson with Todd Gold,
> New York:  HarperCollins Publishers (1991).

8.    The purposes of this research were to describe: (a) how HarperCollins portrayed Audree Wilson and Carl Wilson in the book identified above;  (b) the literary devices and techniques used to achieve that portrayal;  and (c) the extent to which HarperCollins permitted their publication, ostensibly an autobiography by Brian Wilson, to give voice to Dr. Eugene Landy.

9.     Also attached to this declaration are two documents separately entitled, "Analysis of the Portrayals of Audree Wilson and Carl Wilson in Wouldn't It Be Nice, an Autobiography by Brian Wilson" and "Coding Manual."  The two documents are to be considered as a unit and, together, comprise the full report on the research project identified above.

10.     The above-named documents represent research personally designed, executed and interpreted by me.  In the course of performing such research as is described and/or reflected in each of the above-named documents, I personally reviewed and analyzed all documents cited therein, and all findings and conclusions expressed therein reflect my personal knowledge based on data generated from my personal experience in said research, review and analysis.

Signed,

*Marilyn A. Lashner*
_____
     Marilyn A. Lashner, Ph.D.

*November 12, 1996*
_____
                    Date

4

# CURRICULUM VITAE

MARILYN A. LASHNER
Post Office Box 3165
Meadowbrook, Pennsylvania 19046
(215) 884-4331

## PROFESSIONAL INTERESTS

My expertise is in the areas of communications research and content analysis methodologies. I specialize in linguistic analysis of news reports and other communications and in assessment of communication content in relation to legal, ethical and professional standards.

## EDUCATION

| | |
|---|---|
| Ph.D. (Communications), Temple University, Philadelphia, Pennsylvania | 1979 |
| M.S. (English/Education), University of Pennsylvania, Philadelphia, Pennsylvania | 1954 |
| B.S. (English/Education), University of Pennsylvania, Philadelphia, Pennsylvania | 1950 |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| Principal Researcher<br>Media Analysis and Communications Research, Meadowbrook, Pennsylvania | 1984–present |
| President and Director of Research<br>Institute for News Media Analysis, Meadowbrook, Pennsylvania | 1979–84 |
| Assistant Professor of Communications<br>School of Communications, Temple University, Philadelphia, Pennsylvania | 1980–81 |
| Instructor of English<br>Pennsylvania State University, Abington, Pennsylvania | 1967–75 |
| Consultant, Effective English<br>U.S. Civil Service Communication Training Division, Philadelphia, Pennsylvania | 1974 |
| Teacher of English; Public Speaking; Director of Dramatics<br>Cheltenham High School, Elkins Park, Pennsylvania | 1951–54 |

## PUBLICATIONS

### BOOK

THE CHILLING EFFECT IN TV NEWS: Intimidation by the Nixon White House. New York: Praeger Publishers (1984).

### ARTICLES

"Content Analysis: A Method for Analyzing Communications,"
The Expert and the Law, Vol. 10, No. 1 (1990), pp. 2, 5;
also in The Expert Witness Journal, Vol. 2, No. 4 (April 1990) pp. 1, 18-19.

"Broadcasting and the Separate Traditions of First Amendment Theory,"
U.S., Congressional Record, 95th Congress, 1st Session (July 29, 1977),
S13142-44; and (August 1, 1977), E5001-03.

"A Free Electronic Press: The Key to a Vigorous Republic,"
Feedback, Vol. 19, No. 3 (November 1977), pp. 1-4.

"The Role of Foundations in Public Broadcasting, Part I: Development and Trends,"
Journal of Broadcasting, Vol. 20, No. 4 (Fall 1976), pp. 529-47.

"The Role of Foundations in Public Broadcasting, Part II: The Ford Foundation,"
Journal of Broadcasting, Vol. 21, No. 2 (Spring 1977), pp. 235-54.

"Privacy and the Public's Right to Know,"
Journalism Quarterly, Vol. 53, No. 4 (Winter 1976), pp. 679-88.

## PROFESSIONAL MEMBERSHIPS

National Forensic Center for Distinguished Experts
The Reporters Committee for Freedom of the Press

REFERENCES FURNISHED UPON REQUEST

# Media Analysis & Communications Research

Marilyn A. Lashner, PhD

ANALYSIS OF THE PORTRAYALS OF AUDREE WILSON AND CARL WILSON

IN <u>WOULDN'T IT BE NICE</u>, AN AUTOBIOGRAPHY BY BRIAN WILSON

Re: <u>Carl Wilson and Audree Wilson v. HarperCollins Publishers, Inc</u>.

Analysis and Report by Marilyn A. Lashner, Ph.D.

_Marilyn A. Lashner_
Marilyn A. Lashner, Ph.D.

_November 12, 1996_
Date

1341 Gilbert Road
Meadowbrook, PA 19046
(215) 884-4331



**EXHIBIT**

4

# CONTENTS

Page

Introduction ...................................... 1

Conclusions ....................................... 3

Research Design ................................... 8

Findings .......................................... 17

Discussion ........................................ 19

Footnotes ......................................... 31

ANALYSIS OF THE PORTRAYALS OF AUDREE WILSON AND CARL WILSON

IN <u>WOULDN'T</u> <u>IT</u> <u>BE</u> <u>NICE</u>, AN AUTOBIOGRAPHY BY BRIAN WILSON

Re: <u>Carl</u> <u>Wilson</u> <u>and</u> <u>Audree</u> <u>Wilson</u> <u>v.</u> <u>HarperCollins</u> <u>Publishers,</u> <u>Inc.</u>

Analysis and Report by Marilyn A. Lashner, Ph.D.


In 1991 HarperCollins Publishers released a book which was purportedly an autobiography of Brian Wilson, an inductee in the Rock and Roll Hall of Fame and "founder and creative genius" of the Beach Boys, a world-renowned rock and roll band.  Written in the first person and entitled, <u>Wouldn't It Be Nice:  My Own Story</u>, the book was identified as having been authored by Brian Wilson with Todd Gold.

Billed as "one of the most searingly candid memoirs ever published" and as a "no-holds-barred autobiography," the book describes the child abuse suffered by Brian Wilson at the hands of his father;  other mistreatment he was forced to endure from a variety of other persons;  and his life-threatening struggle with drug addiction, alcoholism, self-doubt, obesity and mental illness. Included among those other persons who are cited for inflicting wrongful treatment on Brian Wilson are his mother, Audree Wilson, and his brother and fellow Beach Boys member, Carl Wilson. Blame is also ascribed to the Beach Boys as a group.

Re: <u>Wilson,</u> <u>et al.</u> <u>v.</u> <u>HarperCollins</u>                            Page 2

The book is dedicated to Dr. Eugene Landy, a psychologist who, from the end of 1975 through January 1988, was charged with administering therapy to Brian Wilson and with supervising his recovery, and who afterwards became Brian Wilson's "friend, partner, and manager." Significant amount of the book's text is devoted to describing Dr. Landy's credentials, philosophy, methods of treatment, and the successes he was able to effect through his treatment of Brian Wilson. Also recounted in detail are Dr. Landy's struggles with the Beach Boys individually and as a group and the several public controversies to which Dr. Landy was a party.

The purposes of this research were to describe: (a) how HarperCollins portrayed Audree Wilson and Carl Wilson in the book described above; (b) the literary devices and techniques used to achieve that portrayal; and (c) the extent to which HarperCollins permitted their publication, ostensibly an autobiography by Brian Wilson, to give voice to Dr. Eugene Landy, inasmuch as Dr. Landy was an outside party not identified as an author.

The methodology upon which the research was based is set forth in the accompanying <u>Coding Manual</u>. The two documents, the <u>Coding Manual</u> and this report, comprise the full report on the research project and are to be considered as a unit.

Re: <u>Wilson, et al. v. HarperCollins</u>                                    Page 3

## CONCLUSIONS

1. On the basis of my research and analysis, it is my conclusion that, in its book entitled, <u>Wouldn't It Be Nice:  My Own Story</u>, HarperCollins Publishers defamed Audree Wilson and Carl Wilson in terms of both their personal and/or professional persona, including such aspects as character, actions, motherliness/brotherliness, allegiance and lawfulness.  Said defamation was projected through statement, inference and innuendo and represented an extensive and pervasive attack on both Audree Wilson and Carl Wilson, and would have been so understood by the average reader.

