FILED

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JAN 2 8 1997

_Raymond_
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CARL WILSON, an individual, and
AUDREE WILSON, an individual,

      Plaintiffs,

    v.                            No. CIV 94-892 JC/LFG

HARPERCOLLINS PUBLISHERS INC.,
a Delaware Corporation,

      Defendant.

**BRIEF IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY
OF MARILYN LASHNER OR FOR A DAUBERT HEARING**

I.    INTRODUCTION

      On November 16, 1996 plaintiffs served a copy of a
report, coding manual and affidavit from one Marilyn Lashner.[1]
The inadequacies of the original report are the subject of a
motion to preclude her testimony and for sanctions now pending
before the federal magistrate.

      The sum total of Lashner's submission purports to
assert an "expertise" in "content analysis," an academic
discipline apparently originating from attempts by ecclesiastical

---

      [1] On November 27, 1996, plaintiff forwarded additional
submissions to defendant, including certain calculations and
other data, purporting to support the conclusions of her
report.  On December 3, 1996, plaintiffs forwarded a revised
"Affidavit of Marilyn Lashner, Ph.D, dated December 2, 1996
which is organized to contain headings and other information
that comports with the rule respecting expert witness reports."
Defendant has attached as exhibits the Affidavit (Exhibit A),
the Report (Exhibit B), and the Coding Manual (Exhibit C).
Plaintiffs consent to attaching exhibits in excess of fifty
(50) pages.



authorities to ferret out heretical beliefs and sentiments from written works.[2]  Lashner uses this analysis to reach three conclusions:  (1) Carl Wilson and Audree Wilson were portrayed negatively in the book and that negative portrayal would have been so understood by the average reader (Report at 3); (2) Dr. Landy contributed sections to the book (Report at 6-7)[3]; and (3) HarperCollins Publishers Inc. ("HarperCollins") knew that Dr. Landy contributed portions to the book (Report at 6, ¶ 4; id. at 29).  Lashner thus purports to testify as to the meaning that the challenged passages would have to an ordinary reader, the issue of historical fact as to who wrote the book, and the subjective state of mind of HarperCollins when it published the book.

No less than five courts have previously excluded Lashner's testimony on these types of issues in libel cases, concluding that her testimony would not assist the trier of fact and would be more prejudicial than probative.  They have also rejected her method of analysis as "virtually incomprehensible pseudo-scientific jargon," see infra.

---

[2] "First used for studies in theology when the Church had interest in checking the spread of nonreligious matters, the procedures have evolved into a scientific methodology commonly used in universities and elsewhere for research in Journalism, Literature, Sociology, Political Science, Psychiatry, and Psychology."  (Lashner Aff. ¶ 21.)

[3] Lashner refers to "the major contribution of Dr. Landy to the writing of the book" and further states that HarperCollins permitted "its book to serve as a platform for Dr. Landy." (Report at 6, ¶ 4; id. at 7, ¶ 8.)

We urge this Court to do the same because:  (1) Lashner has no expertise to testify as to who in fact wrote the book (and no basis for concluding that if Brian Wilson did not write the book, then Eugene Landy did); (2) Lashner has no expertise to testify as to whether Brian Wilson was competent to write the book; (3) expert testimony on the issue of a publisher's subjective state of mind has been squarely rejected; (4) expert testimony on the issue as to how an average reader would understand the challenged passages has likewise been rejected; and (5) Lashner's conclusion that the plaintiffs are negatively portrayed is  substantially predicated on passages which are not at issue in this case encompasses speech fully protected by the First Amendment.

The foregoing flaws fully warrant exclusion of Lashner's testimony.  Were the Court to conclude otherwise, then this Court would be required to conduct a hearing pursuant to the Supreme Court decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786 (1993), at which plaintiffs would be required to establish by a preponderance of evidence that Lashner's "content analysis" has sufficient scientific validity to meet Daubert's governing standard as to relevance and reliability.

3

II.   <u>ARGUMENT</u>

    A.   <u>The Court's Gatekeeping Function</u>

       In <u>Daubert</u>, the Supreme Court held that under the 1975 amendments to the Federal Rules of Evidence, the federal courts have an essential "gatekeeping" or "screening" function to perform in passing on the admissibility of expert testimony, especially testimony purportedly based on the scientific method. <u>Id.</u> at 2795, 2798.  Drawing on the language of Rule 702, the Court ruled that the testimony must (1) consist of "scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue," <u>id.</u> at 2796 (footnote omitted), and required that the scientific principles on which it is based be reliable and accurate.  <u>Id.</u> at 2795 ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").

