FILED

UNITED STATES DISTRICT COURT
ALB...

JAN 2 8 1997

Case No. CIV 94 892 JC

CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| CARL WILSON, an individual, and AUDREE WILSON, an individual, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| HARPERCOLLINS PUBLISHERS, INC., a Delaware corporation, | ) ) ) |
| Defendant. | ) ) |

**PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO
DEFENDANT HARPERCOLLINS' MOTION TO EXCLUDE EXPERT
TESTIMONY OF MARILYN LASHNER, Ph.D OR FOR A DAUBERT HEARING**

**ORAL ARGUMENT REQUESTED BY PLAINTIFFS**

wil3\010\oppdaub.brf

145

## TABLE OF CONTENTS

                                                                              **Page**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . .    1

II.     SUMMARY OF DR. LASHNER'S CONCLUSIONS AND THEIR
        RELEVANCY . . . . . . . . . . . . . . . . . . . . . . .    2

III.    UNDER THE CURRENT STANDARD FOR EVALUATING EXPERT
        TESTIMONY, CONTENT ANALYSIS IS ADMISSIBLE TO
        ASSIST THE TRIER OF FACT . . . . . . . . . . . . . . . .   5

IV.     EVEN IF A DAUBERT HEARING IS REQUIRED, DR. LASHNER'S
        EXPERT TESTIMONY QUALIFIES FOR ADMISSION . . . . . . . .  12

V.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . .  23

## TABLE OF AUTHORITIES

<u>Page</u>

### FEDERAL CASES

<u>Amoco Oil Co. v. Rainbow Snow, Inc., et al.</u>,
   809 F.2d 656 (10th Cir. Utah 1987) . . . . . . . . . 20

<u>Auvil v. CBS "60 Minutes"</u>,
   836 F. Supp. 740 (E.D. Wash. 1993) . . . . . . . . . 2

<u>Brueggemeyer v. American Broadcasting Cos.</u>,
   684 F. Supp. 452 (N.D. Tex. 1988) . . . . . . . . . 16

<u>Compton v. Subaru of America, Inc.</u>,
   82 F.3d 1513 (10th Cir. 1996) . . . . . . . . 8, 10, 21

<u>Corneveaux v. Cuna Mut. Ins. Group</u>,
   76 F.3d 1498 (10th Cir. 1996) . . . . . . . . 10, 11, 16

<u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>,
   509 U.S. 579 (1993) . . . . . . . . . . 1, 10, 21, 22

<u>Huddleston v. Herman & MacLean</u>,
   640 F.2d 534 (5th Cir. 1981) . . . . . . . . . . 19, 20

<u>In Re Japanese Elec. Prods. Antitrust Litigation</u>,
   723 F.2d 238 (3d Cir. 1983) . . . . . . . . . . . 12

<u>International Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.</u>,
   851 F.2d 540 (1st Cir. 1988) . . . . . . . . . . . . 11

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>,
   471 U.S. 1002 (1985) . . . . . . . . . . . . . 12

<u>Robinson v. Missouri Pacific R.R. Co.</u>,
   16 F.3d 1083 (10th Cir. 1994) . . . . . . . . . 11, 18

<u>Tilton v. Capital Cities/ABC Inc.</u>,
   938 F. Supp. 751 (N.D. Okla 1995) . . . . . . . . . 18

<u>United States v. Rice</u>,
   52 F.3d 843, 847 (10th Cir. 1995) . . . . . . . . 11, 16

<u>Werth v. Makita Electric Works, Ltd.</u>,
   950 F.2d 643 (10th Cir. 1991) . . . . . . . . . 10, 12

<u>World Boxing Council v. Cosell</u>,
   715 F. Supp. 1259 (S.D.N.Y. 1989) . . . . . . . . 17, 18

## STATE CASES

Dodds v. Surety Indemn. Co.,
  1 Phila. 611 (Common Pleas Ct. Phila. 1978) . . . . . . 20

Duncan v. G.E.W., Inc.,
  526 A.2d 1358 (D.C. Ct. Apps. 1987) . . . . . . . . . . 20

Fish v. Heatherdowns Country Club Ass'n,
  1991 WL 97324 (Ohio Ct. App. 1991) . . . . . . . . . . 17

Fong v. Merena,
  66 Haw. 72 (Sup. Ct. Haw. 1982) . . . . . . . . . . . 19

Thibodeau v. Mayor and Councilmen of Morgan City,
  619 So. 2d 595 (Ct. App. La. 1993) . . . . . . . . . . 20

Weller v. American Broadcasting Companies, Inc.,
  232 Cal. App. 3d 991 (1991) . . . . . . 4, 12, 15, 16, 18

