IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CARL WILSON, an individual, and
AUDREE WILSON, an individual,

      Plaintiffs,

v.                                                No. CIV 94-892 JC/LFG

HARPERCOLLINS PUBLISHERS INC.,
a Delaware Corporation,

      Defendant.

### REPLY TO PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO DEFENDANT HARPERCOLLINS' MOTION TO EXCLUDE EXPERT TESTIMONY OF MARILYN LASHNER OR FOR A DAUBERT HEARING

      In their effort to rescue Dr. Lashner's testimony from exclusion in the face of virtually unanimous precedent holding that her opinions and methodology are unreliable, confusing, and invasive of roles of the court and jury, plaintiffs fail to demonstrate that her expertise has application to the subjects on which she purports to testify and offer no evidence that the method deployed in content analysis meets the criteria set forth in Daubert for the admission of expert testimony. Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786 (1993). This Court should follow the Tenth Circuit's decision in Tilton v. Capital Cities/ABC, Inc., 95 F.3d 33 (10th Cir. 1996), and exclude her testimony.



I.  The Tenth Circuit Affirmance Of Tilton Requires Exclusion Of Lashner's Opinion.

Plaintiffs admit that no written opinion by any court has approved Lashner's testimony in a libel context.[1] To the contrary, in several cases the courts unanimously rejected her expertise as "pseudo-scientific", unnecessary, confusing, or prejudicial. Tilton v. Capital Cities/ABC, Inc., 938 F. Supp. 751 (N.D. Okla. 1995), aff'd, 95 F.3d 32 (10th Cir. 1996), and World Boxing Council v. Cosell, 715 F. Supp. 1259 (S.D.N.Y. 1989); Brueggemeyer v. American Broadcasting Cos., 684 F. Supp. 452 (N.D. Tex. 1988); Winship v. McCurtain County News, Inc., 21 Media L. Rep. (BNA) 2206 Okla. Ct. App. 1993) (unpublished). In a heroic effort to distinguish World Boxing, Plaintiffs argue that there Lashner had employed a statistically-based method, "in contrast to the straightforward documentary analysis utilized here," (Resp. at 1), and that makes all the difference.

It is an odd defense, indeed, to argue that by abandoning statistical validation, a conclusion somehow becomes more scientifically reliable. To the contrary, the Supreme Court in Daubert refers specifically to error rates as a pivotal criterion for ascertaining the reliability of a scientific methodology. 113 S. Ct. at 2797. Plaintiffs appear to argue that by

---

[1] The only written opinion offered by plaintiffs as support for the notion that content analysis has been accepted is Weller v. American Broadcasting Cos., 283 Cal. Rptr. 644 (Ct. App. 1991). While Weller, a decision by a California Court of Appeal, has no precedential value in the Tenth Circuit, especially in light of Tilton, the court there did not purport to speak to the "content analysis" offered by Lashner but rather a linguistic analysis, the parameters of which are undefined in the opinion. In light of the plethora of published cases specifically rejecting Lashner's testimony, the plaintiffs can take cold comfort in locating a single case from a lower appellate court in California suggesting that a linguistic analysis by someone other than Lashner passes the straight-face test.

abandoning a fundamental criterion for validating a questioned methodology, the methodology becomes more reliable!

Moreover, the World Boxing court's rejection of Lashner's expertise was not based on her deployment of statistical techniques to validate her conclusion but rather on its comprehensively pseudo-scientific nature, its confusing terminology, and its injection of a bizarre nomenclature into area peculiarly within the ken of any jury, i.e., the common understanding of the words communicated by Cosell's book. 715 F. Supp. at 1264.  If the World Boxing court found the use of "'codes'" and "'labels'" and "specialized terminology" confusing and unnecessary to the undertaking, id., certainly the court here should find that Lashner's references to "intra-coder reliability coefficient," "ratio of coding agreements," (Lashner Coding Manual at 16), and "linguistic construction," (id. at 12), an unacceptable and confusing diversion from a simple question:  What would an average reader understand the book to say?

Finally, despite the fact that in Tilton, Lashner used, and the court rejected, the very same methodology offered here,[2] plaintiffs attempt to blink away a direct Tenth Circuit precedent by the ipse dixit that it "does not reflect a proper application of Rule 702." (Resp. at 18).  Yet far from merely affirming the judgment of the district court without comment, the Tenth Circuit "adopt[ed] the analysis of the district court" regarding the testimony of the

---

2  Lashner's explanation that after her rejection in World Boxing, she changed her methodology by dispensing with statistical validation and thus is using a different methodology does not apply to Tilton.  There, she used the same methodology employed in this case and made the same argument offered here, i.e., that her approach had changed.

