UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

------------------------------------x

CARL WILSON, an individual, and       :
AUDREE WILSON, an individual,
                                      :
           Plaintiffs,
                                      :   94 Civ. 892 (JC)
     v.
                                      :
HARPERCOLLINS PUBLISHERS INC.,
a Delaware corporation,               :

           Defendant.                 :

------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF AUDREE WILSON'S LIBEL CLAIM

William S. Dixon
RODEY, DICKASON, SLOAN,
 AKIN & ROBB, P.A.
Albuquerque Plaza
201 Third Street NW,
Suite 2200
Albuquerque, New Mexico 87103
Telephone: (505) 768-7266

R. Bruce Rich
Elizabeth Stotland Weiswasser
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000

Attorneys for Defendant,
HarperCollins Publishers Inc.

NYFS03...:\60\51660\0063\1631\COV1307L.040

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

97 APR 21 AM 11:44

---

CARL WILSON, an individual, and  )
AUDREE WILSON, an individual,    )     ORAL ARGUMENT
                                 )     REQUESTED
            Plaintiffs,          )
                                 )
      v.                         )     94 Civ. 892 (JC)
                                 )
HARPERCOLLINS PUBLISHERS INC.,   )
a Delaware corporation,          )
                                 )
            Defendant.           )
---------------------------------)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF AUDREE WILSON'S LIBEL CLAIM

### PRELIMINARY STATEMENT

HarperCollins Publishers Inc. ("HarperCollins") submits this memorandum in support of its motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment in its favor as to Plaintiff Audree Wilson's ("Ms. Wilson's") remaining libel claim as contained in the Second Amended Complaint ("Complaint").[1]

Ms. Wilson's remaining claim alleges that certain passages in Wouldn't It Be Nice -- My Own Story ("the book") falsely portray her as being a passive bystander to her late husband's, Murry Wilson's ("Murry's"), abuse of their children. See Complaint ¶ 11. To prevail on this claim

---

1. On July 14, 1995, this Court dismissed Ms. Wilson's libel claim related to passages which she asserted portrayed her as an alcoholic.

under New Mexico law, Ms. Wilson has the burden of establishing, among other things, that such a portrayal of her is false and that it caused actual injury to her reputation.

As discussed in greater detail below, Ms. Wilson's deposition testimony in this case makes clear that as a matter of law and uncontested fact she will be unable to establish either of these requisite elements.  First, Ms. Wilson has confirmed Murry's abuse of their children, her awareness of such abuse, and her failure to take any action to stop it.  Thus, to the extent that the book may be said to portray Ms. Wilson as a passive bystander to Murry's abuse, it is accurate.  Second, Ms. Wilson has confirmed that publication of the book has not caused injury to her reputation in any respect.  Accordingly, the now fully-developed discovery record reveals that Ms. Wilson will not be able to establish two elements critical to her claim, and that HarperCollins is thus entitled to judgment at this stage of the proceedings as a matter of law.

STATEMENT OF UNCONTESTED MATERIAL FACTS

The facts relevant to this motion are set forth in the ensuing discussion of Ms. Wilson's allegations. Relevant portions of Ms. Wilson's deposition, conducted on November 5, 1996, are discussed herein and annexed hereto as Exhibit A.

## ARGUMENT

In order to establish a <u>prima facie</u> case of defamation under New Mexico law, the plaintiff has the burden of proving a number of elements, including that the challenged statements are false and that they caused actual injury to her reputation. <u>See</u> <u>Philadelphia Newspapers, Inc.</u> v. <u>Hepps</u>, 475 U.S. 767, 775-76 (1986); SCRA § 13-1002; <u>Cowan</u> v. <u>Powell</u>, 115 N.M. 603, 856 P.2d 251 (N.M. Ct. App. 1993). As will be demonstrated below, Ms. Wilson's deposition testimony makes plain that the book's alleged portrayal of Ms. Wilson is accurate, and that publication of the book has caused no injury to her reputation in any event.

