IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**ORIGINAL**

97 APR 21  AM 11:44  *RW*

_____
)
CARL WILSON, an individual,    )
and AUDREE WILSON, an          )
individual,                    )
)
       Plaintiffs,              )
)
    v.                         )
)
HARPERCOLLINS PUBLISHERS,      )
INC., a Delaware corporation,  )
)
       Defendant.               )
_____)

Case No. CIV 94 892 JC

*Robert M Marsh*
CLERK-ALBUQUERQUE

## PLAINTIFF AUDREE WILSON'S MEMORANDUM OF LAW IN RESPONSE TO HARPERCOLLINS' MOTION FOR SUMMARY JUDGMENT

### ORAL ARGUMENT REQUESTED

wil3\010\pleading

161

## I.   **PRELIMINARY STATEMENT**

The passages upon which Audree Wilson has sued accuse her of being a "bystander who refused to intercede in the flagrant child abuse going on in front of her."  [Book p. 27; Second Amended Complaint ¶10.]  The Book defines flagrant child abuse with the examples of her son Brian Wilson receiving blows with a splintered 2x4 board across his back and midsection (Book p. 25) and being tied to a tree (Book p. 27).  The Book also asserts that the incidents described "are modest compared to the worst." [Book p. 27; Second Amended Complaint ¶11.]

HarperCollins' motion for summary judgment relies on a grossly distorted application of the substantial truth doctrine, which ignores Audree Wilson's testimony that the examples of flagrant child abuse described in the Book did <u>not</u> occur. Plaintiff, who is now in her 80's, testified:

"Q.  [The Book states:] . . . 'I was doubled over, lying on the ground in a fetal position, trying to shield whatever part of my skinny little boy's body I could from my father.  With a splintered two-by-four, he delivered blows to my back and midsection, standing over me, a giant with a giant's weapon, swinging it over and over as if truly delighted by the dull thud it made against my torso.

'Stop, Dad.  Please.  You're hurting me.'  Why was he doing this?

Moments earlier I had been playing with our neighbor's puppy, which my dad had volunteered to watch while its owner was out of town.  He kept it chained in our backyard.  Wanting to play fetch with the dog, I untied the little critter.  But no sooner did I loosen his collar than the dog ran off into another yard.

Although I called him, my dad and not the dog came flying around the house.  The expression on his face told me what was coming.  He asked what the hell happened, but didn't wait for me to answer.  That was obvious.  Looking for something with which to strike

me, he picked up the nearest implement  -- the
splintered two-by-four -- and began swinging full force
into the center of my back.

    With the first blow, I let out a cry and doubled
over but he kept swinging.

    'I thought I told you not to unleash the dog,' he
said.

    'Ouch!'  'Buckle up, ya namby-pamby,' he said.

    'Ouch!'

    One more shot to my leg and he tossed the board to
the side.  I didn't dare look up at him as he went back
to the house.

    'And bring the mutt back,' he called.

Q.    Do you recall such an incident being recounted to you
      by either Murray or Brian?

A.    Never.  It's ridiculous

Q.    You want to supplement your answer?

A.    Do I what?

Q.    Do you want to add to your answer?

A.    It's a lot of hogwash.

Q.    How do you know?

A.    I just know.

Q.    Were you there?

A.    No.

Q.    How do you know it didn't happen?

A.    I don't think it happened.  No.  A man
      picking up a splintered, what was it?

Q.    Two-by-four board.

A.    Two-by-four.  No. It's not true.

Q.    It's not true?

A.    I don't think it's true at all.  No.

Q.    And the basis for your belief that it didn't
      happen is what?

A.    Well, I - first of all, I think Brian would
      have been bruised and have splinters in him
      being whacked that hard.  No.  It didn't
      happen.  I don't know where that came from.

[Audree Wilson Depo. pp. 205-208, attached as Exhibit 1.]

               *        *        *

Q.    What is the harshest physical punishment you're aware
      Murray ever administered to one or more of his sons?

A.    I think he took his belt off, in fact, I know he did,
      and -- I don't know which one -- cracked them across
      the rear end.

Q.    How many times?

A.    Oh, I don't know.  Not many.

Q.    How old was the person who was whacked with the belt?

A.   Approximately nine."

[Audree Wilson Depo. p. 210, attached as Exhibit 1.]

