UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

------------------------------------x

CARL WILSON, an individual, and         :
AUDREE WILSON, an individual,
                                        :
              Plaintiffs,
                                        :
       v.                                     94 Civ. 892 (JC)
                                        :
HARPERCOLLINS PUBLISHERS INC.,
a Delaware corporation,                 :

              Defendant.                :

------------------------------------x

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

97 APR 21  AM 11: 41

Robert M. March
CLERK-ALBUQUERQUE

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT ON PLAINTIFF CARL WILSON'S LIBEL CLAIMS**

William S. Dixon
RODEY, DICKASON, SLOAN,
 AKIN & ROBB, P.A.
Albuquerque Plaza
201 Third Street NW,
Suite 2200
Albuquerque, New Mexico 87103
Telephone: (505) 768-7266

R. Bruce Rich
Elizabeth Stotland Weiswasser
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000

Attorneys for Defendant,
HarperCollins Publishers Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

97 APR 21  AM II: 41

| | |
|---|---|
| CARL WILSON, an individual, and AUDREE WILSON, an individual, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) |
| HARPERCOLLINS PUBLISHERS INC., a Delaware corporation, | ) ) ) |
| Defendant. | ) ) ) |

ORAL ARGUMENT
REQUESTED

94 Civ. 892 (JC)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF CARL WILSON'S LIBEL CLAIMS

### PRELIMINARY STATEMENT

HarperCollins Publishers Inc. ("HarperCollins") submits this memorandum in support of its motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for entry of summary judgment in its favor as to Plaintiff Carl Wilson's ("Carl's" or "Mr. Wilson's") libel claims as contained in the Second Amended Complaint ("Complaint").

Mr. Wilson's libel claims against HarperCollins allege that he has been injured by the publication of a number of passages in <u>Wouldn't It Be Nice -- My Own Story</u> ("the book").  To recover on such claims, Mr. Wilson has the burden of proving a number of constitutionally-imposed elements, including, that the challenged passages contain <u>false</u> and <u>defamatory</u> <u>assertions of fact</u> that are <u>of and concerning</u> him. To be discussed in greater detail below, the now fully-

developed discovery record establishes that Mr. Wilson cannot, as a matter of law, discharge one or more of such burdens as to each of the challenged passages.

The discovery record has shown Mr. Wilson's most serious allegations -- that HarperCollins falsely portrayed Mr. Wilson as a purchaser of illegal narcotics and an abuser of alcohol -- to be frivolous and, one must conclude, pled in bad faith.  The challenged portrayals are absolutely true and Mr. Wilson knew them to be so when he filed his Complaint.

As we detail in Point I below, in his deposition in this case, Mr. Wilson has admitted both to a history of purchasing and abusing illegal narcotics and to engaging in a persistent pattern of alcohol abuse.  When Mr. Wilson attempted to cover his tracks in one particular -- a reported episode involving his purchase of heroin -- he was caught flat-footed. Mr. Wilson denied under oath his involvement in such activity, unaware that HarperCollins had come into possession of a taped interview in which Mr. Wilson admitted to the very transaction his complaint assails as false.  A copy of that tape accompanies this motion.

Mr. Wilson's cynical misuse of court process to punish what he regards as unfavorable portrayals -- whatever their truthfulness -- infects the balance of the allegations leveled against HarperCollins.  As we demonstrate in Point II, the discovery record reveals that the remaining passages complained of are also not actionable insofar as they:  are

2

true; are not defamatory; are not of and concerning Mr. Wilson or the Beach Boys; and/or are non-verifiable expressions of opinion.

Because it is now clear that Mr. Wilson will be unable as a matter of law and uncontested fact to establish one or more elements of his libel claims as to each of the challenged passages, HarperCollins is entitled to judgment at this stage of the proceedings as a matter of law.

## STATEMENT OF UNCONTESTED MATERIAL FACTS

The facts relevant to this motion are set forth in the ensuing discussion of each allegedly defamatory statement giving rise to Mr. Wilson's action. Relevant portions of Mr. Wilson's deposition, conducted on November 6-8, 24, and 26, 1996, as well as other documents pertinent to disposition of this motion, are annexed as Exhibits hereto.

## ARGUMENT

A libel plaintiff bears a number of heavy burdens in seeking to recover for alleged injury to reputation. The plaintiff must prove, _inter alia_, that the challenged publication contains _false_ and _defamatory_ _assertions of fact_ that are _of and concerning the plaintiff._  See _Philadelphia Newspapers, Inc._ v. _Hepps_, 475 U.S. 767, 775-76; _New York Times Co._ v. _Sullivan_, 376 U.S. 254 (1964).  As will be demonstrated below, the now fully developed discovery record makes plain that each of the passages challenged by Mr. Wilson fails to

3

satisfy one or more of these constitutional requirements. Accordingly, HarperCollins is entitled to judgment as a matter of law as to each of Mr. Wilson's claims for relief.

I.   THE DRUG AND ALCOHOL PASSAGES ARE TRUE

A.   The Governing Law

Beginning in 1964 with New York Times Co. v. Sullivan, 376 U.S. 254, the Supreme Court has emphasized that the First Amendment absolutely precludes states from sanctioning speech that is true. Thus, in a libel case, the plaintiff bears the burden of proving the challenged statement to be false. Hepps, 475 U.S. at 775-76. A statement will not be considered "false" for purposes of this inquiry if its "gist" or "sting" is substantially true. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516 (1991). That is, "[m]inor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" Id. at 517 (quotations omitted).

In view of these principles, courts routinely grant summary judgment in favor of a libel defendant when the record reveals that the plaintiff is unable to meet its burden of proving falsity.[1] Here, as shown below, the discovery record

---

1. See, e.g., Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993); Unelko Corp. v. Rooney, 912 F.2d 1049 (9th Cir. 1990), cert. denied, 499 U.S. 961 (1991); Estiverne v. Louisiana State Bar Assoc., 863 F.2d 371 (5th Cir. 1989); Vachet v. Central Newspapers, Inc., 816 F.2d 313 (7th Cir. 1987); Waring v. William Morrow & Co., Inc., 821 F. Supp. 1188, (continued...)

4

not only makes plain Mr. Wilson's inability to prove falsity,
it clearly and undeniably establishes the absolute <u>truth</u> of the
drug and alcohol passages, and any reasonable inference that
might be drawn therefrom.  Accordingly, these passages are not
actionable and HarperCollins is entitled to judgment as a
matter of law.

> B.   <u>The Truth of the Passages</u>

Of the various claims by Carl Wilson of injury to
reputation from statements contained in the book (<u>see</u> Complaint
¶¶ 19, 20, 30), clearly the most serious from the standpoint of
social reprobation -- and unsurprisingly those that lead Mr.
Wilson's list -- relate to his abuse of alcohol and his
purchase of illegal narcotics.  Respecting these subjects, Mr.
Wilson contends that identified passages in the book "falsely
portray Carl as an abuser of alcohol" and "falsely impute to
him involvement in the purchase of illegal narcotics."  <u>See</u> <u>id.</u>
¶ 20.

The discovery record reveals Mr. Wilson's flagrant
abuse of court process in levelling these charges.  That record
now reveals that the statements he challenges are absolutely

---

1.  (...continued)
1190 (S.D. Tex. 1993); <u>Hickey</u> v. <u>Capital Cities/ABC, Inc.</u>, 792
F. Supp. 1195 (D. Or. 1992), <u>aff'd</u>, 999 F.2d 543 (9th Cir.
1993); <u>Vetere</u> v. <u>Associated Press, Inc.</u>, 16 Media L. Rep. 1591,
(S.D.N.Y. 1989); <u>Robinson</u> v. <u>U.S. News & World Report, Inc.</u>, 16
Media L. Rep. 1695 (N.D. Ill. 1989); <u>Basilius</u> v. <u>Honolulu
Publishing Co., Ltd.</u>, 711 F. Supp. 548 (D. Haw.), <u>aff'd</u>, 888
F.2d 1394 (9th Cir. 1989).

NYFS08...:\60\51660\0063\1631\BRFN276N.09C

and undeniably true:  Mr. Wilson has a history of purchasing
illegal narcotics and has engaged in a persistent pattern of
alcohol abuse.  HarperCollins did not level these charges
falsely, let alone with knowledge of their falsity; to the
contrary, it is Mr. Wilson's complaint that is knowingly false.

Following is what the record facts, in Mr. Wilson's
own words, reveal.

1.   Mr. Wilson's Illegal Purchases of Narcotics

a.   Cocaine

Mr. Wilson testified at his deposition that he has
been an illegal purchaser and user of cocaine:

Q:   . . .  I believe you testified you were snorting
cocaine?

