ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

97 APR 21 AM 11:39
CLERK-ALBUQUERQUE

CARL WILSON, an individual, and AUDREE WILSON, an individual,

Plaintiffs,

v.

HARPERCOLLINS PUBLISHERS, INC., a Delaware corporation,

Defendant.

Case No. CIV 94 892 JC

**PLAINTIFF CARL WILSON'S MEMORANDUM OF LAW IN RESPONSE TO HARPERCOLLINS' MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

wil3\010\pleading

165

## I. PRELIMINARY STATEMENT

HarperCollins's Motion for Summary Judgment is based on a rejected doctrine of "libel-proof" plaintiff and a distorted application of the doctrine of "substantial truth." Nowhere are HarperCollins' distortions more apparent than in the arguments about Carl Wilson's use of drugs and the statements concerning Carl Wilson's actions with respect to his brother, Brian.

Carl Wilson, as a musician in the '60's and '70's, having fallen prey to drugs, has reformed his life and for years has not used drugs. Is Carl Wilson now condemned to suffer the lies printed by HarperCollins without redress? HarperCollins argues yes, invoking in substance (although not by name) the "libel proof" plaintiff doctrine which the United States Supreme Court and the Ninth Circuit have squarely rejected under both First Amendment considerations and state law (California). Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 523 (1991), *on remand*, Masson v. New Yorker, 960 F.2d 896, 898-899 (9th Cir. 1991).

Carl Wilson has also spent considerable effort and substantial money over the years in trying to help his brother, Brian. HarperCollins now accuses Carl of providing his troubled brother, Brian, with heroin. HarperCollins bases its accusations on a misleading transcript of what may well be a doctored tape recording.

Using this questionable evidence, HarperCollins asserts the "substantial truth" doctrine, but HarperCollins incorrectly explains and misapplies the doctrine. Despite HarperCollins

unfounded assertions of "substantial truth," Plaintiff has made out a *prima facie* case of falsity and HarperCollins has not established its truth defense.

## II.   DISCUSSION OF APPLICABLE LAW

### A.   The Substantial Truth Doctrine

HarperCollins is correct that a public figure plaintiff such as Carl Wilson has the burden of proving falsity, as a prima facie element of his claim.  Philadelphia Newspapers v. Hepps, 475 U.S. 767 (1986).  HarperCollins is also correct that the common law doctrine of substantial truth applies, such that "minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting of the libellous charge be justified.'"  Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 517 (1991).  However, this is only a partial explanation.  As the United States Supreme Court went on to explain in Masson, under the substantial truth doctrine, which is a creature of common law, the "statement is not considered false unless it 'would have a different effect on the mind of the average reader' from that which the pleaded truth would have produced."  Masson, 501 U.S. at 517.  The fact that burden of proving falsity is upon Plaintiff as public figure does not change this:

> "The essence of that inquiry remains the same whether the burden rests upon plaintiff or defendant."

Masson, 501 U.S. at 517.

In other words, when the published statements convey meaning to the reader different than the gist of the actual truth, then

those statements are not substantially true. For example, in Kurz v. Evening News Assn., 453 N.W. 2d 309 (Mich. Ct. App. 1990), the article truthfully reported the fact of the plaintiff's arrest on charges of assaulting a police officer with a shotgun, but according to the plaintiff's allegations, falsely stated that the plaintiff had threatened to kill someone and fire a shot. The trial court granted summary judgment in favor of the defendant newspaper, and the Court of Appeal reversed, because there was a factual dispute as to whether the plaintiff had ever threatened to kill anyone or in fact had fired his weapon:

> Given the tenor of the entire article, we cannot say as a matter of law that this possible inaccuracy constitutes an 'inaccuracy that does not alter the complexion of the affair and would have no different effect on the reader than that which the literal truth would produce.'

Kurz, 453 N.W. 2d at 310.

In this case, the substantial truth doctrine provides no shelter to Defendant -- the claims of falsity are not based on "insignificant inaccuracies of expression." N.M. U.J.I. 13-1006 (defining falsity: "One or more statements of fact in the communication must be false in a material way. Insignificant inaccuracies of expression are not sufficient.") For example, with regard to the alleged defamatory passage regarding the providing of heroin to Brian Wilson, the fact that Carl Wilson may have, during that period, himself used some kind of drugs, does not preclude the falsity of the charge that he supplied his brother, Brian, with heroin. It cannot be said, as a matter of

law, that the false charge of supplying Brian with heroin has no different effect on the mind of the average reader than the truth of the fact that Carl may have used some kind of drugs during that period of time.  The law recognizes that a communication can have multiple defamatory meanings.  *See* N.M.U.J.I. ("Falsity: Defined.  To support a claim for defamation the communication must be false.  <u>One or more</u> statements of fact in the communication must be false in a material way.  Insignificant inaccuracies of expression are not sufficient.")

Turning to the effect upon the reader, the question is:  Can a man's reputation be affected by a charge that he supplied his unstable brother with heroin?  Plaintiff submits that the question is easily answered with a resounding, "yes."  A man's reputation is adversely affected by allegations that he criminally provided heroin to his suffering brother, as opposed to protecting his brother from harm.  Turning to the other defamatory passages, would the reader have a different impression of a man who looks out for his brother as opposed who one who takes advantage of him; one who pushes his brother to write songs and produce albums although his brother is mentally and physically ill; a man who protests his brother's use of the recording studio in therapy treatment because the group is supposedly missing out on studio rental income; one who tricks his brother into signing a trust agreement controlling all of his money?  The defamatory passages clearly present a picture of Carl Wilson as a man who provided his brother with heroin and who was

callous and uncaring in relation to his brother's physical and mental suffering. In fact, just the opposite is true. Carl Wilson did not provide his brother with heroin, he flushed it down the toilet so his brother would not get it. Carl Wilson was not callous towards his brother's suffering, but instead spent substantial amounts of time and money in an effort to help his brother and get him the care he needed.

The substantial truth doctrine works both ways. Certainly it protects the defendant who gets minor details wrong, but is correct as to the gist of the statements. However, the rule also allows for the imposition of liability where the publication selectively reports some details, some of which may be correct, but reports them in a manner which nonetheless communicates a defamatory gist, either by the juxtaposition of the facts or by omitting materials facts, or both. "[T]he language said to be libellous is to be given its plain and natural meaning and to be viewed by the court as people reading it would ordinarily understand and give it meaning." Reed v. Melnick, 81 N.M. 608, 610 (1970), citing with approval Justice Traynor's decision in the oft-cited California Supreme Court case MacLeod v. Tribune Publishing Co., 52 Cal. 2d 536 (1959), relating to protected opinion in Marchiondo v. Brown, 98 N.M. 394, 404 (1982). The law also allows a libel action where "the defamatory meaning is clear from the explanatory circumstances in the remainder of the book. *See* Marchiondo v. New Mexico State Tribune Co., 98 N.M. 282, 287 (Ct. App. 1981)." Judge Conway's Letter Opinion dated July 14,

1995 denying HarperCollins' initial Motion to Dismiss (which was converted into a motion for summary judgment).

The issue of defamation arising from the omission of material facts is in accord with New Mexico libel rules and has been expressly considered and approved in other jurisdictions. As the court's holding in Memphis Publishing Co. v. Nichols, 569 S.W. 2d 412 (Tenn. 1978) illustrates, the test for defamation by material omission incorporates the thrust of the substantial truth inquiry - the disparity in the effect upon the reader of a truthful account as compared to the published account:

> "In our opinion, the defendant's reliance upon the [literal] truth of the facts stated in the article in question [--that the shooting occurred at Plaintiff's home when the shooter's husband was with Plaintiff--] is misplaced. The proper questions is whether the meaning reasonably conveyed by the published words is defamatory, 'whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced.' Fleckenstein v. Friedman, 266 N.Y. 19, 23, 193 N.E. 538, 539 (1934). *See* Lawlor v. Gallagher Presidents Report, Inc. 394 F. Supp. 721 (S.D.N.Y. 1975). **The publication of the complete facts** [-- that neighbors were present at Plaintiff's house when the shooting occurred--] **could not conceivably have led the reader to conclude that Mrs. Nichols and Mr. Newton had an adulterous relationship. The published statement, therefore, so distorted the truth as to make the entire article false and defamatory."**

Memphis Publishing Co., 569 S.W.2d at 420 (emphasis added). The fact that in Memphis v. Nichols the burden of proving falsity was entirely on the defendant (in that falsity was presumed and truth was a defense, as still is the case in private figure cases where the defamation is not a matter of public concern, under Dun & Bradstreet, *infra*), is not a decisive difference. As already

noted, the shifting of the burden of proof of falsity in cases involving public figures against media defendants, does not affect the significance which implications and material omissions of fact have in creating actionable defamation. *See*, Masson, 501 U.S. at 517 (explaining that the essence of the "substantial truth" inquiry "remains the same whether the burden rests upon the plaintiff or defendant"). Also instructive is the recent decision of the Mississippi Supreme Court in McCullough v. Cook, 679 So.2d 627 (1996), which reversed the trial court's grant of summary judgment in favor of the defendant on the issue of truth/falsity:

> This is a situation where certain material facts were omitted and that omission made the statement defamatory or at least rose to the level where reasonable minds could differ. More importantly, the omitted facts were the truth. The trial court erred on this issue.

Id. at 633.

*See also*, Golden Bear Distributing v. Chase Revel, 708 F.2d 944 (5th Cir. 1983). There, the Court rejected the defendant's argument that the statements sued upon were not actionable defamation; the court found that the juxtaposition of truthful statements about the Plaintiff's activities, with truthful statements about another's fraudulent activities, allowed "an ordinary reader to infer" that the plaintiff had engaged in illegal action too. With respect to the defendant's assertion of truth as a defense, the Court held:

> 'Although the truth of an alleged libel may be proven as a complete defense, it is not a defense to show that a statement contained in a publication, if taken alone,

> is literally true, when other facts are omitted which plainly refute the false impression of the partial statement. A statement is not true or even substantially true if, by implication, an entirely untrue impression is made by omission of part of the facts.' [Express Publishing Co. v. Gonzalez, 350 S.W. 2d 589, 592 (Tex. Civ. App. 1961)]. We hold that the assertion of truth as a defense here must fail.

Golden Bear, 708 F.2d at 949 (emphasis added).

Also instructive is the Ninth Circuit's decision in Church of Scientology v. Flynn, 744 F.2d 694, 695 (9th Cir. 1984):

> Although Flynn did not specifically accuse CSC of attempting to cause his death, it would be reasonable to imply a defamatory meaning from his remarks. It is well settled that the "arrangements and phrasing of apparently nonlibellous statements" cannot hide the existence of a defamatory meaning. Kapellas v. Kofman, [1 Cal. 3d 20, 33, 459 P.2d 912, 919-920 (1969)]. Indeed, the meaning of a statement is often dependent upon its context.

744 F.2d at 696.

Although HarperCollins' motion does not set forth these principles, the motion attempts to dissuade the Court from applying them with the argument that "'defamation by implication' claims are disfavored by New Mexico Courts and elsewhere in view of the serious First Amendment concerns in holding defendants liable for statements they did not make. See HarperCollins' FN11. Indeed, a growing number of jurisdictions have adopted a per se rule that there can be no defamation by implication." HarperCollins' Memorandum of Law, p. 26. These assertions deserve scrutiny. A fair examination of the cases shows that there is no legal bar against the type of claims asserted here.

The New Mexico case which Harpercollins' cites, Andrews v. Stallings, 119 N.M. 478, 486 (Ct. App. 1995), disapproves of such a claim against public officials on matters of public concern. The cases HarperCollins cites from other jurisdictions where the Courts have rejected defamation by implication (*see* HarperCollins FN 12), also rejected such claims for public officials. In Diesen v. Hessberg, 455 N.W. 2d 446 (Minn. 1990), *cert. denied*, 498 U.S. 1119 (1991), which itself cites the cases HarperCollins cites, the court explained why a special rule for public officials exists:

> Other jurisdictions have also specifically declined to allow a public official to prove falsity by implication where the [exact] challenged statements are true. See, e.g. Cibenko v. Worth Publishers, Inc., 510 F. Supp. 761, 765 (D.N.J. 1981); Pietrafeso v. D.P.I., Inc., 757 P.2d 1113, 1115-1116 (Colo. Ct. App. 1988): Strada [v. Connecticut Newspapers, Inc.,] 193 Conn. [313] at 326, 477 A.2d [1005] at 1012 [(Conn. 1984)]; Schaefer v. Lynch, 406 So.2d 185, 188 (La. 1981). We concur, believing the subject articles fall within the protected purview as described by the Janklow court: Speech about government and its officials, about how well or badly they carry out their duties, lies at the very heart of the First Amendment * * *. It is vital to our form of government that press and citizens alike be free to discuss and, if they see fit, impugn the motives of public officials. [Janklow,] 788 F.2d at 1304-1305 (citations and footnotes omitted).

Diesen, 455 N.W. 2d at 451 (emphasis added).[1]

---

[1] It is also noteworthy that in Diesden, the Minnesota Supreme court did not overrule the holding of Phipps v. Clark Oil & Refining Corp., 396 N.W.2d 588 (Minn. Ct. App. 1986): "Truth is a defense to defamation only when the underlying implication of the statement is true, not merely when the statement is verbally accurate." Phipps, 396 N.W.2d at 594.

As to cases involving public figures and private figures (as opposed to public officials), the special concern to which HarperCollins alludes -- quoting Chapin v. Knight-Ridder, 993 F.2d 1087, 1092-93 (4th Cir. 1993) as to the need for an "especially rigorous showing where the expressed facts are literally true" -- does not present a bar here. As the Chapin court went on to explain, the "rigorous showing" means simply that "[t]he language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends to endorse the inference," which is a standard easily met in this case. Chapin, 993 at 1093 (citing White v. Fraternal Order of Police, 909 F.2d 512, 520 (D.C. Cir. 1990)). Sassone v. Elder, 626 So. 2d 345, 354 (La. 1993), also cited by HarperCollins, expresses concern about a publication giving rise to an infinite number of interpretations, which is not an issue here.

This Court should resist what, in reality, is HarperCollins' invitation to eliminate the New Mexico libel *per quod* rule as to all but private figure plaintiffs. HarperCollins opposes the same libel *per quod* rule which this Court endorsed and applied in denying HarperCollins' initial motion to dismiss the second cause of action (which motion was converted into a motion for summary judgment). Libel *per quod* consists of written expressions which although not actionable on their face are either (1) susceptible of two reasonable interpretations, one of which is defamatory, and one of which is innocent, or (2) statements which are not on

their face actionable defamatory statements, but become so when considered in connection with innuendo and explanatory circumstances. Marchiondo v. N.M. State Tribune Co., 98 N.M. 282 (Ct. App. 1981). The law of Colorado, the residence of Carl Wilson, is in accord. Sunward Corp. v. Dun & Bradstreet, Inc., 811 F.2d 511, 517 n. 3 (10th Cir. 1987) (applying Colorado law); Keohane v. Stewart, 882 P.2d 1293 (Colo. 1994), *cert. denied,* 130 L. Ed. 2d 882 (1995).

Justice is not served by a rule that is oblivious to truth. In this case the defamatory implication is clearly suggested to the ordinary reader, in the passages concerning Carl Wilson's actions vis-a-vis the Brian Wilson 1982 Trust, the passages portraying Carl Wilson as a callous brother who made statements in opposition to Brian's need for treatment and rest, and the passages portraying Carl Wilson as the brother who exploited Brian as a pop music "hit machine" for the Beach Boys.

HarperCollins' has presented no evidence in the form of declarations with respect to the falsity of any passage (other than the passage suggesting that Carl Wilson supplied heroin to his brother). A fair reading of the Carl Wilson deposition testimony cited by HarperCollins not only fails to make out a case for truth, but in some instances, demonstrates that HarperCollins has taken a large degree of leeway in presenting the testimony out of context or by turning a blind eye to testimony that clearly shows falsity. This is especially true

concerning the passages reporting Carl Wilson's statements to Eugene Landy about the cost of engaging him to treat Brian.

## III. PLAINTIFF'S RESPONSE AS TO EACH PASSAGE

Although HarperCollins purports to discuss why each defamatory passage is not actionable defamation, there are three substantive defects in HarperCollins' arguments. First, when arguing for dismissal on truth and falsity grounds -- which Harpercollins argues for with respect to some, but not all, of the passages -- the motion selectively addresses the defamatory factual assertions in each passage. By selectively choosing amongst the gists or stings of the defamatory passages, HarperCollins fails to dispute the falsity of matters whose truth would produce a different effect upon the reader. As demonstrated above, that is a central inquiry of the substantial truth doctrine which HarperCollins misapplies.

Second, the motion argues that passages from the third cause of action for libel are not actionable because they discuss the conduct of various members of the Beach Boys, but the motion turns a blind eye to the many ways that the passages also refer to Carl Wilson. Thus, HarperCollins' arguments that the passages from the third cause of action fail to satisfy the "of and concerning" element, are fatally defective.

Third, HarperCollins' argument that some of the passages constitute protected opinion, suffers from the same misapplication of law that characterized HarperCollins' initial

assertion of the fact/opinion argument in its motion to dismiss the second cause of action (which the Court converted into a motion for summary judgment and denied). HarperCollins' opinion argument fails because the passages contain factual assertions as to what Carl Wilson said and did. The passages are provably false statements of fact by virtue of Plaintiffs' allegation that he did not make the statements asserted, or, in the case of the passages concerning the Brian Wilson Trust of 1982, by proof of the material facts omitted from the text. (The Book completely omits the role of Brian Wilson's lawyer, John Branca, in suggesting, setting up and administering what was a revocable trust. The result of these egregious omissions is that Carl is presented as the overreaching brother who used trickery to obtain Brian's money. These defamatory passages are presented to the Court and examined in more detail below.)

**A. <u>The First Passage From The Second Cause Of Action (p. 98 of the Book)</u>**

The first passage sued on in the Second Cause of Action purports to accurately describe a brawl. The passage falsely communicates to the reader that Carl Wilson was involved in the brawl and exchanged punches, when in truth and in fact Plaintiff did not engage in any physical violence, either punches or otherwise. (Carl Wilson Depo. p. 539-541, lns. 13-9; Declaration of Carl Wilson, ¶ 4 attached as Exhibit 3 hereto).

The passage quoted in the Second Amended Complaint is as follows:

> "One night, Dennis, Carl, and I were drunkenly walking through the red light district in Amsterdam, heading for a restaurant while Dennis tried talking me into sampling one of the local girls. ...the piano bench was knocked over, punches were exchanged and before I knew it Carl and Dennis were dragging me out the front door and hustling me back to the hotel."

[Book, p. 98; Second Amended Complaint ¶ 19, p. 7, attached as Exhibit 1 hereto.] Defendant's truth/falsity argument focuses solely on whether Carl Wilson drank alcohol at that period of time-- which Plaintiff does not dispute -- and completely fails to address the alleged false allegation that Carl Wilson was involved in a brawl. Thus, summary judgment is properly denied as to this passage.

**B. <u>The Second Passage Plaintiff Sued Upon, From p. 98 of the Book</u>**

The next passage sued upon falsely portrays Carl Wilson as admitting his involvement in the supply of the highly addictive and dangerous drug of heroin to his already troubled brother, Brian Wilson (who is represented to readers as the author of the Book):

> "Dennis smuggled Heroin into New Zealand...Carl, trying to calm the turbulence by admitting his involvement in the purchase of the heroin, ended up getting punched in the face by Rocky."

[Book, p. 252; Second Amended Complaint ¶ 19, p. 7, attached hereto as Exhibit 1.] This passage falsely accuses Carl Wilson of knowingly providing his already troubled brother, Brian Wilson, with heroin. There is nothing relating to substantial truth in this passage. Carl Wilson not only did not provide his

brother with heroin, but intercepted the heroin that was intended for his brother and flushed it down the toilet. Carl Wilson Decl. ¶ 3, attached as Exhibit 3.

Harpercollins' effort to invoke the substantial truth doctrine fails because the evidence of truth HarperCollins presents (an asserted tape recording of an interview Carl Wilson gave Australian reporter Anthony O'Grady in 1978), does not establish the truth of that defamatory sting. While the transcript prepared by Harpercollins quotes Carl Wilson in a manner that suggests he bought heroin, the transcript goes on to also quote Plaintiff as stating that he flushed the heroin he got down the toilet, and that he was falsely accused at the meeting of being involved in the supply of heroin to Brian. (HarperCollins' Exhibits E & F).[2] Although Plaintiff has, for many years, lead an exemplary life and looks back on that period of his life with regret, he did not supply his brother with heroin. Plaintiff apologizes to the Court for the profanity set

---

[2] On the transcript Plaintiff is quoted as stating: "So the deal was I got totally framed and there was a whole thing where . . . I said I had nothing to explain or defend because I didn't do anything with anyone and. . . I had it in my pocket. . . I took it up the stairs, in the elevator and I flushed it down the toilet. But I got attacked just the same, ya know. So ah, as you can imagine. . . anyway. . . you'll write it anyway won't you. . .Ha ha. O'Grady [the interview]: If I can decipher it."

The ellipses are in the original, and indicate undecipherable speech, as confirmed by O'Grady's sworn statement that the transcript "accurately transcribes the conversation between Mr. Wilson and me, including the statement, questions, and answers made by each of us, and as confirmed by tape analysis expert Norman Perle (Perle Decl. attached hereto as Exhibit 4 and discussed *infra*).

forth in this brief in order to show that HarperCollins'
substantial truth argument fails.

