

**DISTRIBUTION MADE
TO COUNSEL  (doc)**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

F I L E D

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JUL 0 7 1997

*[signature]*

CLERK

CARL WILSON, an individual, and
AUDREE WILSON, an individual,

      Plaintiffs,

vs.                                                                    CIV 94-892 JC/LFG

HARPERCOLLINS PUBLISHERS
INC., a Delaware corporation,

      Defendant.

## <u>MEMORANDUM OPINION</u>

THIS MATTER came on for consideration of Defendant's Motion for Summary Judgment on Plaintiff Audree Wilson, and Defendant's Motion for Summary Judgment on Carl Wilson, both filed April 21, 1997. The Court has reviewed the motions, the memoranda submitted by the parties, the relevant authorities, and heard oral argument on July 2, 1997. The Court finds that Defendant's motion as to Audree Wilson is well taken and will be granted. The Court further finds that Defendant's motion as to Carl Wilson is well taken in part and will be granted in part.

### Background

In 1991, HarperCollins published the autobiography of Brian Wilson, <u>Wouldn't It Be Nice</u>. Mr. Wilson is/was a member of the world famous band, the Beach Boys. Plaintiffs filed this libel action against the publishing company, HarperCollins. Plaintiffs allege that HarperCollins negligently printed libelous statements about Audree Wilson, Brian's mother. Plaintiffs further



174

allege that HarperCollins acted with actual malice (also known as constitutional malice) in printing libelous statements about Carl Wilson, Brian's brother. Plaintiffs are seeking both compensatory and punitive damages.

Defendant HarperCollins now moves separately for summary judgment as to each of the plaintiffs. Regarding Audree Wilson, HarperCollins alleges that Audree did not suffer any actual injury to her reputation as required by New Mexico law. Alternatively, HarperCollins argues that the book was substantially true and that there were only minor inaccuracies, if that. Audree Wilson, of course, disputes these claims. She contends that actual injury is not part of the prima facie case, but even if it is, she has adequately alleged injury. Moreover, Plaintiff maintains that the book is libelous and is not substantially true.

As to Carl Wilson, HarperCollins alleges that the book's portrayal of Carl is substantially accurate. In addition, HarperCollins maintains that numerous passages complained of by Carl Wilson are not actionable because they are either true, not defamatory, not concerning Carl, or are non-verifiable expressions of opinion. Conversely, Carl claims that the substantial truth doctrine does not provide any protection to HarperCollins because the effect of the inaccuracies on the reader creates a defamatory impression.

## Analysis

### A. Standard for Consideration of a Motion for Summary Judgment

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Federal Rules of Civil Procedure provide that it is the movant's burden to demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 321-323


(1986). Once the movant has made such a showing, the adverse party "may not rest upon the mere allegations or denials of [their] pleading[s], [they] must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In reviewing a summary judgment motion, "[t]he evidence must be viewed in the light most favorable to the nonmoving party, <u>Frandsen v. Westinghouse Corp.</u>, 46 F.3d 975, 977 (10th Cir. 1995), even when it is produced by the moving party." <u>Buchanan v. Sherrill</u>, 51 F.3d 227, 228 (10th Cir. 1995). "Summary judgment is only appropriate if 'there is [not] sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" <u>Biester v. Midwest Health Servs., Inc.</u>, 77 F.3d 1264, 1266 (10th Cir. 1996) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)). "Thus, to defeat a summary judgment motion, the non-movant 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" <u>Id.</u> (citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-86 (1986)). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 at 249-250 (citations omitted).

B. Defamation

Just last month, Senior Judge Santiago Campos issued a comprehensive opinion on the issue of defamation. <u>Schuler v. McGraw-Hill Companies, Inc., et al.</u>, No. CIV 96-0292, Memorandum Op., June 11, 1997. In his opinion, Judge Campos clearly and succinctly laid out the law of defamation in New Mexico. So as to conserve scarce judicial resources, portions of his opinion are laid out below with only minor changes.

In general, a plaintiff must prove the following elements in order to prevail on a defamation claim: 1) the defendant published a defamatory communication; 2) the communication

3


contained a false statement of fact; 3) the communication was concerning the plaintiff; and 4) the communication proximately caused actual injury to the plaintiff's reputation. N.M. UJI § 13-1002 (1997). In addition, a plaintiff must prove a certain level of culpability on the part of the defendant. The level of culpability that the plaintiff must prove depends upon whether the plaintiff is considered a public or private figure.

