IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES DISTRICT COURT DISTRICT OF NEW MEXICO 97 JUL 30 AM 11:42 CLERK-ALBUQUERQUE

CARL WILSON, et al.,
Plaintiffs,

vs.

HARPERCOLLINS PUBLISHERS, INC.
Defendant.

NO. 94-CV-892 JC

[MOTION FOR SUMMARY JUDGMENT]

Transcript of Proceedings before The Honorable John E. Conway, Chief United States District Judge, Albuquerque, Bernalillo County, New Mexico, commencing on July 2, 1997.

Appearances of Counsel:

For the Plaintiffs: Ernesto Romero
Barry Langberg

For the Defendants: Elizabeth Weiswasser
Bruce Rich
Bill Dixon

Sydney B. Huseby, Jr., RDR, CRR
United States Court Reporter
NM CCR #304
Post Office Box 1160
Albuquerque, NM 87103
Phone: (505) 248-8087
Fax: (505) 248-8002

(Albuquerque, Bernalillo County, New Mexico; July 2, 1997, in open court.)

THE COURT: Good morning. We're here in the matter of Wilson versus Harpercollins, two motions for summary judgment. I'd like to hear the motion on Audree Wilson first.

MR. DIXON: Your Honor, I'd like to introduce Mr. Rich. I think you know him. He's argued the prior two motions before you.

THE COURT: That's fine. He can argue a third one.

MR. RICH: Good morning, Your Honor.

THE COURT: Are you the one I delayed this trial for? Or this hearing for? Or was that you?

MR. LANGBERG: That was me, Your Honor. I appreciate it very much.

THE COURT: That's all right. It worked out fine.

MR. LANGBERG: It worked out very well.

THE COURT: What did you do, just fly in this morning?

MR. LANGBERG: Yes, the flight used to be earlier, and I didn't realize it until it was too late. I appreciate it.

THE COURT: Okay.

MR. RICH: Your Honor, on Audree Wilson, there are two basic points which our briefs address which I can very briefly cover orally. The first, which we don't see contested from the other side, is the requirement contained in the uniform

jury instructions, 13-10-02 that a prima facie, to establish a prima facie case for defamation in the State of New Mexico, the eighth element set forth is a requirement that, quote, "The communication proximately caused actual injury to plaintiff's reputation."

That's a requirement, Your Honor, which is separate from whatever showing might or might not be able to be made respecting any damages, if the prima facie elements of liability are first established.

In Ms. Wilson's deposition, she was unable to identify at all any injury to reputation. She was unable to identify a single communication of which she was aware, either personally directed to her, directed to anyone and then communicated to her adversely impacting on her reputation. No one indicated that they had developed a lesser opinion as to her and so forth. And there is simply a record barren of any information.

As we read a number of authorities in the state interpreting 13-10-02, most recently Cowen versus Powell which is a New Mexico Court of Appeals decision in 1993 indicating that this is a necessary element to be established as part of a claim, and most recently Judge Campos' adoption of that --

THE COURT: It's Campos, Judge Campos.

MR. RICH: Campos, thank you, Your Honor.

THE COURT: Campos. The only person that calls him

Camp-pose is Judge west from Oklahoma City, and he just doesn't know that.

MR. RICH: Happy to be corrected, Your Honor. He just very recently this year identified in his opinion dismissing the motion the need to demonstrate this element, so our first point that we develop further in the brief is there has been absolutely no showing, and without that showing she can't move forward and prove the elements of the defamation claim.

Respecting the underlying allegations themselves, Your Honor, what remains, as you know, is the allegation that she passively tolerated abuse by Murray. Once again, when we review the deposition record carefully in our papers, and what we find is the following: We find, first of all, very little memory on Audree's part about any of the specifics of Murray's comportment to her sons. She basically said, and I can understand it, she said, quote, "It's difficult to remember unpleasant times." It was clear that she was unhappy. The stress at the time about the level of physical punishment administered by Murray on various occasions. She testified variously that she was either present or within earshot of a number of instances of physical punishment of her sons. She professed not to have any specific recollection of the details of that punishment except that she indicated that she believed them to be excessive.

Notably, when I read her one passage from a prior work by Steven Gaines which was published in 1984, I just want to read you one passage from the deposition at pages 278 to 280, Your Honor: I said, "Ms. Wilson, I'm going to read you a passage from Mr. Gaines' 1984 book on the Beach Boys and ask you a few questions about them. Quote" -- this is now quoting from Mr. Gaines -- "'Murray's father beat him. Murray beat his children. Audree watched helplessly from the sidelines, according to Dennis,'" who you know, I think, is the brother, "frightened of Murray herself." Quoting Dennis, quote, "'Oh, please, Murray, no, don't do that.'" That's words attributed to Audree.

And then I asked Ms. Wilson, "Are those passages quoting from -- claiming to quote from Dennis and you accurate?"

"Answer: I think they are."

So here she flatly, frankly, conceded to a characterization by Mr. Gaines reportedly based on interviews with Audrey herself and the deceased brother -- Dennis, her son, Dennis -- in which she acknowledges what everybody knows, which is Murray was very abusive and that she, quote, "watched helplessly from the sidelines." That's really the gist of the passages which are disputed elsewhere by Ms. Wilson.