2. Among the items of defamatory information presented by the book were the following:

<u>In regard to Audree Wilson</u>:

a)  CRUEL AND CALCULATING:  that Audree Wilson is possessed of a character that is cold, cruel, calculating, indifferent and aloof.

b)  WRONGFUL ACTIONS:  that Audree Wilson willfully permitted her children to suffer flagrant physical and psychological abuse at the hands of their father;  that she refused to intercede or, otherwise, to rise up and defend her children from her husband's flagrant child abuse which was of such seriousness as tying Brian to a tree for punishment, and swinging a splintered two-by-four, over and over and with full-force, to nine-year-old Brian's back and midsection;  and that she willfully complied with her husband's command to withhold food from her son for two nights.

c)  RESOLUTE DETERMINATION:  that Audree Wilson was resolute in her determination to permit the flagrant abuse that her husband was inflicting on their children and that was taking place in her presence;  and that she acted affirmatively and with resolution in following the command of her husband to herself inflict abuse on their son Brian.

d)  BLIND ALLEGIANCE:  that Audree Wilson never opposed
her husband during his abuse of their children;  and that
she demonstrated blind allegiance to her husband's agenda
even if it meant sacrificing their children's physical and
psychological health.


e)  UNFIT MOTHER:  that Audree Wilson is an unfit mother who
willfully permitted her son Brian to be physically and
psychologically injured by her husband's continual abuse;  and
who, by her resolute determination to withhold the mothering
he needed, helped cause her son's mental illness that left him
an emotional cripple.


f) CRIMINALITY:  that Audree Wilson was a co-conspirator with
her husband and that she knowingly and intentionally aided and
abetted her husband in the flagrant abuse inflicted on their
children in her presence;  that she both caused, and permitted
to be caused, the flagrant physical and psychological abuse
inflicted on their children;  and that in so doing, she was
guilty of a felony under Section 273(a) of the <u>California
Penal Code</u>, Section 30-6-1 of the <u>New Mexico Statute</u> and as
per <u>People v. Figueroa</u>, 167 Cal. App. 3d 981, 213 Cal. Rptr.
676 (Cal.Ct. of Appeals 1985), and <u>People v. Bautista Vargas</u>,
204 Cal. App. 3d 1455, 251 Cal. Rptr. 904 (Cal. Ct. of Appeals
1988).


<u>In regard to Carl Wilson</u>:

g)  WRONGFUL ACTIONS:  that Carl Wilson, as trustee for The
Brian Wilson Trust of 1982, demonstrated a conflict of interest,
lack of good faith, and failed to administer the trust solely in
Brian's interests, as required by law; that he fired psychologist
Dr. Landy for his own personal reasons and replaced Brian's
heretofore constructive therapy with a regimen of abuse,
belittlement and intimidation;  that he acquiesced to a publicity
campaign designed to exploit Brian's illness for his own and the
Beach Boys' career advancement and monetary reward, about which
publicity campaign Brian and his associate Dr. Landy had been
kept in the dark;  and that he was responsible for his brother
Dennis' death when, in full knowledge of Dennis' life-threatening
condition of substance abuse, he refused to authorize treatment
for reasons of money and his own holiday plans.


h)  ALLEGIANCE TO BEACH BOYS:  that Carl Wilson's allegiance was
to the Beach Boys--their agenda, wealth and success--rather than
to his brother Brian, even if to the detriment of his brother's
health, recovery and general welfare.

Re: Wilson, et al. v. HarperCollins                                    Page 5

i)  MOTIVATED BY GREED:  that Carl Wilson's behavior toward his brother Brian was motivated by selfishness and his own private ends;  and that his overriding aim was to retain his brother Brian as a workhorse and money machine for the Beach Boys rather than to see him function as a healthy person.

j)  CALLOUS AND SCHEMING:  that Carl Wilson is callous, insensitive, scheming, opportunistic and exploitive;  and that, otherwise, he is irresolute, indecisive and feckless without guidance and instruction from his advisers and spiritual master.

k)  UNBROTHERLY:  that Carl Wilson demonstrated selfishness and indifference to both of his brothers during their infirmity; that he put money and personal politics above both brothers' urgent need for therapy;  that he showed treachery toward his brother Brian by taking advantage of his mental incompetence; that he resented his brother Brian's newly found independence and tried to undermine and sabotage his therapy;  that he considered Brian a commodity to be sold rather than a brother to nurture;  that he shunned and deliberately refused to talk to his brother Brian, even at his brother's heartfelt urging;  and that he pursued legal actions intentionally designed to strip his brother Brian of dignity and his rights as a human being.

l)  ILLEGALITY:   that Carl Wilson, as trustee charged with administering The Brian Wilson Trust of 1982, was tortious and in direct violation of the law with regard to standards of care and duties of trustees as set forth in Sections 16002(a), 16004 and 1608(a) of the California Probate Code.

m)  CRIMINALITY:  that Carl Wilson admitted his involvement in the purchase/smuggling of heroin into New Zealand and/or Australia, which heroin was used by his brother Brian Wilson; that such purchase/smuggling of heroin by Carl Wilson would constitute a crime under Section 6 of New Zealand's Misuse of Drugs Act of 1980 and its Customs and Excise Act of 1996, except that said admission by Carl Wilson may not have been genuine and may have been made to protect his brother Dennis from repercussion by the band's management.

Re: <u>Wilson, et al. v. HarperCollins</u>                                    Page 6

3.   It is also my conclusion that HarperCollins permitted its
book to give voice to psychologist Dr. Eugene Landy, albeit through
what was identified as Brian Wilson's testimony;  and that said
voice was given to Dr. Landy despite the fact that Dr. Landy was an
outside party not named as an author.

4.   It is also my conclusion that HarperCollins' permitted its
book to serve as a platform for Dr. Landy;  and that, in so doing,
HarperCollins permitted an inordinate amount of the book's text to
be saturated with details touting, justifying and/or defending
Dr. Landy's competence, methods, successes and ethical integrity,
as well as his positions on controversies to which he was a party.

5.   It is also my conclusion that, through deft use of the
rhetorical device antithesis, HarperCollins' book cast Carl Wilson
as foil to Dr. Landy whereby denigration of Carl Wilson would serve
to make Dr. Landy seem admirable by contrast, and whereby the
portrait of Dr. Landy was enhanced while that of Carl Wilson was
debased;  and that HarperCollins permitted its book to be so used.

Re: <u>Wilson, et al. v. HarperCollins</u>                          Page 7

6.  It is also my conclusion that, in light of Brian Wilson's
self-avowed mental disability throughout much of the time covered
by his narration, and in light also of his explicit disavowel of
insight or personal knowledge regarding many of Dr. Landy's
initiatives and encounters which were explained in great detail in
the book--a goodly portion of information which the book advanced
about Dr. Landy and others was incompatible with Brian's memory or
personal knowledge;  and that such incompatibility would have been
recognizable to HarperCollins as well as other readers.

7.  It is also my conclusion that, by naming Dr. Eugene Landy
in his acknowledgments and by according him the penultimate position,
just before Brian, in his list of nineteen persons thanked for their
support and assistance--associate writer Todd Gold was in essence
acknowledging Dr. Landy as a major contributor to the book, second
only to Brian Wilson.

8.  Finally, it is my conclusion that, given Brian Wilson's
self-avowed mental disability and lack of personal insight or
knowledge during much of Dr. Landy's tenure, and given the book's
fully detailed account and obvious glorification of Dr. Landy--
it follows that the major contribution of Dr. Landy to the writing
of the book (as acknowledged by associate writer Todd Gold)
necessarily directed the tenor of the story, at least with regard to
Dr. Landy's own portrayal and that of his chief adversaries:  the
Beach Boys, particularly Carl Wilson;  and that such reasoning would
have been recognizable to HarperCollins as well as other readers.

Re: <u>Wilson, et al. v. HarperCollins</u>                              Page 8

## <u>RESEARCH DESIGN</u>

In pursuit of the purposes identified above, the following book was subjected to rigorous, systematic and objective content analysis:

<u>Wouldn't It Be Nice:  My Own Story</u>,
by Brian Wilson with Todd Gold,
New York:  HarperCollins Publishers (1991).

Based on classic principles of logic, rhetoric and communication theory, the content analysis procedures were designed to identify the full range of explicit and implicit meanings, such as were communicated by HarperCollins Publishers about plaintiffs Audree Wilson and Carl Wilson, and such as would have been understood by the average reader.  To this end, the analysis focused on specified passages from the book in terms of their words, phraseology, rhetorical devices, juxtapositions and such other factors of their contextual environment as would give insight into the information contained therein.

For purposes of this research, information was defined in terms of statements, inferences and innuendos;  and communication was defined in terms of meanings exchanged between the writer/publisher of the message and the average reader.

Re: <u>Wilson, et al. v. HarperCollins</u>                    Page 9

To proceed with the analysis, the book <u>Wouldn't It Be Nice</u> was examined on a designated passage basis,[1] where "designated passage" was defined for this research as:  a finite segment of language such as was excerpted from the book, <u>Wouldn't It Be Nice</u>, and designated in the plaintiffs' <u>SECOND AMENDED COMPLAINT FOR LIBEL</u> in Paragraph 10 as statements of and concerning Audree Wilson;  Paragraph 19 as statements of and concerning Carl Wilson;  and Paragraph 30 as statements of and concerning the Beach Boys;  which finite segment of language may include one or more phrases, clauses, sentences or paragraphs—in their original order or with an ellipsis to designate omission of a word or words.

All in all, there was a total of twenty-seven designated passages which were subjected to content analysis.  Of the designated passages, three focused on Audree Wilson, thirteen on Carl Wilson, and eleven on the Beach Boys (to the extent that Carl Wilson was referred to individually or as an integral member).

At all times, the various passages were analyzed in terms of the context in which they occurred:  where "context" was defined as the whole structure of a literary work with regard to its bearing upon any of the parts which constitute it;  and where the meaning of any designated passage was determined, in part, on its relationship to the book as a whole and to the effect of the parts which immediately preceded and followed.