       The proffered Lasher testimony fails on every count to meet the <u>Daubert</u> standard.

    B.   <u>Lashner's Testimonial Record</u>

       At least five courts have excluded Lashner's testimony on precisely the issues on which she presently proposes to opine here -- the defendant's subjective state of mind and the meaning that the challenged passages would have to an average reader. These courts have routinely excluded Lashner's opinions as invasive of the roles of the court and jury, as unhelpful to the

trier of fact, and as more prejudicial than probative.   This
Court should do the same.

The most recent decision to confront and reject Lashner
and her mode of analysis was <u>Tilton v. Capital Cities/ABC Inc</u> 938
F. Supp. 751 (N.D. Okla. 1995), <u>aff'd</u>, 95 F.3d 32 (10th Cir.
1996).   In that libel case, the plaintiff sought to proffer
Lashner's "expert" testimony on, among other things:   "how
certain rhetorical devices or patterns of speech convey implicit
meanings;" "how the use of words, patterns of words, the position
of words, the taking of words out of context and the placing of
words with visual presentation, were used by Defendants to convey
meanings to the viewing public;" "how the average reader was
likely to understand the broadcasts;" and the "Defendants'
knowledge of the falsity of the facts and implied facts presented
to the viewing audience."   938 F. Supp. at 752.

The Court excluded Lashner's testimony, concluding that
it would not assist the trier of fact because:   (1) the trier of
fact is clearly capable of determining what the average viewer
understood without the aid of expert testimony; and (2) special
knowledge is not necessary to determine the defendants'
subjective state of mind.   938 F. Supp. at 753.   The Court
further concluded that Lashner's testimony should be excluded
under Federal Rule of Evidence 403, on the basis that it "would
be confusing to the jury, would be a waste of time[,] and would
be unfairly prejudic[ial] to Defendants."   <u>Id.</u>   In so holding,

the Court relied on a decision of the Oklahoma Court of Appeals,
which had excluded Lashner's testimony in a false light case on
the defendant's state of mind, concluding that no special skills
or knowledge were needed to make a determination as to the mental
state of the defendants.  See  Winship v. McCurtain County News,
Inc., 21 Media L. Rep. 2026, 2027 (Okla. Ct. App. 1993)
(unpublished).

Other courts have reached similar conclusions.  In
World Boxing Council v. Cosell, 715 F. Supp. 1259 (S.D.N.Y.
1989), the plaintiff in a libel action offered Lashner as an
expert on the defendant's "subjective state of mind."  The
court's exclusion of Lashner's testimony as confusing "pseudo-
scientific jargon" has acute application to the instant case:

> The WBC . . . seeks to introduce, as evidence of
> Cosell's alleged misuse of the articles, testimony by
> an expert witness "in the field of media analysis and
> communications research."  Through a complicated and
> confusing "scientific/statistical" method of analysis,
> using "codes" and "labels" and specialized terminology,
> the expert, Dr. Marilyn Lashner, attempts to offer her
> view of Cosell's subjective state of mind when he wrote
> the passage.
>
> . . . .
>
> A layman is perfectly capable of reading Cosell's book
> and comparing it with the articles he claims to have
> relied on, without the "help" of a linguistics expert.
> There, Dr. Lashner's testimony would waste the time of
> both the jury and the court.  Because it transforms a
> common sense issue into a technical one, and relies on
> virtually incomprehensible pseudo-scientific jargon,
> Dr. Lashner's analysis must be excluded as more apt to
> confuse than to enlighten, more unfairly prejudicial
> than probative.  Fed. R. Evid. 403 & 702.