## DOCKETED CASES

Henry G. Fieger, Jr., M.D. v. New Times, Inc.,
  Case No. 91 CV 8484 (District County, City and
  County of Denver, Colo. 1993) . . . . . . . . . . . . 4

James Robinson, et al. v. Capital Cities/ABC, Inc.,
  Case No. 90-673728 (125th Judicial District Harris
  County, Tx. 1992) . . . . . . . . . . . . . . . . . . 4

## FEDERAL STATUTES

Fed. R. Evid. Rule 401 . . . . . . . . . . . . . . . . 6, 19

Fed. R. Evid. Rule 702 (Advisory Committee's Note) . . . passim

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant HarperCollins' motion to exclude the expert testimony of communications professor Marilyn Lashner, Ph.D. relies upon a <u>distorted account</u> of her conclusions and analysis, to argue that they are not a proper subject of expert testimony, and that she lacks the expertise necessary to make the conclusions.

Contrary to the impression created by Defendant's discussion of Dr. Lashner's testimonial history, the method of content analysis Dr. Lashner employs in this case <u>has been admitted by several courts</u> and meets the requirements for admissibility under Federal Rule of Evidence 702. Defendant correctly cites cases wherein Dr. Lashner's testimony was excluded, but the motion ignores the fact that in those cases either an entirely different mode of content analysis was utilized (a statistically based method, in contrast to the straightforward documentary analysis utilized here), or there were other important distinguishing factors. Moreover, the fact that some courts have not admitted content analysis is not controlling for legal reasons as well. The United States Supreme Court's decision in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), eschews decisions based on the judge's perception of what is a mainstream or a generally accepted subject of expert testimony:

> "The thrust of <u>Daubert</u> was to move away from the focus on ''general acceptance' as gauged by publication <u>and the decisions of other</u>

courts'' and to focus on whether 'an expert's

testimony both rests on a reliable foundation

and is relevant to the task at hand.'"

Auvil v. CBS "60 Minutes", 836 F. Supp. 740, 741, 21 Media L.

Rptr. (BNA) 2059 (E.D. Wash. 1993) (denying plaintiff's motion to

strike the opinions of defendants' expert) (emphasis added);

aff'd, 67 F.3d 816 (9th Cir. 1995), cert. denied, 116 S. Ct. 1567

(1996).

The tone of Defendant's motion unjustifiably maligns the

academic discipline of communications analysis, and the expertise

of Dr. Marilyn Lashner.  Defendant's motion asserts that content

analysis is an academic discipline "apparently originating" from

attempts by ecclesiastical authorities to ferret out heretical

beliefs and sentiments from written works.  The motion is silent

on the development of the discipline throughout the 20th Century.

Defendant's couching of content analysis only in terms of its

primitive, historical beginnings is akin to describing medicine

only in terms of its outgrowth of barbers' use of leeches.

Rule 702 expressly allows for the admission of expert

testimony beyond what are considered the classical sciences:

"The rule is broadly phrased.  The fields of

knowledge which may be drawn upon are not

limited merely to the 'scientific' and

'technical' but extend to all 'specialized'

knowledge.  Similarly, the expert is viewed,

not in a narrow sense, but as a person

> qualified by 'knowledge, skill, experience,
>
> training or education.'"

Advisory Committee's Note on Fed. R. Evid. 702.  A profusion of
textbooks, articles, scholarly studies and academic conferences
worldwide have been devoted to the development and use of the
content analysis in the 20th Century.  The fact that content
analysis is a recognized field is shown by the curriculum vitae
of Dr. Lashner, which was submitted with her expert report
[attached as Exhibit 7], as well as the attached Declaration and
curriculum vitae of John M. Kittross, Ph.D., former Dean of
Emerson College [attached as Exhibit 1], and the History of
Content Analysis attached as Exhibit A to the Declaration of
Marilyn Lashner dated January 13, 1997 [attached as Exhibit 2].

In none of the cases cited by Defendant, or indeed in any
case, have the qualifications of Dr. Lashner as an expert in
communications and content analysis been rejected or impugned.
[Affidavit of Marilyn Lashner, dated January 11, 1997, attached
hereto as Exhibit 3].

II.    **SUMMARY OF DR. LASHNER'S CONCLUSIONS AND THEIR RELEVANCY**

Dr. Lashner employs content analysis to make conclusions
regarding:

(1) The defamatory meaning of the passages sued on.  Her
conclusions and underlying analysis are helpful to the jury's
determination of the issues of defamatory meaning and the general
damage to reputation and emotional distress caused by the
passages.  Dr. Lashner's classification of the various defamatory

information communicated by the statements sued on <u>provide a
useful rubric for the jury's own analysis</u>.  [*See* page 3 of Dr.
Lashner's Affidavit dated December 2, 1996, attached as Exhibit A
to Defendant's motion, and pages 3-5 of Dr. Lashner's
accompanying Report and Analysis, attached as Exhibit B to
Defendant's motion].