3

expert linguist (Lashner) and in an unusual step, ordered that the district court opinion requiring exclusion "be published." 95 F.3d at 33. The district court in <u>Tilton</u> ruled that Lashner's proposed testimony "would not assist the jury," that the jury was "clearly capable of determining what the average viewer... understood as expressed and implied" by the broadcast in question, and that her testimony "would be confusing to the jury, would be a waste of time and would be unfairly prejudic[ial]" to defendants. Certainly, the Tenth Circuit had a precedential purpose in mind in affirming and then ordering publication of a district court opinion excluding Lashner's testimony as unhelpful, confusing and prejudicial.

II. <u>Plaintiffs Have Failed To Make Any Showing That The Methodology Of Content Analysis Is Capable Of Determining Whether Landy Participated In The Writing Of The Book Or Whether HarperCollins Knew of His Alleged Participation.</u>

Lashner's testimony on Landy's alleged participation in the writing of the book consists of two opinions. First, she attributes authorship of portions of the book to Landy. Second, she opines that HarperCollins had to have known of this participation.[3] Lashner

---

3  Despite plaintiffs' caveat that the court should not make "too much" of Lashner's conclusion that HarperCollins allowed Landy's voice to dominate the book, Lashner eliminates any doubt that her proposed opinion is that Landy was an author and that HarperCollins knew it. (M. Lashner, <u>Analysis of the Portrayals of Audree Wilson and Carl Wilson in "Wouldn't It Be Nice"</u> (hereinafter, Lashner Report), Conclusion 3 ("It is also my conclusion that HarperCollins permitted its book to give voice to psychologist Eugene Landy, albeit through what was identified as Brian Wilson's testimony. ..."), Conclusion 4 ("It is also my conclusion that HarperCollins' permitted its book <u>to serve as a platform for Dr. Landy</u>. ...") (emphasis added), Conclusion 7 ("[A]ssociate writer Todd Gold was in essence acknowledging Dr. Landy as a major contributor to the book, second only to Brian Wilson."), Conclusion 8 ("[I]t follows that the major contribution of Dr. Landy to the writing of the book (as acknowledged by associate writer Todd Gold) necessarily directed the tenor of the story. ...") Also, in describing her purposes in undertaking the analysis Lashner states, "to describe ... the extent to which HarperCollins permitted their publication, ostensibly an

(continued...)

lacks the expertise to testify on either of these subjects, and an application of <u>Daubert</u> principles to her methodology should result in the exclusion of her opinions.

Lashner's "expertise" clearly does not extend to divining the authorship of writings. Neither her original and supplemental affidavits, her report, nor the affidavits filed in support of plaintiffs' response to this motion represent that content analysis is capable of identifying the authorship of literary works.[4] Moreover, her account of the academic history of content analysis does not include authorship as an opinion which her expertise is qualified to render. (<u>See</u> Ex. A to Lashner Decl., Ex. 3 to Pls.' Resp. Br. ("Response").)

Plaintiffs' own confusion over the role content analysis played in Lashner's opinion concerning Landy's authorship is demonstrated by their assertion that Lashner "employs content analysis" to show "that the Book gives voice to the viewpoint of Eugene Landy and serves as a platform for Landy." (Resp. at 5.) In her report, however, Lashner specifically <u>disclaims</u> that she used content analysis in reaching her conclusion:

> The third purpose of the research: to identify and describe the extent to which HarperCollins permitted their publication to give voice to Dr. Eugene Landy---was addressed <u>not by the scientific content analysis described above, but rather by an informal review of other passages selected by this researcher to</u>

---

3(...continued)
autobiography by Brian Wilson, to give voice to Dr. Eugene Landy, <u>inasmuch as Dr. Landy was an outside party not identified as an author</u>." (Emphasis added.) (Lashner Report at 2.)

4  Even the affidavit of John Kittross does not purport to invest content analysis with the inherently parapsychological power of discerning the identity of an author from the analysis of a text. Kittross claims only (without citing to supporting empirical data) that once the authors are known, the discipline can, "in many instances," divine their "intents." (Kittross Decl., Ex. 1 to Resp., ¶3.) The alleged "expertise" does not include identification of crypto authors.

5

<u>represent statements of and concerning Dr. Landy in the following areas. ...</u>"
Lashner Report at 12. (emphasis added)

If Lashner's opinions are so confusing that plaintiffs' counsel themselves do not understand their scope and application, a jury can hardly be expected to do so. Plaintiffs further fail to make any showing that this "informal review" qualifies as reliable science under <u>Daubert</u>.