I.   <u>THE BOOK'S PORTRAYAL OF MS. WILSON IS ACCURATE</u>

   A.   <u>The Governing Law</u>

Beginning in 1964 with <u>New York Times Co.</u> v. <u>Sullivan</u>, 376 U.S. 254, the Supreme Court has emphasized that the First Amendment absolutely precludes states from sanctioning speech that is true. Thus, in a libel case, the plaintiff -- irrespective of whether she is a public or a private figure -- bears the burden of proving the challenged statement to be false. <u>Hepps</u>, 475 U.S. at 775-76; <u>see</u> <u>also</u> SCRA § 13-1002. A statement will not be considered "false" for purposes of this inquiry if its "gist" or "sting" is <u>substantially</u> true. <u>Masson</u> v. <u>New Yorker Magazine, Inc.</u>, 501 U.S. 496, 516 (1991). That is, "[m]inor inaccuracies do

not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" Id. at 517 (quotations omitted). In view of these principles, courts routinely grant summary judgment in favor of a libel defendant when the record reveals that the plaintiff is unable to meet his or her burden of proving falsity.[2]

B.   The Truth of the Challenged Portrayal

What is left of Ms. Wilson's defamation claim centers on certain passages in the book which, she contends, falsely portray her as being a passive bystander to Murry's abuse of their sons.[3]  See Complaint ¶¶ 10, 11; Deposition

---

2. See, e.g., Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993); Unelko Corp. v. Rooney, 912 F.2d 1049 (9th Cir. 1990), cert. denied, 499 U.S. 961 (1991); Estiverne v. Louisiana State Bar Assoc., 863 F.2d 371 (5th Cir. 1989); Vachet v. Central Newspapers, Inc., 816 F.2d 313 (7th Cir. 1987); Waring v. William Morrow & Co., Inc., 821 F. Supp. 1188, 1190 (S.D. Tex. 1993); Hickey v. Capital Cities/ABC, Inc., 792 F. Supp. 1195 (D. Or. 1992), aff'd, 999 F.2d 543 (9th Cir. 1993); Vetere v. Associated Press, Inc., 16 Media L. Rep. 1591, (S.D.N.Y. 1989); Robinson v. U.S. News & World Report, Inc., 16 Media L. Rep. 1695 (N.D. Ill. 1989); Basilius v. Honolulu Publishing Co., Ltd., 711 F. Supp. 548 (D. Haw.), aff'd, 888 F.2d 1394 (9th Cir. 1989).

3. Notably, when asked at her deposition how publication of the book caused her injury, Ms. Wilson stated: "[B]y inferring that I was a drunk. I can't remember the other." Dep. Tr. 237-38 (emphasis added). See also id. 228-29 (stating that the book's "most serious misportrayal" of her was that of her drinking habits). Only secondarily -- indeed, as a virtual afterthought -- did she mention the alleged portrayal of her that is the subject of the instant motion.

4

Transcript of Audree Wilson (hereinafter "Dep. Tr.") 229.[4] Taking Ms. Wilson's interpretation of the challenged passages at face value for purposes of this motion, the record as reflected in Ms. Wilson's deposition testimony confirms that such a portrayal of Ms. Wilson is substantially accurate.

    1.  <u>Murry's physical and psychological abuse of their sons.</u>  Ms. Wilson testified that Murry would use physical force against her sons that inflicted pain, that she regarded such force as "excessive," and that the children were subject to psychological abuse by their father as well.  <u>See</u> Dep. Tr. 184-85, 88, 210-11, 271-72.[5]

---

[4]. While the Complaint embellishes Ms. Wilson's claim by including allegations that Ms. Wilson is portrayed "as an unfit mother who permitted child abuse to occur, and as an individual so emotionally demoralized that she was incapable of defending herself or her children against severe abuse" (<u>see</u> Complaint ¶ 11), as this Court recognized in its July 14, 1995 Order on HarperCollins' motion to dismiss -- and indeed, as Ms. Wilson herself asserted during her deposition -- the essence of Ms. Wilson's remaining claim is the book's alleged portrayal of her "acquiescence" and "just st[an]ding by" and being a "bystander" to her husband's abuse of their children.  <u>See</u> J. Conway Letter Accompanying Order on HarperCollins' Motion to Dismiss, <u>Wilson</u> v. <u>HarperCollins</u>, Civ. No. 94-892 JC/LFG (July 14, 1995); Dep. Tr. 229.