*          *          *

"Q.  [Are the stories true of Murray] 'forcing preteen Brian
     to defecate on a newspaper to humiliate him or
     punishing the brothers by forcing them to stare into
     the socket of his false eye?
A.   Total, unmitigated gall and lie, lie, lie."

[Audree Wilson Depo. p. 259, attached as Exhibit 1.]

*          *          *

"Q.  And on how many occasions altogether would you say you
     were present when he administered one form of physical
     punishment or another to the boys?  Whether in the
     house or in the studio or in the street or anywhere
     else?
A.   I would not venture to guess.
Q.   I don't want you to guess.  Can you make some
     reasonable estimate?
A.   In all of our years together you mean?
Q.   Yes, ma'am.
A.   Maybe five.
Q.   And is it your recollection that in each of those five
     instances that you sought to stop Murray from
     inflicting the physical punishment?
A.   I don't remember."

[Audree Wilson Depo. p.p. 207-208, lns. 9-18, attached hereto as

Exhibit 1.]

     The Declaration of Carl Wilson, attached as Exhibit 2

confirms the falsity of the defamatory charge:

     "The Book (p. 27) accuses my mother Audree of failing
     to intercede in 'flagrant child abuse going on in front
     of her', against my brother Brian by my father Murray.
     The Book describes the flagrant child abuse with the
     examples of Brian being tied to a tree, and Brian being
     hit repeatedly with a splintered 2x4 board across his
     back and midsection.  To my knowledge those incidents
     never occurred.  If they had occurred, or if any
     incidents of that magnitude had occurred, I surely have
     known about them since I shared a room with my brother
     Brian and we talked about the punishments we received
     from our father.  While our father did spank or hit us

from time to time while we were growing up, I never experienced or heard about the types of flagrant child abuse described in the Book."

[Declaration of Carl Wilson, attached as Exhibit 2.]

HarperCollins asserts that Audree Wilson's testimony acknowledging that her husband hit Brian with his hand and spanked one of the boys with his belt once, establish the substantial truth of the defamatory passages.  HarperCollins' defense of truth fails because those facts are of the type which would produce a **different effect** upon the reader than do allegations that she allowed flagrant child abuse to occur along the lines of delivering repeated blows with a splintered 2x4.

## II.   <u>**APPLICABLE LAW & ARGUMENT**</u>

The doctrine of substantial truth which HarperCollins invokes provides that "minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting of the libellous charge be justified.'"  <u>Masson v. New Yorker Magazine, Inc.</u>, 501 U.S. 496, 517 (1991).  However, this definition which the motion quotes is only a partial explanation of the law.  As the United States Supreme Court went on to explain in <u>Masson</u>, the "statement is not considered false unless it 'would have a **different effect** on the mind of the average reader'" from that which the asserted truth would have produced.  <u>Masson</u>, 501 U.S. at 517.  For example, in <u>Kurz v. Evening News Assn.</u>, 453 N.W. 2d 309 (Mich. Ct. App. 1990), the article truthfully reported the fact of the plaintiff's arrest on charges of assaulting a police officer with a shotgun, but according to the plaintiff's

allegations, falsely stated that the plaintiff had threatened to kill someone and fire a shot. The trial court granted summary judgment in favor of the defendant newspaper, and the Court of Appeal <u>reversed</u>, because there was a factual dispute as to whether the plaintiff had ever threatened to kill anyone or in fact had fired his weapon:

> "Given the tenor of the entire article, we cannot say as a matter of law that this possible inaccuracy constitutes an 'inaccuracy that does not alter the complexion of the affair and would have no different effect on the reader than that which the literal truth would produce.'"

<u>Kurz</u>, 453 N.W. 2d at 310. The substantial truth rule is also reflected in New Mexico Jury Instruction 13-1006, defining falsity: "One or more statements of fact in the communication must be false in a material way. Insignificant inaccuracies of expression are not sufficient."