A:   Yes sir.

Q:   And was it only in that '76/'77 period when you were
snorting cocaine?

A:   I think I snorted cocaine maybe once or twice before
that.  And then it became a problem right there, that
'76 time period.  '70 — maybe Christmastime or right
around the holiday time, '75.  Right at '76.

Q:   And how would you describe the level of cocaine use
during that period by you?

A:   I'd say as much as, like nearly a gram a day.
. . .

Q:   However much [cocaine] you were using, how did you
procure it?

A:   Well, I think I would call a coke dealer sometimes.

Q:   And other times?

A:   Be given to me.

6

Q:    By?

A:    I don't remember.

Q:    Fellow users?

A:    Perhaps.

Q:    <u>Did you have any one regular source of supply when you used a dealer?</u>

A:    <u>Yes, sometimes.</u>

Q:    <u>Did you pay to — pay money to this supplier?</u>

A:    <u>Yes.</u>

Q:    Do you remember what the going rate was at the time?

A:    I think a hundred dollars maybe a gram.

Deposition Transcript of Carl Wilson ("Dep. Tr.") 435-436, 438 (emphasis added).[2]

See <u>also</u> Dep. Tr. 442.

      Against this reality, Mr. Wilson at his deposition attempted to retreat to the far more limited contention that the book incorrectly reports the "timing" of his cocaine abuse, <u>see</u> Dep. Tr. 444.  Even this retreat was futile.  When confronted with the specific passage he claimed demonstrated the alleged error (<u>see</u> book at 251, "Carl was coming off a long cocaine problem"),[3] its accuracy was in fact confirmed.[4]

---

2.  The deposition testimony of Mr. Wilson cited herein is attached hereto as Exhibit A.  Plaintiffs have consented to HarperCollins' inclusion of exhibit pages in excess of fifty.

3.  Copies of passages from the book cited herein are attached hereto as Exhibit B.

NYFS08...:\60\51660\0063\1631\BRFN276N.09C

Mr. Wilson's deposition testimony thus clearly establishes as true what the complaint asserts to be false -- that Mr. Wilson has been "involv[ed] in the purchase of illegal narcotics."

b.   <u>Heroin</u>

Mr. Wilson's Complaint also challenges as knowingly false a passage from the book relating to a heroin incident in Australia in 1978.  This passage states:  "Carl, trying to calm the turbulence by admitting his involvement in the purchase of the heroin, ended up getting punched in the face by Rocky." Book at 252; Complaint ¶ 19.

The pattern of Mr. Wilson's testimony in relation to this allegation is more troubling even than his deliberate filing of false accusations against HarperCollins.  As we demonstrate, Mr. Wilson chose at his deposition to testify falsely under oath concerning his involvement in this incident, by vehemently asserting the falsity of this passage, and repeatedly and emphatically denying that he had purchased the heroin involved in the incident.  <u>See</u> Dep. Tr. 453-55.

What Mr. Wilson did not know in so testifying was that, through diligent investigation, in the days immediately

---

4.   (...continued)
4.   Mr. Wilson claims that he stopped using cocaine late in the summer of 1977.  <u>See</u> Dep. Tr. 490.  The timing of the book's reference to Carl's "coming off" of his cocaine problem is the beginning of 1978 -- in other words its characterization is entirely correct.  Mr. Wilson's quibble over whether he was still literally "coming off of" his cocaine addiction in early 1978, <u>see</u> Dep. Tr. 487-90, amounts to semantics.

preceding his deposition, HarperCollins came into possession of a published article and an audio cassette tape containing admissions made by Mr. Wilson in relation to the Australia incident.  The article, entitled "Trauma Amid the Tippling: the Carl Wilson Booze-In," was written by an Australian journalist named Anthony O'Grady, and published in an Australian magazine on April 21, 1978.  The article reported on an interview conducted by Mr. O'Grady with Mr. Wilson during which Mr. Wilson <u>admitted</u> to making <u>two</u> heroin purchases in Australia in 1978.[5]  <u>See</u> Exh. A to O'Grady Aff. (Exh. C hereto).  The article contains two photographs of Mr. Wilson taken by a female photographer at the time of the interview.  The O'Grady article quotes Mr. Wilson as stating: "[S]omeone said someone in the group was on heroin . . .  So I . . . naturally being the mediator of the group, <u>I was the one who made the buy</u> . . . [and then] . . . <u>I made another buy</u> . . . ."  <u>Id.</u> (emphasis added).

When shown the article at his deposition, Mr. Wilson acknowledged having known of the existence of the article previously, as well as having engaged in 1978 in an interview with "a guy in Sidney" at which a female photographer was present, <u>id.</u> 492-93.  He nevertheless maintained that Mr.

_____

5.  Details of the circumstances under which the interview took place and the identities of the parties present are contained in Mr. O'Grady's October 29, 1996 affidavit (hereinafter "O'Grady Aff."), annexed hereto as Exhibit C.

NYFS08...:\60\51660\0063\1631\BRFN276N.09C

O'Grady had misquoted him and emphatically denied his reported admission to making two "buys" of heroin.  See Dep. Tr. 500.

When counsel for HarperCollins advised Mr. Wilson that it possessed an audio cassette tape containing a recording of the complete interview on which the O'Grady article was based, his counsel refused to allow Mr. Wilson to testify as to its contents prior to being afforded an opportunity to listen to it privately.  Counsel for HarperCollins accordingly provided Mr. Wilson with copies of the tape and a transcript of it which they had prepared.[6]

At a deposition session convened some several weeks later, Mr. Wilson testified to the essential accuracy of the transcription of the tape, no longer flatly denied making the statements attributed to him, and could only muster as a response that he did not remember making such statements and

---

6.  A copy of the tape is included herewith as Exhibit D.  The O'Grady affidavit attests to the manner in which the tape was prepared and stored until it was transferred to HarperCollins on October 29, 1996.  See Exh. C hereto.  A copy of the transcription that was prepared by HarperCollins' counsel and marked as Exhibit 40 at Mr. Wilson's deposition is attached hereto as Exhibit E.  Attached hereto as Exhibit F is a copy of Mr. O'Grady's December 13, 1996 supplemental affidavit, which includes Mr. Grady's own transcription of the tape recording of his interview with Carl Wilson, which is substantially identical with respect to the passage at issue as that prepared by HarperCollins' counsel and provided to Mr. Wilson.

that the voice on the tape "sounded funny" to him.[7]  See Dep.
Tr. 613-22, 628.

The record evidence on the 1978 heroin incident is
clear:  HarperCollins got the facts right; Mr. Wilson's denials
have been exposed as lies.

2.   <u>Mr. Wilson's Abuse of Alcohol</u>

Mr. Wilson's contentions that HarperCollins knowingly
falsely portrayed him as an abuser of alcohol have now been
shown to be no less brazen than his narcotics-related claims.
Following is what Mr. Wilson had to say at his deposition
concerning his use of alcohol:

> Q:   <u>Was there ever a period of time when you were
> suffering the effects of use of alcohol in excess any
> time in your life.</u>
>
> A:   <u>Yes.</u>
>
> Q:   Can you identify what period or periods those would
> have been, please?
>
> A:   The period was the mid '70s until early '80s.
>
> Q:   And during that period of time, Mr. Wilson, did you
> seek any medical assistance in connection with your
> consumption of alcohol?  [Objection omitted]
>
> A:   No. I don't think I did.
>
> Q:   And that includes not consulting to your recollection
> Dr. Gans about that issue; is that correct?

─────────────────────

7.  Mr. Wilson was unable to offer any explanation of how a
reported interview with him, accompanied by photographs of him,
previously published and not challenged by him, attested to by
the reporter, occurring at a time when Mr. Wilson recalls
having given such an interview, and all captured on tape, in
fact is anything other than authentic.  See Dep. Tr. 613-16,
620-22, 628.

A:    I don't — I don't have a present recollection of
      talking to Dr. Gans and saying, you know, "I need
      some help with alcohol."  I may have because I did, I
      did back in the '70s.  <u>I drank heavily, heavily.  I
      mean terribly so.</u>
      . . .

Q:    <u>Can you describe your drinking habits during this
      period of what you describe as heavy, heavy
      consumption?  Were you drinking on a regular basis?
      Were you a binge drinker?  Were you a day drinker?
      Were you a night drinker?</u>

A:    <u>Yes.  All of it.  All of it.  It really kind of got
      like that in '70 - 1977 and - to '78.  Very much so
      until the summer of '78.  And then it was just — it
      wasn't binge drinking after that.  It was like heavy
      drinking.  But the really terrible abuse was back
      there in the '70s, especially '77, '78 after I
      stopped doing cocaine.</u>

Dep. Tr. 428-430 (emphasis added); <u>see</u> <u>also</u> <u>id.</u> 624.