Moreover, there is a disputed fact issue as to even buying
heroin.  Carl Wilson's testimony at deposition is that he did not
buy that heroin, but that it was handed to him in an envelope
which he suspected was heroin and that he flushed it down the
toilet.  [Carl Wilson Depo., p. 455, lns. 17-19; confirmed in the
Declaration of Carl Wilson, ¶ 3].  The transcript HarperCollins
prepared and represents to be a complete account, shows ellipses
around the "buy" language, indicating undecipherable text, and
the tape is difficult to understand.  Moreover, an expert on
matters of recorded evidence, who analyzed the tape copy served
on Plaintiffs concludes that the tape copy "exhibits significant
and multiple suspicious areas" and "was likely an edited version
of some events."  [Declaration of Norman I. Perle, p. 3, lines
18-21, attached as Exhibit 4 hereto.]  The expert's analysis,
which included a "computer waveform analysis, spectrographic
chart analysis, FFT spectrum frequency analysis and a critical
aural review of the audio" (p. 3, lines 10-1, see also p. 4, line
19-22), further found that "because of the type and quantity of
signs suggestive of falsification, the context of the words as
heard, are likely not [to] be the way they were spoken." [p. 4,
lines 4-6, emphasis added].

Summary judgment as to what HarperCollins refers to as the
heroin passage should be denied.

C. **The Third Passage At Issue, From pp. 273-275 of the Book**

These statements purport to accurately describe the engagement of Landy to once again treat Brian Wilson. The statements falsely ascribe statements to Carl Wilson in a meeting with Landy to the effect that Carl was concerned with the cost of the treatment, and not his brother Brian's health. Plaintiff unequivocally denies having made these statements:

> "Within a week, Carl was in Dr. Landy's office, asking how much the treatment would cost. ...Dr. Landy explained himself clearly, knowing Carl was going to take the information he got from the meeting and tell Marilyn, who helped him through the dissolution of his marriage and now was providing him comfort in dealing with me. ...Carl never liked Dr. Landy's bluntness and was scared of him...Carl and Al complained Dr. Landy's fees were outrageous...[and at a subsequent meeting] predictably, the first thing they wanted to discuss wasn't my health, it was Dr. Landy's fee."

[Book, pp. 273-275; Second Amended Complaint ¶ 19, p. 8, attached hereto as Exhibit 1.] Carl Wilson's deposition testimony on the subject is that a meeting did occur between himself, Jerry Schilling [Carl Wilson's manager at the time] and Landy; that the meeting occurred after Landy sent a letter suggesting that he treat Brian again (and that at the meeting Landy told him that his fees had gone up and that it would take 12 to 16 months, and 800-900 thousand dollars would be the cost of treatment. HarperCollins asserts that the sued upon passages are true by selectively quoting Carl Wilson's testimony on his thoughts as to fees, focusing on his testimony that he thought Landy was overpriced, given his level of training as a psychologist, while

completely ignoring his testimony that money was not a concern because Carl's concern for Brian's health was paramount:

> "I knew that he was overpriced at the first level of training as a psychologist, and yet I thought Brian was worth way more than any cost of any program. Money was not a concern."

[Carl Wilson depo., p. 731, lns. 11-14, attached hereto as Exhibit 2].

*See also,* his testimony:

> Q: Did you find, putting expenses to one side, did you find Dr. Landy's fees within reason?
> A: My understanding was that it was going to be, when they - yes. My understanding was that his fees would be $800,000.
> Q: For what period of time?
> A: For twelve months. Eight to nine hundred thousand dollars, 12 to 18 months.
> Q And you found that fee to be reasonable?
> A: I didn't really -- I don't know, I thought that's just what the fee was going to be.
> Q: Did you express to anyone at the time you learned what the fee would be whether you thought it was low, high, just right, or something else?
> A: I thought it was worth saving Brian's life, I wasn't concerned about the. Brian could well afford it.
> Q: Had you ever experienced medical or other counseling fees in a range of that magnitude personally?
> A: No.
> Q: Anyone else in your family?
> A: No.
> Q: Were you in any way shocked by those fees?
> A: No. Mark [Meador] told Jerry Schilling that Gene's fees had gone up. He called it the time of Jerry's and I first meeting and it was said, "You know, his fees have gone up to six dollars a minute.
> Q: And your reaction was, just fine with me?
> A: There wasn't anything to react to. It was just, we were desperate to save Brian's life.

[Carl Wilson Depo., pp. 659-660, lns. 6-17, attached hereto as Exhibit 2].

This evidence unequivocally refutes the text's assertion that Carl Wilson made statements protesting the cost of treatment and being concerned with the cost over and above what Plaintiff submits the jury will agree should have been concern for his brother's life. The passage sued on makes factual allegations; either the meeting occurred as it was described, or it didn't; either Carl Wilson made those statements of protest, or he didn't. Plaintiff is not suing upon a statement in the Book which just generally asserts that he is callous; he is suing on a passage that quotes him as making statements he did not make. Nor does the claim of falsity rest upon minor inaccuracies in the reported statements. HarperCollins' effort to invoke the substantial truth doctrine and its opinion arguments fail. Summary judgment should be denied as to these statements.

**D. The Fourth Passage At Issue, From pp. 311-312 of the Book, Regarding Dennis Wilson**

The next passage set forth in the second cause of action purports to describe Carl's actions vis-a-vis what is presented as an accurate account of the circumstances leading up to and surrounding the death by drowning of Carl Wilson's other brother, Dennis Wilson. Here again, the reader is falsely advised that Carl Wilson made statements protesting the cost of treatment, this time for his brother Dennis. The passage advises the reader that Dennis could have gone into treatment with Dr. Landy, and thereby avoided his death by drowning, if only Carl had not been

preoccupied with fees and more concerned about taking a Christmas vacation:

> "...several weeks before Christmas 1983, Carl and his manager, Jerry Schilling, approached Dr. Landy about treating Dennis." ..."the next day Schilling called Landy and told him Carl needed longer to make up his mind. The price was steep, too steep, he thought for the Beach Boys to carry. Beyond that, Carl didn't want to upset his family's holiday plans by having, as Dr. Landy suggested, an intervention in Lake Arrowhead. Carl suggested talking after the holidays. ...Carl was adamant, though; he didn't want to deal with the problem until after the new year."

[Book, pp.311-312; Second Amended Complaint ¶ 19, pp.8-9, attached hereto as Exhibit 1].

HarperCollins comes forward with no evidence to assert the truthfulness this passage; indeed, the passage is not addressed at all in the motion (although HarperCollins addresses a different and later passage that solely concerns Dennis' funeral). In his declaration Carl Wilson attests that he did not make statements protesting the cost of the treatment, of complaining about interference with his holiday plans. Decl. of Carl Wilson ¶ 6, attached as Exhibit 3. Accordingly, Plaintiff's allegation of the falsity prevails, and summary judgment should be denied.

**E. <u>The Fifth Passage At Issue, From p. 314 the Book, Regarding Dennis Wilson's Funeral and John Roger</u>**

The passage concerning Dennis Wilson's death which HarperCollins does address, asserts, with regard to the funeral arrangements:

> "Carl didn't know what to do. Before making any decisions, he insisted on consulting with John Roger, a cult leader Carl referred to as his spiritual master."

Book p. 314.

Carl Wilson's deposition testimony is as follows:

> Q: Is it not true that you were indecisive about the method for burying Dennis?
> A: I was not at all.
> Q: What was your wish?
> A: My wish was that Dennis' wishes be carried out.
> Q: And did you in or about this time period consult with John Roger in relation to any aspect of Dennis' death?
> A: Yeah. I called and had -- I called to ask if one of the ministers would officiate at the funeral, because nobody had any, there was nobody to do it, and this was all with Shawn's, this was - it was all Shawn's decision, she was Dennis' wife at the time of his death, and she was having a very difficult time.

[Carl Wilson deposition, p. 702, lns. 6-21, attached hereto as Exhibit 2].

HarperCollins' Motion ignores this testimony and, instead, focuses on Carl Wilson's answer to why he feels the false passage is defamatory (which, in legal terms, means why he thinks the passage has a tendency to expose a person to contempt, to harm the person's reputation, and to discourage others from associating or dealing with him. N.M.U.J.I. 13-1007. The deposition testimony of Carl Wilson clearly shows that the passage is false. HarperCollins, failing in their burden of going forward with the proof, presents no evidence of any kind whatsoever showing that this is a slight inaccuracy. Clearly,

the truth "would have a different effect on the mind of the average reader" from that which was asserted in this passage. Mason v. New Yorker Magazine, Inc., *supra*, 501 U.S. at 517. Summary judgment should be denied.

Another passage sued on in the Complaint also references John Roger [page 378 of the Book], and is discussed *infra*.

**F.   The Passages Regarding the Brian Wilson Trust of 1982: the Sixth, Seventh and Ninth Passages from pp. 332-33, and 268 of the Book**

These passages communicate to the reader the message that Carl Wilson engaged in overreaching with respect to his brother and tricked his brother into signing a trust agreement.   The passages accomplish this defamatory message not only by what is expressly stated, but by omitting material facts, namely, the fact that it was Brian Wilson's lawyer (John Branca) who suggested and set up the trust, explained it to Brian and administered it along with Carl.   [Carl Wilson Depo. pp. 646-648, lns. 13-7].   HarperCollins has produced the trust agreement and cleverly utilizes its terms to obscure the true issues concerning the defamatory nature of the passage in issue.   The defamatory passages are as follows:

> "In early 1986, Carl threw his weight into the war against Dr. Landy.  ...But the Beach Boys loathed the independence Dr. Landy was giving me.  They hated that I was beginning to be able to say no to them and act on my own thoughts.  They resented that I wrote songs, not with Dr. Landy, but without them.  ...the struggle escalated when Carl began withholding my paychecks and money.  That authority was his through the Brian Wilson trust of 1982, which he had me sign prior to Dr.

Landy's beginning treatment again." [Book p. 332; the sixth defamatory passage]

* * *

"In Carl's opinion, the trust was supposed to protect me from Dr. Landy, but as I got saner, I began questioning my brother. I couldn't remember signing the document in the first place. I was too incompetent at the time to know what I was signing." [Book p. 333; the seventh defamatory passage]

* * *

"As soon as the Beach Boys returned to LA, he [Carl] had me sign a trust document, giving him control of both my money and my vote in the Beach Boys' Corporation, Brother Records, Inc. I didn't know what I was signing though he assured me it was for my own protection. [Book, p. 268, the ninth defamatory passage]

[Second Amended Complaint ¶ 19, pp. 9-10]. These statements are an example of falsity by a combination of a positive misstatement of fact and the omission of fact. In truth and in fact, as Carl Wilson testified:

"...John Branca as Brian's lawyer advised that Brian form a trust to protect him from possible future misconduct at the hands of Eugene Landy. [Carl Wilson Depo., p. 653, lns. 9-11] . . . "It was anticipated that Brian would go back into the Landy treatment program, that was a possibility, and that is what motivated the trust, to my knowledge. I don't know what else John Branca was aware of, because he had been Brian's lawyer for years. I was just Brian's brother."

[Carl Wilson Depo. p. 653, lns. 15-20, attached hereto as Exhibit 2]. Carl Wilson further testified that Branca recommended the trust, and that Carl agreed to act as trustee, because there was a concern that Landy might engage in financial abuse (it should be remembered as portrayed in the book, that Landy's therapy was a 24-hour type of therapy where he exercised total control over his patient's day-to-day activities). [Carl Wilson Depo. pp.

654-655, lns. 15-9, attached hereto as Exhibit 2.]   Further,
Plaintiff testified that he was present when he, Brian Wilson and
John Branca signed the trust agreement, that John Branca read him
the trust. [Carl Wilson Depo. p. 666, lns. 13-20, attached hereto
as Exhibit 2].

Thus, in truth and in fact, Carl was <u>not</u> given sole control
and power over Brian's money, pursuant to a trust that Carl
explained to Brian.   Those are the false assertions created by
the material omissions and false implications in the Book which
make the reader believe that Carl took advantage of Brian with
respect to the trust.   HarperCollins' argument rests on a
material omission of true facts.   Under the principles of law
discussed in Section I, *supra*, "[t]he publication of the complete
facts. . . [disclosing Branca's involvement] would have produced
a different effect on the mind on the reader . . ."   <u>Memphis
Publishing Co. v. Nichols</u>., *supra*, 569 S.W.2d at 418.   "This is a
situation where certain material facts were omitted and that
omission made the statement defamatory or at least rose to the
level where reasonable minds could differ.   More importantly, the
omitted facts were the truth." <u>McCullough v. Cook</u>, *supra*, 679 So.
2d at 632 (Miss. Supr. Ct 1996).   *See also*, <u>Golden Bear
Distributing v. Chase Revel</u>, *supra*, 708 F.2d at 948 (5th cir.
1983) ("Although the truth of an alleged libel may be proven as a
complete defense, it is not a defense to show that a statement
contained in a publication, if taken alone, is literally true,
when other facts are omitted which plainly refute the false

impression of the partial statement. A statement is not true or even substantially true if, by implication, an entirely untrue impression is made by omission of part of the facts.'"); Church of Scientology v. Flynn, 744 F.2d at 695 (9th Cir. 1984)("Although Flynn did not specifically accuse CSC of attempting to cause his death, it would be reasonable to imply a defamatory meaning from his remarks. It is well settled that the "arrangements and phrasing of apparently nonlibellous statements" cannot hide the existence of a defamatory meaning. . . Indeed, the meaning of a statement is often dependent upon its context").

Summary judgment should be denied on the passages concerning the Brian Wilson Trust of 1982.

**G. The Eighth Passage At Issue, From Page 351 of the Book**

This passage falsely asserts that Carl Wilson pressed the Board of Medical Quality Assurance's charges against Eugene Landy. In truth and in fact, Carl Wilson had nothing to do with those charges; this is but another example of facts being twisted to make it seem as though Carl is endeavoring to use any means to prevent Brian from obtaining help:

> Filed by the Attorney General's office, the BQMA's charges originated with a Complaint filed by Carolyn Williams in 1984. They were then fueled by the journal Gary Usher compiled while we wrote songs together the previous year and pressed by Marilyn and Carl.

[Book, p.351, Second Amended Complaint, ¶ 19, p. 10, attached hereto as Exhibit 1].

Not only does the Book falsely state that Carl was pushing the BQMA charges [Plaintiff did not attempt to influence the

BQMA, Declaration of Carl Wilson, ¶ 8, attached hereto as Exhibit 3], but the Book omits the fact that the BQMA charges against Landy included serious allegations of psychologist misconduct that had absolutely nothing to do with Brian Wilson, but charged that Landy prescribed drugs to another patient without a license, used cocaine with another patient, had sexual relations with a patient, and committed gross negligence in the care of another patient. Accusation Before the Psychology Examining Committee, Board of Medical Quality Assurance Dept., State of California, First through Fourth Causes of Action, pp. 3-7 (attached as Exhibit 5). Those facts, if disclosed would have undermined the Book's statement that "the real reason for the BQMA charges had to do with Landy's unorthodox treatment of Brian," (Book, p. 351), which is presented to reflect negatively upon Carl Wilson. HarperCollins' opinion argument fails because the asserted opinion is based on disclosed facts which are false by way of material omission.

Summary judgment should be denied.

**H. <u>The Remaining Defamatory Passages from The Second Cause of Action, from pp. 371, 376, 378 and 387 of the Book</u>**

These passages present a false account of Carl Wilson's actions and conduct following the filing of the conservatorship action:

> For the first hour or so, Mike, Al, and Carl avoided me like the plague. ...then I decided <Unintelligible> action. I found Carl in his dressing room and asked if he wanted to talk about what was going on. "I can't, Brian," he said. "I've got to take care of some

> business I've got going in Colorado." ...it was clear they were shutting me out." (Book, p.371) "My brother Carl, on the other hand, stayed in his room and drank." (Book, p.376] "...I was performing on my own, making my own decisions, even venturing out to art museums and restaurants while Carl was holed up in his room, avoiding the outside world, still drinking heavily, blind to his own problems. ...but then Carl had trouble making even the simplest decisions. He had always needed to consult with numerous people -- his wife, lawyers, his spiritual master, John Rogers. [Book, p.378] "Carl never once tried to talk to me personally. He showed absolutely no sensitivity that I was being stripped of my dignity and rights as a human being."

[Book, p. 387; Second Amended Complaint ¶ 19, p. 10, attached hereto as Exhibit 1]. HarperCollins' argument respecting this passage is simply that Plaintiff's allegation in the Complaint that these passages present him as "callous" is not actionable because callousness is just a general term of personal perception. That is not the proper inquiry. The proper legal inquiry is whether the passages contain false assertions of fact about what Carl Wilson said and did. The only factual matter respecting the passages that HarperCollins addresses is the subject of drinking. HarperCollins points to Carl Wilson's general testimony that he, in the past, drank, but ignores the fact he had stopped abusing alcohol and drugs years before the time presented (the institution of the conservatorship). [Carl Wilson Decl. ¶ 2 attached hereto as Exhibit 3.] In fact, the truth is that Carl Wilson spent substantial effort and considerable money in attempting to free his brother, Brian, from the personal and financial domination and control of Eugene Landy by utilization of the California conservatorship law. The facts

in this passage were manipulated (most likely by Eugene Landy with the knowledge of HarperCollins) as part of Landy's effort to oppose the conservatorship action.

Summary judgment as to these passages should be denied.

## IV. THE THIRD CAUSE OF ACTION FOR LIBEL

The Third Cause of Action for Libel concerns passages that describe the actions of various members of the Beach Boys in a way that makes false, factual assertions about Plaintiff Carl Wilson's conduct. HarperCollins' attacks the claims by asserting that statements about other members of the Beach Boys are true. Of course, this argument is not relevant to establish truth or falsity of the statement as it pertains to Carl Wilson. HarperCollins' argument also fails to recognize the manner in which the passages are "of and concerning" Carl Wilson.

HarperCollins is correct in its contention that, to support a claim for defamation, the communication must be of and concerning the plaintiff. However, HarperCollins fails to present a full discussion of the law. The rule is that a "communication is concerning the plaintiff if the person to whom it was communicated reasonably understood that it was intended to refer to the plaintiff. The communication may be concerning the plaintiff even though it is equally applicable to other unnamed persons." N.M.U.J.I. 13-1005 ("concerning the plaintiff: Defined.") Further, the "communication may be concerning the plaintiff where it refers to a group if the circumstances

indicate that the communication was reasonably understood to refer to the plaintiff." N.M.U.J.I. 13-1005. These are the questions that are presented to the jury, when there is a genuine issue of fact as to whether a statement is of and concerning the plaintiff.

The case Poorbaugh v. Mullen, 99 N.M. 11, 20 (Ct. App.) *cert. denied*, 99 N.C. 47 (1982), cited in the committee comments for the jury instructions, supports Plaintiff's claim. There, the court stated the rule concerning group libel and, by analogy, applied it to permit a partner to sue for libel when the alleged defamation was directed to the partnership containing the name of the plaintiff in its partnership title. Also of relevance is the United States Supreme Court's approval, in Rosenblatt v. Baer, 383 U.S. 75, 83 (1966) of the principle: "[W]e do not mean to suggest that the fact that more than one person is libeled by a statement is a defense to suit by a member of the group." This point is cited in the Committee Note to N.M.U.J.I. 13-1005.

**A. The First Passage From the Third Cause of Action, From p. 148 of the Book**

This passage concerns Brian Wilson's "band mates" and, thus, is of and concerning Carl Wilson:

> "My band mates were not bothered because I hung around with strange people, took drugs, behaved in ways that defied convention, and had a marriage that was truly weird. Their problem was accepting what I was doing to the Beach Boys' music. They were afraid I was fucking up the formula that had made all of them wealthy and famous and that wasn't kosher."

[Book, p. 148; Second Amended Complaint ¶ 30, p. 15, attached

hereto as Exhibit 1]. This passage falsely asserts that Carl Wilson knew of and was not concerned with Brian's problems, but instead was only interested in the fact that Brian was not making "good music." In fact, Carl was not only concerned with his brother's problems, but was very supportive of Brian's music. HarperCollins does not assert that the passage is true, only that it is not susceptible of any defamatory meaning. However, Carl's testimony that he unequivocally expressed support for Brian's music shows that the statements are provably false. The point about Carl's expressed views on Brian's music is important because the passage refers to Brian's creation of the "Good Vibrations" song and other songs which hallmarked Brian's genius as a musician and greatly contributed to critical and commercial success. Given that Carl Wilson is a professional musician, the assertions made as to his views on Brian's music is a matter which would have a tendency to hurt his reputation, and also cause him distress.

Carl Wilson's deposition testimony in response to HarperCollins questioning is that he became aware of Brian's drug use after he took the drugs and that when he became aware he was concerned about it, and further, he unequivocally refutes the negative view of Brian's music attributed to him by HarperCollins:

> "Q: Do you recall approximately when Good Vibrations was written?
> A: Yes.
> Q: When was that?
> A: It was written over a period perhaps '65,

'66. In that, roughly in that period.

Q: Who wrote it?

A: Brian and Michael.

Q: Do you recall in that 1965 and 1966 period whether Brian was experimenting with drugs, using drugs?

A: Well, I am now, of course. I wasn't really aware of his drug taking. I was concerned about it though.

Q: You were concerned about it but you weren't aware of it? That's what I'm confused about in your last answer.

A: Well, I wasn't aware as he was doing it. I would hear about it later.

Q: But during that period of time, you became aware of it?

A: After.

Q: After any particular episode of use?

A: I couldn't have become aware of it before he did it. I became aware of it after.

Q: Well, my questions maybe wasn't precise enough. But you were aware during the 1965-66 period of Brian's use of drugs, not at that moment, necessarily he was using them, but of the fact that he was using them?