The question of whether a person is a public or private figure is a question of law for the court. Marchiondo v. Brown, 98 N.M. 394, 399 (1982). In this matter, the Court has previously ruled that Carl Wilson is a public figure and Audree Wilson is a private figure. Since Carl Wilson is a public figure, he must prove that HarperCollins acted with actual malice when publishing the defamatory communication. New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964). That is, a public figure must prove that the defendant knew the statement was false, or that the defendant acted with reckless disregard for the truth or falsity of the statement. Id. at 280.

As for the book itself, as stated above, it must be defamatory. A statement is defamatory if "it has a tendency to render the party about whom it is published contemptible or ridiculous in public estimation, or expose him to public hatred or contempt, or hinder virtuous men from associating with him." Andrews v. Stallings, 119 N.M. 478, 482 (Ct. App. 1995) (citation omitted). A defamatory communication must contain a false statement of fact. The expression of an opinion or an idea is generally protected by the First Amendment to the United States Constitution. Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40 (1974); but cf. Milkovich v. Lorain Journal Co., 497 U.S. 1, 21 (1990) (no separate constitutional privilege for opinions apart from protections delineated in prior cases). However, an opinion can be actionable "if it implies

4

the allegation of undisclosed defamatory facts as the basis for the opinion." Andrews, 119 N.M. at 482 (citing RESTATEMENT (SECOND) OF TORTS § 566 (1976)).  The trial court determines in the first instance whether a statement is fact or opinion, assuming the statement is unambiguously one or the other.  Marchiondo, 98 N.M. at 404 (1982) (citation omitted).

One final requirement of a defamatory communication, as noted above, is that the communication must be concerning the plaintiff.  "The communication is concerning the plaintiff if the person to whom it was communicated reasonably understood that it was intended to refer to the plaintiff."  N.M. UJI § 13-1005 (1997); see also RESTATEMENT (SECOND) OF TORTS § 564 (1977) ("[a] defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer.")

Plaintiff distinguishes between statements which are allegedly defamatory per se and those which are allegedly defamatory per quod.  The per se/per quod distinction "has probably been overtaken by rulings of the United States Supreme Court."  Newberry, 108 N.M. at 429.  While the New Mexico Supreme Court has not abolished the distinction outright, it has noted its dissatisfaction with jury instructions incorporating the distinction.  Marchiondo, 98 N.M. at 403. Accordingly, the latest version of the N.M. Uniform Jury Instructions does not contain any such distinction.  See N.M. UJI § 13-1002 (1997), committee comment (noting that, in keeping with Marchiondo, the current instruction abolishes the per se/per quod distinction).  Therefore, this Court will not draw a distinction between the statements which Plaintiff claims are defamatory per se and those which are defamatory per quod.  In light of the above criteria, the Court will now review Defendant's motions.



C.  Audree Wilson

Defendant HarperCollins contends that Audree Wilson has failed to prove an actual injury to her reputation.  In fact, HarperCollins maintains that the only injury she alleges is personal, emotional and mental harm.  In her response brief, Plaintiff fails to adequately address this issue. Without any support, Plaintiff claims that the question of injury to reputation is not relevant on a motion for summary judgment.  Nonetheless, Plaintiff argues she has sustained injuries.  In her deposition, she claims she suffered humiliation and became shy, i.e., "withdrawn.  In my own head I felt that way."  Audree Wilson Depo. p. 337.

It is clear from the case law and the uniform jury instructions that to sustain a cause of action for defamation, a plaintiff must prove actual harm to her reputation.  In this case, Audree Wilson has failed to meet this burden.  By her own deposition, she acknowledges that her only injury is personal humiliation and becoming shy.  In fact, when asked whether she knew of anyone who thought less of her because of the publication of the book, she responded  "No."  Audree Wilson Depo. p. 243. The only reference to people who thought less of Audree Wilson because of the book is to "DJ's" (disc jockeys).  However, Audree Wilson couldn't recall when she found out these DJ's thought less of her, or whether it was before or after the book was published.  Moreover, Ms. Wilson doesn't even know who these DJs are; she cannot name a single one.  Finally, Ms. Wilson didn't know if these unnamed DJ's had read the book.  This is hardly sufficient evidence to sustain a claim of injury to her reputation.  Consequently, Plaintiff Audree Wilson has failed to establish a necessary prima facie element for her claim of defamation.  Therefore, Defendant's Motion for Summary Judgment against Audree Wilson shall be granted.  Since Plaintiff has failed to establish a prima facie case of defamation, there is no need to address the issue regarding the veracity of the book itself.