It seems, Your Honor, that she bears the burden of demonstrating the falsity of these passages. We dispute, incidentally, the suggestion in the plaintiff's brief that there

is no manner of public concern involved here, and, hence, the burden of truth/falsity shifts. We think the case law which we cite makes clear that, in any media setting, the concept of public concern and public interest is broadly construed and interpreted, and that the strong presumption in these cases is that most anything which the press decides it ought to write about -- I don't mean to sound arrogant but this is what the cases basically do, they defer to the judgment of the press as to what's newsworthy.

More importantly, in this setting where we're talking about abuse, we're talking about activities which Mr. Langberg, in his brief, identifies as criminally punishable under the State of California law. It seems almost by definition they're matters of public concern.

That being the case, Ms. Wilson has the burden of proving falsity. Where she testifies to a dim memory at best, can't recall her comportment, at most said that she never stood up to Murray in the face of any episode, that she would go privately into a back room and talk to him and express whatever anger or outrage she had. If anything, it's entirely consistent with what Brian observes at page 27 of the book, Your Honor: Quote, "My mother was no help. She almost never opposed my father, almost never rose up and defended her children, not that we saw anyway."

Completely consistent, Your Honor, with what Audree

said, which is, I never did anything demonstrably in front of the sons. It was all done, if at all -- and her memory is very vague -- privately behind closed doors.

How can Brian be faulted for making the observation that she never interceded in front of them anyway? It's entirely accurate as we read the transcript. Those are our central positions.

THE COURT: Is there any testimony that anyone has ever read this book?

MR. RICH: No, and she had not, except I think selected portions.

THE COURT: Actually, my question is, has anybody in the general public read this book?

MR. RICH: There is sales data, Your Honor. About, roughly, 50,000 copies were sold nationally, which by standards of a book of this type is very modest, and that's as much as we know. There were efforts early on, in interrogatory responses by the plaintiff, to identify one or more parties allegedly who formed a diminished opinion of Carl and/or Audree as a result of the book, and everything we chased down on that demonstrated that those were frivolous and insubstantial indications. There's nothing in the record. Nobody has stepped forward. There isn't a shred of evidence in the record to show that her injury has been -- that her reputation has been injured one scintilla.

THE COURT: Thank you, sir.

MR. RICH: Thank you.

THE COURT: Mr. Langberg, I want you to concentrate on telling me how there is actual harm to her reputation.

MR. LANGBERG: Can I deal -- with the court's permission, I can deal with the legal aspect of that question as well as the factual aspect of that question because I think it's important as to what's required.

Mr. Rich cited the jury instruction, and he cited 10-02, I think it's also very important to look at 10-10 in particular, the committee comment on 10-10. And what basically 10-10 says is that the law in this area, harm to reputation has been damaged is evolving and unclear, particularly in a situation, you have a private plaintiff and a matter not of public concern.

Now, we know we have a private plaintiff, the Court has already found that. Mr. Rich makes an argument that this is a matter of public concern. I submit that it is not. Standing by and watching child abuse 30 years ago is not a matter of public concern. If it's not, then according to the committee note, and according to -- first of all, New Mexico's never decided the issue. All the cases cited by Mr. Rich involve matters of public concern, and I believe all of them involve public figures, but I can't remember for sure, so I won't make that representation, but I think they do.

We have here, instead, a private figure, not a matter of public concern. We have a situation that we had in Time, Inc., versus Firestone, U.S. Supreme Court case, where we had a private figure, matter not of public concern, Mrs. Firestone of the famous Firestone family, getting a divorce, Your Honor, and basically part of the holding in that case was that the U.S. Supreme Court said an emotional distress injury was sufficient.

Here we have a woman who has testified to emotional distress clearly on the record, clearly in her deposition. She said that it's -- she felt emotional distress, she said she got headaches, she said it made her shy or withdrawn in relation to other people. There was clear testimony of emotional distress.

And, by the way, Mr. Rich points out that one of his colleagues in the defense -- libel defense organization says in his treatise that Audree Wilson's testimony is not good enough for proving emotional distress. I don't think that -- no cases are cited, and I don't think Mr. Sack is an authority on what's admissible evidence in this court. Certainly in any case of emotional distress, the plaintiff's testimony is evidence.

And I think that we have here emotional distress. We have here a situation where a person who knows the book has been circulated, Mr. Rich says 50,000 copies, and that was along with a national promotional tour. It may not have been as successful as they wanted, but there was a national tour promoting this book. And a person who knows the book has been circulated and

who basically doesn't know -- basically thinks, well, what are people thinking of me? And it has caused her emotional distress, we have evidence of it. The jury may not believe her when she testifies to her emotional distress, although I submit she would, it's not an uncommon situation in a libel case that that is the -- in Burnnett versus National Enquirer, for example, the only evidence of emotional distress was the plaintiff's testimony. The jury has the right to believe it or disbelieve it.

And so I think, in the context of a private plaintiff, a matter not of public interest, something that happened 30 years ago, not of public concern, I think the Time versus Firestone theory is good law and would be adopted in New Mexico, and that is emotional distress is sufficient injury in this kind of a case.

I think that the only other issue that -- that's my answer to the Court's question. Hopefully, it's sufficient. I would like to address the issue of -- the factual issue briefly, if I might, in relation to this -- is it true what they -- what they said, because Audree Wilson happened to testify at her deposition that her husband, to her knowledge, actually struck the children.

And I think once she said he used a belt and the other times he used an open hand. All I can -- I have a few points. First of all -- well, basic -- you know, my father

disciplined me with his hand sometimes, but I would never -- I would take umbrage at anyone that portrayed him as beating me with a 2 by 4, tying me to a tree, forcing me to defecate, and forcing me to go without meals for a couple of nights. That is a whole lot of difference.