 

The focus of content analysis is on mutually exclusive and independent categories which represent an exhaustive array of the topics being discussed in the communications-at-issue and which, in operational terms, are pigeonholes into which the content units are to be classified.  In this present analysis, the following fifteen categories, focusing variously on Audree Wilson and Carl Wilson, were designated as relevant and formed the basis of the research:

<u>Regarding Audree Wilson</u>:  CHARACTER;  MOTHERLINESS;  ALLEGIANCE;  RESOLVE;  ACTIONS;  and CRIMINALITY.

<u>Regarding Carl Wilson</u>:  CHARACTER;  ACTIONS;  ALLEGIANCE;  BROTHERLINESS;  MOTIVATION;  LEGALITY;  CRIMINALITY;  SUBSTANCE ABUSE;  and LANDY/CARL WILSON COMPARISON.

Such designated passages as were identified in the <u>SECOND AMENDED COMPLAINT</u> as statements of and concerning the Beach Boys were analyzed in terms of the "Carl Wilson categories" on the assumption that, and to the extent that, they were deemed relevant to Carl Wilson, individually, or as a member of the Beach Boys.

Re: <u>Wilson, et al. v. HarperCollins</u>                    Page 11

Each of the sentences contained within the designated passages
of HarperCollins' book was dissected into an exhaustive set of
assertions,[2] each assertion physically placed within its relevant
category.  For purposes of this research, "assertion" was defined
as a linguistic construction comprising a single item of relevant
information;  and "relevant information" was defined as information
focusing on one or more of the content categories identified above.
A single sentence in a paragraph may harbor multiple items of
information and thereby generate multiple assertions.  Assertions
may represent statements, inferences or innuendos;  and, according
to the present research design, each assertion was identified in
terms of its explicit/implicit status, source and attribution.
Throughout the analysis, inferences and innuendos were recognized
as emanating from a variety of mechanisms, among which are:
context, including order and arrangement of parts;  transitional
terms;  qualifications;  connotations;  and such rhetorical devices
as antithesis.

Such assertions as were subsumed within each category were
then counted and reviewed for patterns of content, gist and overall
character;  and within this framework, conclusions relevant to the
research questions were formulated.  At all times during the
research process, particular attention was paid to accuracy,
objectivity, validity and reliability.

Re: <u>Wilson, et al.</u> v. <u>HarperCollins</u>                          Page 12

The intra-coder reliability coefficient is a measure of the
reliability of the coding procedures.  Coding reliability
presupposes that repeated measures with the same instrument on a
given communication should yield similar results.  An intra-coder
reliability coefficient for the assertion-identification procedures
was calculated to be:  99 percent.[3]

Accompanying and essential to the instant document, "Analysis
of the Portrayals of Audree Wilson and Carl Wilson in <u>Wouldn't It
Be Nice</u>, An Autobiography by Brian Wilson," is the <u>Coding Manual</u>
which provides definitions for the category labels and explicit
rules for the various procedures used in the content analysis.
Because this detailed explanation is available in the <u>Coding Manual</u>,
only the barest description of the procedures is offered in this
document.[4]

The third purpose of the research:  to identify and describe
the extent to which HarperCollins permitted their publication to
give voice to Dr. Eugene Landy--was addressed not by the scientific
content analysis described above, but rather by an informal review of
other passages selected by this researcher to represent statements
of and concerning Dr. Landy in the following areas:  COMPETENCE;
METHODS OF TREATMENT;  ETHICS;  EFFECTS;  and POSITION ON
CONTROVERSIES.  Said selected passages were not intended to be an
exhaustive representation of information contained in the book
regarding Dr. Landy, generally, or in terms of any of the specified
categories.

Re: <u>Wilson, et al. v. HarperCollins</u>                    Page 13

     For purposes of this analysis, I was asked to assume that, according to <u>Uniform Jury Instructions</u> 13-1007, "defamatory communication" is defined (in pertinant part) as a statement which "tend(s) to expose a person to contempt, to harm the person's reputation, or to discourage others from associating or dealing with him or her."

     I was also asked to assume that, according to the <u>California Penal Code</u>, it is a crime to willfully inflict or permit a child to suffer unjustifiable physical pain or mental suffering.  Note the following language:

> Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in such a situation that its person or health is endangered...[is guilty of a crime]

<u>California Penal Code</u><br>Section 273(a)

> Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in such a situation that its person or health may be endangered, is guilty of a misdemeanor.

<u>California Penal Code</u><br>Section 273(b)

And that according to People v. Figueroa, 167 Cal. App. 3d 981, 213 Cal. Rptr. 676 (Cal. Ct. of Appeals 1985), the court affirmed a mother's conviction under the Penal Code where evidence showed that "some of the child abuse [committed by her male friend] took place while the mother was present and the balance outside her physical presence but within her hearing, or otherwise soon came to her attention" and that "by her own account, defendant's failure to act resulted either from a considered and resolved desire to keep her male friend from leaving, or fear of him if she intervened."

And that according to People v. Bautista Vargas, 204 Cal. App. 3d 1455, 251 Cal. Rptr. 904 (Cal. Ct. of Appeals 1988), the observation is made that permitting child abuse and causing child abuse are equally criminal.  Note the following language:

> The legislature has seen fit to proscribe equally, without distinction as to the available punishment, any violation of section 273a, subdivision (1)...

And that according to New Mexico Statute, Section 30-6-1, child abuse is a felony and that permitting child abuse to occur is a felony even where the abuse does not result in great bodily harm. Note the following language:

> Abuse of a child consists of a person knowingly, intentionally or negligently...causing or permitting a child to be:  (1) placed in a situation that may endanger the child's life or health;  [or] (2) tortured, cruelly confined or cruelly punished...

> Whoever commits abuse of a child which does not result in the child's death or great bodily harm is, for a first offense, guilty of a third degree felony and for second and subsequent offenses is guilty of a second degree felony.  If the abuse results in great bodily harm...he is guilty of a first degree felony.

Re: <u>Wilson, et al. v. HarperCollins</u>                              Page 15

 

I was also asked to assume that it is a crime in New Zealand to bring in prohibitive imports, including heroin--as per Section 6 of New Zealand's <u>Misuse of Drugs Act of 1980</u> and its <u>Customs and Excise Act of 1996</u>.

I was also asked to assume that Sections 16002(a), 16004 and 1608(a) of <u>The California Probate Code</u> define, respectively, the following standards of care and duties for trustees of revocable living trusts:

    -to administer the trust solely in the beneficiaries' interests;

    -to avoid a conflict of interests;

    -to exercise discretion in accordance with fiduciary principles, in good faith, and with regard for the trust purposes;

and that a violation of said standards of care and duties is tortious and a direct violation of the law.

And finally, the assumption was made that, as a psychologist who, from 1969 through 1990, was a member of the American Psychological Association,[5] Dr. Eugene Landy was aware of, and necessarily subscribed to,[6] the <u>Ethical Principles of Psychologists</u> as promulgated by that association over the years 1975 to 1988, the period during which, according to the book, Dr. Landy administered professional treatment to Brian Wilson. What follows is an amalgam of selected principles advocated by the association in versions approved variously in 1972, 1977, 1979 and 1981:

Re: <u>Wilson, et al. v. HarperCollins</u>                          Page 16

a)  Psychologists respect the dignity and worth of the individual and strive for the preservation and protection of fundamental human rights.

b)  Psychologists make every effort to protect the welfare of those who seek their services...and do not knowingly permit their own services to be used by others for purposes inconsistent with these values.

c)  Psychologists define for themselves the nature and direction of their loyalties and responsibilities and keep all parties concerned informed of these commitments.

d)  As practitioners, psychologists are alert to personal, social, organizational, financial, or political situations and pressures that might lead to misuse of their influence.

e)  When a psychologist agrees to provide services to a client at the request of a third party, the psychologist assumes the responsibility of clarifying the nature of the relationships to all parties concerned.

f)  Psychologists make advance financial arrangements that safeguard the best interests of and are clearly understood by their clients;  they willingly contribute a portion of their services to work for which they receive little or no financial return.

g)  Psychologists only provide services and only use techniques for which they are qualified by training and experience.  In those areas in which recognized standards do not yet exist, psychologists take whatever precautions are necessary to protect the welfare of their clients.

h)  Psychologists in clinical or counseling practice do not use their relationships with clients to promote, for personal gain or profit...commercial enterprises of any kind.

i)  In their professional roles, psychologists avoid any action that will violate or diminish the legal and civil rights of clients or of others who may be affected by their actions.

Re: Wilson, et al. v. HarperCollins                    Page 17

## FINDINGS

1.  Reference to Dr. Eugene Landy was made in 26 of the book's 50 chapters, which chapters accounted for a total of 200 out of 390 pages.

2.  In those 26 chapters referencing Dr. Landy, he was specifically named--as either Dr. Landy or Gene--a total of 809 times.

3.  In contrast, reference to the Beach Boys was made in 46 of the book's 50 chapters and they were specifically named a total of 370 times.

4.  Whereas Dr. Landy was specifically named as many as 84 times in one chapter, the average number of times he was named in the chapters in which he was referenced was slightly over 31.

5.  Whereas the Beach Boys were specifically named as many as 20 times in one chapter, the average number of times they were named in the chapters in which they were referenced was slightly over 8.