6

715 F. Supp. at 1264-65 (emphasis added).

And yet again, in <u>Brueggemeyer v. American Broadcasting Cos.</u>, 684 F. Supp. 452, 464 (N.D. Tex. 1988), the court excluded an affidavit of Lashner purporting to opine on the issue of actual malice, concluding that her opinions were "too unreliable to be admitted in evidence" or "to assist the jury in its determination of the relevant facts."   <u>Id.</u> at 465.   The court reasoned that, even if the affidavit satisfied the requirements of Fed. R. Civ. P. 56 (e) (which the Court held it did not), "the probative value of the opinions is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, and the opinions are thus excludable under Fed.R.Evid. 403."   <u>Id.</u>

Finally, the Ohio Court of Appeals has rejected Lashner's proffered testimony on the issue of defamatory meaning on the ground that that issue is a question of law for which expert testimony is inappropriate.   <u>See</u> <u>Fish v. Heatherdowns Country Club Ass'n</u>, 1991 WL 97324 *4 (Ohio. Ct. App. 1991).

Thus, at least five courts have excluded Lashner's testimony, concluding that her claimed area of "expertise" lacks evidentiary utility in libel cases, and that the issues of a defendant's subjective state of mind and defamatory meaning are not appropriate subjects for expert testimony.   Despite the extraordinarily clear message delivered by this and other circuits as to the relevance and reliability of "content

analysis" of works challenged in libel cases, the plaintiffs
proffer just such testimony here.  No differently than the
outcomes in the foregoing cited authorities, her testimony should
be excluded on each of the three issues on which she claims
special expertise here.

      C.    <u>Lashner Lacks Expertise on the Issue of Who Wrote the
Book, HarperCollins' State of Mind, and Brian Wilson's
Mental State</u>

         1.   <u>Landy's Alleged Contribution to the Book</u>

Whatever the utility of "content analysis" as an
academic device for understanding the structure of a novel, it
does not extend to the realm of divining historical facts, such
as the identity of the author of a book or HarperCollins'
knowledge of authorship.  In <u>Daubert</u>, Justice Blackmun referred
to the potential incongruity between an expert opinion and the
issues in a particular case by requiring that there be a "fit"
between the expertise and the facts of the case.  113 S. Ct. at
2796.  As Justice Blackmun explained, by way of example, an
astronomer's testimony on the phases of the moon would be
admissible in a case where visibility was in issue; it would not
be admissible as scientific evidence to show that a party behaved
irrationally on the night in question.  <u>Id.</u>

As the courts faced with Lashner's opinions have
concluded, her expertise in analyzing literature or rhetoric
lacks a "fit" to libel cases.  This incongruity is demonstrated
most vividly by her conclusion that Eugene Landy contributed "his

8

voice" to the book and that HarperCollins knew it (Report at 6-7).  Since plaintiffs have adduced no evidence to establish Landy's participation in writing the book, they attempt to rely on Lashner to establish an historical fact not provable by any witness with personal knowledge.

Lashner arrives at her opinion that Landy contributed to the book by focusing on isolated statements by Brian Wilson concerning substance abuse and mental illness, relating them to defects in his memory, and then concluding that he could not have remembered the events described in the book.  (Lashner Report at 7, ¶ 6) ("a goodly portion of information which the book advanced about Dr. Landy and others was incompatible with Brian's memory or personal knowledge.").[4]  Therefore, she continues, Landy must have contributed these passages to the book.  (Lashner Report at 7.)

Initially, Lashner is not qualified to opine on what Brian Wilson could or did remember.  Lashner's psychological assessment of Brian Wilson's state of mind and the content of what he could or could not remember is clearly beyond Lashner's competence.[5]

_____

[4] See also Lashner's reference to Brian Wilson's "mental disability throughout much of the time covered by his narration."  (Lashner Report at 7, ¶ 6.)

[5] Since Lashner has never examined Brian Wilson and is not qualified to do so, she cannot state that Brian Wilson was incapable of remembering events during the time he was treated
(continued...)

Lashner is not a psychologist or a psychiatrist and does not purport to have any qualifications allowing her to render a professional opinion on whether Brian Wilson was able to recall accurately the events recounted in the book, what events he could or could not recall, and whether the statements in the book were his own recollection of the historical past or someone else's.  Her credentials do not include any training or licensure in psychology.  She has never examined Brian Wilson and would be incompetent to give an opinion on this issue if she had.[6]

Moreover, Lashner's expertise could not conceivably extend to opining on whether a historical fact     -- Landy's alleged contribution to the book -- occurred or not.  Lashner offers, and can offer, no scientific methodology to support the notion that analysis of the text of a book can yield reliable information on the identities of persons contributing to the book.