As discussed below in more detail, Dr. Lashner's content
analysis is precisely the type of analysis that was accepted in
<u>Weller v. American Broadcasting Companies, Inc.</u>, 232 Cal. App. 3d
991, 1007 (1991) on the issue of defamatory meaning.  Further,
Dr. Lashner's own use of this type of content analysis to assess
defamatory meaning was accepted in <u>James Robinson, et al. v.
Capital Cities/ABC, Inc.</u>, Case No. 90-673728 (125th Judicial
District Harris County, Tx. 1992), *see* declaration of counsel
therein, Robert Bennett, Esq. attached hereto as Exhibit 5, <u>and</u>
in <u>Henry G. Fieger, Jr., M.D. v. New Times, Inc.</u>, Case No.
91 CV 8484 (District County, City and County of Denver, Colo.
1993), *see* declaration of counsel therein, Daniel M. Reilly, Esq.
attached hereto as Exhibit 4.

Defendant's motion mischaracterizes Dr. Lashner's
conclusions respecting defamatory meaning, by asserting that she
opines on "negative portrayals" rather than defamatory meaning.
Defendant's argument seems to be that Dr. Lashner's conclusions
speak to an incorrect legal standard.  To the contrary, her
conclusions on defamatory meanings speak in terms of defamatory
meanings, and her cited source material shows that she relied on

the legal definition of defamatory communication prescribed by the New Mexico Uniform Jury Instruction, and relevant criminal and civil statutes and the cases interpreting them (see, e.g. child abuse statutes, and statutes relevant to statements concerning Plaintiff Carl Wilson's duties as trustee of Brian Wilson's trust). [See, pages 13-15 of Dr. Lashner's Analysis and Report, attached as Exhibit B to Defendant's Motion].[1]

(2) Secondly, Dr. Lashner employs content analysis to make conclusions regarding the impression created by certain passages, that the Book gives voice to the viewpoint of Eugene Landy and serves as a platform for Landy, and in contrast disparages Carl Wilson and other members of the Wilson family.[2]

Dr. Lashner's conclusions and analysis focus on the reasons why these impressions are **recognizable** to readers (including HarperCollins' editors), and explains how a contribution by Landy comprises part of the Book's "logic" (a term of communications analysis which refers to the rational means by which in this case

---

[1]    The place where she uses the term "negative" is in her discussion of the rhetorical devices used in the Book, and the juxtaposition of contrasting images of Dr. Landy and Carl Wilson. This relates to the content analysis which is helpful to the jury's determination of actual malice and negligence, as discussed in paragraph number "2," *infra*.

[2]    HarperCollins objects to the term giving "voice," but the discovery record shows that the HarperCollins' editors on the Book use the term "voice" to describe the technique by which viewpoints or sentiments were given expression in the Book. [See, e.g. Deposition of Asst. Editor James Hornfischer, p. 79/lns. 7-10 and p. 93/ln. 13 and Deposition of Senior Editor Tom Miller, p. 120/ln. 12 and p. 135/ ln.4, all attached hereto as Exhibit 6.] The communications term "give voice" is not objectionable, and can be explained to the jury.

the Book's use of the first person voice of Brian Wilson is reconciled with, for example, the presentation of other characters' inner thoughts, and other characters' actions and statements in situations where Brian Wilson is not depicted as being present, or where he is depicted as not being sane or able to remember. [See e.g. pages 28-29 of Dr. Lashner's report and Analysis, attached as Exhibit B to Defendant's motion.] Missing from Defendant's attachments are Dr. Lashner's working papers, which were served on Defendant, and which detail the specific passages she reviewed respecting Landy. Those passages include the alleged defamatory statements, their context and other significant passages respecting Dr. Landy. Although this portion of her analysis goes beyond the statements sued on, her analysis respecting defamatory meaning does not go beyond the statements sued on and their immediate context. Defendant's assertion to the contrary is simply incorrect (see fn. 6, *infra*).[3]

The relevancy of this analysis relates to the nuances of Plaintiffs' actual malice and negligence allegations. The textual clues pointing to a contribution by Landy make HarperCollins' publication with actual malice and negligence "more probable . . . than it would be without the evidence."

---

[3]   Dr. Lashner's working paper will be separately filed with the Court.

Further explanation of these points can obtained by review of Dr. Lashner's Report and Analysis [attached as Exhibit B to Defendant's motion], by a deposition of Dr. Lashner or at a <u>Daubert</u> hearing, if the Court determines such a hearing is necessary.