Reduced to its basics, Lashner's opinion on authorship is grounded in her perception that Landy is presented more positively than is Carl Wilson. Therefore, she reasons, Landy must have been responsible for this disparity in the depiction of the two characters. This is an enormous and palpable non-sequitur. The fact that one person in an autobiography is depicted more favorably than another hardly warrants a conclusion that the advantaged person actually participated in the writing of the book.[5] Lashner's attempt to divine authorship from portrayal of the characters in an autobiography has more in common with the efforts of ecclesiastical authorities to identify the hand of the heretic in a religious tract than it does with any scientific methodology.

Lashner's opinion on HarperCollins' state of mind regarding authorship is, of course, premised on her conclusion that Landy indeed wrote the book.[6] Clearly, she does not present

---

5  Lashner does not purport to use any of Landy's prior writings to compare metaphor, phrasings, or idiosyncratic language with the text of "Wouldn't It Be Nice" so as to draw a conclusion that the same author wrote both. She merely infers that Landy must have authored the book because Brian Wilson presents him in a more favorable light than others.

6  The fact that HarperCollins will be entitled to rebut Lashner's testimony on Landy's alleged participation misses the point. (<u>See</u>, Resp. at 7-8.) Of course, HarperCollins has the right to rebut an expert opinion. The issue is the admissibility of Lashner's mind-reading in the first place.

any validation for her opinion that HarperCollins knew that Landy had allegedly written parts of the book, except for the ipse dixit from Dr. Kittross that "in many instances" the expert may be able to divine "the intents" of a known author. (See, Kittross Decl., ¶3.) Neither Lashner nor Kittross can point to a single scientific study where a statistically relevant number of experts, applying content analysis to the same data in a controlled study, replicated each other's conclusions regarding intent.  In both Tilton and World Boxing, the courts excluded her testimony on the grounds that she was not competent to opine on the knowledge and mental state of publishers on the issue of knowledge of falsity.  Her expertise likewise does not encompass an ability to opine on HarperCollins' knowledge of the identity of the book's authors.  World Boxing, 715 F. Supp. at 1265.

     A linchpin for Lashner's conclusion that Landy wrote portions of the book is her subsidiary opinion that Brian Wilson was psychologically incapable of recounting the events depicted there.  Plaintiffs fail to challenge defendant's contention that Lashner is not qualified to opine on Brian Wilson's mental state or on the effect of his mental state on his ability to recall some or all of the events recounted in the book. If as plaintiffs state, Lashner "is approaching the text as the average reader would," (Resp. at 8), then any inferences to be drawn are available to the jury from the text itself and her opinion is unnecessary and invasive of the jury's function. If Brian Wilson's alleged memory loss or mental state has relevance to his ability to remember the "details of the book,"  the scope, duration, and extent of any disability must be proven by a qualified expert, not by a practitioner of "content analysis."  Plaintiffs' attempt to use Lashner to fill in the evidentiary gaps in their proof by

seeking opinions far beyond her competence is dramatically illustrated by their gambit to use her as both a psychologist and a rhetorician.

III.  Lashner's Testimony Is Of No Assistance To The Jury And Is Invasive of Their Role In Determining Defamatory Meaning

Plaintiffs have been unable to make any cogent argument why this Court should not follow the holdings of the other courts and exclude Lashner's testimony as unhelpful and unnecessary.  The language used in the book is not idiosyncratic, coded, or technical. Lashner admits that she is attempting to identify the range of "explicit and implicit meanings" concerning the plaintiffs but then acknowledges that these meanings "would have been understood by the average reader."  (Lashner Report at 8); see also Lashner Coding Manual at 2 ("The pilot study and the research as a whole are undertaken to identify meaning such as would have been understood by the average reader with regard to portrayal of the plaintiffs in the instant case: Audree Wilson and Carl Wilson.").) (Emphasis added.)  Just so. If indeed these meanings would be so understood by the average reader, Lashner can add little or nothing and can only confuse the jury both by her impenetrable jargon and by the differences between her own interpretations of meanings, implicit or explicit, and those of the jury.  Since the criteria for determining whether a statement is defamatory are based on the community understanding of meaning, the court and the jury are peculiarly well-suited to make that determination. The jury does not need Lashner to act as a platonic guardian instructing it on meanings claimed to exist but which are not apparent to the reader's eye.