[5]. Murry's abusive conduct toward the Wilson children is so well documented as to be beyond dispute.  <u>See</u> excerpts from prior publications attached hereto as Exhibit C (pp. 68, 69), D (p. 15), and F (pp. 46-49).

5

2. <u>Ms. Wilson's presence at and/or contemporaneous awareness of instances of such abuse.</u> Ms. Wilson testified that she was physically present during or within hearing distance of Murry's abuse on at least five occasions:

> Q: And on how many occasions altogether would you say you were present when he administered one form of physical punishment or another to the boys? Whether in the house or in the studio or in the street or anywhere else.
>
> A: I would not venture to guess.
>
> Q: I don't want you to guess. Can you make some reasonable estimate?
>
> A: In all of our years together you mean?
>
> Q: Yes, ma'am.
>
> A: Maybe five.
>
> . . . .
>
> Q: How much do you remember about each of those five or so incidents as you sit here today?
>
> A: I don't know.
>
> Q: Can you tell me your best recollections of as many of them as possible since they go right to the basis for this lawsuit? I realize its a long time ago and we're testing memories, but unfortunately, we have to go through this process.
>
> A: It's over 40 years. It's difficult to remember unpleasant times.
>
> Q: I can understand that. Do you have any recollections? I'm not asking you to guess, but any recollections of any of the five or so incidents that you seem to recall your being a witness to?
>
> A: I don't.

6

Q: Do you remember which of the sons was involved in the incident?

[Attorney colloquy]

. . . .

A: Had to be one out of three.

Q: That's true. Are you able to be any more specific.

A: Very likely could have been Dennis.

Q: And focusing on Dennis, what specific instances come to mind? What pictures remain in your mind however complete or fragmentary of physical punishment inflicted by Murry which you had occasion unhappily, I assume, to observe?

A: Unhappily what?

Q: From your standpoint to observe.

A: You know, it's interesting, I was never present. I could be in the other room, but I didn't witness a spanking or a beating as you call it.

Q: You would hear it on occasion?

A: Yeah.

Q: And was it your choice not to be present?

A: Probably.

Q: Why?

A: I didn't want to see any of my children whipped or whatever. Spanked.

Q: What would it do to you as you heard it happening?

A: It would just hurt really a lot. And made me angry.

Q: Angry at?

A: At Murry.

7

Dep. Tr. 274-78.

   3.   **Ms. Wilson's Failure to Intercede or Failure to Recollect Having Interceded.**  Ms. Wilson testified to having a "very good" memory. Dep. Tr. 177-78. Yet, Ms. Wilson was unable to identify a <u>single</u> <u>instance</u> in which she intervened to stop the abusive behavior which she was aware was occurring. When asked with respect to the five or so instances during which she was either present for a beating or heard it "in the other room," what steps she took "to stop Murry from inflicting the physical punishment," Ms. Wilson could only muster the answer, "I don't remember." <u>See</u> Dep. Tr. 274, 277. Even as to whether, <u>following</u> the episodes, she expressed her anger to Murry, her answer was "I don't remember, I really don't remember." <u>See</u> <u>id.</u> 278.

   At the very most, Ms. Wilson later testified, <u>following</u> a particular episode of abuse, she might follow Murry into their bedroom, close the door, and have a "private discussion" with him:

> Q:   How did you rise up and defend your children?
>
> A:   Well, I probably went and followed him into the bedroom -- I didn't -- I didn't visibly oppose him in front of the kids. I don't think that's a good idea.
>
> Q:   Would you do it privately?
>
> A:   Yeah.
>
> Q:   You would what, go in the bedroom and close the door and have a discussion?