HarperCollins' motion is wrong to assert that Plaintiff bears the burden of proving falsity, in view of this Court's determination that Plaintiff is a private figure (which the Court ruled in denying HarperCollins' earlier motion for summary judgment on actual malice and negligence). As the New Mexico Uniform Jury Instructions provide, where the Plaintiff is a <u>private figure</u>, truth operates as a defense for which the defendant has the burden of proof. N.M.U.J.I. 13-1013. This is the common law rule that falsity is presumed. As the Committee Notes to New Mexico Jury Instruction 13-1013 shows, this placement of the burden on the defendant is in accord with the

United States Supreme Court's ruling in <u>Philadelphia v. Hepps</u>, 475 U.S. 767 (1986), that under the First Amendment the burden of proof in cases against media defendants <u>shifts to the plaintiff only</u>:  in cases involving private figures with issues of public concern; in cases involving public officials; and in cases involving public figures with issues of public concern. <u>Philadelphia v. Hepps</u>, 475 U.S. at 768-769.  *See*, <u>Ramirez v. Rogers</u>, 540 A.2d 475 (Supr. Jud. Ct. Me. 1988) (defendant has burden of proving truth of statements accusing private figure plaintiff of abuse toward gymnastic school students).

Two additional points should be understood.  The fact that Defendant bears the burden of proving truth has no practical effect on the application of the substantial truth doctrine:

> "The essence of that inquiry remains the same whether the burden [on truth/falsity] rests upon plaintiff or defendant."

<u>Masson v. New York Magazine, Inc.</u>, 501 U.S. 496, 517 (1991). However, HarperCollins' failure to provide a declaration by Brian Wilson or any witness attesting to truth exposes a critical failure on HarperCollins' part to meet its burden of proof.

Applying the law to the facts, the question presented by Harpercollins' motion is:  Does the admission that Plaintiff allowed her child to be hit with his father's hand and possibly once with his belt produce the same effect on the reader as accusations of standing by in the face of flagrant child abuse as exemplified by repeated blows across the back and midsection with a splintered 2-by-4?  Plaintiff submits that the answer is

clearly, "no," or at least a question for the jury, as it was in
<u>Masson</u>.

A parent has the right, under California law, to administer
reasonable corporal punishment.  <u>People v. Whitehurst</u>, 9 Cal.
App. 4th 1045, 1050 (1992); <u>People v. Curtis</u>, 116 Cal. App. Supp.
771, 775 (Ct. App. 1931).  In hindsight, Audree Wilson's personal
view is that any such corporal punishment is abusive.  However,
that does not change the falsity of the charge made against her
by HarperCollins in the Book.  Beating a child with a splintered
2x4 is criminal child abuse under California Penal Code Section
273.  In <u>People v. Jaramillo</u>, 98 Cal. App. 3d 830 (1979), the
defendant mother was convicted of felony child endangering (Penal
Code §273a) for hitting her child with ". . . an 18 to 20-inch
long, 1 inch diameter stick . . ."  Furthermore, California law
is clear that a parent who stands by and allows such child abuse
is also guilty of violation of Penal Code section 273.  <u>People v.
Figueroa</u>, 167 Cal. App. 3d 981 (1985).  California law is
relevant because that is where the flagrant child abuse is said
to have occurred, and it is the state of Plaintiff's residence.

In view of the fact that HarperCollins' motion presents no
admissible evidence that incidents of flagrant child abuse
occurred along the lines described in the Book, and HarperCollins
bears the burden of proof, the motion should be denied.  In this
regard, the Court should be aware that HarperCollins' assertion
that incidents of child abuse were reported in an earlier article
by Steven Gaines in *New West* magazine, and his subsequent book

about the Beach Boys ("Heroes & Villains, The True Story of the Beach Boys") <u>do not constitute a source of admissible evidence on the issue of truth</u>.  Newspaper articles constitute a "classic case of double hearsay," and are inadmissible to prove the truth of the matter asserted.  <u>New England Mutual Life Ins. Co. v. Anderson</u>, 1987 U.S. Dist. LEXIS 8188 (D. Kan. 1987), *aff'd*, 888 F.2d 646, 650 (10th Cir. 1989).  Further, serious discrepancies between Mr. Gaines' article and book on the subject of abuse, underscore the very reasons why the materials are inadmissible hearsay -- they are the product of second hand reports by unknown persons.  *See* <u>New England Mutual Life</u>, 888 F.2d at 650 ("[T]he fact that the statement was in the form of a newspaper account reinforces its hearsay character, for the final product is not the reporter's alone").  Mr. Gaines' *New West* article states, "Audree sobbed quietly and helplessly in the background, she says, while her husband unleashed an arsenal of sadistic punishments on the boys - forcing a preteen Brian to defecate on a newspaper to humiliate him or punishing the brothers by forcing them to stare into the socket of his false eye."  [Exhibit 3 hereto, and part of HarperCollins' Exhibit C.]  Significantly, however, <u>his subsequent book</u> "Heroes & Villains" <u>does not identify Audree as the source</u>, and moreover, <u>reports that the story may be derived from a prank by Brian</u> and his brothers with rubber doggy-do:

> "Once, to humiliate a preteen Brian, Murray
> reportedly forced him defecate on a newspaper
> or plate in front of the family.  (This story

has many versions.  Another popular one is
that Brian and his brother served up a
portion of rubber "doggy-do" to Murray on a
plate, which was taken as a good-natured
prank.  Both versions of the story are sworn
to.)"