        In the face of such testimony, that Mr. Wilson would

purport to bring a defamation action, a lead allegation of

which is that he has been falsely charged with abusing alcohol,

is not merely wasteful of judicial and private resources; it

demeans the court process itself.

II.  <u>THE REMAINING PASSAGES ARE NOT ACTIONABLE</u>

        Mr. Wilson's remaining attack on the book centers on

claimed defamatory passages which either do not bear the

defamatory "sting" ascribed to them, do not relate to Mr.

Wilson, are substantially true, or are non-verifiable

expressions of opinion.

    A.   <u>The Governing Law</u>

        The general legal principles which bear on the

ensuing analysis derive from the recognition, as earlier noted,

NYFS08...:\60\51660\0063\1631\BRFN276N.09C

that a defamation plaintiff bears the burden of proving, <u>inter alia</u>, that the statement he purports to challenge is a <u>false</u>, <u>defamatory</u>, <u>assertion of fact</u> that is <u>of and concerning</u> the plaintiff.

      i)   <u>False . . . assertion of fact</u>.  The constitutional parameters of the falsity element have been set forth above.  As many of the remaining challenged passages are provably true, Mr. Wilson cannot recover based upon them.

      Moreover, in view of the plaintiff's burden of proving falsity, a statement that is not "provable as false," <u>i.e.</u>, not verifiable by objective facts, is entitled to full constitutional protection.  <u>See</u> <u>Milkovich</u> v. <u>Lorain Journal Co.</u>, 497 U.S. 1, 19-20 (1990).  In a similar vein, when a defamation claim is based not on the actual statements in a text, but on an <u>implication</u> allegedly arising out of otherwise truthful statements, the plaintiff bears an extremely heavy -- if not insurmountable -- burden in establishing that such an implication is actionable.  <u>See</u> <u>Andrews</u> v. <u>Stallings</u>, 119 N.M. 478, 486 (N.M. Ct. App. 1995), and discussion <u>infra</u>.

      ii)  <u>Of and concerning</u>.  The "of and concerning" requirement is also one of constitutional dimension which requires that the challenged statement be "specifically directed at the plaintiff."  <u>Rosenblatt</u> v. <u>Baer</u>, 383 U.S. 75, 81 (1966); <u>see</u> <u>also</u> <u>New York Times</u>, 376 U.S. at 292.  Where, as is the case with respect to a number of the challenged

passages, the defamatory sting, if any, is <u>not</u> directed to Mr. Wilson, he cannot recover.

      iii) <u>Defamatory</u>.  Under New Mexico law, a statement will not be regarded as defamatory absent a showing of its tendency to render its target "contemptible or ridiculous in public estimation, or expose him to public hatred or contempt or hinder virtuous men from associating with him."  <u>See</u> <u>Bookout</u> v. <u>Griffin</u>, 97 N.M. 336, 539 P.2d 1190, 1193 (1982).  A number of the challenged passages may be embarrassing to Mr. Wilson or cause him discomfort -- but that alone does not render them actionable.  <u>See</u> <u>West</u> v. <u>Thomson Newspapers</u>, 872 P.2d 999, 1009 (Utah 1994).

     B.   <u>The Count Two Passages</u>

      1.   <u>The Trust Passages Are Not Defamatory and Are Substantially True</u>

      Mr. Wilson alleges that the following passages concerning the Brian Wilson Trust of 1982 defame him by falsely stating that he:  "wrongfully withheld money that was payable to Brian;" "obtained control over Brian's funds and Brian's position within the Beach Boys' corporation by trick and for improper purposes;" and "was surreptitiously trying to trick him [Brian] as regards to the trust" (<u>see</u> Complaint ¶ 20; Dep. Tr. 443):[8]

―――――――――――――――

8.  Throughout the Complaint, plaintiffs provide inaccurate quotations of the challenged passages from the book.  While some of these inaccuracies are immaterial to the issues before
                   (continued...)

14

> As soon as the Beachboys returned to L.A., he [Carl] had me sign a trust document, giving him control of both my money and my vote in the Beach Boys corporation, Brother Records, Inc.  I didn't know what I was signing, though he assured me it was for my own benefit and protection.

Book at 268; see Complaint ¶ 19.

> Early in 1986 Carl threw his weight into the war against Dr. Landy, a move that triggered everyone's long-simmering acrimony and distrust toward my friend and therapist.  The Beachboys loathed the independence Dr. Landy was giving me.  They hated that I was beginning to be able to say no to them and act on my own thoughts.  They resented that I wrote songs, not with Dr. Landy, but without them.  They accused him of being a Svengali who was holding me captive.
>     The struggle escalated when Carl began with-holding my paychecks and money.  That authority was his through the Brian Wilson Trust of 1982, which he'd had me sign prior to Dr. Landy's beginning treatment again.  As trustee, he controlled both my corporate vote in the Beach Boys corporation Brother Records Inc., and all my money, property, and stocks.
>     In Carl's opinion, the trust was supposed to protect me from Dr. Landy, but as I got saner, I began questioning my brother.  I couldn't remember signing the document in the first place.  I was too incompetent at the time to know what I was signing.

Book at 332-33; see Complaint ¶ 19.

Not even the most strained reading of these passages could support Mr. Wilson's allegations regarding trickery and wrongful withholding of money.  These passages neither state nor in any way imply that Mr. Wilson tricked Brian into signing the trust document or wrongfully withheld money from Brian.

_____

8.  (...continued)
the Court, others substantially alter the context of the passages.  For purposes of the instant motion, HarperCollins has accurately reproduced each challenged passage, noting where plaintiffs' pleadings represent material alterations.

15

NYFS08...:\60\51660\0063\1631\BRFN276N.09C

Mr. Wilson's "spin" on these passages is entirely fabricated. These passages state only that Carl had Brian sign the trust document prior to re-engaging Landy, that Carl was a trustee with authority to control Brian's assets, that Carl believed that the trust was supposed to protect Brian from Landy, and that Brian was incompetent when he signed the trust and could not remember signing it.  Mr. Wilson's deposition testimony establishes the substantial truth of each of these facts.

Mr. Wilson testified that the trust was set up on behalf of Brian in anticipation of re-engaging Landy to treat Brian.  Dep. Tr. 654.  He stated that the intention in setting up the trust was to protect Brian from Landy's financial abuse, which he viewed "as dangerous to Brian's financial well-being in terms of diverting assets and revenue to himself away from Brian."  Id. 648, 653-54.  He further testified that when the trust was created, there was a general perception that Brian lacked physical, psychological, and mental capacity to handle his own financial affairs and to think lucidly and reason.  Id. 651, 663, 667, 676-77.  In view of his lack of capacity, there can be no dispute as to the sincerity of Brian's perceptions as set forth in the book that "[he] couldn't remember signing the document in the first place," "was too incompetent at the time to know what [he] was signing," and that "[he] didn't know what [he] was signing, though [Carl] assured me [Brian] it was for

16

my own protection."  Mr. Wilson essentially conceded as much. See Dep. Tr. 677-78.

Mr. Wilson testified that he was a co-trustee, but that he "didn't really know" the nature of his responsibilities in relation to Brian's financial affairs.  See Dep. Tr. 655; see also id. 657-71.  The Declaration of Trust (i.e., the document establishing the trust), however, expressly confers on each co-trustee (i.e., Carl Wilson and John Branca) the power to retain all property within the scope of the trust, and further requires that all decisions be made by the co-trustees' unanimous vote.  See Declaration of Trust Art. 2, ¶ 11; Art. 3, ¶ 1 (Exh. G hereto).  Mr. Wilson's testimony and the trust document itself thus establish that Carl was in fact a trustee with authority to control Brian's assets.

Indeed, Mr. Wilson testified that John Branca, the other co-trustee, made significant financial decisions on behalf of Brian.  See Dep. Tr. 657.  Mr. Wilson further testified that he was sent statements relating to Brian's finances, particularly those relating to therapy expenses.  See id. 658.  Accordingly, Mr. Wilson's deposition testimony substantiates the challenged trust passages and any reasonable inferences that might be drawn therefrom.