A: It would be more true to say that I had been made aware that he had taken LSD. I didn't - it wasn't like he was on it or taking it. He had taken it, I think a few times.

Q: Whether related to his drug usage or otherwise, did you observe during this period of time and for a period of time after that he was experimenting with new musical forms?

A: Yes.

Q: How in your own words would you describe what he was attempting to do with music during the period beginning the mid-60s say in the ensuing three or four years?

A: He was evolving musically to a very new place. It was quite incredible. It was not standard pop ditties or commercial songs, he had moved far beyond that, and it was thrilling. It was thrilling to be witness to, and a joy to be part of.

* * *

Q: Did you find all of it artistically incredible? Did you feel that perhaps as a necessary part of experimenting, some of it was better than others?

A: Well, he could do no wrong. It was just

absolutely magical flow of creativity and, it was just a real blessing to be a part of it, and I was very grateful, and it was very stimulating, exciting, and very enriching; very emotionally fulfilling, to see my brother, you know, have this great talent come present.

* * *

Q: Did you have a view separating your artistic reaction from its likely degree of commercial acceptance in the marketplace?

A: No, I didn't. I know that the book tries to paint a picture like we didn't like it. That is absolute crap. I was part of Brian's support system. It omits that we were extremely close and spent all of our time, nearly all of our time together when I was not away on tour.

Q: Was it your view that this music would likely be commercially successful?

A: I thought the music was so great that it could be incredibly successful and possibly change the world, change the musical landscape, the way people approach music, pop music.

[Carl Wilson deposition, pp. 741-745, lns. 15-7, attached as Exhibit 2].

The issue of Carl's attitude toward the music is a defamatory assertion of fact: either Carl expressed the type of effusive support he testified to in his deposition, or he didn't. HarperCollins has come forward with no evidence to refute Carl Wilson's testimony. Summary judgment on this passage should be denied.

### B. **The Second, Third, Fourth and Fifth Passages From the Third Cause of Action, from pp. 224-226, and 239-240**

These passages assert that several members of the Beach Boys' including Carl Wilson, were pressuring Landy to put Brian Wilson back to work writing and producing songs, and also that

Carl objected to the fact that Landy's therapy involved use of the studio with Brian (Carl's protest supposedly being that the studio could have been used instead to generate some rental income). The passages are as follows:

> "After roughly two months, Dr. Landy introduced the piano. <u>From the start of the treatment, the Beach Boys</u> had been pressuring him to get me to a point where I could write and produce again. That's all <u>they</u> wanted. But Dr. Landy resisted. Becoming a Beach Boy again, he explained repeatedly, wasn't a goal of therapy...[At the Beach Boy's own recording studio Dr. Landy] booked ninety minutes of piano time for me everyday...Dr. Landy made sure the studio was empty. Despite previous explanations, <u>the Beach Boys</u>, especially Mike, <u>made no secret that they were anxious to put me back to work writing songs.</u> But Dr. Landy kept them at bay." [Book, p.224] "Mike was the first to register a complaint [about the "therapy" piano sessions with Dr. Landy.] He said I was using the studio unproductively. <u>Carl agreed. He said the music we were making sounded crazy."</u> [Book, p.225] "Dr. Landy told the Beach Boys I wasn't ready to cope with the pressure of making an album. I was still too fragile. <u>They didn't see it that way and began complaining about the studio time he and I were using, time they could have been renting to other people.</u> 'You want Brian back?' Landy asked. 'Or do you want to make a couple hundred bucks a week? What's more important?' When <u>they</u> saw that Dr. Landy had begun recording our piano sessions, <u>they</u> asked for the masters. Dr. Landy refused to turn them over. They were part of my therapy, privileged...but that was only the beginning of war with the Beach Boys." [Book, pp. 224-226]

* * *

> "Steve Love was pushing everyone, especially me, to step up the pace on the next album...at the same time, Dr. Landy was trying to keep me within a therapeutic regimen rather than let the guys take over and put me to work full time. But there were priorities. Steve <u>and the others</u> wanted to get out of the Warner's contract while they still could capitalize on the success of *15 Big Ones* somewhere else. Steve wanted the new LP done no later than January 1, 1977. [Randy rejected that, stating that Brian needed a month's vacation at Christmas]..."that's ridiculous to take so

much time off work,] Steve said. Steve had his own agenda in mind, and Dr. Landy's struck him as unreasonable. Tempers flared. They called Dr. Landy a 'control freak.' Dr. Landy responded by telling the Beach Boys it was exactly this kind of attitude that caused me to break in the first place. ...'he's supposed to make records,' Steve said. 'What the hell are we paying you for?' 'To make him well,' Dr. Landy replied...'[h]e can only make records when he's well, something not one of you seems to understand."

[Book, p. 239-240; Second Amended Complaint ¶ 30, pp. 16-18, attached hereto as Exhibit 1.]

The underlined text clearly shows how the statements apply to Carl Wilson. HarperCollins' motion focuses on proving what Mike Love and Steve Love said and did with respect to Brian Wilson and his therapy; HarperCollins doesn't present any evidence refuting Carl Wilson's assertion that he did not object to the use of the studio and that he was not pressuring Brian to write songs. [Carl Wilson Declaration, ¶ 9, attached as Exhibit 3]. Not only was Carl Wilson not pressuring Brian, as he testified at his deposition, Carl "was suffering from back disease at that time," and "wasn't very involved," which is omitted entirely from the Book:

Q: What is your reaction to the accuracy of that statement [that the Beach Boys, especially Mike, were anxious to put Brian back to work] ?
A: It's like leave me out of it, because it's bull.
Q: What do you mean by leave me out of it?
A: That wasn't my view. I didn't want Brian to be a workhorse, ever.
Q: And where did you line up in relation to Mike Love on that at this time?
A: I wasn't part of it. Michael always wants to write with Brian. He always wants to work with Brian, or play, or whatever.
Q: Did you during - well, how much communication

were you having with Brian directly during this time period?
A: Not much. I was in bed with back, a serious back injury.
Q: And is it, therefore possible that Brian, perhaps mistakenly, perceived that whatever pressure he was receiving from Mike Love or anyone else might have reflected your own perspective as well as Mr. Love's?
A: No.
Q: Why?
A: Because. He knew, he knew better.
Q: How?
A: By knowing that I was, you know, for him, that I was, you know, behind him, supportive to him, not greedy. Never was.

[Carl Wilson deposition, pp. 754-756, lns. 14-19, attached hereto as Exhibit 2].

**C. <u>The Sixth Passage From The Third Cause of Action, From p. 243 of the Book</u>**

Plaintiff agrees that this passage does not expressly refer to him (Book, p.243) although he does not concede the passage's accuracy:

> "Later, Dr. Landy spoke with Steve, who came right out and said he was fired. 'You guys don't understand,' said Dr. Landy. 'If I'm not in the studio, you're not going to get anything out of Brian.'" 'Not true,' Steve countered. "Brian's going to work. He'll work. We're all working. The group's going to finish their album.'"

[Book, p.243; Second Amended Complaint ¶ 30, p. 18, attached hereto as Exhibit 1].

**D. <u>The Seventh Passage From The Third Cause of Action, From p. 373 of the Book</u>**

This passage states: "What could be better for me to be writing songs with Mike again? It had nearly killed me several times before." Plaintiff agrees that this passage does not

expressly refer to him, and withdraws his libel claim thereon.

**E. The Eighth and Ninth Passage From The Third Cause of Action, From pp. 232 and 239**

This eighth passage from p. 232 of the Book accuses Carl Wilson of joining in a "Brian's Back" publicity campaign, which the book falsely asserts was kept secret from Brian Wilson and Landy, thereby portraying Carl as a co-conspirator in what is portrayed as yet another effort to exploit Brian Wilson:

> "We were dumbfounded. Then angered. We'd been had. It turned out Mike had been working for months on this huge publicity campaign heralding my return. He'd written a terrible song, 'Brian's Back,' and sold Warner Brothers on a publicity campaign designed to exploit the fact that I'd produced the Beach Boys' latest album. No one had mentioned a word to me. Nor did Dr. Landy. Everyone knew except us. ...it wasn't enough for me to write and produce songs. Now they had to sell my illness publicly, too."

[Book, p. 232; Second Amended Complaint ¶ 30, p. 19, attached hereto as Exhibit 1].

The ninth passage at issue from page 239 of the Book also concerns this campaign:

> "I understood and agreed with the concept [referring to a Saturday Night Live sketch], which is more than I can say about the Brian is Back campaign."

[Book, p. 239.]

Carl Wilson's testimony is that it was Eugene Landy who proposed the Brian is Back campaign, and that the "Brian's Back song" was written by Mike Love after Landy came up with the campaign. Those facts "would have a different effect on the mind of the average reader," from the Book's passages, Mason v. New

Yorker Magazine, Inc., *supra*, 501 U.S. at 517, they tend to prove, as Carl testified, that he "...was not a part of any conspiracy to exploit his illness." [Carl Wilson depo., pp. 693-694, lns. 25-2, attached hereto as Exhibit 2.]

**F. The Final Passages From The Third Cause of Action, From pp. 246-247**

These passages describe physical abuse and intimidation of Brian Wilson, by persons who are portrayed as being hired by the Beach Boys and following the Beach Boys' orders:

> "One morning Stan and Steve, my tenders, appeared at my bedside. ...'Get out of bed!' Stan barked, yanking back the covers. The sudden movement scared me. I put my hands over my face. 'Don't hit me, I pleaded.' 'Then get out of bed,' Stan said. ...my life became hell under these three hyper macho watchdogs." [Book, p.246] "For the most part, Stan and Rocky intimidated me. They towered over me. Chided me for being overweight. Both screamed at me, 'You goddam fat, lazy, fucking rock star! You chicken shit! When are you going to straighten the fuck up and get your shit together? You fucking pussy!' <u>Against my wishes, the Beach Boys ordered them to drag me on several tour dates early that summer.</u> Every afternoon, my body guards took me to a local YMCA to play basketball. ...In the elevator, Stan pushed me into a corner. He clenched his fist and pushed it into my chest. 'You fucking rock star,' he growled. 'You goddam, fucking, obese rock star. You fucking disgust the shit out of me.' ...As he chided me, Stan pounded his fist into my chest. ...In a state of regression and constant fear, I obeyed like an abused dog."

[Book, p. 247; Second Amended Complaint, ¶ 30, p. 19, attached hereto as Exhibit 1 (emphasis added).] HarperCollins does not present any evidence showing the truth of statements, but argues only that the statements cannot be considered of and concerning Carl Wilson. However, that argument ignores the impression

created by the underlined text that Stan and Rocky were acting on the orders of the Beach Boys, which by definition includes Carl. That accusation is false. Plaintiff did not give them orders, and further he did not know about the physical abuse described in the passages. [Carl Wilson Decl. ¶ 7, attached hereto as Exhibit 3].

## V. CONCLUSION

For all of the foregoing reasons, Plaintiff Carl Wilson respectfully asserts that HarperCollins' motion for summary judgment should be denied.

DATED: March 19, 1997

Respectfully submitted,

LANGBERG, COHN & DROOZ

By: [signature]
Barry B. Langberg, Esq.

12100 Wilshire Boulevard
Suite 1650
Los Angeles, California 90025
(310) 979-3200

Ernesto J. Romero
THE ROMERO LAW FIRM
3602 Campus Boulevard N.E.
Albuquerque, New Mexico 87106
(505) 262-2131

PROOF OF SERVICE
1013A (3) CCP

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 12100 Wilshire Boulevard, Suite 1650, Los Angeles, California 90025.

On March 19, 1997, I served the foregoing document described as **PLAINTIFF CARL WILSON'S MEMORANDUM OF LAW IN RESPONSE TO HARPERCOLLINS' MOTION FOR SUMMARY JUDGMENT** in this action:

___ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list.

_X_ by placing ___ the original _X_ a true copy thereof enclosed in sealed envelopes addressed as follows:

R. Bruce Rich, Esq.
Weil, Gotshal & Manges
767 Fifth Avenue
New York, New York 10153

William S. Dixon, Esq.
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Albuquerque Plaza
201 Third Street NW, Suite 2200
Albuquerque, New Mexico 87103

_X_ BY MAIL

_X_ I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on March 19, 1997, at Los Angeles, California.

_X_ FEDERAL I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

BARRY B. LANGBERG

wil3\010\pleading

Recycled Paper

BLUEBIRD
(310) 477-0700

CAL... ...ED BY Sml
Respo... ...e 9-5-95
FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
95 AUG 14 PM 4:03
CLERK-ALBUQUERQUE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CARL WILSON, an individual, and AUDREE WILSON, an individual,

Plaintiffs,

v.

HARPERCOLLINS PUBLISHERS, INC., a Delaware corporation,
Defendant.

Case No. CIV 94 892 JC

JURY TRIAL DEMANDED

SECOND AMENDED COMPLAINT FOR LIBEL

COME NOW PLAINTIFFS CARL WILSON AND AUDREE WILSON who allege as follows:

FACTS COMMON TO ALL ALLEGATIONS

1. Plaintiff Carl Wilson ("Carl") is and, at all times herein mentioned, was an individual residing in the State of Colorado.

2. Plaintiff Audree Wilson ("Audree") is and, at all times herein mentioned, was an individual residing in the County of Los Angeles, State of California.

3. Plaintiffs are informed and believe and thereupon allege that defendant HarperCollins Publishers, Inc. ("HarperCollins") is a corporation duly organized and existing under the laws of the State of Delaware with principal business offices in New York City.

4. The tortious acts complained of herein were committed, in part, in the State of New Mexico, and plaintiffs sustained injury in said state as a consequence of said tortious acts.

5. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. 1332(a) which confers the subject matter jurisdiction on the United States District Court in all cases in which there is a diversity of citizenship and the amount in controversy exceeds the sum of $50,000, excluding interest and costs.

6. Venue is proper pursuant to 28 U.S.C. section 1391(a) and (c).

7. Within three (3) years of the filing of this Complaint, defendant HarperCollins caused to be written, printed, published and disseminated to the general public, including the public throughout the State of New Mexico, a book entitled Wouldn't It Be Nice (the "Book").

8. The Book was purportedly written by Brian Wilson with Todd Gold. However, Plaintiffs are informed and believe and thereupon allege that Eugene Landy ("Landy"), with the knowledge and consent of HarperCollins, collaborated extensively in the authorship and editing of the Book, and in doing so, altered text and manipulated sources in a manner which impaired the accuracy of the Book, defamed Plaintiffs, and misused and misrepresented the credibility, if any, that the purported authorship by Brian Wilson lends to the Book. The actual malice and negligence of Defendant HarperCollins, as alleged below, in publishing the defamatory statements set forth below, are shown, in part, by the fact that HarperCollins knew or had reason to know that Landy was

acting as previously alleged, and that Brian Wilson was the subject of a conservatorship action instituted to free him from the detrimental physical and psychological control of Landy, having been specifically put on notice of such by Plaintiffs, in written and oral communications from Plaintiffs' attorneys. Further, HarperCollins knew or had reason to know that Landy collaborated in the authorship of the Book in the manner described above. HarperCollins published the Book in reckless disregard of the aforementioned, and thus, in reckless disregard of the truth of the Book and the alleged defamatory statements. Further, the Book contains accounts that Brian Wilson repeatedly suffered from severe delusions resulting from schizophrenia and drug abuse. These accounts, in and of themselves, gave HarperCollins reason to doubt Brian Wilson's ability to accurately remember the events and conversations set forth in the Book. HarperCollins published the Book in reckless disregard of the aforementioned, and thus, in reckless disregard of the truth or falsity of the Book, and the alleged defamatory statements. Plaintiffs are informed and believe and thereupon allege that HarperCollins knew or should have known that publication of a book containing defamatory allegations about Plaintiffs generated by Landy would be especially damaging to Plaintiffs because the Book was ostensibly authored by Brian Wilson, and not by Landy.

**FIRST CLAIM FOR RELIEF**

**(Libel)**

9. Plaintiff Audree Wilson hereby repeats and realleges paragraphs 1 through 8 hereinabove and incorporate said paragraphs herein by reference as though set forth at length.

10. The Book contained the following statements of and concerning Audree that are false and defamatory:

> "My mother was no help. She almost never opposed my father, almost never rose up and defended her children. . . . Who knows? She might've been abused herself. I often saw her pour a drink in the afternoon and continue sipping throughout the evening. She was passive and aloof by the time my dad came home, a bystander who refused to intercede in the flagrant child abuse going on in front of her."

Book, p. 27.

> "She once looked on as he tied me to a tree for punishment. Another time, while the rest of the family was eating dinner, my dad barged into my room and caught me masturbating. . . . Not hiding his disgust, he shouted to my mom 'the boy's not to have dinner for two nights.' My mom complied."

Book, p. 27.

> "[My father] stalked off, irate, muttering threats under his breath, and continuing his tirade in another room. My mother listened passively, as always, refusing to take either side in the matter."

Book, p. 48.

11. These and other statements in the Book are defamatory per se in that they falsely portray Audree as an unfit mother who permitted child abuse to occur, and as an individual so emotionally demoralized that she was incapable of defending herself or her children against severe abuse. Said statements expose Audree to contempt, ridicule and obloquy. The defamatory sting of the statements is confirmed by the context of the statements, including the statements on page 27 of the Book ("Those incidents are modest compared to the worst," and "My Dad started berating me for something, I can't recall what, while my mom looked on passively from the sidelines, gripping her ever-present tumbler.")

12. At the time defendant made said statements, it knew that said statements would expose Audree to contempt, ridicule and obloquy.

13. Plaintiff Audree Wilson is informed and believes and thereupon alleges that defendant made the defamatory statements alleged hereinabove with actual malice (also known as constitutional malice), in that said defamatory statements were made with knowledge that they were false or with reckless disregard for their truth or falsity. Said plaintiff further

alleges that defendant knew that it had no reasonable basis in fact to publish said statements and that it had no reliable and unbiased information with which to support said statements, in part, for the reasons set forth in paragraph 8 above. Plaintiff further alleges that defendant failed to properly determine the truth or falsity of said statements prior to publication.

14. Plaintiff Audree Wilson is informed and believes and thereupon alleges that defendant was negligent in publishing the defamatory statements alleged hereinabove, in that said statements were published without the exercise of ordinary and reasonable care as to the truth or falsity of the statements.

15. Defendant caused the Book to be distributed throughout the United States. The Book was widely sold in the State of New Mexico. Accordingly, the above-enumerated defamatory statements were seen and read by persons who reside in the State of New Mexico. Defendant knew, or should have known, that said defamatory statements would be read by individuals who reside in said state and elsewhere.

16. As a direct and proximate result of the publication of said defamatory statements, Audree has suffered actual injury to her reputation and standing in the community, and further, she has suffered shame, mortification, personal humiliation, mental anguish and suffering and emotional distress, all to her general damage in the amount of Five Million Dollars ($5,000,000).

17. Defendant's conduct was intentional and was done maliciously, with ill will towards Audree and in conscious

disregard for her rights. As a result, Audree is entitled to punitive damages in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**

**(For Libel)**

18. Plaintiff Carl Wilson hereby repeats and realleges paragraphs 1 through 8 hereinabove and incorporates said paragraphs herein by reference as though set forth at length.

19. The Book contained the following false and defamatory statements of and concerning Carl:

> "One night, Dennis, Carl, and I were drunkenly walking through the redlight district in Amsterdam, heading for a restaurant while Dennis tried talking me into sampling one of the local girls." . . . "The piano bench was knocked over, punches were exchanged and before I knew it Carl and Dennis were dragging me out the front door and hustling me back to the hotel." . . . "After downing a few, Dennis, Carl, and Mike hit the dance floor." (pp. 97-98

> "Dennis smuggled heroin into New Zealand . . . Carl, trying to calm the turbulence by admitting his involvement in the purchase of

the heroin, ended up getting punched in the face by Rocky."

Book, p. 252.

"Within a week Carl was in Dr. Landy's office, asking how much the treatment would cost." . . . "Dr. Landy explained himself clearly, knowing Carl was going to take the information he got from the meeting and tell Marilyn, who had helped him through the dissolution of his marriage and now was providing him comfort in dealing with me." . . . "Carl never liked Dr. Landy's bluntness and was scared of him." . . . "Carl and Al complained Dr. Landy's fees were outrageous." . . . "Predictably, the first thing they wanted to discuss wasn't my health, it was Dr. Landy's fee."

Book, pp. 273-275.

". . . Several weeks before Christmas 1983, Carl and his manager, Jerry Schilling, approached Dr. Landy about treating Dennis." . . . "The next day, Schilling called Landy and told him Carl needed longer to make up his mind.  The price was steep, too steep, he thought for the Beach Boys to carry." "Beyond that, Carl didn't want to upset his family's holiday plans by having, as Dr.

Landy suggested, an intervention in Lake
Arrowhead.  Carl suggested talking after the
holidays."   . . . "Carl was adamant, though;
he didn't want to deal with the problem until
after New Year."

Book, pp. 311-312.

"Carl didn't know what to do.  Before making
any decisions, he insisted on consulting with
John Rogers, a cult leader Carl referred to
as his spiritual master."

Book, p. 314.

"In early 1986, Carl threw his weight into
the war against Dr. Landy." . . . "But the
Beach Boys loathed the independence Dr. Landy
was giving me.  They hated that I was
beginning to be able to say no to them and
act on my own thoughts.  They resented that I
wrote songs, not with Dr. Landy, but without
them. . . .

"The struggle escalated when Carl began
withholding my paychecks and money.  That
authority was his through the Brian Wilson
Trust of 1982, which he had me sign prior to
Dr. Landy's beginning treatment again . . ."