D. Carl Wilson

Carl Wilson sues Defendant HarperCollins for defamation in Counts II and III of the Second

Amended Complaint.  In Count II, Carl is suing for alleged defamatory statements made about

himself, personally.  In Count III, Carl is suing for alleged defamatory statements made about him

as a member of the Beach Boys.  HarperCollins moves for summary judgment on these two counts.

### 1.  Passages from Plaintiff Carl Wilson's Second Amended Complaint: Second Cause of Action

a)  Page 98:

> Ducking into a smoky, music filled restaurant, where patrons were either strung out on opium or dancing on tabletops, I spied a piano, which I tried to play.
> No sooner did I start than the barkeep jumped all over me, yanking me off the bench.  I gave him a push and began playing anyway.  A struggle ensued.  The piano bench was knocked over, punches were exchanged, and before I knew it Carl and Dennis were dragging me out the front door and hustling me back to the hotel.

Plaintiff maintains that this passage falsely communicates to the reader that Carl Wilson

was involved in a brawl and exchanged punches.  However, the plain interpretation from this

passage is not that Carl Wilson got into a fight and threw punches, but rather that Brian Wilson

was solely involved in the altercation and that Carl and Dennis broke it up by taking Brian back

to the hotel.  As such, Carl Wilson has not been defamed.  Therefore, the Court shall grant

Defendant HarperCollins's Motion for Summary Judgment as to this passage.



b) Page 252:

> Dennis smuggled heroin into New Zealand, our first stop, then purchased another $100-worth in Melbourne, Australia, from one of David Frost's company employees. I wouldn't have known of this score, except that one night I managed to shake Stan, Rocky, and Steve who continued to maintain a near-twenty-four-hour vigil over me, and snorted the stuff with Dennis . . . . The next day, the shit hit the fan. In a vocal meeting as volatile as an arms depot on fire, the guys insisted that Dennis be sent home, while Frost threatened to cancel the remaining dates and then sue the band if they did. Carl, trying to calm the turbulence by admitting his involvement in the purchase of the heroin, ended up getting punched in the face by Rocky.

Carl Wilson alleges that this passage falsely accuses him of supplying his brother Brian with heroin. Once again, the plain interpretation of this passage does not support Plaintiff's contention. While the book does claim that Carl acknowledged purchasing the heroin, it makes it explicitly clear that it was Dennis who "snorted the stuff" with Brian, not Carl. Further, there is no part of the passage that states or even suggests that Carl supplied heroin to Brian.

Moreover, HarperCollins claims that Carl Wilson originally testified falsely under oath at his deposition regarding this incident. HarperCollins claims that Carl acknowledged buying heroin in a taped interview he gave to Australian writer Anthony O'Grady. The transcript of the interview, however, reveals that Carl further said he flushed the heroin down the toilet and was falsely accused at the meeting of supplying heroin to Brian.

Regardless of this argument, a close reading of the passage in the book fails to demonstrate that Carl gave the heroin to Brian. The passage explicitly states that Brian "snorted the stuff" with Dennis. There is no mention of Carl at this time. The only discussion of Carl is that he was

8

hit in the face for admitting he bought the heroin with Dennis.   There is simply no indication that

Carl supplied Brian with heroin as the complaint alleges.   Therefore, the Court shall grant

Defendant HarperCollins's Motion for Summary Judgment as to this passage.

     c)  Pages 273-275:

> Landy told them to have Carl make an appointment with his office to discuss treatment. Within a week Carl was in Dr. Landy's office, asking how much the treatment would cost.
>
> "About half a million dollars," Dr. Landy said. "Because it's going to take some time."
>
> "How much time?" he asked.
>
> "I can't be sure," Dr. Landy replied.
>
> "He's older now.  I don't know how bad he is. We're going to have to start all over.  But Brian doesn't have a family living with him anymore, so maybe eighteen to thirty-six months.  We don't have to worry about the domicile and all the privileges that go on between the sheets.  But --"
>
> "But what?"  Carl interrupted.
>
> "You know what I mean," Dr. Landy said. They knew each other well.  Dr. Landy explained himself clearly, knowing Carl was going to take the information he got from the meeting and tell Marilyn, who had helped him through the dissolution of his marriage and now was providing him comfort in dealing with me.  That made me jealous.

    * * *

> "This time, Carl," Dr. Landy said, "be a musician.  Don't try to be a doctor."  Carl never liked Dr. Landy's bluntness and was scared of him.