And in California, as we point out in the brief, there is a statute that allows reasonable parental discipline, and there is a criminal statute for child abuse. And when it came to the abusive -- the testimony of the abuse, was that true, for example, forcing Brian to defecate on a newspaper, and forcing the brothers to stare into the socket of a false eye, her answer was, total unmitigated gall and lie, lie, lie. She wasn't equivocal about it. She didn't remember it. She said it was lies.

And so there's no evidence of any kind whatsoever; in fact, evidence that it didn't happen, that Brian was beaten with 2 by 4s, that he was tieds to a tree, forced to defecate, all of those horrible things.

And I think that there is -- Audree testified clearly that that's false, and there's no evidence that it's true. I think that because the statements are false, because the emotional distress damage is sufficient, that -- especially when the book sold 50,000 copies circulated across the country -- we have a motion for summary judgment as to Audree that should be denied.

THE COURT: The law in New Mexico is that she has to prove actual harm to reputation. There's no showing there is any actual harm to her reputation. At page 243 of her deposition, she's asked if anybody thought less of her because of the publication. She responded, "No." So summary judgment will be granted as to Audree Wilson. We'll proceed to Carl Wilson.

MR. RICH: Your Honor, as to Carl, from our perspective, the best way to view the issues analytically is to break them into two broad component parts. There are several statements in the book which, if provably false, clearly we would concede would be defamatory of Mr. Wilson's reputation and would potentially give rise to damages claims. Those are specifically allegations respecting drug -- his use of drugs and alcohol.

There's a second, much broader, category which deal with alleged characterizations, adjectives, if you will, claimed either to be explicitly contained in the text of the book or one level removed, that one might infer from the passages in the book, which fall into the range of characterizations, unfair in Carl's mind, of Carl's thoughts, feelings, emotions, and Brian's personal perspective of concepts of callousness and insensitivity, and we feel those fall into an entirely separate category.

I'd like to review each of those briefly, if I may.

Particularly, focusing on the first level of allegations, those that really have a factual component. I think what the entire record of the case has now disclosed is that Carl played a game, Your Honor. He made allegations. If I may use a chart or two for purposes. Can Your Honor see this?

THE COURT: Yes, sir.

MR. RICH: He made allegations in the complaint, his lead allegations, that the book falsely portrayed him as an abuser of alcohol. That it imputed to to him involvement in the purchase of illegal narcotics. He knew that a number of episodes recounting these events were either fairly private in nature or remote in time and place and undoubtedly assumed that Harpercollins would have a difficult, if not impossible time, dealing with his denials as to them. Unfortunately, based on the record, I think he either caught himself at his deposition or we caught him.

Respecting allegations of illegal purchase of -- purchase of illegal narcotics, there's all --

THE COURT: You might angle that a little bit toward me, if you would, please.

MR. RICH: Sure.

THE COURT: Yeah, that's fine.

MR. RICH: Does that work?

THE COURT: Yes.

MR. RICH: There's all of one passage in the book,

Your Honor, page 251, addressing Carl's prior use of cocaine. And as the passage indicates, Your Honor, it says, "The next year, 1978, began with a three-week tour," and so forth, that "This time Carl was coming off a long cocaine problem." On the right side of this chart, Your Honor, is the relevant deposition excerpt in which Carl concedes that in the period through late summer of 1977, from the period '76 through late summer '77, he was using cocaine and illegal -- purchasing cocaine from drug dealers. That's conceded in his deposition. It's entirely consistent.

What he tried to do in his deposition was to argue that the reference to, Carl was coming off a long cocaine problem was false and defamatory. Why? Because he was already off it at the beginning of '78, since the summer '77, so that he was not literally, quote, coming off it, but was off it for a period of arguably four or five months. Gosh, if -- I hope that's not what libel litigation through trial is about because, basically, he's conceded what the defamatory sting is alleged to be in the first chart, Your Honor, namely his involvement in the purchase of illegal narcotics.

More testimony is devoted to the so-called heroin incident. Your Honor, there was quite a -- quite a melee in a room in Austrailia during a tour in 1978, and it's recounted in several prior books and very partially recounted in Brian Wilson's book. And the passage that caught Carl's attention for

purposes of the complaint is the one we set forth in the left-hand portion of this next chart, which is the allegation that "Carl, trying to calm the turbulence" -- that's at this meeting that occurred -- "by admitting his involvement in the purchase of the heroin, ended up getting punched in the face by Rocky."

We had numerous denials at his deposition that he had ever made the purchase. I'll read you but one, from pages 457 and 458 of Carl's deposition. "Did you have any involvement in the actual purchase of heroin?

"Answer: God, no.

"Or whether to flush it down the toilet, or to supply it to Brian or to Dennis or to anyone else?

"No, no, no, absolutely did not happen. Absolutely didn't happen.

"And anyone who would testify that it happened would be lying?

"Answer: That's correct, including Brian."

As Your Honor knows from reviewing the papers, quite fortuitously, to our surprise, we located a magazine article that was written in 1978 within weeks of the incident itself, and more remarkably the -- we located the reporter in Sydney Australia and he had retained the tape of an interview with Carl whose relevant portion is set forth in this middle column here. I'm not going to read it, Your Honor, it's there.

In that tape and in that interview, Carl admitted to the very buy which he denied repeatedly he had done in his deposition. This was also published incidentally, Your Honor, in 1978, the same quote, in the magazine article, and Carl testified at his deposition that he was aware of that article, claims he never read it, but that it had said some terribly embarrassing things, and it was something he had tried not to think about much in recent years, so it was out there in the public record, never responded to by Carl.