6.  Dr. Landy's association with Brian Wilson was marked by the following dates:

| | | |
|---|---|---|
| First tour of service: | 1975 - 1977 | pp. 207-246 |
| First fired / not in service: | 1977 - 1983 | pp. 244-272; 1-16 |
| Second tour of service: | 1983 - 1988 | pp. 273 - 351 |
| BMQA charges filed: | 1988 | p. 350 |
| Ended Dr./Pt. relationship: | 1988 | p. 351 |
| Stripped of license: | 1989 | p. 351 |
| Conservator action filed: | 1990 | p. 368 |
| Separation agreement: | 1991 | p. 387 |

7.  In the text, when describing events that had taken place before 1988, Brian Wilson, with few exceptions, referred to Eugene Landy as "Dr. Landy;"  when describing events that had taken place after the BMQA charges and the ending of their formal doctor-patient relationship, Brian Wilson, more often than not, referred to him as "Gene."

Re: <u>Wilson, et al. v. HarperCollins</u>                    Page 18


8.  In his acknowledgments, professional writer Todd Gold thanks
19 people for their support and assistance;  among this list,
Dr. Eugene Landy is accorded the penultimate position, just before
Brian.


9.  Scientific content analysis of the 27 designated passages
generated a total of 298 assertions of relevant information:
80 focusing on Audree Wilson;  and 218 focusing on Carl Wilson.

Re: <u>Wilson, et al. v. HarperCollins</u>                    Page 19

<u>DISCUSSION</u>

<u>Platform for Dr. Landy</u>

It was apparent that HarperCollins permitted its book, <u>Wouldn't It Be Nice</u>, to give voice to psychologist Dr. Eugene Landy, albeit through what was identified as Brian Wilson's testimony, even though Dr. Landy was an outside party not named as an author. Though the book was billed as an autobiography written by Brian Wilson with Todd Gold, it served also as a platform for Dr. Landy.  Half of <u>Wouldn't It Be Nice</u>, was devoted exclusively to Brian Wilson's early life and the development of the Beach Boys;  the other half was devoted to the story of Brian Wilson's and the Beach Boys' later life, together with a recounting of Dr. Landy's tours of service as psychologist to Brian Wilson.  Notwithstanding the fact that Dr. Landy's persona was a factor in but half of the book, an inordinate amount of the book's text was saturated with details about Dr. Landy.  The data demonstrate that reference to Dr. Landy was made in 26 of the book's 50 chapters wherein he was specifically named--as either Dr. Landy or Gene--a total of 809 times. In contrast, reference to the Beach Boys was made in 46 of the book's 50 chapters wherein they were specifically named a total of 370 times. With carefully constructed language, the abundant text focusing on Dr. Landy was replete with details touting, justifying and defending his every move;  and his competence, methods, ethical integrity and successes, as well as his positions on controversies to which he was a party, were explicated thoroughly and precisely.[7]

Re: <u>Wilson, et al. v. HarperCollins</u>                    Page 20


   <u>Competence</u>.   According to the book, Dr. Landy's qualifications
and competence as a psychologist were distinguished and abundant.
He was described as "exceptionally smart" and "a pioneer in the
treatment of drug abuse."  He had a reputation for "successfully
treating celebrities and lost causes" and his clients included the
likes of Alice Cooper, Rod Steiger, Richard Harris and Gig Young.
In the case of Brian Wilson, Dr. Landy engineered "one of the all-time
great therapeutic moves ever played," initiated treatment "with
crackerjack precision and scope of a military maneuver," and was the
"conductor of a talented orchestra of medical personnel."  He was
credited with creating an environment for Brian that was a
"sensitive, nurturing milieu...free of pressure;"  and time and time
again, he was spoken of as having engendered Brian's trust and as
being his protector.  Additionally, Dr. Landy was hailed for his
goodness:  "he'd never done anything destructive to me;  he'd never
taken advantage of me;" and  everything he did was "for my benefit."
Also, according to the book, Dr. Landy  was at all times humane,
sensitive and compassionate:  "he used affectionate gestures, lots of
hugs, and spoke with kind, understanding words."  Moreover, "I knew
Dr. Landy was right;  he was always fair;  he didn't put me down;  if
I couldn't do something, he encouraged me."  Testimony by Brian Wilson
as to the success of Dr. Landy's therapy also spoke to Dr. Landy's
competence, and such testimony was both exuberant and profuse:
"I was back from the dead;"  "I hadn't been in such good shape since
high school;"  "I was learning to live again;"  "I sensed there
wasn't anything I couldn't do;"  "I felt like a new person;"  and
"I wouldn't have a life if it were not for him."

    <u>Methods of Treatment</u>.  As noted in the book, Dr. Landy's method of treatment "required him to have total therapeutic authority over the patient and the patient's environment" and, accordingly, "under Dr. Landy's twenty-four-hour therapy, every hour of the day was planned and accounted for."  Within this context it is logical that the text was rife with details as to Dr. Landy's philosophy and procedures, each procedure identified as to its stage in the therapeutic hierarchy and with respect to its purpose, execution and accomplishment.  The book's index gives some insight into the intense focus given to occurrences and initiatives falling under the rubric of Dr. Landy's therapy: breakthrough incident, charade to get Brian Wilson into treatment, Hawaiian treatment center, as songwriter;  Brian's diet, driving, new studio, Outward Bound program, in mental hospitals, and rafting the Rogue River.

    <u>Ethical Integrity</u>.  Most obvious from the book's intense focus on Dr. Landy, was the portrait that emerged whereby he was shown to be a model practitioner with exemplary ethics.  At all times in his dealings with Brian Wilson, Brian's wife, children, mother, brothers Carl and Dennis, and the Beach Boys--Dr. Landy was the picture of restraint, honor and professionalism.  It's as if his every move, as explained in the book, was scripted to meet the standards promulgated by the American Psychological Society (APA) in its <u>Ethical Principles of Psychologists</u>.  What follows is a selection of behaviors which the book ascribes to Dr. Landy along with the particular ethical principle of which said behavior is reflective:

a)  Brian Wilson repeatedly expressed his security in knowing
that Dr. Landy's commitment was first and foremost to Brian
Wilson:  "He was looking out for me and my best interests;"  and
"What was his commitment?  Helping me.  Being there for me."

> APA ETHICAL PRINCIPLE:  Psychologists define for
> themselves the nature and direction of their loyalties
> and responsibilities and keep all parties concerned
> informed of these commitments.

b)  According to Brian Wilson's account, Dr. Landy was
diligent in keeping the Beach Boys and Brian's family at bay
and, otherwise, in running interference to protect Brian from
outside pressures that were counterproductive to his recovery.
Also according to Brian, Dr. Landy was very explicit in
informing all parties concerned that "much more important than
being a Beach Boy is being a whole, live, functioning person,"
that "becoming a Beach Boy wasn't the goal of the therapy,"
and that "his goal wasn't to make me a functioning piano player
and then hand me over to the Beach Boys."

> APA ETHICAL PRINCIPLE:  Psychologists make every effort
> to protect the welfare of those who seek their services
> ...and do not knowingly permit their own services to be
> used by others for purposes inconsistent with these values.

> APA ETHICAL PRINCIPLE:  As practitioners, psychologists
> are alert to personal, social, organizational, financial,
> or political situations and pressures that might lead to
> misuse of their influence.

Re: <u>Wilson, et al. v. HarperCollins</u>                          Page 23

c)  According to Brian Wilson, Dr. Landy was explicit and precise in explaining his philosophy and method of treatment to Brian's wife and to the Beach Boys;  and that he made certain to extract first an oral and then a written commitment from all concerned that he would have total therapeutic authority over the patient and the patient's environment, that the Beach Boys were to remain at arm's length, and that the therapy would be uninterrupted.

> APA ETHICAL PRINCIPLE:  When a psychologist agrees to provide services to a client at the request of a third party, the psychologist assumes the responsibility of clarifying the nature of the relationships to all parties concerned.

d)  The book makes the point that Dr. Landy was explicit and precise in defining the professional fees and expenses that would be due for proposed treatment for both Brian Wilson and his brother Dennis;  and it was clear, from the book's recounting of the procrastination and negotiations that followed, that the responsible parties understood full well their financial obligations.  Moreover, according to the book--when Carl Wilson, empowered by the Brian Wilson Trust, stopped Brian's paychecks, Dr. Landy, himself, paid Brian's bills for six months.

> APA ETHICAL PRINCIPLE:  Psychologists make advance financial arrangements that safeguard the best interests of and are clearly understood by their clients;  they willingly contribute a portion of their services to work for which they receive little or no financial return.

Re: __Wilson, et al. v. HarperCollins__                    Page 24

e)  According to the book, Dr. Landy and Brian Wilson had collaborated on a number of songs for therapeutic purposes without any intention that these songs be used for commercial purposes:  "It wasn't good commercial writing...it wasn't supposed to be...it was therapy."  When the Beach Boys, surreptitiously and without permission, included some of those songs on various albums, Dr. Landy was not credited as a writer nor was he paid royalties, which according to Brian, he deserved.  Dr. Landy did not contest this slight.