Lashner appears to abandon "content analysis" (and hence any scientific pretense for her opinion) altogether with

---

5  (...continued)
by Landy.  In her report she hedges this issue by stating that he was "often not sufficiently lucid to recognize or interpret the goals of Dr. Landy's therapy or even to recall the many stages or procedures." (Report at 28 (emphasis added.))

[6] Moreover, even a qualified psychiatrist would not be allowed to give an opinion on whether Landy actually contributed material for the book. Lashner's report seeks to opine, in this respect, on matters heretofore considered within the province of parapsychology, a discipline which is not recognized as grounded in scientific principle at all.

10

regard to conclusions regarding Landy:  Landy's participation in the writing of the book "was addressed not by the scientific content analysis described above, but rather by an _informal review_ of other passages selected by this researcher to present statements of and concerning Dr. Landy."  Lashner Report at 12 (emphasis added).  Such psychological speculation is clearly beyond the expertise she claims to have.

Lashner's proposed testimony here is indistinguishable from the expert testimony rejected by Judge Parker in _Sanchez v. KPMG Peat Marwick_, 1996 WL 104259 (D.N.M. 1996).  In _Sanchez_ the plaintiff offered expert testimony that certain financial statements were misleading based, in substantial part, on the expert's perception that certain underlying transactions were "illegal."  The court rejected his testimony on the ground that as an accountant, the expert:

> was not qualified to opine as to the legality of transaction. ...  Thus, Adler's testimony demonstrates that he first concluded that the CBG Transactions were illegal and then found fault with Peat for not so reporting.  His opinion is driven by his conclusion that he is not qualified to reach.

_Id._ *3.  Likewise, Lashner's opinion hinges on the psychological assessment of Brian Wilson's mental state, an expertise she admittedly does not possess.

The major conclusion of her report -- that Landy must have contributed to the book -- is predicated both on an expertise she does not have (psychology) and an expertise, if

11

such it can be called, that is based on a nonscientific methodology.  For these reasons, Lashner should not be allowed to testify as to conclusions regarding Landy's contributions to the book.

2.   HarperCollins' State of Mind

Lashner's pretensions of exploring HarperCollins' mind concerning what it knew and when it knew it -- specifically the suggestion that it knew prior to publication that Landy had contributed portions to the book (Report at 6, ¶ 4; id. at 29) -- exceeds by leagues what courts have ever allowed in libel cases. Lashner's opinion clearly exceeds the parameters of her claimed expertise.  Indeed, in rebuffing her opinion in both Tilton and Cosell, the courts flatly rejected her efforts to engage in mind-reading concerning defendants' knowledge of defamatory meanings or truth or falsity.  See Tilton, 938 F. Supp. at 753 (excluding Lashner's proposed testimony on the issue of actual malice); World Boxing, 715 F. Supp. at 1265 (Lashner's "view of [the defendant's] subjective state of mind . . . would waste the time of both the jury and the court").  See also United States v. Evans, 910 F.2d 790, 803 (11th Cir. 1990) (expert linguistic testimony would not aid jury in determine defendant's state of mind), aff'd, 504 U.S. 255 (1992).

Moreover, her pretensions of telepathic powers based on textual analysis -- that HarperCollins "knew" that Landy was a contributor -- is equally absurd.  See United States v. Evans,

12

910 F.2d 790 (11th Cir. 1990) (psycholinguistic analysis to show defendant's state of mind excluded in extortion prosecution), aff'd, 504 U.S. 255 (1992); United States v. Schmidt, 711 F.2d 595 (5th Cir. 1983) (psycholinguistic testimony to show state of mind excluded in false swearing case).

It is outlandish enough that Lashner draws her conclusion on Landy's role based on "an informal review" of passages of her selection; her "informal" methodology could not conceivably extend to divining from the writings of an author what a publisher knew about the identities of contributing authors.[7] United States v. Hearst, 563 F.2d 1331, 1350 (9th Cir. 1977) (psycholinguistic analysis to prove authorship of letters excluded). To the extent that Lashner purports to testify on crypto authors or defendant's knowledge of these authors based on textual analysis of the book, her testimony is clearly beyond the realm of any scientific discipline and more appropriately belongs to the field of parapsychology. This Court should exclude Lashner's opinions on HarperCollins' knowledge of Landy's alleged participation in the writing of the book.[8]

---

[7] An apt analogy is polygraphy, an expertise which can be useful in determining whether a subject believes that he is telling the truth about an event. It does not establish the objective reality of whether the historical event about which the subject is tested occurred or not.