Fed. R. Evid. 401.  They make HarperCollins' professions of good
faith less believable.  As the Court may recall, Plaintiffs
allege that HarperCollins published the so-called autobiography
with negligence and in reckless disregard of the fact that the
Book's purported author (Brian Wilson) was the subject of a
highly publicized pending conservatorship action, which sought,
*inter alia,* to free Brian Wilson from the detrimental physical
and psychological control of Eugene Landy, his defrocked
psychologist.  As the Court may recall from the summary judgment
proceeding, Landy was co-owner along with Brian Wilson of the
corporation "Brains + Genius" which was the <u>contracting</u> author
and copyright owner.  Prior to publication of the Book,
Plaintiffs warned HarperCollins of not only the conservatorship
action, but also their belief that Landy -- who at that time had
a powerful agenda to defame and discredit Brian's family so as to
defeat the conservatorship action which sought to unravel his
alleged improper business relationship with his patient, Brian --
was manipulating the text and accuracy of the Book.

Contrary to the instant motion's assertion, Dr. Lashner does
not purport to opine on HarperCollins' ultimate state of mind.
The recognizability of the impressions created by the Book's text
does not mean that HarperCollins' editors and pre-publication
review lawyers in fact recognized Landy's contribution (although
in the Book itself, co-author Todd Gold does thank Dr. Landy for
his "support and assistance", as Dr. Lashner notes in her
Report).  Dr. Lashner's Report also leaves room for HarperCollins

to argue that even if the textual clues were recognized by its
editors and pre-publication review lawyers, HarperCollins had
some reason to disregard them.  The jury instructions given by
the Court can allow for such conclusions.[4]  Relevant here is the
maxim that "as long as a logical basis exists for an expert's
opinion . . . the [alleged] weaknesses in the underpinnings of
the opinion [] go to the weight and not the admissibility of the
testimony."  Compton v. Subaru of America, Inc. 82 F.3d 1513,
1518 (10th Cir. 1996), cert. denied, 1996 U.S. LEXIS 7707.

     Defendant's critique of Dr. Lashner's reference to Brian
Wilson's ability to remember is not well-founded.  HarperCollins
complains that Dr. Lashner is diagnosing his condition without
having examined Brian Wilson or being trained in mental illness.
This misconstrues her analysis.  Dr. Lashner relies on the
statements in the Book itself which state that Brian Wilson
suffered from schizophrenia and hallucinations, and statements
wherein his memory loss or drug-induced unconsciousness are
expressly stated.  Dr. Lashner is approaching the text as the
average reader would (and indeed how HarperCollins' editors and

---

     **4**     The motion's mistaken assertion that Dr. Lashner's
testimony purports to read HarperCollins' mind, may be the result
of the statement in Dr. Lashner's Report that HarperCollins
"permitted" the Book to be published with these recognizable
impressions.  Too much should not be read into the word
"permitted"; it means only that HarperCollins allowed the Book to
be published with these impressions, which is a historical fact:
HarperCollins' permitted publication of the Book in the face of a
pre-publication warning by Plaintiffs.  A cautionary jury
instruction can address any problem posed by the word
"permitted."

prepublication review lawyers did, as suggested by their testimony that they did not consult a psychiatrist, that they eschewed communicating with the psychiatrist who was conducting the mental examination of Brian for the Conservatorship Court, and that they never inquired whether Brian was taking psychiatric drugs.  These are all facts which were presented to the Court in opposition to HarperCollins' motion for summary judgment, which the Court denied, finding that Plaintiffs had clear and convincing evidence from which the jury could find actual malice and negligence).

The ultimate point, however, is that Dr. Lashner's textual analysis helps the jury to understand the seeming conflict between the details presented in the Book, on the one hand, and the information provided in the Book respecting Brian Wilson's mental illness and loss of memory, on the other hand.  Here again, HarperCollins is free to present evidence that other information privately gained caused HarperCollins not to have any doubts as to the truthfulness of the Book and Brian Wilson's credibility as the author of this "autobiography".

As demonstrated below, Rule 702 and the cases explaining the standard for admitting expert testimony firmly support the admission of Dr. Lashner's analysis and conclusions.

III.  <u>UNDER THE CURRENT STANDARD FOR EVALUATING EXPERT TESTIMONY, CONTENT ANALYSIS IS ADMISSIBLE TO ASSIST THE TRIER OF FACT.</u>

Federal Rule of Evidence Rule 702 provides that "[i]f scientific, technical or other specialized knowledge <u>will assist</u>

the trier of fact to understand the evidence or determine a fact
in issue, a witness qualified as an expert by knowledge, skill,
experience, training or education, may testify thereto in the
form of an opinion or otherwise." Fed. R. of Evid. 702 (emphasis
added). If the scientific testimony sought to be admitted is
based on a unique, untested, or controversial methodology, a
hearing is to be held in accordance with the Supreme Court
standard articulated in Daubert v. Merrell Dow Pharmaceuticals,
Inc., 509 U.S. 579 (1993); Compton, supra, 82 F.3d at 1518.
Defendant argues that Dr. Lashner's testimony should be excluded
without a Daubert hearing, because it is not a proper subject of
expert testimony under Rule 702.