IV.  Lashner's Opinion Is Clearly Invasive Of The Court's Exclusive Role In Determining Whether Particular Units Of Information Are Nonactionable Or Constitutionally Protected

To comprehend fully the extent of Lashner's proposed invasion of the Court's exclusive function in determining whether a particular assertion is actionable or protected under the First Amendment, one need only review plaintiffs' argument asserting that Lashner "relied on" her interpretation of "the New Mexico Uniform Jury Instructions, and relevant criminal and civil statutes and the cases interpreting them." (Resp. at 4-5.)  Thus, Lashner, who in her original report arrogated to herself the professorial role of telling the jury how to read as well psychological expertise concerning Brian Wilson's mental state, now purports to determine the quintessential legal and constitutional issues which are solely the province of the court.  Thus, her opinion relies, in substantial part, on her own assessment that the multiple "assertions" in the "designated passages" are actionable and not constitutionally or otherwise protected.[7]

The problem is that Lashner relies on a myriad of what she perceives to be "negative" assertions, which are not necessarily defamatory, for her conclusion rather than on judicially sanctioned determinations as to what is actionable and what is not.  Indeed, Lashner relies at times on "inferences and innuendos" which she claims to be "negative," a practice that suffers from serious, if not fatal constitutional infirmities.  See Andrews v. Stallings, 119 N.M. 478, 484-85, 892 P.2d 611, 617-18 (Ct. App. 1995) (alleged implication based on true factual

---

7 "A single passage may harbor multiple items of information and thereby generate multiple assertions.  Assertions may represent statements, inferences or innuendoes." (Lashner Coding Manual at 12 (emphasis added).)

9

statements cannot constitutionally support a defamation action); (Lashner Report at 11). Rather than saving her opinion from exclusion, her reliance on her own reading of New Mexico jurisprudence dramatically demonstrates the extent to which she seeks to substitute herself for the Court as well as the high probability that she has relied on nondefamatory portrayals or constitutionally protected statements in forming her opinion.

V.   Plaintiffs Have Failed To Meet Their Burden Under Daubert.

Plaintiffs have simply failed to make a showing by affidavit or otherwise that content analysis meets Daubert criteria. Contrary to the implication on page 10 of the Response, Daubert does not apply only to untested or unique methodologies. Although content analysis is untested and controversial (as well as routinely excluded as a recognized expertise), Daubert applies to scientific techniques or methodologies, whether of recent or ancient vintage.[8] Thus Daubert has been applied to challenge the validity of questioned document examination and hair analysis, which were routinely accepted by the federal courts prior to Daubert. Williamson v. Reynolds, 904 F. Supp 1529 (E.D. Okla. 1995); United States v. Starzecpyzel 880 F. Supp. 1027 (S.D.N.Y. 1995). The key is whether the methodology is reliable, produces replicable results, can be verified by others using the same data and methodology, and has an acceptable error rate. See Daubert, 113 S. Ct. at 2796-97.

Here, Lashner offers no data whatsoever to address the factors which the Daubert court deemed pivotal in determining whether a technique was based on scientific principles. Her

---

8  In Daubert the Supreme Court commented as follows: "Although the Frye decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence." 113 S. Ct. at 2796 n.11.

10

and Dr. Kittross' affidavits are deafeningly silent on whether even a single control study has ever been conducted in which the methodology was applied to the same materials, whether a conclusion of one content analyst has <u>ever</u> been replicated by another using the same methodology, and whether the "discipline" has established an acceptable rate of error, and if so, what it is. Plaintiffs have the burden of establishing the scientific reliability of their methodology and have failed to make even a preliminary showing that content analysis meets the criteria set forth in <u>Daubert</u>.  See 113 S. Ct. at 2797 & n.10.  infra.  Since content analysis fails to meet any of the criteria for reliable science, yet aspires to scientific status, the Court need not engage in a <u>Daubert</u> hearing but can exclude her testimony on the basis of the insufficiency of the affidavits presented here.

        Respectfully submitted,

        RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

        By /s/ William S. Dixon
        William S. Dixon
        Post Office Box 1888
        Albuquerque, New Mexico  87103
        Telephone:  (505) 765-5900

        R. Bruce Rich
        Elizabeth Stotland Weiswasser
        WEIL, GOTSHAL & MANGES LLP
        767 Fifth Avenue
        New York, New York  10153
        Telephone (212) 310-8000

        Attorneys for Defendant
        HarperCollins Publishers Inc.

We hereby certify that a copy of the foregoing was mailed to opposing counsel of record this 28th day of January, 1997 at the following addresses:

> Beth Dumas
> Langberg, Cohn & Drooz
> 12100 Wilshire Boulevard, Suite 1650
> Los Angeles, CA  90025
>
> Ernesto J. Romero
> 3602 Campus Blvd., NE
> Albuquerque, NM  87106

RODEY DICKASON, SLOAN, AKIN & ROBB, P.A.

By *[signature]*
William S. Dixon