> A: (The witness nods head.)
>
> Q: Were the children witnesses to those discussions?
>
> A: I don't think so.
>
> Q: So it was nothing that they saw; is that correct?
>
> A: That's right.

Dep. Tr. 289-90. This is precisely in line with the book's report that any objections to Murry's abuse were not manifested by Ms. Wilson in front of the children: "My mother was no help. She almost never opposed my father, almost never rose up and defended her children. <u>Not that we saw anyway</u>." <u>See</u> book at 27 (emphasis added) (passages from the book cited herein are attached hereto as Exhibit B).[6]

In the face of this testimony -- either generally confirmatory of the gist of what Ms. Wilson's Complaint claims to be false, or evidencing a complete lack of memory on the point -- there is absolutely no basis for Ms. Wilson's charge that HarperCollins published falsely as to her comportment in the face of Murry's abuse. Given that it is Ms. Wilson's constitutionally-imposed burden to prove the <u>falsity</u> of the allegedly defamatory sting of the book, not HarperCollins' burden to prove its truth, there is utterly

---

6. The accuracy of Brian's description of his mother's behavior during his childhood finds additional -- albeit circumstantial -- support in Ms. Wilson's deposition testimony affirming the accuracy of numerous passages in the book depicting other private, family interactions which occurred in the same general time periods. <u>See</u> Dep. Tr. 143, 195, 197, 199-204, 216-17, 219-221, 223-25.

9

no basis for putting these evidentiarily-naked charges to a jury in this case.

II. **THE CHALLENGED PORTRAYAL DID NOT CAUSE INJURY TO MS. WILSON'S REPUTATION**

In order to establish a *prima facie* case of defamation under New Mexico law, the plaintiff has the burden of proving, *inter alia*, not only that the challenged statements are false, but that they "proximately caused actual injury to [the] plaintiff's reputation." SCRA § 13-1002(8); Cowan v. Powell, 115 N.M. 603, 605, 856 P.2d 251, 253 (N.M. Ct. App. 1993). See also Clough v. Adventist Health Systems, Inc., 108 N.M. 801, 806, 780 P.2d 627, 632 (N.M. 1989) (setting forth elements); Paca v. K-Mart Corp., 108 N.M. 479, 481, 775 P.2d 245, 247 (N.M. 1989) (same); SCRA § 13-1001 (defining defamation as "a wrongful and unprivileged injury to a person's reputation"). Thus, a showing that the plaintiff suffered actual injury to her reputation is an element of the cause of action for defamation, and is to be distinguished from the issue of whether any compensation for such injury may be had, which is reached only after the initial determination of liability is made. See SCRA §§ 13-1002(8), 1310; Cowan, 115 N.M. at 604-05, 856 P.2d at 252-53.

Reputational injury is generally defined as injury to the plaintiff's good standing in the community, and to her name and character among her friends and neighbors. See

10

generally ROBERT D. SACK & SANDRA S. BARON, LIBEL, SLANDER, AND RELATED PROBLEMS § 2.4.17 (2d ed. 1994), and cases cited therein. Ms. Wilson's deposition testimony makes clear that she has not suffered any such injury as a result of publication of the book.

Ms. Wilson testified that she cannot identify any person whose opinion of her has been lowered, or in whose eyes her reputation has been diminished, as a result of publication of the book. Dep. Tr. 243-44. Ms. Wilson further testified that none of her family relationships or friendships has been altered in any way as a result of what was said about her in the book, and that not one of her family members or friends even expressed concern over how she was portrayed in the book. Id. 237, 306. Ms. Wilson further testified that she has not experienced any adverse effects in her professional work, been denied credit, missed a job opportunity, or had financial avenues foreclosed to her as a result of publication of the book. Id. 306. Neither has she been forced to alter her day-to-day activities in any respect, nor consult any medical or psychiatric doctor about any "upset" that she might have experienced:

> Q: Did you experience any -- other than emotional response, any physical symptoms following the publication of the book which you attribute to the publication of the statements about you?
>
> A: Probably a big headache.