["Heroes and Villains", p. 47, attached hereto as Exhibit 3, and
part of HarperCollins' Exhibit F.]

HarperCollins' assertion that Audree Wilson suffered no
reputational injury because of those prior works speaks to an
issue that has no relevance to the motion for summary judgment,
and is in any event incorrect.  It is important to remember that
"Wouldn't It Be Nice" is a presented as an autobiography, and as
such purports to provide a first-hand account.  By contrast, the
prior book and articles to which HarperCollins refers are not,
and readers of those pieces would expect that they report second
hand rumors.   Further, it is hornbook common law that, subject
to only a few exceptions for fair and true reports of judicial
proceedings and official charges, "one who repeats or otherwise
publishes defamatory matter is subject to liability as if he had
originally published it."  (Restatement Tort 2d § 578).

Contrary to HarperCollins' assertion, Audree Wilson did
testify to suffering injury from the Book's assertion that she
stood by and watched flagrant child abuse occur:

"Q.  . . . [C]ould you please describe for me the emotional
     distress that you suffered.
A.   Well, it was humiliation, wondering if the people I was
     meeting had read the book and believed it.  It made me
     shy.
Q.   What do you mean it made you shy?
A.   Well, it made me sort of withdrawn.  In my own head I

felt that way."

[Audree Wilson Depo. p. 337.]


### III. **<u>CONCLUSION</u>**

The substantial truth argument HarperCollins asserts is unavailing, and the motion fails to present evidence proving the type of flagrant child abuse described in the Book. Significantly, <u>no</u> declaration by Brian Wilson or any witness is provided.

For all of the foregoing reasons, Plaintiff Audree Wilson respectfully submits that HarperCollins' motion for summary judgment should be denied.


DATED:  March 19, 1997                    Respectfully submitted,

                                          LANGBERG, COHN & DROOZ


                                          By: _____
                                                Barry B. Langberg, Esq.
                                          12100 Wilshire Boulevard
                                          Suite 1650
                                          Los Angeles, California 90025
                                          (310) 979-3200

                                          Ernesto J. Romero
                                          THE ROMERO LAW FIRM
                                          3602 Campus Boulevard N.E.
                                          Albuquerque, New Mexico 87106
                                          (505) 262-2131


wil3\010\pleading                    **11**

<u>PROOF OF SERVICE</u>
1013A (3) CCP

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of Los Angeles, State of
California.  I am over the age of 18 and not a party to the
within action; my business address is 12100 Wilshire Boulevard,
Suite 1650, Los Angeles, California 90025.

On March 19, 1997, I served the foregoing document described
as **PLAINTIFF AUDREE WILSON'S MEMORANDUM OF LAW IN RESPONSE TO
HARPERCOLLINS' MOTION FOR SUMMARY JUDGMENT** in this action:

____  by placing the true copies thereof enclosed in sealed
envelopes addressed as stated on the attached mailing list.

_X_  by placing ____ the original _X_ a true copy thereof enclosed
in sealed envelopes addressed as follows:

R. Bruce Rich, Esq.
Weil, Gotshal & Manges
767 Fifth Avenue
New York, New York  10153

William S. Dixon, Esq.
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque Plaza
201 Third Street NW, Suite 2200
Albuquerque, New Mexico  87103


_X_  BY MAIL

_X_  I am "readily familiar" with the firm's practice of
collection and processing correspondence for mailing.  Under that
practice it would be deposited with U.S. Postal Service on that
same day with postage thereon fully prepaid at Los Angeles,
California in the ordinary course of business.  I am aware that
on motion of the party served, service is presumed invalid if
postal cancellation or postage meter date is more than one day
after date of deposit for mailing in affidavit.

Executed on March 19, 1997, at Los Angeles, California.

_X_  FEDERAL   I declare that I am employed in the office of a
member of the bar of this court at whose direction the service
was made.