2.    Re-engaging Landy to Treat Brian

Mr. Wilson alleges that a passage in the book concerning efforts on the part of Carl and his lawyer/manager to re-engage Landy to treat Brian falsely suggests that he "was willing to risk Brian's life to save money," and "was only interested in money and not in his [Brian's] well-being."   See Complaint ¶ 20; Dep. Tr. 443.   In so alleging, Mr. Wilson misrepresents the tenor and context of the challenged passage by omitting the language which is underscored below (see Complaint ¶ 19):

> Within a week Carl was in Dr. Landy's office, asking how much the treatment would cost.  'About half a million dollars,' Dr. Landy said.  [Discussion about terms of treatment] . . .
> They knew each other well.  Dr. Landy explained himself clearly, knowing Carl was going to take the information he got from the meeting and tell Marilyn, who had helped him through the dissolution of his marriage and now was providing him comfort in dealing with me.
> [Discussion of Landy's psychology philosophy]
> 'I understand,' Carl said.
> 'This time, Carl,' Dr. Landy said, 'be a musician.  Don't try to be a doctor.'  Carl never liked Dr. Landy's bluntness and was scared of him.
> [More discussion about treatment philosophy.]
> In June 1983, two months after the first emergency phone call, Dr. Landy met with Tom Hulett and the Beach Boys' business managers, lawyers, and staff to discuss the same things he had gone over with Carl.
> [In context of conversation with Landy's secretary regarding non-payment of past-due bills,] Carl and Al complained Dr. Landy's fees were outrageous.
> [In context of another meeting regarding re-engaging Landy to treat Brian,] [p]redictably, the first thing they wanted to discuss wasn't my health, it was Dr. Landy's fee.
>                  . . .

18

> 'We want him to get well,' Mike said.
> 'I don't care if he ever sings, plays again, or
> makes one more note of music,' said Carl.
> 'Yeah, we just want him to be well and happy,'
> added Mike.

Book at 273-76 (emphasis added); Complaint ¶ 19.

### a.   This Passage is Not Defamatory

It is a well-established principle of defamation law that a court must view the challenged passage as a whole in ascertaining whether it is susceptible of a defamatory interpretation.  See ROBERT D. SACK & SANDRA S. BARON, LIBEL, SLANDER, AND RELATED PROBLEMS 76 (2d ed. 1994), and cases cited therein.  Thus, it is improper to pick out and isolate particular words or phrases and determine whether, considered alone, they are defamatory.  Id.

Applying these principles here, Mr. Wilson's allegations that this passage portrays him as more concerned about money than about his brother's health and "was willing to risk Brian's life to save money" are clearly untenable. Indeed, when read as a whole, this passage is not reasonably susceptible of any defamatory interpretation, as Carl's concern about Landy's fees is clearly depicted as secondary to his interest in helping Brian to get well.  Specifically, following the discussion of Landy's fees, Mike Love is quoted as saying, "We [which includes Carl] want him [Brian] to get well," followed by a quote from Carl:  "I don't care if he [Brian] ever sings, plays again, or makes one more note of music," and

NYFS08...:\60\51660\0063\1631\BRFN276N.09C

concluding with a quote from Mike Love: "Yeah, <u>we</u> [which includes Carl] just want him to be well and happy."  Book at 276 (emphasis added).  Thus, considered in its entirety -- <u>i.e.</u>, in the context of the material language that Mr. Wilson intentionally omits from his complaint -- this passage portrays Carl in precisely the <u>opposite</u> way of that which is alleged. In sum, this passage is simply not defamatory.

   b. <u>Any Defamatory Sting of this Passage of this Passage is Substantially True and Not Actionable In any Event</u>

   To the extent Mr. Wilson would focus on the passage's description of his and the group's concern over the cost of Dr. Landy's treatment, the deposition testimony of Mr. Wilson establishes its substantial truth.  Mr. Wilson testified that prior to re-engaging Landy, he had a conversation in Landy's office with Landy and Jerry Schilling (Carl's manager/lawyer) regarding the financial terms of the proposed engagement.  Dep. Tr. 726.  Mr. Wilson testified that Landy gave him a fee estimate of $800,000, about which Mr. Wilson stated:  "Well, it could be observed that it's an extremely high fee for a psychologist to receive."  <u>Id.</u> 661.

   Mr. Wilson testified that he thought that Landy "was out to make as much money as he possibly could," that he "knew that Landy was overpriced," and it "could have been easily observed" that Landy's fees were "exorbitant."  Dep. Tr. 731, 735.  Mr. Wilson further testified that another member of The

Beach Boys, Al Jardine, also believed Landy's fees to be exorbitant, that Al Jardine expressed his view to Landy, and that it is possible that he (_i.e._, Carl) could have expressed a similar view.  _Id._ 735-38.  Finally, Mr. Wilson testified that he tried to keep Landy's therapy expenses "at bay."  _Id._ 658. Mr. Wilson's and the group's motivation to limit Brian's therapy expenses is supported by the fact that the Beach Boys were funding Brian's therapy.  _See id._ 740-41.[9]  Thus, it is abundantly clear from the record that Carl was in fact concerned about Landy's fees.

Finally, to the extent that Mr. Wilson is challenging Brian's perspective as to Carl's motivation for not hiring Landy, such motives are not susceptible of being verified as true or false and are thus not actionable.  _See_ discussion _infra_; _see also_ _Haynes_ v. _Alfred A. Knopf, Inc._, 8 F.3d 1222, 1227 (7th Cir. 1993) (Posner, J.) ("As for Luther's motives for leaving Ruby for Dorothy, they can never be known for sure

_____

9.  Regarding the remainder of the passage -- which Mr. Wilson does not allege to be defamatory of him -- it too is substantiated by Mr. Wilson's deposition testimony.  Mr. Wilson testified that he discussed with Marilyn Wilson the subject of re-retaining Landy.  _See_ Dep. Tr. 728.  The sincerity of Brian's perception that Carl was "scared of Landy" is supported by Carl's testimony that he viewed Landy as "arrogant," "egotistical," "crazy," liking "to play games," and "attempting to use techniques of intimidation in his interpersonal dealings."  _See id._ 729-31.

NYFS08...:\60\51660\0063\1631\BRFN276N.09C

(even by Luther) and anyone is entitled to speculate on a
person's motives from the known facts of his behavior.").[10]

        3.    The BMQA Passage is Not Defamatory

        Mr. Wilson challenges the following passage:

> Filed by the attorney general's office, the [Board of
> Medical Quality Assurance's (BMQA's)] charges
> originated with a complaint filed by Carolyn Williams
> in 1984.  They were then fueled by the journal Gary
> Usher compiled while we wrote songs together the
> previous year and pressed by Marilyn and Carl.

Book at 351; Complaint ¶ 19.  Mr. Wilson alleges that he did
not press the BMQA charges and that the passage injures his
reputation by "suggest[ing] that [he] was trying to use the BMQ
[A] to undermine Brian's therapy and . . . that [he] was
interfering or being unethical in some way."  Dep. Tr. 768.

        This passage makes no such assertion about Mr. Wilson
and in no way leads to such an implication.  Mr. Wilson's
interpretation is particularly unreasonable -- indeed,
outlandish -- when the passage is considered in the context in
which it appears in the book, which makes clear that the BMQA
investigated Landy for ethical violations and that <u>the outcome</u>

---

10.  Mr. Wilson also challenges a passage in the book relating
to efforts on the part of Carl and his manager/lawyer to engage
Landy to treat Dennis.  The passage states that Carl considered
the price "too steep . . . for the Beach Boys to carry."  <u>See</u>
book at 311-12; Complaint ¶ 19.  The same deposition testimony
discussed in the foregoing section regarding Carl's view of the
magnitude of Landy's fees supports the substantial truth of
this passage.  Further, while Mr. Wilson fails to allege how
this passage is defamatory, any challenge as to Brian's
perspective with regard to Carl's motives for not hiring Landy
is not actionable for the reasons set forth above.

NYFS08...:\60\51660\0063\1631\BRFN276N.09C

<u>of the proceeding was favorable</u>, <u>i.e.</u>, that Landy surrendered his license.  <u>See</u> book at 351-52.  Thus, this passage in its proper context would vindicate the position of those who "pressed" the charges.  It is simply inconceivable that a statement concerning the "pressing" of a meritorious ethics investigation could be considered defamatory.  Thus, even if this passage incorrectly states that Mr. Wilson "pressed" the BMQA charges, it is not defamatory and thus not actionable.

    4.   <u>The "Callousness" Allegation</u>

Mr. Wilson complains that two passages in the book -- both of which relate to <u>Brian's perception</u> that Carl failed to talk to him at certain times -- "falsely suggest that he was callous and unconcerned about his brother Brian's physical and emotional health," and "call[] into question . . . [his] love for Brian" (<u>see</u> Complaint ¶ 20; Dep. Tr. 443).  These passages read as follows:

> . . . I flew back to San Francisco that night, Sunday, for another show.  . . .  For the first hour or so, Mike, Al, and Carl avoided me like the plague.
> Then I decided to take action.  I found Carl in his dressing room and asked if he wanted to talk about what was going on.
> 'I can't, Brian,' he said.  'I've got to take care of some business I've got going in Colorado.'
> 'You have to do that right now?'  I asked.
> 'I've been planning to make a few calls,' he said.  'I guess that's what I'm going to do.  I'll catch you later.'
> It was clear they were shutting me out.  I don't know why I expected anything more.