Book, p. 332.

"In Carl's opinion, the trust was supposed to
protect me from Dr. Landy, but as I got

saner, I began questioning my brother.   I
couldn't remember signing the document in the
first place.   I was too incompetent at the
time to know what I was signing."

Book, p. 333.

"Filed by the Attorney General's office, the
BMQA's charges originated with a complaint
filed by Carolyn Williams in 1984.   They were
then fueled by the journal Gary Usher
compiled while we wrote songs together the
previous year and pressed by Marilyn and
Carl."

Book, p. 351.

"As soon as the Beach Boys returned to L.A.,
he [Carl] had me sign a trust document,
giving him control of both my money and my
vote in the Beach Boys' corporation, Brother
Records, Inc.   I didn't know what I was
signing, though he assured me it was for my
own protection."

Book, p. 268.

"For the first hour or so, Mike, Al, and Carl
avoided me like the plague.


"Then I decided to take action.   I found Carl
in his dressing room and asked if he wanted
to talk about what was going on.

     'I can't, Brian,' he said. 'I've got to take care of some business I've got going in Colorado.' . . . It was clear they were shutting me out."

Book, p. 371.

"My brother Carl, on the other hand, stayed in his room and drank."

Book, p. 376.

". . . I was performing on my own, making my own decisions, even venturing out to art museums and restaurants while Carl was holed up in his room, avoiding the outside world, still drinking heavily, blind to his own problems." . . . "But then Carl had trouble making even the simplest decisions. He had always needed to consult with numerous people -- his wife, lawyers, his spiritual master, John Rogers."

Book, p. 378.

"Carl never once tried to talk to me personally. He showed absolutely no sensitivity that I was being stripped of my dignity and rights as a human being."

Book, p. 387.

20. These and other statements in the Book are defamatory per se in that, inter alia, they falsely portray Carl as an abuser of alcohol; falsely impute to him involvement in the

purchase of illegal narcotics; falsely characterize him as an emotionally troubled, weak individual who could be easily intimidated and/or controlled by his wife, John Rogers, Landy, and others; falsely suggest that he was callous and unconcerned about his brother Brian's physical and emotional health and was willing to risk Brian's life to save money; falsely state that he wrongfully withheld money that was payable to Brian; and falsely state that he obtained control over Brian's funds and Brian's position within the Beach Boys' corporation by trick and for improper purposes. Said statements expose Carl to contempt, ridicule and obloquy, and have a tendency to injure him in his reputation.

21. At the time defendant made said statements, it knew that said statements would expose Carl to contempt, ridicule and obloquy, and would have a tendency to injure him in his occupation.

22. Plaintiff Carl Wilson is informed and believes and thereupon alleges that defendant published the defamatory statements alleged hereinabove with actual malice (also known as constitutional malice), in that said statements were published with knowledge that they were false or with reckless disregard for their truth or falsity. Said plaintiff further alleges that defendant knew that it had no reasonable basis in fact to publish said statements and that it had no reliable and unbiased information with which to support said statements, in part, for the reasons set forth in paragraph 8, above. Said plaintiff

further alleges that defendant failed to properly determine the truth or falsity of said statements prior to publication.

23. Plaintiff Carl Wilson is informed and believes and thereupon alleges that defendant was negligent in publishing the defamatory statements alleged hereinabove, in that said statements were published without the exercise or ordinary and reasonable care as to the truth or falsity of the statements.

24. Defendant caused the Book to be distributed throughout the United States. The Book was widely sold in the State of New Mexico. Accordingly, the above-enumerated defamatory statements were seen and read by persons who reside in the State of New Mexico. Defendant knew, or should have known, that said defamatory statements would be read by individuals who reside in said state and elsewhere.

25. As a direct and proximate result of the publication of said defamatory statements, Carl has suffered actual injury to his reputation and standing in the community, and further, he has suffered shame, mortification, personal humiliation, mental anguish and suffering and emotional distress, all to his general damage in the amount of Five Million Dollars ($5,000,000).

26. As a further direct and proximate result of the publication of said defamatory statements, Carl has suffered special damages in that the public's erroneous belief in the truth of the defamatory statements contained in the Book has caused the public to lose interest in The Beach Boys, the professional music group in which Carl performs. As a result of the public's loss of interest, there has been a decline in

revenue derived from the group's live performances and record sales, which has resulted in a loss of business profits and a loss of salary to Carl. Although the precise amount of Carl's special damages cannot be ascertained with certainty at this time, preliminary discovery shows that Carl has suffered a loss of profits associated with a drop in concert tour revenues in the amount of approximately five million and seven hundred and twenty-seven thousand dollars ($5,727,000), based on a comparison of tour revues for the year period ending June 30, 1991 and the year period ending June 30, 1992. The defamatory statements were published in September 1991.

27. Defendant's conduct was intentional and was done maliciously, with ill will towards Carl and in conscious disregard for his rights. As a result, Carl is entitled to punitive damages in an amount to be proven at trial.

**THIRD CLAIM FOR RELIEF**

**(For Libel)**

28. Plaintiff Carl Wilson hereby repeats and realleges paragraphs 1-8 and 19-27 hereinabove and incorporate said paragraphs herein by reference as though set forth at length.

29. Carl is, and at all material times was, a member of the popular musical group professionally known as "The Beach Boys."

30. The Book contains numerous false and defamatory statements of and concerning The Beach Boys, including statements falsely suggesting: that The Beach Boys deliberately exploited Carl's brother and fellow band member, Brian Wilson, in order to

earn more money for themselves; that The Beach Boys coerced Brian to write songs and produce records even though the group knew that doing so would damage Brian Wilson's mental health; that The Beach Boys' efforts to obtain and finance psychological/ psychiatric treatment for Brian Wilson were motivated by the group's desire to secure a lucrative record deal; that The Beach Boys opposed Wilson's therapy with Dr. Landy solely because it was interfering with the group's ability to coerce Brian Wilson to make records with them; that once the new record deal was signed, The Beach Boys had no further regard for Brian Wilson's mental and physical health (in this vein, the Book falsely states that The Beach Boys "almost killed" Brian Wilson by requiring him to work on songs and albums when he was not healthy enough to do so); that The Beach Boys created a "Brian is back" publicity campaign in 1976 without Brian Wilson's consent or approval, which campaign attempted to capitalize on Brian Wilson's illness for pecuniary gain; and that the Beach Boys allowed their bodyguards to abuse and intimidate Brian Wilson:

> "My band mates were not bothered because I hung around with strange people, took drugs, behaved in ways that defied convention, and had a marriage that was truly weird. Their problem was accepting what I was doing to the Beach Boys' music. They were afraid I was fucking up the formula that had made all of

them wealthy and famous, and that wasn't kosher."

Book, p. 148.

"After roughly two months, Dr. Landy introduced the piano. From the start of the treatment, the Beach Boys had been pressuring him to get me to a point where I could write and produce again. That's all they wanted. But Dr. Landy resisted. Becoming a Beach Boy again, he explained repeatedly, wasn't the goal of therapy. . . . [At the Beach Boys' own recording studio Dr. Landy] booked ninety minutes of piano time for me every day. . . . Dr. Landy made sure the studio was empty. Despite previous explanations, the Beach Boys, especially Mike, made no secret that they were anxious to put me back to work writing songs. But Dr. Landy kept them at bay."

Book, p. 224

"Mike was the first to register a complaint [about the "therapy" piano sessions with Dr. Landy]. He said I was using the studio unproductively. Carl agreed. He said the music we were making sounded crazy."

Book, p. 225

"Dr. Landy told the Beach Boys I wasn't ready to cope with the pressure of making an album. I was still too fragile. They didn't see it that way and began complaining about the studio time he and I were using, time they could have been renting to other people. 'You want Brian back?' Landy asked. 'Or do you want to make a couple hundred bucks a week? What's more important?' When they saw that Dr. Landy had begun recording our piano sessions, they asked for the masters. Dr. Landy refused to turn them over. They were part of my therapy, privileged . . . But that as only the beginning of war with the Beach Boys."

Book, pp. 226.

"Steve Love was pushing everyone, especially me, to step up the pace on the next album . . . At the same time, Dr. Landy was trying to keep me within a therapeutic regimen rather than let the guys take over and put me to work full-time. But there were priorities. Steve and the others wanted to get out of the Warners contract while they could still capitalize on the success of *15 Big Ones* somewhere else. Steve wanted the new LP done no later than January 1, 1977. [Landy

rejected that, stating that Brian needed a month's vacation at Christmas] . . . 'That's ridiculous to take so much time off work,' Steve said.  Steve had his own agenda in mind, and Dr. Landy's struck him as unreasonable.  Tempers flared.  They called Dr. Landy a 'control freak.'  Dr. Landy responded by telling the Beach Boys it was exactly this kind of attitude that caused me to break in the first place. . . . 'He's supposed to make records,' Steve said.  'What the hell are we paying you for?  'To make him well,' Dr. Landy replied. . . .'[H]e can only make records when he's well, something not one of you seems to understand."

Book, pp. 239-240.

"Later, Dr. Landy spoke with Steve, who came right out and said he was fired.  'You guys don't understand,' said Dr. Landy.  "If I'm not in the studio, you're not going to get anything out of Brian.'"  'Not true,' Steve countered.  "Brian's going to work.  He'll work.  We're all working.  The group's going to finish their album.'"

Book, p. 243.

"What could be better for me to be writing songs with Mike again?  It had nearly killed

me several times before."

Book, p. 373.

"We were dumbfounded.  Then angered.  We'd
been had.  It turned out Mike had been
working for months on this huge publicity
campaign heralding my return.  He'd written a
terrible song, 'Brian's Back,' and sold
Warner Brothers on a publicity campaign
designed to exploit the fact that I'd
produced the Beach Boys' latest album.  No
one had mentioned a word to me.  Nor to Dr.
Landy.  Everyone knew except us....It wasn't
enough for me to write and produce songs.
Now they had to sell my illness publicly
too."

Book, p. 232

"I understood and agreed with the concept,
which was more than I could say about the
Brian is Back campaign."

Book, p. 239.

"One morning Stan and Steve, my tenders,
appeared at my bedside. . . . 'Get out of
bed!' Stan barked, yanking back the covers.
The sudden movement scared me.  I put my
hands over my face.  'Don't hit me, I
pleaded.'  'Then get out of bed,' Stan said.
. . . My life became hell under these three

> hypermacho watchdogs."

Book, p. 246.

> "For the most part, Stan and Rocky intimidated me. They towered over me. Chided me for being overweight. Both screamed at me, 'You goddamn fat, lazy, fucking rock star! You chickenshit! When are you going to straighten the fuck up and get your shit together? You fucking pussy!' Against my wishes the Beach Boys ordered them to drag me on several tour dates early that summer. Every afternoon my bodyguards took me to a local YMCA to play basketball. . . . In the elevator, Stan pushed me into a corner. He clenched his fist and pushed it into my chest. 'You fucking rock star,' he growled. 'You goddamn, fucking obese rock star. You fucking disgust the shit out of me.' . . . As he chided me, Stan pounded his fist into my chest. . . In a state of regression and constant fear, I obeyed like an abused dog."

Book, p. 247.

31. Readers of said defamatory statements reasonably understood said statements to refer to The Beach Boys and their agents, and thus to have personal reference and application to Carl, as a member of The Beach Boys.

32. At the time defendant made said statements, it knew that said statements would expose The Beach Boys and its members to contempt, ridicule and obloquy, and would have a tendency to injure them in their business.

33. Plaintiff Carl Wilson is informed and believes and thereupon alleges that defendant published the defamatory statements alleged hereinabove with actual malice (also known as constitutional malice), in that said statements were published with knowledge that they were false or with reckless disregard for their truth or falsity. Said plaintiff further alleges that defendant knew that they had no reasonable basis in fact to publish said statements and that it had no reliable and unbiased information with which to support said statements, in part, for the reasons set forth in paragraph 30, above. Said plaintiff further alleges that defendant failed to properly determine the truth or falsity of said statements prior to publication.

34. Plaintiff Carl Wilson is informed and believes and thereupon alleges that defendant was negligent in publishing the defamatory statements alleged hereinabove, in that said statements were published without the exercise of ordinary and reasonable care as to the truth or falsity of the statements.

35. Defendant caused the Book to be distributed throughout the United States. The Book was widely sold in the State of New Mexico. Accordingly, said defamatory statements were seen and read by persons who reside in the State of New Mexico. Defendant knew, or should have known, that said defamatory statements would be read by individuals who reside in said state and elsewhere.

36. As a direct and proximate result of said defamatory statements, The Beach Boys' reputation has been injured and the good will associated with The Beach Boys' name has been diminished. As a member of The Beach Boys, Carl has suffered actual injury to his reputation and standing in the community, and further, has suffered shame, mortification, personal humiliation, mental anguish and suffering, and emotional distress, all to his general damage in the amount of Five Million Dollars ($5,000,000).

37. As a further direct and proximate result of said defamatory statements, the business of The Beach Boys has been damaged, including but not limited to business resulting from record sales, merchandising and concert tours. As a member of The Beach Boys, Carl has suffered special damages in that he has suffered pecuniary losses by virtue of the diminution of such business, including loss of business profits and loss of salary. Although the precise amount of Carl's special damages cannot be ascertained with certainty at this time, preliminary discovery shows that Carl has suffered a loss of profits associated with a drop in concert tour revenues in the amount of approximately five million and seven hundred and twenty-seven thousand dollars ($5,727,000), based on a comparison of tour revues for the year period ending June 30, 1991 and the year period ending June 30, 1992. The defamatory statements were published in September 1991.

38. Defendant's conduct was intentional and was done maliciously, with ill will towards The Beach Boys and in

conscious disregard for its rights. As a result, Carl is entitled to punitive damages in an amount to be proven at trial.

WHEREFORE, plaintiffs pray for judgment as follows:

**ON THE FIRST CLAIM FOR RELIEF**

1. For general damages in the amount of Five Million Dollars ($5,000,000); and

2. For punitive damages in an amount to be proven at trial.

**ON THE SECOND CLAIM FOR RELIEF**

1. For general damages in the amount of Five Million Dollars ($5,000,000);

2. For special damages in excess of Two Hundred Thousand Dollars ($200,000); and

3. For punitive damages in an amount to be proven at trial.

**ON THE THIRD CLAIM FOR RELIEF**

1. For general damages in the amount of Five Million Dollars ($5,000,000);

2. For special damages in excess of Two Hundred Thousand Dollars ($200,000); and

3. For punitive damages in an amount to be proven at trial.

DATED: August 14, 1995

Ernesto J. Romero
3602 Campus Boulevard, N.E.
Albuquerque, New Mexico 87106
(505) 262-2131

Barry B. Langberg (#48158)
Beth F. Dumas (#150064)
LANGBERG, LESLIE & GABRIEL
2049 Century Park East
Suite 3030
Los Angeles, California 90067
(310) 286-7700

Attorneys for Plaintiffs
CARL WILSON and AUDREE WILSON

PLAINTIFFS HEREBY DEMAND A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiffs hereby demand a trial by jury in this action.

DATED: August 4, 1995

Ernesto J. Romero
3602 Campus Boulevard, N.E.
Albuquerque, New Mexico 87106
(505) 262-2131

Barry B. Langberg (#48158)
Beth F. Dumas (#150064)
LANGBERG, LESLIE & GABRIEL
2049 Century Park East
Suite 3030
Los Angeles, California 90067
(310) 286-7700

Attorneys for Plaintiffs
CARL WILSON and AUDREE WILSON

CERTIFICATE OF SERVICE

I certify I caused a true copy of the foregoing pleading to be hand delivered to opposing counsel, William S. Dixon, Esq., and mailed to Defendant, care of Mr. Dickson's co-counsel, Bruce Rich, Esq., Weil, Gotshal & Manges, 767 Fifth Avenue, New York, New York 10153. This 14th day of August, 1995, with first class postage affixed.

Ernesto Romero

v:\wil3\010\2ndamend.com

BLUEBIRD (310) 477-0700
Recycled Paper

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

-------------------------------

CARL WILSON, an individual and )
AUDREE WILSON, an individual, )
Plaintiffs, )
vs. ) No. CIV 94 892 JG
HARPERCOLLLINS PUBLISHERS, ) VOLUME III
INC., a Delaware corporation, )
Defendant. )

-------------------------------

CERTIFIED COPY

Continued deposition of **CARL DEAN WILSON**, taken at 10940 Wilshire Boulevard, Suite 800, Los Angeles, California, commencing at 10:10 A.M., Thursday, November 7, 1996, before Paulette M. Griffin, CSR No. 2499.

PAGES 314 - 508

Interim.
COURT REPORTING

3530 Wilshire Boulevard, Suite 1700
Los Angeles, CA 90010
(213) 385-4000 • (800) 722-1235
Fax (213) 389-8514

Wilson

heroin episode or episodes that are being discussed, that were discussed at the meeting and that are being discussed in this passage?

A. My participation was being at this meeting. I did participate in it.

Q. Did you have anything to do with the heroin transaction itself?

A. None.

Q. Did you ever physically take possession of heroin at the time being described by this episode and being discussed at that meeting?

A. Dennis put a package in my hand and I got rid of it.

Q. And you what?

A. I got rid of it.

Q. You flushed it down the toilet?

A. That's correct.

Q. What was the package that he handed you?

A. I don't know. It was just a little package. He was very scared. It was very of the moment and very like somebody was chasing him. And he said something, "Get out of here. Go.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CERTIFIED COPY

-------------------------------

CARL WILSON, an individual and )
AUDREE WILSON, an individual, )
Plaintiffs, )
vs. ) No. CIV 94 892 JG
HARPERCOLLLINS PUBLISHERS, ) VOLUME IV
INC., a Delaware corporation, )
Defendant. )

-------------------------------

Continued deposition of **CARL DEAN WILSON**, taken at 10940 Wilshire Boulevard, Suite 800, Los Angeles, California, commencing at 10:15 A.M., Friday, November 8, 1996, before Paulette M. Griffin, CSR No. 2499.

PAGES 509 - 565

Interim
COURT REPORTING

3530 Wilshire Boulevard, Suite 1700
Los Angeles, CA 90010
(213) 385-4000 • (800) 722-1235
Fax (213) 389-8514

Wilson

have drunk on occasion while you were in Amsterdam in 1964? You don't remember, do you?

MS. DUMAS: Compound.

THE WITNESS: I do not recall that particular visit to Amsterdam very well at all. It's very dim. It's very long ago.

BY MR. RICH:

Q. So I take it, that if you had been drinking, you wouldn't remember that detail either; is that correct?

A. I just simply don't know.

Q. Now, looking at Page 98, you said that you were not involved in a brawl; is that correct?

A. That's correct.

Q. Where does this passage say that you were involved in a brawl?

A. "The piano bench was knocked over, punches were exchanged, and before I knew it Carl and Dennis were dragging me out the front door and hustling me back to the hotel."

Q. Yeah, that is what it says. You read that as saying you were in the brawl?

Wilson

A. Well, yes, it suggests that we, the four of us were there and that punches were exchanged.

Q. If you look at the beginning of that paragraph, it says, quote, "no sooner did I start," meaning Brian, "than the barkeep" who I take was not you; correct? You were not the barkeep; correct?

A. Of course not.

Q. -- "jumped all over me, yanking me off the bench. I gave him a push and began playing away. A struggle ensued," unquote, and then there follows your language.

A. Yes.

Q. You think the only reasonable interpretation of that passage is that you were involved in the brawl even though it indicates that Brian and the barkeep were mixing it up?

A. Well, that obviously is the most evidence, that he was in it also.

Q. Keep your voice up for the reporter.

A. It also in a nebulous way mentions the other people's names. It doesn't say I

punched him, he punched me. It says "punches were exchanged."

Q. I would agree with that.

Do you have any recollection of such an incident one way or the other?

MS. DUMAS: Vague and ambiguous.

THE WITNESS: No, I do not recall it happening.

BY MR. RICH:

Q. Did you ever take to the dance floor when you would socialize?

A. I suppose I did. Sometimes.

Q. Is there anything about public dancing that you think injures your reputation? The sight of you dancing?

A. Do I think the sight of me dancing injures --

Q. In any way injures your reputation.

A. No.

Q. Do you think the fact of your having several beers injures your reputation if you were observed downing several beers?

A. No.

C O P Y

0:15:56

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

---

| | | |
|---|---|---|
| CARL WILSON, an individual, and | ) | No. CIV 94 |
| AUDREE WILSON, an individual, | ) | 892 JG |
| Plaintiffs, | ) | |
| vs. | ) | |
| HARPERCOLLINS PUBLISHERS, Inc., | ) | |
| a Delaware corporation | ) | VOLUME V |
| Defendant. | ) | PAGES 566-710 |

---

Deposition of **CARL DEAN WILSON**, held at the offices of Weil, Gotshal & Manges, 767 Fifth Avenue New York, New York commencing at 10:20 A.M., Sunday, November 24, 1996, before DAVID HENRY, RPR.

230 Park Avenue, Suite 847
New York, NY 10169-1317
(212) 490-3430 • (800) 362-2520
Fax: (212) 490-3534

14:16:32 in any way to suppress that.

14:17:10 Q. Did Mike Love to your knowledge have one or more children out of wedlock?

14:17:22 A. Oh, I don't know. I don't think so. At least I'm not aware of it. I believe I know all of his children. That doesn't mean they weren't, or perhaps doesn't.

14:17:46 Q. Can you tell me the circumstances under which the Brian Wilson trust was created?

14:17:56 A. Yes, I can.

14:17:56 Q. Would you, please.