    * * *

> Carl and Al complained Dr. Landy's fees were outrageous. . . Predictably the first thing they wanted to discuss wasn't my health, it was Dr. Landy's fee.  "Are we here to talk about my fees or are we here to talk



about [Brian] Wilson?"  Dr. Landy asked.

"Well, what can you do for him?"  Mike challenged?

"What do you mean what can I do for him?" Dr. Landy replied.  "I can do better than you've done.  But what I don't know is if I can ever undo what you've done.  I had him pretty much on the road to recovery, and then you took him away in nineteen seventy-six.  What can I do now?  I don't know.  What do you want me to do?"

"We want him to get well," Mike said.

"I don't care if he ever sings, plays again, or makes one more note of music," said Carl.

"Yeah, we just want him well and happy," added Mike.

Plaintiff argues that the above passage defames him by giving the impression that he was more interested in saving money than in Brian's health.  HarperCollins responds by pointing out the final part of the passage where Carl is given credit for just wanting Brian to be better, and not caring whether he "ever sings, plays again, or makes one more note of music."

HarperCollins maintains that the passage is not defamatory when considered in its full context.  In fact, HarperCollins argues that, when read as a whole, the passage is not ever susceptible to a reasonable defamatory interpretation.  Alternatively, HarperCollins claims that any defamatory implication of the passage is substantially true and therefore not actionable.  It cites the deposition testimony of Carl that admits he talked with Dr. Landy regarding his fee, and that he thought the fee to be excessive.

In considering the whole passage, it does appear to cast Carl Wilson in the light of caring only about the costs of Brian's treatment.  Despite the final portion, the earlier part gives the clear and repeated impression that Carl was constantly and only interested in the fees.  Only at the end does the passage mention any concern on the part of Carl for his brother.  In his deposition, Carl

10



does admit that he thought the fees were too high, but that nonetheless, he wanted his brother to get better at any cost.  The crux of the analysis is that while the book does state the truth, it fails to accurately demonstrate the true level of concern Carl had for Brian's well-being.  It is because of that deficiency in the passage of the book that a reasonable jury could determine it to be defamatory.  Therefore, Defendant's Motion for Summary Judgment as to this passage shall be denied.

d)  Page 311-312:

HarperCollins makes no reference to this passage (Second Amended Complaint, ¶ 19) in their motion, and therefore it will not be considered for review.

e)  Pages 314 and 378-379:

> i) Page 314:  My mom didn't want a funeral.  Like me, she didn't believe in them.  She didn't like the sorrow.  My only wish was that Dennis not be cremated.  Carl didn't know what to do.  Before making any decisions, he insisted on consulting with John Rogers, a cult leader Carl referred to as his spiritual master.  However, it turned out that Shawn, whose divorce from Dennis wasn't yet finalized, had ultimate authority, and she decided that he'd be buried at sea.

> ii) Pages 378-379:  Even though he hated Gene, I knew he was telling the truth.  He still hadn't decided where he stood on the conservatorship issue.  But then Carl had trouble making even the simplest decisions.  He had always needed to consult with numerous people--his wife, lawyers, his spiritual master, John Rogers.

Plaintiff argues that the above passages defame him because they "falsely characterize him as an emotionally troubled, weak individual who could easily be intimidated and/or controlled."  Second Amended Complaint, ¶ 20.  In addition, Carl claims the passages "makes it seem like

I am indecisive, don't have a mind of my own, that I'm weak . . . ." Id. Moreover, in his deposition, Carl Wilson disputes that he was indecisive in making funeral arrangements at all.

HarperCollins claims that the above passages are limited to specific events in Carl Wilson's life and do not create any reasonable inference as to his overall decision-making capacity. This argument, however, rings hollow in light of the fact that the book says that Carl "had trouble making even the simplest of decisions" and that he "*always* needed to consult with numerous people." (Italics added). Alternatively, HarperCollins maintains that even if these statements are general characterizations, they are not actionable because they are entirely subjective and incapable of being verified by objective facts. In essence, HarperCollins is arguing that this is merely Brian's opinion, and as such, not actionable.

The expression of an opinion or an idea is generally protected by the First Amendment to the United States Constitution. Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40 (1974); but cf. Milkovich v. Lorain Journal Co., 497 U.S. 1, 21 (1990) (no separate constitutional privilege for opinions apart from protections delineated in prior cases). However, an opinion can be actionable "if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Andrews, 119 N.M. at 482, 892 P.2d at 615 (citing RESTATEMENT (SECOND) OF TORTS § 566 (1976)). The trial court determines whether a statement is fact or opinion, assuming that the statement is unambiguously one or the other. Marchiondo, 98 N.M. at 404.