But, in any event, it's on the tape, and Your Honor has a copy of the tape. And so we have this. We have Mr. O'Grady, in a present affidavit, testifying to his recollection of the interview, testifying to his specific recall of Carl's statements respecting the purchase of heroin, and we've had the tape analyzed, as you know from an affidavit, not a copy, not a copy of the tape, which is what the plaintiffs looked at, never asked us for the original, never asked to authenticate it.

They took the copy, gave it to Mr. Pearl who says, well, I can't really work with a copy, but I have suspicions. We gave the original to a tape expert, and his affidavit of authenticity accompanies our papers, Your Honor.

So what does Carl do? Carl says, well, that's not really -- that's not really what I'm complaining about. Even though the complaint, Your Honor, talks about imputing to Carl

involvement in the purchase of illegal narcotics, and that's what we've demonstrated to be absolutely true, not only as to the cocaine but as to the heroin. The lead charge of these summary judgment opposition papers is, no, no, no, whether or not I bought the heroin, this passage, the one we cite on the left here, Your Honor, somehow suggests or implies that I supplied it to my brother, Brian.

Now, I've read this passage, Your Honor, any number of times. I don't see it. It's not there. It was never claimed to be there. It was never charged as a gist of allegation or allegation of defamation in the complaint. I don't see it in the complaint. And at his own deposition, Your Honor, in this case, at pages 453 and 454, Carl himself agreed that that passage does not say that he supplied heroin to Brian. He himself recognized in his deposition that the passage has nothing to do with what he claims is now belatedly the defamatory import of it.

I don't know how our client, Your Honor, can be asked to respond to alleged implications that don't exist, that aren't fairly there, and that legally no reasonable reader would infer from the passages.

13-10-07 of the uniform jury instructions instructs us that in deciding whether a communication is defamatory you must consider its plain and obvious meaning. I would submit to Your Honor, consistent with numerous authorities in this state

and out, construing what plain and obvious meaning is that that passage set forth on the left side of this chart cannot conceivably reasonably be read, let alone have its plain and obvious import be read, as indicating that Carl, whether or not he bought the heroin, had supplied it to Brian. It's just not there. The complaint says, Your Honor, paragraph 20, that the book falsely portrays Carl as an abuser of alcohol. The next chart sets forth his testimony on that subject, Your Honor.

I almost fell out of my seat when he spilled this out at his deposition because I couldn't imagine how someone could give that testimony consistently with that allegation in the pleading. He basically said that for years and years he was a day drinker, a night drinker, a binge drinker. He used the word terrible abuse. Those are his own words, Your Honor. We got it right, we got it right in context. There's nothing wrong with the book saying it. It's there, and he admitted it openly in his deposition. I was absolutely stunned and still to this moment can't understand how somebody could bring a complaint, the lead allegation of which is that the book falsely portrays Carl as an abuser of alcohol and then testify as he did at his deposition.

Now that leaves Your Honor a whole host of other passages in the book, and the problem we have in grasping the arguments from the other side is that they keep moving. We address very, very specifically, and our papers tried to be very

faithful to the record, each and every factual allegation that we thought might remotely give rise to a defamation claim in this lawsuit.

And our papers very carefully go through the substantial truth we developed as to most, if not all, of those. On this motion, what we're seeing is taking passages which say one thing, and we're getting again suggestions that they really mean something else and then taking Harpercollins to task for not having addressed those suggestions either by omitting other information, which the plaintiffs would have preferred had been published, or allegedly not addressing the defamatory sting.

I'll just give you two or three examples of the point I'm trying to make: There are certain passages in the book, Your Honor, which discuss in 1983 the group's decision to reengage Dr. Landy to treat Brian, and of course he's very controversial.

Above the yellow highlighting is what the complaint sets forth that are the defamatory passages in the book. The complaint charges -- and Carl in his deposition echoed the view -- that those passages indicated or portrayed Carl as willing to risk Brian's life, willing to risk Brian's life, to save money.

Well, what they didn't publish in the complaint, Your Honor, and certainly don't highlight, is the immediately-following colloquy that we've highlighted in yellow.

This directly follows at page 276 of the book. Hornbook definition law says that you've got to look at everything in its proper context, certainly within the context of the passage.

"'We want him to get well,' Mike said." That's a reference to Mike Love. "'I don't care if he ever sings, plays again, or makes one more note of music,' said Carl.

"'Yeah, we just want him to be well and happy,' added Mike."

Again, it baffles us, Your Honor, how, in its proper context, that statement in the book indicating Carl's concern overall for Brian's well-being, to the point where he doesn't care if he ever sings or plays again, can be twisted in this lawsuit into an assertion that this passage indicates that Carl was willing to risk Brian's life to save money.

Another example, Your Honor, deals with something called the Brian Wilson Trust of 1982. Carl asserts that the book's discussion of that trust portrays him as engaging in trickery of Brian, of wrongfully withholding money from Brian.

Well, you read the passage, and you certainly don't see it. What you do see is Brian indicating that he didn't really understand what that trust was about, and when later on he came -- and that later on he came to question whether the trust was something that was in his best interests or not.

Well, what does Carl say at his deposition? Carl at his deposition indicates that at the time the trust was

negotiated and entered into with Brian, Brian was suffering severe physical, psychological, and mental difficulties.