> APA ETHICAL PRINCIPLE:  Psychologists in clinical or counseling practice do not use their relationships with clients to promote, for personal gain or profit...commercial enterprises of any kind.

f)  The book has Brian Wilson explaining that Dr. Landy's decision not to fight for his license to practice psychology was based on altruism and concern for Brian's welfare;  that the voluntary surrender of his license was done "to take the heat off me" and because the scrutiny of a trial "would be devastating to everything we'd accomplished."  Also, Dr. Landy's agreement, in response to the conservator action, to sever all connections with Brian, is commented on thusly:  "Caving in to the pressure...Gene sacrificed himself for me again."

> APA ETHICAL PRINCIPLE:  In those areas in which recognized standards do not yet exist, psychologists take whatever precautions are necessary to protect the welfare of clients.

> APA ETHICAL PRINCIPLE:  In their professional roles, psychologists avoid any action that will violate or diminish the legal and civil rights of clients...

Re: <u>Wilson, et al. v. HarperCollins</u>                      Page 25

<u>Defense of Positions in Controversies</u>.  When Dr. Landy was charged with demanding salary increases and percentages of tour grosses, Brian Wilson avers that none of the stories was true. When Gary Usher's journal, which had noted Brian's derogatory comments about Dr. Landy, was presented as evidence in the BMQA matter--Brian explains that Gary was in error when he took his words literally;  that he, Brian, was just venting at Dr. Landy whom he considered as "family" because that's what felt safe and comfortable;  and that he was really upset only at himself, not at Dr. Landy.  When Dr. Landy was charged with keeping Brian from family functions, Brian says, "Wrong! He tried encouraging me to do family things" and additionally includes a letter which, according to Brian, Dr. Landy had penned to his brother Carl:

> Over the last five years every invitation Brian has extended to come to his home has been rejected by every member of the family.  Carl, you refused two of his invitations;  Brian's children refused lunches, dinners, and Thanksgiving dinner at his home;  and your mother was never feeling well enough to accept several invitations to come to dinner, despite Brian's offer to send a limo to pick her up...[8]

Most blatant in this regard, is Brian's dissection of the ethical dilemma faced by Dr. Landy in the BMQA matter:

> At a certain juncture, he was faced with a dilemma created by the state's canon:  Is it ethical to take a patient to a certain point and then leave him there because the ethics say not to go any further?  Should he depart from his traditional therapeutic process and enter into another role in which he could help me or should he not help because of an ethical process?  Should he stop at a certain point because ethics imposed restrictions, or should he throw ethics to the wind and continue to improve my life?  I feel the ethics should fit the circumstances, not the other way around.  In my opinion, I'm able to write these words only because of the choice he made.[9]

Re: <u>Wilson, et al. v. HarperCollins</u>                              Page 26

### Antithesis:   Carl Wilson as Foil to Dr. Landy

Through deft use of the rhetorical device antithesis,
HarperCollins' book cast Carl Wilson as foil to Dr. Landy whereby
denigration of Carl Wilson would serve to make Dr. Landy seem
admirable by contrast.   "Antithesis" is defined as the juxtaposition
of contrasting ideas, often in parallel structure.   An antithesis
occurs when both the wording and the sense, or one or other of them,
are opposed in a contrast.[10]   Early in the Landy half of <u>Wouldn't It
Be Nice</u>, Brian Wilson, referring to an incident involving the Beach
Boys and Dr. Landy, writes "But that was only the beginning of war
with the Beach Boys."   From that point on, antithesis was fundamental
to the book as the weapon of choice to fight Dr. Landy's war--
whereby a positive portrayal of Dr. Landy would convey the notion of
contrary characteristics as to the Beach Boys, particularly Carl
Wilson;   and vice versa, whereby a negative portrayal of the Beach
Boys and Carl Wilson would signal what amounts to praise for
Dr. Landy.   The mechanism was set in motion by a series of explicit
juxtapositions[11] and continued throughout as a pattern on both an
explicit and implicit level.   The following presents a selection from
the book's many antithetical messages whereby the portrait of
Dr. Landy is enhanced while that of Carl Wilson is debased:

> Whereas Dr. Landy was Brian's friend,
> Carl was Brian's enemy.

> Whereas Dr. Landy was trustworthy,
> Carl was scheming and exploitive.

> Whereas Dr. Landy was calm and understanding,
> Carl was pressuring and insensitive.

Re: <u>Wilson, et al.</u> v. <u>HarperCollins</u>                    Page 27

Whereas Dr. Landy was Brian's protector,
Carl was Brian's spoiler.

Whereas Dr. Landy was interested only in Brian's health,
Carl was interested only in Dr. Landy's fees.

Whereas Dr. Landy respected Brian's dignity and strove for the
protection of his fundamental human rights, Carl acted in ways
that stripped Brian of his dignity and human rights.

Whereas Dr. Landy stood ready to intervene in efforts to save
Dennis' life--Carl, acting from selfish motives, contributed
to Dennis' death.

Whereas Dr. Landy was accused of completely dominating Brian,
Carl was unable to make even the simplest decision before
consulting with his spiritual master John Rogers.

Whereas Dr. Landy's goal was to make Brian well, Carl's and the
Beach Boys' goal was to have Brian make records, well or not.

Whereas Dr. Landy was interested only in Brian's recovery and
the restoration of his health, Carl and the Beach Boys were
interested only in increasing their income.

Whereas Dr. Landy was trying to keep Brian within a therapeutic
regimen, Carl and the Beach Boys wanted to take over and put
Brian to work fulltime.

Whereas Dr. Landy's method for Brian's treatment was
constructive therapy, Carl and the Beach Boys signed on to a
method of abuse, belittlement and intimidation.

Whereas Dr. Landy saw Brian as a human being who needed warmth
and family interaction,  Carl and the Beach Boys saw him only
as a work horse and money machine.


Antithesis was also the mechanism by which Brian's wife,

Marilyn Wilson, was debased while Dr. Landy's image was elevated.

According to the book, similar to Dr. Landy's "war" with the Beach

Boys was Dr. Landy's "clash" with Marilyn Wilson who was described

as resentful and jealous of Dr. Landy and as fearful of losing her
heretofore autonomy over house and husband.  This despite the
obvious improvements in Brian's health which, according to the book,
Dr. Landy's therapy was able to effect.  Note the following
antithetical juxtaposition and its implication as to Marilyn Wilson's
self-serving indifference to her husband's health:

> Marilyn just wanted a household that ran smoothly.
> Dr. Landy aimed for much more.  He wanted me healthy.[12]

## The Incongruity of Brian's Memory with the Facts Advanced

Though the portrayal of Dr. Landy was presented in the book as
the testimony of Brian Wilson speaking in the first person--Brian
Wilson, by his own admission, often was not sufficiently lucid to
recognize or interpret the goals of Dr. Landy's therapy or even to
recall the many stages or procedures.  In Brian's words, he had had
a "full-scale breakdown," was "diagnosed as a schizophrenic,"
had been in "seven-year stupor" and walked around with his "eyes,
unfocused and zombielike."  On several occasions, he allowed that
his response to Dr. Landy's initiatives was to roll his eyes back
into their sockets and withdraw and retreat into a world that made
sense to him alone;  and admittedly, according to Brian, many of
Dr. Landy's behind-the-scenes preparations, which were explained in
great detail in the book, led him "down a path he didn't even know
he was traveling" and went on "unbeknownst" to him.

In light of Brian Wilson's self-avowed mental disability
throughout much of the time covered by his narration, and in light
also of his explicit disavowel of insight or personal knowledge
regarding many of Dr. Landy's initiatives and encounters which were
explained in great detail in the book--a goodly portion of information
which the book advanced about Dr. Landy and others was incompatible
with Brian's memory or personal knowledge.  Such incompatibility
would doubtless have been recognizable to HarperCollins as well as
other readers.

In his acknowledgments, associate writer Todd Gold thanks
nineteen people for their support and assistance;  among this list,
Dr. Eugene Landy is accorded the penultimate position, just before
Brian.  Because a writer has an interest in making plain the relative
importance of his ideas, the emphatic positions in any piece of
writing are traditionally reserved for the words which express the
most important ideas.  And traditionally, the emphatic positions in
writing are the beginning and the end--especially the end.[13]
By ranking Dr. Landy at the end of a long list of contributors just
before Brian Wilson, the book's focus and essential character--
associate writer Todd Gold was in essence acknowledging Dr. Landy as
a major contributor, second only to Brian Wilson.

Re: <u>Wilson, et al. v. HarperCollins</u>                     Page 30

Finally, given Brian Wilson's self-avowed mental disability during much of Dr. Landy's tenure in addition to his explicit disavowel of personal knowledge regarding many of Dr. Landy's initiatives, and given the book's fully detailed account and obvious glorification of Dr. Landy--it follows that the major contribution of Dr. Landy to the writing of the book (as acknowledged by associate writer Todd Gold) necessarily directed the tenor of the story, at least with regard to Dr. Landy's own portrayal and that of his chief adversaries:  the Beach Boys, particularly Carl Wilson. Clearly, such reasoning would have been recognizable to HarperCollins as well as other readers.

Re: <u>Wilson, et al. v. HarperCollins</u>                    Page 31

<u>FOOTNOTES</u>

[1]In Content Analysis parlance, the designated passage was the "designated grammatical unit" for the analysis.

[2]In Content Analysis parlance, the assertion was the "recording unit" for the analysis.

[3]Calculated by means of a "Coefficient of Reliability" formula presented in Ole R. Holsti, <u>Content Analysis for the Social Sciences and Humanities</u>, (Reading, Mass.: Addison Wesley, 1969, p. 140.