[8] From this, Lashner makes the inexplicable leap that Landy (as opposed to someone else) must have been the source of the challenged assertions in the book.

D.   <u>Lashner's Testimony on the Book's "Negative" Portrayal</u>
<u>of Plaintiffs Should be Excluded</u>

Lashner also proposes to testify that Carl Wilson is presented negatively in the book, especially in relation to Landy, that Audree is portrayed negatively as well, and that the average reader "would have understood" these portrayals to be negative. (Lashner Manual at 2).

At the outset, in reaching here conclusions on the portrayal of the plaintiffs, Lashner bases her opinion in substantial part on communications that are not even complained of by the plaintiffs and are protected under core First Amendment principles.  The issue in a libel case is not whether Carl or Audree are presented negatively in the book, but whether the negative portrayal is the result of <u>false</u> and <u>defamatory</u> <u>assertions of fact</u>.  A mere negative portrayal of a person cannot form the basis of an action for defamation.  The twenty-four designated passages that have been reconstructed into "assertions" and categorized as negative to Carl Wilson[9]

_____

[9] <u>See</u> Report.  Lashner's approach is to identify certain "designated passages" in the book (Lashner Report at 9), analyze these passages in unidentified "contexts," <u>id.</u>, and then apparently break the passages into smaller units called "assertions."  <u>Id.</u> at 11.  Lashner states the conclusion that "scientific content analysis of the 27 designated passages generated a total of 298 assertions of relevant information: 80 focusing on Audree Wilson; and 218 focusing on Carl Wilson." <u>Id.</u> at 18.  She then places the "assertions" into fifteen categories, (<u>id.</u> at 10), and applies a formula to arrive at the conclusion that the plaintiffs are not favorably depicted.  <u>Id.</u> at 11, Coding Manual at 16.

constitute a hodgepodge of statements that include ones that are not challenged by plaintiff here, are not of and concerning Carl Wilson,[10] and are clearly opinion.[11]  Whatever Lashner's opinion as to the negative light thrown by such statements they are firmly protected under the First Amendment.

To the limited extent Lashner addresses factual assertions about the plaintiffs that are claimed to have defamatory meaning, it is well-established that expert testimony on the issue of defamatory meaning is improper, as it invades the provinces of the judge and jury and cannot assist the trier of fact.

Under the law of defamation, the court determines as a matter of law whether a statement is susceptible to a defamatory meaning.  If so, it is for the trier of fact to determine whether

---

[10] "The designated passages focusing on the Beach Boys are to be analyzed in terms of the 'Carl Wilson categories' on the assumption that, and to the extent that, they are deemed relevant to Carl Wilson, individually, or as a member of the Beach Boys."  (Coding Manual at 11 (emphasis added.))

[11] See Report.  Several categories of negative commentary are absolutely protected by the First Amendment and by state constitutional privileges.  Rhetorical hyperbole, for example, is constitutionally protected speech under the First Amendment. Henderson v. Times Mirror Co., 669 F. Supp. 356 (D. Colo. 1987) (reference to plaintiff as "sleaze-bag" who "slimed up from the bayou" not actionable), aff'd mem., 876 F.2d 108 (10th Cir. 1989); Mingus v. Dell Publishing Co., 17 Media L. Rep. (BNA) 1370 (N.Y. Sup. Ct. 1990) (statements describing plaintiff as a "primitive creature" who "spent a lot of time mentally AWOL" not actionable); Rowland v. Fayed, 14 Media L. Rep. (BNA) 1257 (D.C. Super. Ct. 1987)(characterizing plaintiff as "the Al Capone of London" mere rhetorical hyperbole and not actionable).

it was so understood.  See White v. Fraternal Order of Police, Inc., 909 F.2d 512, 518 (D.C. Cir. 1990);  Foretich v. Chung, 23 Media L. Rep. (BNA) 1414 (D.D.C. 1995).[12]