A thoughtful review of the case law explaining Rule 702
shows that Dr. Lashner's opinions and analysis are both properly
admitted.[5]  The Tenth Circuit has recognized that the
"touchstone" of admissibility of expert testimony under Rule 702
is the helpfulness to the trier of fact.  Compton, supra, 82 F.3d
at 1518; Werth v. Makita Electric Works, Ltd., 950 F.2d 643, 648
(10th Cir. 1991); Corneveaux v. Cuna Mut. Ins. Group, 76 F.3d
1498, 1504-05 (10th Cir. 1996).  The Tenth Circuit also adheres

---

[5]     Reference is separately made to Dr. Lashner's
conclusions and analysis, because Rule 702 allows for their
separate consideration. See, Notes of Advisory Committee ("Most
of the literature assumes that experts testify only in the form
of opinions.  The assumption is logically unfounded.  The rule
accordingly recognizes that an expert on the stand may give a
dissertation or exposition of scientific or other principles
relevant to the case, leaving the trier of fact to apply them to
the facts."

wil3\010\oppdaub.brf                      10

to the rule that "[d]oubts about whether an expert's testimony
will be useful should generally be resolved in favor of
admissibility unless there are strong factors such as time or
surprise favoring exclusion." Robinson v. Missouri Pacific R.R.
Co., 16 F.3d 1083, 1090 (10th Cir. 1994). This is in harmony
with the rule that at trial "the burden is on opposing counsel to
explore and expose any weaknesses in the underpinnings of the
expert's opinion." Robinson, 16 F.3d at 1090 (quoting
International Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.,
851 F.2d 540, 544 (1st Cir. 1988)). Thus, in Robinson, the Tenth
Circuit rejected the defendant's argument that the claimed
"overly speculative" nature of the expert testimony made its
introduction erroneous. The Notes of the Advisory Committee for
Rule 702 contemplate the same; they characterize the expert's
offering of "opinions" as the "suggesting [of] the inference
which should be drawn . . ." Fed. R. Evid. 702 Advisory
Committee's Note.

A party offering expert testimony need not prove it is
absolutely necessary to the jury's contemplation of the evidence.
In Corneveaux v. Cuna Mut. Ins. Group, supra, the Tenth Circuit
explained that the test to determine whether the testimony will
be of assistance looks to whether "the untrained layman would be
qualified to determine intelligently and to the best possible
degree the particular issue without enlightenment from those
having a specialized understanding of the subject involved in the
dispute." Corneveaux, supra, 76 F.3d at 1504-05 (quoting United

States v. Rice, 52 F.3d 843, 847 (10th Cir. 1995) and *citing* Fed.
R. Evid. 702 Advisory Committee's Note (emphasis added).  And,
in Werth v. Makita Electric Works, Ltd., *supra*, the Tenth Circuit
explained that the standard in Rule 702 looks to whether the
expert testimony will "assist the trier of fact to understand the
evidence or determine a fact in issue . . ." Werth, 950 F.2d at
648.  Accordingly, the standard for expert testimony does not
require that the jury be ignorant of the subject matter.

This point was emphasized in Re Japanese Electronic Products
Anti-trust Litigation, wherein the Third Circuit ruled that the
trial court's interpretation of Rule 702 as requiring the expert
testimony to be beyond the jury's sphere of knowledge, was an
erroneous formulation that was "rejected by the drafters of Rule
702." In Re Japanese Elec. Prods. Antitrust Litigation, 723 F.2d
238, 279 (3d Cir. 1983), *cert. granted, in part,* Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 471 U.S. 1002, 105 S. Ct. 1863
(1985).

This point was echoed in Weller v. American Broadcasting
Companies, Inc., *supra,* a defamation action wherein the
California Court of Appeal approved the admission of expert
testimony by a linguistics professor, concerning how the average
person was likely to understand the broadcasts.  The Weller court
thoughtfully rejects the argument made here by HarperCollins:

> "Appellants argue that Dr. Lakoff should not
> have been permitted to testify on this
> subject because the meaning of the language

used, and its likely interpretation by the average viewer, is not a subject sufficiently beyond the common experience of the jury that expert testimony would be of any assistance. (*See* [Cal.] Evid. Code, § 801). They further assert that the error was prejudicial because Dr. Lakoff's testimony imbued respondents' interpretations of the broadcasts with the aura of scientific authority and induced the jury to substitute the judgment of the expert for its own.