11

```
Q:    Anything else?

A:    No.

Q:    And the headache went away?

A:    Sure. Eventually.

Q:    How long did it last?

A:    I don't know.

Q:    What did you take for it?

A:    A Bufferin or aspirin.

Q:    And that brought it under control?

A:    Uh-huh.

Q:    Did you consult a doctor about the headache?

A:    No.
```

See Dep. Tr. 306-11. By the foregoing, Ms. Wilson has thus admitted that the book has not caused any injury to her reputation.[7]

      This conclusion is reinforced by the fact that statements describing Ms. Wilson as a passive bystander to her husband's abuse of their children have been widely and repeatedly published dating back over a twenty-year period. For example, an article published by Steven Gaines in 1976 -- some 15 years before the instant book was published -- states: "Audree sobbed quietly and helplessly in the background, she says, while Murry unleashed an arsenal of sadistic punishments on the boys." See p. 68 in Exh. C

---

7.  See also supra n.3.

12

hereto (emphasis added); Dep. Tr. 258-59. That passage was quoted in a Beach Boys biography published in 1978 by David Leaf -- an author much admired by both Audree and Carl Wilson -- and republished in 1985.[8] See p. 15 in Exh. D hereto; Dep. Tr. 248-50, 263-67; Deposition Transcript of Carl Wilson 6-7 (Exh. E hereto). Mr. Gaines' 1986 biography of the Beach Boys states: "Murry beat his children. Audree watched helplessly from the sidelines." See p. 4 in Exh. F hereto; Dep. Tr. 278-80.

When shown these prior published statements during her deposition, Ms. Wilson testified that neither she nor, to her knowledge, any other family member, had ever complained as to their accuracy; nor, she stated, had their publication adversely affected her reputation. See Dep. Tr. 265-66, 301-02. Against this backdrop, the notion that the republication of similar statements in Wouldn't It Be Nice has caused Ms. Wilson reputational injury where none occurred previously is outlandish. Ms. Wilson's inability to identify any such injury is totally consistent with what one would expect in the circumstances.

---

8. Indeed, Mr. Leaf states in a "retrospective" at the end of the 1985 edition of his book that "Audree Wilson was a primary source for the book." See p. 202 in Exh. D hereto. Ms. Wilson testified that she was interviewed by Mr. Leaf, that she reviewed transcripts of what Mr. Leaf had written based on such interviews, and that she found Mr. Leaf to be generally accurate. See Dep. Tr. 248, 250-52.

13

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of HarperCollins as to Ms. Wilson's remaining libel cause of action.

WHEREFORE, HarperCollins prays for judgment dismissing Ms. Wilson's Claim for Relief and for the award of its costs and expenses, and such other relief as the Court deems just and appropriate.

Dated:  January 31, 1997

> WEIL, GOTSHAL & MANGES LLP
> R. Bruce Rich
> Elizabeth Stotland Weiswasser
>
> 767 Fifth Avenue
> New York, New York 10153
> Telephone: (212) 310-8000
>
> By _____
>     R. Bruce Rich
>
>         - and -
>
> RODEY, DICKASON, SLOAN,
> AKIN & ROBB, P.A.
> William S. Dixon
>
> Post Office Box 1888
> Albuquerque, New Mexico 87103
> Telephone: (505-765-5900)
>
> Attorneys for Defendant,
> HarperCollins Publishers Inc.

I hereby certify that a copy of the foregoing was sent via federal express to Ernesto J. Romero and to Beth F. Dumas this 31st day of ~~January~~, 1997 at the following addresses:

Ernesto J. Romero
3602 Campus Boulevard, NE
Albuquerque, New Mexico 87106

Beth F. Dumas
Langberg Cohn & Drooz
1210 Wilshire Boulevard
Suite 1650
Los Angeles, California 90025

By _____
Elizabeth Stotland Weiswasser

15