BARRY B. LANGBERG



1

2                    UNITED STATES DISTRICT COURT

3                  FOR THE DISTRICT OF NEW MEXICO

4

5

6          - - - - - - - - - - - - - - - - - - - - - - - - - - -

7     CARL WILSON, an individual and )

8     AUDREE WILSON, an individual,  )

9                    Plaintiffs,     )

10                   vs.             ) No. CIV 94 892 JG

11    HARPERCOLLINS PUBLISHERS,      ) VOLUME II

12    INC., a Delaware corporation,  )

13                   Defendant.      )

14         - - - - - - - - - - - - - - - - - - - - - - - - - - -

15

16         Continued deposition of **AUDREE WILSON**,

17         taken at 9500 Wilshire Boulevard,

18         Beverly Hills, California, commencing

19         at 10:00 A.M., Tuesday, November 5, 1996,

20         before Paulette M. Griffin, CSR No. 2499.

21

22

23

24

25    PAGES 135 - 331


Interim.
COURT REPORTING

3530 Wilshire Boulevard, Suite 1700
Los Angeles, CA 90010
(213) 385-4000 • (800) 722-1235
Fax (213) 389-8514

Wilson

1

2    "It wasn't the only

3    impression that's lasted.  I remember

4    standing in the backyard.  A

5    nine-year-old boy.  Helpless.

6    Screaming."

7    Quote, "'Ouch.  Stop, please.

8    Ouch!'"  Unquote.

9    "I was doubled over, lying on

10    the ground in a fetal position, trying

11    to shield whatever part of my skinny

12    little boy's body I could from my

13    father.  With a splintered

14    two-by-four, he delivered blows to my

15    back and midsection, standing over me,

16    a giant with a giant's weapon,

17    swinging it over and over as if truly

18    delighted by the dull thud it made

19    against my torso.

20    "'Stop, Dad.  Please.

21    You're hurting me.'  Why was he doing

22    this?

23    Moments earlier I had been

24    playing with our neighbor's puppy,

25    which my dad had volunteered to watch

205

1                    Wilson

2          while its owner was out of town.  He

3          kept it chained in our backyard.

4          Wanting to play fetch with the dog, I

5          untied the little critter.  But no

6          sooner did I loosen his collar than

7          the dog ran off into another yard.

8                    "Although I called him, my

9          dad and not the dog came flying around

10         the house.  The expression on his face

11         told me what was coming.  He asked

12         what the hell happened, but didn't

13         wait for me to answer.  That was

14         obvious.  Looking for something with

15         which to strike me, he picked up the

16         nearest implement -- the splintered

17         two-by-four -- and began swinging full

18         force into the center of my back.

19                    "With the first blow, I let

20         out a cry and doubled over but he kept

21         swinging.

22                    "'I thought I told you not

23         to unleash the dog,' he said.

24                    "'Ouch!'  'Buckle up, ya

25         namby-pamby,' he said.

1                       Wilson

2                  "'Ouch!' .

3                    "One more shot to my leg and

4          he tossed the board to the side.  I

5          didn't dare look up at him as he went

6          back to the house.

7                         "'And bring the mutt back,'

8          he called."

9                  Do you recall such an incident

10    being recounted to you by either Murry or Brian?

11          A.       Never.  It's ridiculous.

12                   MS. DUMAS:  Court Reporter, did you

13    get that?

14                   THE REPORTER:  (Nods head.)

15    BY MR. RICH:

16          Q.       You want to supplement your

17    answer?

18          A.       Do I what?

19          Q.       Do you want to add to your answer?

20          A.       It's a lot of hogwash.

21          Q.       How do you know?

22          A.       I just know.

23          Q.       Were you there?

24          A.       No.

25          Q.       How do you know it didn't happen?

```
 1                      Wilson
 2          A.      I don't think it happened.  No.  A
 3    man picking up a splintered, what was it?
 4          Q.      Two-by-four board.
 5          A.      Two-by-four.  No.  It's not true.
 6          Q.      It's not true?
 7          A.      I don't think it's true at all.
 8    No.
 9          Q.      And the basis for your belief that
10    it didn't happen is what?
11          A.      Well, I -- first of all, I think
12    Brian would have been bruised and have splinters
13    in him being whacked that hard.  No.  It didn't
14    happen.  I don't know where that came from.
15          Q.      Were you aware of all instances in
16    which Murry lifted a hand to Brian?
17          A.      I think so.
18          Q.      How did you become aware of them?
19          A.      Well, I was either around or the
20    boys told me.
21          Q.      And you were never told of this
22    incident?
23          A.      Never, huh-uh.
24          Q.      You seem shocked by the reported
25    force of the beating.
```

1                          Wilson

2          A.      I do.

3          Q.      What is the harshest physical

4    punishment you're aware Murray ever administered

5    to one or more of his sons?