Book at 371; Complaint ¶ 19.

NYFS08...:\60\51660\0063\1631\BRFN276N.09C

> In the first week of March [1991] Carl suddenly accelerated the conservatorship case. . . . Carl never once tried to talk to me personally. He showed absolutely no sensitivity that I was being stripped of my dignity and rights as a human being.

Book at 387; Complaint ¶ 19.

In its motion to dismiss, HarperCollins asserted these passages to be devoid of defamatory meaning and protected statements of opinion. The Court denied the motion on the ground that both issues presented questions of fact preventing disposition on the face of the pleadings. Now that the record has been fully-developed, the substantial accuracy of the passages has been confirmed. Mr. Wilson's claim, it is now clear, is premised not on the challenged passages themselves, but on implications that allegedly derive from facially accurate text. For the reasons discussed below, this claim should be rejected.

> a.   The Factual Backdrop

Mr. Wilson's deposition testimony establishes the accuracy of each of the challenged passages. As made clear in the book, the events described in each of the passages took place during the pendency of the conservatorship proceeding. Specifically, the time frame of the first passage is early May, 1990, the day after the conservatorship suit was filed (see book at 368), and the time frame of the second passage is the first week of March, 1991, while the conservatorship proceeding was pending (see book at 376, 380, 387).

24

In his deposition, Mr. Wilson admitted that he did not talk to and was "estranged" from his brother Brian during these time periods.  Mr. Wilson testified that he and Brian became estranged sometime around 1983, that their estrangement lasted for approximately ten years, and that their relationship did not begin to "heal" until after the conservatorship, sometime around 1993.  See Dep. Tr. 376-77, 543-44.  Mr. Wilson testified that during the period of their estrangement, he and Brian were "seldom" in contact.  Id. 377-78; see also 370-72. Thus, Carl and Brian were not on speaking terms throughout the time period in which each of these passages is said to have occurred.  Brian's statements that he perceived his brother to be "shutting him out" and not talking to him are thus accurate, truthful descriptions of what was happening in their relationship at those points in time.

> b.   The Alleged Implications Are Not Actionable

Each challenged passage thus simply and truthfully sets forth the fact that Carl was not interacting with Brian during the relevant time periods.  Mr. Wilson's allegations that these passages portray him as "callous" or "unconcerned" are not supported by any explicit text so charging, and are thus premised on implications allegedly deriving from truthful, facially non-actionable text.  Mr. Wilson is thus arguing (although the Complaint fails to so acknowledge) that he has been defamed by implication.

25

"Defamation by implication" claims are strongly
disfavored in New Mexico and elsewhere in view of the serious
First Amendment concerns in holding defendants liable for
statements they did not make.[11]   Indeed, a growing number of
jurisdictions have adopted a per se rule that there can be no
defamation by implication.[12]   Such concerns are even greater,
where, as here, the alleged implications of callousness and

---

11.   See, e.g., Andrews, 119 N.M. at 484-85 (alleged
implication based on true factual statements cannot
constitutionally support a defamation claim); Chapin v. Knight-
Ridder, Inc., 993 F.2d 1087, 1092-93 (4th Cir. 1993) ("a libel-
by-implication plaintiff must make an especially rigorous
showing where the expressed facts are literally true"); Woods
v. Evansville Press Co., Inc., 791 F.2d 480, 487-88 (7th Cir.
1986) ("[a] publisher reporting on matters of general or public
interest cannot be charged with the intolerable burden of
guessing what inferences a jury might draw from an article and
ruling out all possible false and defamatory innuendoes that
could be drawn from the article"); Conroy v. Kilzer, 789 F.
Supp. 1457, 1462 (D. Minn. 1992) ("[h]olding media defendants
liable for statement they did not make raises serious first
amendment concerns"); Locricchio v. Evening News Ass'n, 438
Mich. 84, 122, 476 N.W.2d 112, 129 (1991) ("claims of
defamation by implication, which by nature present ambiguous
evidence with respect to falsity, face a severe constitutional
hurdle"); Strada v. Connecticut Newspapers, Inc., 477 A.2d
1005, 1011 (Conn. 1984) ("[a] publisher cannot be responsible
for every strained interpretation that a plaintiff might
attribute to its words").  See also Sassone v. Elder, 626 So.
2d 345, 354 (La. 1993) ("when the court looks not at what was
said, but at what impression was created, a media publication
can give rise to an infinite number of impressions").

12.   See, e.g., Price  v. Viking Penguin, Inc., 881 F.2d 1426,
1432 (8th Cir. 1989); Diesen v. Hessburg, 455 N.W.2d 446, 451-
52 (Minn. 1990); cert. denied, 493 U.S. 1036 (1990); Strada,
193 Conn. at 324, 477 A.2d at 1011; Schaefer v. Lynch, 406 So.
2d 185, 188 (La. 1981); De Falco v. Anderson, 209 N.J. Super.
99, 107, 506 A.2d 1280, 1284 (App. Div. 1986); Pietrafeso v.
D.P.I., Inc., 757 P.2d 1113, 1116 (Colo. Ct. App. 1988);
Mihalik v. Duprey, 11 Mass. App. 602, 606, 417 N.E.2d 1238,
1241 (Mass. App. Ct. 1981).

lack of concern do not clearly and necessarily derive from the challenged text;[13] indeed, the first passage clearly yields precisely the <u>opposite</u> implication -- that Carl was in fact interested in speaking with Brian and would "catch [him] later." <u>See</u> book at 371.  These passages simply offer Brian's perspective that Carl would not talk to him at certain specified times.  For these reasons, Mr. Wilson's defamation by implication claim should be rejected as a matter of law.

However, even if the alleged implications are cognizable, Mr. Wilson still bears the burden of establishing that such implications, <u>inter alia</u>, are <u>defamatory assertions of fact</u>.  First, personal characterizations such as "callous," not "concerned," and not "loving" one's brother are simply not the "stuff" of defamation.  <u>See</u> <u>Mitchell</u> v. <u>Random House, Inc.</u>, 865 F.2d 664, 670 (5th Cir. 1989) (personal adjectives such as "insensitive, unsympathetic or callous . . . do[] not suffice for defamation").  That is, such characterizations do not have a tendency to render a person "contemptible or ridiculous in public estimation, or expose him to public hatred or contempt or hinder virtuous men from associating with him." <u>See</u> <u>Bookout</u>, 97 N.M. at 336, 639 P.2d at 1193 (1982).

---

13.  <u>See</u>, <u>e.g.</u>, <u>Chapin</u>, 993 F.2d at 1094 (report of poor financial condition does not necessarily imply dishonesty); <u>Sassone</u>, 626 So. 2d at 354 (implication must at least be the "principal inference" and not merely one of "[a]ny number of equally plausible inferences"); <u>Locricchio</u>, 438 Mich. at 130, 476 N.W.2d at 132 (no proof that "inescapable implication" of news article was false).

NYFS08...:\60\51660\0063\1631\BRFN276N.09C

Moreover, such implications are inherently subjective and unverifiable.  They are, as such, not actionable.  The Supreme Court's decision in <u>Milkovich</u> requires that statements "be provable as false" before there can be liability under state defamation law.  497 U.S. at 19; <u>see</u> <u>also</u> <u>Andrews</u>, 119 N.M. at 486.  Thus, "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."  <u>Haynes</u>, 8 F.3d at 1227.

For this reason, courts have uniformly treated subjective assessments of people and events to be protected statements of opinion, rather than assertions of objective fact.  <u>See</u>, <u>e.g.</u>, <u>Partington</u> v. <u>Bugliosi</u>, 56 F.3d 1147, 1158 (9th Cir. 1995) (personal assessments of others are not susceptible of being verified as true or false); <u>Beverly Hills Foodland, Inc.</u> v. <u>United Food and Commercial Workers Union</u>, 39 F.3d 191, 196 (8th Cir. 1994) ("'Unfair' is a term requiring a subjective determination and is therefore incapable of factual proof"); <u>Communications Workers of America</u> v. <u>Archibeque</u>, 105 N.M. 635, 638 (N.M. 1987) (characterizations such as "amoral," "totally void of character," and "an embarrassment" are not actionable).