14:17:58 A. John Branca advised that it was in Brian's best interests to have a trust, and --

14:18:14 Q. Who was Mr. Branca representing at the time he gave that advice?

14:18:18 A. Brian.

14:18:22 Q. And who did he give the advice to?

14:18:22 A. Well, I don't know who all he gave it to, but I know that I was one of them, and of course Brian was.

14:18:32 Q. And when was this date-wise?

14:18:34 A. The date?

14:18:36 Q. Yes, by year.

14:18:40 A. I don't -- mid-80s, early 80s.

14:18:42 Q. Would 1982 sound correct?

14:18:44 A. Oh, it was the Brian Wilson trust of 1982.

14:18:54 Q. And was Brian himself a party to these discussions?

14:19:04 MS. DUMAS: Vague.

14:19:06 MR. RICH: What's vague about it, Ms. Dumas?

14:19:08 MS. DUMAS: I don't know which discussions -- you said discussions plural.

14:19:14 Q. Responding to the prior question, the answer to the prior question. You can answer.

14:19:22 A. Well, I don't know how many conversations John Branca had with people other than myself.

14:19:28 Q. To your knowledge, was Brian a participant in the decision to set up the trust?

14:19:32 A. Yes, he was, and John explained to Brian very carefully what the purpose of a trust was, that it was an instrument, and that it would place his assets into a -- in a way that would protect them.

14:19:58 Q. Why did Mr. Branca recommend that this trust be set up?

CARL DEAN WILSON

14:20:02 A. To protect Brian from Eugene Landy, to protect Brian from Eugene's abuse, financial abuse, because it was known that Gene was very abusive, and that he was dangerous to Brian's financial well-being in terms of diverting assets and revenue to himself away from Brian.

14:20:34 Q. Did Brian at this time agree that Dr. Landy was being financially abusive toward him?

14:20:42 A. I don't know if he was aware at that point.

14:20:46 Q. Is it your understanding that the trust could only have been set up with Brian's knowledge and consent?

14:20:54 A. Yes, I would think so.

14:20:58 Q. So does it not follow that he would then had to have agreed that Dr. Landy was being financially abusive?

14:21:04 MS. DUMAS: He is not here to speculate, he is here to testify --

14:21:08 MR. RICH: No, I don't want him to speculate, I'm trying to refresh his recollection.

MS. DUMAS: No, you're not, you're trying to do if then, then so.

14:21:14 MR. RICH: Some lawyers think in

14:26:12 Q. And can you help me clarify, please, I'm trying to understand what the rationale for setting the trust up was, and I am now somewhat confused by what I think are inconsistent answers.

14:26:22 A. I think I have told you before that it was learned in 1976, 77, that Eugene Landy could be very abusive, and that his excess knew no bounds, and that John Branca as Brian's lawyer advised that Brian form a trust to protect him from possible future misconduct at the hands of Eugene Landy.

14:27:04 Q. Is it your recollection that the trust was set up at a time when there was no existing relationship between Brian and Dr. Landy?

14:27:12 A. It was anticipated that Brian would go back into the Landy treatment program, that was a possibility, and that is what motivated the trust, to my knowledge. I don't know what else John Branca was aware of, because he had been Brian's lawyer for years. I was just Brian's brother.

14:27:36 Q. And were you during this period party to the discussions about whether and if so under what conditions Dr. Landy would be re-engaged to work with Brian?

14:27:50 A. Somewhat.

CARL DEAN WILSON

14:27:54 Q. Who was the decision-making group?

14:27:56 A. It was Brian's partners and John Branca, and I think Tom Hewlett was part of the discussion, and Jerry Schilling, who was my manager at the time; and myself, of course.

14:28:36 Q. And did that group eventually determine that it would be in Brian's best interests to re-engage Dr. Landy for a period of time? This is as of 1982 now.

14:28:50 A. Yes, I believe so.

14:28:50 Q. And did you agree with that judgment at the time?

14:28:52 A. Yes, in desperation we all did.

14:28:56 Q. And just so I understand, please tell me if I'm correct in understanding your testimony. Your best recollection is that it was in anticipation of re-engaging Dr. Landy that the trust was set up, the purpose of which was to protect Brian from potential financial abuse at Dr. Landy's hands, is that correct?

14:29:18 A. That's what I recall.

14:29:20 Q. And what do you remember about how this trust was to work?

14:29:26 A. I don't know. I was just asked to be

14:29:28 co-trustee because I was a brother. I was a family
14:29:32 member. John Branca did -- I didn't know a trust
14:29:36 from this -- you know, from anything. I didn't
14:29:36 know.
14:29:40 Q. Was he the other co-trustee,
14:29:40 Mr. Branca?
14:29:42 A. Of course he was. He was the one who
14:29:44 set up the trust, which was omitted.
14:29:48 Q. Did you develop an understanding of
14:29:50 what your responsibilities as trustee were?
14:29:58 A. I understood that I was to sign
14:30:00 documents and just be supportive of Brian.
14:30:10 Q. What were the responsibilities of the
14:30:10 trust in relation to Brian's financial affairs?
14:30:16 How encompassing was this?
14:30:16 A. I didn't really know.
14:30:20 Q. Do you recall examples of the kinds of
14:30:24 things you did in Brian's behalf as trustee?
14:30:28 MS. DUMAS: As co-trustee.
14:30:30 Q. As co-trustee.
14:30:32 A. I think I signed several documents,
14:30:54 and was more a support function than anything else,
14:30:56 because I did not run Brian's business affairs.
14:30:56 Q. That's what I was going to ask you.

CARL DEAN WILSON

14:34:38 Q. And did you as co-trustees take any action with respect to that bill?

14:34:42 A. I don't recall what action was taken. It obviously was called into question.

14:34:50 Q. Did you find, putting expenses to one side, did you find Dr. Landy's fees within reason?

14:34:58 A. My understanding was that it was going to be, when they -- yes. My understanding was that his fees would be $800 thousand.

14:35:10 Q. For what period of time?

14:35:12 A. For 12 months. Eight to nine hundred thousand dollars, 12 to 18 months.

14:35:20 Q. And you found that fee to be reasonable?

14:35:26 A. I didn't really -- I don't know, I thought that's just what the fee was going to be.

14:35:34 Q. Did you express to anyone at the time you learned what that fee would be whether you thought it was low, high, just right or something else?

14:35:40 A. I thought it was worth saving Brian's life. I wasn't concerned about the fee. Brian could well afford it.

14:35:50 Q. Had you ever experienced medical or

14:35:54 other counselling fees in a range of that magnitude
14:35:56 personally?
14:35:58 A. No.
14:35:58 Q. Anyone else in your family?
14:36:00 A. No.
14:36:02 Q. Were you in any way shocked by those
14:36:06 fees?
14:36:06 A. No. Mark Metter told Jerry Schilling
14:36:14 that Gene's fees had gone up. He called at the
14:36:18 time of Jerry's and I first meeting and it was
14:36:24 said, you know, his fees have gone up to six
14:36:26 dollars a minute.
14:36:28 Q. And your reaction was, just fine with
14:36:30 me?
14:36:30 A. There wasn't anything to react to. It
14:36:34 was just we were desperate to save Brian's life.
14:36:36 Q. Did you feel that paying fees of that
14:36:38 magnitude was consistent with discharging your
14:36:42 fiduciary responsibilities as co-trustee of the
14:36:44 trust and someone charged with preserving Brian's
14:36:48 assets?
14:36:50 A. Well, I wasn't charged with preserving
14:36:52 Brian's assets, I was as a family member just doing
14:36:58 as John Branca instructed me to do, and there as a

14:43:34 have been unable to receive a copy.

14:43:42 A. I have to say I am.

14:43:42 Q. Well, who has copies?

14:43:42 A. Well, I would think John Branca would have a copy.

14:43:50 Q. Did you during the time were you co-trustee retain a copy of whatever document it is we're talking about?

14:43:56 A. No.

14:43:56 Q. How many pages was this document?

14:43:58 A. I don't know.

14:44:00 Q. Who signed it?

14:44:02 A. Well, I think John, Brian and myself.

14:44:08 Q. And were you present when Brian signed it?

14:44:10 A. I think I was.

14:44:10 Q. Did you read it to him before he signed it?

14:44:12 A. John Branca did.

14:44:14 Q. John Branca read it. Did Brian ask questions about it?

14:44:18 A. I think so.

14:44:20 Q. And do you remember the nature of the questions he asked?

BY MR. RICH:

Q. Do you see the reference, the suggestion that this was the brainchild of Mike Love?

A. Yes.

Q. Does that in any way refresh your recollection or cause you to recall in any sense that Mike Love was involved in developing such a publicity campaign rather than Dr. Landy?

A. No, it doesn't. In fact, I thought that Michael had written a song after the publicity campaign -- that that gave Michael the idea to write this song. That's my impression.

Q. And by the song --

A. Not that the idea came first.

Q. Okay, we are referring here to the song Brian's Back that is referred to in this passage?

A. Yes.

Q. Do you doubt the reaction to this that Brian describes, namely that he viewed this as turning his illness into a bit of a publicity tool?

A. Well, I was not a part of any

A. That I didn't know what to do? Nonsense. Absolutely nonsense. Before making any decisions, he insisted on consulting with John Rogers. It's just untrue. Not so.

Q. It is not true that you were indecisive about the method for burying Dennis?

A. I was not at all.

Q. What was your wish?

A. My wish was that Dennis's wishes be carried out.

Q. And did you in or about this time period consult with John Roger in relation to any aspect of Dennis's death?

A. Yeah, I called and had -- I called to ask if one of the ministers would officiate at the funeral, because nobody had any, there was nobody to do it, so, and this was all with Shaun's, this was -- it was all Shaun's decision, she was Dennis's wife at the time of his death, and she was having a very difficult time.

Q. Assuming for the sake of this question that the report that you were indecisive is inaccurate, how would a report that, before deciding on how Dennis's remains would be disposed

C O P Y

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

---

| | | |
|---|---|---|
| CARL WILSON, an individual, and | ) | No. CIV 94 |
| AUDREE WILSON, an individual, | ) | 892 JG |
| Plaintiffs, | ) | |
| vs. | ) | |
| HARPERCOLLINS PUBLISHERS, Inc., | ) | |
| a Delaware corporation | ) | VOLUME VI |
| Defendant. | ) | PAGES 711-837 |

---

Continued Deposition of **CARL DEAN WILSON**, held at the offices of Weil, Gotshal & Manges, 767 Fifth Avenue New York, New York commencing at 10:07 A.M., Tuesday, November 26, 1996, before DAVID HENRY, RPR.

NOON&PRATT
AN [illegible] LEGAL SERVICES COMPANY

230 Park Avenue, Suite 847
New York, NY 10169-1317
(212) 490-3430 • (800) 362-2520
Fax: (212) 490-3534

CARL DEAN WILSON

10:49:32 Q. Did you also believe that he was out
10:49:32 to financially exploit his clients?
10:49:36 A. I didn't think he was out to exploit
10:49:52 at that moment in time. I thought he was out to
10:49:54 make as much money as he possibly could.
10:49:56 Q. Did you think he was overpriced?
10:50:02 MS. DUMAS: Asked and answered at
10:50:02 the last session of the deposition.
10:50:04 Q. You can answer.
10:50:04 A. I knew that he was overpriced at the
10:50:08 first level of training as a psychologist, and yet
10:50:14 I thought Brian was worth way more than any cost of
10:50:16 any program. Money was not a concern.
10:50:24 Q. Did Landy attempt to use techniques of
10:50:24 intimidation in his interpersonal dealings?
10:50:28 A. Of course. That's well-known.
10:50:36 Q. Do you recall -- looking at the bottom
10:50:38 sir, of 274 and the top of 275, do you recall
10:50:42 Dr. Landy expressing that it was going to be more
10:50:46 difficult to bring results about with Brian this
10:50:50 time around as opposed to during the prior course
10:50:54 of treatment?
10:50:56 A. At the bottom of 74?
10:50:58 Q. Yeah, if you'd read the last two lines

CARL DEAN WILSON

11:16:32 A. Brian and the Beach Boys were going to do one concert per month and just pay it straight over to Brian, so it would help defray some of the expense.

11:16:44 Q. So would that explain why various members of the group had an interest in the first place in Dr. Landy's fee structure, namely because there would be some process which by concert or something they would be in essence defraying his fees?

11:17:00 A. I think it was interest. It was just being interested in -- being involved. I think it was more a matter of principle.

11:17:16 Q. Do you recall approximately when Good Vibrations was written?

11:18:10 A. Yes.

11:18:12 Q. When was that?

11:18:12 A. It was written over a period perhaps 65, 66. In that, roughly in that time period.

11:18:30 Q. Who wrote it?

11:18:38 A. Brian and Michael.

11:18:46 Q. Do you recall in that 1965 and 1966 period whether Brian was experimenting with drugs, using drugs?

CARL DEAN WILSON

11:18:58 A. Well, I am now of course. I wasn't really aware of his drug taking. I was concerned about it though.

11:19:20 Q. You were concerned about it but you weren't aware of it? That's what I'm confused about in your last answer.

11:19:26 A. Well, I wasn't aware as he was doing it. I would hear about it later.

11:19:30 Q. But during that period of time, you became aware of it?

11:19:32 A. After.

11:19:34 Q. After any particular episode of use?

11:19:38 A. I couldn't have become aware of it before he did it. I became aware of it after.

11:19:40 Q. Well, my question maybe wasn't precise enough. But you were aware during the 1965-66 period of Brian's use of drugs, not at the moment necessarily he was using them, but of the fact that he was using them?

11:20:00 A. It would be more true to say that I had been made aware that he had taken LSD. I didn't -- it wasn't like he was on it or taking it. He had taken it I think a few times.

11:20:16 Q. Whether related to his drug usage or

11:20:18 otherwise, did you observe during this period of time and for a period of time after that he was experimenting with new musical forms?

11:20:30 A. Yes.

11:20:30 Q. How in your own words would you describe what he was attempting to do with music during the period beginning the mid-60s say in the ensuing three or four years?

11:20:44 A. He was evolving musically to a very new place. It was quite incredible. It was not standard pop ditties or commercial songs, he had moved far beyond that, and it was thrilling. It was thrilling to be witness to, and a joy to be a part of.

11:21:18 Q. What were some examples of the product of his evolution? What kinds of musical work reflect that evolution, do you recall?

11:21:26 A. Certainly. Certainly I do. There is a song written called Let Him Run Wild, and the musical arrangement was very classic and classical compared with what came before it musically in terms of just the straight pop, you know, the hit records. It was much more complex and it had a lot more depth and movement.

CARL DEAN WILSON

11:22:04 Q. Did you form a view -- artistically I take it it was thrilling, I take it that was your word?

11:22:14 A. It was incredible.

11:22:16 Q. Did you find all of it artistically incredible? Did you feel that perhaps as a necessary part of experimenting, some of it was better than others?

11:22:32 A. Well, he could do no wrong. It was just absolutely magical flow of creativity and, it was just a real blessing to be a part of it, and I was very grateful, and it was very stimulating, exciting, and very enriching; very emotionally fulfilling, to see my brother, you know, have this great talent come present.

11:23:08 Q. Did you have a view separating your artistic reaction from its likely degree of commercial acceptance in the marketplace?

11:23:22 A. No, I didn't. I know that the book tries to paint a picture like we didn't like it. That is absolute crap. I was part of Brian's support system. It omits that we were extremely close and spent all of our time, nearly all of our time together when I was not away on tour.

CARL DEAN WILSON

11:23:46 Q. Was it your view that this music would likely be commercially successful?

11:23:54 A. I thought the music was so great that it could be incredibly successful and possibly change the world, change the musical landscape, the way people approach music, pop music.

11:24:12 Q. Did Michael Love share your perspective?

11:24:16 A. Yes, musically. Theoretically he was concerned with presenting a joyful, happy, good time essence.

11:24:40 Q. And was that consistent or inconsistent with the direction Brian was moving?

11:24:46 A. It was consistent and inconsistent sometimes. That came -- that was later. That was a different thing. Pet Sounds is the album that really chronicles that time more than any other album, and it was a fantastic time. It was just absolutely great.

11:25:26 Q. Were these songs songs which the Beach Boys could easily perform?

11:25:32 A. At the time it was thought that it would be difficult, but it was much easier than we thought. We performed all the songs and they all

CARL DEAN WILSON

11:39:10 A. Well, it would have been in 1976.

11:39:14 Q. Is that the only time period that you recall that he used it for that purpose?

11:39:20 A. Well, yes.

11:39:34 Q. Okay. And do you recall having a reaction one way or the other to the appropriateness of that use of the studio facilities?

11:39:46 A. Well, I was suffering from back disease at that time, and I wasn't very involved.

11:39:58 Q. Were you aware that Dr. Landy was using the recording studio for these purposes?

11:40:06 A. Yes, I do recall that they were at the studio.

11:40:10 Q. Did Mike Love have occasion to express to you his concerns about that use of the studios?

11:40:18 A. I would think he complained to me about it.

11:40:54 Q. Were you aware that he was unhappy about that use of the studios, whether or not he expressed it directly to you?

11:41:42 A. Not other than to observe that it was -- that it would be perhaps an expensive way to play the piano.

11:49:04 recollection of his viewpoint.

11:49:12 A. Well, I'm not really sure. It sounds right, but that is me kind of putting it in there, you know, and that's speculation. The truth is, I don't remember talking to Steve about it.

11:49:24 Q. Okay. There is a reference in the third paragraph down on 224, there is a sentence which reads as follows: "Despite previous explanations, the Beach Boys, especially Mike, made no secret that they were anxious to put me back to work writing songs". Do you see that sentence?

11:49:56 A. I do.

11:49:58 Q. What is your reaction to the accuracy of that statement?

11:50:00 A. It's like leave me out of it, because it's bull.

11:50:04 Q. What do you mean by leave me out of it?

11:50:04 A. That wasn't my view. I didn't want Brian to be a work horse, ever.

11:50:12 Q. And where did you line up in relation to Mike Love on that at this time?

11:50:16 A. I wasn't part of it. Michael always wants to write with Brian. He always want to work

11:50:32 with Brian, or play or whatever.

11:50:34 Q. Did you during -- well, how much
11:50:36 communication were you having with Brian directly
11:50:38 during this time period?

11:50:40 A. Not much. I was in bed with back, a
11:50:50 serious back injury.

11:50:52 Q. And is it therefore possible that
11:50:58 Brian, perhaps mistakenly, perceived that whatever
11:50:58 pressure he was receiving from Mike Love or anyone
11:51:02 else might have reflected your own perspective as
11:51:06 well as Mr. Love's?

11:51:08 A. No.

11:51:08 Q. Why?

11:51:10 A. Because. He knew, he knew better.

11:51:14 Q. How?

11:51:16 A. By knowing that I was, you know, for
11:51:28 him, that I was, you know, behind him, supportive
11:51:34 to him, not greedy. Never was.

11:51:42 Q. How had you manifested overtly your
11:51:48 support for him in the period we're now talking
11:51:54 about when you were laid up with your back and so
forth?

11:51:54 A. I don't know how to answer that.

11:52:22 Q. Over on 225, there is, slightly below

the mid-point of the page, the book says "Mike was the first to register a complaint. He said I was using the studio unproductively. Carl agreed. He said the music we were making sounded crazy."

Now, you and I have already discussed your, I take it, disagreement with the assertion that you agreed that the studio was being unproductive, correct?

A. Well, --

MS. DUMAS: I believe that question has been asked and answered.

Q. Well, but if he wants to amplify, please do. We need a complete record.

MS. DUMAS: What is the question?

Q. Well, my question is first to ask him to respond to the accuracy of the first three sentences of that paragraph.

A. I think it's inaccurate, untrue. I think it's twisted, and I think that it's out of context, and -- I know generally this is not true.

Q. Sitting here today, are you positive that you did not have one or more conversations with either Mike or Steve Love in which you expressed the sentiment that Dr. Landy's use of the

Recycled Paper
BLUEBIRD (310) 477-0700

**EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CARL WILSON, an individual, and AUDREE WILSON, an individual,

Plaintiffs,

v.

HARPERCOLLINS PUBLISHERS, INC., a Delaware corporation,

Defendant.

Case No. CIV 94 892 JC

**DECLARATION OF CARL WILSON IN SUPPORT OF RESPONSE TO HARPERCOLLINS' MOTION FOR SUMMARY JUDGMENT RE CARL WILSON'S CLAIMS**

I, Carl Wilson, hereby declare as follows:

1. This declaration discusses the falsity of passages from Wouldn't It Be Nice, purportedly an autobiography written by my brother Brian Wilson with Todd Gold (the "Book"). The purpose of this declaration is to discuss the falsity of passages which were not fully addressed in my deposition, and to clearly explain to the Court my involvement with drugs. This declaration is based on my personal knowledge, and if I called as a witness I would and could testify to the truthfulness of the matters set forth herein.

2. The Book makes several false statements about my involvement with drugs. While it is true that as a musician in the 60's and 70's I fell prey to drugs, I have reformed my life. The charge in the Book that I was using cocaine in the mid-1980's is false. While I did abuse cocaine in the years 1976-1977, I stopped using any cocaine after 1978. It has been many, many years since I abused any type of drugs, and I have long advocated a drug-free lifestyle. The Book fails to report that I stopped abusing drug, and presents the exact opposite false picture.

3. The Book (p. 252) also charges me with supplying the highly addictive and devastating drug of heroin to my brother Brian, at a time when he was already troubled. I have never supplied my brother Brian with heroin. The statements in the Book that I admitted my involvement in the supply of heroin to Brian while we were in New Zealand, grossly manipulates the truth. While it is true that when we were in New Zealand someone travelling with the group handed me a packet of drugs supposedly intended for my brother Brian that I suspected was heroin, I for that very reason flushed it down the toilet.