The above passages mix fact and opinion. In essence, while yes it is Brian's opinion that Carl is indecisive, he nonetheless provides examples of this and presents them in a way that connotes Carl's alleged indecisiveness as a fact. Consequently, HarperCollins is not entitled to protection on the basis that these passages are merely Brian Wilson's opinion. Therefore,

HarperCollins's Motion for Summary Judgment as to these passages shall be denied.

    f) Page 268 and Pages 332-333:

> i) Page 268: As soon as the Beach Boys returned to L.A., he [Carl] had me sign a trust document, giving him control of both my money and my vote in the Beach Boys corporation, Brother Records, Inc. I didn't know what I was signing, though he assured me it was for my benefit and protection.

> ii) Page 332-333: Early in 1986 Carl threw his weight into the war against Dr. Landy, a move that triggered everyone's long-simmering acrimony and distrust toward my friend and therapist. The Beach Boys loathed the independence Dr. Landy was giving me. They hated that I was beginning to be able to say no to them and act on my own thoughts. They resented that I wrote songs, not with Dr. Landy, but without them. They accused him of being a Svengali who was holding me captive.

>     The struggle suddenly escalated when Carl began withholding my paychecks and money. That authority was his through The Brian Wilson Trust of 1982, which he'd had me sign prior to Dr. Landy's beginning treatment again. As trustee, he controlled both my corporate vote in the Beach Boys corporation Brother Records Inc., and all my money, property, and stocks.

>     In Carl's opinion, the trust was supposed to protect me from Dr. Landy, but as I got saner, I began questioning my brother. I couldn't remember signing the document in the first place. I was too incompetent at the time to know what I was signing. As I got saner, Dr. Landy began questioning me to see what I knew about the trust. What kind of trust was it? I didn't know. Why don't you know? I don't know. Wouldn't a responsible person know? Don't you think you should know? Yes. Then why don't you ask?

>     That's when the money stopped. By making it impossible for me to pay my bills, Carl figured he could drive Dr. Landy away. He assumed my therapist was only interested in the money. Typically, he miscalculated.

Plaintiff claims that the above passages defame him by falsely stating that he "wrongfully obtained money that was payable to Brian;" "obtained control over Brian's funds and Brian's position within the Beach Boys corporation by trick and for improper purposes;" and was "surreptitiously trying to trick [Brian] as regards to the trust." Second Amended Complaint, ¶ 20.

HarperCollins maintains that these passages in no way imply that Carl Wilson tricked Brian into signing the trust document or that he wrongfully withheld money from Brian. It is difficult to understand how Brian could have been tricked, especially since he admitted he was "too incompetent at the time to know what he was signing." Moreover, the book never accuses Carl of tricking Brian into signing the trust, it merely says that Carl had Brian sign the document. Therefore, Defendant's Motion for Summary Judgment as to the above passage on trickery shall be granted.

Conversely, Plaintiff's claim that the passage falsely accuses him of using the money improperly shall not be dismissed. The clear implication that Carl stopped giving money to Brian when he asked about the trust is that he used the money improperly. Merely asking about the specifics of the trust document is not a sufficient reason to withhold money. Consequently, the only plausible explanation is that Carl improperly withheld Brian's money. Therefore, Defendant's Motion for Summary Judgment as to the improper use of the 1982 trust money shall be denied.

g) Page 351:

> Filed by the Attorney General's office, the BQMA's (Board of Medical Quality Assurance) charges originated with a complaint filed by Carolyn Williams in 1984.

14



> They were then fueled by the journal Gary Usher compiled while we wrote songs together the previous year and pressed by Marilyn and Carl.

Plaintiff alleges that this passage falsely asserts that he pressed the BMQA charges against Dr. Landy. To the contrary, Carl claims that he had nothing to do with those charges. In fact, Carl claims that this passage injures his reputation by suggesting that he was trying to use the BMQA to undermine Brian's therapy. In addition, Plaintiff claims that by omitting the other reasons, besides the treatment of Brian Wilson, that Dr. Landy was forced to surrender his license, the book creates the image that Carl pressed the issue in order to prevent Brian's treatment.

HarperCollins maintains that the above passage in no way implies that Carl was pressing the claim in order to obstruct Brian's treatment. Further, HarperCollins argues that because Dr. Landy in the end did in fact surrender his license, it is inconceivable that a statement concerning the pressing of a meritorious ethics investigation could be considered defamatory.