He was, in Carl's mind, incompetent or effectively incompetent as of 1982. In other words, Your Honor, it's exactly consistent with Brian's exhortations in the text dealing with these passages saying, I didn't know what I was signing. He didn't, in fact, know what he was signing, if you agree with Carl's characterization of Brian as of 1982.

The papers in opposition also, Your Honor, make much of the fact that the book made a mistake in one respect. The book did not reference a co-trustee named John Brown. If one were to look at the trust agreement -- it's Exhibit G to our opening brief respecting Carl, Your Honor -- there were two trustees, not one. There was Mr. Branca, and there was Carl Wilson.

Carl argues that by omitting the fact that he was merely co-trustee, that somehow all of the reactions that Brian had to the desirability or not of the trust come back and hit him squarely between the eyes; whereas, he argues, all of the decisions were really made by Mr. Branca.

The problem with that testimony is, Your Honor, if you look on the face of the trust agreement, all activities undertaken had to be undertaken by the unanimous action of the trustees. So you talk about an immaterial, because the passages would have been entirely correct had it said as co-trustee, he

did the following things, that's really the nature of how they will take a passage, innocent, substantially accurate, and twist it.

The last example I'll give Your Honor, which to me it takes the cake, is citing a claim by Brian that Carl characterized at one point, his music as sounding crazy. All right, maybe he did, maybe he didn't, but here's what Carl claims that calling something sounding -- music sounding crazy implies. It implies that he's unsupportive of Brian, uncaring, interfering in therapy, callous, and greedy about use of the studio. All from the words "music sounding crazy."

I dare say we all have opinions about music, even Carl I suspect. I don't know that it would ever be viewed as a jury question whether Brian was sincere in his view that his brother viewed something as crazy or not. The point is it doesn't give rise to a libel lawsuit.

Your Honor, I'm not going to rehearse, unless you want me to, the law dealing with opinion, but we feel very strongly that characterizations, even to the extent, fair ones, of callousness, of indecisiveness, of insensitivity and the like, let alone that music sounds crazy, are simply not the stuff of a defamation suit.

I would be perplexed how to have a jury decide whether a characterization, those use of adjectives, are susceptible of being proven true or false, and if there is a

touch stone in the law opinion in the State of New Mexico and broadly it is that if a statement is not subject to being verified it is opinion, it is protected speech under the First Amendment. And we find that at the end of the day, even if you accept it at face value, the extrapolations of the statements and/or to agree hypothetically that they characterize Carl with all of these adjectives which upset him, we say, at the end of the day, those are still not actionable. Your Honor, that's, in brief, our position.

THE COURT: Thank you very much, sir.

MR. RICH: Thank you.

MR. LANGBERG: May I use your chart?

Your Honor, I think, if I could, I would like to address this issue of the tape recording first because I think it's sort of indicative of what we have. And I must say, just as a side-light, that I was -- you know, 30-odd years ago I was a policeman, and I worked undercover, and I made a lot of tape recordings, and I listened to a lot of tape recordings on this kind of subject, and I would hate to think that a tape -- that this tape recording can be -- can be construed, in spite of what it says, actually, on the tape and in the original article that was written by Mr. O'Grady, can be construed to think that Carl Wilson bought drugs, bought heroin for his brother or for anyone else, as opposed to the opposite, and, that is, flushed it down the toilet.

This is interesting because we have the challenged passage from the book. We have Carl's statements to O'Grady as recorded on audio tape and the O'Grady affidavit.

There's a couple things left out that we need to look at. What we have is we have the tape itself, and I don't know if Your Honor has actually listened to it, but there's a lot of garbled parts of that tape. The second thing we have is we have Harpercollins' transcript of that tape recording, which is attached as an exhibit to their motion.

And then we have Mr. O'Grady's affidavit, which also is a transcript, in effect, a tape recording. And then we have something else, we have Exhibit F to their own motion, which is the original article that Mr. O'Grady wrote back in the '70s where he again states verbatim what is supposed to be on this tape, and there's lots and lots of discrepancies between Mr. O'Grady's first publication of what is on this tape and his later affidavit, which now coincides perfectly with Harpercollins' transcript.

Let me give you a couple of those examples because they're very substantive. First of all, if you look at Exhibit F -- and, unfortunately, the print is real small. I don't know -- it gave me a lot of trouble. I can sort of see it. But if you look at Exhibit F to their -- I'm sorry -- Exhibit C -- I was using my own -- Exhibit C on Harpercollins' motion, this is the first O'Grady affidavit, the original one, and as an exhibit

to that affidavit, about four pages back or five is this article, "Trauma Amid the Tippling," that Carl Wilson is boozing. If you go to the second page of that, Carl -- let me first point out, and you see there's a little inset picture, not the big inset picture, but the little one in the middle of the column, right below that picture --

THE COURT: Let me interrupt you just a second. Would you go on my desk and get those Walgreen glasses I've got that magnify things.

MR. LANGBERG: I had to try three pair before I could actually see this thing.

THE COURT: I paid $10 for mine at Walgreen's, a lot better than these. Somewhere in this I'm supposed to be able to read. I'll get these others.

All right. Where on the page?

MR. LANGBERG: The second page of the article.

THE COURT: All right.

MR. LANGBERG: Right below the small inset picture in the middle column you see the words, "So" -- three dots -- "I made another buy," three dots.

THE COURT: Right.

MR. LANGBERG: Now, if you compare that with the language of their audio tape -- I don't know -- you see, "So I made another buy." There's no three dots after the "so" here. This says, "So I made another buy."