[4]The <u>Coding Manual</u> serves to enhance reliability of the research project and to assure replicability. It is presumed that subsequent researchers, following the rules and procedures set forth in the <u>Coding Manual</u> would arrive at similar results.

[5]In a telephone conversation on September 4, 1996 with Darnetta Bascomb of the American Psychological Association's membership office, this researcher was advised that Dr. Eugene Landy was a member in good standing from 1969 through 1990.

[6]In documents entitled variously, <u>Ethical Standards of Psychologists</u> and <u>Ethical Principles of Psychologists</u> for the years 1977, 1979 and 1981, the following statement--or one that is similar-- is included: "Acceptance of membership in the American Psychological Association commits the member to adherence to these principles."

[7]And also, events were recounted earlier in the book that would serve as rebuttal to charges made later. For example, recounting of Marilyn's rebuff of Dr. Landy's suggestion that Brian's daughters sing on his latest soundtrack in addition to detailed descriptions of Dr. Landy's efforts to keep up Brian's ties with his family: flowers and birthday gifts in Brian's name (both on p.332)--served to give lie to charges in the conservator action (identified on p. 373) that Dr. Landy prevented Brian from having a relationship with his wife and daughters.

[8]Wilson, Brian with Todd Gold, <u>Wouldn't It Be Nice:</u>
<u>My Own Story</u>, (New York:  HarperCollins Publishers, 1991), p. 383.


[9]<u>Ibid.</u>, p. 351.


[10]Corbett, Edward P.J., <u>Classic Rhetoric for the Modern Student</u>,
3d ed., (New York:  Oxford University Press, 1990), p. 429.


[11]For example, note the following explicit antithetical
juxtapositions that would serve to generate a positive message
about Dr. Landy while signaling what amounts to negative criticism
of Carl Wilson:

    p. 247     "My life became hell under these three hypermacho
               watchdogs [ordered by the Beach Boys].  In contrast
               to Dr. Landy's constructive therapy...."

    p. 273     "Within a week Carl in Dr. Landy's office, asking how
               much the treatment would cost...Predictably, the
               first thing they wanted to discuss wasn't my health,
               it was Dr. Landy's fee.  'Are we here to talk about
               my fees or are we here to talk about Mr. Wilson?'
               Dr. Landy asked."

    p. 312     "Carl needed longer to make up his mind.  The price
               was too steep...Beyond that, Carl didn't want to
               upset his family's holiday plans by having, as Dr.
               Landy suggested, an intervention...Dr. Landy told
               Schilling to tell Carl he was making a grave error.
               Whether he knew it or not, Dennis was on a self-
               destructive binge heading in only one direction.
               Carl was adamant, though;  he didn't want to deal
               with the problem until after New Year's"


[12]Wilson, <u>Ob Cit</u>., pp. 221-222.


[13]Greever, Garland and Easley S.Jones, <u>The Century Handbook</u>
<u>of Writing</u>, 4th ed., (New York: Appleton-Century-Crofts, 1942), p. 85.

# Media Analysis & Communications Research

**Marilyn A. Lashner, PhD**

CODING MANUAL

Re: Carl Wilson, et al. vs. HarperCollins Publishers, Inc.

Developed by Marilyn A. Lashner, Ph.D.

_Marilyn A. Lashner_
Marilyn A. Lashner, Ph.D.

_November 12, 1996_
Date

1341 Gilbert Road
Meadowbrook, PA 19046
(215) 884-4331



**EXHIBIT**

5

## CODING MANUAL

Re: <u>Carl Wilson, et al. vs. HarperCollins Publishers, Inc.</u>

Developed by Marilyn A. Lashner, Ph.D.

The content analysis used in this research begins with the original sentences as published and ends with a full rhetorical dissection of the communications-at-issue with regard to meanings and information that would be understood by the average person. The end result of said analysis would generate banks of assertions organized around particular themes chosen for their relevance to the research at hand.  Where appropriate, such aspects as sources and attributions on the part of the writer/publisher are identified and addressed.

For purposes of this research,  information is defined in terms of statements, inferences and innuendos;  and communication is defined in terms of meanings exchanged between the writer/publisher of the message and the average reader.

The procedures involve six distinct stages:

Stage I:        Pilot Study

Stage II:       Identification of Categories

Stage III:      Identification of Sources and Attributions

Stage IV:       Dissection of Original Message into Assertions

Stage V:        Check for Accuracy and Reliability

Stage VI:       Determination of Conclusions

CODING MANUAL - Re: <u>Wilson, et al. v. HarperCollins</u>          Page 2


<u>Stage</u> <u>I</u>:   <u>Pilot</u> <u>Study</u>


     Using content categories determined at time of initial review, a pilot study is to be conducted, by employing procedures identified below, to content analyze the passages-at-issue in the book, <u>Wouldn't</u> <u>It</u> <u>Be</u> <u>Nice</u>, an autobiography written by Brian Wilson with Todd Gold.  Said pilot study is classically undertaken for the purpose of constructing appropriate categories by trial and error methods and for determination of rules designed to imbue the study with objectivity and system.  The pilot study and the research as a whole are undertaken to identify meaning such as would have been understood by the average reader with regard to portrayal of the plaintiffs in the instant case:  Audree Wilson and Carl Wilson

CODING MANUAL - Re: <u>Wilson, et al. v.</u> <u>HarperCollins</u>          Page 3

## <u>Stage II:</u>  <u>Identification of Categories</u>

The focus of content analysis is on categories which represent the topics being discussed in the communications-at-issue and which, in operational terms, are pigeonholes into which the content units are to be classified.  In this present analysis, fifteen mutually exclusive and independent categories were designated as relevant for study:  six focusing on Audree Wilson;  and nine focusing on Carl Wilson.  Determined as a result of the pilot study, the following category scheme is to form the basis of the analysis:

<u>Re:  Audree Wilson</u>

| | |
|---|---|
| (1) | CHARACTER |
| (2) | MOTHERLINESS |
| (3) | ALLEGIANCE |
| (4) | RESOLVE |
| (5) | ACTIONS |
| (6) | CRIMINALITY |

<u>Re:  Carl Wilson</u>

| | |
|---|---|
| (7) | CHARACTER |
| (8) | ACTIONS |
| (9) | ALLEGIANCE |
| (10) | BROTHERLINESS |
| (11) | MOTIVATION |
| (12) | SUBSTANCE ABUSE |
| (13) | LEGALITY |
| (14) | CRIMINALITY |
| (15) | COMPARISON WITH DR. LANDY |

CHARACTER refers to the sum total of physical, mental, emotional and social characteristics which portray each of the plaintiff's individual nature, personality and manner.  Included are references to temperament, disposition, sensitivity, empathy and state of mind.

CODING MANUAL - Re: <u>Wilson, et al. v. HarperCollins</u>          Page 4

Particular actions would trigger assertions as to character.  For
example, a reference that Audree Wilson "refused to intercede in the
flagrant child-abuse going on in front of her" would trigger an
assertion that her character was cruel and unfeeling;  and a
reference that "the first thing [Carl] wanted to discuss wasn't
[Brian's] health, it was Dr. Landy's fee," would trigger a reference
to Carl's character as dispassionate and grudging.

ACTIONS refers to all acts, deeds and behavior performed by
plaintiffs Audree Wilson or Carl Wilson.  Included in this category
are references to Audree Wilson's never opposing her husband in his
abuse of their children, refusing to intercede in the child abuse
going on around her, and complying with her husband's command that
Brian not have dinner for two nights;  and references to Carl
Wilson's shutting Brian out, and needing to consult with numerous
people before making decisions.  Not included in this category are
references to Carl Wilson's SUBSTANCE ABUSE.

ALLEGIANCE refers to loyalty, devotion or adherence to a
person or cause that has a legitimate claim to one's support.
Included here are references when choices are made between competing
legitimate claims.  Such references would include indications of
Audree Wilson's allegiance to her husband's agenda at the expense of
her children, or Carl Wilson's allegiance to the Beach Boys' agenda
even if he meant sacrificing support for his brother Brian.

SUBSTANCE ABUSE refers to use of any of a category of behavior altering or addictive drugs, such as heroin, which possession and use are restricted by law.  Included here are references to Carl Wilson's admitting his involvement in the purchase of heroin.  Not included are references to Audree Wilson's or Carl Wilson's usage of alcoholic beverages.

MOTHERLINESS refers to the demonstration of characteristics befitting, resembling or characteristic of a mother toward her child, which characteristics would include love and affection for that child and the tendancy to watch over, nourish and protect him. Particular actions on the part of Audree Wilson would trigger assertions as to her motherliness.  For example, references that Audree Wilson "refused to intercede in the flagrant child abuse going on in front of her" and that she "almost never rose up and defended her children" would trigger assertions that Audree Wilson was an unfit mother and that she willfully permitted her children to be physically and psychologically injured by their father's continual abuse.

BROTHERLINESS refers to characteristics befitting the treatment of one brother toward another, which characteristics would include a shared background with, and love and affection for, one's brother and the tendancy to watch over and be protective of him.  Particular actions on the part of Carl Wilson, such as would affect his brother Brian, would trigger assertions as to Carl's brotherliness.  For example, a reference that "predictably, the

first thing [Carl] wanted to discuss wasn't [Brian's] health, it
was Dr. Landy's fee"  would trigger assertions to Carl Wilson's
brotherliness:  that he begrudged spending the money for Brian's
treatment and that he put money above Brian's health.