If statements in the book are capable of a defamatory understanding and are not protected as opinion or rhetorical hyperbole, it will certainly be apparent to the jury without an expert telling it that a passage is "really" defamatory and should be understood as such, although it does not appear to be so.  Since a defamatory statement is one which reduces the plaintiff's reputation within his community, who is better able to determine whether a statement is capable of being understood in a defamatory sense than the trial court, and who is better able to conclude that it was so understood than the representatives of the very community which constitutes the standard?  See, e.g., Jetcraft Corp. v. Flight Safety Int'l 16 F.3d 362, 366 (10th Cir. 1993) ("the district court properly prohibited plaintiffs' expert from doing what the jury could do just as well on its own"); Persinger v. Norfolk & W. Ry. Co., 920 F.2d 1185, 1188 (4th Cir. 1990) ("Rule 702 excludes expert testimony on matters within the common knowledge of jurors"); United States v. Schmidt, 711 F.2d 595, 599 (5th Cir. 1983)

---

[12] See N.M. U.J.I. 13-1007 Directions For Use ("This instruction is to be used when the court determines that the communication, while not defamatory as a matter of law, is capable of a defamatory meaning.  In such cases it is for the jury to determine whether the communication is defamatory.").

(affirming preclusion of testimony by linguistics expert that "complicated an otherwise simple issue before the jury"); United States v. Devine, 787 F.2d 1086, 1088 (7th Cir. 1986) (linguistic analysis not needed where contents of tape were within average person's understanding).

For these reasons, the courts in Tilton, Cosell, Brueggemeyer, and Fish excluded Lashner's testimony on this issue on the ground that her claimed expertise would not assist the trier of fact. These holdings conform to the consistent line of federal cases excluding psycholinguistic testimony in a variety of issues and circumstances. See McCabe v. Rattiner, 814 F.2d 839, 843 (1st Cir. 1987) (expert testimony on meaning of word "scam" excluded in libel action); James v. San Jose Mercury News, Inc., 20 Cal. Rptr. 2d 890, 900 (Ct. App. 1993) (linguistic analysis to show impact of alleged defamation irrelevant in libel action); United States v. Aguon, 851 F.2d 1158, 1171 (9th Cir. 1988) (Ninth Circuit has "repeatedly upheld the exclusion of psycholinguistic expert testimony;" expert testimony to show state of mind excluded in false swearing case), overruled on other grounds by Evans v. United States, 504 U.S. 255 (1992); United States v. DeLuna, 763 F.2d 897, 912 (8th Cir. 1985) (linguistic analysis properly excluded).

This is not a case concerning an allegedly libelous technical journal intended for sophisticated readers involving any issue or subject matter that an ordinary juror will not be

17

able to comprehend without scientific assistance.  It concerns a book written by a layman in plain English about his life and travails.  The Court has an obligation to exclude irrelevant and speculative opinion stamped with the imprimatur of precise scientific knowledge, especially where the subject of the proposed testimony is the common meaning of ordinary words directed to ordinary readers and capable of understanding by judges and jurors.  Newell v. Field Enters., 415 N.E.2d 434, 442 (Ill. App. Ct. 1980) ("[T]he defamatory effect of a writing is 'to be ascertained not from the viewpoint of a critic or language expert, but rather from that of a reader of reasonable intelligence who takes ordinary interest in the articles of a periodical but does not commonly subject them to careful scrutiny and analysis.'" (quoting Christopher v. American News Co., 171 F.2d 275, 278 (7th Cir. 1948)).

In these circumstances, Lashner's proposed testimony on the asserted "negative" portrayal of Carl and Audree Wilson would be far more prejudicial than probative, and thus should, in addition, be excluded under Rule 403.

Accordingly, this Court should, consistent with Rules 702 and 403 and the cases cited above, exclude this testimony because its minimal relevance, if any, is substantially outweighed by its potential for prejudice and confusion.

E.    A Daubert Hearing is Required if Any of Lashner's Testimony is to Remain

18

For the reasons set forth above, the Court should exclude Lashner's testimony on each of the issues she proposes to address.  However, if any issues remain, the Court should conduct a <u>Daubert</u> hearing to determine whether Lashner's claimed expertise is based on any valid scientific principle or technique.