Appellants' argument has some initial appeal because common sense tells us that the average juror has experience with interpreting the English language. However, section 801 of the [California] Evidence Code <u>does not require that the jury 'be wholly ignorant of the subject matter of the [expert] opinion in order to justify its admission</u>; if that were the test, little expert opinion testimony would ever be heard. Instead, <u>the statute declares that even if the jury had some knowledge of the matter, expert opinion may be admitted whenever it would it 'assist' the jury</u>. It will be excluded only when it would <u>add nothing at</u>

<u>all</u> to the jury's common fund of information, i.e., when 'the subject of inquiry is one of such common knowledge that men [and women] of ordinary education could reach a conclusion <u>as intelligently as</u> the witness.'' [Citation].

Thus, for example, expert testimony regarding psychological factors that have been identified through empirical studies affecting eye witness identification may be admitted despite the fact that most jurors will know from common experience that an eye witness identification can be mistaken based on such factors as lighting, proximity and duration of observation. [Citation].

We are persuaded that Dr. Lakoff's testimony provided the jury with information sufficiently beyond its common experience that it <u>was of assistance in determining</u> whether the average viewer would have understood the broadcast as implying defamatory facts. <u>Dr. Lakoff explained that linguists are able to identify and explain how certain rhetorical devices or patterns of speech convey implicit meaning</u>. She then applied these techniques to the broadcast in

dispute and <u>elucidated how the context,</u>
<u>juxtaposition of certain pieces of</u>
<u>information, the choice of words,</u> and the
tone and inflection of the speakers, <u>were</u>
<u>likely to affect the viewer's understanding</u>
<u>of what was being said expressly and</u>
<u>implicitly</u>.

> Although the average juror no doubt
could listen to the broadcast and understand
their meaning, he or she is <u>not as well</u>
<u>equipped as is a linguist</u> to explain the
disparity between the words expressly stated
and the implicit meaning conveyed.  To the
extent that linguistics provides a method to
articulate how and why broadcasts implied
that Weller had sold stolen property to the
de Young Museum at a grossly inflated price,
or any of the other alleged implied
defamatory facts, <u>it may have aided the jury</u>
<u>in identifying the evidentiary basis of the</u>
<u>implicit meaning they perceived</u>."

<u>Weller</u>, *supra,* 232 Cal. App. 3d at 1007-1008 (emphasis added;
citations and footnotes omitted).  The <u>Weller</u> court's thoughtful
discussion of the standard for admission of expert testimony
under California law, tracks the Tenth Circuit's discussion of
Rule 702, as detailed *infra.*

wil3\010\oppdaub.brf                    15

Dr. Lashner's proposed expert testimony regarding defamatory meaning is wholly in accord with the expert testimony admitted in <u>Weller</u>, for all the reasons emphasized in the quoted text. Dr. Lashner's testimony is of assistance because it will help the jury "to determine intelligently and to the best possible degree" the explicit and implicit meanings of the alleged defamatory statements.  The evidence will also assist the jury to understand the various ways in which the statements sued on have the potential to damage reputation and cause emotional distress.[6] <u>Corneveaux</u>, <i>supra</i>, 76 F.3d at 1504-05.  In addition, Dr. Lashner's testimony will also assist the jury in determining actual malice and negligence by assisting the jury to discern intelligently how choice of words, patterns, juxtaposition of certain pieces of information, and other factors that provided recognizable clues as to the alleged contribution by Landy, of which Plaintiffs contend HarperCollins published in reckless disregard, and with negligence.  The fact that this textual evidence is only one component of Plaintiffs' actual malice and negligence case is not a reason to exclude the testimony.

The fact that Dr. Lashner's testimony was rejected in the <u>Brueggemeyer v. American Broadcasting Cos.</u>, 684 F. Supp. 452, 464

---

[6]    As noted <i>infra</i>, Defendant's motion is simply incorrect when it asserts that Dr. Lashner's analysis of defamatory meaning impermissibly extends beyond the sued on passages.  As page 9 of her Analysis and Report states, the 27 designated passages she examined to determine defamatory meanings comprised of statements designated in the Plaintiffs' Second Amended Complaint.  Dr. Lashner properly examined the statements in context, as the law of defamation prescribes.