6          A.      I think he took his belt off, in

7    fact, I know he did, and -- I don't know which

8    one -- cracked them across the rear end.

9          Q.      How many times?

10         A.      Oh, I don't know.  Not many.

11         Q.      How old was the person who was

12   whacked with the belt?

13         A.      Approximately nine.

14         Q.      Who was it?

15         A.      I don't really know.

16         Q.      How do you know it happened?

17         A.      Because I was there.

18         Q.      Did you approve of the beating?

19         A.      Of course not.

20         Q.      What did you do?

21         A.      What did I do?

22         Q.      Yes.

23         A.      I probably yelled at Murry.

24         Q.      Probably or do you remember yelling

25   at him?

1                          Wilson

2          helplessly in the background, she

3          says, while Murry unleashed an arsenal

4          of sadistic punishments on the boys --

5          forcing a preteen Brian to defecate on

6          a newspaper to humiliate him or

7          punishing the brothers by forcing them

8          to stare into the socket of his false

9          eye."

10          A.      Total, unmitigated gall and lie.

11    Lie, lie, lie.

12          Q.      Everything stated in there is a

13    lie, lie, lie?

14          A.      What is the beginning of it?

15          Q.      Let's go through it sentence by

16    sentence.

17          A.      Sock -- where was I doing this?

18          Q.      "Audree sobbed quietly and

19    helplessly in the background while Murry

20    unleashed an arsenal of sadistic punishments on

21    the boys."

22          A.      Huh-uh.  Huh-uh.  He's an asshole.

23          Q.      Having had this passage read to

24    you, is your recollection in any way refreshed,

25    Ms. Wilson, about giving an interview to Steven

                                                      259

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF NEW MEXICO

3

4        - - - - - - - - - - - - - - - - - - - - - - - - -

5        CARL WILSON, an individual,        )

6        and AUDREE WILSON, an              )

7        individual,                        )

8                    Plaintiffs,            )

9              vs.                          ) No. CIV 94 892 JC

10       HARPERCOLLINS PUBLISHERS, INC.,    ) VOLUME III

11       a Delaware corporation,            )

12                   Defendant.             )

13       - - - - - - - - - - - - - - - - - - - - - - - - -

14

15

16              Continued deposition of AUDREE WILSON,

17              at 10430 Wilshire Boulevard, Suite

18              1105, Los Angeles, California,

19              commencing at 10:40 A.M., Friday,

20              January 17, 1997, before Marchelle

21              Hartwig, CSR No. 9347.

22

23

24

25       PAGES 332 - 342

```
 1                        Wilson
 2           Q       There is an allegation in your complaint
 3      that you've suffered emotional distress and shame as
 4      a result of the statements that you've sued on.   My
 5      question to you is, could you please describe for me
 6      the emotional distress that you suffered.
 7           A       Well, it was humiliation, wondering if
 8      the people I was meeting had read the book and
 9      believed it.   It made me shy.
10           Q       What do you mean it made you shy?
11           A       Well, it made me sort of withdrawn.   In
12      my own head I felt that way.
13           MS. DUMAS:   Could you read back the witness's
14      full answer to me.
15                        (Record read.)
16           MS. DUMAS:   I think I'm done with my
17      questioning, but I think I will mark as an exhibit
18      this letter just so we have a neat deposition record.
19      So here is a letter addressed to Tom Miller, Editor
20      of HarperCollins Publishers, dated August 8, 1991.
21      And it's a letter from which I quoted earlier in my
22      questioning.
23                        (Plaintiffs' Exhibit 26 was
24               marked for identification and is
25               annexed hereto.)
```

337

Recycled Paper

BLUEBIRD
(310) 477-0700

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

```
_____ )
                            )
CARL WILSON, an individual, )      Case No. CIV 94 892 JC
and AUDREE WILSON, an       )
individual,                 )
                            )
         Plaintiffs,        )
                            )
     v.                     )
                            )
HARPERCOLLINS PUBLISHERS,   )
INC., a Delaware corporation, )
                            )
         Defendant.         )
_____ )
```