In view of these principles, inherently subjective adjectives such as "callous" or "unconcerned" are simply not

28

verifiable by objective facts, since such adjectives admit of numerous interpretations and are thus not "susceptible of being proved true or false."  See Phantom Touring, Inc. v. Affiliated Pubs., 953 F.2d 724, 728 (1st Cir.) (article describing play as "a rip-off, a fraud, a scandal, a snake-oil job" not actionable because adjectives not capable of objective verification), cert. denied, 504 U.S. 974 (1992); Henderson v. Times Mirror Co., 669 F. Supp. 356, 360 (D. Colo. 1987) (article describing plaintiff as "sleaze-bag" who "slimed up from the bayou" is protected opinion because such terms are incapable of factual proof or disproof), aff'd, 876 F.2d 108 (10th Cir. 1989). Thus, any "implication" by Brian that his brother is "callous" or "unconcerned" reasonably could be understood only as Brian's personal conclusion about the information presented, not as a verifiable statement of fact about Mr. Wilson.

Finally, the opinion-nature of the challenged statements is underscored by the context in which they are found -- an autobiography (which includes "My Own Story" in the title).  This context makes plain that the book contains Brian's personal perspective about the people and events in his life.  In concluding that statements in a book of a similar genre (i.e., a lawyer's personal account of a trial in which he was involved) were opinion, not fact, the Ninth Circuit reasoned:

> The purpose of the book is to offer the personal
> viewpoint of the author [on issues on which he has

knowledge]. . . .   Indeed, readers presumably purchased the book not to read a dry description of the facts but to learn of [the author's] personal perspective about the [events]. . . .   Because the book outlines [the author's] own version of what took place, a reader would expect him to set forth his personal theories about the facts . . . and the conduct of those involved in them. . . .   [Otherwise,] authors of every sort would be forced to provide only dry, colorless descriptions of facts, bereft of analysis or insight.

Partington, 56 F.3d at 1147, 1153-54.  See also Goetz v. Kuntsler, 625 N.Y.S.2d 447, 451 (1995) (the reader of an autobiography would "realize that [the author] was voicing a personal point of view").

Similarly here, the purpose of Brian Wilson's autobiography is to offer his personal viewpoint on issues on which he has knowledge -- including his relationships with his brother and with the Beach Boys.  The book outlines Brian's version of the events, and predictably offers Brian's perspective.  Indeed, it is that perspective which would likely have encouraged readers to take up the book in the first place.[14]  Brian's opinion may be painful to Carl, but it is

_____

14.  In addition, Milkovich teaches that when a speaker truthfully sets forth the facts upon which an opinion is based, that opinion is not actionable as a matter of federal constitutional law.  497 U.S. at 19.  In that context, opinions are protected "[b]ecause the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts."  Moldea v. New York Times Co., 22 F.3d 310, 317 (D.C. Cir.), cert. denied, 115 S. Ct. 202 (1994).  See also Partington, 56 F.3d at 1156-57; Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1093 (4th Cir. 1993); Phantom Touring, Inc. v. Affiliated Pubs., 953 F.2d 724, (continued...)

nevertheless entitled to full constitutional protection.   For
these reasons, the allegations of callousness and lack of
concern should be dismissed.

> 5.   Mr. Wilson's Consultation With Others

Finally, Mr. Wilson alleges that two passages in the
book "falsely characterize him as an emotionally troubled, weak
individual who could be easily intimidated and/or controlled by
his wife, John Rogers,[15] Landy, and others," and "make[] it
seem like I am indecisive, don't have a mind of my own, that
I'm weak . . .."  Complaint ¶ 20; Dep. Tr. 703; see also id.
443.  These passages read as follows:

(1)      My mom didn't want a funeral [for Dennis.]  Like
         me, she didn't believe in them.  She didn't like the
         sorrow.  My only wish was that Dennis not be
         cremated.  Carl didn't know what to do.  Before
         making any decisions, he insisted on consulting with
         John Rogers, a cult leader Carl referred to as his
         spiritual master.  However, it turned out that Shawn,
         whose divorce from Dennis wasn't yet finalized, had
         ultimate authority, and she decided that he'd be
         buried at sea.

Book at 314; Complaint ¶ 19.

---

14.   (...continued)
730 (1st Cir.), cert. denied, 504 U.S. 974 (1992); Andrews, 119
N.M. at 487, 490.  The deposition testimony of Mr. Wilson
discussed supra establishes that each passage upon which Mr.
Wilson bases his callousness allegation constitutes a truthful
recitation of the relevant facts.  Accordingly, any opinion
offered by Brian that is premised on such facts is protected
speech.

15.  Mr. Wilson's Complaint and the book refer to John Rogers,
while Mr. Wilson testified that this individual's name is John
Roger.  See book at 314, 378-79; Complaint ¶¶ 19, 20; Dep. Tr.
696.

NYFS08...:\60\51660\0063\1631\BRFN276N.09C

(2)     It was the perfect opportunity for me to press the issue. After all, I was in Montreal. Dr. Landy was in L.A. I was performing on my own, making my own decisions, even venturing out to art museums and restaurants while Carl was holed up in his room, avoiding the outside world, still drinking heavily, blind to his own problems. . . .

Even though he hated Gene, I knew he [Carl] was telling the truth. He still hadn't decided where he stood on the conservatorship issue. But then Carl had trouble making even the simplest decisions. He had always needed to consult with numerous people -- his wife, lawyers, his spiritual master, John Rogers.

Book at 378-79; Complaint ¶ 19.

Considered in their proper contexts -- the book's description of Dennis Wilson's death and the conservatorship proceeding -- the challenged passages are clearly limited to specific events in Mr. Wilson's life and do not create any reasonable inference as to Mr. Wilson's overall decision-making capacity. Nor do they state or in any way imply that Mr. Wilson is a weak and emotionally troubled individual; they simply state that Carl had not made up his mind as to how Dennis should be buried or where he stood on the conservatorship issue. No reasonable reader would equate indecisiveness on such specific, important issues as to how one's brother should be buried or whether the other brother should be subjected to a conservatorship proceeding with "weakness" or "not having a mind of one's own." Indeed, it is perfectly normal to consult with spiritual or religious advisers and family members under such grave circumstances.

32

Nevertheless, even if Brian's point of view can fairly be stated to be that Mr. Wilson is indecisive or weak, such characterizations are not actionable, as they are entirely subjective and incapable of being verified by objective facts. Indeed, Mr. Wilson admitted as much, agreeing that different people could make different judgments as to whether or not a given individual possessed such qualities.  <u>See</u> Dep. Tr. 704-05.

In any event, Mr. Wilson's deposition testimony establishes the substantial truth of the passage.  Mr. Wilson testified that he has consulted with John Roger in the past, and indeed consulted with him around the time of Dennis' death. Dep. Tr. 696-702.  He admitted that he would "share" with Mr. Roger his feelings about people, the group, and his goals for the group.  <u>Id.</u> 698-700.  He further confirmed that he had consulted with Marilyn Wilson regarding personal issues, including whether to re-engage Landy to treat Brian.  <u>See id.</u> 728.

    c.   <u>The Count III Passages Are Not Actionable</u>

The passages that form the basis of Count III allegedly injure Mr. Wilson's reputation by defaming the Beach Boys.  <u>See</u> Complaint ¶¶ 29-31.  These passages are not actionable for the following reasons.

1.   <u>The Steve Love Passages Are Not Of and
Concerning Mr. Wilson or The Beach Boys and Are
Substantially True</u>

Mr. Wilson challenges two passages that are directed at Steve Love and concern neither Mr. Wilson nor the Beach Boys.  In setting forth these passages in the Complaint, Mr. Wilson conveniently omits language which makes clear that the passages are not directed at Mr. Wilson or The Beach Boys. These passages read as follows:

(1)      <u>Steve Love</u> was pushing everyone, especially me, to step up the pace on the next album . . . At the same time, Dr. Landy was trying to keep me within a therapeutic regimen rather than let the guys take over and put me to work full-time.

But there were priorities.  <u>Steve</u> and the others wanted to get out of the Warners contract while they could still capitalize on the success of *15 Big Ones* somewhere else.  <u>Steve</u> wanted the new LP done no later than January 1, 1977.  [Landy rejected that, stating that Brian needed a month's vacation at Christmas.]

'Can you explain why?'  <u>Steve asked.</u>[16]
'He seems to be doing fine,' <u>Mike added.</u>[17]
<u>To both Love brothers</u>,[18] Landy [responded that Brian needs to spend Christmas with his family.]

'That's ridiculous to take so much time off work,' <u>Steve</u> said. . . .

<u>Steve</u> had his own agenda in mind, and Dr. Landy's struck him as unreasonable.  Tempers flared. They called Dr. Landy a 'control freak.'  Dr. Landy responded by telling the Beach Boys it was exactly this kind of attitude that caused me to break in the first place.' . . .