4. The Book (p. 98) also contains statements falsely suggesting that I was exchanging punches in a drunken brawl, in Amsterdam in the early 1970's. While I was there when Brian was involved in an altercation in Amsterdam, I did <u>not</u> engage in any physical violence, either punches or otherwise.

5. The Book (pp. 376 and 378) also accuses me of being holed up in my room drinking heavily while the group was on tour

in Canada in 1990.  This is the same time period in which the Conservatorship Action pertaining to my brother Brian, which I joined in, was filed.  The charge of excessive drinking is absolutely untrue, and in my opinion was put in the Book to try to bolster Landy's defense against the Conservatorship action. While in the past I had an alcohol abuse problem, I had by 1990 stopped drinking heavily.  Since 1980-1981 my use of alcohol has been limited to sharing the occasional bottle of wine at dinner and an occasional cocktail.

6.   The Book (p. 311-312) also falsely accuses me of making statements protesting the cost of treatment by Landy for my brother Dennis, and making statements protesting against Landy performing an intervention for Dennis because I did not want to upset my Christmas holiday plans.  My concerns about the intervention Landy proposed, which I made known, were that the plan carried a real risk of prompting Dennis to flee, because of the hatred Dennis had expressed about Landy.  I did not make any statements of protest because of the cost or my holiday plans.

7.   The Book (p. 247) also contains passages describing physical abuse and intimidation of my brother Brian by persons (Stan and Rocky) who are portrayed as following the Beach Boys' orders. I did not give any such orders and I did not know about the physical abuse described in the passages.

8.   The Book (p. 351) also falsely accuses me of pushing the charges that had been filed against Landy by the California State BQMA.  I did not attempt to influence the BQMA.

9. The Book (pp. 224-226, 239-240) also accuses me of objecting to the use of the Beach Boys' recording studio by Brian and Landy for therapy and that I objected because of lost studio rental income. The Book also accuses me of pressuring Brian to write songs. Those charges are false. I never objected to Brian's use of the studio for therapy, and I did not pressure Brian to write songs.

Executed this 19th day of March, 1997, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Carl Wilson

Recycled Paper

BLUEBIRD
(310) 477-0700

NATIONAL AUDIO/VIDEO FORENSIC LABORATORY
NORMAN I. PERLE

P.O. BOX 24-C-72
LOS ANGELES, CALIFORNIA 90024
CALIF. (818) 989-0990
OUT OF STATE (800) 798-7630
FACSIMILE (818) 993-8550

DECLARATION OF NORMAN I. PERLE

Case : C. Wilson & A. Wilson v. HarperCollins, Publishers

I, Norman I. Perle, declare the following:

I am a California State Licensed Investigator (#A-6088-I) and I am the owner and Director of the National Audio/Video Forensic Laboratory located in Northridge, California..

Among the services N.A./V.F.L. offers is the authentication of recordings consistent with the accepted federal guidelines.

A foundation for authentication was established in U.S. v. McKeever[3], received on other grounds[4], and was upheld throughout the years in cases such as Slatinsky v. Bailey[5], U.S. v. McMillan[6], U.S. v. Kandiel[7], Lamar v. State[8], Todisco v. U.S.[9]. The cases are in general agreement as to what constitutes a proper foundation for the admission of a sound recording, and indicated a reasonably strict adherence to the rules prescribed for testing admissibility of recordings, which have been outlined as follows:

1A. The recording device must have been capable of taking the conversation now offered in evidence.

2A. The operator of the device must be competent to operate the device.

3A. **The recording must be authentic and correct.** (emphasis added)

NOISE REMOVAL
VIDEO ENHANCEMENTS
SOUND ENHANCEMENTS
COMPUTER EVALUATIONS
EVIDENCE AUTHENTICATION
VOICE PRINT IDENTIFICATION
EXPERT WITNESS TESTIMONY
CERTIFIED ACCURATE TRANSCRIPTS

4A. **Changes, additions or deletions have not been made in the recording**. (emphasis added)

5A. The recording must have been preserved in a manner that is shown to the Court.

6A. The speakers must be identified.

7A. The conversation elicited was made voluntarily and in good faith, without any kind of inducement.

AUTHENTICITY and Correctness of Recording:

(1) Authentication is satisfied by evidence sufficient to support that the questioned matter is "what its proponent claims," as decreed in Federal Rule 901...[11]. The standard for correctness of a recording is whether **"THE POSSIBILITY OF MISIDENTIFICATION AND ADULTERATION [IS] ELIMINATED, NOT ABSOLUTELY, BUT AS A MATTER OF REASONABLE PROBABILITY"**[12]. (emphasis added)

I am an accepted Expert Witness in these matters of recorded evidence and I currently have testified in more than 100 trials, State, Federal, and Foreign Courts.

I am attaching my Resume and a Partial Case Roster of proceedings in which I have qualified as an Expert Witness and given testimony.

On March 7, 1997 I received a cassette recording in the above captioned matter.

The recording appears to be of a conversation with some people.

On the label of the cassette is, in part, : "...EXHIBIT D CARL WILSON - "BOOZE "N" HEROIN:".

I affixed a Security Seal Number 16801 to this cassette for identification.

My primary assignment was to review and analyze this recording in order to determine if the content appears to be authentic, in that the words spoken are in context and appear to be are all the words spoken at the moment in time the recorded event occurred.

Additionally, there should be no signs of inappropriate stopping and restarting of the recorder as well as the other classifications of signs suggestive of falsification including erasures.

The analysis procedure which included computer waveform analysis, spectrographic chart analysis, FFT spectrum frequency analysis and a critical aural review of the audio revealed the following:

Tape #16801 has Side 1 has audio recorded to approximately 30 +/- minutes in duration. Side 2 appears to have the segment continued through approximately 22 minutes.

This recording, on Side 1, starts with an event already underway.

And on Side 2, the side also starts with the event already underway.

To summarize my opinions, this tape recording of unknown generation exhibits significant and multiple suspicious areas which warrant further analysis.

It is my professional opinion that the "MASTER RECORDING" from which this recording was made was likely an edited version of some events.

I do not believe that these deficiencies might possibly be the product of some mechanical process or problem within the recording or duplication process and I believe that they exist at what is considered to be a higher degree than that of a coincidence. . Further, it is also my opinion that because of the type and quantity of signs suggestive of falsification, the context of the words as heard, are likely not be the way they were spoken.

In as much as this analysis is conducted upon a copy of unknown generation, it is strongly recommended that the Original Source recording and tape recorder be obtained in order to conduct a Forensic Analysis to determine the authenticity and originality of the evidence.

I strongly recommend that an independent Forensic Analysis be conducted on the Master recording in order to determine the authenticity and originality of the evidence. This analysis requires what is represented as the original recording and the original tape recorder upon which this recording was represented to be made.

The forensic instrumental tests include computer analysis, FFT spectral analysis, spectrogram chart analysis, and microscopic photography of the magnetic field on the original recording. Additionally, these recordings will be compared for (dis)similarities as the Critical Aural Perception procedure is performed.

These tests are directed to discover (1) if the recording has been edited in any manner so as to effect the context of words (ie: erasures, inappropriate stopping and restarting of the recorder), (2) if, in fact, the audio material is an original source recording and not a re-recorded version.

The testing would determine the cause of any deficiency within the audio track and is focused on establishing an opinion as to the integrity and authenticity of the evidence.

It is a common practice for law enforcement to transport recorded evidence of this type to my laboratory : 8357 Shirley Avenue, Northridge, Ca., 91324 for unsupervised processing and analysis.

The manner of transport has included Federal Express, UPS Overnight Service, and DHL Courier Services as well as personal delivery. The F.B.I. has, in the past, used DHL Courier Constant Surveillance Service.

I have received many hundreds of Original Source recordings, along with associated recording equipment, at my laboratory for unsupervised analysis and processing over the years without encountering any problems whatsoever.

The examination and analysis is time consuming and the procedures require many pieces of equipment which are not portable. As a practical matter, testing of this type could not be conducted outside of a laboratory.

I am attaching an Addendum of the Protocol for the Forensic Analysis of an evidence recording.

I certify under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct to the best of my knowledge and ability. Executed on March 13, 1997, in Northridge, California.

Norman I. Perle

REFERENCE NOTES:

3: 169 F.Supp.426,430 (SD NY,1958)

4: 271 F2d 669 (CA 2,1959)

5: 330 F2d 136

6: 508 F2d 101,104 (CA 8,1974), cert den 421 U.S.916 (1975) Cf.

7: 865 F2d 967, 973-74 (CA 8,1988), cert den 487 U.S. 1210 (1988)

8: 282 NE 2d 795 (IND,1972)

9: 298 F2d 208 (CAL 1962)

10a. U.S. v. McCowan, 706 F2d 863 (1983).

11. Zenith Radio Corp. v. Matsushita Electrical Industries C.., 505 F Supp. 1190 (E.D. Pa.1980) and Finance Co. of America v. Bankamerica Corp. 493 F. Supp. 895 (D.C.Md.1980)

12. Gass v. U.S. 416 F2d 767, 770 (D.C. Cir.Md.1980)

12A. U.S. v. Haldeman 559 F2d 31, 107 (D.C. Cir.1976)

**ADDENDUM**

The following is my anticipated protocol for testing:

Receipt of materials, create file,  photographing materials for Identification marking of materials, open file.

Create digital master recordings from "Original/Source" recordings.

Create Exemplar recordings with original tape recorder.

Physical inspection of materials.

Critical aural review, logging the time addresses of deficiencies.

Comparison of "copy", from preliminary analysis, to Original/Source.

Spectrographic chart  audio analysis.

Waveform audio analysis.

FFT spectrum frequency audio analysis

Magnetic Track Development inspection and photography of magnetic field on original recording.

Comparison of photographs and charts.

Correlation of notes, findings, and Report.

The authentication testing and examination will require a minimum of 25 working days to complete.  A report of findings is usually finished within 3 to 5 days of the end of testing.

Norman I. Perle, B.C.F.E., F.A.C.F.E.
(BOARD CERTIFIED FORENSIC EXAMINER)
(FELLOW, AMERICAN COLLEGE OF FORENSIC EXAMINERS)
National Audio/Video Forensic Laboratory
(818) 989-0990
HOMEPAGE = http://ourworld.compuserve.com/homepages/perle
E-MAIL - perle@ix.netcom.com /or\ CompuServe #71601,771 /or\ Internet #ae293@LAFN.ORG

***********************************

PARTIAL CASE REFERENCE ROSTER

***********************************

10/31/96 : Expert Witness Testimony
ATTORNEY: Edi Faal, Esq.
(714) 502-1900

CASE :Geil v. Simpson #129770

Testimony Specifics regarding authenticity of video tape and technical presentation of video segment which was transferred to 3/4" professional cassette with time code/frame counter. Presentation for Jury focused on analysis of images in sequence and detail to determine the validity of personal injury claim.

10/25/96 : Expert Witness Testimony
ATTORNEY: Mark Werksman, Esq.
(213) 688-0460

CASE : Peo. v. RATHBURN #YA026602

Testimony Specifics regarding photographic image comparison. Specific identifying characteristics from video conversion of photographic enlargements compared to Coroner photographs for victim identification. Further testimony regarding procedures, process, training and background and experience.

10/23/96 : Expert Witness Testimony
ATTORNEY: Charles Boags, Esq.
(310) 532-8245

CASE : Peo. v.WOODS #TA033082-01

Testimony Specifics regarding Spectrographic Analysis of unknown voice on evidence recording relative to voice identification and comparison. Evidence Recording contained approximately 10 clear utterances taken from a telephone message and was technically insufficient to use for identification.

10/11/96 : Expert Witness Testimony
ATTORNEY: Darryl Mounger, Esq.
(818) 990-9393

CASE : Peo. v. SEOANE #GA 025505-03

Testimony regarding analysis of evidence recording, filtering and extracting literal transcript or utterances, process and procedures

6/19/96 : Expert Witness Testimony

ATTORNEY"S :        Richard B. Mazer, Esq.
                    (415) 621-4100

                    Andrew Parnes, Esq.
                    (208) 726-1010

        CASE : U.S.A. v. Choe #CR-94-20066-JW / Northern California Federal District (San Jose)

Testimony regarding Authenticity of evidence recording; specific testing and procedures with a broken tape recorder represented as the source recorder.

3/21/96 :  Expert Witness Testimony

ATTORNEY :   Alex Kessel
             (818) 995-1422

                        CASE : Peo. v. Kearney #KA 025265

Testimony regarding attributes of surveillance video purported to show Defendant.  Video Enhancement show perpertrator has different features.  Testimony regarding process/procedures/qualifications, etc.

3/18/96 :  Expert Witness Testimony

ATTORNEY :   Edi Faal / Dan O'Sullivan

CASE : Peo. v. Edu #FEH-0168

Testimony specifics regarding flasified evidence recording, supportive technical documentation of examination and analysis.

1/8/96 :  Expert Witness Testimony

ATTORNEY :   Larry Artis
             (818) 915-6411

                    CASE : People v. Jason Goodbout #KA027551

Testimony Specifics regarding Spectrographic Analysis of unknown voice on evidence recording relative to voice identification and comparison.  Evidence Recording contained approximately 10 clear utterances taken from a telephone message and was technically insufficient to use for identification.

11/30/95 :  Expert Witness Testimony

ATTORNEY :          Andrew Thorpe, Esq.
                    Deputy Public Defender
                    (310) 603-7271

CASE : People v. STEWART #TAO 32370 : SPECIAL CIRCUMSTANCES/MURDER

Testimony Specifics regarding audio track from surveillance video.  Literal transcript/intelligibility processing/spectrographic analysis for interpretation of recorded words.

11/20/95 : Expert Witness Testimony

ATTORNEY :  (1)   Los Angeles City Attorney Office
Wilma Pinder, Esq.
(2)   Mr. Skip Miller, Esq.
Christensed,White,Miller,Fink & Jacobs
(310) 553-3000

CASE : Beyda v. City of Los Angeles, et al. (Councilman Nate Holden)

Testimony specifics regarding falsified evidence recording, supportive technical documentation of examination and analysis.

6/6/95 : Expert Witness Testimony

ATTORNEY :      Joan Whiteside Green
(213) 387-6628

CASE : Peo. v. Hawkins, et al. #A982891

Testimony specifics regarding technical aspects of evidence photographs.  Accuracy of detail, color balance, and distortion were at issue.

5/19/95 : Expert Witness Testimony

ATTORNEY :      Steven Berman
(310) 328-1234

CASE : Peo. v. Brown #YA021564

Testimony specifics regarding Voice Identification and Comparison using Spectrogram Charts, procedures, training, etc. (Kelly-Frye 402 Hearing)

5/15/95 : Expert Witness Testimony

ATTORNEY :      Richard Millard
(310) 826-6608

CASE : Peo. v. Vanke #BA038270

Testimony specifics regarding falsified evidence recording, supportive technical documentation of examination and analysis.

2/14,15/95 : Expert Witness Testimony

ATTORNEY :      Larry Easterwood, Esq.
(213) 388-7563

CASE : Peo. v. Richardson

Testimony regarding attributes of surveillance video purported to show Defendant touching a store clerks breast.  Enhancements and technical presentation show, in fact, there was no touching.  Prosecution presented edited time lapse version which created false perceptions.  Defendant acquitted of Sexual Battery.

3/3/95 : Expert Witness Testimony

ATTORNEY :          Herbert Weiss, Esq.
                    Alternate Defense Counsel
                    (818) 778-1000

CASE : Peo. v. Bolden #PA016240

Testimony regarding attributes of surveillance video purported to show Defendant.  Video Enhancements show perpetrator has different features.


3/7/95 : Expert Witness Testimony

ATTORNEY :          Ron Tudor, Esq.
                    El Paso, Texas
                    (915) 544-5039

CASE : MEDIAN v. Dept. of Army #DA-0752-95-0370-I-1

Testimony specifics regarding falsified evidence recording, supportive technical documentation of examination and analysis.


4/4/95 : Expert Witness Testimony

ATTORNEY :          Marsha Fitzgerald
                    Victorville, Ca.
                    (619) 241-0783

CASE : Peo. v. Ross #FVI-02400

Testimony specifics regarding authenticity of evidence recordings containing erasures, supportive technical documentation of examination and analysis.


June 15, 1994 :    ATTORNEY :
                          Ms. Kelly Aden, Esq.
                          Mr. Andre Jardini
                          KNAPP, PETERSEN & CLARKE
                          (818) 547-5000

          CASE : Brown v. L.A. Mortuary : California Superior Court CASE #TC003569/BC049549

                    **********************************
                    TESTIFIED AS EXPERT WITNESS
                    **********************************


Testimony specifics: Video Image Enhancements / Photographic exhibits from video evidence.  Audio Enhancements.  Voice Identification.

******************************************

April 20, 1994 : ATTORNEY :

Tracy Goldberg, Esq.
BORTON,PETRINI & CONRONI
(909) 381-0527

CASE : Russell v. Goodner : California Superior Court CASE #VCV-018456

**********************************
TESTIFIED AS EXPERT WITNESS
************************************

Testimony specifics: Video Image Enhancements / Photographic exhibits from video evidence.
******************************************

October 6, 12, 13, 1993 :

ATTORNEY: Mr. Steven Yagman, Esq.
(310) 452-3200

CASE: Oborn v. Gates, et al. Federal CASE #88-401-JWC (GX)
Honorable Judge Mariana Pfaelzer

**********************************
TESTIFIED AS EXPERT WITNESS
************************************

Testimony specifics: Authenticity of tape recorded evidence

******************************************

September 22/23, 1993 :

ATTORNEY: Mr. Edi Faal, Esq.
Ms. Wilma Shanks, Esq.
(714) 999-2017

CASE : Peo. v. Williams, et al. (DENNY CASE) Cal.Sup.CASE #BA-058116
Honorable Judge Ouderkirk

**********************************
TESTIFIED AS EXPERT WITNESS
************************************

Testimony specifics: Video Image Enhancements / Photographic exhibits from video evidence.

******************************************

November 4/5, 1992

ATTORNEY : Ms. Judith Fouladi,
Deputy Public Defender - Laguna
23560 Pacific Island Drive
Laguna Niguel, Ca., 92677
(714) 249-5060

CASE : Peo. v. Robert Bell #92M70706

**********************************

TESTIFIED AS EXPERT WITNESS
************************************

Testimony specifics: Analysis of recording showing insufficiency of technical audio standards which are necessary for SPECTROGRAPHIC VOICE ANALYSIS FOR IDENTIFICATION THROUGH VOICE COMPARISON

******************************************

March 20, 1992

ATTORNEY : Mr. Darryl Mounger, Esq.
Attorney at Law
(818) 766-1000

CASE : Peo. v. Stacey Koon et.Al.
RODNEY KING TRIAL : Hon. Stanley Weisberg

***********************************
TESTIFIED AS EXPERT WITNESS
************************************

Testimony relative to Noise Removal/Sound Enhancement procedures & Transcript of audio taken directly from original "Holiday Video 8mm tape"

***** ***** ***** *****

January 29 / 30, 1992

ATTORNEY : Ms. Gayle A. Gutenkunst, Esq.
(209) 268-4021

CASE : PEOPLE v. Edward Woods : California Superior Court : CASE #8954

***********************************
TESTIFIED AS EXPERT WITNESS
************************************

Testimony relative to Authenticity of Evidence Recording

***** ***** ***** *****

July 11, 1991

ATTORNEY : Mr. Mark Foster, Esq.
Deputy Public Defender
(714) 275-6000

SUPERIOR COURT CASE #CR-38758 : People v. Wheeler

***********************************
TESTIFIED AS EXPERT WITNESS
************************************

STIPULATION entered at trial RE: Testimony about Identification of Defendant with VoicePrint Waveform/Spectrographic Analysis

***** ***** ***** *****

March 4, 1991

ATTORNEY : Mr. Mick Bodek, Esq.
Deputy Public Defender
(818) 898-2450

CASE : PEOPLE v. Stone : #A 707630

**********************************
TESTIFIED AS EXPERT WITNESS
**********************************

Testimony relative to Authenticity of Evidence Recording

***** ***** ***** *****

June 28,29, 1990

ATTORNEY : Ms. Mary Kelly, Esq.
Attorney at Law
(213) 472-7121

U.S.A. v. Bernarbe-Rameriz, et al.
FEDERAL CASE : CR-87-422(F)-ER : Hon. Edward Rafadie

**********************************
TESTIFIED AS EXPERT WITNESS
**********************************

Testimony re; Computer/Waveform/Spectrographic Analysis/Accuracy of Transcript/Noise Removal, Sound Enhhancement techniques.