HarperCollins's argument is totally persuasive and shall be adopted. Furthermore, even if Carl didn't press the investigation, as he alleges, there is no defamation because the passage does not say anything negative about him. In other words, there is no implication whatsoever from the above passage that Carl was inappropriately interfering with Brian's treatment. Therefore, Defendant's Motion for Summary Judgment as to the above passage shall be granted.

h) Pages 371 and 387:

> i) Page 371: Although I was extremely anxious, I was too mad to allow myself to come unglued. Wanting to underscore my good health, I flew back to San Francisco that night, Sunday, for another show. The Beach Boys were playing a private show at the Cow Palace and I

15

wanted to prove to everyone that I was anything but incompetent. For the first hour or so, Mike, Al, and Carl avoided me like the plague.

Then I decided to take action. I found Carl in his dressing room and asked if he wanted to talk about what was going on.

"I can't, Brian," he said. "I've got to take care of some business I've got going in Colorado."

"You have to do that right now?" I asked.

"I've been planning to make a few calls," he said. "I guess that's what I'm going to do. I'll catch you later."

It was clear they were shutting me out. I don't know why I expected anything more.

ii) Page 387: In the first week of March Carl suddenly accelerated the conservatorship case. Claiming to have "proof" that Gene brainwashed and bankrupted me, he threatened to have the court appoint a temporary but immediate conservator. He wanted Dr. Landy once and for all, preferably, he told people, in jail. Carl never once tried to talk to me personally. He showed absolutely no sensitivity that I was being stripped of my dignity and rights as a human being.

Carl Wilson maintains that these passages contain false assertions as to what he said and did. In addition, Plaintiff contends that the above passages suggest he was callous and unconcerned about Brian's physical and emotional health. Conversely, HarperCollins argues that the passages are substantially true. During his deposition, Carl admitted that he and Brian became estranged around 1983, and that their relationship did not begin to heal until after the end of the conservatorship in 1993. Carl Wilson Depo. at 376-377 and 543-44. The two instances described in the above passages both occurred during that period. Further, Carl admitted that during that time period he and his brother were in "seldom" contact. Depo. 376-377. Despite this being true, both these passages give the connotation that Carl and Brian were not just not

16

getting along, but rather that Carl didn't care about Brian and was in fact shutting him out.

Nonetheless, this type of defamation by implication has been rejected in New Mexico. Andrews v. Stallings, 119 N.M. 478, 484-485 (Ct. App. 1995). The Andrews court, in considering whether the implication in a newspaper article defamed a public official, held that "the mere allegation that such statements imply malfeasance is insufficient to support a claim of defamation." Id. at 485. In that case, the plaintiffs did not claim the underlying statements were false. Similarly, in this matter, the deposition testimony of Carl Wilson reveals that he and Brian were estranged. As such, there is no genuine dispute as to the veracity of the passages, and therefore the possible implications of those passages are not actionable. Therefore, Defendant's Motion for Summary Judgment on these passages shall be granted.

### 2.  Passages from Plaintiff Carl Wilson's Second Amended Complaint, Third Cause of Action

a)  Page 148:

> My band mates were not bothered because I hung around with strange people, took drugs, behaved in ways that defied convention, and had a marriage that was truly weird. Their problem was accepting what I was doing to the Beach Boys' music. They were afraid I was fucking up the formula that had made all of them wealthy and famous, and that wasn't kosher.

HarperCollins contends that this passage is in no way defamatory. Rather, it is merely Brian Wilson's opinion, and as such is not actionable. Carl Wilson responds that this passage claims that he knew of and was not concerned with Brian's problems. Moreover, Carl argues it says he was not supportive of Brian's music. He firmly denies both of these claims in his deposition testimony. Depo. at 741-745. Plaintiff's interpretation of the passage appears

accurate, and his flat out denial of it creates a genuine issue of material fact.  Therefore,

Defendant's Motion for Summary Judgment as to this passage shall be denied.

b)  Pages 223-226 and 239-240:

> i)  Pages 223-226:  After roughly two months, Dr. Landy introduced me to the piano.  From the start of the treatment, the Beach Boys had been pressuring him to get me to a point where I could write and produce again.  That's all they wanted.  But Dr. Landy resisted.  Becoming a Beach Boy again, he explained repeatedly, wasn't the goal of therapy.  First, he was trying to make me a healthy person, physically and mentally.  I began to see Dr. Landy as a protector.