Mr. O'Grady's later transcription, the one that they got, conforms to this; there's no three dots after the "so." But when Mr. O'Grady first wrote what was said here, and if you listen to the tape, there is something said between the "so" and "I made another buy."

And Mr. O'Grady points -- makes that clear in his original -- in his original article, and this happens a number of times. There are a number of discrepancies. There's no discrepancies of any merit, of any substance, between the Harpercollins transcript and the second O'Grady affidavit, none of any substance.

There are substantial discrepancies between the Harpercollins transcript, second O'Grady affidavit, on the one hand, and the O'Grady article that he wrote at the time, on the other hand, and they're substantive, like the "so" and some of the other ones.

For example, in the article it says -- the whole article starts out differently. The transcript says, "There was something about transcendental meditation." The preceding statement was "transcendental meditation," and Carl answers sort of sarcastically, and we put a question mark at it, "We were?" And then he continues the mediator, and then there are some ellipses that are left out of one and not the other.

In the Harpercollins transcript it says, "I got set up. Someone in the group wanted heroin." In the article, the

original O'Grady article, it said, "Someone in the group was on heroin." But the one thing -- and there's a half a dozen of those kind of examples where ellipses are left out of the Harpercollins transcript and the second O'Grady transcript which obviously is made to conform to the Harpercollins and the original publication by O'Grady of what was said.

Another time in the article, after the word "buy" there's ellipses. In the Harpercollins and O'Grady transcript, after the word "buy" there's no ellipses.

So you get to the point where you realize, and you listen to the tape, and when you listen to the tape, you realize that the original article that O'Grady wrote is a more faithful reproduction of what was said, with the ellipses and all those things that you can't hear.

But one thing is clear, it's clear from the tape, it's clear from Carl Wilson's deposition, Carl Wilson said he didn't buy any heroin for himself or anyone else. He also said that he got some heroin from his brother, Dennis, who was a user of heroin, and he took that heroin, and he flushed it down the toilet because he didn't want them to use it. And that is not a person who is buying heroin and supplying it.

Now, the second part of this issue is did Carl Wilson -- does the article say -- does the book say that he supplied heroin to his brothers? We know, Mr. Rich has pointed out, and it's basic law, that you have to construe a defamatory

statement in the context in which it's made. And the context in which this is made is the rest of the book and the rest of the book that's relative is right in the -- in the pages following and in the pages that we're talking about.

For example, Your Honor, we have a story on page 252 and 253 in the book where the phrase that we're suing on is found which says that Carl Wilson -- and I'll read it -- "Carl tried to calm the turbulence by admitting his involvement in the purchase of heroin."

But what is in the very preceding paragraph? The story of how Brian joined Dennis in snorting heroin. Well, what heroin was "the purchase of heroin" that they're talking about if it wasn't the purchase -- that's the only purchase of heroin that was going on here, that's discussed here.

So if you read the whole two paragraphs together, we know that that statement is accusing Carl Wilson of purchasing heroin for his brothers. There's no evidence, no statements, that -- anywhere, not only on this page or anywhere else -- that Carl Wilson ever used it, that he bought it for himself.

The only people using heroin in the immediately preceding paragraph are his brothers. And then "Carl trying to calm the turbulence," according to them, "admitted to his involvement in the purchase of heroin." Well, Carl has denied his involvement in the purchase of heroin or any purchase of heroin, and he's particularly denied his involvement in trying

to supply heroin to his brothers and, as a matter of fact, has explicitly testified, and the tapes make it explicitly clear, he keeps saying in the tapes, "I was set up. What I did was take heroin that was given to me by Dennis, go up in the elevator and flush it down the toilet."

This is not consistent with the statements that have been published by Harpercollins in relation to this heroin issue. So I think that the tapes are not only -- the transcriptions of the tapes are not only misleading, but if you look and listen -- if you listen to the tapes, what you find is statements by Carl Wilson perfectly consistent with what he has been saying all along, and that is that he didn't buy heroin and that he flushed heroin down the toilet.

I think it goes a long way -- it's a long way -- the truth is a long way from what's published here about purchasing heroin.

Your Honor, the other statements I'd like to deal with simply because we did deal with them in detail in the papers statement by statement, I think that, as in the past, I don't see any reason to reiterate the arguments we made.

Mr. Rich isolating each statement, not reading it in context, as in this case, of what went before and what comes after, says, well, how can this statement be imputed to mean that the -- that Carl Wilson was callous to his brother's sickness and only exploitive of his brother's business? And we

have statements that we've pointed out in the papers that say "Carl was only interested, as the rest of the Beach Boys were, in renting out the studio time and not interested in me getting treatment. They were only interested in me performing and not interested in me getting treatment, that it was too expensive." And Carl -- in effect, the clear implication of the statements concerning Dennis that we point out in the papers, Carl let his brother, Dennis, die because he didn't want to spend the money on Dr. Landy, and he was going on vacation and didn't want to interrupt his vacation.

Carl Wilson has had his problems in life, and for years, though, he's led what is -- what I think we could call an exemplary life. If someone drags up the past, albeit long in the past, and no matter the fact that he's leading an exemplary life and he's actively against drugs and he's spent a lot of money and a lot of effort to free his brother from Landy and have this conservatorship established, albeit, all of that, if someone dredges up the past, and it's true, the statements are true, then I guess he -- it's terrible, but it's -- the law is that he has to suffer through it.

But if you dredge up the past and make the statements false, if you make them serve the purpose, as we talked about in the argument over malice, if you make them serve the purpose of the real author of this book, Gene Landy, and they're false, then it's another story, then there's legal remedy, and that's

what we have here.