    RESOLVE refers to an emphatic determination or decision to
behave in a particular way toward a particular event or series of
events.  Particular actions on the part of Audree Wilson would
trigger assertions as to her resolve.  For example, references that
Audree Wilson "refused" to intercede in her husband's flagrant
child abuse would trigger an assertion that Audree Wilson was
resolute in her determination to permit the flagrant abuse
inflicted by her husband on her children.  This, by virtue of a
consensus of dictionaries which define "refuse" as a positive,
unyielding decision not to act, accept or do something;  and the
notation by the <u>Random House Dictionary of the English Language</u>
that the word "implies a direct and emphatic expression of
determination not to accept what is offered or proposed."

    MOTIVATION refers to the desires, needs, goals or similar
impulses held by persons and to their overriding aim or purpose as
it appears to be from behavior, expressions and communications.
Particular actions on the part of Carl Wilson would trigger
assertions as to his motivation.  For example, a reference
to Carl Wilson's and the Beach Boys' "Brian is Back" publicity

campaign that was "designed to exploit" Brian Wilson and to "sell his illness"--would trigger an assertion as to Carl Wilson's motivation:  that his behavior toward Brian stemmed from selfish motives and for his own private ends rather than for Brian's benefit.

LEGALITY refers to adherence or observance of the law and to violations thereof.  For example, illegality would apply to Carl Wilson's failure to administer The Brian Wilson Trust of 1982 in accordance with statutory provisions in Sections 16002(a), 16004 and 1608(a) of <u>The California Probate Code</u> which define, respectively, the following standards of care and duties for trustees of revocable living trusts:

   -to administer the trust solely in the beneficiaries' interests;

   -to avoid a conflict of interests;

   -to exercise discretion in accordance with fiduciary principles, in good faith, and with regard for the trust purposes.

CRIMINALITY refers to guilt of criminal behavior as per state or federal laws.  For example, criminality would apply when Audree Wilson's actions regarding the abuse of her children conform to all or part of the following laws:

   Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in such a situation that its person or health is endangered...[is guilty of a crime]

                                             <u>California Penal Code</u>
                                             Section 273(a)

Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in such a situation that its person or health may be endangered, is guilty of a misdemeanor.

California Penal Code
Section 273(b)

The court affirmed a mother's conviction under the Penal Code where evidence showed that "some of the child abuse [committed by her boyfriend] took place while the mother was present and the balance outside her physical presence but within her hearing, or otherwise soon came to her attention" and that "by her own account, defendant's failure to act resulted either from a considered and resolved desire to keep her male friend from leaving, or fear of him if she intervened."

People v. Figueroa,
167 Cal. App. 3d 981,
213 Cal. Rptr. 676 (Cal.
Ct. of Appeals 1985)

Abuse of a child consists of a person knowingly, intentionally or negligently...causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health; [or] (2) tortured, cruelly confined or cruelly punished...

Whoever commits abuse of a child which does not result in the child's death or great bodily harm is, for a first offense, guilty of a third degree felony and for second and subsequent offenses is guilty of a second degree felony. If the abuse results in great bodily harm...he is guilty of a first degree felony.

New Mexico Statute,
Section 30-6-1.

And also, based on the provisions in Section 6 of New Zealand's
Misuse of Drugs Act of 1980 and the Customs and Excise Act of 1996,
which makes it an offense to import such prohibited products as
narcotics--criminality would apply when reference is made to Carl
Wilson's being a party to the smuggling of heroin into New Zealand.

COMPARISON WITH DR. LANDY refers to information generated
through such rhetorical devices as antithesis whereby information
portraying Carl Wilson is juxtaposed with sharply contrasting
parallel information portraying Dr. Landy.  For example--in the
context of Dennis Wilson's severely compromised mental health and
prior to his death--when Dr. Landy's plans for treatment of
Dennis were put off by Carl Wilson who "needed longer to make up his
mind," felt the "price was too steep," and "didn't want to upset his
family's holiday plans by having, as Dr. Landy suggested, an
intervention in Lake Arrowhead,"--the following comparison would be
generated:  while Dr. Landy stood ready to try to save Dennis' life,
Carl, acting from selfish motives, contributed to his death.

CODING MANUAL - Re: Wilson, et al. v. HarperCollins          Page 10

Stage III:    Identification of Sources and Attributions

   A legend, referencing various prefixes and typefaces--to be
used in the coding of each assertion--is to be created for
identification of the nature of such information as is presented in
the communication (i.e., statement or inference);   and for
identification, also, of source and attributions as appropriate to
every assertion of the communication.


   Accordingly, for purposes of this research, each assertion is
to be coded in terms of the following legend:


Pica Type Not Indented:        Language Verbatim:  as Published

Indented & Underlined:         Information by Statement

Indented & Not Underlined:     Information by Inference

_____


Prefix:


BW                             Attributed to Brian Wilson
                               (by use of first person or,
                               otherwise, as indicated by context)


EL                             Attributed to Dr. Eugene Landy

CODING MANUAL - Re: <u>Wilson, et al.</u> v. <u>HarperCollins</u>          Page 11


<u>Stage IV</u>:  <u>Dissection of Original Message into Assertions</u>


For this research, the designated grammatical unit is the "designated passage," defined for this research as:  a finite segment of language such as was excerpted from the book-at-issue and designated in the plaintiffs' <u>SECOND AMENDED COMPLAINT FOR LIBEL</u> in Paragraph 10 as statements of and concerning Audree Wilson; Paragraph 19 as statements of and concerning Carl Wilson;  and Paragraph 30 as statements of and concerning the Beach Boys;  which finite segment of language may include one or more phrases, clauses, sentences or paragraphs--in their original order or with an ellipsis to designate omission of a word or words.


All in all, there is a total of twenty-seven designated passages which are to be subjected to content analysis.  Of the designated passages, 3 focus on Audree Wilson, 13 on Carl Wilson, and 11 on the Beach Boys.  The designated passages focusing on the Beach Boys are to be analyzed in terms of the "Carl Wilson categories" on the assumption that, and to the extent that, they are deemed relevant to Carl Wilson, individually, or as a member of the Beach Boys.

CODING MANUAL - Re: <u>Wilson,</u> <u>et</u> <u>al.</u> <u>v.</u> <u>HarperCollins</u>        Page 12

The recording unit for this analysis is the "assertion;"  and the assertion-forming analysis would proceed designated passage by designated passage.  The objective at this stage is to dissect the language of each designated passage into an exhaustive set of assertions, each assertion physically placed within its relevant category.  For purposes of this research, "assertion" is defined as a linguistic construction comprising a single item of information about a designated subject.  A single passage may harbor multiple items of information and thereby generate multiple assertions. Assertions may represent statements, inferences or innuendos.

At all times, the various passages are to be analyzed in terms of the context in which they occurred;  where "context" is defined as the whole structure of a literary work with regard to its bearing upon any of the parts which constitute it;  and where the meaning of any designated passage is determined, in part, on its relationship to the book as a whole and to the effect of the parts which immediately precede and follow.

The following rules apply to assertion-forming:

1.  Design worksheets so that each page is identified by a header with the category name and where each new category begins with page #1.

2.  As a preliminary function, on an unprepared sheet of paper, proceed with assertion-identification on a passage by passage basis as indicated below.

CODING MANUAL - Re: <u>Wilson, et al. v. HarperCollins</u>        Page 13

3.   Preliminary assertion-identification includes the following steps:

 a) Identify the passage under analysis with a numeric
   phrase placed in the upper left hand margin;  said
   numeric phrase is to include:  the number of the passage
   to which the work refers;  the letter "A," "C," or "B" to
   indicate focus respectively on Audree Wilson, Carl Wilson,
   or the Beach Boys;  and the page number from the book on
   which the passage occurs.  (Example:  1-A-27)

 b) Follow the original language of the passage under analysis
   with an exhaustive array of the assertions thereby
   generated.

 c) Where other language is important to the context of the
   passage under analysis, include said other language after
   reproduction of the passage under analysis and label it
   "CONTEXT."

 d) For each assertion, record by prefix, or otherwise as
   indicated, the relevant identification data.

 e) In the margin before each assertion, indicate the
   specified category label to which assertion applies.

 f) Note that one sentence may be comprised of multiple
   clauses or phrases and each may carry its own meaning;
   and that a single sentence may generate assertions
   relevant to multiple categories.

 g) Type original language as published so as to begin on
   Column 1;  below original language, type category label in
   column 1;  indent prefixes so as to begin on Column 11;
   indent assertions so as to begin on Column 16;

4.  Once the preliminary assertion-identification is complete for
each passage, proceed to prepared worksheets and physically place
the original copy plus the individual assertions into their relevant
categories.

5.  The prepared worksheets for each category should present an
assemblage--on a passage by passage basis--of the assertions
relevant to the research questions.