At such a hearing, the Court must scrutinize the reliability of the expert scientific methodology to determine whether it is "scientifically valid," 113 S. Ct. at 2796. Relevant facts will be:  (1) whether the methodology can be empirically tested and whether its  application results in replicable outcomes; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether there is a known or potential rate of error, and if so, the rate of error and (4) its general acceptance within the relevant expert community.  <u>Id.</u> at 2796-97.  A <u>Daubert</u> is thus a complex, but necessary proceeding:

> Federal judges ruling on the admissibility of expert scientific testimony face a far more complex and daunting task in a post-<u>Daubert</u> world than before.  .
> .  .  Under <u>Daubert</u>, we [judges] must engage in a difficult, two-part analysis.  First we must determine nothing less than whether the experts' testimony reflects "scientific knowledge," whether their findings are "derived by the scientific method," and whether their work product amounts to "good science."

<u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 43 F.3d 1311, 1315-16 (9th Cir.).

Here, if a <u>Daubert</u> hearing is necessary, the Court
would need to focus on a host of questions typically directed at
any expert purporting to apply a scientific methodology or
technique: what exactly is the scope of the expertise? Is it
limited to the academic inquiry of how words and rhetorical
devices operate to convey meaning? Does it purport to be able to
opine on the subjects that Lashner addresses in her report, for
example, the authorship of a book, or what a publisher knew or
understood? Does the methodology have any objective features or
do subjective factors[13] necessarily enter into the application
of the methodology?  Are the results replicable using the
technique or do the results depend on the identity of the content
analyzer?  Has the scientific community done validation studies
to determine whether given the same raw materials, several
different qualified experts reach the same conclusion when
applying the methodology or principles?[14]  What are the

---

[13] The disqualifying subjectivity of this enterprise is
reflected in the very coding manual on which Lashner relies.
Under Stage V, Lashner states that "[C]oding reliability is a
function of the coder's skill, insight, experience; and clarity
of categories and coding rules which guide their use."  Content
analysis does not qualify as either "hard" or "soft" science.
Indeed, it does not qualify as science at all.  (Coding Manual
at 16.)

[14] Dr. Lashner can only "presume" that her conclusions
would be reached by others applying her methodology.  No
validation has been attempted or performed on her work.
(Report at 31, n.4) ("It is presumed that subsequent
researchers, following the rules and procedures set forth in
the Coding Manual, would arrive a similar results").

acceptable known or potential error rates in applying the scientific technique? What is the standard against which the error rate is addressed?[15]  Does any standard exist in this field?

While HarperCollins believes that Lashner's testimony should be excluded for the reasons provided, if a Daubert hearing is required, HarperCollins will be prepared to demonstrate the complete failure of content analysis to conform to the requirements of Daubert.  Lashner's acknowledgment that her discipline has its origins in the efforts of inquisitors to identify errant religious beliefs itself casts grave doubt on its claim to be a juridically cognizable "scientific" expertise.

As one court which previously rejected Lashner's method of "content analysis" concluded, plaintiff, at the end of the day, cannot "demonstrate that content analysis is an acceptable study within the scientific community."  See Fish, 1991 WL 97324 at *2.

---

[15] In Daubert, on remand, the Ninth Circuit noted that the factors recited by the Court "raise many questions, such as how do we determine whether the rate of error is acceptable, and by what standard?"  43 F.3d at 1316 n.3.

21

III. Conclusion.

For the reasons set forth above, HarperCollins respectfully submits that the Court should preclude Lashner's testimony or, in the alternative, conduct a <u>Daubert</u> hearing to determine whether her method of analysis satisfies the requirements of the Federal Rules of Evidence.

Respectfully Submitted,

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: _William S. Dixon_
    William S. Dixon
    Post Office Box 1888
    Albuquerque, New Mexico  87103
    Telephone:  (505) 765-5900

    R. Bruce Rich
    Katherine J. Daniels
    Elizabeth Stotland Weiswasser
    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, New York  10153
    Telephone (212) 310-8000

    Attorneys for Defendant
    HarperCollins Publishers Inc.

We hereby certify that a copy
of the foregoing was mailed to
counsel of record this _19th_
day of December, 1996.

RODEY DICKASON, SLOAN, AKIN & ROBB, P.A.

By _William S. Dixon_
  William S. Dixon