(N.D. Tex. 1988), <u>World Boxing Council v. Cosell</u>, 715 F. Supp.
1259 (S.D.N.Y. 1989) and <u>Fish v. Heatherdowns Country Club Ass'n</u>,
1991 WL 97324 *4 (Ohio Ct. App. 1991) is not dispositive or even
persuasive because in those cases a different mode of content
analysis was employed:  the statistically-based Evaluative
Assertion Analysis.  That mode of content analysis begins with
the "raw" sentence as written and ends with a statistical summary
of the frequency, direction, and intensity of the attitudes
expressed in the original sentences.  Through Evaluative
Assertion Analysis, the significant words of the original
communication are assigned numerical values in terms of various
perceptual dimensions, which through a long history of
psychological and linguistic research, were found to be primary
in the perception of meaning by individuals.  Once the scores for
all significant words are recorded, they are summarized and
descriptive statistics are computed for each category and each
linguistic dimension.  Where appropriate, probability testing
(i.e., tests of significance) is undertaken for comparisons.
[Declaration of Marilyn Lashner Ph.D, dated January 11, 1997,
attached hereto as Exhibit 2.]  While the complexity of
Evaluative Assertion Analysis caused the Judge in <u>World Boxing
Council</u> to conclude that the methodology was "virtually
incomprehensible pseudo-scientific jargon," and more unfairly
prejudicial than probative, that conclusion is not relevant
because that is not the method of content analysis employed here
(or in the other defamation cases where Dr. Lashner's testimony

was admitted.)  World Boxing Council, 715 F. Supp. at 1264-65.
Further, that Judge's view of Evaluative Assertion Analysis was
not a rejection of Dr. Lashner's qualifications.

As noted above, Dr. Lashner's testimony utilizes the
straightforward documentary content analysis that was approved in
Robinson, Fiegler, and Weller, supra.  Dr. Lashner's documentary
content analysis assesses meaning by focusing on such aspects as
rhetoric, logic, linguistic configurations, and communications
theory.  Dr. Lashner's conclusions under this documentary
analysis identify both explicit and implicit defamatory meanings
contained in the publication, and explain the role of context and
rhetoric in generating said implicit defamatory meaning.  No
statistical analysis is involved.  [Affidavit of Marilyn Lashner,
Ph.D., dated January 11, 1997, attached hereto as Exhibit 2.]

In view of the numerous cases wherein Court have explained
that the admissibility of expert testimony does not hinge upon
the jury's ignorance or the jury's ability to make any
determination without expert testimony, Plaintiffs submit that
the decision in Tilton v. Capital Cities/ABC Inc., 938 F. Supp.
751 (N.D. Okla 1995), aff'd without elaboration, 95 F.3d 32 (10th
Cir. 1996), excluding Dr. Lashner's content analysis, does not
reflect a proper application of Rule 702.  The District Court of
Oklahoma's citation to World Boxing Council, in which a different
mode of content analysis was utilized, and its reference to an
unpublished Oklahoma case are additional weakness of the
decision.  Also, there is no discussion of the type of testimony

wil3\010\oppdaub.brf

18

considered on the issue of actual malice.  The Tenth Circuit affirmed the Oklahoma District Court's decision, <u>without any discussion of the issue</u>.  <u>Titlon</u>, 95 F.3d 32 (10th Cir. 1996)

Libel plaintiffs are not the only ones to seek admission of expert testimony respecting communications analysis.  In <u>Fong v. Merena</u>, 66 Haw. 72, 655 P.2d 875 (Sup. Ct. Haw. 1982), the Hawaii Supreme Court held that the trial court erred in refusing to admit the testimony of a linguistic expert offered by the defendant in support of the defendant's argument that the writing sued on did not carry a defamatory meaning.

Case law in other areas of litigation besides defamation recognize the helpfulness of communication content analysis.  For example, in the case <u>Huddleston v. Herman & MacLean</u>, the Fifth Circuit ruled that expert testimony as to the meaning of language in a prospectus (by which it was alleged the defendants committed fraud), was properly admitted:

> "This testimonial evidence had a 'tendency to make the existence of. . .(a) fact. . . (consequent) to the determination of the action more probable than it would be without the evidence.'  Rule 401, Fed. R. Evid. . . . Even if it embraced an ultimate issue, it was not for that reason alone objectionable. Rule 704, Fed. R. Evid.  See generally 11 Moore's Federal Practice § 704.10(1) (2d ed. Supp. 1976)."

19

wil3\010\oppsub.brf

<u>Huddleston v. Herman & MacLean</u>, 640 F.2d 534, 552 (5th Cir. 1981) *aff'd in part on other gr., and rev'd. in part on other gr.,* 459 U.S. 375 (1983), *on remand,* 705 F.2d 775 (5th Cir. 1983).

*See also,* <u>Duncan v. G.E.W., Inc.</u>, 526 A.2d 1358, 1361 (D.C. Ct. Apps. 1987) (testimony of a linguistics expert admitted to demonstrate that the interpretation by the defendant's agent of a lease provision, was reasonable and the ambiguity he perceived was genuine); <u>Amoco Oil Co. v. Rainbow Snow, Inc., et al.</u>, 809 F.2d 656, 658 (10th Cir. 1987) (expert testimony of a designer to show that the visual impact of the parties' respective trademarks admitted on issue of similarity); <u>Thibodeau v. Mayor and Councilmen of Morgan City</u>, 619 So. 2d 595, 598, 1993 La. App. LEXIS 1613 (Ct. App. La. 1993) (trial court admitted witness's testimony as an expert in "sign interpretation" on issue of public's interpretation of warning signs at issue).