### DECLARATION OF CARL WILSON IN SUPPORT OF RESPONSE TO HARPERCOLLINS' MOTION FOR SUMMARY JUDGMENT RE AUDREE WILSON'S CLAIMS

I, Carl Wilson, hereby declare as follows:

1.   This declaration discusses the falsity of passages from _Wouldn't It Be Nice_, purportedly written by Brian Wilson with Todd Gold (the "Book"), which are the subject of my mother Audree Wilson's libel action.  This declaration is based on my personal knowledge, and if I called as I witness I would and could testify to the truthfulness of my declaration.

2.   The Book (p. 27) accuses my mother Audree of failing to intercede in "flagrant child abuse going on in front of her", against my brother Brian by my father Murry.  The Book describes the flagrant child abuse with the examples of Brian being tied to

wil3\010\pleading

a tree, and Brian being hit repeatedly with a splintered 2x4 board across his back and midsection.  To my knowledge those incidents never occurred.  If they had occurred, or if any incidents of that magnitude had occurred, I surely have known about them since I shared a room with my brother Brian and we talked about the punishments we received from our father.  While our father did spank or hit us from time to time while we were growing up, I never experienced or heard about the types of flagrant child abuse described in the Book.

Executed this 19th day of March, 1997, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Carl Wilson

Recycled Paper

BLUEBIRD
(310) 477-0700

Amazing Middle-Aged Athletes: How They Run!

Secrets of California's Top Gardeners

The Beach Boys: Trying to Catch Another Wave

75 CENTS

AUGUST 16, 1976

# NEW WEST

Superstar Women And Their Marriages:

Now The Men Have the Supporting Roles

Ann-Margret And Roger Smith



# Brian Wilson Is Trying Hard To Catch Another Wave

By Steven Gaines

Photographed by Guy Webster



The Beer Imported
for people who have
been there.

Imported by: Wisdom Import Sales Co. Inc. Irvine, CA. 92714
Cerveceria Cuauhtemoc, S.A. Monterrey, Mexico

PASSPORT

# 20% OFF SALE
## ARABIA DINNERWARE

**ANEMONE, RUSKA, TROUBADOUR.** These are the names of famous hand-painted, dishwasher proof stoneware patterns from **FINLAND**, and now they're on sale at **20%** off their regular prices.



A 5 piece place setting consists of a Dinner, Salad, Bread/Butter plate, Cup and Saucer.
(left to right)

**NOW THRU
AUGUST 15**

ANEMONE . . . . . reg. 29.75 barn 23.80
RUSKA . . . . . . . reg. 28.00 barn 22.40
TROUBADOUR . . reg. 30.00 barn 24.00

Mail order - 3.00 for postage & handling plus 6% Calif. sales tax.

WESTWOOD VILLAGE • 477-3553 • 10914 Kinross
SHERMAN OAKS • 986-2276 • Sherman Oaks Fashion Square
TORRANCE • 370-3688 • Del Amo Fashion Square
SANTA BARBARA • 687-6707 • La Cumbre Plaza
MARINA DEL REY • 822-3966 • Warehouse-store • 4729 Alla Rd.

SOON TO OPEN: Century City • La Jolla
ALL STORES OPEN SUNDAY • 12-5
NEW YORK • CONNECTICUT • NEW JERSEY • PENNSYLVANIA



THE POTTERY
barn

sheriff's badge. Kiddie gifts of Wisconsolately losses them aside. Later he will give them to his daughters, Carnie, eight, and Wendy, six-and-a-half.

"Children's toys," Marilyn Wilson says angrily behind the crowd. "What do people think he wants with children's toys?"

The last gift is a set of stereophonic headphones from Eugene Landy which Brian dutifully puts on his head. "That's just great," Marilyn's sister shrieks, "for Brian's one good ear."

Audree Wilson sits on a sofa on the other side of the room and proudly watches as her oldest son Brian is presented with his birthday cake. "As a youngster Brian was marvelous, very together, a good student, a marvelous athlete. No, he didn't have any problems. Of couse, there was the pressure of his career. And his father was a very high-strung man. He would get uptight about things that were just not that important. But no, no real problems."