'He's supposed to make records,' <u>Steve</u> said. 'What the hell are we paying you for?'

---

16.  Omitted from Complaint.

17.  Omitted from Complaint.

18.  Omitted from Complaint.

NYFS08...:\60\51660\0063\1631\BRFN276N.09C

> `To make him well,' Dr. Landy replied.  `The fact is he made one record already, more than the Beach Boys have done in four years.  But he can only make records when he's well, something not one of you seems to understand.'

Book at 239-40 (emphasis added); Complaint ¶ 30.

(2)　　　`Listen, Marilyn,' Dr. Landy said.  `I think Brian needs to do Christmas.  That's what I think. I'm sure that's what you'd prefer.  Now <u>Steve</u> just wants to get that goddamn album made, which can wait till January.  And Carl, you can tell him for me that he should stop being so jealous of his brother.'[19]
> 　　　Later, Dr. Landy finally spoke with <u>Steve</u>, who came right out and said he was fired.
> 　　　`You guys don't understand,' said Dr. Landy. `If I'm not in the studio, you're not going to get anything out of Brian.'
> 　　　`Not true,' <u>Steve</u> countered.  `Brian's going to work.  He'll work.  We're all working.  The group's going to finish their album.'

Book at 242-43 (emphasis added); Complaint ¶ 30.

A reading of the first passage in its entirety makes plain that the views reflected are those of Steve Love -- who was not a member of the Beach Boys, but served as the group's manager for a brief period of time (<u>see</u> book at 232; Dep. Tr. 386, 751-52) -- (and Mike Love to a lesser degree), not those of The Beach Boys and certainly not those of Carl.

The second passage suffers from the same infirmity. The first paragraph of that passage -- which was conveniently omitted from the Complaint -- clearly separates the point of view attributed to Steve from that of Carl.  Read in its entirety, this passage makes plain that Steve, and Steve alone,

---

19.  First paragraph omitted from Complaint.

35

was pushing to have the album made.  No fair reading of this passage could ascribe those views to Mr. Wilson, and Mr. Wilson essentially admitted as much:

> Q:  That reference [on page 243 of the book] is Steve being anxious to get the album made.  It doesn't say Steve and Carl, does it?
>
> A:  No, that doesn't.
>
> Q:  It doesn't.
>
> A:  That, what you said doesn't, no, it says what you said it said.
>
> Q:  And the next passage nowhere references you by name, does it?
>
> A:  I don't see my name, that's true.

Dep. Tr. 684-85.

Nevertheless, Mr. Wilson's testimony establishes its substantial truth.  Mr. Wilson admitted that Steve Love fired Landy, that Steve was employed "by all of us individually and . . . perhaps for the company as well," that Carl was aware of the decision to fire Landy, that he did not communicate his objection to the firing of Landy, and that he viewed Landy as "doing everything for his own financial gain."  Id. 679, 682. Mr. Wilson admitted that he was not present for this conversation, and thus cannot speak to whether or not it occurred.  Id. 683.  He further admitted he "wasn't really around that much" during that period of time because he had injured his back.  Id. 680.

2.   The "Pressuring Brian" and "Use of Studio"
     Passages Are Not Defamatory and Are
     Substantially True

Mr. Wilson alleges that the following passages falsely suggest that The Beach Boys: "deliberately exploited" Brian "in order to earn more money for themselves;" "coerced Brian to write songs and produce records even though the group knew that doing so would damage Brian Wilson's mental health;" "opposed [Brian] Wilson's therapy with Dr. Landy solely because it was interfering with the group's ability to coerce Brian Wilson to make records with them; "had no further regard for Brian Wilson's mental and physical health" once the new record deal was signed; and "almost killed Brian Wilson by requiring him to work on songs and albums when he was not healthy enough to do so" (Complaint ¶ 30):

(1)          After roughly two months, Dr. Landy introduced
     the piano.  From the start of the treatment, the
     Beach Boys had been pressuring him to get me to a
     point where I could write and produce again.  That's
     all they wanted.  But Dr. Landy resisted.  Becoming a
     Beach Boy again, he explained repeatedly, wasn't the
     goal of therapy. . . .
          Dr. Landy changed our daily meeting site from my
     mansion to Brother Studios, the Beach Boys' own
     recording studio.  He booked ninety minutes of piano
     time for me every day.  . . .
          Dr. Landy made sure the studio was empty.
     Despite previous explanations, the Beach Boys,
     especially Mike, made no secret that they were
     anxious to put me back to work writing songs.  But
     Dr. Landy kept them at bay.

Book at 223-24; Complaint ¶ 30.

(2)          Mike was the first to register a complaint
     [about the "therapy" piano sessions with Dr. Landy].
     He said I was using the studio unproductively.  Carl

37

agreed.  He said the music we were making sounded
crazy.

Book at 225; Complaint ¶ 30.

(3)        Dr. Landy told the Beach Boys I wasn't ready to
cope with the pressure of making an album.  I was
still too fragile.  They didn't see it that way and
began complaining about the studio time he and I were
using, time they could have been renting to other
people.
           'You want Brian back?'  Landy asked.  'Or do you
want to make a couple hundred bucks a week?  What's
more important?'
           When they saw that Dr. Landy had begun recording
our piano sessions, they asked for the masters.  Dr.
Landy refused to turn them over.  They were part of
my therapy, privileged.
           [Mike and Carl secretly taped recording sessions
and Landy and Brian found out.]
           But that was only the beginning of war with the
Beach Boys.

Book at 226-27; Complaint ¶ 30.

(4)        What could be better for me than to be writing
songs with Mike again?  It had nearly killed me
several times before.

Book at 373; Complaint ¶ 30.

           First, the fourth passage set forth above relates
exclusively to Mike Love and is simply not of and concerning
Carl or The Beach Boys.  It is, as such, not actionable.
Neither are the first three passages, as they simply do not
support Mr. Wilson's allegations regarding exploitation,
coercion, and "almost killing" Brian.  The passages make no
such assertions; rather they merely set forth Brian's
perspective that The Beach Boys did not regard favorably
Landy's use of the studio for therapy and pressured Brian to
recover to the point where he would be able to write and

38

produce.  These statements -- including any alleged implication as to Mr. Wilson's acquiescence -- are substantially true, as follows.

        a.   <u>Pressuring Brian to Write and Produce</u>

Mr. Wilson admitted that the "proper level of involvement of Brian and the Beach Boys business" had been "absolutely" discussed.  Dep. Tr. 380.  He testified that "Mike Love's view has been that we [the Beach Boys] had an agreement for a certain level of involvement [on the part of Brian] and then, you know, something other than that agreement transpired."  <u>Id.</u> 381.  He testified that Mike Love viewed the logical consequence of Brian's reduced involvement to be a reduction in Brian's financial participation.  <u>Id.</u>  Mr. Wilson admitted that during the 1980s, Mike Love wanted Brian to write more songs with him; that "Michael always wants to write with Brian.  He always want[s] to work with Brian, or play or whatever."  <u>Id.</u> 383-84, 754-55.  He admitted that Al Jardine wanted Mike and Brian to write together.  <u>Id.</u> 384-85.  These facts substantiate Brian's perception that the Beach Boys pushed Brian to work.

As to Mr. Wilson's acquiescence in such pressure, Mr. Wilson admitted that he never communicated to Brian any contrary view he may have had (that is, that Brian should not be pushed to work) because he "wasn't really in the loop on that[;] wasn't really a part of Mike and Brian's, do you want

to write, do you not want to write." Dep. Tr. 385.  In fact, Mr. Wilson testified that he wasn't communicating much with Brian during this time period.  <u>Id.</u> 755.  Mr. Wilson nevertheless asserted that Brian could not have perceived pressure he was receiving from Mike Love or anyone else as reflecting his own perspective because "He [Brian] knew, he knew better [and knew] that I [Carl] was, you know, behind him, supportive to him, not greedy."  <u>Id.</u>  Yet Mr. Wilson could not say how he had overtly manifested his support for Brian during that period of their "estrangement."  <u>Id.</u>  In sum, Mr. Wilson's testimony supports any inference that Carl did not take action to protect Brian from any pressure he may have felt.

        b.   <u>Brian's and Landy's Use of the Studio for Therapy</u>

Mr. Wilson admitted that Landy used the studio for therapy in 1976, and that Mike Love complained about such a use of the studio and had "observe[d] that it was -- that it would be perhaps an expensive way to play the piano."  Dep. Tr. 748-49.  Mr. Wilson admitted that he was aware that Brian and Landy were using the studio for therapy, that Mike Love complained about such use, and that Carl "wasn't very involved" at that time, and that it would be "unlike" him to speak out against Mike's views.  <u>See</u> Dep. Tr. 748-49, 751.