***** ***** ***** *****

May 1, 1990

ATTORNEY : Mr. Gary Bond, Esq.
(602) 774-0303

CASE : ARIZONA v. Wright : #CM89-482

**********************************
TESTIFIED AS EXPERT WITNESS
**********************************

Testimony relative to Identity of Speakers/Spectrographic Analysis

***** ***** ***** *****

March 29, 1990

ATTORNEY : Mr. Kwame Motilewa, Esq.
Attorney at Law
St. Thomas, Virgin Island 00801
(809) 776-2772

CASE : U.S.A. v. Hopkins : #1989-155
ST.THOMAS/ST.JOHN FEDERAL DISTRICT : HONORABLE JUDGE PIERCE

**********************************
TESTIFIED AS EXPERT WITNESS
**********************************

Testimony relative to authenticity of Evidence Recording and Identity of Speakers through Spectrographic Analysis

***** ***** ***** ***** *****

March 29, 1990

ATTORNEY : L. PATRICK PIGGOTT, ESQ.
(209) 943-1941

CASE #41093 Superior Court : People vs . MUELLER

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

Accuracy of Transcript and Spectrographic Analysis : Quantity of speakers

***** ***** ***** ***** *****

December 12, 1989

ATTORNEY : Stephen Yagman
(213) 452-3200

CASE : Clark v. Ford, ET AL : #84-239 AHS

ORANGE COUNTY FEDERAL DISTRICT COURT : Honorable Judge Stotler

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

Testimony relative to Accuracy of Transcript

***** ***** ***** ***** *****

June 22, 1989

ATTORNEY : BRIAN O'NEILL, ESQ.
(213) 541-5700

CASE : U.S.A. v. Bernfeld

LOS ANGELES FEDERAL DISTRICT : HONORABLE JUDGE REA

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

Testimony relative to authenticity of Evidence Recording

***** ***** ***** ***** *****

June 14, 1989

ATTORNEY : L. PATRICK PIGGOTT, ESQ.
(209) 943-1941

CASE #41093 Superior Court : People vs . MUELLER

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

Accuracy of Transcript : Kelly-Frye issues relative to testimony : Acoustical evaluation : quantity of speakers

***** ***** ***** ***** *****

October 6, 1988

ATTORNEY : George H. Savord, Esq.
(714) 676- 2202

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

CASE #SE-8938 N.T.S.B./F.A.A. vs . BYBYK : Authenticity of Evidence Recording

***** ***** ***** ***** *****

April 20, 1988

BARRISTERS & SOLICITORS :

E.F. Anthony Merchant
Michael D. Tochor
Regina, Canada S4P 4H9
(306) 359-7777

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

CASE : THE QUEEN vs. Dimitrios Voutsis, MD.
Authenticity of Evidence Recording

***** ***** ***** ***** *****

April 11, 1988

ATTORNEY: Robert LaBau,
Deputy Public Defender
(818) 901-3854

CASE : #87-PO-0691 Peo. v. TUFFIN
Court Appointment for ANALYSIS & REPORT on Video Taped Evidence

***** ***** ***** ***** *****

March, 24/25, 1987

ATTORNEY : Mr. Gerald M. Cobb
(213) 658-8977

***** ***** ***** *****

U.S.A vs. Delgado, Damaso et al. #USA-CR 86-624-FFF

FEDERAL DISTRICT LOS ANGELES

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

RE: Authenticity of Audio Evidence

***** ***** ***** ***** *****

February 9, 1987

ATTORNEY: Mr. Jeffrey A. Brightwell, Esq.

CASE: vs. Abe Chaplan, M.D. : #A-083075

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

Testimony relative to Authenticity of Recordings

February 1/2/3, 1987

ATTORNEY: Rayford Fountain
(818) 793-4111

CASE : California v. RUBY PADGETT #A591707

SPECIAL CIRCUMSTANCES - MURDER

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

Testimony specifics relative to accuracy of transcripts
Noise Removal/Sound Enhancement techniques

***** ***** ***** ***** *****

October 15, 1986

ATTORNEY: Michael L. Sprague
(805) 323-6666

CASE: California v. MASON #31585

***** *****

COURT ACCEPTED FOR FORENSIC ANALYSIS OF ORIGINAL EVIDENCE
RECORDINGS FOR SIGNS OF MATERIAL DELETIONS
ANALYSIS FOR VOICE IDENTIFICATION
NOISE REMOVAL/SOUND ENHANCEMENT

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

TESTIMONY: Re: recordings containing signs of deletions

***** ***** ***** ***** *****

August 23, 1986

ATTORNEY: James R. Kalyvas, Esq.
(213) 277-2223

CASE : Sokoloff v. Bank of America

***** *****

Noise Removal/Sound Enhancement/Accurate Transcript

***** ***** ***** ***** *****

August 1, 1986

ATTORNEY : Mr. David Kenner,Esq.
(818) 995-1195

CASE: U.S.A. vs. Wycoff : #86-483AHS

VOICE IDENTIFICATION, VOICE EXEMPLARS

Analysis for Voice Identification

***** ***** ***** ***** *****

March 23, 1986

ATTORNEY: Bradley Brunon, Esq.
(213) 273-6022

CASE: PEOPLE vs. Kathy Kay #A-766091

***** *****

COURT ACCEPTED FORENSIC TESTING OF ORIGINAL EVIDENCE SOUND RECORDINGSFOR SIGNS OF FALSIFICATION.

***** *****

Analysis of original evidence recordings.
24 hour, 10 track L.A.S.O. Dispatch tape.

***** ***** ***** ***** *****

November 17, 1985

ATTORNEY: Donnalee H. Huffman, Esq.
(805) 327-1328

CASE: Kern County Superior Court : People vs. MARKEY

***** *****

COURT APPOINTMENT : FORENSIC TESTING OF ORIGINAL EVIDENCE SOUND RECORDINGS FOR SIGNS SUGGESTIVE OF FALSIFICATION

***** *****

Analysis of original evidence recordings for Authentication

***** ***** ***** ***** *****

September 6, 1985
November 19, 1985

ATTORNEY: Richard Sherman,
(213) 553-5111

CASE: vs. Abe Chaplan, M.D. : #A-083075

***** *****

COURT ACCEPTED FORENSIC TESTING OF ORIGINAL EVIDENCE SOUND RECORDINGS FOR SIGNS OF FALSIFICATION.

***** *****

Analysis of original evidence recordings for Authentication

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

***** ***** ***** ***** *****

May 13, 1985

ATTORNEY: Russell H. Thaw
(818) 901-7955

CASE: vs. TERRY #A756764

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

Testified re: Authenticity of Audio Evidence Recording.

***** ***** ***** ***** *****

May 1, 1985

LOS ANGELES PUBLIC DEFENDERS OFFICE
Andrew Thorpe, D.P.D.
(213) 491-6378

***** *****

CASE: vs. DECAMP #A-029090

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

Re: Motion to support Forensic Testing of original recordings containing signs suggestive of falsification.

***** ***** ***** ***** *****

October 28, 1984

ATTORNEY : George A. Peters,
(714) 835-0400

CASE: People vs. Marchette - C-54507

**********************************

TESTIFIED AS EXPERT WITNESS

**********************************

Testimony : Re: Authenticity of Evidence Recordings
(ORANGE COUNTY February 11/12/13, 1984)

***** ***** ***** ***** *****

July 31, 1984

ATTORNEY : Gregory Pagan, D.P.D.

SAN FRANCISCO OFFICE OF THE PUBLIC DEFENDER
(415) 553-1671

CASE: Court Appointment   People v. Malcolm - #112583

Noise removal and sound enhancement of evidence recording.

***** ***** ***** ***** *****

June 22, 1984

LOS ANGELES COUNTY PUBLIC DEFENDER OFFICE
Martin Staven, Deputy Public Defender
(818) 898-2440

CASE: California vs. Erikson  #A-701260

Court Appointment to evaluate recorded evidence
and generate accurate transcripts of confession.

***** ***** ***** ***** *****

April 10, 1984

L.A.P.D. PROTECTIVE LEAGUE
L.A.P.D.  SGT. DARRYL MOUNGER, Board of Rights Advocate
(213) 626-5341

CASE:  Board of Rights Hearing : Officer Jay Paul, P.D.I.D.

***********************************
TESTIFIED AS EXPERT WITNESS
***********************************
Tape analysis of interview, word identification, sound enhancement, noise removal.

***** ***** ***** ***** *****

April 6, 1984

ATTORNEY:   Chester L. Brown,
(213) 208-8877

CASE: California vs. Schwartz :

***********************************
TESTIFIED AS EXPERT WITNESS
***********************************

RECONSTRUCTIVE ACOUSTICAL  ANALYSIS AND DUPLICATION OF ARREST EVENTS

***** ***** ***** ***** *****

January 15, 1984

ATTORNEY :   Frank H. Snitow, Esq.
NEW YORK, NEW YORK, 10017
(212) 687-1166

CASE: #7642/82   State of New York vs. Katz and Cincotti

***** *****

COURT ACCEPTED FORENSIC TESTING OF ORIGINAL EVIDENCE

***** *****

October 31, 1983

Peter Noyes, Executive News Editor
N.B.C News Department
Burbank, California 91523

CASE: DeLorean Audio Tape

Tape Analysis for Authentication

***** ***** ***** ***** *****

October 18, 1983

ATTORNEY: David Leveton,
(213) 553-4700

CASE: vs. Wendt (Obscene Phone Calls)

**********************************
TESTIFIED AS EXPERT WITNESS
**********************************

Spectrographic Analysis for technical Voice Identification/Comparison

***** ***** ***** ***** *****

August 31, 1983

ATTORNEY: Charles Nickell,
(818) 248-1399

CASE: SUPERIOR COURT APPOINTMENT #378657 : vs. Johnny Hairston

SPECIAL CIRCUMSTANCES : MURDER

Tape Analysis for Authentication/Sound Enhancement - Generate Accurate Transcript

***** ***** ***** ***** *****

CALIFORNIA LAWYER MARCH 1996

# You Can't *Fool* Mother Technology

## Tamper with tapes and you leave fingerprints

FORENSICS

Last fall Marlee Beyda, a receptionist for the field office of Los Angeles City Councilman Nate Holden, sued Holden for sexual harassment. Beyda claimed that she visited Holden's apartment eight times and that Holden repeatedly groped and harassed her and had even exposed himself to her at one point. When she refused to "put out," she said, he began to withhold job opportunities.

Holden's defense team first tried to submit an audiotape of an interview between a defense psychiatrist and Beyda. Unfortunately, the psychiatrist's machine had malfunctioned, so that taped record was unavailable. The defense then subpoenaed a six-minute audiotape that Beyda had presumably made independently during the same psychiatric session.

Beyda's tape shocked the courtroom: Among other things, she stated that during the exposure incident, she noticed the councilman was circumcised. Holden defended himself to an eager public. He never exposed himself to her, he told reporters. What's more, his family had been too poor when he was born to afford such medical procedures as circumcision.

The seven-week case involved voluminous evidence, including expert evaluations of the plaintiff's mental state, witness reports for both sides, allegations of a hostile environment in Holden's field office, and Holden's vehement assertions that he had never laid a hand on the plaintiff. One of the key pieces of evidence, however, was that tape. Sure, Holden had pretty much defused the circumcision issue, but what about the rest of the material on the tape. Could it be trusted?

Holden's attorney, Skip Miller of Christensen, White, Miller, Fink, Jacobs, Glaser & Shapiro in Los Angeles, decided to call in Norman Perle of National Audio/Video Forensics Laboratory in Northridge. Perle is known for his work on authenticating and clarifying recorded evidence. Using a simple device called the CE-3000, by DigiVision, Perle enhanced images of the magnetic field of the audiotape. What he found was a patchwork quilt of recordings.

"The entire side was 30 minutes long," Perle notes, chuckling. "There were less than six minutes of recording at the beginning. The rest of the tape was erased all the way to the end. But in those first seven minutes, there were 64 starts and restarts, which are basically edits. And there were signatures from three different tape recorders, as if the tape had been made on three different tape recorders. The bottom line was that the tape was flawed."

But Perle still had to convince the jury of the flaws. First he treated the tape with magnetic track developing fluid, a liquid that quickly evaporates, leaving traces of iron on the magnetic track of the tape. Using a microscope, Perle saw when the machine was recording or erasing and when an area was recorded over. What he saw told him that three different machines were used to make the tape. These techniques are complicated to show a jury. So Perle made a videotape of the magnetic fields on the audiotape,

Norman Perle of National Audio/Video Forensics Laboratory

enchanced the image with the DigiVision CE-3000, and then enhanced that image with a computer to prepare it for the jury. The tape was dismissed and Holden was eventually acquitted.

### Accentuate the Visual

DigiVision's CE-3000 is actually a video enhancement product originally designed for medical use. The CE-3000,

Continued on page 62

which has been used by doctors, reconnaissance pilots, and various government agencies since 1993, allows viewers to sharpen contrast and compensate for poor lighting. The company has been marketing it to attorneys and forensics experts for about a year. A small stand-alone unit that goes between your TV or camera and your VCR, it takes all the pixels (the tiny points that form an image on your screen) coming in on the video stream (about 250,000 of them) and averages out what the value of each pixel should be, according to a mathematical formula. There is actually a gain in apparent resolution similar to the way the graphic equalizer on your stereo makes music sound brighter. You can adjust three different aspects of the picture you see: the contrast (you can sharpen the edges of objects), the amount of detail, and the light balancing (the color of the background). To run the machine, you just twirl three little knobs (kind of like focusing your television set). Notes DigiVision marketing vice president Bruce Lawrence, "It's even easier than word processing."

The only reason more people aren't using it, Lawrence admits, is that the device is pricey. At $8,000, you, or your forensics expert, will probably want to have a lot of video- and audiotape to examine. But consider what you get: Although videotape enchancers have existed for years, what's different about DigiVision's product is that it works in real time. Instead of capturing (or extracting from the video) a photo or video frame and working on it to make it look better, DigiVision makes the camera or monitor fiddle with each frame in 1/30th of a second (video runs at 30 frames a second). In other words, DigiVision fixes each little pixel at a rate of 1/250,000th of 1/30th of a second, which is so fast you can just call it 50 nanoseconds.

The advantage of all this real-time processing technology, which DigiVision calls V-LACE, is that it allows you to view the enhanced video as it's coming into your video monitor. A police officer, for example, might want to enhance the video of what appears to be a drug deal on a playground—as she's watching through a camera. Or a forensics expert might need to examine the tape of an alleged assault.

"I had a tape just a little while ago from a surveillance camera in a department store," Perle says. "One of the clerks accused a guy of going up to her counter, reaching over, and tweaking her breast. So the cops went in and looked at the security tape in the store and felt there was enough there to arrest him.

"Now, the lenses on these cameras had never been cleaned and the pictures were very gray and washed out. The resolution on these cameras stinks, for lack of a better word. But when I enhanced the contrast, I saw that it showed nothing. The jury ended up reducing the charge to some kind of assault, because they thought he touched her shoulder. Me, I thought the guy should have skated."

Doesn't all this enhancement somehow distort the evidence? Not at all. In video "restoration" the programs calculate what's supposed to be there, based on the existing video signal. In this kind of video "enhancement," however, the programs actually manipulate only the information that is already on the tape. "It doesn't add anything," Perle says. "The picture is there; this just clears up the playback process."

### Sound of Silence

Perle, who says about 80 percent of his business is for defense attorneys, spins story after story of the images he's clarified on videotape. But it's the audio work Perle does that is most intriguing. For instance, Perle was once able to get a man acquitted who had been in jail for four years awaiting trial on capital murder charges in a firebombing case, when he found 21 problems with a crucial interview tape, including an hour's worth of falsified tape.

"And with the Holden case," Perle says, cackling as he remembers, "the plaintiff's attorney even brought in some other recording expert to corroborate what she was saying. And that man said the reason there were 64 start-overs on the tape was because it was a voice-activated machine. Well, anyone who knows me was smiling during that testimony because it was like, 'We know it was a voice-activated machine. But that doesn't explain the 24-minute erasure.' And besides, 64 restarts is kind of outrageous."

Notes Miller, who represented Holden, "We got hold of Norm late in the case, and when he analyzed that tape it was very telling. The process is very technical, but Norm was straightforward about the evidence. Even the judge was impressed."

Video is a little easier to handle than audio and provides a wealth of potential evidence. "Ten years ago, hardly anybody did forensic work with video," Perle notes. "But there's been a remarkable turn of events. The amount of video evidence has doubled at least three times in the last decade and it's going to double again. There are video cameras in police cars, on belt buckles, corsages, and hats. It's only going to get more widespread. The DigiVision CE-3000 is the device for enhancing resolution, contrast, and detail in these tapes."

National Audio/Video Forensic Laboratory
Norman I. Perle
(800) 798-7630

THE NATIONAL LAW JOURNAL Monday, July 24, 1995

# Jailed Four Years, Freed Before Trial

LOS ANGELES – Robert Vanke Jr., 22, spent four years in jail awaiting trial for capital murder for a firebombing, allegedly committed in retaliation for a gang shooting that killed a woman and her 11-month-old baby.

On the day of trial July 12, the Los Angeles district attorney's office dropped the charges, citing evidence the audiotape of his purported confession had been altered.

Deputy D.A. Craig W. Hum said he was unaware of any questions about the roughly 90-minute tape, which includes conversations between four suspects, until 2 months ago when a defense audio expert, Norman I. Perle, told the court it had been altered. *People v. Vanke*, BA038270.

Mr. Hum then went to the FBI forensic lab, which on the eve of trial confirmed by fax that as much as 2 minutes, 18 seconds had been erased from the start of a pivotal conversation.

"It's possible there's an innocent explanation, but it raised questions in my mind about what actually happened," he said, adding that his other evidence was not strong enough to proceed. He said the FBI had not found any "alteration" as opposed to an erasure that could be accidental.

In contrast, Mr. Perle – who has testified in several high-profile cases including the Reginald Denny beating – flatly states the tape was "falsified."

There were "21 specific things wrong and about an hour's worth was constructed, that is, put together in such a way as to indicate the defendant was guilty," Mr. Perle asserted. "You have to say somebody did this to the kid."

The investigating officer, ex-Det. Carl A. Sims, could not be reached for comment. He left the force in 1992 after he was disciplined for falsifying a search warrant request in a separate case.

Mr. Vanke's attorney Richard Millard, an L.A. sole practitioner, declined to speculate about how the tape might have been altered, but said his client is considering a lawsuit.

Mr. Millard said, regarding his client's long pretrial custody, that repeated discovery delays had caused him to waive speedy trial guarantees.

–GAIL DIANE COX

*Compiled from National Law Journal staff correspondent and Associated Press Reports.*

VALLEY EDITION

Los Angeles Times

THURSDAY, NOVEMBER 16, 1995
COPYRIGHT 1995/THE TIMES MIRROR COMPANY/F/CC†/146 PAGES

# Psychiatrist Disputes Holden Foe's Statement

■ **Courts:** Doctor says plaintiff described defendant as circumcised. Councilman says he is not.

By JODI WILGOREN
TIMES STAFF WRITER

A psychiatrist testified Wednesday that the woman suing Los Angeles City Councilman Nate Holden for sexual harassment—in part because he allegedly forced her to touch his penis and attempted to make her perform oral sex—told him that Holden is circumcised.

But Holden, outside court, said he is not. "If you don't see, you don't know," the 66-year-old lawmaker said. "She didn't see—I've been saying that all along. She doesn't know. She is dead wrong."

"It's a fairly clear-cut issue," said Holden's attorney, Skip Miller.

Lawyers for plaintiff Marlee M. Beyda, who worked as a receptionist in Holden's field office for about 14 months, insist that their client never discussed circumcision with the psychiatrist, David Paster. During six days on the stand, Beyda was never asked about circumcision; she testified that she saw Holden's penis but did not notice any distinguishing marks.

"I am certain that she never said he was circumcised," attorney Dan Stormer said during a break in Paster's testimony Wednesday. "She tried not to look at what [Holden] was shoving in her face."

One of two women suing Holden and the city for harassment, Beyda has focused her accusations on a series of after-hours visits to Holden's Marina del Rey apartment during which she says he forced sexual contact and offered to advance her career in exchange for sexual favors.

The circumcision controversy was heightened by the fact that both Paster and Beyda tape-recorded their four-hour interview, but neither tape mentions circumcision, prompting accusations of Watergate-type evidence tampering.

Both sides joked about bringing in Rose Mary Woods, the late secretary to President Richard Nixon, who allegedly erased parts of her boss's tapes before turning them over to government investigators.

Lawyers for the defense requested Beyda's tape after they discovered that Paster's tape recorder had malfunctioned. They said Wednesday that audio expert Norman Pearl would testify that the tape Beyda gave them was not the original, and had been altered or erased in about 60 places.

"We have destruction of evidence," Michael O'Connor, Miller's partner, told Superior Court Judge Raymond D. Mireles, who is hearing the case without a jury. "There is no benign explanation for this."

Please see HOLDEN, B15

# HOLDEN

Continued from B14

But Stormer told Mireles his opposition was "grandstanding."

"We did not touch, alter the tape in any way," Stormer said outside court.

During his lengthy testimony Wednesday, Paster said the circumcision question was just one of several examples of how Beyda muddled details of the alleged incidents with Holden, leading him to think her story was made up.

"She described at one point graphic sexual events . . . and yet said there was nothing about his penis that stood out physically," he said. "She at times changed her answers and seemed to have significant difficulty with specific recall of events. . . . There went on to be confusion about dates, about what happened when."

Paster also disputed previous expert testimony that Beyda suffered from depression, and said instead that she had a personality disorder caused by events other than the alleged harassment.

He described her as an "opportunist" who tended to "externalize blame" onto authority figures and showed deep-seated hostility toward her family. He also said she was prone to explosive outbursts, "someone who presents a good social front but has a longstanding anger and resentment."

Paster will charge the city about $25,000 for his work on the Holden case.

Case 1:94-cv-00892-JEC-LFG Document 165 Filed 04/21/97 Page 129 of 147

# Sound expert's testimony attacks taped confession

By KATHY BRAIDHILL
Staff Writer

An audio expert cast doubt Monday on a confession of a South Carolina woman who had admitted in a taped statement that she dunked the head of a Domino's pizza deliveryman under water in a bathtub.

The testimony of sound expert Norman I. Perles, who played the key phrases over and over again to a rapt jury, could negate the admission of Ruby Carolyn Padgett, 21, on trial for the murder of deliveryman John Harrigan, 20.