> * * *

> Dr. Landy changed our daily meeting site from my mansion to Brother Studios, the Beach Boys' own recording studio.  He booked ninety minutes of piano time for me every day.  The first time I went there I didn't want to get out of Scott's little Honda.  Petrified about returning to the studio, the whole idea brought back too many memories and got me down. * * *

> Dr. Landy made sure the studio was empty. Despite previous explanations, the Beach Boys, especially Mike, made no secret that they were anxious to put me back to work writing songs.

> * * *

> Mike was the first to register a complaint.  He said I was using the studio unproductively.  Carl agreed.  He said the music we were making sounded crazy.  That's what they thought all right -- until they recorded some of these songs later on, such as "Johnny Carson" and "The TM Song."

> * * *

> Dr, Landy told the Beach Boys I wasn't ready to cope with the pressure of making an album.  I was still

too fragile.  They didn't see it that way and began complaining about the studio time he and I were using, time they could have been renting to other people.

"You want Brian back?" Landy asked.  "Or do you want to make a couple hundred bucks a week? What's more important?"

When they saw that Dr. Landy had begun recording our piano sessions, they asked for the masters. Dr. Landy refused to turn them over.  They were part of my therapy, privileged.

\* \* \*

But that was only the beginning of war with the Beach Boys.

ii) Pages 239-240:  Steve Love was pushing everyone, especially me, to step up the pace on the next album, the last one on the Warner Brothers contract.  At the same time, Dr. Landy was trying to keep me within a therapeutic regimen rather than let the guys take over and put me to work full-time.

But there were priorities.  Steve and the others wanted to get out of the Warner's contract while they could still capitalize on the success of *15 Big Ones* somewhere else.  Steve wanted the new LP done no later than January 1, 1977.  With several million dollars at stake in a new contract, Dr. Landy didn't exactly endear himself to the group or Steve when he told them that was impossible.

"Can you explain why?" Steve asked.

"He seems to be doing fine," Mike added.

To both Love brothers, Dr. Landy calmly said, "Brian is indeed doing better, but he's taking Christmas off and spending it with his family.  He's never done that.  He's never had a family dinner.  He's never gone shopping for a tree.  He's going to play with the kids."

"That's ridiculous to take so much time off work," Steve said.

"Look, Brian's never done Christmas," Dr. Landy said. He's been working since he was nineteen.  He's thirty-four.  Don't you think it would be good for him to shop for a tree?"  To buy his kids some presents?"

19

"He needs an entire month to do that?," Steve asked.

"Yes, Brian needs an entire month," Dr. Landy said.

Steve had his own agenda in mind, and Dr. Landy's struck him as unreasonable. Tempers flared. They called Dr. Landy a "control freak." Dr. Landy responded by telling the Beach Boys it was exactly this kind of attitude that caused me to break in the first place. As this went on, I sat at the piano and played, ignoring the argument exactly as I had done as a kid when my dad's temper turned our house into a free-for-all.

"He's supposed to make records," Steve said. "What the hell are we paying you for?"

"To make him well," Dr. Landy replied. "The fact is he made one record already, more than the Beach Boys have done in four years. But he can only make records when he is well, something not one of you seems to understand."

HarperCollins maintains that the above passages do not refer to Plaintiff. Carl Wilson replies that as a member of the Beach Boys, he is included in the statements "Steve and the others" and "something not one of you seems to understand," not to mention in the first passage where he is mentioned by name. This argument is meritorious and shall be adopted.

In the alternative, HarperCollins argues that the passages are substantially true. While Carl admits that Steve Love was the Beach Boys' manager for a short while, he argues that the passages defame him by suggesting that he was more interested in money than in Brian's well-being, a charge he has repeatedly denied. A genuine issue of material fact exists as to these passages and therefore the Motion for Summary Judgment shall be denied.

c) Pages 243 and 373:

Plaintiff agrees with HarperCollins that these passage are not "of and concerning" Carl



Wilson.  Therefore, Defendant's Motion for Summary Judgment shall be granted with regard to these passages.

  d)  Pages 232 and 239:

> i) Page 232:  We were dumbfounded.  Then angered.
> We'd been had.  It turned out Mike had been working
> for months on this huge publicity campaign heralding
> my return.  He'd written a terrible song, "Brian's
> Back," and sold it to Warner Brothers on a publicity
> campaign designed to exploit the fact that I'd produced
> the Beach Boys' latest album.  No one had mentioned a
> word to me.  Nor to Dr. Landy.  Everyone knew except
> us.  I got frightened and turned to leave, but Dr. Landy
> grabbed my arm and led me to my seat.