And in each of those statements taken in the context, read in context of Carl being oblivious to his brother's needs and actually trying to circumvent his -- getting his brother's help, these are false statements, and these are defamatory statements.

And the heroin one probably most of all, and, as I say, Carl has testified at his deposition, he testified unequivocally. He was asked about his involvement in the purchase of heroin, the question was, "Which you did not?" And he says, "Which I did not, and they knew it," and he said, "Dennis put a package in my hand and I got rid of it."

And the question was, "You flushed it down the toilet?"

The answer was, "That's correct."

You have the clear implication from the statement that Carl Wilson purchased heroin for Brian, and there's no way to circumvent that implication because it says that that is the story of those two paragraphs, and that is false, it is defamatory. And, as a result, the motion should be denied.

THE COURT: I'm going to put out a written opinion on this motion which I hope will at least rise to the level of the literary expertise of the book. In it I'm going to find that the following pages do not say anything defamatory, and summary judgment as to these pages will be granted, to the information

on these pages: 98, 252, 268, 332 to 333. As to the trickery part of it, 351, 371, 387, 243, 373, 232, and 239.

As to the other parts of the motion, the remaining pages that I have not mentioned, I'll deny summary judgment as to the statements on those pages. I think there are questions of fact for -- at least for a trial. The trial of this matter will be September 15th. We'll pick a jury that day.

My experience in a lot of cases has been that the plaintiff will just barely survive summary judgment, and then this plaintiff is faced with judgment as a matter of law at the end of the plaintiff's case. Sometimes the plaintiff will pass that. Then they've got to go through the same thing at the end of the case. Then they have to overcome the judgment notwithstanding the verdict. That's happened in some of my cases. I just throw that out to you as one of the procedural things that does go on.

How long do you think it will take to try this case now?

MR. DIXON: Your Honor, we'd have to go back and look, what the pages Your Honor identified exclude from the case. The summary judgment probably has reduced the scope of the lawsuit somewhat. But I think it's accurate to state that because of the extent of the damage claims that are being made about lost economic -- economic injury to Carl -- we're still talking about three weeks, three to four weeks. I think that

was our original estimate. Mr. Romero and I mentioned to you, I think we said four weeks, but that could well change depending, after we analyze the scope of the summary judgment, what it removes from the case.

THE COURT: Okay.

MR. LANGBERG: I agree.

THE COURT: Well, all right. How does that -- how does our schedule look?

THE CLERK: Well, we can't fit three weeks if we start it on the 15th because of Duran but --

THE COURT: Oh, that's right, Duran is the 29th.

THE CLERK: Right.

THE COURT: Well, maybe it will go away. We'll see.

THE CLERK: Okay.

THE COURT: Three to four weeks is pretty difficult to find with our criminal case loads here, but we'll try to work it in. Was there a need for a Daubert hearing in this case? I forget.

MR. DIXON: Yes, Your Honor. We have to look at the nature of the testimony of Ms. Lashner, what it really would apply to. In light of the rulings of the court, perhaps, there will be some kind of a rethinking about whether she is even necessary. If she is going to testify, we would need a Daubert hearing. And I believe the terms of the court's order staying this case until this summary judgment motion to be heard

provided for 45 more days of discovery from the date of the hearing on the motion for summary judgment or the decision.

And I think that could be done, if it could be accommodated in the court's schedule, but there would be a Daubert hearing if Mrs. Lashner intends to testify on any of the remaining issues in the case.

THE COURT: Well, what is this Mrs. Lashner going to testify to?

MR. DIXON: Mrs. Lashner purports to be able to divine from reading the book the author of the book, that really it wasn't Brian Wilson who wrote the book, it was Eugene Landy, it was someone else, and she does this without comparing the book to any writing of Eugene Landy's or any writing of Brian Wilson's.

She has these powers that apparently developed in the early ecclesiastical law when people were ferreting out heretics and would read text to determine if evidence of Satan was there. This has become part of her expertise. I'm not saying she purports to do that, but what I'm saying is that she purports to be able to divine authorship with respect to written material by some kind of an analysis, and we don't believe that will mean meet the first basis of Daubert.

THE COURT: Sounds like she thinks she's a federal judge, doesn't it?

MR. DIXON: Well, it sounds like she thinks she's a

federal judge, but the federal judges who ruled on her testimony in the past have almost, to a man or a woman, declined to allow her to testify, either on Daubert basis --

THE COURT: Well, what am I missing, why is that testimony relevant?

MR. DIXON: We don't think it is.

THE COURT: Where we're seeking damages based on the fact that he wrote the book and Harpercollins published it?

MR. LANGBERG: Your Honor, that -- first of all, it is not a fair characterization of Mrs. Lashner's testimony.

THE COURT: I understand he's coming from his standpoint.

MR. LANGBERG: No, I'm not even talking about the characterization but the nature of it even. We're talking about an expert in language and a person who can talk about the interrelationship of paragraphs and how certain language is used. And it may not be necessary, as counsel indicated. My suggestion -- if I may -- is that in the next week that we talk together after analyzing the court's ruling and reevaluate how long this case is going to take to try, and reevaluate the necessity of Mrs. Lashner and other people, and then come up with perhaps what I think will be a new estimate of time -- at least I have a good feeling that it will -- and then report back to the court on that.

THE COURT: She is going to read this book and say

this paragraph interrelates with this other paragraph, and all of that means this? Is that what you're telling me?