6.  Follow all principles of grammar and rhetorical theory to
identify meanings and inferences as per the context.

CODING MANUAL - Re: <u>Wilson, et al. v. HarperCollins</u>          Page 14

7.  Inferences can be generated from a variety of mechanisms and rhetorical devices, among which are: context including order and arrangement of rhetorical parts;  transitional terms;  qualification; connotations;  slang and colloquialisms;  figures of speech;  logical structure;  and techniques of persuasion.


8.  When premises of a logical syllogism are stated in the Story, identify an assertion for the conclusion which would logically follow even if that conclusion is not stated in the article.  Identify such an assertion as an inference.


9.  Where premises of context logically suggest several alternative inferences, identify assertions for those alternatives that comply with the immediately surrounding context.


10.  Where two opposite sets of facts are stated or implied, or when a statement appears to be the antithesis of what is actually meant, or when figurative language implies meaning that is other than the literal statements, identify assertions that support the context.  Identify all such assertions as inference.


11.  Where an inference is suggested because of context created by order and/or arrangement of sentences, paragraphs, sets of paragraphs or other rhetorical parts, identify such an assertion as an inference.


12.  When information is presented via a rhetorical question, select the meaning that supports the context;  identify such an assertion as an inference.


13.  When coding for Audree Wilson, place the prefix "A-" before each category label.


14.  When coding for Carl Wilson, place the prefix "C-" before each category label.

CODING MANUAL - Re: <u>Wilson, et al. v. HarperCollins</u>          Page 15

15.   When information contained in references conform to parameters in the following laws (articulated on pp. 7-9 above), create assertions including the language of those parameters:

      For Audree Wilson, re child abuse:     <u>California Penal Code</u> Section 273(a)

                                                                  <u>California Penal Code</u> Section 273(b)

                                                                 <u>People v. Figueroa</u>, 167 Cal. App. 3d 981, 213 Cal. Rptr. 676 (Cal. Ct. of Appeals 1985)

                                                                 <u>New Mexico Statute</u>, Section 30-6-1.

      For Carl Wilson, re heroin:         New Zealand's <u>Misuse of Drugs Act of 1980</u>, Section 6

                                                                  New Zealand's <u>Customs and Excise Act of 1996</u>

      For Carl Wilson, re trusteeship:    <u>California Probate Code</u> Sections 16002(a), 16004 and 1608(a)

CODING MANUAL - Re: <u>Wilson, et al. v. HarperCollins</u>          Page 16


Stage <u>V</u>:          <u>Check for Accuracy and Reliability</u>


     Coding reliability is basic to any systematic approach;  it
presupposes that repeated measures with the same instrument on a given
communication should yield similar results.  Coding reliability is a
function of the coder's skill, insight, experience;  and clarity of
categories and coding rules which guide their use.


     To enhance reliability all assertions are to be checked for
accuracy.  After a period of at least several days, the assertions
are to be rechecked and an intra-coder reliability coefficient is to
be computed.  By means of the following formula presented in Ole R.
Holsti, <u>Content Analysis for the Social Sciences and Humanities</u>,
(Reading, Mass.: Addison Wesley, 1969), the computations will
determine the ratio of coding agreements to the total number of
coding decisions:


$$\text{C.R.} = \frac{2M}{N(1) + N(2)}$$


where N(1) and N(2) = the number of coding decisions made in the
first and second checks, respectively;  and
where M = the number of coding decisions on which the two checks are
in agreement.

CODING MANUAL - Re: <u>Wilson, et al. v. HarperCollins</u>          Page 17

Stage VI:        Determination of Conclusions

    After creating an exhaustive set of assertions relevant to each
of the designated categories, compute numerical data on assertion
counts relevant to various aspects of the research;  and review
substance of assertions for trends and patterns.  Create conclusions
descriptive of the trends and patterns evidenced generally and for
each of the relevant categories.


    Also construct "banks of information" appropriate to each
category.  Defined as an amassment of detailed information that
summarizes the gist of the accumulated assertions relevant to a
particular category, a bank of information will consolidate the
accumulated assertions into a detailed summary statement and it may
include stringing together several items of information deemed of
particular significance.

CODING MANUAL - Re: <u>Wilson, et al. v. HarperCollins</u>        Page 18

## <u>BEYOND</u> <u>SCIENTIFIC</u> <u>CONTENT</u> <u>ANALYSIS</u>

The third purpose of the instant research project:  to identify and describe the extent to which HarperCollins permitted their publication to give voice to Dr. Eugene Landy--is not to be addressed by the scientific content analysis described above, but rather by an informal review of other passages selected by the researcher to represent statements of and concerning Dr. Landy in the following areas:  COMPETENCE;  METHODS OF TREATMENT;  ETHICS;  EFFECTS;  and POSITION ON CONTROVERSIES.  Said selected passages are not intended to be an exhaustive representation of information contained in the book regarding Dr. Landy, generally, or in terms of any of the specified categories.

For the above-named categories, the following definitions apply:  COMPETENCE--the education, training or experience necessary to be a psychological practitioner and to the ability, faculty, skill or expertise with which psychological practitioner Dr. Eugene Landy offered services appropriate to the psychological needs of his patient, Brian Wilson;  METHODS OF TREATMENT--the philosopy underlying Dr. Landy's practice of psychology and the techniques, procedures and course of action utilized by him in the treatment of Brian Wilson;  EFFECTS--the comprehensive result regarding the emotional and physical soundness of Brian Wilson as caused or influenced by the treatment and therapy administered by Dr. Landy;

CODING MANUAL - Re: <u>Wilson, et al. v. HarperCollins</u>          Page 19


POSITION ON CONTROVERSIES--the avowed stance of Brian Wilson and

Dr. Landy, as expressed by Brian Wilson, on controversies affecting

Dr. Landy such as the BMQA and conservator controversies, including

the various charges associated with each;  and ETHICS--compliance

with principles promulgated by the American Psychological Association

in various versions of their document entitled <u>Ethical Principles of</u>

<u>Psychologists</u>, such as were in effect over the years 1975 to 1988,

the period during which Dr. Landy allegedly administered professional

treatment to Brian Wilson.  A selection of said principles follows,

and Dr. Landy's professional behavior, as explained in the book,

should be reviewed in light of these principles:

   a)  Psychologists respect the dignity and worth of the
   individual and strive for the preservation and protection of
   fundamental human rights.

   b)  Psychologists make every effort to protect the welfare of
   those who seek their services...and do not knowingly permit
   their own services to be used by others for purposes
   inconsistent with these values.

   c)  Psychologists define for themselves the nature and
   direction of their loyalties and responsibilities and keep all
   parties concerned informed of these commitments.

   d)  As practitioners, psychologists are alert to personal,
   social, organizational, financial, or political situations and
   pressures that might lead to misuse of their influence.

   e)  When a psychologist agrees to provide services to a client
   at the request of a third party, the psychologist assumes the
   responsibility of clarifying the nature of the relationships
   to all parties concerned.

   f)  Psychologists make advance financial arrangements that
   safeguard the best interests of and are clearly understood by
   their clients;  they willingly contribute a portion of their
   services to work for which they receive little or no financial
   return.

CODING MANUAL – Re: <u>Wilson, et al. v. HarperCollins</u>          Page 20

g)  Psychologists only provide services and only use
techniques for which they are qualified by training and
experience.   In those areas in which recognized standards do
not yet exist, psychologists take whatever precautions are
necessary to protect the welfare of their clients.

h)  Psychologists in clinical or counseling practice do not
use their relationships with clients to promote, for personal
gain or profit...commercial enterprises of any kind.

i)  In their professional roles, psychologists avoid any
action that will violate or diminish the legal and civil
rights of clients or of others who may be affected by their
actions.

<u>RESEARCH DEFINITIONS</u>

ASSERTION - a linguistic construction comprising a single item of relevant information.

BANKS OF INFORMATION - an amassment of detailed information that summarizes the gist of the accumulated assertions relevant to a particular category, a bank of information will consolidate the accumulated assertions into a detailed summary statement and it may include stringing together several items of information deemed of particular significance.

COMMUNICATION - meanings exchanged between the writer/publisher of the message and the average reader.

CONTEXT - the whole structure of a literary work with regard to its bearing upon any of the parts which constitute it;  and where the meaning of any designated passages is determined, in part, on its relationship to the book as a whole and to the effect of the parts which immediately precede and follow.

DESIGNATED PASSAGE a finite segment of language such as was excerpted from the book-at-issue and designated in the plaintiffs' <u>SECOND AMENDED COMPLAINT FOR LIBEL</u> in Paragraph 10 as statements of and concerning Audree Wilson;  Paragraph 19 as statements of and concerning Carl Wilson;  and Paragraph 30 as statements of and concerning the Beach Boys;  which finite segment of language may include one or more phrases, clauses, sentences or paragraphs--in their original order or with an ellipsis to designate omission of a word or words.

INFORMATION - communication in terms of statements inferences and innuendos.

RELEVANT INFORMATION - information focusing on one or more of the various categories identified above.

SELECTED PASSAGES - a finite segment of language such as was excerpted from the book-at-issue and selected by the researcher to represent statements of and concerning Dr. Eugene Landy in the following areas:  COMPETENCE;  METHODS OF TREATMENT;  ETHICS;  EFFECTS;  and POSITION ON CONTROVERSIES;  where said selected passages were not intended to be an exhaustive representation of information contained in the book regarding Dr. Landy, generally, or in terms of any of the specified categories.