And, in <u>Dodds v. Surety Indemn. Co.</u>, 1 Phila. 611, 1978 Phila. Cty. Rptr. LEXIS 77 (Common Pleas Ct. Phila. 1978), the court admitted testimony of an expert in linguistics as to the ambiguity of certain text, and the fair and reasonable interpretations of the text.  The court held that the expert testimony was properly admitted to aid in the jury's determination of the meaning of a stock option agreement.  The ruling was based, in part, on the expert's testimony that "linguistics involves understanding where a single sentence fits into the structure of an entire message or an entire document." 1978 Phila. Cty. Rptr. LEXIS 77, *8.

For all of the foregoing reasons, the expert testimony of
Dr. Lashner is a proper subject of expert testimony under Rule
702, because it will assist the jury to determine intelligently
and to the best possible degree, the issues of defamatory
meaning, damages, actual malice and negligence. As shown above,
case law provides that doubts as to usefullness of the testimony
are to be resolved in favor of admission of Dr. Lashner's
testimony.

IV.   **EVEN IF A DAUBERT HEARING IS REQUIRED, DR. LASHNER'S EXPERT**
      **TESTIMONY QUALIFIES FOR ADMISSION**

Because Dr. Lashner's expert testimony would be helpful to
the jury in deciding this case, it should be admitted under Rule
702. However, should the court determine that an additional
Daubert analysis is required, Dr. Lashner's testimony qualifies
under that standard.

The Tenth Circuit has recognized that the Supreme Court's
decision in Daubert merely sets out additional reliability
factors the Court should consider under the Rule 702 analysis of
relevance. Compton, supra, 82 F.3d at 1518-19. To determine
reliability, the Court considers (1) whether the theory or
technique has been, or can be, tested; (2) whether the theory has
been subject to peer review or publication; (3) the known or
potential rate of error; and (4) the degree of acceptance of the
theory of technique within the relevant scientific community.
Daubert, 509 U.S. at 593-594.

wil3\010\oppdaub.brf                    21

Dr. Lashner's expert testimony addresses the field of content analysis. Content analysis is not a traditional science; rather, content analysis applies scientific methods to documentary evidence. However, if the Court determines that a Daubert analysis is required, application of the Daubert factors to this case demonstrates that Dr. Lashner's testimony is sufficiently reliable. As already demonstrated, content analysis is not only a methodology, but has been a recognized field of study spanning two centuries. The precise rate of error in Dr. Lashner's documentary method of content analysis is not relevant, because it is not a statistically-based methodology. The text reviewed by Dr. Lashner and her tally of references are documented in her working papers (to be separately lodged). The definitional sources and legal sources she relied on are set forth in her Report and Analysis (attached as Exhibit B to Defendant's motion). If after review of these materials, the Court determines that a Daubert hearing on reliability is still needed, Plaintiffs and Dr. Lashner will make a detailed presentation respecting the Daubert inquiry at the hearing.

///

///

///

///

///

///

///

wii3\010\oppdaub.brf                          22

V.    **CONLCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully submit that HarperCollins' motion to exclude Dr. Lashner's testimony should be denied.

DATED:   January 14, 1997

Respectfully submitted,

THE ROMERO LAW FIRM

By: _____
        Ernesto J. Romero
3602 Campus Boulevard N.E.
Albuquerque, New Mexico 87106
(505) 262-2131

Barry B. Langberg, Esq.
Beth F. Dumas, Esq.
LANGBERG, COHN & DROOZ
12100 Wilshire Boulevard
Suite 1650
Los Angeles, California 90025
(310) 979-3200

wil3\010\oppdaub.brf

23

## CERTIFICATE OF SERVICE

I certify I sent via Federal Express a true copy of the
foregoing pleading to R. Bruce Rich, Esq., Weil, Gotshal &
Manges, 767 Fifth Avenue, New York, New York, 10153 and William
S. Dixon, Esq., Rodey, Dickason, Sloan, Akin & Robb, P.A.,
Albuquerque Plaza, 201 Third Street NW, Suite 2200, Albuquerque,
New Mexico, 87103, this 14th day of January, 1997.

LANGBERG, COHN & DROOZ

By: _____
       Beth F. Dumas, Esq.
       12100 Wilshire Boulevard
       Suite 1650
       Los Angeles, California 90025
       (310) 979-3200
       Attorneys for Plaintiffs