No stage mother ever rivaled the stage father that the Beach Boys had in Murray Wilson. Murray met his wife Audree at Washington High School, Los Angeles. Their first son, Brian, was born in 1942. Dennis followed two years later, and, soon after moving to Hawthorne, five miles from the beaches her sons were to make famous around the world, Audree had her youngest child, Carl.

A frustrated songwriter, Murray Wilson owned a failing machinery shop and took out his rage on his three sons. ██████████ quietly and helplessly in ████████████, she says, while Murray unleashed arsenal or ███████ punishments on the boys—forcing a pre-teen Brian to defecate on a newspaper to humiliate him or punishing the brothers by ████ ███████ ████ into the socket of his false eye.

"My father just had a unique way of showing his affection," remembers Dennis Wilson, at 32 still a rugged and handsome surfer type, "which consisted of beating the shit out of us. He burned my hands for playing with matches and beat me up in front of my friends.

"The only thing my father really loved was music. He knocked on doors his whole life trying to get his tunes played. His biggest dream was that Lawrence Welk would record one of his tunes. He even made a demo of one of his songs and played it at home twenty times a day. I can remember my Mom frying bacon in the kitchen and him laying in bed yelling, 'Play it again! Play it again!' Boy, he loved the music. He would cry 'boo-hoo,' like the lion in *The Wizard of Oz,* when he heard music."

It's not surprising that in 1961, when the brothers were only nineteen, seventeen, and fifteen years old, they formed a rock group with Mike Love and Al Jardine called Kenny and the Kadets,

Recycled Paper

BLUEBIRD
(310) 47-0700

# HEROES &

# VILLAINS

## *The True Story Of The*

# BEACH BOYS

## STEVEN GAINES





DEPOSITION
EXHIBIT
25 A. Wilson
11-5-96

If our father came in,
not to laugh, covering
and Brian would keep
all asleep harmonizing
me Down, Come Down
emembered Murry with
thers. "When my dad
ke," he said. "It sounded

119th Street and Korn-
tivity. With three grow-
of friends, there were
ame of catch, or touch
at the helm, coaching,
On Saturdays the boys
shop in east L.A. and
they all dreaded. Murry
dad; as far as he was
ddy-buddy, and nothing
riends that he had told
yeball to eyeball," all in
rty. Some nights, Murry
room and make them
es.

oys seemed to be well-
for a strict father. But
the doors of the Wilson
ple values, where a swift
ught to be a good thing,
the ordinary. But Mur-
ft crack. Twenty years
onal issue, it would be

## 4

"My father resented the fucking kids to death," was Dennis's explanation for it. "The motherfucker hated us, or he would have loved the shit out of us. It's that fucking simple. That asshole beat the shit out of us." Then Dennis grinned sardonically. "He just had a very unique way of expressing himself physically with his kids," he said. "Instead of saying, 'Son, you shouldn't shoot a beebee gun at the streetlight,' he'd go *boooom*!!! I got the blunt end of the broom. *Crack!* One minute late! Just one minute late! *Boom!* And that's it. Brian and Carl would hide in the bathroom, 'Oh God! He's getting it!' Later they'd ask, 'Did it hurt, Dennis?'"

Murry's father beat him; Murry beat his children. Audree watched helplessly from the sidelines, according to Dennis, frightened of Murry herself. "Ohh, please, Murry, no, don't do that."

According to Audree, "He was a taskmaster. He really was. He was tough. And I used to think he was too tough. But, it was a very hard job for him having three teenage boys. He used to call them 'young stallions.'"

"Denny did [get] some pretty hard spankings..." Audree said. "Dennis reminds me very much of his father. Sometimes I think, I don't believe this, it's like Murry revisited. Dennis got the worst of it. Because he was more aggressive. But what constitutes a beating, I don't know."

Indeed, if beating the boys had been all Murry did, it would have been one thing. But Murry had red-faced, screaming, roaring tantrums. On many occasions his punishments went beyond simple beatings into the realm of the sadistic. Dennis spoke of Murry beating him up in the bathtub so he couldn't break anything by kicking. ▓▓▓ to humiliate a preteen Brian, Murry reportedly forced him to defecate on a newspaper or plate in front of the family. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓ and his brothers served up ▓▓▓▓▓▓▓▓▓▓ to Murry on a plate, which ▓▓▓▓▓▓▓▓▓▓▓▓▓ oth versions of the story ate sworn to.) Another time, Murry reportedly tied Brian to a