Moreover, Mr. Wilson admitted that he could have made one or more statements which could have been interpreted as supporting Mike's and Steve's points of view that use of the

studio for therapy was unproductive:  "I think there was perhaps a moment when something that I said was used to support what Steve wanted perhaps or what Mike wanted."  Dep. Tr. 757. Mr. Wilson further testified that it "is within the realm of possibility, of course," that Carl could have made a statement to Mike or Steve that they "construed as your [Carl] agreeing that the use of the studio for therapy was an unproductive use."  See id. 760.

> c.    Music "Sounded Crazy" Passage

When asked in his deposition how the statement attributed to Carl that "the music we [Landy and Brian] were making sounded crazy" diminished his reputation, Mr. Wilson answered:  "It suggests that I am unsupportive, uncaring, trying to get in the way of his therapy, callous, greedy about the studio."  Dep. Tr. 762.  This interpretation is entirely contrived, as a statement reflecting one's opinion as to the sound and quality of another's music cannot in any way be interpreted to mean that the person giving the opinion is "unsupportive," "uncaring," "callous," or "greedy."

Moreover, musical taste is inherently subjective, and Mr. Wilson admitted as much.  Id. 747.  Mr. Wilson further admitted that he may have used the term "crazy" in reference to Brian's music and that Brian may have misunderstood him.  Id. 761-62 ("it's possible that Brian said here, let's get this crazy song, and I said yeah, that's a crazy song.  And then it

41

was used in this way, in that sentence").  Carl was thus unable

to deny that Brian could have heard what he heard and

misconstrued Carl's intention.  Id. 762.

3.   Brian Is Back Campaign

Mr. Wilson challenges the following passages:

> We were dumbfounded.  Then angered.  We'd been had.
> It turned out Mike had been working for months on
> this huge publicity campaign heralding my return.
> He'd written a terrible song, "Brian's Back,' and
> sold Warner Brothers on a publicity campaign designed
> to exploit the fact that I'd produced the Beach Boys'
> latest album.  No one had mentioned a word to me.
> Nor to Dr. Landy.  Everyone knew except us.  . . .
> It wasn't enough for me to write and produce songs.
> Now they had to sell my illness publicly too.

Book at 232 (emphasis added); Complaint ¶ 30.

> I understood and agreed with the concept, which was
> more than I could say about the Brian is Back
> campaign.

Book at 239; Complaint ¶ 30.

These passages are simply not of and concerning Carl.

The first passage focuses on Mike Love engineering the

publicity campaign, writing the song, and selling the campaign

to Warner Brothers.  The second passage is not of and

concerning anyone; it simply sets forth Brian's feeling about

the "Brian is Back" campaign.

Mr. Wilson asserts that this passage defames him by

suggesting his participation in "a conspiracy and a whole

series of plans, and that [he] was willing to exploit [his]

brother's illness for financial gain."  Dep. Tr. 694.  Yet Mr.

Wilson testified that he never verbally or in writing stated an

42

objection to the campaign going forward, or even expressed his disapproval.  Id. 694-95.  In fact, Mr. Wilson testified that he was actually out of commission during that period of time from his back injury and was not present at the Warner Brothers meeting referenced in that passage.  Id. 695-96.  Finally, Mr. Wilson would not affirmatively testify that he doubted Brian's reaction to the "campaign" as "turning his illness into a bit of a publicity tool."  Id. 693-94.

### 4.   Abusive Bodyguards

Mr. Wilson challenges the following passages, alleging that they falsely suggest that "the Beach Boys allowed their bodyguards to abuse and intimidate Brian Wilson" (see Complaint ¶ 30):

> One morning Stan and Steve, my tenders, appeared at my bedside.  I stared up at them blank-faced.  I hadn't spoken a word to anyone for the past week, and I didn't plan to start.
> 'Get out of bed!' Stan barked, yanking back the covers.
> The sudden movement scared me.  I put my hands over my face.
> 'Don't hit me, I pleaded.'
> 'Then get out of bed,' Stan said.
> Stan and Steve handled me as they would a truculent child at summer camp, threatening, pushing, and goading me into one frightening situation after another.  Stan finally went to Marilyn and said he and Steve needed help.
>         . . .
> [Rocky was hired.]  Rocky was put on salary at $40,000 a year and later raised to $50,000.  Clearly, Marilyn liked his qualifications.
> My life became hell under these three hypermacho watchdogs.

Book at 246-47; Complaint ¶ 30.

43

> For the most part, Stan and Rocky intimidated me.  They towered over me.  Chided me for being overweight.  Both screamed at me, 'You goddam fat, lazy fucking rock star!  You chickenshit!  When are you going to straighten the fuck up and get your shit together?  You fucking pussy!'
>
> Against my wishes the Beach Boys ordered them to drag me on several tour dates early that summer.  Every afternoon my bodyguard took me to a local YMCA to play basketball. . . .
>
> . . .
> In the elevator, Stan pushed me into a corner.  He clenched his fist and pushed it into my chest.
> 'You fucking rock star,' he growled.  'You goddamn, fucking obese rock star.  You fucking disgust the shit out of me.'
>
> As he chided me, Stan pounded his fist into my chest. . . .
>
> In a state of regression and constant fear, I obeyed like an abused dog.

Book at 247-48; Complaint ¶ 30.

The first passage is not of and concerning the Beach Boys or Carl.  It does not mention either by name; Stan and Steve are Mike Love's brothers and neither has ever been a member of the Beach Boys (Steve Love served only briefly as The Beach Boys' manager in the 1970s).  See Dep. Tr. 386, 750-52.

Both passages are nevertheless substantially true, as is any inference that the Beach Boys allowed Brian to be abused.  Carl testified that Stan Love and Rocky Pamplin "accompanied Brian for a time at, I think at different times," and that both individuals had exhibited violent behavior, of which Carl was aware.  Dep. Tr. 388, 685-87.  Indeed, Mr. Wilson admitted that Rocky had "slugged [Carl] and knocked [him] out," and that both Rocky and Stan had assaulted Carl's and Brian's brother, Dennis.  See id. 686-87.  Mr. Wilson

44

further testified that he was aware that Brian felt intimidated or belittled by Stan and Rocky, and that he (Carl) was engaged in periods of heavy drinking during the time in which Stan and Rocky were serving as Brian's bodyguards.  Id. 689-690.

The objective evidence of Stan's and Rocky's behavior -- beating up Carl and Dennis on different occasions -- is consistent with the portrayal of them in this passage.  With respect to the Beach Boys, Carl's testimony establishes that he knew that Rocky and Stan were violent individuals, and that, in spite of such knowledge, neither Carl nor the group opposed their accompanying of Brian.  Thus, any perception on the part of Brian that the Beach Boys had "allowed" Stan and Rocky to "intimidate" him is thus grounded in the truth.

5.   The Remaining Passage is Not Defamatory

Finally, Mr. Wilson challenges the following passage:

> My band mates were not bothered because I hung around with strange people, took drugs, behaved in ways that defied convention, and had a marriage that was truly weird.  Their problem was accepting what I was doing to the Beach Boys' music.  They were afraid I was fucking up the formula that had made all of them wealthy and famous, and that wasn't kosher.

Book at 148.  Mr. Wilson fails to identify how this passage defames him or the Beach Boys.  Nor could he do so, as this passage is clearly not susceptible of any defamatory meaning and is simply Brian's subjective point of view about the Beach Boys' reaction to Brian's new style of music.  Accordingly, this passage is not actionable.

45

## CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of HarperCollins as to the Second and Third Claims for Relief.

WHEREFORE, HarperCollins prays for judgment dismissing the Second and Third Claims for Relief and for the award of its costs and expenses, and such other relief as the Court deems just and appropriate.

Dated:  January 31, 1997

WEIL, GOTSHAL & MANGES LLP
R. Bruce Rich
Elizabeth Stotland Weiswasser

767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000

By _R. Bruce Rich_
    R. Bruce Rich

- and -

RODEY, DICKASON, SLOAN,
AKIN & ROBB, P.A.
William S. Dixon

Post Office Box 1888
Albuquerque, New Mexico 87103
Telephone: (505-765-5900)

Attorneys for Defendant,
HarperCollins Publishers Inc.

46

I hereby certify that a copy of the foregoing was sent via federal express to Ernesto J. Romero and to Beth F. Dumas this 21st day of ~~January~~, 1997 at the following addresses:

Ernesto J. Romero
3602 Campus Boulevard, NE
Albuquerque, New Mexico 87106

Beth F. Dumas
Langberg Cohn & Drooz
1210 Wilshire Boulevard
Suite 1650
Los Angeles, California 90025

By_____

Elizabeth Stotland Weiswasser

47