According to transcripts of tapes played for the jury last week, Padgett said, "All I did was push his face down under the water."

Using sophisticated sound equipment to block background noise and static, Perle played the same tape for the jury, but this time Padgett seemed to say, " 'Cause all it did was push his face underwater."

Defense attorney Ray Fountain said that statement supports his client's claim that the water pouring from the bathtub faucet forced the bound and gagged deliveryman's face underwater.

When the defense portion of the Pasadena Superior Court trial resumes today, Deputy District Attorney Terry Green will cross-examine Perle and try to show that manipulation of the tape is meaningless.

"You can make anything sound like anything," said Green, who rested the prosecution side of the case last week.

Padgett and Mitchell Carlton Sims, 25, face murder charges in separate trials in the strangling and drowning of Harrigan after he delivered a pizza to their Glendale motel room on Dec. 9, 1985.

The South Carolina couple also face charges of robbery and attempted murder for allegedly leaving two Domino's employees hanging by their necks in a food freezer the same night.

In the four hours of tapes played last week, Padgett explains how Sims gagged and hogtied Harrigan, tightly tied a pillowcase around his neck, then carried Harrigan into the bathtub.

Although Padgett blurted out on the tape that she pushed Harrigan's face under the water, she also says that Sims does it and that nobody does it.

Throughout the tape, she also describes Harrigan's struggles once he is in the tub and the tub fills with water.

Perle played the tape containing Padgett's confession on devices that filter out background noise and enhance the sound quality.

Jurors listened intently as Perle isolated and repeatedly played the crucial phrase, which sounded like, " 'Cause all it did was push . . . 'Cause all it did was push . . ., 'Cause all it did was push . . . "

Perle also demonstrated how bolstering the sound quality pointed up another discrepancy in the transcript of the tape in a non-crucial segment.

The transcript reads that Padgett said she was sitting "right on the side on the bed," although in the enhanced tape, she seems to say she was sitting "right beside it, on the bed."

Fountain tried to show that the transcript of the tape contains numerous similar errors that could be corrected by improving the tape's sound quality.

In other testimony designed to poke holes in the prosecution's case, the coroner who performed the autopsy on Harrigan said Harrigan died of strangulation, not both strangulation and drowning.

The cause of death is important to the defense, said Fountain, who will try to convince the jury that Sims strangled and killed Harrigan before he was placed in the bathtub.

Cogan also testified that — a year after the autopsy — he is changing the death certificate and the autopsy report to show that Harrigan died of both drowning and strangulation.

Cogan said he amended the report after he testified at the trial two weeks ago and learned that Padgett said she saw Harrigan struggling in the tub.

Fountain tried to show that Cogan should have formed his opinion on the scientific evidence from the autopsy, not statements by the defendant.

**Audio expert Norman Perle shows jury sound wave patterns in Ruby Padgett tape**

John Lloyd / Star-News

The Leader-Post Regina Thurs., Apr. 21, 1988

# Recording messed with, audio expert tells court

By Mark Wyatt
of The Leader-Post

Someone tampered with the secret tape recording a Regina woman made for police as she allegedly traded sex favors for painkillers, a court heard Wednesday.

Defence witness Norman Perle, a forensic audio analyst, said someone shut off the tape recorder during parts of Lynn Dianne Scott's visit to former Regina physician Dimitrios Voutsis, and as a result the conversation captured on the tape is out of context.

Perle, who runs a private forensic laboratory in California, called the omissions "blatant" attempts to falsify the true content of the conversations.

He warned such omissions from a tape can "change the intent of a conversation."

The Crown is attempting to enter the tape into evidence at Voutsis' Court of Queen's Bench trial on charges of trafficking in codeine.

Scott, 27, has testified that Voutsis gave her seven painkillers when she visited his office on June 23, 1986. In return for the drugs, Scott said she allowed Voutsis to kiss her and touch her breasts, although she spurned other sexual advances.

Scott and three police witnesses have testified that a tape recorder was placed inside the purse Scott carried with her into Voutsis' office.

Members of the Regina city police drug squad also said the tape recorder was started before Scott entered Voutsis' office and was not stopped until she left with the seven painkillers in hand.

However, Perle said his tests show that it was more likely Scott carried a microphone that transmitted a signal to a remote tape recorder.

"It is my opinion that tape could not have originated in a body recorder or a purse recorder." Perle said. "I am lead to that conclusion by the presence of radio frequency interference which occurred in large quantities throughout this recording."

Perle said he knows of no way that radio frequency interference could be heard on a tape that is recorded by a body or purse recorder.

"My conclusions are that I do not believe that this recording is the product of a body recorder or a purse recorder, and in addition, it is my opinion that the conversations are not in context by virtue of the recorder stopping at various times before the end of the incident."

Perle said the most blatant omission from the tape comes where Scott and Voutsis are talking, while a radio plays the song Love Train by the O'Jays in the background.

A blast of static interrupts their dialogue and when the dialogue becomes audible again, the background music is no longer present.

In addition to his findings that the tape was stopped and re-started while conversations between Voutsis and Scott progressed, Perle said it is possible that some of the dialogue on the tape was recorded over other dialogue.

"It is my suspicion that it could have occurred, unfortunately, I'm not in a position to qualify or disqualify it," he said.

Perle said he spent more than 100 hours performing a battery of tests on the tape of the conversations, which took place in Voutsis' former office in the Medical and Dental Building in downtown Regina.

Perle was called to testify during the third day of a voir dire to determine whether the tape recording can be tendered by the Crown as admissible evidence in the actual trial.

In addition to questioning the authenticity of the tape, defence lawyers Tony Merchant and Mike Tochor are attempting to show Scott was emotionally unstable in June 1986 and was coerced by police into recording her conversation with Voutsis.

Scott was the only other witness to testify Wednesday.

She said that prior to June 23, 1986, she had sexual intercourse with Voutsis on four occasions in exchange for prescription drugs.

"This occasion (June 23, 1986) was quite different than any other occasion because we didn't have sex," Scott said.

Scott also said Voutsis' wife, who worked as the doctor's receptionist, had on two occasions given her pills to ease her anxiety.

Voutsis has been suspended from practising medicine by the Saskatchewan College of Physicians and Surgeons, pending the outcome of his criminal trials.

Crown prosecutor Dave Halvorsen is expected to cross-examine Perle when the trial continues today before Justice Paul Hrabinsky.

Recycled Paper
BLUEBIRD (310) 477-0700

JOHN K. VAN DE KAMP, Attorney General
of the State of California
CALVIN W. TORRANCE,
MARILYN H. LEVIN,
Deputy Attorneys General
3580 Wilshire Boulevard
Los Angeles, California 90010
Telephone: (213) 736-2013

Attorneys for Complainant

BEFORE THE
PSYCHOLOGY EXAMINING COMMITTEE
DIVISION OF ALLIED HEALTH PROFESSIONS
BOARD OF MEDICAL QUALITY ASSURANCE
DEPARTMENT OF CONSUMER AFFAIRS
STATE OF CALIFORNIA

| In the Matter of the Accusation Against: EUGENE LANDY, Ph.D., 1516 Westwood Boulevard, #206, Los Angeles, California; Psychology License No. PK-3571, Respondent. | Case No. D- 3745<br>ACCUSATION |
|---|---|

Thomas O'Connor, complainant, as grounds for disciplinary action charges as follows:

I

Thomas O'Connor is the Executive Officer of the Psychology Examining Committee (hereinafter "PEC") of the Division of Allied Health Professions of the Board of Medical Quality Assurance of the State of California, and makes and files this Accusation in his official capacity and not otherwise.

II

Eugene Landy, Ph.D., (hereinafter "respondent") was

EXHIBIT A

issued a psychologist's license on or about June 4, 1971 by the PEC. Said license at all times since that date has been and now is in full force and effect, having been renewed through and including November 30, 1988.

III

Sections 2960 and 2961 of the Business and Professions Code (all statutory references hereinafter are to that code unless otherwise indicated) provide that the PEC may order a psychologist's license revoked or suspended if the psychologist is proved, after a hearing, to have committed any of the offenses set forth in the various subdivisions of section 2960.

IV

Section 2960, subdivision (b) provides, in pertinent part, that it is grounds for discipline if a psychologist uses any controlled substance as defined in Division 10 of the Health and Safety Code or dangerous drug to an extent or in a manner dangerous to any other person or the public, or to an extent that such use impairs his ability to perform the work of a psychologist with safety to the public.

V

At all times mentioned herein, cocaine was a controlled substance as defined in Division 10 of the Health and Safety Code, and amyl nitrite was a dangerous drug as defined in section 4211 of the Business and Professions Code.

VI

Section 2960, subdivision (k) provides that violation of any of the provisions of the Psychology Act is grounds for

discipline.

VII

Section 2904 provides that the practice of psychology shall not include prescribing drugs.

VIII

Section 2960, subdivision (n) provides that the commission of any act of sexual abuse or sexual relations with a patient, or sexual misconduct which is substantially related to the qualifications, functions or duties of a psychologist is grounds for disciplinary action.

IX

Section 2960, subdivision (j) provides that it is grounds for discipline for a psychologist to be grossly negligent in the practice of his profession.

FIRST CAUSE OF ACTION

Prescribing Drugs to Patient R. G.

X

Respondent is subject to disciplinary action, pursuant to the provisions of section 2960, subdivision (k), in that he has violated the provisions of section 2904, in that he has prescribed drugs to a patient, as more particularly set forth hereinafter:

A. During the periods of time between September 1981 and February 1982, and also during the period of time between June 1982 and September 1983, R. G. (hereinafter the "patient") was a patient at the Foundation for Rechanneling Emotions and Education, also known as F.R.E.E. clinic

(hereinafter the "clinic") located on Robertson Boulevard in Beverly Hills, California. During said periods of time, patient was receiving counseling in weekly individual therapy sessions from a series of counselors at the clinic. In addition to respondent, the main counselors giving therapy to patient were unlicensed counselor Sara Hardman from July to December 1982 and Marriage, Family and Child Counselor intern Gary Peskin from January to June 1983. During said periods of time, patient was also receiving group therapy at the clinic from January to September 1983.

B. During the period of time referred to in subparagraph A, hereinabove, respondent was the supervisor of all of the counselors of patient at the clinic and provided individual therapy sessions to patient.

C. During the period of time between July 1982 and May 1983, respondent on several occasions interrupted a regular individual therapy session which patient was having with one of the other clinic counselors, took over the remainder of that therapy session himself, and provided individual therapy sessions to patient. During said period of time, respondent on a number of other occasions conducted individual therapy sessions with patient.

D. During the period of time set forth in subparagraph C, hereinabove, respondent prescribed, administered and furnished drugs and controlled substances to patient, on the dates and places set forth below:

/ / /

| | Date | Place | Drug | Details |
|---|---|---|---|---|
| 1. | August 1982 | Clinic | cocaine | During Sara H. therapy session and later that night |
| 2. | February and March 1983 | Respondent's car and clinic office | cocaine | After group therapy session- between 9 p.m. and 2 a.m. |
| 3. | March 1983 Friday Evening | Before orgy session | cocaine | in car just prior to attending orgy session |
| 4. | Late March 1983 | Clinic | cocaine | After therapy session |
| 5. | April 3, 1983 | Respondent's condo | cocaine & amyl nitrite | |
| 6. | After April 9, 1983 | Respondent's condo | cocaine | |
| 7. | May 1983 Friday | Respondent's condo | cocaine & amyl nitrite | Last therapy session |

XI

SECOND CAUSE OF ACTION

Use of Cocaine With Patient R. G. to the Extent Dangerous to Others and Public

Respondent's license as a psychologist is further subject to discipline in that he has violated the provisions of section 2960, subdivision (b), in that he has on numerous occasions used a controlled substance, to wit, cocaine, to an extent or in a manner dangerous to other persons and the public, or to an extent that such use has impaired his ability

to perform the work of a psychologist with safety to the public; the details are set forth more particularly hereinafter:

A. The allegations of paragraphs I through V, inclusive and also paragraph X, subparagraphs A, B, C, and D are incorporated herein by reference.

B. On each of the seven instances set forth in paragraph X, subparagraph D, hereinabove, and incorporated herein by reference, respondent used and administered cocaine to himself.

XII

THIRD CAUSE OF ACTION

Sexual Misconduct with Patient R. G.

Respondent's license is further subject to discipline, in that he violated the provisions of section 2960, subdivision (n), in that he has committed acts of sexual misconduct, sexual abuse, or sexual relations with a patient; the details are set forth more particularly hereinafter:

A. The allegations of paragraphs I through III, VIII and X hereinabove are incorporated by reference herein.

B. During incidents numbered 2, 3, 5 & 7 that are set forth in paragraph X, subparagraph D, hereinabove, respondent had patient perform fellatio on him.

C. During incident 2 set forth in paragraph X, subparagraph D, hereinabove, respondent had intercourse with patient and also performed cunnilingus upon her.

D. During incident 3 set forth in paragraph X,

subparagraph D, hereinabove, respondent had patient perform fellatio on him on two separate occasions during the orgy, and on another occasion while respondent was driving his car and patient was a passenger. During this latter occasion, the fellatio occurred while the car was being driven down a hill after leaving the orgy.

E. During incident 4 set forth in paragraph X, subparagraph D, hereinabove, respondent masturbated himself in the presence of patient.

F. During incident 7 set forth in paragraph X, subparagraph D, hereinabove, on one occasion respondent forced the patient to perform fellatio on him. Subsequently that night respondent broke vials of amyl nitrite in the face of patient, and again had patient perform fellatio on him. A little later that night, respondent forced his penis down the throat of the patient against her will and had forced fellatio with her.

XIII

FOURTH CAUSE OF ACTION

<u>Gross Negligence in Treatment of Patient R. G.</u>

Respondent's license is further subject to discipline in that he violated the provisions of section 2960, subdivision (j) in that he engaged in acts constituting gross negligence; the details are set forth more particularly hereinafter:

A. The allegations of paragraphs I to IX inclusive, and also paragraph X, subparagraphs A, B, C and D, paragraph XI, subparagraphs A and B, and paragraph XII,

subparagraphs A, B, C, D, E and F hereinabove are incorporated by reference.

XIV

FIFTH CAUSE OF ACTION

Dual Relationship - Gross Negligence
In Treatment of Patient B.W.

The allegations of paragraphs I to III, inclusive and of paragraph IX hereinabove are incorporated by reference herein.

XV

Respondent's license is further subject to discipline in that he violated the provisions of section 2960, subdivision (j) in that he engaged in acts constituting gross negligence, in that he has acted as the business manager, business advisor, executive producer, and co-song writer with his patient while also serving as his therapist; in each of these instances, respondent has been involved in a "dual", "triple", or "quadruple" relationship with his patient, the details of which are set forth more particularly hereinafter:

A. During the period of time from 1961 to the present, B.W. has been and continues to be a member of a musical group. During the period of time beginning on or about January 2, 1983 and continuing to the date of this Accusation, respondent has been treating and continues to treat B. W. (hereinafter the "patient") as a patient. Said therapy has been conducted 24 hours a day, 7 days a week during said period which is now in excess of five years.

Respondent has employed one or more persons (hereinafter referred to as "assistants") who have lived with the patient and go with him wherever he goes, so that the patient is never alone.

B. During the period of time beginning on or about January 2, 1984 and continuing through and including the date of this Accusation, respondent has engaged in a continuous course of conduct of acting in each of the following capacities for and with patient:

(1) The executive producer of patient;

(2) The business manager of patient;

(3) Co-song writer with patient; and

(4) Business advisor of the patient;

details of which are set forth more particularly in subparagraph C, below:

C. On or about January 1, 1987, a committee was formed called the Management Advisory Committee of the musical group. The purpose of said committee is to advise each of the members of the musical group on various business decisions. Each member of the musical group appointed a person to be his representative on this committee. Respondent used his influence as the therapist of the patient to have the patient appoint him, respondent, as the patient's representative on this advisory committee. Said committee has continued to function from January 1987 to and through the date of this Accusation.

(1) During the period of time between January and

November 1987, respondent was paid the sum of approximately $140,000 for serving as patient's advisor on this committee. Respondent has been paid additional sums (1.25% of the revenue of the corporation for the musical group) during the months of December 1987, and January and February 1988 unknown to complainant. [Complainant will file an amendment to this Accusation alleging the specific sums for these additional months when they are known].

(2) On or about October 15, 1987, respondent was paid the sum of approximately $5,000.00 as the executive producer of a recording which the patient made for Barbie dolls to be manufactured by Mattel Corporation.

(3) During the period beginning on or about June 1, 1986 and ending on or about April 1, 1987, songwriter G.U. (hereinafter "G.U.") spent a considerable period of time (several hours on several days each week) with the patient, and some of that time also with respondent. G.U. and the patient wrote and recorded several songs during this period. On or about July or August 1986, it was agreed between respondent, G.U. and the patient that respondent would receive 25% of any profits "off the top". The profits referred to were those anticipated from the record which it was then hoped would result from the patient-G.U. collaboration. The specific profits were those anticipated for songwriter and publisher. It was further agreed that respondent would be the executive producer of this forthcoming solo album of the patient, and would receive an

additional 1% of the profits for this role.

(4) On or about December 1986, the musical group performed in a concert in Honolulu, Hawaii, which celebrated their 25th Anniversary as a musical group. This concert was broadcast on national commercial television on or about March 13, 1987. Respondent acted as the executive producer for the patient during the rehearsals and the concert and was given credit on the television program as a special consultant.

(5) On or about January to April 1987, a single record song by the patient was produced, entitled "Let's Go to Heaven in My Car". Said record contains the name of respondent as executive producer.

(6) On or about the summer of 1985, the musical group produced a record entitled "The [name of musical group] 1985". Respondent received partial credit for three of the songs on that album, which are listed below:

(a) "Crack at Your Love" by the patient, another member of the group and respondent, (Side One);

(b) "I'm So Lonely" by the patient and the respondent (Side Two); and

(c) "It's Just a Matter of Time" by the patient and the respondent, ( Side Two).

(7) During the period 1985 to March 1987, respondent wrote either all or part of the lyrics or the music with the patient and (in some cases) others for each of the following songs:

(a) "Just Say No";

(b) "Little Children";

(c) "Let's Go to Heaven in My Car";

(d) "The Spirit of Rock and Roll";

(e) "Black Widow";

(f) "I'm Broke";

(g) "Christmas Time";

(h) "Christine"; and

(j) "Baby Let Your Hair Grow Long".

C. The participation by respondent in the various dual, triple and quadruple relationships with his patient has caused severe emotional damage, psychological dependency and financial exploitation to his patient.

XVI

SIXTH CAUSE OF ACTION

Prescribing of Drugs to Patient B.W.

The allegations of paragraphs I to III and VI and VII, hereinabove, are incorporated by reference herein.

XVII

Respondent's license is further subject to discipline, pursuant to the provisions of section 2960, subdivision (k), in that he has violated the provisions of section 2904, in that he has prescribed drugs to patient B.W.; the details of which are set forth more particularly hereinafter:

A. The allegations of paragraph XV, subparagraph A are incorporated by reference herein.

B. During the period of time between January 2, 1983

and the date of this Accusation, respondent has followed the continuous course of conduct of dealing with the patient's medication that is set forth in the remaining subparagraphs of this paragraph, below.

C. First, respondent has the patient examined by psychiatrist Sol Samuels, M.D. who then has prescribed various medications. Respondent obtains the medications for the patient and has them placed in a locked file cabinet in patient's house. Patient does not possess a key to this cabinet, only respondent and his assistants do. On many occasions, respondent's assistants have carried small supplies of each of the various drugs in a zippered bag on their person.

D. On almost every day of the slightly in excess of five year period referred to in subparagraph B, hereinabove, that the patient has been under treatment by respondent, the procedure outlined in this subparagraph D has been followed. In the morning, again in the evening, and occasionally at other times during the day, there are telephone conversations between respondent and his assistants. Respondent is told by the assistant the apparent medical condition of the patient, and respondent then dictates over the telephone to the assistant which drugs and in what quantity the assistant should furnish to the patient. Then the assistant carries out respondent's instructions and furnishes patient with the drugs and in the quantity specified by respondent.

E. None of the several assistants who have been employed by respondent in this capacity to assist in the treatment of the patient during the slightly over five year period referred to in subparagraph B, above, have been licensed, either as physician's assistants, registered physical therapists, registered nurses, licensed vocational nurses, psychological interns or on any other capacity.

F. The decision by respondent of which drugs to dictate to his assistants to furnish to the patient, under the circumstances set forth above, constitutes "prescribing" drugs within the meaning of section 2904 of the Code.

XVIII

SEVENTH CAUSE OF ACTION

<u>Gross Negligence in Prescribing Drugs to Patient B.W.</u>

Respondent's license is further subject to discipline, in that he has violated the provisions of section 2960, subdivision (j) in that he has engaged in acts constituting gross negligence; the details of which are set forth more particularly hereinafter:

A. The allegations of paragraphs I-III, VI, VII, XV, subparagraph A and paragraph XVII hereinabove are incorporated by reference.

WHEREFORE, complainant prays that the Committee hold a hearing on the allegations set forth hereinabove, and, following said hearing, issue a decision:

1. Revoking or suspending the psychologist's license of respondent; or

2. Taking such other and further action as it deems proper.

DATED: February 16, 1988.

/S/ THOMAS O'CONNOR
THOMAS O'CONNOR
Executive Officer
Psychology Examining Committee
Board of Medical Quality Assurance
Department of Consumer Affairs
State of California

Complainant

03598110-LA86AD14441

1 B

LAN 0016