> ii) Page 239:  I understood and agreed with the concept
> (referring to the Saturday Night Live sketch), which was
> more than I could say about the Brian is Back campaign.

HarperCollins claims that these passages are simply not "of and concerning" Carl Wilson.

Plaintiff, however, argues that these passages suggest he participated in a conspiracy to exploit his brother's illness for financial gain.  From a plain reading of these passages, it is hard to imagine that they suggest what Carl Wilson says they do.  While Carl is incorporated by reference to the Beach Boys, the implication of a conspiracy is too tenuous to be viable.  Therefore, Defendant's Motion for Summary Judgment as to these passages shall be granted.

  e) Pages 246-248:

> One morning Stan and Steve, my tenders,
> appeared at my bedside.  I stared up at them blank-
> faced.  I hadn't spoken a word to anyone for the past
> week, and I didn't plan to start.
> "Get out of bed!" Stan barked, yanking back the
> covers
> The sudden movement scared me.  I put my
> hands over my face.

"Don't hit me, " I pleaded.

"Then get out of bed," Stan said.

Stan and Steve handled me as they would a truculent child at summer camp, threatening, pushing, and goading me into one frightening situation after another. Stan finally went to Marilyn and said he and Steve needed help.

* * *

(Rocky was hired). Rocky was put on salary at $40,000 a year and later raised to $50,000. Clearly, Marilyn liked his qualifications.

My life became hell under these three hypermacho watchdogs. In contrast to Dr. Landy's constructive therapy, Stan, Steve, and Rocky had their own idea of care. They ordered me out of bed in the morning. They screamed at me when I wouldn't get out of my bedroom chair. They threw me into a cold shower, ignoring my cries that I was scared of the water. On good days, they bribed me to dress, wash, or go to the studio with cigarettes. On days when I was beyond control, they calmed me with cigarettes.

For the most part, Stan and Rocky intimidated me. They towered above me. Chided me for being overweight. Both screamed at me, "You goddamn fat, lazy, fucking rock star! You chickenshit! When are you going to straighten the fuck up and get your shit together? You fucking pussy!"

Against my wishes, the Beach Boys ordered them to drag me on several tour dates early that summer. Every afternoon my bodyguards took me to a local YMCA to play basketball. One time, while they were showering, I slipped downstairs to the coffee shop and ordered a couple of sandwiches. Stan discovered I wasn't in my room. He and Rocky found me in the coffee shop, finishing my meal. Stan swept his arms across the table, knocking the food and dishes onto the floor.

* * *

In the elevator Stan pushed me into a corner.

22



He clinched his fist and pushed it into my chest.

"You fucking rock star," he growled. "You goddamn, fucking obese rock star. You fucking disgust the shit out of me.

As he chided me, Stan pounded his fist into my chest, not to hurt me, but enough so that I though he was going to kill me. Because of his and Rocky's size advantage, there wasn't a damn thing I could do but flinch and take the abuse.

\* \* \*

In a state of regression and constant fear, I obeyed like an abused dog.

Carl Wilson claims that the above passages falsely suggest that the Beach Boys allowed their bodyguards to abuse and intimidate Brian Wilson. HarperCollins argues that large portions of the passage do not refer to Carl or the Beach Boys. In fact, the only time the Beach Boys are mentioned is when Brain says they ordered Stan, Steve, and Rocky to "drag" him on some tour dates. Consequently, HarperCollins contends that the passages are not "of and concerning" Carl Wilson. Alternatively, HarperCollins argues that the passages are substantially true. Carl responds that he never ordered the abusive behavior and did not know it was happening. However, in his deposition, Carl admitted that both Stan and Rocky displayed violent behavior. Nonetheless, this does not establish the truthfulness of these passages. Consequently, a genuine issue of material fact exists. Therefore, this Court shall deny Defendant's Motion for Summary Judgment.

An order in accordance with this opinion shall be entered.

_____
CHIEF UNITED STATES DISTRICT JUDGE

23

Counsel for Plaintiff:

>Ernesto J. Romero
>Albuquerque, New Mexico
>
>Beth Dumas
>Barry B. Langberg
>Los Angeles, California

Counsel for Defendant:

>William S. Dixon
>Albuquerque, New Mexico
>
>R. Bruce Rich
>Elizabeth Stotland Weiswasser
>New York, New York