MR. LANGBERG: Your Honor, she's going to testify in terms of -- in terms of how journalistics -- how writing style and how language can be used, juxtaposing sentences or so forth to create a certain effect or give a certain impression, so on and so forth. This is testimony.

It's not true that Mrs. Lashner has been rejected by every federal judge she's been in front of. As a matter of fact she's testified as an expert many times. That's her testimony. Her testimony is going to be expert testimony with respect to the use of language, how it's used in this book to create certain effects, to create certain impressions on the reader and so on.

It is -- if I may, Your Honor, it is not uncommon testimony in a defamation case to have expert testimony, expert linguistic testimony, in terms of how language has been used or manipulated and the context.

THE COURT: Now, where does she live?

MR. LANGBERG: She lives in Connecticut, in Massachusetts, someplace like that.

THE COURT: I was going to say I have to be out in San Diego the end of this month. If we needed to I could do the hearing out there, but if she's in Connecticut I'll skip that.

MR. DIXON: I think she's lives in Philadelphia.

THE COURT: It's all one place back there.

MR. DIXON: Your Honor, I think, to the extent there has ever been acceptance of this woman's testimony on the kinds of things that Mr. Langberg is suggesting here, the court can read the briefs, I won't try to argue it, but most courts, all the federal courts that I'm aware of, have rejected her testimony because what she purports to do is to reserve the role of the jury and say, gee, this can be construed into a defamatory, meaning this really means this even though it says this, and those are quintessential jury questions, if there's a factual question, so that's our position.

THE COURT: Well, that's like Mr. Langberg's idea, you all get together next week and figure out where we're going in this case. But we'll go ahead and pick our jury on the 15th. I'll try to have our pretrial conference before that. How many exhibits are we going to have in this case?

MR. DIXON: It again, Your Honor, is going to depend on the extent to which -- how the summary judgment ruling affects. I think there could be voluminous exhibits, if most of the damage notions that have been advanced by the plaintiffs remain in the case, because they're claiming loss of merchandising revenue, they're claiming that the book destroyed Carl Wilson, the Beach Boys' reputation as family entertainment. So there's a need to go into royalties, attendance at concerts, other factors that would have caused a diminution of the

reputation of all the Beach Boys including Carl Wilson. Those kinds of things could be -- it could be quite document intensive.

THE COURT: Okay. Well, we've got a visualizer in this courtroom now, so that you can put your exhibits up on the TV for them, and that makes the trial go a lot faster, get rid of them that way, and --

MR. DIXON: Your Honor, would we have the opportunity to use real time?

THE COURT: Sure. Yeah. I mean, that's why I have this crack court reporter sitting here is to -- crack in the sense of very sharp individual -- taking it down that way, so -- but --

MR. LANGBERG: We're way behind you where I come from.

THE COURT: I'm sorry, sir?

MR. LANGBERG: We're way behind you where I come from.

THE COURT: Oh, on real time?

MR. LANGBERG: Yeah, just on some sensationalized cases they're probably familiar with it, but as a rule --

THE COURT: Well, we're pretty lucky, and I forget how we got the visualizers, but Syd is -- there are only, like, 42 court reporters in the federal system who are qualified on real time, and we have what two -- one -- two?

Yeah, we'll have real time. You can get daily copy and all that from him if you want it, too. When you get your notices setting, there will be a bunch of criminal cases in front of you, I probably told you. So there will be 15 or 20 criminal trials. That means I may try one or two. So when we say September 15th, we can pick the jury that day, if you really tell me it's going to take that long to try, then I'll have to -- to maybe send out a questionnaire to get jurors who can spend 30 days with us. So maybe we can shorten it up somewhere along the line. Have you had a settlement conference in this yet?

MR. DIXON: No, we haven't, Your Honor. I think we were all waiting to see what the disposition of the motion for summary judgment was and maybe to make our disposition.

MR. LANGBERG: We've been actively -- Mr. Rich and and I are on speaking terms. We've been actively talking about that issue.

THE COURT: I hope you're on speaking terms.

MR. LANGBERG: Very much so.

MR. DIXON: I don't think a settlement conference would be inappropriate in this case, though, in any event, if Your Honor could schedule one.

THE COURT: All right. Who is the -- who --

THE CLERK: It's Judge Garcia.

THE COURT: Judge Garcia? Well, I'll try to get a

settlement conference scheduled for you with either Judge Garcia or Judge DiGiacomo. And I'll try to get that opinion out within the next week. Appreciate the quality of your briefs.

MR. RICH: Thank you, Your Honor.

THE COURT: Anything further we need to talk about?

MR. LANGBERG: No, Your Honor. Thank you again for the scheduling, appreciate that.

THE COURT: That's no problem.

MR. RICH: Thank you, Judge.

THE COURT: We'll be in recess.

**C-E-R-T-I-F-I-C-A-T-E**

UNITED STATES OF AMERICA
DISTRICT OF NEW MEXICO

I, Sydney B. Huseby, Jr., RDR, CRR, Official Court Reporter for the State of New Mexico, do hereby certify that the foregoing pages 1-40 constitute a true transcript of proceedings had before the said Court held in the city of Albuquerque, Bernalillo County, New Mexico, in the matter therein stated.

In testimony whereof, I have hereunto set my hand on this 6th day of July, 1997.

Sydney B. Huseby, Jr., RDR, CRR
United States Court Reporter
Certified Realtime Reporter
NM CCR #304
Post Office Box 1160
Albuquerque, NM 87103
Phone: (505) 248-8087
Fax: (505) 248-8002